## **DECLARATION OF ERIC C. BJORNLUND**

I, Eric C. Bjornlund, declare as follows:

1.     I am President and CEO of Democracy International, Inc. ("Democracy International" or "DI"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at DI.

2.     Democracy International is a U.S.-based small business headquartered in Bethesda, Maryland. DI is an international development consulting firm that supports active citizens, responsive governments, and engaged civil society and political organizations to achieve a more peaceful, democratic world. The company provides technical assistance, analytical services, and project implementation for democracy, human rights, governance, peace and resilience, youth empowerment, and other international development programs worldwide. By developing and using new knowledge, tools, and approaches, DI works to change people's lives and improve the effectiveness and efficiency of development assistance.

3.     Democracy International was founded in 2003 to conduct democracy and governance analytical services for the U.S. Agency for International Development ("USAID"). In the 22 years since its founding, DI has conducted more than 200 projects for USAID in more than 80 countries, including some of the world's most challenging environments. It has also conducted projects for the U.S. Department of State and other international development funders.

4.     Democracy International supports political systems around the world to be responsive, inclusive, and competitive. It supports accountable government systems and

1

institutions that are responsive, effective, and transparent. It promotes peaceful, democratic transitions and political settlements to resolve conflict so that societies are at peace and can repair their own divisions. It works to protect human rights where they are under imminent threat. And it uses innovation and learning to improve international development outcomes, especially for democracy and governance, human rights, rule of law, conflict, and transition programs.

5. In particular, the Company works in the subfield of international development known as Democracy, Human Rights and Governance (DRG). In DRG, working for USAID Missions and Bureaus, DI offers expertise and practical, field-based experience in elections and political transitions, political parties, civil society building, civic advocacy, political empowerment for women and marginalized groups, rule of law, decentralization and local government, legislative strengthening, anticorruption, and human rights. In Bangladesh, for example, where the country is in the midst of a fragile transition after a popular uprising ousted the country's authoritarian government in August, we are building political party capacity and strengthening relationships between parties and constituents while reducing political violence. In Bosnia and Herzegovina, Guinea, Liberia, and Libya, we are working with election commissions and civil society to strengthen electoral integrity and promote accountable governance. In Malawi, we are advising the parliament on how to engage more effectively with the executive branch, civil society, the media, and their constituents. In Kosovo, we are using insights from social and behavioral science to strengthen the partnership between local governments and the constituents they serve.

6. In the Peace and Resilience field, DI works on conflict management and mitigation, countering violent extremism, and youth empowerment as well as on transition initiatives in conflict-affected or fragile countries, including for the USAID Office of Transition

Initiatives (OTI) and USAID Missions. In Armenia, for example, we are supporting marginalized populations by improving applicable laws, services, and government-civil society cooperation, including providing emergency assistance to refugees forced in 2024 from Nagorno Karabakh. In Jamaica, we are working to prevent at-risk youth from becoming involved in violence. Our global Justice, Rights, and Security—Rapid Response program provides emergency, life-saving assistance to human rights defenders in imminent personal danger.

7. Approximately 96 percent of Democracy International's approximately $41.7 million in revenues in 2024 came from prime cooperative agreements and contracts from USAID and an additional approximately 2 percent came indirectly from USAID through subawards and subcontracts, for a total of approximately 98 percent directly or indirectly from USAID.

8. As of December 31, 2024, DI held prime contracts and cooperative agreements with USAID with a remaining combined obligated amount of $35,859,919; a total combined obligated amount of $107,166,273; and a total ceiling amount of $244,679,239.

9. Between January 24 and 27, 2025, DI received stop work orders for all of its USAID contracts and suspension notices for all of its USAID cooperative agreements. DI immediately complied and sought to minimize subsequent costs. Notwithstanding established rules for agreeing on continuity costs for projects under stop work orders, however, in every case USAID has not responded to DI proposals about how to proceed and which costs will be allowable while stop work orders are pending and until decisions are made whether projects will resume or be terminated.

