## DECLARATION OF SCOTT CARLSON

I, Scott Carlson, declare as follows:

1. I am the Associate Executive Director in charge of the Center for Global Programs at the American Bar Association (ABA). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at the ABA.

2. The ABA is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally.

3. The ABA Center for Global Programs (CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, the U.S. Agency for International Development (USAID), U.S. Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. ABA believes that a strong rule of law and participatory democracies around the world result in a safer, more prosperous, and stable planet. Moreover, functioning and fair justice systems create more favorable environments for U.S. business interests and enhance the viability of global markets.

4. ABA CGP employs over 400 staff members in Washington, D.C., and across twenty-seven (27) field offices, supporting the effective implementation of more than eighty programs, in every region of the world, through its Rule of Law Initiative (ROLI) and Center for

1

Human Rights (CHR). These ABA programs involve a network of legal contracts with more than 160 sub-recipients, contractors, and other vendors worldwide.

5. ABA CGP's programs support U.S. allies to strengthen the rule of law and defend human rights, which often focuses on judicial and law enforcement reform, strengthening commercial law, arbitration, promoting fundamental freedoms, prosecuting trans-national crime, and combatting corruption in foreign governments. Specifically, the ABA strengthens legal institutions, supports legal professionals, and advances public understanding and appreciation for the law and citizen rights, and in the process, our global programs help reduce and prevent illicit activities—such as money laundering and drug and human trafficking—from reaching our shores in support of American interests. ABA's renowned legal experts (often *pro bono*) help countries develop strong commercial law and arbitration systems to protect American businesses. The ABA supports legal professionals to protect brave men and women that speak out against abuse and corruption, even in zones of conflict, using creative methods, such as early warning systems to prevent violence and terrorism in local communities before it escalates beyond borders. In sum, the ABA works closely with governments, businesses, and civil society around the world to protect fundamental freedoms, support rule of law, and promote U.S. interests.

***Current USAID Programs and Impact of the Freeze***

6. In total, approximately 38% of ABA's FY 2025 international awards funding is derived from USAID, after a competitive procurement process.

7. Currently, ABA implements nineteen (19) programs funded by Defendant USAID either directly or via subaward. These programs collectively commit USAID to

$109,197,310 in funding over the next five (5) years. Of the $51,790,772 obligated amount to ABA from USAID and/or ABA's prime implementing partners, $24,869,777 is currently frozen. The chart below breaks down the total number of active awards and obligations:

| Country/Project | Obligated Amount | Frozen Funds from the Current Obligations |
|---|---|---|
| BURKINA FASO HUMAN RIGHTS AND ACCESS TO JUSTICE PROGRAM | $5,796,489 | $302,157 |
| GAMBIA PROMOTING RIGHTS AND JUSTICE | $2,976,242 | $135,292 |
| CAR STRENGTHENING HUMAN RIGHTS ACTIVITY IN THE CENTRAL AFRICA REPUBLIC | $900,000 | $283,952 |
| DRC ACTION TO REDUCE AND RESPOND TO EXPLOITATION AND TRAFFICKING | $4,900,000 | $3,626,826 |
| STRONG AND INCLUSIVE MALDIVES DEMOCRACY (SIMD) PROGRAM | $4,411,365 | $720,429 |
| HRSM/RELIGIOUS AND ETHNIC FREEDOM | $210,000 | $66,907 |
| SRI LANKA ASIA REF | $600,000 | $153,034 |
| HRSM/RELIGIOUS AND ETHNIC FREEDOM SOUTHEAST ASIA LEGAL SUPPORT TO INDIGENOUS COMMUNITIES (SEALS) | $350,000 | $56,333 |
| BURMA INCLUSIVE DEMOCRATIC PROCESSES AND GOVERNANCE ASSISTANCE PROGRAM | $750,000 | $261,302 |
| ARMENIA USAID/CHECCHI INTEGRITY PROJECT | $819,296 | $47,004 |
| TAJIKISTAN LEGAL SUPPORT PROGRAM | $1,397,082 | $267,318 |
| GEORGIA RULE OF LAW ACTIVITY | $2,150,000 | $0 |
| LEGAL SUPPORT PROJECT (LSP) | $4,005,639 | $1,563,149 |
| UKRAINE HEALING AND ACCOUNTABILITY THROUGH HUMAN RIGHTRS | $10,202,377 | $8,343,842 |
| ARMENIA CEPPS EPPA PROJECT | $200,000 | $191,743 |
| GUATEMALA HUMAN RIGHTS FOR ALL GUATEMALA | $4,000,000 | $2,426,267 |
| LIBYA RECONCILIATION AND JUSTICE | $4,112,500 | $2,569,303 |
| WESTERN BALKANS EQUALITY SHIELD | $3,929,783 | $3,789,510 |
| CEPPS LEADER AWARD | $80,000 | $65,408 |
| **TOTAL** | 51,790,772 | 24,869,777 |

