# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| AIDS VACCINE ADVOCACY ) | |
| COALITION, et al., ) | Civil Action No. 25-400 (AA) |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
# TEMPORARY RESTRAINING ORDER

Lauren E. Bateman (D.C. Bar No. 1047285)
Allison M. Zieve (D.C. Bar No. 424786)
Nicolas A. Sansone (D.C. Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

February 12, 2025

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ........................................................................................................... 9

   I.   Plaintiffs are likely to succeed on the merits. ....................................... 9

      A.   The Executive Order is unconstitutional. ..................................... 10

      B.   The State Department Memo has no basis in law, is arbitrary and capricious, and violates federal statutes. ...................................... 15

      C.   The stop-work orders are unlawful. ............................................... 18

   II.  Plaintiffs will suffer irreparable injury absent prompt relief. ........................... 18

   III. The balance of equities and public interest favor Plaintiffs. ........................... 21

   IV. This Court should issue prompt relief enjoining enforcement of the Executive Order and State Department Memo against all recipients of foreign assistance. ........................................................................................... 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Arizona Dream Act Coalition v. Brewer,*
855 F.3d 957 (9th Cir. 2017) ........................ 14

*Beattie v. Barnhart,*
663 F. Supp. 2d 5 (D.D.C. 2009) ........................ 18

*Bowsher v. Synar,*
478 U.S. 714 (1986) ........................ 10

*C.G.B. v. Wolf,*
464 F. Supp. 3d 174 (D.D.C. 2020) ........................ 21

*Center for Biological Diversity v. McAleenan,*
404 F. Supp. 3d 218 (D.D.C. 2019) ........................ 14

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ........................ 9

*Correctional Services Corp. v. Malesko,*
534 U.S. 61 (2001) ........................ 13

*D.A.M. v. Barr,*
474 F. Supp. 3d 45 (D.D.C. 2020) ........................ 9

*Department of Homeland Security v. Regents of the University of California,*
591 U.S. 1 (2020) ........................ 16

*District of Columbia v. U.S. Department of Agriculture,*
444 F. Supp. 3d 1 (D.D.C. 2020) ........................ 24, 25

*Doe 2 v. Mattis,*
344 F. Supp. 3d 16 (D.D.C. 2018) ........................ 24

*East Bay Sanctuary Covenant v. Garland,*
994 F.3d 962 (9th Cir. 2021) ........................ 20

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ........................ 17

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
561 U.S. 477 (2010) ........................ 13

*Gundy v. United States,*
588 U.S. 128 (2019) ................................................................ 11

*Hall v. Johnson,*
599 F. Supp. 2d 1 (D.D.C. 2009) ............................................... 9

*Immigration & Naturalization Service v. Chadha,*
462 U.S. 919 (1983) ................................................................ 10

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928) ................................................................ 12

*Kendall v. United States ex rel. Stokes,*
37 U.S. (12 Pet.) 524 (1838) ................................................... 14

*Kirwa v. U.S. Department of Defense,*
285 F. Supp. 3d 21 (D.D.C. 2017) ........................................... 10

*League of Women Voters of the United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) .................................................... 21

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
526 U.S. 172 (1999) ................................................................ 23

*Mistretta v. United States,*
488 U.S. 361 (1989) ................................................................ 12

*Morrison v. Olson,*
487 U.S. 654 (1988) ................................................................ 13

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual
Automobile Insurance Co.,*
463 U.S. 29 (1983) .................................................................. 17

*National Council of Nonprofits v. Office of Management & Budget,*
— F. Supp. 3d —, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ...................... 6

*New York v. Trump,*
— F. Supp. 3d —, 2025 WL 357368 (D.R.I. Jan. 31, 2025)...................... 6

*Open Communities Alliance v. Carson,*
286 F. Supp. 3d 148 (D.D.C. 2017) ......................................... 22

*United States v. Texas,*
577 U.S. 1101 (2016) .............................................................. 14

*Whitman-Walker Clinic, Inc. v. U.S. Department of Health & Human Services*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 20, 21

*Wilkerson v. Rahrer*,
    140 U.S. 545 (1891) ........................................................................... 11

*Wisconsin Gas Co. v. Federal Energy Regulatory Commission*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................ 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................... 14, 23

**Statutes**

2 U.S.C. § 683 ....................................................................................... 17

31 U.S.C. § 1512(c)(1) ............................................................................ 17

5 U.S.C. § 706(1) .................................................................................. 18

5 U.S.C. § 706(2) .............................................................................. 18, 23

5 U.S.C. § 706(2)(A) ............................................................................. 15

Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (2024) ................................................. 11

**Other Authorities**

Andelson Office of Public Policy, *Impact of Stop Work Orders for PEPFAR Programs*
    (Jan. 20, 2025) ................................................................................... 7

Tom Bateman, *How a US Freeze Upended Global Aid in a Matter of Days*, BBC
    (Jan. 29, 2025) ................................................................................... 6

