UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00402 (AHA) |

**Order**

Plaintiffs in *Global Health Council v. Trump*, No. 25-cv-00402, are (or represent) small and large businesses, nonprofits, and other organizations across the United States. Plaintiffs in *AIDS Vaccine Advocacy Coalition v. United States Department of State*, No. 25-cv-00400, are health and journalistic nonprofits that receive federal grant money to perform foreign assistance work. In both cases, Plaintiffs have brought claims under the Administrative Procedure Act (APA) and federal Constitution challenging the issuance and implementation of Executive Order 14169, which immediately stopped all congressionally appropriated foreign assistance funding pending future review. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. Plaintiffs

in both cases have moved for a temporary restraining order, with evidence detailing the devastating effects on American businesses and nonprofits, which have been forced to shut down programs, to furlough or lay off employees, and in some instances to shutter altogether as a result of the challenged action. *See AIDS Vaccine*, ECF No. 13 at 7–8; *Glob. Health*, ECF No. 4 at 15–17. Plaintiffs' proposed temporary restraining orders originally sought to enjoin all Defendants, including the President, from enforcing the Executive Order in its entirety. *AIDS Vaccine*, ECF No. 13-6; *Glob. Health*, ECF No. 4-1. The Court held a prompt hearing, at which the Government rightly highlighted the importance of respecting the President's Article II power, while also recognizing that the harms Plaintiffs described may well be irreparable. During the hearing, the Court questioned the breadth of Plaintiffs' proposed relief, which Plaintiffs have since narrowed. For the reasons below, the Court grants Plaintiffs' motions for a temporary restraining order in part, on narrower terms than Plaintiffs originally and subsequently requested.

**I.   Background**

Each year, Congress appropriates billions of dollars of funds for foreign assistance, which are then administered by the U.S. Agency for International Development (USAID) and the U.S. Department of State. *Glob. Health*, ECF No. 1 ¶ 3. USAID "is the lead international humanitarian and development arm of the U.S. government." Cong. Rsch. Serv., IF10261, *U.S. Agency for International Development: An Overview* 1 (Jan. 6, 2025). Among other things, it "provides assistance to strategically important countries and countries in conflict" and "leads U.S. efforts to alleviate poverty, disease, and humanitarian need." *Id.* Most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations. *Id.*

On January 20, 2025, the President issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025).

The order directed an immediate pause in "United States foreign development assistance" and directed the Office of Management and Budget (OMB) to "enforce this pause through its apportionment authority." *Id.* § 3(a). The order further directs responsible department and agency heads to review each foreign assistance program and to determine within 90 days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of OMB and with the concurrence of the Secretary of State. *Id.* §§ 3(b), (c). The order provides that the Secretary of State has authority to waive the pause "for specific programs" and allows for new obligations or the resumption of disbursements during the 90-day review period, if a review is conducted sooner and the Secretary of State, in consultation with the Director of OMB, approves. *Id.* §§ 3(d), (e).

In the days that followed, agency officials took actions to institute an immediate suspension of all congressionally appropriated foreign aid. The Secretary of State issued a memorandum suspending all new funding obligations, pending a review, for foreign assistance programs funded by or through the State Department and USAID. *Glob. Health*, ECF No. 1 ¶ 42. USAID officials also issued instructions to pause new funding, immediately issue stop-work orders, and develop appropriate review standards. *Id.* ¶¶ 41, 44–45. The OMB's acting director issued a memorandum ordering a temporary pause of all federal financial assistance, including assistance for foreign aid and nongovernmental organizations." *Id.* ¶ 47. According to the *Global Health* complaint, Defendants have "halt[ed] the obligation and disbursement of foreign-assistance funding wholesale." *Id.* ¶ 56. Plaintiffs have adduced evidence of numerous letters terminating programs and contracts received as a result of these actions. *See, e.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5, 7, 13. A list Defendants provided to the Court shows that roughly 230 contracts and grants were terminated in just the two days after they were sued, and Defendants say that list does not include

the contracts and grants cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those two days. *Glob. Health*, ECF Nos. 20, 20-1.

Plaintiffs claim that they have suffered and will continue to suffer enormous and concrete harm to their businesses, and that their core missions and existence are in jeopardy as a result of Defendants' actions. Among other things, Plaintiffs have provided evidence that they have been and will continue to be forced to shut down program offices, to furlough or terminate staff, and in some cases to shutter their businesses entirely. *See Glob. Health*, ECF No. 4 at 20–23. They have also provided supporting evidence that Defendants' actions have had and will continue to have a catastrophic effect on the humanitarian missions of several plaintiffs. *See id.* at 15–19.

