# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00402 (AHA) |

**DECLARATION OF PETE MAROCCO**

I, PETE MAROCCO, declare the following to be true and correct:

Background

    1.    This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

    2.    Since Thursday, January 30, 2025, I have performed the duties and functions of Deputy Administrator of the United States Agency for International Development (USAID). Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State (State). Previously, I served as a U.S. Marine and a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3. On January 20, 2025, President Trump exercised his constitutional authority to conduct foreign policy to issue an executive order directing a pause on "United States foreign development assistance" and requiring agencies to conduct a review of existing foreign aid programs to determine whether they should be modified or terminated. Exec. Order No. 14169 § 3(a), 90 Fed. Reg. 8619 (Jan. 20, 2025). On January 24, the Secretary of State issued a direction (25 STATE 6828) implementing the executive order and pausing all new obligations of foreign assistance funded by State or USAID pending review. In addition, for existing foreign assistance awards, the Secretary directed contracting officers and grant officers to immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.

4. I am aware that this Court entered a temporary restraining order (TRO) on February 13, 2025, against State, USAID, and OMB. USAID and State provided notice of the Court's order to contract and grant counterparties, attached hereto as Exhibits A (USAID Notice) and B (State Notice). *See also* https://sam.gov/opp/f71de5a84d7044b09d48f8f7550a1edc/view.

USAID

5. Over the holiday weekend, USAID's Chief Acquisition Officer and Senior Procurement Executive notified USAID acquisition and assistance staff of the TRO. That notice states that: "[U]ntil further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards." *See* Exhibit C.

6. As described below, USAID paused foreign aid payments in order to facilitate a targeted, case-by-case review of foreign assistance programs. The case-by-case review remains ongoing. Consistent with the TRO, USAID will continue to exercise Agency discretion to individually examine outgoing payments pursuant to a new Payment Integrity Review Process, and, as appropriate, to enforce the terms and conditions, including provisions allowing the Agency to issue stop work or termination notices, contained in USAID awards and contracts.

7. Historically, USAID had limited and insufficient payments control or review mechanisms. Certifying officers pushed out payments—or grantees directly drew down on letters of credit or other facilities—and the system automatically processed those payments, without sufficient opportunity for payments integrity or program review. Under that legacy system, USAID employees were unable to adequately identify basic information about specific payments, such as the programs with which specific payments were associated. Moreover, following the Executive Order, USAID staff were unable—for several days in some instances, including for urgent national security and humanitarian aid payments—to identify which payments were associated with particular enumerated accounts or programs. These system deficiencies and inability to provide complete information led to serious questions about waste, fraud, abuse, and even illegal payments. The lack of sufficiently effective controls of an integrated payments review process has led to significant payment delays in some cases and has placed certain USAID programs at risk of catastrophic failure.

8. To correct these deficiencies, USAID is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud or other bases for termination. Payments will be released as they are processed through this process, which will require a clear link between outgoing payments and specific USAID programs or appropriated accounts. Any entities that are dissatisfied with individualized payment determinations have recourse both within USAID and in the courts. *See infra* ¶ 17. This payment-by-payment processing is especially important because in the absence of such a program, certain USAID funding recipients could obtain lines of credit on certain grants and contracts, allowing them to rapidly drain the full amount of an award without proper review or accountability to the authorizing agency. *See* 48 C.F.R. 732.4; Automatic Directives System (ADS) 636.3.2.1.

9. In accord with the Executive Branch's robust statutory and constitutional authority over the provision of foreign aid, USAID has broad authority under the specific instruments themselves and existing statutes and regulations to suspend and terminate foreign assistance funding obligations.

10. For example, substantially all of USAID's foreign assistance grants and cooperative agreements authorize the agency to "suspend or terminate [the] award in whole or in part" if the Agency "determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States or would be in violation of an applicable law." 2 CFR 700.14. Likewise, USAID grants permit suspension "pending a decision to resume or terminate the award." 2 CFR 700.1; *see also* ADS Chapter 303 MAB § M10.[1]

11. Substantially all USAID contracts are terminable by the Agency for convenience, pursuant to the Federal Acquisition Regulation (FAR) and USAID regulations.[2] *See* 48 C.F.R. 52.249-1(authorizing termination for convenience when termination is "in the Government's interest"); *id.* 49.502(a)-(b), 52.249-4, 52.249-6(a)(1). Termination for convenience terms are mandatory and are implied when not included explicitly. *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018). *Cf. M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304 (D.C. Cir. 1971) ("[e]ven if [a] clause [permitting the government to terminate a contract for its own convenience] is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by [the Armed Services Procurement Regulations] and this requirement has the force and effect of law"). Likewise, applicable FAR regulations also authorize contract suspension in certain circumstances. 48 C.F.R. 42.1305(a)-(b), 52.242-14, 52.242-15.

