UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AIDS VACCINE ADVOCACY COALITION, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 25-cv-400 |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' EMERGENCY MOTION TO ENFORCE TEMPORARY RESTRAINING ORDER AND TO HOLD RESTRAINED DEFENDANTS IN CIVIL CONTEMPT**

Several weeks ago, without warning or stated justification, Defendants abruptly cut off funding to thousands of foreign assistance programs on which communities throughout the world rely for their health and safety, and ordered those programs to stop their important work. On February 13, 2025, this Court, having determined that Plaintiffs met their burden for emergency relief, issued a temporary restraining order (TRO) (1) enjoining the suspension of appropriated foreign-assistance funds to those programs, (2) enjoining the issuance of terminations, suspensions, and stop-work orders in connection with those grants, and (3) ordering the Defendants to "take all steps necessary to effectuate" its order. (ECF No. 17). This Court also ordered Defendants to file a status report by February 18, 2025, "apprising the Court of the status of their compliance with this order."

Meanwhile, Plaintiffs, along with countless other recipients of federal foreign assistance awards, continued without funding, as they waited for Defendants to comply with the unambiguous language of the TRO. Each day, their irreparable harm increased, as did the suffering of millions of people across the world who depend on the work performed with these grants. Deaths have already been directly attributed to Defendants' actions.[1]

On February 18, nearly at midnight, Defendants filed the status report ordered by this Court. The report makes the remarkable assertion that Defendants have reviewed thousands of affected State Department and USAID grants, contracts, and cooperative agreements, and concludes that—despite this Court's unambiguous order—terminating nearly all foreign assistance funding was legal.

This Court should not brook such brazen defiance of the express terms of its order. The Court should order Defendants to immediately comply, today, with the terms of the TRO by rescinding all suspensions, stop-work orders, and terminations issued since January 19, 2025. It should also order Defendants to immediately reimburse, today, foreign assistance recipients for work already performed and to promptly pay such recipients for work going forward. And the Court should issue an order finding Defendants in civil contempt and imposing specific penalties until Defendants comply with the Court's order.

---

[1] Sarah Newey, *US aid freeze claims first victims as oxygen supplies cut off*, The Telegraph (Feb. 11, 2025), https://www.telegraph.co.uk/global-health/climate-and-people/us-aid-freeze-claims-first-victims-as-oxygen-supplies-cut/.

**FACTUAL BACKGROUND**

This Court's February 13, 2025, order was unambiguous: It enjoined Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget and their "from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by: suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." ECF 17 at 14. At the same time, the Court declined to "enjoin any aspect of the Government's internal review of government programs." (ECF No.17 at 13).

This Court also determined that, on the record before it at the time, "it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id*. Focusing on that sentence, Defendants suggest that they are in compliance with this Court's order because they

3

have—in the last five days—conducted an internal review of the thousands of grants, contracts, and cooperative agreements issued by the State Department and USAID, and determined that the en masse suspensions, stop-work orders, and terminations were consistent with the terms of every grant, contract, and cooperative agreement. This assertion strains credulity. It is also contradicted by accounts from within the government, which show that Defendants' actions have lacked and continue to lack a "reasoned basis." *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).

**Defendants' Representations as to Compliance**

Defendants claim that, between February 13 and 18, they had "begun an analysis of the thousands of contracts, grants, and cooperative agreements on which action was taken during the almost four weeks between the issuance of the Executive Order and the Court's order" and determined that, for those managed by USAID, "at least substantially all of the terminations, suspensions, and stop-work orders" were either "allowed by the terms of those instruments or implicitly incorporated" into those terms. ECF 22 ¶ 9. For contracts, grants, and cooperative agreements managed by the State Department, Defendants were even more equivocal: "[A] large share" of terminations, suspensions, and stop-work orders were allowed by or implicitly incorporated into the agreements. *Id.* at ¶ 10. They went on to say that, for thousands of State Department grants, "review is ongoing." *Id.* at ¶ 11.

