## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AIDS VACCINE ADVOCACY
COALITION, et al.,

       Plaintiffs,

v.

PRESIDENT DONALD TRUMP, *et al.*,

       Defendants.

Civil Action No. 1:25-cv-00400

## RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO ENFORCE TEMPORARY RESTRAINING ORDER AND TO HOLD RESTRAINED DEFENDANTS IN CIVIL CONTEMPT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 6

ARGUMENT ....................................................................................................................... 8

I.      The Department of State and USAID Defendants have not violated the TRO. ................. 8

II.     The Office of Management and Budget Defendants have not violated the TRO............ 14

III.    Contempt Would Be Especially Inappropriate Because Defendants Have Not Had
        a Meaningful Opportunity to Present Their Defenses to Plaintiffs' Claims..................... 15

IV.     A Contempt Sanction that Grants Plaintiffs Ultimate Relief Is Inappropriate Given
        the Undisputed Mechanisms for Grant and Contract Recipients to Seek
        Reimbursement of Costs Incurred. ................................................................................. 16

V.      Plaintiffs Should be Required to Post Security For Any Taxpayer Funds
        Wrongfully Distributed During the Pendency of the Court's Order................................. 17

CONCLUSION.................................................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Executive Office of the President,*
  1 F.3d 1274 (D.C. Cir. 1993) ................................................................................ 6, 7, 8

*Balla v. Idaho State Bd. of Corrs.,*
  869 F.2d 461 (9th Cir. 1989) ......................................................................................... 7

*California Paving Co. v. Molitor,*
  113 U.S. 609 (1885) ...................................................................................................... 6

*City of New Haven v. United States,*
  809 F.2d 900 (D.C. Cir. 1987) ................................................................................... 13

*Cobell v. Babbitt,*
  37 F. Supp. 2d 6 (D.D.C. 1999) ................................................................................... 8

*Dabney v. Reagan,*
  542 F. Supp. 756 (S.D.N.Y. 1982) ............................................................................. 13

*Eavenson, Auchmuty & Greenwald v. Holtzman,*
  775 F.2d 535 (3d Cir.1985) .......................................................................................... 7

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,*
  636 F.2d 755 (D.C. Cir. 1980) ................................................................................... 18

*FTC v. Affordable Media,*
  179 F.3d 1228 (9th Cir. 1999) ...................................................................................... 8

*Gen. Land Off. v. Biden,*
  722 F. Supp. 3d 710 (S.D. Tex. 2024) ....................................................................... 13

*Gompers v. Buck's Stove & Range Co.,*
  221 U.S. 418 (1911) ...................................................................................................... 6

*In re Brown,*
  454 F.2d 999 (D.C. Cir. 1971) ..................................................................................... 6

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
  10 F.3d 693 (9th Cir. 1993) .......................................................................................... 7

*In re Fannie Mae Sec. Litig.,*
  552 F.3d 814 (D.C. Cir. 2009) ................................................................................. 7, 8

*In re McConnell,*
  370 U.S. 230 (1962) ...................................................................................................... 6

iii

*In re Resource Technology Corp.*,
   2009 WL 1873529 (N.D. Ill. June 29, 2009) ................................................................. 11, 12

*International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*,
   389 U.S. 64 (1967) .................................................................................................... 7, 14

*Joshi v. Professional Health Services, Inc.*,
   817 F.2d 877 (D.C. Cir. 1987) ............................................................................................ 6

*Nat'l Conference on Ministry to Armed Forces v. James*,
   278 F. Supp. 2d 37 (D.D.C.2003) ....................................................................................... 17

*Nye v. United States*,
   313 U.S. 33 (1941) ............................................................................................................... 6

*Petties v. District of Columbia*,
   888 F. Supp. 165 (D.D.C. 1995) ......................................................................................... 8

*Pub. Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) ....................................................................................... 13

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006)............................................................................................. 7

*S.E.C. v. Current Financial Services, Inc.*,
   798 F. Supp. 802 (D.D.C. 1992) ....................................................................................... 11

*SEC v. Showalter*,
   227 F. Supp. 2d 110 (D.D.C. 2002) .................................................................................... 8

*Stone v. City & Cty. of San Francisco*,
   968 F.2d 850 (9th Cir. 1992)................................................................................................ 8

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019) ........................................................................................................ 8

*Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ............................................................................................................ 13

