# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL,
   2300 N Street NW, Suite 501 A
   Washington, DC 20037,

SMALL BUSINESS ASSOCIATION FOR
INTERNATIONAL COMPANIES,
   655 15th Street NW, Suite 425
   Washington, DC 20005,

HIAS,
   300 Spring Street,
   Silver Spring, MD 20910,

MANAGEMENT SCIENCES FOR HEALTH,
   4201 Wilson Blvd., Suite 500
   Arlington, VA 22203,

CHEMONICS INTERNATIONAL, INC.,
   1275 New Jersey Ave. SE, Suite 200
   Washington, DC 20003,

DAI GLOBAL, LLC,
   7600 Wisconsin Ave., Suite 200
   Bethesda, MD 20814,

DEMOCRACY INTERNATIONAL, INC.,
   7200 Wisconsin Ave., Suite 1000
   Bethesda, MD 20814,

and

AMERICAN BAR ASSOCIATION,
   321 N. Clark Street
   Chicago, IL 60654,

       *Plaintiffs*,

   v.

Civil Action No. 25-cv-402

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
    1600 Pennsylvania Ave NW
    Washington, DC 20050,

MARCO RUBIO, in his official capacity as
Secretary of State and Acting Administrator of the
United States Agency for International
Development,
    2201 C St NW
    Washington, DC 20520,

PETER MAROCCO, in his official capacity as
Acting Deputy Administrator for Policy and
Planning, Acting Deputy Administrator for
Management and Resources of the United States
Agency for International Development, and Director
of Foreign Assistance at the Department of State,
    1300 Pennsylvania Ave NW
    Washington, DC 20004,

RUSSELL VOUGHT, in his official capacity as
Director of the Office of Management and Budget,
    725 17th St NW
    Washington, DC 20503,

UNITED STATES DEPARTMENT OF STATE,
    2201 C St NW
    Washington, DC 20520,

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
    1300 Pennsylvania Ave NW
    Washington, DC 20004,

and

OFFICE OF MANAGEMENT AND BUDGET,
    725 17th St NW
    Washington, DC 20503,

            *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has created chaos in the funding and administration of the United States Agency for International Development (USAID) and other federal foreign-assistance programs, causing grievous irreparable harm to Plaintiffs and other grantees, contractors, and partners.

2.      In an unprecedented series of actions, the President and other executive-branch officials have sought to dismantle an independent agency established by Congress and withhold billions of dollars in congressionally appropriated foreign-assistance funding. One cannot overstate the impact of that unlawful course of conduct: on businesses large and small forced to shut down their programs and let employees go; on hungry children across the globe who will go without; on populations around the world facing deadly disease; and on our constitutional order.

3.      As directed by federal statute, USAID and the Department of State administer billions of dollars appropriated by Congress each year for foreign assistance. Through grantees, contractors, subcontractors, and other partners—many of whom have worked with USAID for decades—the agency plays a critical role in advancing the United States' interests and standing abroad.

4.      But on the day he took office, President Trump issued an executive order announcing his view that U.S. foreign-assistance programs are "antithetical to American values" and ordered a "pause" on all foreign-assistance funding. Since then, the Department of State, USAID, and the Office of Management and Budget (OMB) have issued a series of vague, unreasoned directives implementing the executive order. The reality on the ground is even more dire than those directives would suggest. With extremely limited exceptions, USAID and the State Department have halted the flow of funding even to existing partners, even for work performed

before President Trump took office, plunging those organizations (and the people who depend on them) into turmoil and costing thousands of Americans their jobs. At the same time, the Department of State has apparently undertaken to permanently shutter USAID and discontinue its operations altogether. Officials have gone so far as to pull the USAID sign down from its headquarters.

5.     Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish USAID and fund foreign-assistance operations, which have been legislatively mandated for more than a half century. And in implementing his executive order, the government has offered no reasoned justification for its actions other than to effectuate the President's "policy agenda."

6.     Just yesterday, the USAID Office of Inspector General sounded the alarm on the scope and effects of Defendants' actions. The waiver process that supposedly allows certain foreign-assistance programs to resume is opaque and illusory. The freeze has halted not just the obligation of new funding, but the disbursement of funds for work that has already been performed. And far from combating waste, fraud, and abuse in U.S. foreign-assistance programs, Defendants' actions have exacerbated it.

7.     Like other abrupt funding freezes that courts have already enjoined, the actions here violate basic precepts of administrative law, numerous federal statutes, and bedrock separation-of-powers principles. Neither the President nor his subordinates have authority to thwart duly enacted statutes and substitute their own funding preferences for those Congress has expressed through legislation. And the scant explanations offered to justify dismantling USAID's operations utterly fail to grapple with its grave implications for USAID partners, the people who depend on them, and the United States. The Court must hold these actions unlawful and set them aside.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, because the action arises under federal law, including the United States Constitution and

the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists

between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant

declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02

and 5 U.S.C. §§ 705-06.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action

seeks relief against federal agencies and officials acting in their official capacities; at least one

defendant is located in this district; and a substantial part of the events or omissions giving rise to

the claim occurred in this district.

