**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-00402 (AHA) |

**DEFENDANTS' MOTION TO CLARIFY OR STAY THE COURT'S ORDERS**

Defendants respectfully seek clarification or a stay pending emergency appellate relief of the Court's orders of February 13, 2025 (ECF No. 17, Civil Action No. 25-cv-400; ECF No. 21, Civil Action No. 25-cv-402) and February 20, 2025 (ECF No. 30, Civil Action No. 25-cv-400; ECF No. 28, Civil Action No. 25-cv-402). Absent clarification of the Court's orders, a stay would be warranted pending requests for immediate appellate relief from the TRO orders. *See* Fed. R. App. P. 8(a) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").[1] Specifically, to the extent the Court's orders (1) prohibit Defendants from relying on existing statutory or contractual bases for suspending or

---

[1] Pursuant to Local Rule 7(m), counsel for Defendants conferred with counsel for Plaintiffs before filing this motion. Plaintiffs oppose the relief requested herein.

terminating contracts or grants, under the terms of the award or under other authorities, (2) treat all contractual and grant terms as enforceable by contempt, and/or (3) prohibit Defendants from conducting a payment integrity review process (including pursuant to statutorily or contractually conferred authority to suspend or terminate contracts or grants), such prohibitions would raise serious constitutional concerns and would amply warrant a short stay. Defendants alternatively request clarification if the Court's TRO order yesterday does not create such prohibitions, which would obviate the need for urgent appellate relief or an accompanying stay.

"[T]he factors regulating the issuance of a stay are . . . (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, each of the factors favor a stay.

*First*, as to the merits, to the extent the Court's TRO requires the Executive Branch to continue funding foreign assistance programs that the Executive Branch has determined should be suspended for review or terminated based on the United States' interests, the Court's order would usurp the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Congress has confirmed the Executive Branch's extensive foreign-relations powers by granting expansive discretionary authority over what foreign aid should be provided, "on such terms and conditions as [the President] may determine." *See, e.g.,* section 122(a) of the Foreign Assistance Act of 1961 (FAA) (22 U.S.C. § 2151t(a)) ("In order to carry out the purposes of this chapter, the President is authorized to furnish assistance, on such terms and conditions as he may determine, to countries and areas through programs of grant and loan assistance, bilaterally or through regional, multilateral, or private entities."); *see also* section 635 of the FAA (22 U.S.C. § 2395) (assistance under the FAA "may be provided on a grant basis or on such terms...as may be determined best suited to the achievement of the purposes of [the FAA]...."); section 622(c) of the FAA (22 U.S.C. § 2382(c)) (the Secretary of State, under the direction of the President, "shall be responsible for

the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby").

Foreign relations priorities are dynamic and can change swiftly. The statutes and regulations governing foreign assistance aid, most notably the FAA, thus give broad flexibility to the Executive Branch with respect to foreign assistance agreements, whether they are contracts or grants. In particular, various FAA provisions explicitly authorize the President to provide for assistance "on such terms and conditions as he may determine." *See*, *e.g.,* 22 U.S.C. § 2151b(c)(1)) (health assistance); 22 U.S.C. § 2291(a)(4) (counternarcotics and anti-crime assistance); 22 U.S.C. § 2346 (assistance to promote economic or political stability); 22 U.S.C. § 2347 (International Military Education and Training assistance); 22 U.S.C. § 2348 (Peacekeeping Operations); 22 U.S.C. § 2349aa (anti-terrorism assistance).

The Court temporarily restrained Defendants' implementation of certain sections of an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order. No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025), as well as a related directive of the Secretary of State. The executive order established that it is "the policy of the United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2. On that premise, one of the now-restrained sections of the executive order directed department and agency heads to pause certain foreign assistance funding pending a determination that such funding is consistent with the new administration's foreign policy.

The Court's February 20 order about the TRO now raises concerns about whether the Executive Branch can continue to rely on terms of the contract or grant at issue or other authorities to terminate or suspend a contract or grant: "Defendants may not simply replace their earlier implementations with 'other directives' to their agencies." ECF No. 30 at 5-6. The new order further raises the prospect that, for President Trump's administration to shift aid funding from his predecessor's choices, Defendants must distinguish their current reasoning from that which

motivated the executive order, i.e., a decision to halt "foreign assistance . . . that is not fully aligned with the foreign policy of the President." Exec. Order 14,169, § 2. Yesterday's order explains that "the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action." ECF No. 30 at 2. And that Defendants cannot "simply continue their blanket suspension . . . pending a review of the agreements for whether they should be continued or terminated." *Id.* at 4. Elsewhere, however, the order states that the TRO "does not restrain the agencies' exercise of authorities under law," including "statutes, regulations and other legal authorities," and that "nothing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so." *Id.* at 1-2, 4.