10. As of the current date, DI has not received payment for a total of $3,376,832 for work completed within the scope of duly authorized USAID programs completed before the issuance of stop work orders and suspension notices began on January 24, 2024. More

specifically, to date, DI has not received payment for contract invoices for work completed before January 24, 2024, within the scope of duly authorized programs within obligated amounts totaling $1,290,266. To reimburse expenses under cooperative agreements, DI draws on a letter of credit with HHS Payment Management System; since January 24, the HHS Payment Management System has been inoperable, has indicated that payment draws are "under review," "rejected," or have otherwise not been paid. To date, DI has not received payment in reimbursement of a total of $2,086,567 of expenses incurred before January 24, 2025, for work within the scope of duly authorized programs under cooperative agreements within obligated amounts.

11. Because of stop work orders and suspension notices and because DI's invoices and draws for work completed before January 24, 2025, have not been paid, DI had to cease all operations as of January 31, 2025. We have furloughed 100 percent of our 95 U.S.-based home office employees and placed 163 of 176 employees (92.6 percent) working on USAID projects in overseas offices on "administrative leave" pending resolution of stop work/suspension orders; we are not currently able to pay those on administrative leave and will not be able to pay them unless and until USAID pays past invoices and draws and agrees to pay continuity costs. We have cancelled all benefits, including health insurance, for employees and have terminated all consultants. The company has not been able to pay virtually all of its obligations to contractors, vendors (including our mission-critical IT vendor), landlords under existing leases, program partners, grantees, outside advisors (including lawyers, accountants, financial advisors, and human resource experts), insurance contracts, pension plan administrator, and others. We have been unable to pay termination costs for home office or overseas employees, such as accrued vacation time or, in other countries, legally mandated severance benefits. We have shut down and attempted to secure all but one of our overseas offices (which has non-USAID funding) and

downsized our computer systems and licenses.

12. The orders to cease work have had profoundly negative effects on essentially all DI's overseas programs. Following are some examples.

   a. DI's Justice, Rights, and Security program provides lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. In Bangladesh, the sudden cessation of activities has left hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last July-August without necessary medical services. In Burkina Faso, human rights defenders who are working to track violence by the military junta and terrorist groups that have targeted Christian communities are at risk of being killed because the program can no longer help them relocate to safer locations and provide them with food, shelter, and subsistence support. Likewise, we are no longer providing shelter, medical care, and food in Guatemala to former political prisoners from Nicaragua and their families, including children and victims of torture; to human rights defenders who are victims of state-sanctioned violence in the wake of contested national elections in Mozambique; to critics of extreme government repression in the Philippines; and to individuals defending human rights and democracy who are facing serious threats in Tanzania.

   b. As a result of this Stop Work Order, more than 500 vulnerable Jamaican youth who have been involved in or are at risk of joining violent gangs have been abruptly cut off from counseling services, apprenticeship opportunities, and vocational skills building trainings. The cessation of these activities will not only have immediate negative effects on the youth we were reaching, it will also severely damage trust that

has taken DI's staff and volunteers years to build with these young people, families, and communities.

c. As a result of the suspension, DI can no longer engage key government agencies in Bangladesh at a critical point in its political and governance transformation. As a result, USAID and the U.S. Government will no longer be able to provide direct inputs and recommendations to Bangladesh leaders on effective strategies for government reform.

d. As a result of the suspension, local lawyers in Kyrgyzstan are no longer able to help civil society organizations navigate responses to the foreign agents law, widely considered part of Russia's "Authoritarian Playbook" to suppress free speech and democracy in post-Soviet Central Asia.

e. As a result of the suspension, DI will no longer be providing technical assistance to the Armenian government and civil society organizations in mobilizing external funding to address service gaps for displaced populations. This reduction in funding may contribute to increased instability in the Caucasus region, leading to issues such as increased poverty and irregular migration.

f. As a result of the suspension, pro-American Libyan officials and civil society leaders suddenly do not have access to the support they expected provided by the U.S. Government through DI, which undermines U.S. national security in the region and which is especially dangerous as Russia is in the process of moving military resources from Syria to Libya.