8.     In reliance on those USAID obligations, ABA has hired staff members in Washington, D.C., and various countries, established field offices, entered long-term leases, issued binding subawards and subcontracts, and incurred a host of liabilities related to the planned expenditure of the obligated funds.

9.     On or about January 25, 2025, and continuing through January 27, 2025, ABA CGP began receiving notices from Agreement Officers, Grant Officers, and other U.S. officials, demanding that it "stop-work" or "suspend activity" on its programs, including activities wherein U.S. Government funds had already been obligated to ABA CGP. These notices varied

by USAID Mission and region.

10. The notices received from Defendant USAID specifically note that, "Pursuant to 2 CFR 700.14 (Award Suspension and Termination), or the Mandatory Standard Provisions for Non-U.S. Nongovernmental Organizations, Standard Provisions for Public International Organizations (PIOs), or General PASA Agreements, as appropriate, effective immediately, the Agreement Officer hereby issues as order for the recipient to immediately suspend performance under the agreement your organization was awarded." The notification also directed ABA CGP's authorized official to "send the below certification that your DEIA-related activities have completely ceased to your cognizant A&A specialist and Agreements Officer with a copy to the USAID Industry Liaison team… The certification must state: [Insert Recipient Name] certifies that DEIA-related activities have completely ceased under award number [insert award number] in accordance with the suspension of work issued by USAID/Ukraine on January 25, 2025."

11. ABA responded to this correspondence confirming receipt and seeking clarification of the directives included in the letter. ABA's response asked, "[T]o the extent your notice references "DEIA-related activities", we kindly request that you identify the specific activities that you view as being implicated under that rubric. Given that the current programmatic Scope of Work that you provided focuses on a range of issues and topics, we are unclear what, if any, changes in our agreed upon SOW you may be seeking."

12. In almost no cases did ABA receive a response to this request, though on at least one occasion, USAID replied, "USAID/Ukraine has no further guidance to give as requested in your response. If ABA ROLI will not provide the certification by 5:00pm Kyiv time today 01/30/25 please respond to my email indicating ABA Roli will not be submitting the certification." Accordingly, ABA responded to the best of its ability.

13. Adding to the confusion, as recently as February 10, 2025, ABA received dozens

of emails from the U.S. Government's "My Grants" portal notifying the organization that quarterly reports on the awards were overdue and should be submitted – despite the fact that the due date of the reports fell squarely in the "freeze" time frame and despite the fact that ABA had previously been directed to pause all activities.

14. The freeze has had direct impacts on ABA programming, causing immediate and irreparable harm to the organization and its stakeholders. Every program has suffered as a result of the freeze. Examples include:

   a. *Religious Freedom Programming in Asia*

With our partners in Indonesia, ABA is actively pursuing six religious freedom cases, including 4 representing Christian churches who were denied necessary permits to hold worship services and 2 representing Shia and Ahmadiyya Muslims who were accused of blasphemy/heresy. And in Sri Lanka, ABA ROLI and our partners were planning to hold a risk management workshop for grassroots faith-based and religious freedom organizations in March. This would have strengthened their operational, physical, and digital security in the face of increasing threats from both governmental and extremist actors who seek to prevent religious minorities from exercising their religious freedom rights. Without this workshop, these small Sri Lankan organizations remain more vulnerable to physical and digital attack, particularly those operating in highly militarized areas. We also provide funding to several faith-based and grassroots organizations through multiple programs for activities involving protection of Freedom of Religious Belief (FoRB) rights and documentation of associated human rights violations. These funds have been cut off with immediate effect. At least one organization, which provides legal representation to persecuted religious minorities, has told us they cannot afford to continue operations.