Thalia Beaty, *Volunteers Are Now Tracking What's Already Been Lost in the USAID
    Freeze*, Associated Press (Feb. 10, 2025) .................................................. 23

Laura Kelly & Nathaniel Weixel, *Chaos and Uncertainty Swirl Around Trump's
    Foreign Aid Freeze*, The Hill (Jan. 30, 2025) .............................................. 6

Kate Knibbs, *Elon Musk's DOGE Is Still Blocking HIV/AIDS Relief Exempted from
    Foreign Aid Cuts*, Wired (Feb. 3, 2025) ..................................................... 7

Brett Murphy & Anna Maria Barry-Jester, *"People Will Die": The Trump
    Administration Said It Lifted Its Ban on Lifesaving Humanitarian Aid. That's
    Not True*, ProPublica (Jan. 31, 2025) ........................................................ 7

iv

Stephanie Nolen, *Health Programs Shutter Around the World After Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025) .................................................................... 6

Office of Management & Budget, Memorandum, OMB No. M-25-13 (Jan. 27, 2025) ......................................................................................................... 5

Office of Management & Budget, Memorandum, OMB No. M-25-14 (Jan. 29, 2025) ......................................................................................................... 6

Mark Townsend et al., *Deaths Predicted Amid the Chaos of Elon Musk's Shutdown of USAid*, The Guardian (Feb. 4, 2025) ................................................................ 22

U.S. Agency for International Development, Office of the Inspector General, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (Feb. 10, 2025) ............. 22

U.S. Department of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025) ................................................................................................ 8

U.S. Department of State, *Prioritizing America's National Interests One Dollar at a Time* (Jan. 29, 2025) .......................................................................................... 12, 16

Sui-Lee Wee et al., *How the World Is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025) ............................................................................................................ 6

**INTRODUCTION**

As the world's economic superpower, the United States has long devoted resources to building international goodwill and promoting global wellbeing by partnering with aid organizations throughout the world to support projects that combat deadly diseases, amplify the voices of embattled local journalists, and feed communities at risk of starvation. Year after year, Congress has recognized the value of these efforts and has directed billions of dollars to fund aid projects that save lives, promote democracy, and shore up America's national security and status as a global leader. Up to now, the executive branch has faithfully followed the law by directing congressionally appropriated funds for international aid programs to grantees doing that vital work.

Three weeks ago, with no warning and no justification, Defendants abruptly cut off funding to innumerable foreign aid programs on which communities throughout the world rely for their health and safety, and Defendants ordered the foreign assistance grantees to stop their important work. These destructive and misguided actions were not just unwise but unlawful. The separation-of-powers principles that undergird our constitutional plan require the executive to implement and abide by federal statutes, including appropriations acts, the Impoundment Control Act, and the Antideficiency Act. Moreover, principles of sound decision-making require executive agencies to base their actions on evidence and reasoned analysis—both of which are lacking here.

1

Defendants' actions in freezing foreign aid funding and ordering the immediate cessation of hundreds of critical projects throughout the world are unlawful and must be enjoined. But time is of the essence. Every day that international aid organizations such as Plaintiffs go without the federal funding that Congress has guaranteed them, the less likely they are to survive, and the more suffering will be heaped on the communities that depend on their work. Indeed, Defendants' unlawful actions are already causing irreparable harm. Many organizations, including Plaintiffs, have had to shed staff, slash budgets, and reduce or eliminate the services that they offer to the world's most vulnerable populations. If this Court does not act to restore order, it will be a matter of weeks, if not days, before Plaintiffs may have to join the other organizations that have been forced to shutter their projects entirely.

To restore the constitutional balance and avert irreparable harm, this Court should act immediately to enter a temporary restraining order barring Defendants from enforcing their unlawful funding freeze and stop-work orders, and requiring Defendants to resume funding for foreign assistance programs, including Plaintiffs'. In addition, because grantees must be assured of their legal rights and their protection against unlawful executive action before they can make sensible decisions about staffing, priorities, and resource allocation going forward, this Court should enter an expedited schedule for cross-motions for summary judgment.

## STATEMENT OF FACTS

Plaintiffs AIDS Vaccine Advocacy Coalition (AVAC) and Journalism Development Network, Inc. (JDN) are nonprofit organizations that receive federal

grant money to perform critical foreign assistance work that fosters international goodwill, promotes global health and safety, and advances public knowledge.

AVAC, which works to hasten the end of the global HIV/AIDS epidemic, has received congressionally authorized federal funding for nearly a decade for its global HIV prevention work pursuant to a Cooperative Agreement that it entered into with Defendant USAID in 2016 and renewed in 2021. Warren Decl. ¶¶ 3, 9. The agreement, which is currently set to expire on June 19, 2026, guarantees AVAC federal grant funding that it uses to support a coalition called "CASPR" that operates in African countries with the highest burden of new HIV infections and that focuses on accelerating biomedical HIV prevention research and translating that research into accessible resources for policymakers, clinical trial participants, and other community members. *Id.* ¶¶ 2–4, 8–9.