Plaintiffs seek a temporary restraining order enjoining Defendants from implementing, enforcing, or otherwise giving effect to Executive Order 14169 and subsequent instructions and clarifications issued by the State Department and USAID. The Court held a hearing in both cases on February 12, 2025. Following the hearing, Plaintiffs submitted revised proposed orders that narrowed the scope of their requested relief. *AIDS Vaccine*, ECF No. 16-1; *Glob. Health*, ECF No. 18.

**II.  Legal Standard**

The grant of temporary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a temporary restraining order must make the same showing as he would if seeking a preliminary injunction: he must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).[1]

### III. Discussion

At least at this early stage, the Court finds Plaintiffs have met their burden for temporary, emergency relief, although not with the breadth they initially or subsequently proposed.

The Court begins with irreparable harm, given the scale of the disruption Plaintiffs have described. Plaintiffs attest Defendants' blanket suspension of congressionally appropriated funds has caused them immense financial harm and has, in many cases, forced them to significantly cut down on staff or otherwise reduce core operations. Plaintiffs do not assert this harm based upon expectations of receiving future grants or aid; they do so upon expectations set in existing contracts with the respective agencies. To give just a few examples from the record:

- One plaintiff, a large investigative journalism organization, has agreements with USAID and the State Department that constitute 38% of its budget, which supports investigations into corruption, sanction violations, and other wrongdoing. *AIDS Vaccine*, ECF No. 13-4 ¶¶ 2, 6–7, 9. Due to the suspension of appropriated funding and stop-work orders received as a result, the organization has been forced to cut 43 of 199 staff members, with most remaining being moved to a shorter work week. *Id.* ¶ 12. The organization has had to cancel events, cut travel for reporting, and freeze new equipment purchases. *Id.* The organization attests that the disruption will continue absent relief. *Id.* ¶ 13.

- A nonprofit plaintiff focused on protecting refugees and asylum seekers has had to lay off 535 staff members since receiving termination notices for multiple grants. *Glob. Health*, ECF No. 7-3 ¶¶ 3–4, 13. It has been forced to shutter program offices and defer payments to vendors. *Id.* ¶ 21.

---

[1] At the hearing on these motions, Plaintiffs noted that courts in this Circuit have sometimes employed a "sliding scale" approach to these factors, which was particularly common before the Supreme Court's decision in *Winter*. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). However, the Court's resolution of these motions does not depend on a sliding scale method and arrives at the same place when each prong is evaluated as "an independent, free-standing requirement." *Sherley*, 644 F.3d at 393 (citation omitted).

- Another plaintiff representing small businesses across all sectors attests that the suspension included USAID failing to pay its member organizations for months of unpaid invoices. *Glob. Health*, ECF No. 7-2 ¶ 8. This has forced small businesses to furlough "most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 10.

- Another plaintiff focused on addressing the global HIV/AIDS epidemic has already been forced to lay off seven employees and will lay off ten more over the next month if the suspension of appropriated foreign aid continues. *AIDS Vaccine*, ECF No. 13-2 ¶ 12.

Other plaintiffs have described how the blanket suspension of funds has undermined their core missions and jeopardized vital services to vulnerable populations. For example:

- One plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organizations. *Glob. Health*, ECF No. 7-1 ¶ 8. One of those member organizations reports that a $20 million project to support the development of hospital accreditation in Cambodia has been suspended. *Id.* Another reports that a stop-work order has disrupted a total of $4 million in funding for American Schools and Hospitals Abroad grants in Nepal and Vietnam. *Id.* The plaintiff organization attests that the suspension of appropriated foreign aid funding "is an existential threat to [its] members and their life-saving work." *Id.* ¶ 11.

- Another plaintiff reports that it can no longer fund shelters for minors in Central America trying to escape recruitment into criminal gangs. *Glob. Health*, ECF No. 7-7 ¶ 10.

- A different plaintiff explains that it has abruptly stopped providing medical services for hundreds of adolescents and young students in need in Bangladesh. *Glob. Health*, ECF No. 7-8 ¶ 12(a).

- An additional plaintiff attests that the freeze has delayed several time-sensitive antimalaria campaigns that are expected to benefit millions of people in Kenya, Uganda, Ghana, Ethiopia, and Zimbabwe. *Glob. Health*, ECF No. 7-1 ¶ 8(d).

- Another plaintiff that supports HIV prevention research and the rollout of HIV prevention medication to high-risk communities in various African countries asserts that the funding freeze has disrupted clinical trials and the rollout of life-saving medication. *AIDS Vaccine*, ECF No. 13-2 ¶¶ 3–4, 11.