12. Since January 22, 2025, USAID has terminated 498 contracts, grants, and related funding instruments. Other contracts, grants, and related funding instruments were separately placed on stop work, *i.e.*, were paused or suspended, consistent with the terms and rights of the

---

[1] Other authorities may apply to non foreign assistance grants. For example, government grants generally may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 CFR 200.340.
[2] Some contracts may have even more permissive termination rights. *See, e.g.*, ADS Chapter 308 MAB § M9 (permitting termination at will for certain Agency contracts).

specific awards or contracts at issue. USAID has not quantified those contracts, grants, and related funding instruments that were placed on stop work.

13. The USAID Front Office has generally terminated or suspended instruments after a multistep, case-by-case review process, and those instruments are not being reinstated because the terminations were, to the best of my knowledge, permissible under the terms of the contracts. First, senior USAID staff and political appointees identify specific awards they believe should be evaluated for termination or suspension. Those recommendations are submitted to me, and I evaluate them in consultation with the Office of Foreign Assistance at the Department of State. This review may in some cases include outreach to relevant intergovernmental and external stakeholders. We examine the relevant program and account; potential operational and programmatic consequences of termination; and reliance interests and the effect on third parties including USAID contractors, partners, and counterparties. We then submit a list of awards for suspension or termination to Secretary Rubio who is performing the duties and functions of (PTDO) USAID Administrator, in consultation with senior staff, conducts an independent review that considers, among other things, American foreign policy and national interests.

14. Awards or obligations approved for termination or suspension are transmitted to the Agency's Office of Acquisition Assistance (OAA), which disseminates them to contracting officers and program officers. Before any termination or suspension notice is finalized, OAA consults USAID's regional and pillar bureaus to obtain additional stakeholder input and discuss potential consequences. Bureaus have the option of requesting that senior leadership pause or reconsider their decision. As a result of this process, more than 20 awards or obligations previously slated for termination were not terminated by USAID.

15. Since the TRO, the Agency has authorized at least 21 payments that are in total worth more than $250 million and are expected to be paid this week. These payments are on contracts, grants, cooperative agreements, loans, or other federal foreign assistance awards that were in existence as of January 19, 2025. They are not covered by waivers issued before the TRO was issued.

16. To the best of my knowledge, the 498 contracts, grants, and related instruments terminated by the USAID Front Office thus far were subject to termination either under particular contract terms or implicitly incorporated terms. In summary, the relevant instruments – which were terminated for national interest or convenience – were identified by the following policy bases and Administration priorities:

    a. DEIA Oriented Awards

    b. Unnecessary Reliance on Third-Party Consultants and Contractors or Organizations with Accountability Issues

    c. Operational Expenses and/or General Waste

    d. Unrelated to USAID's Core Mission or Delivery of Life-Saving Aid

    e. Regime Change, "Civic Society" or "Democracy Promotion"

      f.      Sustainability and Climate Change

      g.      Inconsistency with Unrelated Executive Orders or Presidential Directives

17. To the extent that counterparties believe they are entitled to reimbursement for past work or other remedies under their funding instruments, USAID is prepared to entertain such claims and seek resolution. Indeed, there is an established mechanism for counterparties to submit disputes for resolution to USAID. *See, e.g.*, ADS Chapter 303 MAB § M10(e) & M13 (disputes and appeals). If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

18. Consistent with its constitutional, statutory, regulatory, and instrument-specific authorities, and pursuant to the terms of the TRO stating that Defendants may still "enforce[e] the terms of contracts or grants," USAID intends to continue its case-by-case review of existing contracts and grants. Following its review process and consistent with the terms and conditions of the relevant instruments, USAID intends to terminate instruments that the PTDO Administrator determines are inconsistent with the national interests or USAID's mission.

19. USAID also issued numerous stop-work orders. Those orders directed work stoppages pursuant to specified contract and grant terms.

State

20. The Department of State drafted a notice to alert the Department's contractors and grant recipients of this Court's TRO. That notice is attached as Exhibit B. The Department posted it on SAM.gov, the official platform for federal contracting notices, at approximately 11:35 pm on Friday, February 14th. All domestic federal contractors, as well as overseas federal contractors whose contract award values exceed $30,000, are required to be registered in SAM.gov. It is the Department of State's experience that the overwhelming number of registered contractors also sign-up for automatic push notifications of all Department SAM.gov postings. The Department is in the process of identifying the population of overseas contractors that are not registered in SAM.gov that may require notification and will push notification via email once that is determined. Many federal assistance recipients are also registered on SAM.gov and would have received the notice in a similar manner.

21. For other overseas grant recipients, the Department conducted a data pull from the Department's internal grants system identifying available email addresses for federal assistance award recipients. The notice was directly emailed to 12,000 grants recipients beginning at approximately 11:35 pm on Friday February 14th and finishing by 1:20 am on Saturday February 15th. The Department also conducted a separate data pull from an internal database for overseas grants and sent a second round of emails to 2000 grants recipients at approximately 1:26pm on Sunday, February 16th.

22. On Monday, February 17, the Department issued FAMA-2025-05(A) and Acquisition Alert 25-05-01, Exhibits D and E. These notices directed grant officers and contracting officers, respectively, to cease any further actions to newly pause or terminate any Foreign Assistance-funded Federal Assistance Awards at this time.