Meanwhile, on February 15, Defendant Trump appeared to flout his obligation to comply with the Constitution and the law, posting on social media, "He who saves his Country does not violate any Law."[2]

**Defendants Continue to Suspend Funds and Enforce Stop-Work Orders in Violation of the Court's Order**

Following issuance of the TRO, Plaintiffs AIDS Vaccine Advocacy Coalition (AVAC) and Journalism Development Network (JDN) reached out to their partners at USAID and the State Department to ask about implementation of the TRO. They were stonewalled. A USAID agreement officer responded to AVAC's inquiry: "Thank you for your email. The agency has not provided guidance." Third Decl. of Mitchell Warren, Ex. A, ¶ 6. And replying to JDN, a State Department grants officer stated, "The suspension remains in effect, and new cost should not be incurred unless you receive notification from your Grants Officer that the suspension has been lifted. We are awaiting further guidance from our leadership and will let you know as soon as we receive additional information." Third Decl. of Andrew Sullivan, Ex. B, ¶ 5. Similarly, a contracting officer within USAID advised, "All work must remain suspended until a formal authorization is granted in writing by USAID. At this time, USAID has not issued any directive to rescind the Stop-Work Order. Please hold off until you receive formal notification to continue." *Id.*

As USAID Contracting Officer Jessica Doe explains, it was not until February 17, four days after the Court's order, that Jami Rodgers, USAID Senior Procurement

---

[2] @realDonaldTrump, X (Feb. 15, 2025, 1:32 pm), https://x.com/realDonaldTrump/status/1890831570535055759.

5

Executive, issued any guidance about the scope of the TRO to USAID contracting officers. At that time, he stated that USAID leadership was "in the process of adopting a comprehensive review process" and that "[f]urther guidance on the new payment integrity and grants and contracts review process is forthcoming." Decl. of Jessica Doe, Ex. C ¶ 43. Contracting Officers within the agency sought clarification, but Mr. Rodgers never responded. *Id.* at ¶¶ 44, 45.

Declarant Jessica Doe has "not personally seen any evidence that a thorough, case-by-case analysis" has taken place with regard to the suspension of funds or stop work orders issued by USAID. *Id.* at ¶ 49.

**Defendants Continue to Issue Terminations in Violation of the Court's Order**

Defendants continue to terminate foreign assistance awards without regard for the law or for this Court's order. Sworn declarations filed in *American Foreign Service Ass'n v. Trump*, D.D.C. No. 25-cv-352, tell the story of what happened prior to the TRO: Thomasina Doe, a member of the Acquisition and Assistance workforce at USAID, indicated that she received a February 6, 2025, email instructing USAID Contracting and Agreement Officers to "immediately terminate 800 awards." The instruction "did not come from an authorized procurement official" and offered no rationale or authority for the terminations. Decl. of Thomasina Doe ¶ 4 (1:25-cv-352, ECF No. 24-8). That email was rescinded, without explanation, "[w]ithin one or two hours," and was followed by instructions on February 10, 2025, to terminate 200 "new and different" awards. *Id.* at ¶¶ 4-7. Virginia Doe, a contracting officer at USAID, corroborates that account: "We are told to terminate and when we raise legal concerns

they are dismissed and we are told to terminate anyway or risk appearing insubordinate." Decl. of Virginia Doe ¶ 6 (1:25-cv-352, ECF No. 24-10).

Nothing meaningful changed after this Court's TRO: Contracting Officer Jessica Doe reports that seeing no "evidence that a thorough, case-by-case analysis" has taken place with respect to terminations issued by the Agency, and that contracting officers have "been left without guidance or direction to implement this Court's order." Decl. of Jessica Doe, Ex. C, ¶¶ 49, 50.

## LEGAL STANDARD

There is "no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States,* 384 U.S. 364, 370 (1966). Civil contempt is a "remedial sanction used to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 274 F. Supp. 2d 62, 65 (D.D.C. 2003) (citing *NLRB v. Blevins Popcorn, Co.,* 659 F.2d 1173, 1184 (D.C.Cir.1981)). Its principal purpose is "vindication of judicial authority." *Blevins Popcorn*, 659 F.2d at 1185 n. 73.