*United States v. Landsberger*,
   692 F.2d 501 (8th Cir. 1982)............................................................................................. 11

*United States v. Shelton*,
   539 F. Supp. 2d 259 (D.D.C. 2008) .................................................................................... 7

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)........................................................................................................... 17

**STATUTES**

18 U.S.C. § 401 ................................................................................................................ 6

Further Consolidated Appropriations Act of 2024 (FCAA),
   Pub. L. No. 118-47, 138 Stat. 460 (2024) ............................................................. 15

**RULES**

Fed. R. Civ. P. 65 ....................................................................................................... 7, 18

**REGULATIONS**

2 CFR § 700.14 ......................................................................................................... 10, 11

*Reevaluating and Realigning United States Foreign Aid,*
   Executive Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ..................................... 2

**OTHER AUTHORITIES**

ADS Chapter 303 MAB § M10 ......................................................................................... 10

Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025) ..................................................... 2

H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971) ........................................................ 13

Sec'y of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025),
   http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause .......................... 3

## INTRODUCTION

The Court should deny Plaintiffs' Emergency Motion To Enforce Temporary Restraining Order And To Hold Restrained Defendants In Civil Contempt.  Plaintiffs seek to enforce the terms of a temporary restraining order they wish the Court had entered in an effort to tax Defendants' time and resources while they are preparing an opposition to Plaintiffs' motion for a preliminary injunction.  They make no attempt to explain how Defendants have violated the text of the Court's temporary restraining order—nor could they, because that order clearly and unambiguously authorizes Defendants to enforce their rights under the terms of contracts and grants, including by terminating them.  Plaintiffs similarly make no attempt to argue that their agreements did not include terms authorizing terminations, or that the actions taken to terminate their agreements were inconsistent with those terms or the operative regulation.  Nor have Defendants identified any specific foreign aid that should have been distributed pursuant to the Court's order.

Plaintiffs' motion, albeit cloaked in contempt styling, in effect seeks reconsideration of the Court's temporary restraining order to inappropriately expand its reach and eliminate the explicit provision in that order allowing Defendants to continue to exercise the Government's right to enforce the contracts or grants at issue.  While acknowledging that the temporary restraining order permitted Defendants' very exercise of those rights, Plaintiffs seek to hold Defendants in contempt without providing their own contract or grant instruments for the Court to review.  They also do not dispute the temporary restraining order's inapplicability to Defendants' exercise of statutory, regulatory, and other authorities independent of the Executive Order and the Secretary of State's directive.  Instead, Plaintiffs attempt to establish Defendants' purported contempt based primarily on a pseudonymous declaration that mostly discusses allegations pre-dating the temporary restraining order.

In addition to seeking to hold the Department of State and USAID Defendants in contempt, Defendants ask the Court to hold the OMB Defendants in contempt. But they do so without articulating any basis whatsoever. The Court should deny Plaintiffs' Emergency Motion and remind Plaintiffs not to accuse Defendants of contempt where they have not come close to submitting clear and convincing evidence that an unambiguous order has been violated.

## BACKGROUND

Plaintiffs are two non-profit organizations that receive federal grant money to perform foreign assistance work. They assert claims under the Administrative Procedure Act (APA) and the United States Constitution challenging the issuance and implementation of Executive Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), which directed an immediate pause in "United States foreign development assistance" and directed OMB to "enforce this pause through its apportionment authority." *Id.* § 3(a). The Executive Order further directs responsible department and agency heads to review each foreign assistance program and to determine within 90 days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of OMB and with the concurrence of the Secretary of State. *Id.* § 3(b), (c). The order provides that the Secretary of State has authority to waive the pause "for specific programs" and allows for new obligations or the resumption of disbursements during the 90-day review period, if a review is conducted sooner and the Secretary of State, in consultation with the Director of OMB, approves. *Id.* § 3(d), (e).