## PARTIES

10.     Plaintiff Global Health Council (GHC) is a private, not-for-profit, membership

alliance incorporated in Delaware, headquartered in Washington, D.C., and enjoying tax-exempt

status under Section 501(c)(3) of the Internal Revenue Code. GHC was founded in 1972 under the

name National Council of International Health as a U.S.-based, nonprofit membership

organization with the purpose of identifying priority world health problems and reporting on them

to the U.S. public, legislators, international and domestic government agencies, academic

institutions, and the world health community. Many of GHC's members administer global health

programs and receive funding from USAID and other federal agencies and depend on sustained,

uninterrupted funding to continue their work.

11.     Plaintiff Small Business Association for International Companies (SBAIC) is a

membership organization established to promote the meaningful utilization of U.S. small

businesses at U.S government agencies providing foreign assistance, including USAID. SBAIC has almost 170 members, including small businesses under every Small Business Administration category.

12.     Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. Approximately 58% of HIAS's funding comes from the U.S. government, including the Department of State and USAID.

13.     Plaintiff Management Sciences for Health (MSH) is a global nonprofit organization headquartered in Arlington, VA. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries worldwide by providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. Approximately 88% of MSH's funding comes from USAID. MSH holds funding agreements with USAID for 19 different projects in 20 countries.

14.     Plaintiff Chemonics International, Inc. (Chemonics) is an employee-owned sustainable development company headquartered in Washington, DC. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. Approximately 88% of Chemonics and its subsidiaries' funding comes from USAID. Chemonics is currently working with USAID on 104 different projects in over 90 countries.

15.    Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted partner of the U.S. government, and especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. Nearly 80% of DAI's revenue (more than $750 million in 2024) comes from USAID, including the Millenium Challenge Corporation and its affiliated Millenium Challenge Accounts in Compact Countries. DAI is currently working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

16.    Plaintiff Democracy International, Inc., a small business, is an international development company headquartered in Bethesda, Maryland. Over the past 22 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96 percent of Democracy International's revenues in 2024 came from prime cooperative agreements and contracts from USAID.

17.    Plaintiff the American Bar Association (ABA) is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. In total, approximately 38% of ABA's FY 2025

international awards funding is derived from USAID, after a competitive procurement process. Currently, ABA implements nineteen programs funded by USAID either directly or via subaward.

18.    Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

19.    Defendant United States Department of State is an executive department of the United States government that is responsible for the United States' foreign policy and relations. The Department of State is headquartered in Washington, D.C.

20.    Defendant United States Agency for International Development is an independent agency of the United States government that is responsible for administering civilian foreign aid and assistance. USAID is headquartered in Washington, D.C.

21.    Defendant Office of Management and Budget is a federal agency within the Executive Office of the President that is responsible for producing the President's budget and coordinating interagency policy initiatives. OMB is headquartered in Washington, D.C.

22.    Defendant Marco Rubio is the Secretary of State and Acting Administrator of USAID. He is being sued in his official capacity only. Secretary Rubio maintains an office at 2201 C St NW, Washington, DC 20520.

23.    Defendant Peter Marocco is the Acting Deputy Administrator for Policy and Planning and Acting Deputy Administrator for Management and Resources of USAID and Director of Foreign Assistance at the Department of State. He is being sued in his official capacity only. Deputy Administrator Marocco maintains an office at 1300 Pennsylvania Ave NW, Washington, DC 20004.

24.    Defendant Russell Vought is the Director of OMB. He is being sued in his official capacity only. Director Vought maintains an office at 725 17th St NW, Washington, DC 20503.

**FACTUAL ALLEGATIONS**

***Congress Establishes USAID as an Independent Agency
and Appropriates Funding for Foreign Assistance***

25.    For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). And for more than a half century, USAID has fulfilled that statutory mandate by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (2025) (CRS Report).

26.    Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), http://bit.ly/4hwm68U. Or as Sen. Lindsey Graham noted more recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S. — And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://bit.ly/3WVDNGy. "If you don't get involved in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

7

27.    Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting child poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

28.    USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] …. [it] cultivates democracies and creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), https://bit.ly/4hwmx32 (Barsa, *Remarks*). In short, USAID has long played a key role in furthering American interests.

29.    But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Instead, most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations, including nonprofits and academic institutions. *See* CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to

safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

30.     In 1998, Congress formally established USAID as an independent agency outside the Department of State. Foreign Affairs Reform and Restructuring Act of 1998 § 1413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after its establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

31.     Since then, Congress has repeatedly appropriated funds for foreign assistance through USAID. The most recent of those appropriations bills, enacted into law March 23, 2024, directs funding to USAID for global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad, among other purposes. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739-43.

32.     Likewise, Congress has appropriated funds for foreign aid to be administered by the Department of State. Most recently, the 2024 Appropriations Act directs funding to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 742-49.

33.    The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds appropriated for global health programs "shall be apportioned directly to the United States Agency for International Development." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID for specified purposes. *E.g.*, *id.*, 138 Stat. 741-43. The Act generally prohibits deviation from these funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. 772.

### *Defendants Abruptly Freeze Foreign Assistance Funding*

34.    Starting two weeks ago, things changed drastically. Defendants have dismantled the federal foreign-assistance system, reducing USAID to a husk of its former self: stripped of funding, devoid of employees, unable to perform basic tasks, and ultimately swallowed by the State Department.