The scope of acceptable reasons under the TRO for the Executive to change foreign assistance remains unclear. While the executive order broadly halted some aid pending a consistency review, Mr. Marocco's declaration explained that the Administration had succeeded in terminating many contracts based on actual inconsistency determinations. For example, USAID terminated contracts, grants, and related instruments for being "DEIA Oriented," involving "Sustainability and Climate Change," and being "Inconsisten[t] with Unrelated Executive Orders or Presidential Directives." ECF No. 22-1 at 4-5. Others were cancelled because of "Operational Expenses and/or General Waste" or "Unnecessary Reliance on Third-Party Consultants and Contractors or Organizations with Accountability Issues." *Id.* at 4. Yesterday's order in some places appears to permit such practices. *See, e.g.*, *id.* ("[N]othing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so."). But other parts of the order could be read differently. *See, e.g.*, *id.* at 5 ("[T]he Court was not inviting Defendants to continue the suspension while they reviewed contracts and legal authorities to come up with a new, post-hoc rationalization for the *en masse* suspension.").

Yesterday's order also creates ambiguities about Defendants' ability to take action on contracts and grants in common categories. The Court clarified that Defendants may "undertak[e] a

good-faith, individualized assessment of a contract or grant." ECF No. 30 at 6; *see also id.* at 4 ("[N]othing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so."). While Defendants are proceeding on a "case-by-case review," ECF No. 22-1 at 3, that does not necessarily mean award-by-award. As Mr. Marocco explains, Defendants have acted on groups of contracts or grants for reasons that apply uniformly to those groups. *See id.* at 4-5. In addition, many of Defendants' contracts and grants have similar terms and implicate the same authorities, supporting their uniform treatment.

The Court's order also creates concerns about the Executive's ability to protect the integrity of its payment systems and exercise its rights under the relevant instruments. Mr. Marocco explained that in addition to pausing foreign assistance funding to review funding for foreign policy consistency, USAID is instituting a new Payment Integrity Review Process to improve control and review mechanisms. ECF No. 22-1 at 2. Under USAID's "legacy system, USAID employees were unable to adequately identify basic information about specific payments, such as the programs with which specific payments were associated." *Id.* These deficiencies "led to serious questions about waste, fraud, abuse, and even illegal payments." *Id.* The new integrity system can delay payments because "[p]ayments will be released as they are processed through this process." *Id.* Although Plaintiffs have not challenged this review process, parts of yesterday's order appear to throw doubt on it, for instance by "order[ing]" Defendants "to immediately . . . take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." ECF No. 30 at 5. But other parts of the order appear to correctly recognize that Defendants can take steps to protect and exercise their rights under the relevant instruments. *See id.* at 4 ("[T]he Court's TRO in this case does not restrain Defendants from taking action with respect to agreements based on their 'exercise of authorities under statutes, regulations, and other legal authorities.'"). However, the now-restrained executive order's direction to improve "programmatic efficiency," Exec. Order 14169, § 3(a), when combined with a motive-based

5

application of the TRO, could suggest Defendants are restrained from relying on integrity improvement to pause foreign assistance funding.

In addition, the Court's order could be read to convert ordinary breach of contract claims into potential violations of a court order. The TRO allowed Defendants to "enforc[e] the terms of contracts or grants." ECF No. 17 at 15. But yesterday's order appears to narrow that exception in significant and problematic ways, stating that "the TRO does not preclude Defendants from undertaking a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required (including, for example, notice to contracting parties)." ECF No. 30 at 6; *see* Civil Action No. 1:25-cv-00402, Minute Order (Feb. 21, 2025) (ordering defendants "to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms"). That language suggests that the TRO itself now incorporates the relevant terms of the grant, with the result that a termination that violates a procedural requirement could be construed as a violation of the TRO itself rather than a mere breach of contract. ECF No. 30 at 6. There are thousands of contracts at issue here, and although Defendants believe in good faith that they have broad termination authority as discussed above, they should not be forced to litigate every arguable breach of contract in a contempt posture. The new order compounds that problem with its reference to a "good-faith" assessment, suggesting that termination decisions will be subject to review by the Court in an enforcement proceeding for pretext or other subjective motivations.

If a funding recipient believes that the government has not abided by a grant's particular terms, the appropriate remedies lie outside this suit. As Mr. Marocco explains, "there is an established mechanism for counterparties to submit disputes for resolution to USAID." ECF No. 22-1 at 5. "If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United

6

States Court of Federal Claims." The Court's order could be read to supplement that process with enforcement or contempt proceedings in federal district court—a remedy that neither Congress nor the contracts and grants at issue authorized. And while the Court's order disclaims any pre-clearance requirement, ECF No. 30 at 4 n.4, it seems to permit contract-by-contract contempt litigation based on even an alleged failure to comply with a procedural requirement (such as a requirement for advance notice).