13. The damage from suddenly stopping work on programs is profound and incalculable. Stopping the programs has done immense damage to people and organizations who had relied on our assistance. As the examples above show, this includes leaving human rights

defenders vulnerable to threats to their physical safety; stopping emergency assistance to refugees and victims of state-sponsored violence; interrupting programs working to prevent at-risk youth from joining gangs and protecting communities from violence; and leaving beneficiaries vulnerable to being recruited into terrorist organizations. It has undermined the credibility and thus the effectiveness of civil society and human rights and democracy advocates and undermined years-long efforts to build trust with local governments, parliaments, and other government institutions that is essential for success. Our sudden withdrawal from these efforts, along with that of others involved in complementary programs, has ceded enormous political influence to Russia and China. Moreover, assets funded by USAID—including vehicles, generators, and other equipment—are now abandoned and unmaintained, depreciating rapidly and unnecessarily, resulting in potential inability to use them or recover losses in the future.

14. Suddenly freezing programs has destroyed hard-earned trust and relationships with employees, partners, subgrantees, government agencies, and other stakeholders and led to a loss of trust for those organizations with their constituencies. Some of our vendors, partners, and grantees will quickly go out of business. Our employees have lost their health insurance as well as all of their other benefits. The freeze has undermined the credibility of our staff and partners in their communities and with their stakeholders. It has already caused them serious legal and financial problems and the loss of credibility has threatened their ability to make a living; it has even put some in danger of arrest or reprisals due to their inextricable association with these USAID programs that are suddenly not keeping promises or meeting their obligations.

15. The sudden freeze on programs and failure to pay invoices have put the company, its owners, and some of its employees in potentially serious legal jeopardy in the U.S. and in all the countries in which we work because of our inability to pay legitimate invoices to us for work performed before January 24 and stopping programs and other benefits. If left unpaid, we will

soon be in default on our contracts and have legal problems with landlords and vendors. Our shareholders, because we are Subchapter S corporation, will have to pay taxes on the company's 2024 income for income they never received without being reimbursed by the company. The freeze has left us vulnerable to claims of local labor law violations for failure to pay legally mandated termination and other benefits. We are unable to pay taxes due, including employee withholding taxes, and accordingly will incur serious penalties. Because of these problems, the security of our overseas program leads (chiefs of party) and some senior staff in the countries in which we work could be threatened. Even if the stop work orders are lifted or the company could receive future funding from non-U.S. government clients, the company's ability to be legally registered and to operate in countries in the future is threatened. Relationships cannot be repaired even if past invoices are paid or programs are later resumed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in  Bethesda, Maryland
_____

_Eric C. Bjornlund_
Eric C. Bjornlund
President and CEO
Democracy International, Inc.

# Declaration of Harm - Democracy Intl - Bjornlund

Final Audit Report 2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA57_Zfkz21aZIMyruSIE8QP_nA6pzLH63 |

## "Declaration of Harm - Democracy Intl - Bjornlund" History

- Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
  2025-02-11 - 1:49:50 AM GMT- IP address: 163.116.146.118

- Document emailed to Eric Bjornlund (eric@democracyinternational.com) for signature
  2025-02-11 - 1:51:10 AM GMT

- Email viewed by Eric Bjornlund (eric@democracyinternational.com)
  2025-02-11 - 1:54:15 AM GMT- IP address: 208.58.92.6

- Document e-signed by Eric Bjornlund (eric@democracyinternational.com)
  Signature Date: 2025-02-11 - 1:55:41 AM GMT - Time Source: server- IP address: 208.58.92.6

- Agreement completed.
  2025-02-11 - 1:55:41 AM GMT

Arnold & Porter | Powered by Adobe Acrobat Sign