Also under this program, ABA assembled an expert working group of legal professionals—many with extensive experience in human rights, religious freedom, and indigenous rights—alongside our pro bono legal specialist to create a practical guide designed to equip civil society organizations (CSOs), bar associations, and law schools with the tools necessary to rapidly establish legal clinics to protect religious freedom. ABA and its partners have been piloting this legal clinic toolkit in Indonesia and the Philippines, providing essential legal support to vulnerable communities. These clinics address legal injustices experienced by individuals due to their religious beliefs, including issues such as identity card changes, land registration, birth registration, and access to public education.

### b. *Democratic Republic of Congo (DRC) Anti-Trafficking Program*

The ABA is building the long-term capacity of the Congolese government, lawyers, and local service providers to combat human trafficking and violence against women, children, and other vulnerable groups around the country. ABA's partners include medical, legal, psychological, shelter, and economic support providers alongside security actors, Congolese government representatives, and judicial personnel who receive training, technical assistance, capacity building, and direct distribution of goods or services for survivors. The project also works with local NGOs to raise public awareness on existing laws, rights, referral pathways, and resources for survivors to collectively improve long-term attitudes toward victims of trafficking and violence against women, children, and other vulnerable groups. This program delivers short-term emergency support to survivors alongside long-term capacity building and training of protection actors to prevent, deter, and respond to trafficking and violence against women, children, and vulnerable groups. Suspension of these activities, particularly without notice or attempt to mitigate the impact of such a rapid withdrawal of support, fractures hard-won trust

that is vital to effective anti-trafficking efforts in addition to the obvious and immediate impact on survivors and advocates.

      c.  *Ukraine Transitional Justice*

In Ukraine, ABA implements a five-year transitional justice program designed to ensure that Ukraine is well positioned to recover from the effects of the Russian invasion. The program seeks to identify and deploy transformative approaches for reconciling divided groups by assessing needs across geographic and sectoral divides, developing communications strategies to assist state agencies effectively connect with the public, and provide a venue for public dialogue on issues needed for healing and resolution of issues. ABA has planned to use its convening power and strong government relationships to reinvigorate conversations on a national level regarding inclusive transitional justice framework, using the 2020 Transitional Justice Policy Proposal as a framework. Significantly, the Ukraine program supports mechanisms to enhance public communication and education about reparations, war crimes documentation, and other transitional justice tools. Among the immediate impacts of the freeze is that ABA will be forced to cease its assistance to the Victim and Witness Coordination Center under the Prosecutor General's Office related to the documentation of war crimes and atrocities resulting from the full-scale invasion.

      d.  *Advancing Democracy in Myanmar*

ABA's Advancing Democracy program is a vital U.S. initiative that enhances national security, strengthens American influence in the Indo-Pacific, and reinforces strategic competition against China by supporting Myanmar's pro-democracy movement. Through direct engagement with subnational and national governance actors, this program 1) advances the rule of law, 2)

strengthens democratic governance structures, and 3) aids human rights defenders in their resistance against military repression and autocracy. In 2024, ABA's experts helped draft parliamentary law and state constitutions by Myanmar's democratic actors, laying the legal and institutional groundwork for a future democratic Myanmar. This effort, not only promotes stability and self-governance, but also aligns with, and is responsive to, the Burma Act, a bipartisan Congressional commitment to supporting democratic resilience and countering authoritarianism in Myanmar. Beyond the financial harm of the abrupt withdrawal of support, there is substantial harm to the perception of the trustworthiness of pro-democracy forces, which undermines the work of partners and explicitly runs counter to the objectives of the Burma Act.

15. At present, the above-referenced programs, along with 15 other USAID-funded programs, are frozen in place and unable to provide promised, sometimes lifesaving, support to vulnerable communities and colleagues under siege in some of the most difficult rule of law crises around the world. In addition to the ABA, 28 sub-recipients of these funds are unable to continue their work under the freeze of these programs.

16. Because the ABA customarily pays expenses incurred through its foreign assistance programming in advance, billing and seeking reimbursement afterwards, the ABA utilizes a commercial line of credit to pay these costs as they accrue. Until reimbursement is complete, these paid expenses incur interest charges. With the freeze, ABA access to the U.S. Payment Management System (PMS) has been interrupted, imposing additional interest costs. Moreover, while the ABA has cancelled external activities and new commitments under the freeze, USAID has instructed the ABA to maintain readiness to resume work. For example, in a "Suspension of Work Notice" received on January 27, 2025, the notice reads in pertinent part: "Partners are also expected to maintain staff and operational capacity and only incur reasonable,

allocable and allowable recurrent costs, so long as they do not violate the terms of this suspension of work order." Consequently, ABA remains contractually obligated to maintain its offices and workforce in place, which, in turn, implies all associated rent, utilities, salary and benefits. Currently, these costs amount to approximately 2.4 million U.S. Dollars per month.