JDN, which supports investigative news outlets throughout the world, has received a range of congressionally authorized State Department and USAID grants. Sullivan Decl. ¶¶ 6–11. JDN uses grant money to support journalists in places ranging from the Pacific Islands to Paraguay by providing them with reporting partners, investigative technology and data, robust editing and fact-checking, digital and physical security support, and protection against harassment. *Id.* ¶¶ 4, 11. Federal grant money supports JDN's participation in the Global Anti-Corruption Consortium, which unites journalists, advocates, and anti-corruption stakeholders from around the world to tackle transnational corruption and facilitate anti-corruption action by government, law enforcement, and international organizations.

3

*Id.* ¶ 9. And federal grant money is also a vital source of funding for JDN's Strengthening Transparency and Accountability Through Investigative Reporting program, which supports collaborative investigative journalism networks in Europe and Eurasia. *Id.* ¶ 7.

Defendants' funding freeze has placed Plaintiffs' ability to continue advancing their critical missions under serious threat. On January 20, 2025, President Trump signed an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," Exec. Order. No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025). The Executive Order effects a "90-day pause in United States foreign development assistance" and directs Defendant Office of Management and Budget (OMB) to enforce the pause "through its apportionment authority." 90 Fed. Reg. at 8619. Within 90 days of the order, "[t]he responsible department and agency heads, in consultation with the Director of OMB," are to determine "whether to continue, modify, or cease each foreign assistance program" based on a review of the program's "efficiency and consistency with United States foreign policy." *Id.* In the meantime, "new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors," including Plaintiffs, are to be entirely frozen. *Id.*

Four days after the President issued the Executive Order, Defendants U.S. Department of State and Secretary of State Marco Rubio sent a memorandum to all U.S. diplomatic and consular posts purporting to implement the Executive Order by "paus[ing] all new obligations of funding, pending a review, for foreign assistance

programs funded by or through the [State] Department and USAID." Memorandum, 25 State 6828 (Jan. 24, 2025) (hereafter, State Department Memo), https:// tinyurl.com/4u48dduk. As for "existing foreign assistance awards," the memorandum states that "contracting officers and grant officers shall immediately issue stop-work orders," which will be lifted only at a time that "Secretary [Rubio] shall determine, following a review." *Id.*

The same day that the State Department Memo issued, JDN received the first of several stop-work orders. JDN was informed, among other things, that its foreign assistance awards were "immediately suspended" and that although its projects supposedly "no longer effectuate[d] agency priorities," the suspension of funds was "not due to any actions" of JDN but was instead meant to "give the new administration time to review the use of Foreign Assistance Funds." Sullivan Decl. Exh. A. On January 27, AVAC received a stop-work order directing it to "immediately suspend work" and to "cease implementation immediately" of the programs funded by its Cooperating Agreement with USAID. Warren Decl. Exh. A. Hundreds of aid organizations that receive federal foreign assistance grants, including Plaintiffs, have since attempted to draw down State Department and USAID grant funding but remain unable to access their funds. The funding freeze and stop-work orders that prevent Plaintiffs from carrying out their missions remain in effect to this day.[1]

---

[1] On January 27, 2025, the OMB's Acting Director issued a memorandum directing executive department and agency heads to "pause all activities related to obligation or disbursement of all Federal financial assistance, … including, but not limited to, financial assistance for foreign aid." Memorandum, OMB No. M-25-13 at 2 (Jan. 27, 2025), https://tinyurl.com/4f3u4p2p. The OMB memo has since been rescinded,

The effects of Defendants' funding freeze and stop-work orders have been immediate and severe. Non-governmental organizations across the world have begun "shutting doors, sending staff home and turning away their dependents." Laura Kelly & Nathaniel Weixel, *Chaos and Uncertainty Swirl Around Trump's Foreign Aid Freeze*, The Hill (Jan. 30, 2025), https://tinyurl.com/4w7b7ha3. Programs that have shut down include humanitarian operations at refugee camps in Syria, Tom Bateman, *How a US Freeze Upended Global Aid in a Matter of Days*, BBC (Jan. 29, 2025), https://tinyurl.com/24ubaf8r; soup kitchens that feed nearly a million people in famine-stricken Khartoum, Sui-Lee Wee et al., *How the World Is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://tinyurl.com/2s3f2hz2; counterterrorism programs to gather intelligence on Al Qaeda in the Ivory Coast, *id.*; and programs that deliver rehydration salts to toddlers in Zambia who are suffering life-threatening diarrhea, Stephanie Nolen, *Health Programs Shutter Around the World After Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://