At the Court's hearing, Defendants acknowledged that the types of harms above affecting Plaintiffs' businesses, as well as the availability of food and medicine, are types of harm that are appropriately considered in the irreparable harm inquiry. Defendants offered that some of the contracts terminated might have included clauses that allowed them to be terminated in certain circumstances, but also acknowledged that the approach taken was blanket and not limited to such contracts.[2]

Plaintiffs have further adduced evidence that this harm has taken place and is likely to continue despite the Secretary of State's authority to waive the suspension of appropriated funds for specific programs. *See Glob. Health*, ECF No. 17-1 at 21. They have proffered specific facts that this has not meaningfully mitigated the harm they have described. One plaintiff, for example, attests to a meeting with the State Department to discuss what activities would qualify for a waiver and thus be exempted from suspension. *Glob. Health*, ECF No. 7-3 ¶ 11. The officer contacted stated that he could not provide any information regarding the application of the waiver. *Id.* ¶¶ 11–12. The plaintiff further attests that even in the event of a waiver, no funds could be disbursed because federal government payout portals are no longer functioning. *Id.* ¶ 11. Another plaintiff

---

[2] While not necessary to the Court's analysis given the extensive and, at least to date, unrebutted evidence of other types of irreparable harm, Plaintiffs have also offered evidence that they will suffer harm to "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders." *Glob. Health*, ECF No. 4 at 23. This includes concrete examples such as having to violate contractual duties by deferring payments to suppliers, vendors, and landlords, *Glob. Health*, ECF No. 7-6 ¶¶ 10, 15; disruptions to relationships with longstanding partners whose trust had been cultivated over decades, *id.*; and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been cancelled, *Glob. Health*, ECF No. 7-9 ¶ 21. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

attests that it received a waiver, but was told that the waiver lasted only for a thirty-day period. *Glob. Health*, ECF No. 7-6 ¶ 6. The plaintiff explains that such waivers do not address the problem because a business cannot halt global supply chains midstream and then resume operations with uncertainty as to whether it will have to halt again in thirty days. *Id.* At the hearing, Defendants pointed to the waiver process but did not rebut this evidence, acknowledging that the waiver process may have had "hiccups." At this stage, the record before the Court does not suggest that the waiver process in place has mitigated the irreparable harms Plaintiffs face.

Plaintiffs have made a sufficient preliminary showing that the loss of funding at issue in this litigation "threatens the very existence of [their] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And they have likewise shown that the "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The *Global Health* Plaintiffs have also adduced evidence indicating that terminations and resulting harms have continued, and possibly increased, in the two days since this lawsuit was filed. Since the filing of their motion for a temporary restraining order, multiple plaintiffs that had not previously received terminations or stop-work orders have started to receive them. *See Glob. Health*, ECF No. 19 at 3. At the request of the Court, Defendants submitted documentation showing that just in the two days after they were sued, they have cancelled roughly 230 additional contracts, which Defendants say do not include the contracts cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those days. *Glob. Health*, ECF Nos. 20, 20-1. Absent temporary injunctive relief, therefore, the scale of the enormous harm that has already occurred will almost certainly increase. Plaintiffs have made a strong preliminary showing of irreparable harm.

It also appears, at least at this early stage, that Plaintiffs are likely to succeed on the merits. Between the two cases, Plaintiffs challenge the actions at issue as (1) arbitrary and capricious in violation of the APA; (2) contrary to law in violation of the APA; (3) in violation of the separation of powers; (4) in violation of the Constitution's Take Care Clause; and (5) *ultra vires*. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. The Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a temporary restraining order. That said, as the Court emphasized at the hearing and Plaintiffs acknowledged, any relief should also be tailored accordingly.[3]

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

---

[3] Both parties will, of course, have the opportunity to develop their claims further at the preliminary injunction phase, where the record and therefore the appropriate relief may well evolve, and to develop them further as the case continues.

9

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

Here, the stated purpose in implementing the suspension of all foreign aid is to provide the opportunity to review programs for their efficiency and consistency with priorities. However, at least to date, Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs. The most Defendants offer is the possibility that some of the abruptly terminated contracts might have had clauses which allowed termination in certain circumstances; however, as noted, Defendants have acknowledged that they implemented a blanket suspension that was not based on the presence or consideration of such contractual terms. To be sure, there is nothing arbitrary and capricious about executive agencies conducting a review of programs. But there has been no explanation offered in the record, let alone a "satisfactory explanation . . . including a rational connection between the facts found and the choice made," as to why reviewing programs—many longstanding and taking place pursuant to contractual terms—required an immediate and wholesale suspension of appropriated foreign aid.

Plaintiffs have also shown that implementation of the blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests, including among businesses and other organizations across the country. No aspect of the implemented policies or submissions offered by Defendants at the hearing suggests they considered and had a rational reason for disregarding the massive reliance interests of the countless small and large businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process. In their implementation of the blanket suspension of foreign

aid, Defendants accordingly appear to have "entirely failed to consider an important aspect of the problem."