23. The Department of State has broad authority under statutes, regulations, and specific instruments to terminate funding obligations. Among other things:

    a. Again, as with USAID, State may terminate contracts for convenience. 48 C.F.R. Part 49.502; *see G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963). Additionally, many contracts include stop-work or similar provisions. *See* 48 C.F.R. 42.1305(b); 48 C.F.R. 52.242-15.

    b. As with USAID, State may terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 CFR 200.340(a)(4).

24. As described below, State broadly paused or terminated foreign assistance awards and foreign assistance payments in a manner consistent with its legal authorities and relevant contract or grant instruments. Almost immediately, however, Secretary Rubio issued a number of programmatic waivers of the pause that permitted broad categories of foreign aid to flow where consistent with foreign policy priorities of the United States. Other, more targeted waivers followed. Given these waivers, Plaintiffs' characterization of a "blanket" pause is inaccurate.

25. Since January 20th, the Department has terminated 25 foreign assistance-funded contracts. Those contracts were all terminated for convenience, which is a mandatory term that must be included in all contracts governed by the Federal Acquisition Regulation (FAR).

26. Additionally, the Department has issued stop work or suspension orders for at least 711 additional contracts. Each of these stop work or suspension orders is consistent with the President's and Secretary of State's authority. In addition, the majority of these orders were issued pursuant to terms included in the contracts themselves (*e.g.*, FAR 52.242-15 Stop Work Order clause) or pursuant to bilaterally negotiated modifications. There are approximately 70 contracts that did not contain stop work or suspension terms and for which no contractual modifications have been able to be negotiated thus far. The Department would be entitled to terminate each of these contracts under those contracts' terms if it chooses to do so. *See* ¶ 24, *supra*.

27. Since January 20th, the Department has terminated 733 foreign assistance-funded grants. Those grants were terminated pursuant to their terms, which permit awards to be terminated if they no longer effectuate the program goals or agency priorities (consistent with 2 CFR 200.340(a)(4)).

28. In addition, since January 20th, the Department has issued guidance to suspend approximately 6,824 grants. The Department did not wish to exercise its right under the terms of the grant documentation to terminate those grants; instead, it wished to examine these grants individually, consistent with the review directed by President Trump and the Secretary of State, to ascertain whether those grants should be continued. As with the approximately 70 contracts identified in paragraph 26, *supra*, the suspension of these 6,824 grants is consistent with the Secretary of State's statutory authorities.

29. If the Department were not permitted to leave the approximately 70 contracts and 6,824 grants in a suspended status under its legal authorities—authorities that the Department understands were not enjoined by the TRO—then the Department would consider terminating these contracts and grants on a case-by-case basis. Restarting work now would impose additional expenses, and if these grants are subsequently paused again, further expenses still. These escalating costs may exhaust or even exceed the federal assistance funds obligated under individual contracts or grants, which might leave State with no choice but to terminate the awards even if the ongoing review by the Secretary determines that they should be continued.

30. As is the case with USAID, *see supra* ¶ 17, to the extent that counterparties of State believe they are entitled to reimbursement for past work or other remedies under their particular funding instruments, State is prepared to entertain such claims and seek resolution. *See* Contracts Disputes Act, 41 U.S.C. § 7101, *et seq.* Likewise, there is an established mechanism for counterparties to submit disputes for resolution. And if counterparties believe the claims process is not sufficient, mechanisms exist to pursue, settle, and in certain cases litigate such claims through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

31. Following the issuance of the Secretary's pause on foreign assistance but before the Court entered its TRO, the Department implemented revisions to the system for disbursements of foreign assistance funds related to foreign assistance awards.

32. The Administration, upon review of USAID disbursements, including many that were unauthorized, discovered there were insufficient review mechanisms before disbursements of funds to ensure policy compliance. Payments were being input by contracting and certifying officers, and processed by Treasury, HHS, State or others without sufficient explanation or checks, and automatically released for disbursement resulting in hundreds of payments not in compliance with policy.

33. To ensure payments are both in compliance with policy and have the appropriate management controls, the Administration implemented new procedures. These new procedures require employees submitting requests for payments for contract services or grants to have documentary evidence from a senior official to validate compliance with policy. Controls were also established within the financial systems to ensure disbursements were not submitted without evidence of compliance, tracking each payment to authorization. These internal controls are intended to assure payment integrity and determine that payments under existing contracts and grants are not subject to fraud or other bases for termination.

34. The Administration has established improved process and system controls, consolidating functions in State's Bureau of Comptroller and Global Financial Services (CGFS), and providing additional training and guidance to over a thousand staff members involved in administrative management. In addition to enhancing the integrity of payments, improved processes are required to eliminate the inefficiency and risk inherent in the broken and nearly untraceable system that existed as of January 20, which, for example, required dozens of people in three agencies to see a single payment through to completion. As described earlier in this

declaration, USAID is implementing similar procedures to strengthen management controls and oversight.

35.    Since January 24, the U.S. Department of State has authorized or requested the disbursement of $112.9 million in foreign assistance funding and anticipates the new payment process will accelerate outlays as staff members become more efficient with the new process and procedures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2025

/s/ Peter Marocco

PETE MAROCCO