A civil contempt proceeding is a three-stage process. First, "a court must issue an order directing a party to take or not take certain action." *Am. Rivers.*, 274 F. Supp. 2d at 65 (citing *Blevins Popcorn*, 659 F.2d at 1184). This Court has already done so through its TRO. Second, "if there is disobedience of that order, the court must issue a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party complies with prescribed conditions set forth in a 'purgation order'." *Id*. Finally, the last step is

7

"execution of the threatened penalty if the conditions are not fulfilled." *Id*. The moving party in a civil contempt proceeding "has the burden of proving by clear and convincing evidence that the court's order has been violated." *Id*.

## ARGUMENT

It is a "basic proposition that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). "Defendants "who make private determinations of the law and refuse to obey an order"—even government defendants—"generally risk criminal contempt even if the order is ultimately ruled incorrect." *Id*. "If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority and to compel compliance with lawfully issued directives." *Am. Rivers*, 274 F. Supp. 2d at 70.

Here, Defendants are plainly in violation of the TRO. They assert, though, that the TRO did not prohibit enforcement of the terms of contracts or grants, and that they have now determined that the same actions subject to the TRO are, for the most part, permitted by those terms. In reality, Defendants' continuation of their en masse termination or suspension of foreign assistance grants and contracts cannot be excused as an application of "independent authorities" outside the scope of the TRO. No legal authority permits Defendants' actions. This Court should act as expeditiously as possible to compel compliance.

### I. Defendants' excuse for noncompliance lacks merit.

Defendants' justification for continuing to suspend funds and enforce stop-work orders and terminations is sheer pretext. They claim that, in keeping in place

8

all the actions covered by the TRO, they were not defying this Court's order, but merely implementing the results of an analysis, already underway, "of the thousands of contracts, grants, and cooperative agreements on which action was taken during the almost four weeks between the issuance of the Executive Order and the Court's order." ECF 22 ¶ 8. Coincidentally, they claim, this review process determined that "at least substantially all" USAID terminations, suspensions, and stop-work orders were permitted under "the terms of those instruments." *Id.* at ¶ 9. Similarly, Defendants assert that for State Department contracts, grants, and cooperative agreements, a "large share" of (unspecified) terminations, suspensions, and stop-work orders were allowed by the agreements. *Id.* at ¶ 10. They go on to say that, for thousands of State Department grants, "review is ongoing," *id.* at ¶ 11, during which time they will evidently continue to defy the TRO.

First, it is preposterous to suggest that Defendants were able, between 9:46 pm on February 13 when this Court issued its TRO and 11:32 pm on February 18, to make individualized determinations as to thousands of suspended and terminated grants, contracts, and cooperative agreements. And sworn statements of contracting officers reveal that no such determinations took place. *See* Decl. of Jessica Doe, Ex. C, ¶ 49 (stating that declarant, a contracting officer, has not seen "any evidence that a thorough, case-by-case analysis" has taken place with respect to terminations").

In reality, prior to the issuance of the TRO, Defendants suspended payment and issued stop-work orders as to nearly all contracts, grants, and cooperating agreements—actions that they have not rescinded since the February 13 TRO. *See*

9

*generally* Mem. in Support of Mot. For TRO (ECF 13-1); Order, ECF 17 at 10 (stating that the "blanket suspension of all congressionally appropriated foreign aid . . . set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country"). This blanket suspension is still nearly entirely in place, and it is the blanket suspension that Plaintiffs continue to challenge. *Cf. Press Commc'ns LLC v. Fed. Commc'ns Comm'n*, 875 F.3d 1117, 1122 (D.C. Cir. 2017) ("[A] reviewing court may only affirm an agency's action on the grounds the agency articulated." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943)). And Defendants' claim that, in some cases, lifesaving humanitarian work and PEPFAR work has been permitted consistent with waivers, Decl. of Marocco, ECF 22-1 at ¶ 24, is misleading at best and, in any event, remains unadorned by "specific facts" showing that waivers have "meaningfully mitigated" the massive consequences to human health, safety, and well-being wreaked by Defendants. ECF 17 at 7; *see also* Decl. of Jessica Doe, Ex. C, ¶¶ 25, 34, 37–42 (explaining that although contracting officers have been "authorized" to restart certain programs, implementing partners have not been able to actually do so due to lack of funding).