Consistent with that Executive Order, Secretary of State Marco Rubio directed a pause on foreign assistance funded by or through the Department of State and USAID on January 24, 2025. U.S. Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025). Secretary Rubio also

approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and legitimate expenses incurred before the pause went into effect, and a waiver on the pause for life-saving humanitarian assistance during the review, *see* Sec'y of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

Plaintiffs filed their complaint on February 10, 2025. ECF No. 1. Two days later, the Court set a hearing to begin less than three hours after a notice by Plaintiffs in the parallel case of their previously filed motion for a temporary restraining order (TRO). *See* ECF No. 16, *Global Health Council et al. v. Trump et al.*, No. 25-cv-402 (Feb. 12, 2025). *After* that hearing was set, and more than two weeks after the Executive Order and Secretary Rubio's memo, Plaintiffs filed a motion for a TRO in this case, which Defendants received less than two hours before the hearing on both of those motions began. Plaintiffs' motion sought to enjoin Defendants from implementing, enforcing, or otherwise giving effect to Executive Order 14,169 and subsequent instructions and clarifications issued by the State Department and USAID. ECF No. 13. Following the hearing, Plaintiffs submitted a revised proposed order narrowing the scope of their requested relief. ECF No. 16.

On February 13, 2025 at 9:45pm, the Court entered a TRO against Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State (Department), the U.S. Agency for International Development (USAID), and OMB restraining them from:

> "[E]nforcing or giving effect to Sections 1, 5, 7, 8, and 9, of Dep't of State, Memorandum 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order 14169 . . . including by suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or

other federal foreign assistance award that was in existence as of January 19, 2025."

TRO, ECF No. 17 at 14.

In so ruling, the Court acknowledged Defendants' representation "that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances." *Id.* The Court concluded "it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id.* The Court therefore included a specific provision addressing Defendants' conduct when it "ORDERED that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants." *Id.* at 15.

On February 18, 2025, pursuant to the Court's direction in the TRO, *see id.*, Defendants complied by filing a report advising the Court of the status of their compliance. ECF No. 22. That filing is accompanied by a declaration by Peter Marocco, the Director of Foreign Assistance at the State Department and Deputy Administrator of USAID. *See* Declaration of Peter Marocco ("Marocco Decl."), ECF No. 22-1. Defendants explained that they had worked diligently to comply with the TRO during the two business days and three-day holiday weekend that had passed since the TRO issued. ECF No. 22 ¶ 5. Defendants detailed their significant efforts to provide notice of the TRO, as required by it, to grantees or contractors whose awards may be affected by the TRO. *Id.* ¶ 6. Defendants also provided their own contract officers and agreements officers a notice to advise them that the TRO was in effect and that they should no longer pause payments based on the Executive Order or State Department Memorandum. *Id.* ¶ 7.

Defendants also explained (among other compliance efforts) that the State Department and USAID had begun to analyze "the thousands of contracts, grants, and cooperative agreements on which action was taken during the almost four weeks between the issuance of the Executive Order

4

and the Court's order" in order to determine the effect of the Court's TRO and its explicit "exception for enforcing the terms of contracts or grants." *Id.* ¶ 8.  As noted, that analysis had "confirmed that at least substantially all of the terminations, suspensions, and stop-work orders issued on USAID contracts, grants, and cooperative agreements were allowed by the terms of those instruments or terms implicitly incorporated into those instruments." *Id.* ¶ 9 (citing Marocco Decl. ¶¶ 6, 9-19).  Moreover, with respect to State Department contracts, grants, and cooperative agreements, Defendants explained that "a large share of the terminations, suspensions, and stop-work orders issued on [those State Department instruments] was allowed by those instruments' terms or terms implicitly incorporated into those instruments." *Id.* ¶ 10 (citing Marocco Decl. ¶¶ 23-30).

Defendants further explained their understanding that, based on the Court's TRO—which, again, states on its face that "nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants," ECF No. 17 at 15—Defendants may terminate, suspend, or issue a stop-work order on contracts or grants pursuant to express terms of those contracts and grants, terms implicitly incorporated into those instruments, and pursuant to the State Department's own authorities independent of the now-temporarily enjoined Executive Order or State Department memorandum—such as authorities under statutes and regulations. ECF No. 22 ¶¶ 11-12, 14.  Although the Court's TRO permits Defendants to exercise these rights, Defendants brought this point to the Court's attention "[o]ut of an abundance of caution" and respectfully requested that the Court modify its ruling, or permit Defendants to move for a modification, "[t]o the extent Defendants' understanding of the Court's order is incorrect." *Id.* ¶ 15.