35.    This hollowing out began with Executive Order 14,169. Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). In this Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

36.    In order to more "fully align[]" foreign assistance programs with President Trump's policy preferences, Executive Order 14,169 directs four actions. *Id.*

10

37.     First, it directs a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It requires all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs are to be paused "pending review[]," and OMB is to "enforce this pause through its apportionment authority." *Id.* This "pause" may be waived for specific programs by the Secretary of State. *Id.* § 3(e).

38.     Second, the Executive Order directs each "responsible department and agency head[]" to initiate those"[r]eviews of each foreign assistance program ... under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

39.     Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" is ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program ... with the concurrence of the Secretary of State." *Id.* § 3(c).

40.     Fourth, Executive Order 14,169 purportedly allows "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

11

41.     Defendants swiftly set to work implementing the President's order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (Gray Initial Instructions). The instructions further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels. Any pause on disbursements will be subject to further guidance." *Id.* The instructions permitted waivers only "for emergency humanitarian assistance" with individual approval from "both the Acting Administrator of USAID and the Director of Foreign Assistance at the U.S. Department of State," subject to a waiver process that supposedly was forthcoming. *Id.*

42.     On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or though the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (Rubio Memo).

43.     Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers

[must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that neither the Department of State nor USAID would provide any foreign assistance "without the Secretary of State's authorization or the authorization of his designee." *Id.* ¶ 5.

44.    The same day, USAID Senior Procurement Executive Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (Rodgers Guidance). The notice directed agency contracting and agreement officers to "<u>immediately</u> issue stop-work orders, amend, or suspend existing awards." *Id.* It also forbid agency personnel to "issue new awards or release any new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation for foreign assistance funding until each activity has been reviewed and approved as consistent with the President's policy." *Id.*

45.    Also the same day, Gray issued follow-up instructions to agency employees for implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24, 2025) (Gray Follow-Up Instructions). The follow-up instructions directed that, "[p]er the [Rubio Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this review process will be shared as it becomes available." *Id.* The follow-up instructions further stated that, "[c]onsistent with and building on" the Gray Initial Instructions, "all new program-funded obligations and

subobligations are to remain on pause unless exempt." *Id.* Gray also announced that he was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.* Finally, Gray summarized the provisions of the Rubio Memo regarding waivers and stated, "[w]e will provide further guidance related to implementation of this direction including the process for waivers as soon as possible. We will also provide subsequent guidance on how USAID will review all programs, to include current and ongoing programs, to ensure they are aligned with the foreign policy of the President of the United States." *Id.*

46.     Two days later, on January 26, 2025, Gray issued a further clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (Gray Clarification). As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (OIG Report) at 1 (Feb. 10, 2025) (quotation marks omitted).

47.     The next day, then-Acting OMB Director Matthew J. Vaeth issued a similar directive. On January 27, 2025, he issued a memorandum ordering a "temporary pause of agency grant, loan, and other financial assistance programs." Memorandum For Heads of Executive Departments and Agencies 1, M-25-13 (Jan. 27, 2025) (capitalization modified), https://bit.ly/3WUBPWY. That memorandum directed that, to implement the Executive Order and the President's other policy directives, "each agency must complete a comprehensive analysis of all their Federal financial assistance programs," and, in the interim, "**temporarily pause** all

activities related to obligation or disbursement of all Federal financial assistance, and other relevant activities that may be implicated by the executive order[], including, but not limited to, financial assistance for foreign aid. [and] nongovernmental organizations." *Id.* at 2.

48.    Vaeth's memo, while expressly written to implement President Trump's Executive Order 14,169, gave additional reasons for OMB's actions. The memo cited the need "to align Federal spending and action with the will of the American people as expressed through Presidential priorities." *Id.* at 1; *see also id.* at 2 ("This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities."). Director Vaeth also stated that "[f]inancial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

49.    Vaeth's memorandum has since been stayed and rescinded. A court in this District has enjoined the government from "implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and ordered it to "to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *Nat'l Council of Nonprofits v. OMB*, __ F. Supp. 3d __, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025).

50.     Defendants have nonetheless continued to carry out the Executive Order and implementing directives by Rubio, Gray, Rodgers, and Vaeth. USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Subject to limited waivers—for which a formal approval process does not exist— Defendants have halted the flow of foreign-assistance funding to USAID partners. In a declaration filed with this Court yesterday, Defendant Morocco admitted that USAID "has generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Pete Marocco ¶ 28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

51.     Defendants simultaneously began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in your chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://bit.ly/3CNJtM6. Defendants have also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in a February 10, 2025 report, these "personnel actions … have substantially reduced the [agency's] operational capacity." OIG Report at 1.

52.     On February 3, 2025, Defendants took further action to dismantle USAID, with a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://bit.ly/4hVdBUR. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.* The next day, Secretary Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://bit.ly/3Q9gWDQ. Secretary Rubio further designated Pete Marocco as Deputy Administrator of USAID, and directed him to "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* Secretary Rubio also stated that "USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law." *Id.*

53.     Although the Rubio Memo purported to freeze only "new obligations," Defendants have in fact acted to abruptly halt the overwhelming majority of disbursements to USAID and State Department partners even for *existing* grants, cooperative agreements, and contracts. Such partners remain totally cut off from federal funds, including funds appropriated in fiscal year 2023 or earlier and payments for work already performed, even where the Department of State has purported to issue a waiver. As the USAID Inspector General has recognized, "uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance."