Defendants thus request that, to the extent the Court's recent order is intended to limit the Executive Branch in the ways listed above, the Court should stay its order. Such intrusions would significantly interfere with the President's authority to exercise "all of" "the 'executive Power'" of the United States, *Seila Law LLC v. Consumer Financial Prot. Bur.*, 591 U.S. 197, 203 (2020). For each of these reasons, and those stated in Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants are likely to succeed on the merits of their appeal from the Court's order. To the extent yesterday's order does not prohibit the conduct listed above, Defendants respectfully request clarification in the alternative. Specifically, the Court should clarify that its order granting the motion to enforce does not modify the obligations contained in the original temporary restraining order.

*Second*, to the extent the Court's order limits the Executive Branch as described, Defendants will be irreparably harmed absent a stay, as the Court's order would "compromise the very capacity of the President to speak for the nation with one voice" in foreign affairs. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000). Here, the President has determined that "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases[are] antithetical to American values," and that such work "serve[s] to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *See* Exec. Order 14,169, § 1, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025). Failing to give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34

(2010), including "the timing of those . . . decisions[,]" *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), would irreparably harm Defendants, including the President of the United States.

Plaintiffs, by contrast, have not established any countervailing irreparable harm, especially given that any stay would expire along with the TRO. Rather, to the extent that Defendants' implementation of Executive Order Number 14,169 violates any of Plaintiffs' contractual rights, they may seek recourse through other avenues, including in the Civilian Board of Contract Appeals or the Court of Federal Claims. *See* 41 U.S.C. § 7101 *et seq.*; 41 U.S.C. § 7104(b); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) ("[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act . . . a district court has no power to grant injunctive relief in such a case."). Because Plaintiffs have not demonstrated irreparable harm that is "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (internal quotation marks and citation omitted), and that is "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), the Court should stay its order granting the motion to enforce pending appeal.

*Third*, the balance of equities and public interest also favor a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). The public has an interest in ensuring that tax dollars are not spent toward foreign aid projects that "are not aligned with American interests and in many cases antithetical to American values" and have "serve[d] to destabilize world peace." *See* Exec. Order No. 14,169, § 1, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025). By restricting the President's attempts to bring foreign aid in line with the new administration's priorities, a Court's order that purports to require the expenditure of funds in a manner inconsistent with the Executive Branch's foreign policy determinations impermissibly intrudes on the President's ability to set the foreign affairs agenda of the United States and the President's determination about how to address these threats to foreign affairs. Because the public has an interest in the executive branch effectuating its chosen foreign affairs policies, this factor tips in favor of Defendants.

8

By contrast, Plaintiffs voluntarily entered into contracts and grants with USAID and the Department of State that they knew contained clauses or were controlled by relevant regulations and law that permitted Defendants to withdraw from them whenever "such assistance would not be in the national interest of the United States" or "if an award no longer effectuates the program goals or agency priorities" or for convenience when "in the Government's interest." *See* 2 C.F.R. § 700.14; 2 C.F.R. § 200.340(a)(4); 48 C.F.R. § 52.249-1 (authorizing termination for convenience when termination is "in the Government's interest"); *id.* §§ 49.502(a)–(b), 52.249-4, 52.249-6(a)(1)). With such clear regulatory background, Plaintiffs could not possibly possess a reliance interest, as a matter of law, in possessing continued, unfettered access to foreign assistance funds. Any pecuniary harm they now have allegedly suffered is as a result of them taking on that risk. Similarly, any delay in payments for past work or claim for overdue payments of funds from the United States for work that occurred before the pause or termination is pecuniary harm can later be remedied through established administrative winddown procedures that are part of their contracts and grants or, if they are dissatisfied, through a claim for reimbursement in the Civilian Board of Contract Appeals or the Court of Federal Claims. Accordingly, these factors tip in favor of staying the Court's order pending appeal.

At a minimum, the Court's order should be stayed as to parties who are not properly before the Court, and who cannot claim to be irreparably harmed from the staying of an injunction to which they have not demonstrated their entitlement. *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (holding that judicial remedies "must be tailored to redress the plaintiff's particular injury"); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Whether framed as injunctions of 'nationwide,' 'universal,' or 'cosmic' scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case."); *see Trump v. Hawaii*, 585 U.S. 667, 712-21 (2018) (Thomas, J., concurring).

## CONCLUSION

For the foregoing reasons, the Court should clarify its order or stay the TRO to give Defendants the opportunity to seek emergency appellate relief.

Dated: February 21, 2025

Respectfully submitted,

BRETT A. SHUMATE
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
CHRISTOPHER D. EDELMAN
Senior Counsels
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

10