*Current Department of State Programs and Impact of the Freeze*

17. In total, approximately 57% of ABA's FY 2025 international awards funding is derived from Defendant US Department of State, after a competitive procurement process.

18. Currently, ABA implements fifty-nine (59) programs funded by Defendant Department of State, either directly or via subaward. These programs collectively commit the US Department of State to $109,553,515 in funding over the next five (5) years. CGP has already spent $67,729,030. The remaining/frozen amount is $41,824,485, as of December 2024.

19. On or about January 24, 2025, and continuing through January 27, 2025, ABA CGP began receiving notices from Agreement Officers, Grant Officers, and other U.S. officials, demanding that it "stop-work" or "suspend activity" on its programs, including activities wherein U.S. Government funds had already been obligated to ABA CGP.

20. The freeze has had direct impacts on ABA programming, causing immediate and irreparable harm to the organization and its stakeholders. Every program has suffered as a result of the freeze. Examples include:

   a. ***Combatting Money Laundering and Terrorism Financing in Argentina, Brazil, and Paraguay***

Under a program, funded by the Department of State, Bureau of Counter Terrorism, ABA provides technical support to the governments, the financial sector, and civil society in Argentina, Brazil, and Paraguay to combat money laundering, transnational crime, and terrorism

financing, thereby reducing the capacity of criminals and terrorist organizations to move assets and to conduct illicit activities. Working closely with central and local government agencies, financial institutions, and civil society, we leverage specialized expertise to support these countries in meeting their commitments under the international standards on anti-money laundering (AML) set by the Financial Action Task Force (FATF). As a result of the funding freeze, the ABA will no longer be able to help law enforcement and financial institutions prevent criminals, terrorists, and other bad actors to move assets or conduct other illicit financing activities.

      b. ***Combatting Child Trafficking in Colombia***

In Colombia, ABA ROLI is implementing the Child Protection Compact (CPC) Partnership program, which aims to strengthen investigations, prosecutions and adjudications of child and adolescent trafficking cases through institutional strengthening as well as advocacy and increased access to justice. Emphasizing sustainable outcomes, this program adopts highly participatory approaches that increase commitment of the government, ensures sustained technical knowledge, and has developed tools and standard operating procedures, and improved law enforcement's practices to obtain reliable data. As a result of the funding freeze, despite Colombia's efforts to address the worst forms of child labor, children will still remain subjected to commercial sexual exploitation, illicit activities, forced labor, and recruitment by criminal groups.

      21.    In addition, in a number of our programs, ABA engages in Memoranda of Understanding (MoUs) or similar arrangements with foreign government entities where the ABA has made commitments on behalf of the U.S. Government to perform trainings and provide other support. For example, ABA has active MoUs with Ministries of Justice in Argentina, Bahrain, Tunisia, and The Gambia. The U.S. Government's imposition of

"suspensions" and "stop work orders" without notice—and outside any prescribed processes—interrupted this complex network of legal relationships and commitments, causing a wide range of planned events, activities, and related support to be cancelled. These unforeseeable interruptions directly harm the ABA's global goodwill and reputation across this constellation of actors and entities. Never before in the ABA's 35-year history of foreign assistance programming has something similar occurred. The ABA's reputation as a trusted reliable partner in legal programming has been damaged from the freeze, and the damage is becoming increasingly acute during this period of uncertainty because the ABA is unable to provide clarity and assurances to the affected parties.

22.    As the largest voluntary bar association in the world, the ABA and its members engage in global commerce around the world on a day-to-day basis. The ABA's global brand is a critical asset of its membership. When the ABA unexpectedly, and without notice, abrogates commitments with governments, organizations, businesses, and individuals in dozens of countries simultaneously, the damage to the ABA's brand is direct, immediate, and foreseeable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Washington, DC.

Scott Carlson
Associate Executive Director
American Bar Association

11