---

Memorandum, OMB No. M-25-14 (Jan. 29, 2025), https://tinyurl.com/fhaumb22, and OMB has been enjoined from "implementing [it], giving effect to [it], or reinstating under a different name the directives in [it]," *Nat'l Council of Nonprofits v. OMB*, — F. Supp. 3d —, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025); *see New York v. Trump*, — F. Supp. 3d —, 2025 WL 357368, at *5 (D.R.I. Jan. 31, 2025), *appeal pending* No. 25-1138 (1st Cir. Feb. 10, 2025) (issuing a temporary restraining order and requiring that any "'review' of federal financial assistance programs, as identified in the OMB [memo], … shall not [e]ffect a pause, freeze, impediment, block, cancellation, or termination of … such awards and obligations"). Whatever the status of the OMB memo, White House Press Secretary Karoline Leavitt has announced that President Trump's Executive Orders on federal funding "remain in full force and effect, and will be rigorously implemented," @PressSec, X (Jan. 29, 2025, 1:40 PM), https://tinyurl.com/5n7p2ur3, and Plaintiffs cannot access federal grant money and remain subject to stop-work orders issued pursuant to the State Department Memo.

tinyurl.com/3ry4mzfc. Other programs—such as grant-funded medical facilities in Sudan that give life-saving care to severely malnourished children—have managed to continue operations temporarily but will imminently deplete their remaining funds. *See* Brett Murphy & Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said It Lifted Its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/bdzjdtvn.

The cost to human health has already been profound. For example, over 222,333 people—including 7,445 children under the age of 15—daily pick up life-saving antiretroviral treatments from organizations that receive grant funding that has been frozen or threatened. Andelson Off. of Pub. Pol'y, *Impact of Stop Work Orders for PEPFAR Programs* (Jan. 20, 2025), https://tinyurl.com/mr8krwp8. As a result of Defendants' actions, one USAID worker estimates that "[a]t a minimum, 300 babies that wouldn't have had HIV, now do." Kate Knibbs, *Elon Musk's DOGE Is Still Blocking HIV/AIDS Relief Exempted from Foreign Aid Cuts*, Wired (Feb. 3, 2025), https://tinyurl.com/4dfb6b7s.

For Plaintiffs, too, the consequences have been disastrous. The funding that AVAC receives through its Cooperative Agreement constitutes 40 percent of its total operating budget, and the ongoing funding freeze has severely compromised AVAC's ability to continue supporting CASPR's work on researching HIV prevention, including by conducting clinical trials, and offering resources to local African communities. Warren Decl. ¶¶ 10–13. Indeed, as a result of the funding freeze and stop-work order, AVAC has had to halt all CASPR work and lay off seven of its 46-

person staff. *Id.* ¶¶ 11–12. If the funding freeze and stop-work order remain in effect, AVAC will need to make further layoffs imminently. *Id.* ¶ 12.

As for JDN, it has had to slash its budget, curtail its operations, lay off nearly a quarter of its staff, and reduce salaries and working hours for the majority of its remaining employees. Sullivan Decl. ¶¶ 10–12. If JDN is not allowed to access its funding and resume its work, it will imminently be forced to close programs, severely compromising the investigative journalism and anti-corruption efforts that it supports. *Id.* ¶¶ 8, 10–13.

Although Defendants' actions caused immediate, serious harm, Plaintiffs did not immediately seek emergency relief due to the many uncertainties surrounding the legal status of the freeze: Secretary Rubio had suggested that waivers might be available, *see* U.S. Dep't of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), https://tinyurl.com/5n7u8tmf; the scope of court orders barring enforcement of an OMB memo purporting to implement the Executive Order was in question, *see supra* note 1; and, as recently as Friday, February 7, government attorneys made representations in court—since corrected—that Secretary Rubio's freeze on funding applied only to "new obligations" rather than previously obligated grants. *Compare* Hr'g Trans., *Am. Fed. of Gov't Emps. v. Trump*, No. 25-cv-352 (D.D.C) (Feb. 7, 2025), at 45, *with* Notice of Corr., *Am. Fed. of Gov't Emps*, ECF No. 21 (filed Feb. 10, 2025) (noting that counsel had been "unaware" that "payments on existing contracts were paused"). Now, though, it is clear that Defendants will not lift this devastating freeze unless ordered to do so. Due to the

severe and worsening harms that Plaintiffs have experienced and will continue to experience as a result of the funding freeze and stop-work orders, Plaintiffs ask this Court to grant a temporary restraining order enjoining Defendants from enforcing the Executive Order, the State Department Memo, and the stop-work orders and requiring Defendants to reinstate congressionally authorized foreign aid grants.

## STANDARD OF REVIEW

To secure a temporary restraining order, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if [an] injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). Where, as here, the requested temporary relief would run against the government, "the final two … factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

Defendants' actions in freezing Plaintiffs' grant funding and ordering them to cease operations are unlawful for multiple independent reasons, and Plaintiffs have accordingly advanced several claims to relief. Although Plaintiffs "need only show

likelihood of success on one claim," *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (quoting *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995)), Plaintiffs can establish a likelihood of success as to all of them.

## A. The Executive Order is unconstitutional.

The same day that he took office, President Trump issued an Executive Order mandating the cessation of congressionally sanctioned funding flows and halting foreign assistance projects that the legislative branch has chosen to authorize as a matter of national policy. This order overstepped constitutional limits on executive power for two distinct but related reasons: It transgressed the separation of powers that is central to American government, and it flouted the constitutional requirement that the executive must take care to effectuate legislative policy.