At the Court's hearing, Defendants' principal argument was that the State Department's and USAID's actions taken to implement a blanket suspension of appropriated foreign aid funds should not be considered "agency action" within the meaning of the APA. Defendants observe that the President's own actions are not reviewable under the APA because the President is not an "agency." *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). It follows, they say, that an agency's actions implementing Presidential directives should not be considered agency action. At least at this juncture, that argument does not appear persuasive. Defendants do not ground their argument in the text of the APA, which specifically defines "agency" to include "each authority of the Government of the United States." 5 U.S.C. § 551(1). While it is true that implementation of the blanket suspension of appropriated funds took place in accordance with Presidential policy and priorities, as agency action routinely does, the relevant directive of the Secretary of State and subsequent determinations of agency heads have immediate effect and constitute the action under review, without any further action by the President. And Defendants' argument, at least as it has been articulated to date, proves too much—it would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review.[4] Defendants will, of course, have an opportunity to more fully develop this argument as it relates

---

[4] Defendants' argument also presupposes that this is an area where the President has exclusive authority and runs into Plaintiffs' contention that the President was acting in violation of the separation of powers because he "does not have unilateral authority to refuse to spend the funds" Congress appropriates. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). As Plaintiffs point out, even just a 90-day review period would extend past the date that relevant appropriations are due to expire and therefore funds would literally be unspent. The Court expects Defendants will give further shape to this argument as this litigation continues to the preliminary injunction phase.

11

to the particular actions in this case at the preliminary injunction stage. For now, however, Plaintiffs have shown that they are likely to succeed in their argument that the implementation of the suspension of congressionally appropriated foreign aid violated the APA.

The final two factors—balancing the equities and the public interest—often overlap in the context of an action to enjoin the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020). Here, there are important interests on both sides, but the factors, at least at this stage, again favor Plaintiffs. Defendants have repeatedly, and rightly, emphasized the importance of respecting the President's Article II power as it relates to foreign policy. Plaintiffs, for their part, have emphasized the Constitution's separation of powers, which also demands respect for Congress's Article I role in legislating, including Congress's choice to allow judicial review through the APA and other statutes constraining the Executive Branch, as well as Congress's important role in appropriating funds. Ultimately, Plaintiffs have adduced, and Defendants have not (yet) meaningfully contested, detailed and credible evidence of harm to countless American businesses, ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether. Plaintiffs also detailed the existential consequence to their missions, which may endanger the health and safety of children and other vulnerable populations. At the Court's hearing, Defendants did not dispute the likelihood of those consequences, although they looked forward to having more time to develop a record in response as the proceedings continue. And on the other side, Defendants did not argue or adduce evidence that any concrete, real-world harm will take place in the event temporary relief is granted. Notwithstanding the important principles on both sides, which will continue to be given careful consideration, Plaintiffs' credible and unrebutted evidence of harm, and the absence of any

such evidence on the other side, tilts both the balance of equities and the public interest in their favor.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motions for a temporary restraining order are denied in part and granted in part.

Plaintiffs' initial proposed relief asked the Court to enjoin the President and enforcement or implementation of Executive Order 14169. The Court does not find it appropriate or necessary to enjoin the President or the Executive Order itself. Given the breadth of the relief initially sought by Plaintiffs, the Court also makes clear that it does not enjoin the President's or Secretary of State's statements of purpose or policy, nor does the Court enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs. While Plaintiffs have made the showing required for a temporary injunction, such relief would not be adequately tailored to the showing made at this stage.

The Court finds Plaintiffs have satisfied their burden for a narrower injunction concerning the implementation of the blanket suspension of foreign aid funding, as specified below. However, the Court also finds Plaintiffs' proposed injunctions overbroad by including specific directives regarding USAID personnel decisions or operational details. *See Glob. Health*, ECF No. 4-1 (proposed language enjoining Defendants from "terminating, furloughing, or placing personnel on administrative leave" and ordering Defendants to clear "any administrative, operational, human resource, or technical hurdles"); *Glob. Health*, ECF No. 18 (revised proposal, including the same language). Plaintiffs appear to be including such language to ensure meaningful compliance with the Court's order; however, directives as to such specific operational details are overbroad in the

absence of evidence of non-compliance. As specified below, it is sufficient to order Defendants to take all necessary steps to carry out the Court's order.

Finally, at the hearing, Defendants noted that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances. The Court finds on this record that it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions.

Consistent with the reasoning above, it is hereby **ORDERED** that Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

It is further hereby **ORDERED** that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants.

It is further hereby **ORDERED** that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance.

It is further hereby **ORDERED** that the Restrained Defendants shall file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above.

The parties shall meet and confer and file a joint status report by February 14, 2025, at 5:00 p.m. proposing an expedited preliminary injunction briefing schedule.

_____
AMIR H. ALI
United States District Judge

Date:   February 13, 2025