Second, as in *State of New York v. Trump*, No. 25-cv-39 (D.R.I), Defendants claim that "they are just trying to root out fraud." *See* Order, *State of New York v. Trump*, No. 25-cv-39 (D.R.I) (Feb. 10, 2025) (p. 3); Decl. of Marocco, ECF 22-1 at ¶ 7, 8. To begin with, the reason for Defendants' nearly across-the-board freeze and stop-work orders does not justify defiance of the TRO. And, to be sure, as in *State of New*

10

*York*, "the freezes in effect now were a result of [a] broad categorical order, not a specific finding of fraud." Order, *State of New York v. Trump*, No. 25-cv-39 (D.R.I) (Feb. 10, 2025). Even now, trying to defend their non-compliance, Defendants do not suggest that any of the terminations, suspensions, or stop-work orders stemmed from any specific findings of fraud.

Third, Defendants threaten that, if this Court determines the suspensions of 6,824 State Department grants to be unlawful, then the State Department "would consider terminating these contracts and grants on a case-by-case basis" because "[r]estarting work now would impose additional expenses … which might leave State with no choice but to terminate the awards even if the ongoing review by the Secretary determines that they should be continued." ECF 22-1 ¶ 29. This Court should not allow Defendants to threaten their way to non-compliance. Any costs of restarting unlawfully suspended awards will arise only because Defendants chose to violate the law by suspending grants and contracts en masse.

Moreover, exhibiting considerable audacity in light of the facts of this case, Defendants' request that the Court, if it requires them to comply with the order issued a week ago, require Plaintiffs to post security under Federal Rule of Civil Procedure 65(c). Rule 65(c) authorizes the Court to order security that it "considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." The Court has "broad discretion … to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (cleaned

up and citation omitted). And in exercising its discretion, the Court may take into consideration Plaintiffs' "ability to post a bond" and whether they are "seeking to vindicate important procedures and protections." *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 176–77 (D.D.C. 2021), *aff'd in part, rev'd in part on other grounds,* 27 F.4th 718 (D.C. Cir. 2022). As numerous courts have held, "security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action." *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (citing cases); *see id.* (rejecting request for a bond where "[t]o require the plaintiffs in the case at bar to post security in the amount requested by the Government to cover the alleged losses would have the effect of denying three nonprofit environmental organizations from obtaining judicial review of the defendant's actions").

Here, security is not warranted for two reasons. First, requiring Defendants to lift their funding freeze and stop-work orders will not cause them to incur "costs and damages" within the scope of Rule 65(c). Second, Plaintiffs are nonprofit organizations that would not be able to post a bond to cover the amount of the federal foreign assistance awards covered by the Court's order, which include both their own awards and those of other grantees. Indeed, the suspension of those awards has caused Plaintiffs to lay off employees and cease many of their operations. In addition, Plaintiffs are seeking to vindicate important constitutional and statutory rights, and, as this Court has already found, they will suffer irreparable harm absent preliminary relief. In any event, the Court's order does not require payment. In these

circumstances, requiring security would bolster Defendants' effort to evade the TRO and the law, and would undermine the very objective of Plaintiffs' lawsuit.[3]

## II. Defendants' actions are unlawful.

As was clear at the time Plaintiffs filed their motion for temporary restraining order and is even clearer now, Defendants' wholesale termination and suspension flouts the separation of powers carefully crafted in the Constitution and violates the Impoundment Control Act of 1974, 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions are subject to congressional approval, *id.* With respect to the grants and contracts at issue here, however, Defendants have made clear that they have no intention of spending the most or all funds specifically appropriated by Congress for foreign assistance awards. In fact, the State Department has described the freeze on funding as "*sav[ing]* U.S. taxpayers" money and "*prevent[ing]*" expenditure of more than $1 billion. Office of the Spokesperson, Dep't of State, *Prioritizing America's Interests One Dollar at a Time* (Jan. 29, 2025), https://www.state.gov/prioritizing-americas-national-interests-one-dollar-at-a-time/.