Notwithstanding Defendants' demonstrated good faith and transparency in disclosing their

understanding of the Court's TRO and requesting clarification should that understanding be incorrect, the day after Defendants filed their status report—and without conferring with undersigned counsel—Plaintiffs filed an emergency motion to enforce the TRO and to hold the Restrained Defendants in civil contempt.  ECF No. 26.  That motion lacks merit for the reasons explained below.

## LEGAL STANDARD

Courts have inherent power to enforce compliance with their lawful orders through civil contempt.  *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993).  For more than a century, however, the law has been well-settled that civil contempt "is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." *Cal. Artificial Stone Co. v. Molitor*, 113 U.S. 609, 618 (1885).   "In light of the [contempt] remedy's extraordinary nature, courts rightly impose it with caution." *Joshi v. Prof. Health Servs., Inc.*, 817 F.2d 877, 879 n.2 (D.C. Cir. 1987).  As the Supreme Court has held, "the very amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 451 (1911).  Indeed, in order to prevent abuses of the contempt power and to protect those on whom the potent authority may be visited, Congress has long regulated the exercise of the contempt power by statute.  *See* 18 U.S.C. § 401(3) (providing that a court of the United States shall have the power to punish only certain acts as contempt, including "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"); *In re McConnell*, 370 U.S. 230, 233-34 (1962); *Nye v. United States*, 313 U.S. 33, 44-48 (1941); *In re Brown*, 454 F.2d 999, 1002 (D.C. Cir. 1971).

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n, v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). While a party's behavior "need not be willful" to constitute civil contempt, there is no contempt when the party's action "appears to be based on a good faith and reasonable interpretation of the [court's order]." *In re Dual-Deck*, 10 F.3d at 695 (citations omitted). In addition, "[s]ubstantial compliance with a court order is a defense to an action for civil contempt." *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989).

As the Supreme Court has explained:

The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Int'l Longshoremen's Ass'n v. Phil. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (discussing Fed. R. Civ. P. 65(d) regarding injunctions).

Accordingly, civil "contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous . . . and the violation must be proved by 'clear and convincing' evidence." *Armstrong*, 1 F.3d at 1289 (citations omitted); *United States v. Shelton*, 539 F. Supp. 2d 259, 262-63 (D.D.C. 2008) (Urbina, J.). Put differently, "[civil] contempt is appropriate only for violation of a 'clear and unambiguous' order." *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 821 (D.C. Cir. 2009) (quoting *Armstrong*, 1 F.3d at 1289 (D.C. Cir. 1993)). In a civil contempt proceeding, the "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media*, 179 F.3d

7

1228, 1239 (9th Cir. 1999) (quoting *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

Civil contempt is a remedial device used to achieve compliance with an order of the court that is being violated, *see SEC v. Showalter*, 227 F. Supp. 2d 110, 120-21 (D.D.C. 2002) (Urbina, J.), and contempt sanctions can be avoided by prompt compliance with the order, *see Petties v. District of Columbia*, 888 F. Supp. 165, 169 (D.D.C. 1995) (Friedman, J.). Further, the party alleged to be in contempt may assert the defense of "good faith substantial compliance." *See Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9-10 (D.D.C. 1999) (Lamberth, J.). "[G]ood faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019).

## ARGUMENT

### I.    The Department of State and USAID Defendants have not violated the TRO.

Plaintiffs have not shown with clear and convincing evidence a violation of the Court's TRO. "[C]ontempt will lie only if the putative contemnor has violated an order that is clear and unambiguous . . . and the violation must be proved by 'clear and convincing' evidence." *Armstrong*, 1 F.3d at 1289 (citations omitted). Not only have Plaintiffs failed to carry their burden, but, as their status report explained, Defendants have complied with the TRO. Plaintiffs do not question that the Department of State and USAID sent notices to contracting and grant parties as required by the Court. *See* ECF No. 22 ¶ 6. Nor do Plaintiffs dispute that the Department of State and USAID directed their contracting and grant officers to comply with the Court's temporary restraint on the Executive Order and the Secretary of State's directive. *See id.* ¶ 7. Plaintiffs' pseudonymous declarant even confirms this. ECF No. 26-3 at 10.