OIG Report at 5. Plaintiff Democracy International, for instance—a small business—has not received payment for $3,376,832 for work completed within the scope of duly authorized USAID programs concluded before the issuance of stop work orders and suspensions. USAID has also failed to make payment on over $120 million in invoices for work Plaintiff DAI has already completed, some of which are now past due. Plaintiff Chemonics has roughly $103.6 million in outstanding invoices issued to USAID for work performed in 2024, most of which were submitted prior to the stop-work orders. And USAID has failed to pay tens of millions of dollars for work performed by Plaintiff SBAIC's members.

54.     USAID continues to implement the President's executive order and the Rubio Memo by terminating contracts with hundreds of USAID contractors. On information and belief, those terminations are based on hourly targets and not on any substantive or programmatic considerations. The termination notices, for example, give no indication what criteria Defendants have applied in the "review process," if any. And once terminated, it may be impossible to reinstate or restore these contracts without starting the procurement process anew.

55.     The Department of State has also halted disbursement of appropriated foreign-assistance funding through programs administered outside USAID. For example, Plaintiff ABA implements 59 programs funded by the Department of State. They commit the Department of State to more than $109 million in funding over the next five years. The ABA has already spent $67 million, and the remaining frozen amount is approximately $42 million as of December 2024. ABA has received stop-work and suspend-activity orders for its programs. The Department of State has also ordered Plaintiff HIAS to suspend or halt work entirely on more than $20 million in FY25 grants. This is on top of USAID's order that HIAS halt work on a $18.5 million cooperative agreement to assist the most vulnerable populations in Venezuela.

56.    The effect of these actions has been to halt the obligation and disbursement of foreign-assistance funding wholesale. In the words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between BHA staff and its implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

57.    President Trump summed up his view of Defendants' actions in a post on social media: "USAID IS DRIVING THE RADICAL LEFT CRAZY, AND THERE IS NOTHING THEY CAN DO ABOUT IT BECAUSE THE WAY IN WHICH THE MONEY HAS BEEN SPENT, SO MUCH OF IT FRAUDULENTLY, IS TOTALLY UNEXPLAINABLE. THE CORRUPTION IS AT LEVELS RARELY SEEN BEFORE. CLOSE IT DOWN!" @realDonaldTrump, Truth Social (Feb. 7, 2025). In fact, Defendants' efforts to close down USAID have not served to combat waste, fraud, and abuse, but rather have exacerbated it. Defendants' actions have "curtailed USAID's ability to vet humanitarian assistance awards for potential terrorist ties and monitor aid deliveries in high-risk environments." OIG Report at 3 (capitalization omitted). They also have "limited [the agency's] ability to receive and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid." *Id.* at 4.

### The Funding Freeze Shutters Longstanding USAID Partners and Imperils Their Employees

58.    Defendants' actions have devastated USAID's partners.

59.    Most of USAID's programs are implemented—whether by grant, cooperative agreement, or contract—by private-sector partners. CRS Report, *supra*, at 1. USAID has thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work is critical to

USAID's efforts to fight disease, educate children, provide clean water, and support economic and other forms of development in approximately 130 countries around the world. *See id.* And they do their jobs in some of the most needy parts of the world, including throughout conflict zones. *See id.* For example, in recent years, USAID—working with its partners—has "provided significant humanitarian development, and economic support to Ukraine and countries affected by Russia's war in Ukraine, as well as humanitarian assistance in Gaza and elsewhere." *Id.* at 1-2.

60.    Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars worth of food grown in America's heartland—enough to feed more than 30 million people—is rotting in domestic ports and warehouses, unable to reach starving populations abroad. *See* Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025), https://bit.ly/40U5KQl; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://bit.ly/4guXYlK. Efforts aimed at preventing and treating disease have stalled out as tens—if not hundreds—of thousands of healthcare workers are let go. Declan Walsh, "*We Are in Disbelief": Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT. Girls' access to education has been cut off, demining operations have been defunded, and shelter for Ukrainian citizens fleeing Russian bombardment has been jeopardized. Kimberlee Kruesi, *What Is USAID and What Impact Does It Have Across the Globe*, Time (Feb. 6, 2025), https://bit.ly/4hxXhtb.

61.    Plaintiffs are not immune. Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Activity provides lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International has had to stop providing

medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence.

62.    Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-threatening effects. Specifically, Defendants' actions have frozen funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for cybersecurity for the government of Ukraine, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh.

63.    Plaintiff Chemonics, under its Global Health Supply Chain Program-Procurement and Supply Management project, has received approval for and has made contractual commitments to suppliers for $240 million worth of medicines and other health supplies that were manufactured prior to receipt of the applicable stop-work order and are in various stages in the supply chain. Another $150 million in health commodities remain stranded in warehouses around the world, and $88.5 million are currently in transit. As commodities wait to be routed, products risk expiring, being damaged, being stolen, or being delivered without means for pick-up. Not delivering these health commodities on time could potentially lead to as many as 566,000 deaths from HIV/AIDS, malaria, and unmet reproductive health needs, including 215,000 pediatric deaths.