### 1. The Order violates the separation of powers.

The Framers of the U.S. Constitution "divide[d] the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). This fundamental choice arose from the recognition that "checks and balances [are] the foundation of a structure of government that [will] protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). As relevant here, by "[r]estricting the task of legislating to one branch characterized by difficult and deliberative processes," the Constitution "promote[s] fair notice and the rule of law, ensuring the people [will] be

10

subject to a relatively stable and predictable set of rules." *Gundy v. United States*,
588 U.S. 128, 155 (2019) (Gorsuch, J., dissenting).

Rather than respecting Congress's exclusive "power to make a law," *Wilkerson
v. Rahrer*, 140 U.S. 545, 562 (1891), the Executive Order disregards Congress's
legislative authority entirely. In the Further Consolidated Appropriations Act of 2024
(FCAA), Pub. L. No. 118-47, 138 Stat. 460 (2024), Congress allocated federal funds to
the sort of foreign assistance work that Plaintiffs perform. Specifically, with respect
to AVAC's work, the FCAA provides that nearly $4 billion "shall be made available"
for "programs for the prevention, treatment, control of, and research on HIV/AIDS,
… and for assistance to communities severely affected by HIV/AIDS." *Id.* div. F, tit.
III, 138 Stat. at 740. And with respect to JDN's work, the Act allocates $2.9 billion in
funds for "democracy programs," including "programs that support good governance,
credible and competitive elections, freedom of expression, association, assembly, and
religion, human rights, labor rights, independent media, and the rule of law, and that
otherwise strengthen the capacity of democratic political parties, governments,
nongovernmental organizations and institutions, and citizens to support the
development of democratic states and institutions that are responsive and
accountable to citizens." *Id.* div. F, tit. VII, 138 Stat. at 786; *see id.*, 138 Stat. at 787
(directing that federal funds "shall be made available to support and protect civil
society activists and journalists who have been threatened, harassed, or attacked"
and "shall be made available for programs to protect international freedom of
expression and independent media, including through multilateral initiatives").

11

The Executive Order unlawfully vitiates these legislative choices. The order starves grantees carrying out programs for which Congress appropriated funding. Indeed, the order decries Congress's decision to support "[t]he United States foreign aid industry" as "directly inverse to harmonious and stable relations internal to and among countries" and "not fully aligned with the foreign policy of the President." 90 Fed. Reg. at 8619. Critically, the order does not reflect an exercise of appropriate executive "discretion" to "interpret[] a statute and direct[] the details of its execution," *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928), or to flexibly implement Congress's "broad general directives," *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Rather, it reflects executive *rejection* of the policy goals that Congress has embraced. The Executive Order, in other words, does not announce principles for deciding *which* assistance projects to support to best give effect to Congress's judgment. It announces instead that the executive—in direct contravention of Congress's will—has decided to fund no such projects at all.

The supposedly temporary nature of the funding freeze does not cure the constitutional deficiency. Even setting aside that Congress has not authorized a pause in the disbursement of the funds that it has allocated to foreign assistance programs, the executive branch has been transparent that its goal is to "prevent[]" foreign assistance spending. *See* U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at a Time* (Jan. 29, 2025), https://tinyurl.com/mw7n9zjn; *see* @elonmusk, X (Feb. 2, 2025, 12:20 PM), https://tinyurl.com/4bnu7b7z (statement from presidential advisor Elon Musk that "USAID is a criminal organization" and

that it is "[t]ime for [USAID] to die"). The results speak for themselves. As explained *supra* at pp. 6–8, the funding freeze has already caused countless aid organizations to scale back operations, if not shut down entirely. Plaintiffs' situation is a case in point. Less than one-third of the way into the 90-day "pause" in congressionally authorized funding unilaterally announced by the executive branch, AVAC and JDN face existential threats to the ongoing viability of their operations. *See infra* Part II. For many organizations, the Executive Order—if allowed to take full effect—does not represent a temporary setback, but a death knell. And as the statements of officials speaking for the executive branch lay bare, that result is intended and desired.

Plaintiffs are thus likely to prevail on their claim that the Executive Order violates the separation of powers and that they are therefore entitled to permanent injunctive relief. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing an implied right of action under the Constitution to seek injunctive relief for a separation-of-powers violation).

### 2.    The Order violates the Take Care Clause.

Under Article II of the U.S. Constitution, the President has a "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). This duty "refutes the idea that [the President] is to be a lawmaker" and makes clear that "Congress has … exclusive constitutional authority to make laws necessary and proper to carry out the

powers vested by the Constitution" in the federal government. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). And "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). Holding otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Id.*

Thus, for the same reasons that the Executive Order violates the separation of powers, it also violates the Take Care Clause. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause"). The order, after all, "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.[2]

Whether the Executive Order is viewed as an encroachment on Congress's exclusive authority to legislate or as a dereliction of the executive's duty to faithfully take care that congressional will be followed, the upshot is the same: the order disrupts the careful balance that the Constitution strikes between the various branches of government and so is unlawful and unenforceable.