Neither our Constitution nor the Impoundment Control Act allows Defendants to refuse to spend funds lawfully appropriated for these programs. As the D.C. Circuit has explained, the President lacks the statutory authority to engage in policy-based deferrals that would "negate the will of Congress." *City of New Haven v. United*

---

[3] If the Court were to find a bond appropriate at all, the amount should be minimal. *See Red Wolf Coal. v. United States Fish & Wildlife Serv.*, No. 2:20-CV-75-BO, 2021 WL 230202, at *7 (E.D.N.C. Jan. 22, 2021) (ordering a $100 bond where "plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal").

13

*States*, 809 F.2d 900, 901 (D.C. Cir. 1987). But Defendants seek to do exactly that here. *See, e.g.*, Compl. (ECF 1) at ¶¶ 17-24; Decl. of Jessica Doe, Ex. C at ¶¶ 20, 25, 26; *see also* https://doge.gov/savings (touting the "savings" from contract cancellations at numerous agencies).

### III. Civil contempt is an appropriate sanction for Defendants' defiance of this Court's order.

"This Court has the inherent power to protect its integrity and to prevent abuses of the judicial process by holding those who violate its orders in contempt and ordering sanctions for such violations." *Landmark Legal Found. v. E.P.A.*, 272 F. Supp. 2d 70, 75 (D.D.C. 2003). "For contempt to issue, two conditions must be present: (1) the existence of a reasonably clear and specific order … [and] (2) violation of that order by the defendant." *Id.*

Both conditions are present here. This Court was clear that "[a]bsent temporary injunctive relief, therefore, the scale of the enormous harm that has already occurred will almost certainly increase. Plaintiffs have made a strong preliminary showing of irreparable harm." ECF 17 at p. 8. The Court was likewise clear that, on the record before it, Plaintiffs were "likely to succeed on the merits" and that "implementation of the blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests, including among businesses and other organizations across the country." *Id.* at 10, 12. The Court continued: "No aspect of the implemented policies or submissions offered by Defendants at the hearing suggests they considered and had a rational reason for disregarding the massive reliance interests of the countless small and large

14

businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process." *Id.* at 10. And the Court concluded that Plaintiffs had produced "credible and unrebutted evidence of harm," and that Defendants had not. *Id.* at 12–13.

Those conclusions led the Court to issue an unambiguous order restraining Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget and their agents "from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, 'Reevaluating and Realigning United States Foreign Aid' (Jan. 20, 2025), including by: suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025."

Defendants purposely chose to violate the order. By their own admission, they are continuing to suspend funds and to enforce virtually *every* termination, suspension, and stop-work order. This Court has no discretion to "overlook a proven violation, absent a recognized defense," *Potter v. D.C.*, 126 F.4th 720, 724 (D.C. Cir.

2025), and no such defense exists. The Defendants subject to the TRO have acted contemptuously to the Court and should be held in contempt. Accordingly, the Court should issue an order directing Defendants to immediately comply with the terms of the TRO by rescinding all suspensions, stop-work orders, and terminations in connection with any federal foreign assistance awards in existence as of January 19, 2025; immediately company with the terms of the TRO by taking all steps necessary to reimburse foreign assistance recipients for work already performed and to promptly pay such recipients for work going forward; and prohibit the Defendants subject to the TRO from issuing any new suspensions, stop-work orders, or terminations unless the Court permits such issuance after considering particularized, case-by-case bases for any such suspensions, stop-work orders, or terminations. It should further order the Defendants subject to the TRO to be held in civil contempt, and order penalties until they purge themselves of contempt of this Court.

## CONCLUSION

For the reasons foregoing above and those set forth in this Court's February 13 order, the Court should enforce the clear and unambiguous text of its temporary restraining order and (1) order Defendants to immediately rescind all stop-work orders and terminations issued after January 19, 2025; (2) order Defendants to immediately take all necessary steps to disburse funds withheld pursuant to the Executive Order and subsequent agency actions, and (3) issue an order holding agency Defendants, Marco Rubio, and Peter Marocco in civil contempt until they

comply with this Court's orders and articulating specific penalties for continued non-compliance.

February 19, 2025                    Respectfully submitted,

                                                                /s/ Lauren E. Bateman
Lauren E. Bateman (D.C. Bar No. 1047285)
Allison M. Zieve (D.C. Bar No. 424786)
Nicolas A. Sansone (D.C. Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

17