Plaintiffs allege Defendants have violated the TRO by not taking additional action with respect to their contracts and grants, the terms of which Plaintiffs have not provided. But Plaintiffs acknowledge that the Court's TRO excepted action taken by Defendants under the terms of contracts. ECF No. 26 at 3. And while they summarily assert that Defendants' conduct "cannot be excused as an application of 'independent authorities' outside the scope of the TRO," *id.* at 8, they do not dispute that those "independent authorities" are "outside the scope of the TRO," *id.*[1]

Unable to challenge Defendants' interpretation of the TRO, Plaintiffs essentially seek reconsideration and expansion of the Court's ruling on their motion. Plaintiffs' proposed contempt order would rewrite the TRO to strip out the TRO's references to the Executive Order and Secretary of State's directive. ECF 26-4, at 1-2. Plaintiffs also ask the Court to strike the exception permitting the Government to exercise its rights and authority under the terms of its contracts and grants, essentially to rewrite the agreements to which Plaintiffs agreed. Plaintiffs now ask the Court to order Defendants to "rescind[] all suspensions, stop-work orders, and terminations issued in connection with any federal foreign assistance award that was in existence as of January 19, 2025"—whatever the justification. *Id.* at 1.

Plaintiffs effectively ask this Court to place the Department of State and USAID in a receivership with the Court, allowing changes to the thousands of contracts these agencies manage only if the "Court permits" it "after considering particularized, case-by-cases [sic] bases for any such suspensions, stop-work orders, or terminations." *Id.* at 2.

Yet Plaintiffs do not even attempt to show the inapplicability of the TRO's contracts-enforcement clause which, again, on its face permits Defendants to "enforc[e] the terms of

---

[1] Defendants' status report explained that their interpretation of the TRO was consistent with the TRO entered in *State of New York v. Trump*, No. 25-cv-39 (D.R.I.) (Feb. 10, 2025). ECF. No. 22 at 4-5. Plaintiffs' motion cites *New York* and does not dispute Defendants' assertion.

contracts and grants." Plaintiff AIDS Vaccine Advocacy Coalition (AVAC) avers it is a party to a cooperative agreement with USAID to fund a biomedical research project. ECF No. 1 ¶ 17. But it has not submitted that agreement to the Court for review. Nor does AVAC claim that its cooperative agreement did not permit the action that USAID allegedly took. AVAC is silent about the terms of the agreements underlying its claims in this action. Instead, the documents submitted by AVAC suggest the suspension of the agreement was consistent with independent authority and standard terms in USAID agreements. ECF No. 13-3 at 2. The USAID letter attached to Plaintiffs' motion for a TRO shows AVAC's agreement was suspended "pursuant to 2 CFR § 700.14 Award Suspension and Termination (incorporated in Standard Provision M.10 for Non-U.S. NGOs)." *Id.*; *see also* ADS Chapter 303 MAB § M10 ("recipient or Agreement Officer (AO) may terminate this award *at any time*, in its entirety or in part, upon written notice") (emphasis added). The cited regulation permits USAID to "suspend[] or terminate[]" a program "[i]f at any time USAID determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States." 2 C.F.R. § 700.14. Plaintiffs' submission does not even cite that authority, let alone attempt to explain why it does not apply or what provision of its agreement is violated by the conduct.

Plaintiff JDN describes itself as "the recipient of a range of grants from the State Department." ECF No. 26-2 ¶ 3. But JDN also does not attempt to prove Defendants' non-compliance with the terms of those grants, and it does not assert Defendants are not enforcing the terms of contracts and grants as permitted by the TRO. JDN has not submitted the instruments that govern its grants. And like AVAC, attachments to Plaintiffs' motion for a TRO appear to establish the applicability of the TRO's exception for contract and grant terms. Both of the State Department suspension notices submitted by JDN state that the suspensions were "in accordance

with the U.S. Department of State Standard Terms and Conditions." ECF No. 13-5 at 6, 7. Like the USAID notice submitted by AVAC, JDN's USAID suspension notice cites 2 C.F.R. § 700.14 for authority. *Id.* at 10.