64.    Plaintiff ABA has had tens of millions of dollars in USAID and State Department funding frozen. This freeze has decimated ABA's programs, including its efforts to protect religious freedom in Asia, fight human trafficking in the Democratic Republic of Congo and Colombia, prepare Ukraine to recover from Russia's invasion, advance democracy in Myanmar,

21

and combat money laundering and terrorism in South America.

65.    Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, have also been severely impacted by the freeze. One member has had to suspend a $20 million hospital accreditation program in Cambodia. Another will have to close up to 1,226 primacy care clinics. And a third has had to delay implementation of anti-malarial campaigns in Africa that must take place before the rainy season to be effective.

66.    Plaintiff SBAIC's members—small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also faced ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their projects devastated by losing access to vitally necessary appropriated funds.

67.    Plaintiff HIAS has had its work helping refugees across South America and Africa put on hold, including its work helping displaced children who are at high risk of trafficking, sexual exploitation, abuse, and neglect.

68.    These programs cannot simply be restarted on command. USAID's partners are hemorrhaging resources and employees.

69.    Plaintiff Democracy International has furloughed 100 percent of its 95 U.S.-based home office employees and placed 163 of 176 employees (92.6 percent) working on USAID projects in overseas offices on "administrative leave," pending resolution of stop work/suspension orders; Democracy International is not currently able to pay those on administrative leave and will not be able to pay them unless and until USAID pays past invoices and draws, and agrees to pay continuity costs. Democracy International has also cancelled all benefits, including health insurance, for employees; terminated all consultants; shut down all but one of its overseas offices (which has non-USAID funding); and downsized its computer systems and licenses.

70.    Plaintiff DAI, in the last 10 days alone, has furloughed 383 U.S.-based staff, retracted many signed offers of employment, reduced salaries for senior staff members by 20%, deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements. In numerous cases, DAI staff members are no longer able to meet their own critical financial obligations for housing, education, and medical care. Pushed to the brink, some have already begun to leave DAI's permanent employ, imposing costly future requirements for recruitment and training.

71.    Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, are at risk of having to permanently scale back or cease operations.

72.    Plaintiff Chemonics has furloughed 750 of its U.S.-based staff, which represents 63% of its US-based workforce, and reduced the hours of the remaining U.S. employees. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food. Further, if Chemonics's current financial situation continues, it will furlough additional employees at the end of this month and will be unable to extend healthcare benefits to furloughed employees beyond March.

73.    Plaintiff MSH is being forced to take imminent, extraordinary measures, including furloughing nearly 50% of its U.S.-based staff and reducing hours for the remaining employees, terminating long-standing partnerships with more than 50 consultants, and is facing the prospect of letting go as many as 1,000 employees abroad.

74.    Many of Plaintiff SBAIC's members are already running on thinly stretched lines of credit, each day without USAID payments brings them closer to bankruptcy.

75.    Plaintiff HIAS has had to lay off more than 500 international staff, shutter its

23

program offices, and defer payments to vendors.

76.     At this rate, many of USAID's and the State Department's partners—including several Plaintiffs—will simply not be around to carry on their projects even if Defendants decide to turn funding for foreign assistance back on.

77.     Some USAID and State Department partners have been placed in the impossible position of having to choose between furloughing their employees or having enough (already obligated) cash on hand to ensure they are able to secure American lives and U.S. property overseas for as long as possible. For example, staff from Plaintiff DAI have been notified that legal actions are being prepared against them in their countries of assignment, and they are acutely aware that they, their dependents, and their belongings could be stranded overseas if USAID continues to repudiate its payment obligations.

78.     Defendants' actions also shred Plaintiffs' and other partners' credibility within the communities that they operate in. These organizations often operate in unstable, conflict-torn environments. The people and governments there are often skeptical of them and their efforts. It takes hard work to build trust in these communities and to prove that they are truly there to help. Once that trust is gained, these communities then rely on these organizations for important, basic services. Defendants have forced Plaintiffs and others to abruptly shut their doors and cease offering those services, destroying the trust and credibility that has been built up over decades.

## LEGAL ALLEGATIONS

### Neither the President, Secretary of State, nor USAID Administrator Have Authority to Unilaterally Withhold Appropriated Foreign-Assistance Funds

79.     The Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Understood since the founding as

"'the most complete and effectual weapon'" of a representative body, Congress's power of the purse serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Id.* at 1346-47 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). To ensure that Congress alone would control the public fisc, the Constitution both grants to Congress the power to direct federal spending and denies that power to the other branches. The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. And the Appropriations Clause forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.*, art. I, § 9, cl. 7.

80.    Consistent with the Constitution's division of legislative and executive powers, the President must "faithfully execute[]" the law as Congress enacts it. U.S. Const., art. II, § 3. Like other statutes enacted by Congress, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7. The separation of powers forbids the President from revising or ignoring such a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

81.    The President also lacks inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the President possesses only the powers that the Constitution independently confers on the Executive. U.S. Const., art. II, § 1, cl. 2. The power to set federal funding policies is not among those powers. When the President "has policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] … even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

82.    Longstanding historical practice and the reasoned views of every branch of government confirm that the President has no authority to unilaterally revise congressional appropriations. The Comptroller General, the top legislative-branch official charged with oversight

of federal expenditures, has explained in opinions going back to 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020); *see Report to the Sen. Subcomm. on Separation of Powers*, B-135564, 1973 WL 159460 (Comp. Gen. July 26, 1973). And the Supreme Court, since before the Civil War, has disapproved assertions of executive power to withhold funds required to be disbursed by statute. *See Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838).