---

[2] *Cf. United States v. Texas*, 577 U.S. 1101 (2016) (order granting certiorari and asking parties to brief the question "Whether [a challenged executive action] violates the Take Care Clause of the Constitution, Art. II, § 3"); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 976 (9th Cir. 2017) (entertaining claim alleging violation of Take Care Clause but finding no violation).

**B. The State Department Memo has no basis in law, is arbitrary and capricious, and violates federal statutes.**

The Administrative Procedure Act (APA) provides that a "reviewing court shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The State Department Memo, which suspended all new disbursements of congressionally appropriated funds and required the issuance of stop-work orders to all but a handful of existing grantees, is arbitrary and capricious, and not in accordance with law for several reasons.

To begin with, the State Department Memo purports to implement the Executive Order, which is itself "not in accordance with" the U.S. Constitution. *Id.*; *see supra* Part I.A. Because the Executive Order is unlawful and unenforceable, the agency actions that effectuate it are similarly unlawful.

Beyond that, the Memo is arbitrary and capricious. The State Department's stated rationale for imposing a blanket freeze on virtually all foreign assistance funding and operations is that it wants to review "whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." State Department Memo. This rationale, however, does not justify the immediate cessation of vital funding flows to innumerable organizations across the globe and the abrupt suspension of all manner of critical foreign aid work on which the safety, health, and wellbeing of communities worldwide depend. The Memo offers no reason why review of spending cannot be conducted absent a suspension of funding and aid work, why any such

15

suspension should apply universally to virtually all grantees, and why it serves any conceivable state interest to compel such a suspension immediately, in a highly disruptive manner, without giving grantees or the communities that depend on their work any wind-down period in which to plan and adjust. As with the Executive Order itself, the most plausible inference is that disruption *is* the purpose. And as with the Executive Order, effectuating that purpose thwarts Congress's constitutional prerogatives.

Days after the State Department Memo issued, the Department claimed that "[i]t is impossible to evaluate programs" absent a funding freeze and operational pause because there is "little to no incentive to share programmatic-level details so long as the dollars continue to flow." U.S. Dep't of State, *Prioritizing America's National Interests*, *supra* at p. 12. This rationale, however, is "nowhere to be found in the [State Department] Memorandum" and so "can be viewed only as [an] impermissible *post hoc* rationalization[]" that is "not properly" considered on judicial review. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020). Even on its own terms, moreover, the justification is unsubstantiated ipse dixit. Defendants offered no explanation of what "programmatic-level details" they lack, what efforts Defendants have made to obtain them, and what evidence supports the assumption that they would not be disclosed absent an immediate, across-the-board termination of congressionally authorized activities that the executive branch has long previously left unmolested. The absence of any "reasoned analysis" of the reasons for "changing … course" rendered Defendants' actions arbitrary and capricious. *Motor Vehicle Mfrs.*

16

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here [an] agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.").

What is more, the State Department Memo is unlawful because it contravenes several federal statutes. For one thing, the Memo is inconsistent with the FCAA, which directs that federal funding "shall" be made available for projects of the sort that Defendants have deliberately halted. *See supra* at p. 11. Defendants' suspension of funding for foreign assistance programs also violates the Congressional Budget and Impoundment Control Act of 1974 (ICA), which provides that congressionally appropriated funds "shall be made available for obligation" unless the President sends a "special message" to Congress justifying a proposed funding rescission and Congress then passes a recission bill. 2 U.S.C. § 683. Because none of the ICA's statutory preconditions have been satisfied, Defendants lack authority to withhold appropriated funds. Finally, under the Antideficiency Act, the executive branch may reserve appropriated funds "only … to provide for contingencies; … to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or … as specifically provided by law." 31 U.S.C. § 1512(c)(1). Defendants have not identified any contingencies or sources of law that justify holding appropriated foreign aid funds in reserve and, as just explained, Defendants' claim that a funding freeze will support efficiency gains is unsupported by any evidence or reasoned analysis.

The State Department Memo is thus triply unlawful: It oversteps constitutional limits on executive power. It is the product of arbitrary and capricious decision-making. And it flouts statutory requirements. Under the APA, it must be "h[e]ld unlawful and set aside," 5 U.S.C. § 706(2), and Defendants must be "compel[led]" to resume the funding that has been "unlawfully withheld," *id.* § 706(1).

### C. The stop-work orders are unlawful.

The stop-work orders that have been issued to Plaintiffs must be held unlawful and set aside for the same reason. Those orders purport to effectuate the unlawful State Department Memo—which in turn purports to effectuate the unlawful Executive Order—and so lack any foundation in law. None of the orders that Plaintiffs received offered any project-specific reason for requiring them to suspend their operations, and Defendants openly acknowledged that the suspension of JDN's funding was "not due to any actions" of JDN but was instead meant to "give the new administration time to review the use of Foreign Assistance Funds" pursuant to the Executive Order and State Department Memo. Sullivan Decl. Exh. A. Because the only basis for the stop-work orders is a series of unlawful executive actions, those orders are likewise unlawful.