Unable to contest meaningfully that Defendants have exercised their rights under the terms of the agreements at issue or the operative legal authority that exists independent from the Executive Order and Secretary Rubio memo, Plaintiffs instead rely on a jumble of allegations, including conduct occurring before the Court entered the TRO. Plaintiffs assert—including in a heading—that "Defendants Continue to Issue Terminations in Violation of the Court's Order." ECF No. 26 at 6. But not one sentence in this section of Plaintiffs' brief identifies even a single termination against any Plaintiff occurring between the issuance of the TRO and Defendants' compliance filing, let alone a termination against any Plaintiff that violated the Court's TRO. This section of Plaintiffs' brief misleadingly attempts to substantiate a claim about Defendants' *post-TRO* conduct with alleged terminations that "*happened prior to the TRO.*" *Id.* at 6 (emphasis added). Yet "[t]he Court may consider only the [Defendants'] actions after the entry of the TRO . . . conduct prior to the Court's Orders could not have violated them and therefore could not constitute contempt." *S.E.C. v. Current Financial Services, Inc.*, 798 F. Supp. 802, 806 (D.D.C. 1992) (citing *United States v. Landsberger*, 692 F.2d 501, 503 (8th Cir. 1982)); *see also In re Resource Technology Corp.*, 2009 WL 1873529 at *2 (N.D. Ill. 2009) ("Contempt may be based only on conduct that occurs after the court order allegedly violated."). It does not appear that anything in Plaintiffs' brief or attachments identifies any new terminations by Defendants and certainly not a termination that violated the TRO.

Plaintiffs principally rely on an attack on Defendants' analysis during the two business days and three-day holiday weekend that separated the entry of the Court's TRO and Defendants'

Tuesday filing.  Plaintiffs say Defendants could not have possibly analyzed thousands of contracts during that time.  ECF No. 26 at 4, 9.  But Plaintiffs ignore the relevant law and the terms of the contracts, which grant Defendants broad-based termination authorities. Many, if not most, instruments are subject to uniform termination provisions that allow the government to terminate for convenience or in the national interest. *See, e.g.*, 48 C.F.R. 52.249-1 (authorizing termination for convenience when termination is "in the Government's interest"); *id.* 49.502(a)-(b), 52.249-4, 52.249-6(a)(1); 2 CFR 700.14 (authorizing USAID to "suspend or terminate [the] award in whole or in part" if the Agency "determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States"); 2 CFR 700.1. Plaintiffs do not challenge those authorities or suggest they are inapplicable here. Even if Plaintiffs could identify isolated instruments where, in their view, Defendants lacked a termination right, that would be an issue to be resolved in the normal contract or grant adjudication process. Consistent with the TRO, Defendants are no longer relying on the Executive Order or Secretarial Memorandum to pause payments, and the TRO does not purport to turn every contract dispute into contempt.

Plaintiffs also ignore Mr. Marocco's declaration explaining that a significant degree of case-by-case analysis of particular instruments occurred before the TRO was entered. Given the compressed timeline associated with the TRO, Defendants were not in a position to explain that fact to the Court before the TRO was issued. In any event, And Defendants acknowledge that their analysis of the relevant instruments is "ongoing." ECF No. 22 at 4; ECF No. 22-1 at 3.  Plaintiffs' assertions are incoherent and internally inconsistent--Plaintiffs never explain how the time since the TRO issued was insufficient for Defendants' analysis but sufficient for the additional steps Plaintiffs mistakenly depict the TRO as requiring.  In any event, Plaintiffs of course cannot

overcome the reality that three of the five days preceding Defendants' status report were non-working days for federal employees, and that Defendants rely on large numbers of contract and grant officers to take action on contracts and grants.  Plaintiffs' objections to Defendants' efforts under those constraints is fundamentally flawed.

Plaintiffs later accuse Defendants of "threaten[ing] their way to non-compliance."  ECF No. 26 at 11.  Not so.  Defendants' status report explained that if the TRO were understood to permit them to exercise termination rights under contract and grant terms but not suspension rights based on their authorities independent of the Executive Order and the Secretary of State's directive, such a disparity could result in the Department converting some suspensions into terminations. ECF No. 22 at 5-6.  Defendants noted this issue to prevent surprise and to be transparent about their efforts to comply with the TRO.  But Defendants did not make any threat.  And most importantly, Plaintiffs do not dispute that Defendants would be entitled to make terminations based on the TRO's contract-enforcement clause.

Plaintiffs also contend that Defendants violated the Impoundment Control Act.  ECF No. 26 at 13.  The Court did not rule on that argument in its TRO.  In any event, Plaintiffs are wrong. The Impoundment Control Act enforces Congress's power over the purse in relation to the Executive.  *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement.  Thus, that statute is generally not enforceable through an APA suit.  *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  Plaintiffs appear to believe Defendants have violated laws that appropriate money to agencies for certain purposes. But Plaintiffs do not claim that any statute requires Defendants to contract with AVAC or JDN

specifically.  And as the D.C. Circuit has explained, temporary pauses in obligations or payments of appropriations are quite common.  *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)).