83. Indeed, since 1969, even the Department of Justice has adhered to that settled understanding of the separation of powers. As later-Chief Justice Rehnquist wrote in an Office of Legal Counsel opinion, "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). That "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

84. Even if the Constitution did not altogether deny the President the power of the purse, Congress has done so through two federal statutes. In this posture, the President's "power is at its lowest ebb," and his attempt to override Congress's funding priorities could be sustained only if Congress had no power over federal expenditures at all, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)—a proposition flatly inconsistent with the Constitution's text and structure.

85. First, Congress has expressly disabled the President from declining to obligate appropriated funds in the Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 682 *et seq.*). Under the Impoundment Control Act,

appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b); *see id.* § 684(a). That framework comports with the constitutional mandate that changes to enacted legislation—including appropriations acts—require bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 956 (1983).

86.    The Impoundment Control Act also permits the President to "defer[]" a budget authority—that is, to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, only for a limited time, and only after transmitting a special message to Congress setting forth, among other information, the reasons for the proposed deferral. 2 U.S.C. § 684(a); *see id.* § 682(1). Under that provision, deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.* Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds for policy reasons. *Aiken County*, 725 F.3d at 261 n.1.

87.    Second, the Anti-Deficiency Act Amendments of 1982, Pub. L. No. 97-258, 96 Stat. 929 (codified as amended at scattered sections of Title 31), prohibit executive branch officers from holding appropriated funds in reserve in similar circumstances. Under the Anti-Deficiency Act, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). Like the Impoundment Control Act, this

27

statute forbids the Executive to decline to spend and hold in reserve appropriated funds for policy reasons or to otherwise redirect funds to purposes other than those Congress prescribed in the appropriation.

88.    No provision of the 2024 Appropriations Act or any other statute authorizes the President, Secretary of State, or USAID Administrator to impose a wholesale freeze or termination of appropriated foreign assistance funding.

### The Stated Grounds for the Funding Freeze Conflict with Applicable Law and Fail to Consider Important Aspects of the Problem

89.    The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

90.    Under that standard, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

91.    The reviewing court must also determine whether a challenged agency action is "contrary to law." *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024). In doing so, courts

do not defer to an agency's interpretation of a statute, but rather use their "independent legal judgment" and "apply[] all relevant interpretive tools" to find "the best reading," i.e., "the reading the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) (citation omitted).

92.    Defendants have failed to "identif[y] and explain[] the reasoned basis" for their sudden, blanket freeze on foreign aid. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).

93.    President Trump's order claimed that "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values." Exec. Order No. 14,169 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). In the President's view, "[t]hey serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* The Executive Order offered no explanation or justification for this vague and sweeping statement. On the contrary, the government has long taken the position that foreign aid and development promote peace and global security by addressing the root causes of extremism and violence. *See, e.g.*, Barsa, Remarks, *supra*.

94.    The Rubio Memo cited the Executive Order as the basis for the funding freeze, and further claimed that "[i]t is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." Rubio Memo ¶ 2. Yet that claim about the need for access to information in one place bears no connection to the direction to "immediately issue stop-work orders" for existing grants and contracts, or to halt the process of reviewing proposals for new grants and contacts. *Id.* ¶¶ 7-9.

95.    No subsequent directive purporting to implement the President's executive order or the Rubio Memo has identified any other ground for freezing foreign-assistance funding.

96.    Defendants did not "examine the relevant data" and then articulate a "rational connection between the facts found" and a blanket freeze on foreign aid. *Ark Initiative*, 816 F.3d at 127 (citation omitted). They have offered not one shred of evidence for their "implausible" justifications. *Id.*

97.    Nor, in any event, did any Defendant explain why a comprehensive, undifferentiated freeze was necessary to achieve their purported goals. Nor did they explain why they eschewed a more orderly and targeted approach—such as one that aimed only at particular programs Defendants found to be destabilizing or corrupt or one that kept funding in place for the 90 days Defendants claim it will take to identify such problematic programs. *See Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses.").

98.    Defendants have also "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Indeed, Defendants have acknowledged that they are still conducting a "review" of all foreign assistance funding, which necessarily means that they have not yet evaluated "important aspect[s] of the problem." And at the same time they claim that a review is ongoing, Defendants have dismissed the agency personnel with the experience and technical expertise necessary to conduct any "review."

99.    Nor did Defendants consider that these programs are not light switches to be turned on and off at will. Damage to these interests is being done now, and that damage cannot be undone. Indeed, by halting foreign-assistance payments that are already due and owing, Defendants are

preventing Plaintiffs and other partners from taking the steps necessary to remain ready to resume work (if the freeze is lifted) or to wind down their projects in an orderly manner (if it is not).