## II.    Plaintiffs will suffer irreparable injury absent prompt relief.

Plaintiffs are suffering, and will continue to suffer, irreparable injury from Defendants' ongoing, unlawful withholding of federal grant money, and from the stop-work orders that prevent them from pursuing their missions. "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009).

Plaintiffs' injuries are not only imminent and certain—they are already occurring. Every additional moment that Plaintiffs are deprived of the federal grant money that they have been guaranteed, the more dramatically they will be forced to scale back operations, and the more severely compromised the populations they serve will be.

For AVAC, federal grant funding makes up 40 percent of its total operating budget. Warren Decl. ¶ 10. As a result of Defendants' actions, AVAC has already been forced to stop all CASPR work and lay off seven staff members. *Id.* ¶¶ 11–12. These cutbacks have critically hampered AVAC's ability to pursue HIV prevention research and development and clinical trials, and they have slowed the rollout of life-saving medicines that dramatically reduce the incidence and spread of HIV within high-risk communities. *Id.* ¶¶ 4–8, 11. Absent an injunction, the harms to AVAC and its vulnerable constituencies will grow only more severe. AVAC will have to further reduce its already diminished staff by an additional 10 people, further compromising AVAC's ability to accelerate the public health measures needed to protect the lives and health of individuals who face the imminent risk of HIV infection. *Id.* ¶ 12.

For JDN, meanwhile, Defendants' actions have deprived it of 38 percent of its budget and have already forced it to terminate longstanding programs in the Pacific, Latin America, Europe, and Asia and lay off associated staff. Sullivan Decl. ¶¶ 6, 11. Closure of these programs has created gaps in JDN's global network, diminishing its ability to support cross-border investigations and anti-corruption reporting. *Id.* ¶ 11. More broadly, Defendants' funding freeze and stop-work orders have required JDN to cut its staff by nearly a quarter, reduce programming and necessary travel, refrain

from purchasing new equipment, and slash pay and hours for remaining staff. *Id.* ¶¶ 8, 10, 12. Absent an injunction, JDN will need to make further cuts, curtailing its award-winning investigative work and its ability to maintain its fight against corruption and other official malfeasance. *Id.* ¶¶ 5, 8–10.

These existing and worsening injuries to Plaintiffs and the communities that depend on their work cannot be remedied by monetary relief after the fact. As evidenced by the severe impact that Defendants' funding freeze and stop-work orders have had on Plaintiffs' operations within just three weeks, the additional injuries that Plaintiffs would sustain absent an injunction would likely "threaten[] the very existence" of their operations. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Moreover, "'where economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable' even if it would not wipe the [plaintiff] out." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (quoting *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019)); *see E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021) ("In the APA context, economic harms may be irreparable because plaintiffs are otherwise unable to recover monetary damages.").

Even apart from the tangible threat to Plaintiffs' viability, a temporary restraining order is the only means of ensuring that they can fully carry on with their missions during the pendency of this case. Where government action creates "obstacles [that] unquestionably make it more difficult for [a plaintiff] to accomplish

[its] primary mission," those obstacles can constitute "irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see Whitman-Walker*, 485 F. Supp. 3d at 57–58 (citing cases and finding irreparable harm based on "the significant financial and operational harms" the plaintiffs would suffer "and the consequent, well-established threat to their ability to deliver timely and effective [services]" to the constituencies they served). As explained above, *see supra* at pp. 12–13, disrupting the critical services that Plaintiffs and other organizations like them supply to the global community is not only an irreversible, massive-scale harm that will predictably result from Defendants' actions: It is the purpose of those actions in the first place. This Court should reject Defendants' efforts to unlawfully inflict this grave and significant harm and should enter relief without delay.

## III.    The balance of equities and public interest favor Plaintiffs.

As against the certain and irreparable injury that Plaintiffs and innumerable other recipients of foreign assistance grants are presently experiencing as a result of Defendants' unlawful suspension of their funding and activities, Defendants would suffer no cognizable harm if enjoined from continuing this suspension. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Moreover, the congressionally authorized funding that Defendants abruptly and unlawfully suspended was available to Plaintiffs and other organizations as recently as a month ago, with no demonstrated ill effect on government operations.

Defendants have not explained why an immediate blanket suspension of vital federal support for foreign assistance is necessary to facilitate their stated goals of reviewing expenditures to ensure efficiency and consistency with U.S. policy. The balance of equities thus tips decisively in favor of granting injunctive relief.

Meanwhile, such relief would serve the public interest. "There is generally no public interest in the perpetuation of unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (quoting *League of Women Voters*, 838 F.3d at 12). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (quoting *League of Women Voters*, 838 F.3d at 12). Restoring the flows of federal assistance that Congress has authorized on behalf of the American people would respect the constitutional design and guard against the unlawful agglomeration of power in the executive branch.