Additionally, Plaintiffs err in relying on a declaration by a pseudonymous USAID contracting officer.  ECF No. 26-3.  The declaration offers little new information about Defendants' conduct after the TRO.  The declarant alleges that she recently raised a concern about the flow of funding to a specific category of contracting partners.  *Id.* at 8-9.  She acknowledges that she received an instruction on President's Day to comply with the TRO.  *Id.* at 10.  And she asserts that in the two business days following that instruction, questions have been raised and contracting officers have been told they would receive further information. The bulk of the declaration is devoted to assertions about events or transactions preceding the TRO.  Among these, the declaration asserts that, before the TRO, USAID cancelled awards under an executive order entitled "Ending Radical and Wasteful Government DEI Programs and Preferences."  *Id.* at 1-2. The TRO did not enjoin that order.  And this is not new information.  Mr. Marocco's declaration acknowledged that some awards were cancelled as part of DEI policies.  ECF No. 22-1 at 5.

Hence, Plaintiffs do not come close to establishing contempt by the Department of State or USAID Defendants.

## II.    The Office of Management and Budget Defendants have not violated the TRO.

The OMB Defendants have likewise complied with the TRO.  But it is enough to deny Plaintiffs' motion that they have not articulated *any* basis on which to hold the OMB Defendants

in contempt. OMB's Program Associate Director, Thomas Mackin Williams, submitted a declaration explaining that "OMB is not a party to any contracts, grants, or cooperative agreements for foreign assistance." ECF No. 22-7 at 3. He also explained that, with one exception, "OMB does not make obligations or disbursements of foreign assistance." *Id.* Plaintiffs do not argue that anything in Mr. Williams's declaration is inaccurate. They do not even cite Mr. Williams's declaration. In fact, their motion does not identify anything that anyone at OMB has ever done. Their motion only mentions OMB and its director in noting that the TRO applied to them. Nonetheless, Plaintiffs ask the Court to exercise the "potent weapon" of contempt on those defendants. *International Longshoremen's Ass'n*, 389 U.S. at 76.

**III.    Contempt Would Be Especially Inappropriate Because Defendants Have Not Had a Meaningful Opportunity to Present Their Defenses to Plaintiffs' Claims.**

Plaintiffs' motion should be denied because Defendants have complied with the Court's TRO as discussed above. However, imposing the extraordinary measure of civil contempt on Defendants would be particularly egregious because it would improperly deny Defendants a meaningful opportunity to have this Court consider substantial arguments concerning the deficiencies in Plaintiffs' claims on the merits. Defendants have not yet filed a merits brief in this case. The Court ordered a hearing on February 13, 2025, with less than three hours' notice to the parties. And at the time the hearing was noticed, Plaintiffs had not even filed a motion for a TRO. Plaintiffs filed their motion less than two hours before the hearing began.

In particular, even assuming, for purposes of this motion, that Plaintiffs' claims were properly raised in this Court, the claims are meritless on their own terms for an overarching reason they never address: All of their claims arise from their receipt of foreign assistance monetary awards under the terms of particular funding instruments—terms Plaintiffs never grapple with. Those terms, explicitly or implicitly, confer on the agencies the contractual authority to make the

15

challenged suspensions or terminations. Moreover, although Plaintiffs have advanced constitutional claims, ECF No. 13 at 10-14, they miss the mark because they raise purely statutory arguments predicated on the Further Consolidated Appropriations Act of 2024 (FCAA), Pub. L. No. 118-47, 138 Stat. 460 (2024). And in any event, Plaintiffs' Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and generally unreviewable, ECF No. 13 at 10-13, and their Take Care Clause argument fails as that clause cannot be used to obtain affirmative relief, *id.* at 13-14.

Plaintiffs' APA claims also do not establish a likelihood of success. *Id.* at 15-18. Plaintiffs have another adequate remedy at law in the form of actions seeking resolution of claims resulting from agency dispositions of any particular agreements with funding recipient Plaintiffs. *See* Marocco Declaration ¶¶ 17, 30 (discussing the dispute resolution mechanisms available to contract and grant recipients, up to and including review in the Civilian Board of Contract Appeals and Court of Federal Claims). And Plaintiffs cannot demonstrate that Defendants have acted contrary to law, arbitrarily and capriciously, or exceeded their authority—particularly in light of the expansive suspension or termination authority granted to Defendants either expressly or implicitly in the particular agreements underlying Plaintiffs' claims.