100.    Irreparable damage is also being done to the grantees, contractors, and other partners who carry out these programs right now. Without funding, these actors must lay off staff, cut ties with local actors, and essentially terminate their operations. There is a serious risk that they simply will not exist if Defendants ever decide to un-pause their work. And while generally partners who have been ordered to stop work may work with USAID officials to ensure interim funding is available to keep them afloat until work resumes, such interim funding has been halted and such coordination is impossible here when Defendants have recalled and laid off those USAID workers. So when Defendants promise to "decide to continue [some] program[s] in the same or modified form," Exec. Order No. 14,169 § 3(d), 90 Fed. Reg. 8619 (Jan. 20, 2025), it is clear they have not grappled with the reality that those programs may not be able to be revived.

101.    Defendants also failed to account for the substantial reliance interests their actions have eviscerated. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted). Yet Defendants did not consider the effect their pause policy would have on grantees, contractors, and other partners—as well as their employees—all of whom have relied on USAID's and the State Department's longstanding policies.

102.    Defendants have also failed to account for how USAID and State Department programs further U.S. interests and how a sudden withdrawal of U.S. assistance will provide opportunities to adversaries of the United States and risk instability in countries around the world. Analysts and experts are warning that China and Russia will quickly step in to fill the void—and

indeed are already doing so. *See, e.g.*, Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—How China, Russia May Benefit*, NBC News, Feb 4, 2025; Kruesi, *supra*.

103.    Defendants' sudden freeze on U.S. foreign aid, on the supposed premise that such aid "destabiliz[es] world peace," Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025), is also an abrupt reversal of decades of U.S. policy. For years, the United States government has considered foreign aid programs to be an important part of America's foreign policy and national security strategy. *See, e.g.*, Barsa, Remarks, *supra*. Now, however, Defendants have asserted that foreign aid programs are a threat to those same interests. But they have failed to "display awareness that [they are] changing position[s]," never mind articulated "good reasons" for the shift. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted); *see also State Farm*, 463 U.S. at 43.

104.    Defendants' actions are also contrary to law. *See Env't Def. Fund*, 124 F.4th at 11.

105.    As discussed above, the Impoundment Control Act forbids the Executive to "refuse to spend the funds" Congress has appropriated unless Congress "approve[s] a recission bill." *Aiken County*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). Although that statute permits limited deferrals of a budget authority upon transmission of a special message to Congress, it does not allow any form of impoundment, including deferral, for policy reasons. *Id.*; *see* 2 U.S.C. § 684(b). By refusing to spend appropriated funds in order to "align[]" that spending with President Trump's "policy agenda," Rubio Memo ¶ 3, Defendants have violated the Impoundment Control Act.

106.    The Anti-Deficiency Act imposes similar restrictions. Government officers violate that statute if, among other things, they establish a monetary reserve by withholding appropriated funds from their congressionally assigned program, except for limited purposes. 31 U.S.C. § 1301(a); *id.* § 1512(c)(1). Like the Impoundment Control Act, the Anti-Deficiency Act prohibits

repurposing appropriated funds for policy reasons. *See id.* § 1512(c)(1). To the extent Defendants are holding appropriated foreign-assistance funds in reserve to effectuate the President's policy preferences rather than spending them as Congress has directed, Defendants have violated the Anti-Deficiency Act.

107.    Beyond the Impoundment Control Act and the Anti-Deficiency Act, Defendants also have violated the appropriations statutes, including the 2024 Appropriations Act, which direct USAID and the State Department to spend appropriated funds for particular foreign-assistance purposes. When Congress wishes to give the executive branch discretion to spend less than the full amount appropriated, Congress uses specific language—for example, that an agency is appropriated "sums not exceeding" or "up to" an amount for a particular purpose. *See, e.g., CFPB v. Cmty. Fin. Servs. Ass'n,* 601 U.S. 416, 432-33 (2024); *id.* at 442-43 (Kagan, J., concurring). Absent such language, courts properly understand appropriations statutes as commands to obligate and expend the full amount of money appropriated. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 41-48 (1975) (prior to enactment of Impoundment Control Act, interpreting statute to require the agency to spend the full amounts specified for a particular program, and rejecting the agency's argument that it had discretion to spend less). The relevant appropriations statutes here confer no discretion to halt foreign-assistance funding wholesale. To the contrary, the 2024 Appropriations Act specifies that the appropriated amounts "shall" be apportioned and used for specified purposes, including USAID's global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, titles II-III, 138 Stat. 460, 739-43. The 2024 Appropriations Act also appropriates funds to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons,

combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 744-49. By broadly halting obligations and expenditures related to these purposes, Defendants have violated these congressional appropriations.

108.    Defendants identify no statutory authority for the wholesale freeze of foreign-assistance funding. Under the major questions doctrine, agencies must point to "clear congressional authorization" when they claim power to take actions of vast "economic and political significance." *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022). In *West Virginia*, for example, the Supreme Court held that the EPA lacked the authority to devise certain emissions caps that would have "billions of dollars of impact," because the Clean Air Act did not provide a clear statement to allow the agency to make such a drastic change from the existing standards. *Id.* at 2605. Similarly, in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Court held that the Biden administration's student loan forgiveness program exceeded the authority of the Department of Education because there was no clear statement authorizing the agency to forgive billions in loans on this matter of economic and political significance. Here, Defendants' unilateral, overnight freeze of billions of dollars a year in congressionally appropriated funding to American nonprofits, academic institutions, and businesses implicates at least as serious economic and political questions. Defendants' actions lack any congressional authorization, much less the clear authorization Supreme Court precedent requires.