Beyond the public's interest in lawful governance, there is a further pressing public interest in affording immediate relief. Choking funding to scores of life-saving humanitarian operations has had predictable, tragic, and senseless consequences. As a half-billion dollars' worth of food grown by American farmers rots in ports and warehouses, USAID, Off. of Inspector Gen., *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 3 (Feb. 10, 2025), https://tinyurl.com/3dmnuxmx, children around the world have been "left without food and battling malnutrition," Mark Townsend et al., *Deaths Predicted Amid the Chaos of Elon Musk's Shutdown of USAid*, The Guardian (Feb. 4, 2025), https://tinyurl.com/s29vk8vn. Meanwhile, over

ten thousand Americans have reportedly lost their jobs as a result of Defendants'
actions. Thalia Beaty, *Volunteers Are Now Tracking What's Already Been Lost in the
USAID Freeze*, Associated Press (Feb. 10, 2025), https://tinyurl.com/68bs5xun.
Absent an injunction, the American and global public will suffer further grave harms.

## IV.    This Court should issue prompt relief enjoining enforcement of the Executive Order and State Department Memo against all recipients of foreign assistance.

Plaintiffs seek barring enforcement of the unlawful stop-work orders issued to
them and requiring Defendants to resume disbursements of the federal grant money
to which they are entitled. The relief should go further, however, because the actions
that Defendants are taking against Plaintiffs derive from the State Department
Memo, which in turn derives from the Executive Order. As explained above, this
series of interrelated executive actions is unlawful from start to finish, and this Court
should therefore enter a temporary restraining order barring Defendants from
enforcing any link in this chain of illegality.

The remedy for an agency action that is arbitrary, capricious, or contrary to
law is to have that action "set aside" pursuant to the APA. 5 U.S.C. § 706(2).
Similarly, an unlawful executive order is "ineffective" and without legal force.
*Minnesota v. Mille Lacs Band of Chippewa Inds.*, 526 U.S. 172, 193 (1999); *see
Youngstown*, 343 U.S. at 583–84 (affirming an injunction that restrained the
executive from "acting under the purported authority" of an "invalid" executive
order). Courts in this Circuit have accordingly recognized that when a "reviewing
court determines that [executive actions] are unlawful, the ordinary result is that the

[actions] are vacated—not that their application to the individual petitioners is proscribed"—because the executive action itself is treated as a nullity. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). This reasoning applies at this stage, just as it does upon entry of final judgment. *Id.* at 49 (collecting cases at the preliminary injunction stage). Enjoining enforcement of the Executive Order and State Department Memo will ensure that the actions challenged here, which are "likely to be proven unlawful," do "not become effective … while [their] legality is finally adjudicated," thus "ensur[ing] that complete relief remains available to the plaintiffs after … final adjudication." *Id.*; *see, e.g.*, *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 23 (D.D.C. 2018) (stating at the preliminary injunction stage that "Plaintiffs were injured by a rule of broad applicability, so the Court acted properly in granting systemwide relief, even if that relief has the consequence of protecting the rights of other … individuals not before the Court").

This Court should apply that default rule here. In abruptly suspending all federal foreign assistance funding across the board, Defendants effected a sweeping, programmatic maneuver that will have—and indeed has already had—immediate and severely destabilizing consequences for countless organizations across the world. Under these circumstances, if this Court concludes—as it should—that Defendants' actions were likely unlawful, the appropriate course is to restore order by enjoining the unlawful actions that have injured (and continue to injure) Plaintiffs along with other, similarly situated organizations. *See District of Columbia*, 444 F. Supp. 3d at

50–51 (holding that a nationwide injunction was "necessary" where implementation of an executive action that was likely unlawful "would have 'nationwide impact' and would cause injuries of 'sufficient similarity to the plaintiff[s]' to other … individuals throughout the country" (alteration in original; quoting *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018))).

By contrast, relief applicable only to Plaintiffs would court judicial inefficiency, requiring a host of follow-on suits—many of them likely in an emergency posture—to challenge, again and again, the same executive actions whose likely unlawfulness has already been established. This approach would also allow Defendants to enforce unlawful orders against innumerable aid organizations throughout the world and thereby to cause widespread and potentially existential irreparable injury to those organizations and their beneficiaries, without legal authority to do so. Accordingly, because the Executive Order and the State Department Memo are likely unlawful, this Court should enjoin Defendants from enforcing those orders pending further proceedings in this case.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court enter a temporary restraining order enjoining Defendants from enforcing the Executive Order, the State Department Memo, and the stop-work orders issued to Plaintiffs, and requiring Defendants to reinstate congressionally authorized foreign assistance grants. Plaintiffs further request that this Court issue a schedule for expedited briefing on a preliminary injunction and summary judgment.

25

Respectfully submitted,

/s/ Nicolas A. Sansone
Lauren E. Bateman (D.C. Bar No. 1047285)
Allison M. Zieve (D.C. Bar No. 424786)
Nicolas A. Sansone (D.C. Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

26