## IV. A Contempt Sanction that Grants Plaintiffs Ultimate Relief Is Inappropriate Given the Undisputed Mechanisms for Grant and Contract Recipients to Seek Reimbursement of Costs Incurred.

The purpose of injunctive relief is merely to preserve the relative parties' positions until the Court can reach a merits decision. Given this limited purpose and given the haste that is often necessary if those positions are to be preserved, the procedures for deciding on TRO applications are less formal and the evidence proffered to support them less complete than is appropriate for remedies of longer duration. All the more so here, where the Court entered a TRO based on Plaintiffs' filings and argument held very shortly later. In light of those limitations, it would not

16

be appropriate to grant preliminary relief to Plaintiffs that would constitute the ultimate relief in the case on the merits—and certainly not to do so through a contempt motion. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.").

That is particularly true in this case where Plaintiffs do not, and did not, merely seek a freeze of the parties' positions but asked this Court, as they do in their motion for contempt, for an order that amounts to a mandatory injunction that would alter the status quo as it existed before 9:45 pm on February 13, 2025. *See Nat'l Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C.2003) (mandatory preliminary injunction should not issue unless the facts and law clearly favor the movant). Indeed, Plaintiffs seek an order that would "rescind[] all suspensions, stop-work orders, and terminations in connection with any federal foreign assistance awards in existence as of January 19, 2025" and "take[e] all steps necessary to reimburse foreign assistance recipients for work already performed and to promptly pay such recipients for work going forward." ECF No. 26 at 16. Plaintiffs fail entirely to dispute or take issue with the fact, as described in the Marocco Declaration ¶ 17, that recipients of foreign aid contracts and grants already possess mechanisms to dispute reimbursements.

## V. Plaintiffs Should be Required to Post Security For Any Taxpayer Funds Wrongfully Distributed During the Pendency of the Court's Order.

As noted in Defendants' status report, to the extent the Court intended to prevent Defendants from exercising their authorities under statutes, regulations, and other legal authorities not mentioned in its temporary restraining order, Defendants respectfully ask that the Court (i) convert its temporary restraining order into a preliminary injunction so that Defendants may take an immediate appeal; (ii) stay its Order pending any appeal authorized by the Solicitor General; and (iii) require Plaintiffs to post security for any taxpayer funds wrongfully distributed

during the pendency of the Court's Order, consistent with the mandatory language Federal Rule of Civil Procedure 65(c). *See* ECF No. 22 ¶ 18.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the D.C. Circuit has allowed courts to dispense with this requirement in certain circumstances, *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980), the injunctive relief that Plaintiffs seek here would cause "material damage" to the Executive by requiring Defendants to continue contracts and grants notwithstanding the termination or suspension of those contracts or grants pursuant to the express or implied terms of those instruments.

Without any explanation, Plaintiffs assert that requiring Defendants to "lift their funding freeze and stop-work orders" would not impose "costs and damages" on Defendants. *See* ECF No. 26 at 12. But requiring Defendants to continue paying for contract or grant programs is, by definition, a cost to Defendants. Plaintiffs claim that they lack the resources to post a bond commensurate with the scope of relief ordered (*e.g.* covering the amount of their own awards as well as all other federal foreign assistance awards covered by the Court's Order). That concern only highlights the extraordinary breadth of the relief they attempt to secure for third parties not before the Court, parties whose claims they generally lack standing to assert.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion.


Dated: February 20, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Principal Deputy Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Director
                                            Federal Programs Branch

                                            LAUREN A. WETZLER
                                            Deputy Director
                                            Federal Programs Branch

                                            CHRISTOPHER R. HALL
                                            Assistant Branch Director

                                            */s/ Indraneel Sur*
                                            INDRANEEL SUR
                                            CHRISTOPHER D. EDELMAN
                                            Senior Counsels
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L St. NW
                                            Washington, DC 20005
                                            Phone: (202) 616-8488
                                            Email: indraneel.sur@usdoj.gov

                                            *Counsel for Defendants*