109.    Defendants' conduct also contravenes numerous constitutional guarantees designed to protect liberty through the separation of governmental powers. The Constitution gives Congress, not the President, the power to spend money, U.S. Const. art. I, § 8, and forbids expenditures it does not authorize, *id.* art. I, § 9, cl. 7. The Constitution then requires the President to "faithfully execute[]" those authorized expenditures. *Id.*, art. II, § 3. These articles work together to separate

the duties of the legislative branch and the executive branch such that only the legislative branch can control federal spending. *Dep't of Navy*, 665 F.3d at 1346. Defendants have breached this separation, usurping for the executive branch the legislature's exclusive powers. By unilaterally refusing to spend what Congress has ordered, Defendants have unlawfully wrested control over the federal fisc from Congress and violated the Constitution.

110.    Because Defendants' actions are arbitrary, capricious, and not in accordance with law, the Court must hold those actions unlawful and set them aside. *See* 5 U.S.C. § 706(2).

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
**(Against Defendants Rubio, Marocco, Vought, Department of State, USAID, and OMB)**

111.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

112.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

113.    The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

114.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

### SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—
Contrary to Statutory and Constitutional Law
(Against Defendants Rubio, Marocco, Vought, Department of State, USAID, and OMB)**

115.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

116.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

117.    The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

118.    Both the Impoundment Control Act and the Anti-Deficiency Act generally obligate the executive branch to spend funds that Congress has appropriated, and to spend it on the programs for which Congress has made appropriations. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1). If the executive branch wishes not to spend funds that has been lawfully appropriated, it must follow a set procedural path and rely on specific types of reasons. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1).

119.    Relevant appropriations statutes, including the 2024 Appropriations Act, direct that appropriated funds shall be obligated and disbursed for specified foreign-assistance purposes.

120.    By refusing to spend funds that Congress has allocated for foreign assistance programs, without following the procedural paths set by Congress, Defendants have violated the Impoundment Control Act, the Anti-Deficiency Act, and relevant appropriations statutes, including the 2024 Appropriations Act.

121.     The Constitution vests exclusive power over federal spending in Congress. The executive branch lacks inherent constitutional power to decline to spend funds that Congress has appropriated. By refusing to spend funds that Congress has allocated for foreign-assistance programs, Defendants have violated the constitutional separation of powers.

122.     Defendants' actions are contrary to law, and the Court must hold them unlawful and set them aside.

### THIRD CLAIM FOR RELIEF

**Violation of the Separation of Powers**
**(Against All Defendants)**

123.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

124.     The Constitution vests exclusive power over federal spending in Congress.

125.     Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore congressional appropriations. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

126.     The President also lacks inherent constitutional power to decline to spend funds that Congress has appropriated. Although the President would lack that power even in the absence of any statutory prohibition, the Impoundment Control Act and Anti-Deficiency Act forbid executive-branch officers from declining to spend appropriated funds in these circumstances, foreclosing any claim of concurrent presidential power.

127.     By withholding foreign-assistance funds that Congress has appropriated, Defendants have violated the separation of powers.

37

128.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

## FOURTH CLAIM FOR RELIEF

### Ultra Vires
### (Against All Defendants)

129.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

130.    No statute, constitutional provision, or other source of law authorizes Defendants to withhold foreign-assistance funds that Congress has appropriated. Defendants' actions doing so exceed their lawful authority.

131.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request judgment in their favor against Defendants as follows:

1.    Declare that Executive Order 14169 is unconstitutional and unlawful;

2.    Vacate and set aside the Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement Executive Order 14169 and declare that those actions are contrary to law and arbitrary and capricious;

3.    Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14169, the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14169 or other otherwise freeze the obligation and disbursement of appropriated foreign-assistance funds;

38

4.    Temporarily restrain and preliminarily and permanently enjoin Defendants from dismantling USAID or taking any other action that prevents Defendants from fulfilling their statutory duty to obligate and disburse appropriated foreign-assistance funds;

5.    Postpone the effective date of the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14169 or other otherwise freeze the obligation and disbursement of appropriated foreign-assistance funds;

6.    Award Plaintiffs reasonable attorneys' fees and costs; and

7.    Grant such other and further relief as the Court may deem appropriate.


Dated: February 11, 2025                    Respectfully submitted,

                                             _/s/ Stephen K. Wirth_____
                                             William C. Perdue (D.C. Bar 995365)*
                                             Sally L. Pei (D.C. Bar 1030194)
                                             Samuel M. Witten (D.C. Bar 378008)
                                             Stephen K. Wirth (D.C. Bar 1034038)
                                             Dana Kagan McGinley (D.C. Bar 1781561)
                                             Allison Gardner (D.C. Bar 888303942)
                                             Daniel Yablon (D.C. Bar 90022490)
                                             ARNOLD & PORTER
                                                KAYE SCHOLER LLP
                                             601 Massachusetts Ave., NW
                                             Washington, DC 20001-3743
                                             Tel: (202) 942-5000
                                             stephen.wirth@arnoldporter.com

                                             *application for admission pending

                                             _Counsel for Plaintiffs_

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

_/s/ Stephen K. Wirth_____
Stephen K. Wirth