**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR
PRELIMINARY RELIEF**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    STATUTORY BACKGROUND ................................................................................. 3

II.   FACTUAL BACKGROUND ...................................................................................... 5

III.  THE INSTANT ACTION ............................................................................................ 7

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR
CLAIMS. ................................................................................................................... 10

      A.    Plaintiffs Have Not Established Subject-Matter Jurisdiction Over Their
Claims ............................................................................................................. 11

            1.    Plaintiffs Must Pursue the Delayed Payment Claims Advanced
Here Through Established Agreement-Specific Procedures ..................... 12

            2.    Plaintiffs Fail to Show Article III Standing for the Broad Relief
that They Seek ........................................................................................ 18

      B.    Plaintiffs Have No Likelihood of Success on the Merits Because They Fail
to Address the Express or Implied Terms of their Funding Agreements,
Which Authorize the Disputed Suspensions and Terminations ........................... 21

      C.    Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims. .................. 23

            1.    The Separation of Powers Claims Additionally Fail Because the
President's Powers in the Realm of Foreign Affairs are Vast and
Generally Unreviewable. ........................................................................ 24

            2.    *AVAC*'s Take Care Clause Claim Additionally Fails Because the
Take Care Clause Cannot be Used to Obtain Affirmative Relief. ............ 26

      D.    Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure
Act Claims. ..................................................................................................... 30

            1.    Plaintiffs Do Not Allege Any Agency Action Beyond Their
Contract-Specific Grievances. ................................................................ 30

2.     The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs. ........................ 32

3.     Defendants Have Not Acted Contrary to Law. ......................................... 33

4.     Defendants Have Not Acted Arbitrarily and Capriciously. ...................... 37

II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION. .......... 39

III.   THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION. ............................................... 43

IV.   ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED. ....... 45

CONCLUSION .......................................................................................................... 50

# TABLE OF AUTHORITES

## Cases

\*  *A & S Council Oil Co. v. Lader,*
   56 F.3d 234 (D.C. Cir. 1995) ..................................................................... 14, 15, 41

*Adams v. Vance,*
   570 F.2d 950 (D.C. Cir. 1978) .......................................................................... 10, 26

*Air Transp. Ass'n of Am. v. Reno,*
   80 F.3d 477 (D.C. Cir. 1996) ................................................................................. 20

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.,*
   840 F. Supp. 2d 327 (D.D.C. 2012) ......................................................................... 42

*Alabama-Coushatta Tribe of Tex. v. United States,*
   757 F.3d 484 (5th Cir. 2014).................................................................................. 32

*Alexander v. Trump,*
   753 F. App'x 201 (5th Cir. 2018)........................................................................... 31

\*  *Am. For. Serv. Ass'n v. Trump,*
   No. 1:25-cv-352 (D.D.C. Feb. 21, 2025) ................................................................ 17

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003)............................................................................................. 25

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
   968 F. Supp. 2d 38 (D.D.C. 2013) .......................................................................... 42

*Am. Whitewater v. Tidwell,*
   770 F.3d 1108 (4th Cir. 2014)................................................................................ 30

*Ancient Coin Collectors Guild v. CBP,*
   801 F. Supp. 2d 383 (D. Md. 2011), *aff'd,* 698 F.3d 171.................................... 31, 38

*Angelus Milling Co. v. Commissioner,*
   325 U.S. 293 (1945)......................................................................................... 27, 28

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015)............................................................................................. 47

*Baker v. Carr,*
   369 U.S. 186 (1962)............................................................................................. 28

*Bancoult v. McNamara*,
  445 F.3d 427 (D.C. Cir. 2006) ................................................................. 26

*Bernstein v. Kerry*,
  962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014). .......................... 19

*Boaz Housing Auth. v. United States*,
  995 F.3d 1359 (Fed. Cir. 2021) ............................................................. 15, 16

*Boivin v. U.S. Airways, Inc.*,
  297 F. Supp. 2d 110 (D.D.C. 2003) ............................................................. 40

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................... 33

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................. 39, 40

*Chi. & S. Air Lines v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ...................................................................... 26, 29

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................................. 40

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ................................................................. 35

*Clinton v. Jones*,
  520 U.S. 681 (1997) ....................................................................... 29

*Cmty. Oncology All. v. Becerra*,
  No. 23-CV-2168 (CJN), 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ...................................... 9

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989) .............................................................. 14, 15, 17

*Collins v. Yellen*,
  594 U.S. 220 (2021) ....................................................................... 18

*Dabney v. Reagan*,
  542 F. Supp. 756 (S.D.N.Y. 1982) ............................................................. 35

*Dai Glob. v. Adm'r of USAID*,
  945 F.3d 1196 (Fed. Cir. 2019) ............................................................... 13

*Dalton v. Specter,*
  511 U.S. 462 (1994) .......................................................................... 24, 27, 29

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ................................................................ 9, 43

*Detroit Int'l Bridge Co. v. Canada,*
  189 F. Supp. 3d 85 (D.D.C. 2016) ................................................................ 31

*DHS v. New York,*
  140 S. Ct. 599 (2020) ............................................................................. 46

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) .............................................................. 49

*Elm 3DS Innovations LLC v. Lee,*
  No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)................................. 33

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................................... 21, 46

\*   *Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..................................................................... 31, 38, 48, 50

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) .............................................................................. 29

*G.L. Christian & Assocs. v. United States,*
  312 F.2d 418 (Ct. Cl. 1963) ...................................................................... 22

*G.L. Christian and Assocs. v. United States,*
  320 F.2d 345 (Ct. Cl. 1963) ...................................................................... 22

*Garcia v. Vilsack,*
  563 F.3d 519 (D.C. Cir. 2009) ................................................................... 33

*Gen. Land Off. v. Biden,*
  722 F. Supp. 3d 710 (S.D. Tex. 2024) .......................................................... 35

\*   *Gill v. Whitford,*
  585 U.S. 48 (2018) ............................................................................ 18, 46

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) .............................................................................. 47

*Gulf Oil Corp. v. Brock*,
     778 F.2d 834 (D.C. Cir. 1985) ............................................................... 45

*Gulf Oil Corp. v. Dep't of Energy*,
     514 F. Supp. 1019 (D.D.C. 1981) ........................................................... 40

*Harisiades v. Shaughnessy*,
     342 U.S. 580 (1952) ............................................................................... 26

*Heckler v. Chaney*,
     420 U.S.  (1985) ...................................................................................... 25

*Hi-Tech Pharmacal Co. v. FDA*,
     587 F. Supp. 2d 1 (D.D.C. 2008) ...................................................... 39, 42

*Holder v. Humanitarian L. Project*,
     561 U.S. 1 (2010) ................................................................................... 44

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
     219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............................... 44

*Hunt v. Wash. State Apple Advert. Comm'n*,
     432 U.S. 333 (1977) ........................................................................... 19, 20

*In re Navy Chaplaincy*,
     738 F.3d 425 (D.C. Cir. 2013) ................................................................. 9

*Indigenous People of Biafra v. Blinken*,
     639 F. Supp. 3d 79 (D.D.C. 2022) ......................................................... 19

*Ingersoll-Rand Co. v. United States*,
     780 F.2d 74 (D.C. Cir. 1985) ................................................................. 15

*Johnson v. Eisentrager*,
     339 U.S. 763 (1950) ............................................................................... 26

*K-Con, Inc. v. Sec'y of Army*,
     908 F.3d 719 (Fed. Cir. 2018) ............................................................... 22

*Kendall v. United States ex. rel. Stokes*,
     37 U.S. (12 Pet.) 524 (1838) ................................................................. 28

*Kim v. FINRA*,
     698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*, 2025 WL 313965
     (D.C. Cir. Jan. 27, 2025). ................................................................. 43, 45

vi

*Labat-Anderson, Inc. v. United States*,
   42 Fed. Cl. 806 (1999) ................................................................................... 22

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 41

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................. 18, 46

*Long Term Care Pharm. All. v. UnitedHealth Group, Inc.*,
   498 F. Supp. 2d 187 (D.D.C. 2007) ............................................................. 15

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................... 31

*Louisiana v. United States*,
   948 F.3d 317 (5th Cir. 2020) ........................................................................ 32

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 19, 29

*Lujan v. Nat'l Wildlife Fed'n.*,
   497 U.S. 871 (1990) ...................................................................................... 32

*M. Steinthal & Co. v. Seamans*,
   455 F.2d 1289 (D.C. Cir. 1971) .................................................................... 22

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ...................................................................................... 47

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002), *aff'd*, 2003 WL 349713 (D.C. Cir. 2003) ....................... 19

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ................................................................. 28, 29

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ...................................................................................... 16

\*   *Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) ................................................................ *passim*

*Morrison v. Olson*,
   487 U.S. 654 (1988) ...................................................................................... 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................... 30

*Munaf v. Geren*,
  553 U.S. 674 (2008) ......................................................................................... 9

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) .................................................................. 41

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ........................................................................ 49

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 48, 49

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ......................................................................................... 48

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................... 9, 43

\*   *Norton v. S. Utah Wilderness All.* ("SUWA"),
  542 U.S. 55 (2004) ........................................................................................... 32

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ........................................................................... 30

*Pa. Dep't of Pub. Welf. v. United States*,
  48 Fed. Cl. 785 (2001) ..................................................................................... 23

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric., (PETA)*,
  797 F.3d 1087 (D.C. Cir. 2015) ....................................................................... 20

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ......................................................................... 33

*Printz v. United States*,
  521 U.S. 898 (1997) ......................................................................................... 29

*Pub. Citizen v. Stockman*,
  528 F. Supp. 824 (D.D.C. 1981) ...................................................................... 35

*Raines v. Byrd*,
  521 U.S. 811 (1997) ......................................................................................... 18

*Rick's Mushroom Serv. v. United States*,
521 F.3d 1338 (Fed. Cir. 2008) ........................................................... 13

*S.J. Amoroso Constr. Co., Inc. v. United States*,
12 F.3d 1072 (Fed. Cir. 1993) ............................................................. 22

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014) .................................................... 40, 42

\*   *Sampson v. Murray*,
415 U.S. 61 (1974) .............................................................................. 43

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ............................................................. 26

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ............................................................... 9

*Sierra Club v. Peterson*,
228 F.3d 559 (5th Cir. 2000) ............................................................... 32

*Slattery v. United States*,
635 F.3d 1298 (Fed. Cir. 2011) ........................................................... 14

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ............................................................. 48

*Tenet v. Doe*,
544 U.S. 1 (2005) ................................................................................ 48

*Tolliver Group, Inc. v. United States*,
20 F.4th 771 (Fed. Cir. 2021) .............................................................. 17

*Totten v. United States*,
92 U.S. 105 (1876) .............................................................................. 48

*Trauma Serv. Grp. v. United States*,
104 F.3d 1321 (Fed. Cir. 1997) ........................................................... 13

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
No. 23-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ......................... 20

*Trump v. Hawaii*,
585 U.S. 667 (2018) ............................................................................ 46

*Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ................................................................................. 35

*Tulare Cnty. v. Bush*,
   306 F.3d 1138 (D.C. Cir. 2002) ............................................................. 31

*Turlock Irrigation Dist. v. FERC*,
   786 F.3d 18 (D.C. Cir. 2015) ................................................................. 21

*U.S. ex rel. McLennan v. Wilbur*,
   283 U.S. 414 (1931) ............................................................................... 49

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ................................................................ 13

\*   *United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) .......................................................................... 25, 26

*United States v. Intrados/Int'l Mgmt. Group*,
   277 F. Supp. 2d 55 (D.D.C.2003) ......................................................... 13

*United States v. Kellogg Brown & Root Servs., Inc.*,
   856 F. Supp. 2d 176 (D.D.C. 2012) ...................................................... 13

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) .......................................................................... 17, 23

*Va. Petroleum Jobbers Ass'n v. FPC*,
   259 F.2d 921 (D.C. Cir. 1958) ............................................................... 40

*Versata Dev. Corp. v. Rea*,
   959 F. Supp. 2d 912 (E.D. Va. 2013) .................................................... 33

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ................................................................. 32

*Watkins v. Westinghouse Hanford Co.*,
   12 F.3d 1517 (9th Cir.1993) .................................................................. 15

*Wilbur v. U.S. ex rel. Kadrie*,
   281 U.S. 206 (1930) ............................................................................... 49

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ............................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 9

\*   *Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .......................................................... 39, 40, 41, 42

*Worthy v. Herter*,
  270 F.2d 905 (D.C. Cir. 1959) ........................................................................... 26

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
  165 F.3d 43 (D.C. Cir. 1999) ............................................................................. 40

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .......................................................................................... 25

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) .............................................................................................. 24

**Constitutional Provisions**

U.S. Const. art. II .................................................................................... 27, 28

U.S. Const. art. II, § 3 ..................................................................................... 29

**Statutes**

2 U.S.C. § 683 ................................................................................................. 35

2 U.S.C. § 684 ................................................................................................. 36

2 U.S.C. §§ 682 *et seq.* .................................................................................... 35

5 U.S.C. § 104 ................................................................................................... 4

5 U.S.C. § 702 ................................................................................................. 15

5 U.S.C. § 704 ......................................................................................... 31, 33

5 U.S.C. § 706 ......................................................................................... 30, 34

22 U.S.C. § 2151 *et seq.* ..................................................................................... 3

22 U.S.C. § 2151b ............................................................................................. 3

22 U.S.C. § 2151t ............................................................................................ 47

22 U.S.C. § 2291 ............................................................................................... 3

22 U.S.C. § 2346 ........................................................................................................ 3, 4

22 U.S.C. § 2347 ........................................................................................................... 3

22 U.S.C. § 2348 ........................................................................................................... 3

22 U.S.C. § 2349aa ........................................................................................................ 3

22 U.S.C. § 2381 note .................................................................................................... 4

22 U.S.C. § 2382 ........................................................................................................... 4

22 U.S.C. § 2601 ........................................................................................................... 3

22 U.S.C. § 2763 ........................................................................................................... 3

22 U.S.C. § 6563 ........................................................................................................... 4

22 U.S.C. § 6592 ........................................................................................................... 4

28 U.S.C. § 1346 ......................................................................................................... 14

28 U.S.C. § 1491 ..................................................................................................... 13, 14

41 U.S.C. § 605 ........................................................................................................... 13

41 U.S.C. § 7101 ...................................................................................................... 1, 12

41 U.S.C. § 7102 .................................................................................................. 1, 12, 13

41 U.S.C. § 7103 .............................................................................................. 1, 12, 13, 17

41 U.S.C. § 7104 ..................................................................................................... *passim*

41 U.S.C. § 7105 .............................................................................................. 1, 12, 13, 14

41 U.S.C. § 7106 ...................................................................................................... 1, 12

41 U.S.C. § 7107 ...................................................................................................... 1, 12

41 U.S.C. § 7108 ...................................................................................................... 1, 12

41 U.S.C. § 7109 ...................................................................................................... 1, 12

Pub. L. No. 87-195, 75 Stat. 424 (1961) ........................................................................ 3

Pub. L. No. 87-510, 76 Stat. 121 (1962)...................................................................... 3

Pub. L. No. 93-344, 88 Stat. 297 (1974)................................................................... 35

Pub. L. No. 97-258, 96 Stat. 877 (1982)................................................................... 35

Pub. L. No. 101-179, 103 Stat. 1298 (1989).............................................................. 3

**Regulations**

2 C.F.R. § 200.340............................................................................................... 22

2 C.F.R. § 200.343............................................................................................... 23

2 C.F.R. § 700.1........................................................................................... 21, 36

2 C.F.R. § 700.14......................................................................................... 21, 36

48 C.F.R. pt. 49.502............................................................................................ 22

48 C.F.R. § 42.1305............................................................................................ 22

48 C.F.R. § 49.201............................................................................................. 23

48 C.F.R. § 49.502............................................................................................. 22

48 C.F.R. § 52.249-1..................................................................................... 22, 36, 37

48 C.F.R. § 52.249-4...................................................................................... 22, 36

48 C.F.R. § 52.249-6...................................................................................... 22, 36

48 C.F.R. § 52.249-14.......................................................................................... 22

48 C.F.R. § 52.249-15.......................................................................................... 22

Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ...................................... 4

Exec. Order  No. 12,163, 44 Fed. Reg. 56,673 (Sept. 29, 1979) (22 U.S.C. § 2381 note)............ 4

Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021)....................................... 31

Exec. Order No.14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025)................................. *passim*

**Other Authorities**

ADS ch. 303 MAB § M10 .................................................................................................. 23

ADS ch. 303 MAB § M13 .................................................................................................. 23

H.R. Rep. No. 93-658, 93d Cong., 1st Sess. (1971) ....................................................... 35

Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel,
   Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally
   Impacted Schools, 1 Supp. Op. O.L.C. 303 (1969) (Dec. 1, 1969) .......................................... 25

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause
   (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-
   assistance-pause ................................................................................................................. 5, 37

## INTRODUCTION

Plaintiffs, AIDS Vaccine Advocacy Coalition ("AVAC"), Global Health Council ("GHC") and other companies and organizations, allege that the "Defendants' actions in freezing foreign aid funding and ordering the immediate cessation of hundreds of critical projects throughout the world are unlawful and must be enjoined." AVAC Pls.' Mot. for Temp. Restraining Order, ECF No. 13-1 ("AVAC Pls.' Mot.") at 1; *see also* GHC Pls.' Mot. for Temp. Restraining Order, ECF No. 4 ("GHC Pls.' Mot.") at 1. They invoke broad Administrative Procedure Act ("APA") claims and constitutional challenges, but they are ultimately pressing contractual disputes—claims that can be resolved only through the specific procedures provided in the Contract Disputes Act, 41 U.S.C. §§ 7101–09 ("CDA"). Plaintiffs' proposed remedy of an overbroad injunction is independently unlawful; Plaintiffs seek essentially to place the U.S. Agency for International Development ("USAID") in a receivership, superintended by the Court, by requiring Defendants to make disbursements and to "clear[] any administrative, operational, human resource, or technical hurdles to implementation" to do so. *See*, *e.g.*, *AVAC* Proposed Order, ECF No. 13-6.

Plaintiffs' motions for preliminary injunctions fail to establish a likelihood of success on the merits of their claims. As an initial matter, Plaintiffs have not demonstrated that this Court has subject-matter jurisdiction over their claims. *First*, the funding-recipient Plaintiffs, who are counterparties to funding arrangements with USAID and State, have not shown that their claims fall within an applicable waiver of sovereign immunity. The CDA and the Tucker Act waive sovereign immunity for certain claims based on contract payment obligations, but those claims must be brought in the Court of Federal Claims or the Civilian Board of Contract Appeals. And Plaintiffs cannot merely repackage their contract-payment claims as claims for injunctive relief falling within the APA's waiver of sovereign immunity. *Second*, even if the funding recipient

1

Plaintiffs had shown that their monetary payment claims are properly before this Court, no Plaintiff has Article III standing to obtain an injunction against the Executive Order or against the Secretary of State's memorandum. And for their part, the association Plaintiffs lack associational standing because they have not shown that the asserted claims, which arise from particular funding arrangements between the agencies and funding recipients, can be adjudicated in the absence of those recipients.

Even if Plaintiffs' claims were proper in this Court, the claims are meritless on their own terms. With respect to Plaintiffs' constitutional claims, Plaintiffs miss the mark because they raise purely statutory arguments. And in any event, Plaintiffs' Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and generally unreviewable. Their Take Care Clause argument fails as that clause cannot be used to obtain affirmative relief.

Plaintiffs' APA claims also do not establish a likelihood of success. Apart from their contract-specific grievances, for which they have not shown that this Court is the proper forum, Plaintiffs' claims do not challenge any *agency* action, so those claims cannot be brought under the APA. Further, Plaintiffs have another adequate remedy at law, and they cannot demonstrate that Defendants have acted contrary to law or arbitrarily and capriciously, or exceeded their statutory authority.

Finally, Plaintiffs likewise do not prevail on the remaining preliminary-injunction factors. They have not established with certainty that they will suffer harms serious enough to warrant an exception to the settled rule that monetary harms are not irreparable. And they have not established that they will actually suffer from the other harms they allege. Because the public has an interest in the President taking decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor. As such, Plaintiffs have not established the criteria

necessary for this Court to enter the extraordinary remedy of a preliminary injunction. Hence, the Court should deny the motions and dissolve the Temporary Restraining Order ("TRO") previously issued. *AVAC* ECF No. 17, GHC ECF No. 30.

## BACKGROUND

### I.    STATUTORY BACKGROUND

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance. Many of the authorities provided under the Foreign Assistance Act of 1961 ("FAA"), Pub. L. No. 87-195, 75 Stat. 424 (22 U.S.C. § 2151 *et seq.*) and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine." *See, e.g., id.* § 104(c)(1) (22 U.S.C. § 2151b(c)(1)) (health assistance); *id.* § 481(a)(4) (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); *id.* § 531 (22 U.S.C. § 2346) (assistance to promote economic or political stability); *id.* § 541(a) (22 U.S.C. § 2347) (International Military Education and Training assistance); *id.* § 551 (22 U.S.C. § 2348) (Peacekeeping Operations); *id.* § 571 (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, § 2(c)(1), 76 Stat. 121 (codified as amended at 22 U.S.C. § 2601(c)(1)); Support for East European Democracy ("SEED") Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498b(i)); section 23(a) of the Arms Export Control Act (22 U.S.C. § 2763(a)).

The Secretary of State may exercise those authorities, including under delegations from the President. For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general

direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c). Executive Order 12163 (22 U.S.C. § 2381 note) delegated to the Secretary of State a range of functions related to foreign assistance, including most functions under the FAA.

President Kennedy in 1961 issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Congress later recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (1) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment . . . ."). Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. And several types of foreign assistance are jointly administered by the Department of State and USAID. *See, e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States' provision of foreign aid is aligned with American interests. Upon taking office on January 20, 2025, President Trump instituted a 90-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy. The President also directed reviews of each foreign assistance program by departments and agencies under guidelines provided by the Secretary of State, in consultation with the Director of OMB, with determinations on these reviews to be made within 90 days. *See* Exec. Order 14,169, *Reevaluating and Realigning United States*

4

*Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025).  Consistent with that order, Secretary of State

Marco Rubio directed a pause on foreign assistance programs funded by or through the Department

and USAID.  U.S. Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025) (2025 Mem.), *attached

as* Ex. B to Declaration of Pete Marocco ("2/10 Marocco Decl."), *AVAC*, ECF No. 15-1.  Secretary

Rubio also approved waivers of the pause, including waivers for foreign military financing for

Israel and Egypt, emergency food expenses, administrative expenses, legitimate expenses incurred

before the pause went into effect, and legitimate expenses associated with stop-work orders.  2/10

Marocco Decl. ¶ 10.   The Secretary also approved a waiver of the pause for life-saving

humanitarian assistance during the review.  *See* Sec'y of State, Emergency Humanitarian Waiver

to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-

foreign-assistance-pause.

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the

Acting Administrator of USAID.  2/10 Marocco Decl. ¶ 8.  Secretary Rubio, in line with the views

of the President, concluded that USAID's foreign assistance processes reflected signs of severe

inefficiency, and that a substantial number of the programs funded by USAID neither substantially

benefit the American people, nor reflect the priorities of the President and Secretary.  *Id.* ¶ 7.  Thus,

Secretary Rubio sent a letter to Congress on February 3, 2025, stating that Pete Marocco was

delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging

in a review and potential reorganization of USAID's activities to maximize efficiency and align

operations with the national interest."  *Id.* ¶ 8.

USAID has broad authority under the specific funding instruments and existing statutes

and regulations to suspend and terminate foreign assistance funding obligations.  *See* Declaration

of Pete Marocco ("2/18 Marocco Decl.") ¶ 9, *AVAC*, ECF No. 22-1; *see id.* ¶¶ 10–11.  "Since

January 22, 2025, USAID has terminated 498 contracts, grants, and related funding instruments.

Other contracts, grants, and related funding instruments were separately placed on stop work, i.e.,

were paused or suspended, consistent with the terms and rights of the specific awards or contracts

at issue." *Id.* ¶ 12.  The USAID Front Office has generally terminated or suspended instruments

after a multistep, case-by-case review process.  *Id.* ¶ 13; *see id.* ¶¶ 13–14 (describing Front Office

process including review by Secretary Rubio).  To the best of Mr. Marocco's knowledge as of

February 18, 2025, the 498 contracts, grants, and related instruments terminated by the USAID

Front Office were subject to termination either under particular contract terms or terms set by

statutes and regulations that were implicitly incorporated in the contracts.  *Id.* ¶ 16.

The Department of State likewise has broad authority under statutes, regulations, and

specific instruments to suspend or terminate funding obligations.  *Id.* ¶ 23.  State broadly paused

or terminated foreign assistance awards and foreign assistance payments in a manner consistent

with its legal authorities and relevant contract or grant instruments.  Almost immediately, however,

Secretary Rubio issued a number of programmatic waivers of the pause that permitted broad

categories of foreign aid to flow where consistent with foreign policy priorities of the United

States.  Other, more targeted waivers followed.  *Id.* ¶ 24.  Hence, as of February 18, 2025:  The

Department had terminated 25 foreign assistance-funded contracts since the beginning of the new

administration.  *Id.* ¶ 25.  Those contracts were all terminated for convenience, which is a

mandatory term that must be included in all contracts governed by the Federal Acquisition

Regulation (FAR).  *Id.*  Additionally, the Department had issued stop work or suspension orders

for at least 711 additional contracts.  *Id.* ¶ 26.  The Department had also terminated 733 foreign

assistance-funded grants.  *Id.* ¶ 27.  And the Department issued guidance to suspend approximately

6,824 grants. *Id.* ¶ 28. Rather than exercise its right under the terms of the grant documentation to terminate those grants the Department opted to examine these grants individually, consistent with the review directed by President Trump and the Secretary of State, to ascertain whether those grants should be continued. *Id.*

## III.    THE INSTANT ACTION

Plaintiffs in No. 25-cv-400, AVAC and Journalism Development Network, Inc. ("JDN"), aver that they are "nonprofit organizations that receive" federal funds for their "foreign assistance work." *AVAC* Pls.' Mot. at 2–3. Plaintiffs in No. 25-cv-402 are similar organizations that receive federal funds from USAID or State (Democracy International, DAI, Chemonics, Management Sciences for Health, American Bar Association, HIAS), or associations that attest their members are such recipients (Global Health Council and Small Business Association for International Companies). *GHC* Pls.' Mot. at 15–17. Asserting that Plaintiffs are harmed by the terminations or suspensions USAID and State issued since January 30, 2025, Plaintiffs moved for a temporary restraining order or preliminary injunction, seeking provisional relief predicated on their contentions that the challenged Executive Order and Secretary Rubio's January 24 Memorandum, as well as USAID and State's implementing suspensions and terminations, violate the Constitution and the APA. *AVAC* Pls.' Mot. at 9–18; *GHC* Pls.' Mot. at 25–35.

On February 12, 2025, the Court held a hearing before the Government filed an opposition to Plaintiffs' motions, and, the next day, the Court issued an order granting Plaintiffs' motions for a TRO in part. That TRO temporarily restrained Defendants Rubio, Peter Marocco, Russell Vought, the Department, USAID, and the Office of Management and Budget from "enforcing or giving effect to Sections 1, 5, 7, 8, and 9, of the Department of State Memorandum and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14,169, including by

"suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025"; or "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." TRO at 14. The Court noted Defendants' representation at the hearing on February 12, 2025, "that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances." *Id.* The Court concluded "it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id*. The Court thus "ORDERED that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts and grants." *Id*. at 15. In addition, the Court ordered Defendants to "take all steps necessary to effectuate this order" and to "provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance." *Id.*

Additionally, the Court required Defendants to "file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above." *Id.* Defendants filed that report on February 18, 2025. *AVAC*, ECF No. 22. The Court on February 20, 2025 granted in part and denied in part the AVAC Plaintiffs' ensuing motion to enforce the TRO and to hold certain Defendants in contempt, extending the TRO to the earlier of "11:59 p.m. on March 10, 2025, or" the disposition date of the PI motions, while rejecting the contention that Defendants' status report showed them to be in contempt. *AVAC*, ECF No. 30.

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach." *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted).  Indeed, injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be

awarded only upon "an extraordinarily strong showing" as to each element.  *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

Plaintiffs have failed to meet their burden to demonstrate any of the requirements to obtain preliminary injunctive relief because (1) they have not shown there is a likelihood of success on the merits on any of their constitutional or statutory claims because the Court lacks subject-matter jurisdiction to hear those claims, and they are unlikely to succeed on the merits; (2) they have not demonstrated irreparable harm because all of Plaintiffs' alleged harms are redressable; and (3) the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that the Executive is allowed to take decisive action in the realm of foreign affairs.  For any one of these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## I.   PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

Plaintiffs' motions for preliminary injunctions fail to establish a likelihood of success on the merits of their claims.  Plaintiffs have not demonstrated that his Court has subject-matter jurisdiction to reach the merits of their claims because (1) the recipient Plaintiffs that have funding arrangements with USAID and State have not shown that their dispute with those agencies about allegedly delayed payments may be heard in this Court, rather than in the Court of Federal Claims (or, as applicable, the Civilian Board of Contract Appeals), and (2) the association Plaintiffs have not shown that their asserted claims, which arise from particular funding arrangements between the agencies and fund recipients, can be adjudicated in the absence of those recipients.  In any event, even if Plaintiffs had met their burden to establish subject-matter jurisdiction, their constitutional claims fail because (1) they raise purely statutory arguments, (2) the President's powers in the realm of foreign affairs are vast and generally unreviewable, and (3) the Take Care

Clause cannot be used to obtain affirmative relief.  Moreover, Plaintiffs' APA claims also do not establish a likelihood of success.  Those claims do not challenge any *agency* action and thus cannot be brought under the APA.  Further, Plaintiffs have another adequate remedy at law, and Plaintiffs cannot demonstrate that Defendants have acted contrary to law or arbitrarily and capriciously or exceeded their statutory authority.  For these reasons, the Court should deny Plaintiffs' request for preliminary injunctive relief.

### A.  Plaintiffs Have Not Established Subject-Matter Jurisdiction Over Their Claims

Plaintiffs purport to seek injunctive relief from the agencies' implementation of the January 24, 2025, pause on foreign assistance funding.  But they have not shown that this Court has subject-matter jurisdiction over their claims.  *First*, the *recipient* Plaintiffs have not demonstrated that their claims fall within an applicable waiver of sovereign immunity because they fail to address whether the instruments (or award documents) underpinning their receipt of federal funds allow the instant dispute—which is essentially about delayed payment of money—to be heard in this Court, rather than under the procedures spelled out in their award documents, including those contracts at issue covered by the Contract Disputes Act ("CDA").  *Second*, the *association* Plaintiffs (GHC and SBAIC) lack Article III standing to litigate the asserted injuries from the delayed payments, where those injuries purportedly arise from particular implementation decisions based on particular written instruments, and cannot be adjudicated in the absence of the funding recipients whose instruments define the parties' payment (and other) responsibilities.  Because Plaintiffs cannot surmount those threshold obstacles of subject-matter jurisdiction, Plaintiffs fail to show likelihood of success on the merits, and the Court should deny preliminary injunctive relief.

**1. Plaintiffs Must Pursue the Delayed Payment Claims Advanced Here Through Established Agreement-Specific Procedures.**

Plaintiffs fail to satisfy their burden to establish that this Court has subject-matter jurisdiction over their claims. The recipient Plaintiffs aver that USAID or State have improperly delayed paying Plaintiffs funds under various types of foreign assistance awards, such as contracts (*e.g.*, Decl. of James Butcher ¶ 5, ECF No. 7-6; Decl. of Zan Northrip ¶ 10(c), ECF No. 7-7; Decl. of Eric Bjornlund ¶ 7, ECF No. 7-8), cooperative agreements (*e.g.*, Decl. of Mark Hetfield ¶ 8, ECF No. 7-3; Decl. of Marian Wentworth ¶ 4, ECF No. 7-5; Northrip Decl. ¶ 10(c); Bjornlund Decl. ¶ 7; Decl. of Mitchell Warren ¶ 3, ECF No. 1-11), or grants (*e.g.*, Wentworth Decl. ¶ 4; Decl. of Andrew Sullivan ¶ 6, ECF No. 1-12). As discussed below, this Court lacks subject-matter jurisdiction to hear many disputes involving payment under federal contracts. Whether Plaintiffs' claims fall into that category turn on the precise terms of their award documents. Yet Plaintiffs do not attach those award documents, or even quote the provisions of those documents that specify the timing for payment or the proper forum for disputes. It is Plaintiffs' burden to establish this Court's jurisdiction. In light of those omissions, the proper remedy is dismissal of the case, not granting a preliminary injunction.

First and foremost, Plaintiffs fail to establish that their claims will not ripen into the type of payment claims that can *only* be brought through the procedures of the CDA, 41 U.S.C. §§ 7101–09, and over which this Court would lack subject-matter jurisdiction. The CDA applies to certain types of contracts with the Federal Government, including contracts for "the procurement of services[.]" 41 U.S.C. § 7102(a)(2). Categorization of an award document as a contract for purposes of the CDA hinges not on the label the parties assigned to the document but rather on the terms of the award document itself and the context in which the award arose. "[A]ny agreement can be a contract . . . provided that it meets the requirements for a contract with the

Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997); *cf. Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343–44 (Fed. Cir. 2008) (special government cost-share agreement fell outside CDA because it did not provide substantive right to recover money damages).

The CDA provides a procedure for resolving any "claim by a contractor . . . relating to a [procurement] contract." 41 U.S.C. § 7103(a)(1); *see also* 41 U.S.C. § 7102(a)(1) (defining covered contracts); *see, e.g.*, *Dai Glob. v. Adm'r of USAID*, 945 F.3d 1196, 1199–200 (Fed. Cir. 2019). "The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts . . . Second, it waives sovereign immunity over actions 'arising under' that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency board of contract appeals. 41 U.S.C. §§ 7104(a), 7105." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023). Under the CDA, the "contractor [must] take recourse against the government's alleged breach by submitting *a written claim to the contracting officer* for a final decision prior to commencing suit." *United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 183 (D.D.C. 2012) (quoting *United States v. Intrados/Int'l Mgmt. Group*, 277 F. Supp. 2d 55, 63 (D.D.C.2003) (citing, *inter alia*, 41 U.S.C. § 605(a), now 41 U.S.C. § 7103(a)(1)) (emphasis added).

After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State (*see* 41 U.S.C.

§ 7105(e)(1)(B)), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b).   In that regard, the D.C. Circuit has "recognized a congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," such that "the Claims Court has exclusive jurisdiction except to the extent that Congress has granted any other court authority to hear the claims that may be decided by the Claims Court."  *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (cleaned up).

Moreover, although some Plaintiffs may have award documents that are *not* procurement contracts, that still would not make this Court a proper forum for their payment claims.  Depending on the particular instrument, some of the claims may proceed under the Tucker Act, 28 U.S.C. § 1491(a)(1).  The Tucker Act provides for judicial review of breach claims for express or implied contracts over $10,000 with the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute . . . ."  *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*).  Put another way, "[t]he only remedy to which the United States has consented in cases of breach of contract is to the *payment of money damages* in either the Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less.  28 U.S.C. § 1346(a)(1)."  *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (emphasis in original).  And "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."  *Id.* at 3.

Additionally, a few of the declarants have identified grants or cooperative agreements as the source of their dispute, but (again) lacking the critical instrument-specific analysis.  Yet the typical grant issued by USAID and State provides procedures designed to address concerns with administration of the grant.  And in some instances, where the United States employs contract

terms to implement a statutorily mandated program, like certain grant programs, "the government may find itself subject to suit in the Claims Court for damages related to an alleged breach." *Boaz Housing Auth. v. United States*, 995 F.3d 1359, 1368 (Fed. Cir. 2021).

To attempt to avoid the jurisdictional bars of the CDA and the Tucker Act, Plaintiffs depict their claims as ones for injunctive relief under the APA rather than for delayed payments of money predicated on their award documents. The APA waives sovereign immunity for claims "seeking relief other than money damages" from acts of agencies. *See* 5 U.S.C. § 702. But Plaintiffs' superficial effort to invoke the APA fails. Even where "plaintiffs cloak the[ir] claims in" APA "language," such claims "are in fact contract claims covered by" the CDA or the Tucker Act, which "provides the exclusive avenue for relief for all such contract claims against the United States." *A & S Council Oil Co.*, 56 F.3d at 236. When assessing whether the CDA governs, "plaintiffs' labelling is of little importance," given that "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Id.* at 241 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)); *Coggeshall*, 884 F.2d at 4 ("this is an action for breach of contract, irrespective of how it is packaged"); *see also Long Term Care Pharm. All. v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) ("court must look to the 'substance of the remedy sought . . . rather than the label placed on that remedy'") (quoting *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n.5 (9th Cir.1993))); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993))).

That principle controls here. Plaintiffs' declarations expose the superficiality of the "label placed" by Plaintiffs on the remedy they seek. Those declarations make plain that the funding recipient Plaintiffs seek *monetary payments* allegedly due under the award documents they allege

to have been improperly delayed.  *See* Wentworth Decl. ¶ 8 (asserting MSH has "not received *payment* for work completed on contracts") (emphases added); Butcher Decl. ¶ 14 (averring "rough[]" amount of "outstanding invoices issued to USAID for work performed in 2024, most of which were submitted prior to the stop-work orders," a share of which is "past due with no visibility into when they may be *paid*") (emphasis added); Bjornlund Decl. ¶ 10 ("DI has not received *payment* . . . for work completed . . . within the scope of duly authorized USAID programs" before receiving stop work orders) (emphasis added); Northrip Decl. ¶ 6 (alleging "USAID has failed *to make payment* . . . for work DAI completed," including "some" amount "now past due") (emphasis added); Decl. of Scott Carlson ¶¶ 7, 18, ECF No. 7-9 (averring dollar amounts USAID and State were "*obligated*" or "collectively *commit[ted]*" to pay ABA or its program "partners" and specifying portion "frozen") (emphasis added); *see also* Warren Decl. ¶¶ 9–10 (describing amount of USAID "funding"); Sullivan Decl. ¶¶ 8, 10 (describing USAID and State "funding"); Hetfield Decl. ¶¶ 8, 10, 15, 17 (describing USAID and State "[f]unding" amounts to HIAS, including under contracts State "terminated" before action commenced).  Hence Plaintiffs' own declarations show they "seek to receive" amounts they contend are "promised" by the Government in written instruments.  *Cf. Boaz*, 995 F.3d at 1368 (where claimants "simply seek to receive the amount [agency] promised," "true nature of" claim was for compensatory money damages and not equitable relief").  For some of those claims Plaintiffs must first obtain a final agency decision on their post-termination monetary claim, and some Plaintiffs may also have access to judicial review.  41 U.S.C. §§ 7104(b)(1), 7103(g); *see Tolliver Group, Inc. v. United States*, 20 F.4th 771, 775–76 (Fed. Cir. 2021) ("[O]btaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim in the Claims

Court."). For some other claims, any judicial remedy likely lies with the Court of Federal Claims under the Tucker Act. And some claims may not be of the type that can be judicially redressed.

And importantly, "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall*, 884 F.2d at 3. But by asking for a preliminary injunction to enforce the terms of their funding instruments, that is precisely the relief plaintiffs are requesting.

At this stage, Plaintiffs assert only that they have received suspensions or terminations, not that their claims for funds due under the applicable instruments have been rejected by the pertinent agency officials. As a result, their claims would be at best unripe at this stage—raising yet another doubt as to Plaintiffs' showing of subject-matter jurisdiction here.

In short, Plaintiffs cannot meet their burden to establish that their claims fall within an applicable waiver of sovereign immunity and that this Court has subject-matter jurisdiction. Although Plaintiffs superficially invoke the APA, which waives sovereign immunity as to non-monetary claims, Plaintiffs' own declarations show that their claims seek payment of money, and depending on the terms of the award documents (omitted from Plaintiffs' submissions), those claims may fall within the CDA. Hence, the recipient Plaintiffs have not established that sovereign immunity is waived in this Court on their claims (rather than in the Civilian Board of Contract Appeals or the Court of Federal Claims). As a result, they cannot show a likelihood of success at the threshold. Another Court in this District recently declined to issue a preliminary injunction against related aspects of USAID and State's operations on the basis that it "likely lacks jurisdiction over plaintiffs' claims" because of alternative schemes for review. *See* Memorandum

17

Opinion, ECF No. 49 at 18, *Am. For. Serv. Ass'n v. Trump et al.*, No. 1:25-cv-352 (D.D.C. Feb. 21, 2025) ("AFSA Order").  The Court should do the same.

### 2.  Plaintiffs Fail to Show Article III Standing for the Broad Relief that They Seek.

Apart from award-specific suspensions or terminations, the funding recipient Plaintiffs lack Article III standing to challenge any *other* agency acts implementing Executive Order 14,169 or Secretary Rubio's January 24, 2025 Memorandum, 25 STATE 6828 (Jan. 24, 2025)—that is, implementing acts that do *not* affect Plaintiffs directly—given Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Here, that is at most each funding recipient Plaintiffs' "pocketbook injury" from individual instrument-specific agency decisions, *Collins v. Yellen*, 594 U.S. 220, 243 (2021), and no more than that.  And although Plaintiffs have sought broad relief against a vast array of agency decisions regarding funding instruments of nonparties, in Article III courts, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Gill*, 585 U.S. at 72 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Going further than those pocketbook injuries would flout the principle that the "standing inquiry [must be] especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).  In that regard, no Plaintiff can be allowed to maintain Article III standing based on anything less than "concrete" injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Plaintiffs' broad fears about foreign policy outcomes lack the requisite concreteness.   *See, e.g.*, Bjornlund Decl. ¶ 12

(forecasting such effects as impedance of Government communications with Bangladesh and "increased instability in the Caucasus region"); Butcher Decl. ¶ 13(b) (forecasting "risks stirring anti-American sentiment and threatening national security").  Rather, courts in this Circuit recognize that "the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014).  And Plaintiffs' forecasts of harms to conditions overseas "amount[] to nothing more than speculation about future events that may or may not occur," especially given Defendants' waiver process for certain funds.  *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd*, 2003 WL 349713 (D.C. Cir. 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) (John Does who "reasonably fear[] injury at the hands of the Nigerian government," after the United States' sale of aircraft to Nigerian government, failed to allege injury-in-fact).

In any event, two Plaintiffs in *Global Health Coalition* are not themselves funding recipients—instead, it is the members of those two Plaintiffs, GHC and SBAIC, that are funding recipients.  The membership associations have no Article III standing at all.  Such membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  GHC and SBAIC fail on both counts.

*First*, as to *associational* standing: Precedent requires an organization to show that it has a member who would otherwise have standing to sue in his or her own right; that the interests the organization seeks to protect are germane to its purpose; and that neither the claim asserted nor the relief requested requires the participation of the individual member in the lawsuit. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *Hunt*, 432 U.S. at 343. Monetary relief typically violates the third prong of *Hunt*, because "damages claims are not common to the entire membership, nor shared by all in equal degree, and consequently there is simply no way the extent of the harm to [an organization's] members can be determined without individualized proof." *See Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483–84 (D.C. Cir. 1996) (citation omitted). "If such proof is required to resolve a claim—whether monetary or not—the member-participation prong is not satisfied." *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-2776, 2025 WL 27162 at *12 (D.D.C. Jan. 3, 2025). Here, as explained above, *supra* at 17, no matter that they cloak their arguments in the garb of injunctive relief, Plaintiffs' claims seek to obtain disbursement of foreign assistance *funds* to which Plaintiffs assert entitlement under particular instruments. The real focus (rather than the rhetorical one) of the claims is monetary recovery, and the "extent of the harm" to the members of GHC or SBAIC would hinge on "individualized proof." Hence, GHC and SBAIC lack associational standing.

*Second*, as to *organizational* standing: Neither GHC nor SBAIC attests that the challenged conduct has concretely injured them (as distinct from their members), and, importantly, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Neither GHC nor SBAIC attest that the pause in foreign aid injures those entities. *See id.* Nor do they attest that

they are using their resources to counteract any purported harm from that pause. *See id.* For example, to allege an injury to its interest, an organization like GHC or SBAIC "must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quotations omitted). As Plaintiffs make no such showing, the claims of GHC and SBAIC fail for lack of Article III standing.

**B. Plaintiffs Have No Likelihood of Success on the Merits Because They Fail to Address the Express or Implied Terms of their Funding Agreements, Which Authorize the Disputed Suspensions and Terminations.**

Plaintiffs' claims fail on the merits for a simple, overarching reason. All of their claims arise from their receipt of foreign assistance monetary awards under the terms of particular funding instruments—terms Plaintiffs never grapple with. Those terms, explicitly or implicitly, confer on agencies contractual authority to make the challenged suspensions or terminations. *See* 2/18 Marocco Decl. ¶¶ 9–11, 23. In particular:

Substantially all of USAID's foreign assistance grants and cooperative agreements authorize the agency to "suspend or terminate the award in whole or in part" if the Agency "determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States or would be in violation of an applicable law." 2 C.F.R. § 700.14; *see* 2/18 Marocco Decl. ¶ 10. Likewise, USAID grants permit suspension "pending a decision to resume or terminate the award." 2 C.F.R. § 700.1.

Moreover, substantially all USAID contracts are terminable by the Agency for convenience, pursuant to the Federal Acquisition Regulation ("FAR") and USAID regulations. 2/18 Marocco Decl. ¶ 11; *see* 48 C.F.R. § 52.249-1 (authorizing termination for convenience when termination is "in the Government's interest"); 48 C.F.R. §§ 49.502(a)–(b), 52.249-4, 52.249-6(a)(1). Termination for convenience terms are mandatory for procurement contracts and are

implied when not included explicitly. *See K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018); *S.J. Amoroso Constr. Co., Inc. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993); *G.L. Christian and Assocs. v. United States*, 320 F.2d 345 (Ct. Cl. 1963). *Cf. M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304 (D.C. Cir. 1971) ("[e]ven if [a] clause [permitting the government to terminate a contract for its own convenience] is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by [the Armed Services Procurement Regulations] and this requirement has the force and effect of law"). Likewise, applicable FAR regulations also authorize contract suspension in certain circumstances. 48 C.F.R. §§ 42.1305(a)–(b), 52.242-14, 52.242-15.

For its part, the Department of State has broad authority under statutes, regulations, and specific instruments to terminate funding obligations. Hence, State, like USAID, may terminate contracts for convenience. 48 C.F.R. § 49.502; *see generally G.L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963). As noted above, many contracts include stop-work or similar provisions. *See* 48 C.F.R. § 42.1305(b); *id.* § 52.242-15. *Cf. Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 856 (1999) (reading Protest After Award clause, authorizing issuance of stop work order, into USAID contract under *Christian*).

In addition, State may terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). That language is included in paragraph V(4) of State's Standard Terms and Conditions for Federal Awards, which are incorporated by reference in all of State's standard federal assistance award instruments.

As parties that have contracted with the Agency and the Department, Plaintiffs' remedies are properly found in their contracts, not in the Constitution or the APA. For example, there is an established mechanism for counterparties to submit disputes for resolution to USAID. *See, e.g.*,

ADS ch. 303 MAB § M10(e) & M13. If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. § 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. § 200.343 (effects of suspension and termination); *cf. Pa. Dep't of Pub. Welf. v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction). And as noted above, *supra* at 19, money "damages are always the default remedy for breach of contract," *Winstar*, 518 U.S. at 885, and the various agreements at issue provide the procedures available to seek those money damages.

### C. Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims.

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. In Count I (Separation of Powers), the *AVAC* Plaintiffs allege, "the Executive Order purports to amend Congressional appropriations statutes." *AVAC* Compl. ¶ 48. In Count II (Take Care Clause), the *AVAC* Plaintiffs allege "the President lacks the authority to direct federal officers or agencies to act in derogation of a federal statute." *Id.* ¶ 56. Similarly, in Count III (Separation of Powers), the *Global Health Coalition* Plaintiffs allege, "the Impoundment Control Act and Anti-Deficiency Act forbid executive-branch officers from declining to spend appropriated funds." *GHC* Compl. ¶ 126; *see also id.* ¶ 125 ("the President has no unilateral authority to amend or ignore congressional appropriations"). And in Count IV (Ultra Vires), the *GHC* Plaintiffs allege, "No statute, constitutional provision, or other source of law authorizes Defendants to withhold foreign-assistance funds that Congress has appropriated." *Id.* ¶ 130.

All these claims are statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the

23

long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. At the outset, therefore, Plaintiffs cannot prevail on their Separation of Powers, Take Care Clause, or Ultra Vires claims alleging constitutional violations. There are also additional reasons why these claims must fail.

> ### 1. The Separation of Powers Claims Additionally Fail Because the President's Powers in the Realm of Foreign Affairs are Vast and Generally Unreviewable.

Plaintiffs argue that Defendants violated the separation of powers because "[t]he Executive Order unlawfully vitiates . . . legislative choices. The order starves grantees carrying out programs for which Congress appropriated funding." *AVAC* Pls.' Mot. at 12. But the President's actions were in fact within his authorized discretion to take. *See infra* at 29-32. There can be no reasonable doubt that it is the President whose authority reigns principally in the realm of foreign affairs.

Under Article II of the Constitution, as well as powers conferred by Congress in the Foreign Service Reform and Restructuring Act of 1998, the President has broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. Giving aid to projects that are inconsistent with American values could actually destabilize foreign countries and our relations with those countries. *See* E.O. 14,169 § 1. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (the President's power in the field of international relations "does not require as a basis for

its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36 & n.2 (the President can "act in external affairs without congressional authority").

The *GHC* Plaintiffs' contention that the Executive Branch is infringing on Congress's power of the purse, *GHC* Pls.' Mot. at 32–33, is misplaced. That argument fails to account for the President's distinct interest in foreign affairs. "[I]f a Congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority . . . over foreign affairs . . . a situation would be presented very different from [a domestic impoundment]." Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303, 310–11 (1969) (Dec. 1, 1969). But in any event, no impoundment has taken place. *See infra* at 37–38. Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to take action. *Cf. Heckler v. Chaney*, 420 U.S. 821 (1985). It is precisely the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.

Plaintiffs' request that this Court step in to supervise Defendants' foreign assistance operations in some sort of receivership arrangement would create a grave separation of powers problem. Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d

427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign

affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines v. Waterman*

*S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy

is political, not judicial. Such decisions are wholly confided by our Constitution to the political

departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S.

763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic

and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to

the conduct of foreign relations . . . are so exclusively entrusted to the political branches of

government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270

F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the

power of action and the courts will not attempt to review the merits of what he does. The President

is the nation's organ in and for foreign affairs.''). As such, injunctive relief related to foreign

affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only

upon "an extraordinarily strong showing" as to each element. *Adams*, 570 F.2d at 954–55.

Plaintiffs are not likely to prevail on their separation of powers claims where the relief they seek

would in reality result in a serious overstep of the judiciary into the exclusive domain of the

Executive.

## 2. AVAC's Take Care Clause Claim Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief.

Plaintiffs attempt to circumvent the limitations of the APA by asserting what can only be

characterized as a broad programmatic attack against the President as well as the agency

Defendants under the Take Care Clause, U.S. Const. art. II, § 3. *See AVAC* Compl. ¶¶ 52–59

(Count II). And in support of their Take Care Clause claim, Plaintiffs do not so much as attempt

to make any independent argument, but rather state, "[F]or the same reasons that the Executive

Order violates the separation of powers, it also violates the Take Care Clause." *AVAC* Pls.' Mot. at 14.  They seek both declaratory and injunctive relief to correct this alleged failure, *AVAC* Compl. at 20, Prayer for Relief (A), (B).  It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief.  Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims.  *See Dalton*, 511 U.S. at 473.  Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing USAID themselves, but rather, are based on Plaintiffs' subjective views about how to best implement and administer USAID.

In their Complaint, the *AVAC* Plaintiffs cite *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945) for the proposition that "[t]he Take Care Clause is judicially enforceable against presidential action that undermines statutes duly enacted by Congress." *AVAC* Compl. ¶ 54.  But in fact, that case holds no such thing and does not even reference the Take Care Clause. *See Angelus Milling Co.*, 325 U.S. at 296 (holding only and uncontroversially that "[i]nsofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of Treasury officials").[1]  And the *AVAC* Plaintiffs' motion contains no case law

---

[1] Plaintiffs' citation of *Kendall v. United States ex. rel. Stokes*, 37 U.S. (12 Pet.) 524, 612–13 (1838), *AVAC* Compl. ¶ 54, fares no better.  In that case, the Supreme Court held that the Take Care Clause could not be used as a sword to justify "clothing the President with a power entirely to control the legislation of congress." *Kendall*, 37 U.S. (12 Pet.) at 613.  That case said nothing at all about the justiciability of a claim purporting to arise out of a Take Care Clause violation.

citations whatsoever and no substantive argument beyond conclusory allegations supporting their Take Care Clause argument.  *See AVAC* Pls.' Mot. at 13–14.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President.  U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress.  But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws.  Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction.  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character.").  To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone.  *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi.*

*& S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

Moreover, Plaintiffs' invocation of the Take Care Clause is particularly inappropriate as a mechanism to advance their own political and policy views. Their challenge must fail because the actions that they identify are discretionary in nature. For example, Plaintiffs challenge USAID's decision to reduce or cut funding for programs like clinics distributing HIV medication, soup kitchens in Khartoum, and rehydration salts to treat diarrhea in Zambia, *see AVAC* Compl. ¶ 39, but these are discretionary budgetary decisions made by the agency based on its experience and expertise. The discretionary nature of these programs makes them ill-suited for a Take Care Clause

challenge because it is within the President's purview to interpret the statutory guidance Congress provides him as he sees fit in executing the duties of the executive branch.

### D.  Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure Act Claims.

Under the APA, the Court may set aside an agency action if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).  The Court's review is "ultimately narrow and highly deferential" and focused on "ensur[ing] that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'"  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (citations omitted).  The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made" to have its decision sustained.  *Id.* (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).  A court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' APA claims are not likely to succeed here because (1) they do not allege any *agency* action, (2) an adequate alternative remedy is available to Plaintiffs, (3) Defendants have not exceeded their statutory authority, (4) Defendants have not acted contrary to law, and (5) Defendants have not acted arbitrarily and capriciously.

### 1.  Plaintiffs Do Not Allege Any Agency Action Beyond Their Contract-Specific Grievances.

Review under the APA is available only for "agency action." 5 U.S.C. § 704.  Presidential actions are not agency actions reviewable under the APA.  It is "well-settled" that Presidential action is not subject to review under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  Because the President is

not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018).

Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to Executive Order No. ("EO") 14,169 under the APA are not reviewable. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (citation omitted) (holding that a challenge to Executive Order No. 14,008 "cannot be reviewed under the APA because the President is not an agency"). Thus, Plaintiffs' claims that the President lacked authority to issue the EO, relied upon evidence which lacked veracity, and did not make appropriate findings are all non-cognizable under the APA. *See id.*

Plaintiffs' challenges to the implementation of the EO likewise fail. First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA).

Second, their contract-specific grievances for which they have not shown subject-matter jurisdiction in this Court, Plaintiffs do not even identify a concrete action that either of the defendant agencies here—USAID and State—has taken that could specifically be redressed by a federal court. A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife*

*Fed'n.*, 497 U.S. 871, 899 (1990); *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 62

(2004) (APA limits judicial review to "circumscribed, discrete agency actions"). These final

agency actions must be "circumscribed [and] discrete." *SUWA*, 542 U.S. at 62 (2004). The APA

does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan*, 497

U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of*

*Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited

approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020)). The APA thus

contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale

improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v.*

*United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559,

566 (5th Cir. 2000)).

Here, Plaintiffs' complaints do not challenge a discrete agency action. Rather, the *AVAC*

Plaintiffs complain of Defendants "imposing a blanket freeze on virtually all foreign assistance

funding and operations." *AVAC* Pls.' Mot. at 15. Similarly, the *GHC* Plaintiffs take issue with

how "the President and other executive-branch officials have sought to dismantle an independent

agency established by Congress and withhold billions of dollars in congressionally appropriated

foreign-assistance funding." *GHC* Pls.' Mot. at 1. These are the exact types of broad

programmatic challenge and supervision of an agency's day-to-day activities that courts have

repeatedly ruled are impermissible under the APA.

### 2. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a

court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court,"

*id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate

existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Further, a remedy may be adequate even if "the arguments which can be raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above in Section I.A.1, this is, in essence, a contract dispute for payment of funds allegedly delayed, and given that the Tucker Act and Contract Disputes Act provide specified remedies for such contractual claims, those statutes remain potentially available to Plaintiffs as an adequate alternative. They are therefore barred from bringing this as an APA claim.

### 3. Defendants Have Not Acted Contrary to Law.

As explained above, the Court may set aside an agency action under the APA only if the Court finds that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). *First*, Plaintiffs argue that Defendants' actions are "inconsistent with the FCAA, which directs that federal funding 'shall' be made available for projects of the sort that Defendants have deliberately halted." *AVAC* Pls.' Mot. at 17; *see also GHC* Pls.' Mot. at 31–32. But the appropriations acts grant the President significant discretion in how to use these funds. Secretary Rubio informed Congress on February 3, 2025, of his "intent to

initiate consultations with [Congress] regarding the manner in which foreign aid is distributed around the world through [USAID]." 2/10 Marocco Decl., Ex. C., Letter from Sec'y of State (Feb. 3, 2025) at 2, *AVAC*, ECF No. 15-1. And more specifically, Secretary Rubio noted that this review "may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees." *Id.* at 3.

Defendants have made no final decision regarding reorganization and have simply paused foreign assistance to permit a review process to make those decisions. And, in any event, the issue of whether Defendants appropriately used Congressionally allocated federal funds is a political question. The provisions at issue are for the benefit of Congress, and it is up to Congress to determine whether they are satisfied—not the courts. If not, Congress has constitutional tools at its disposal to push back on the Executive Branch. But the federal courts have no role in that back-and-forth; and this Court should not inject itself, superintending Congress's judgment about the President's use of funds. Instead, this is the precise sort of statutory condition that is not privately enforceable.

*Second*, Plaintiffs argue that Defendants' actions violate the Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*) and Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877, 929 (1982) (codified as amended at scattered sections of Title 31). *See AVAC* Pls.' Mot. at 17; *see also GHC* Pls.' Mot. at 30–31. Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the

34

appropriation.  2 U.S.C. § 683(b).  But the Impoundment Control Act enforces Congress's power over the purse in relation to the Executive.  *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982).  It provides for enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement.  Thus, that statute is generally not enforceable through an APA suit.  *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  Plaintiffs appear to believe Defendants have violated laws that appropriate money to agencies for certain purposes.  But Plaintiffs do not claim that any statute requires Defendants to contract with Plaintiffs specifically.  And as the D.C. Circuit has explained, a pause does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971)).  Therefore, any challenge that Plaintiffs might bring under the Impoundment Control Act is, at best, not ripe.  Moreover, in any event, even if Plaintiffs' Impoundment Control Act theory had merit, they still could not obtain the broad relief they seek here.  At most, Plaintiffs would have established that the Executive Order or Secretary Rubio Memo constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684.  In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to review and reevaluate existing funding.

*Third*, the *AVAC* Plaintiffs argue that Defendants' stop-work orders are contrary to law because "[t]hose orders purport to effectuate the unlawful State Department Memo—which in turn purports to effectuate the unlawful Executive Order—and so lack any foundation in law." *AVAC* Pls.' Mot. at 18. That argument fails because the State Department Memo and Executive Order were both lawful, as already explained. But it also fails for the additional reason that, as explained above, substantially all of USAID's foreign assistance grants and cooperative agreements authorize the agency to 'suspend or terminate [the] award in whole or in part' if the Agency 'determines that continuation of all or part of the funding for a program . . . would not be in the national interest of the United States or would be in violation of an applicable law.' 2 CFR 700.14." *See* 2/18 Marocco Decl. ¶ 10. Likewise, USAID grants permit suspension 'pending a decision to resume or terminate the award.' 2 CFR 700.1." *Id.* Similarly, "substantially all USAID contracts are terminable by the Agency for convenience, pursuant to the Federal Acquisition Regulation (FAR) and USAID regulations." *Id.* ¶ 11; *see* 48 C.F.R. § 52.249-1 (authorizing termination for convenience when termination is 'in the Government's interest'); *id.* §§ 49.502(a)-(b), 52.249-4, 52.249-6(a)(1). Hence, all stop-work orders were permitted under the terms of the original contracts or grants or otherwise guaranteed under law. They could therefore not have been unlawful.

*Fourth*, the *GHC* Plaintiffs argue that Defendants' actions are contrary to law because they violate the Separation of Powers. *GHC* Pls.' Mot. at 32. The *GHC* Plaintiffs do not actually provide any APA-related argument in support of that notion, and in any event, Defendants' actions do not violate the Separation of Powers for all of the reasons described above. *See supra* at 25–27.

36

#### 4.   Defendants Have Not Acted Arbitrarily and Capriciously.

Plaintiffs further argue that Defendants acted arbitrarily and capriciously, *first*, by "not explain[ing] why a comprehensive, undifferentiated freeze was necessary to achieve their purported goals." *GHC* Pls.' Mot. at 28; *see AVAC* Pls.' Mot. at 15–16.  But it is factually incorrect to suggest that any suspension of funding was comprehensive or undifferentiated:  Secretary Rubio approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food assistance, certain administrative expenses, legitimate expenses incurred before the pause went into effect, and legitimate expenses associated with stop-work orders, 2/10 Marocco Decl. ¶ 10, and a waiver on the pause for life-saving humanitarian assistance during the review, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

And in any event, President Trump's Executive Order did explain that he had instituted a 90-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy and values to promote world peace.  *See* Exec. Order No. 14,169.  Moreover, Secretary Rubio similarly explained:

> Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

Sec'y of State Mem. ¶ 2.  That is more than enough explanation, particularly given that, as already explained, the President's powers in the realm of foreign affairs as they relate to funding for various State and USAID initiatives are vast.  *See supra* at 26–29.  Requiring a federal agency to

37

articulate a rationale for its action— beyond simple compliance with the President's directives— would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800–01; *cf. Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 403 ("[T]he State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA."), *aff'd*, 698 F.3d 171 (4th Cir. 2012)."  These are not actions reviewable under the APA in the first place, much less are they arbitrary and capricious.

*Second*, the *GHC* Plaintiffs wrongly argue that Defendants failed to consider the harmful consequences of their actions.  *GHC* Pls.' Mot. at 28–29.  But President Trump and Secretary Rubio ultimately exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause.  That Plaintiffs do not agree with Defendants' preferred policy approach, *see id.* at 29 ("Defendants have . . . failed to account for how foreign-assistance programs further U.S. interests and how a sudden withdrawal of U.S. assistance will provide opportunities to U.S. adversaries and risk instability in countries around the world"), does not mean that Defendants acted arbitrarily and capriciously in forming that policy.  To put it succinctly, policy disagreements cannot form the basis of an APA arbitrary and capricious claim, and Plaintiffs are therefore not likely to succeed on the merits.[2]

---

[2] Similarly, *GHC* Plaintiffs claim that Defendants failed to display an awareness that they were changing positions by rejecting the policy that "the U.S. government has considered foreign aid programs an important part of America's foreign policy and national security strategy."  *GHC* Pls.' Mot. at 30.  This, too, ignores that no permanent shift has been made and that, rather, a pause in certain foreign aid payments, while permitting others through waivers, is all that has been effected to date.

## II. PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Plaintiffs likewise fail to establish that they will suffer irreparable harm absent a preliminary injunction. To demonstrate irreparable harm, Plaintiffs must meet a "high standard"— they must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm they identify "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiffs identify three sources of irreparable harm: Economic harms stemming from the funding pause, reputational harms, and additional harms related to the stop-work orders. *See AVAC* Pls.' Mot. at 18–21; *GHC* Pls.' Mot. at 20–25. None is sufficient to justify the extraordinary relief of a preliminary injunction.

At the outset, courts do not find irreparable harm where an ongoing, individualized review process could prevent the harm from transpiring at all. Here, Defendants are reviewing individual awards to determine which should be continued and which may properly be terminated. 2/18 Marocco Decl. ¶¶ 12–14, 28. Plaintiffs thus cannot show "that they will suffer immediate and significant hardship in the absence of immediate judicial intervention" based on the challenged action—the funding pause and stop-work orders. *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (holding that to be irreparable, the threatened injury must be "certain" and "actual" (citation omitted)).

In any event, the particular injuries that Plaintiffs identify do not meet the "high standard" for irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, Plaintiffs

identify several harms that stem from their lack of access to award funds as the pause is pending. They allege that their loss of access to those funds has caused cascading harms to their business operations and efforts to fulfill their missions. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business" or a threat to the business's "very existence." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory). Here, even Plaintiffs who allege the most serious harms have not

offered "proof" that they will cease to exist if the Defendants' temporary funding pause is not enjoined. *Wis. Gas Co.*, 758 F.2d at 674; *see, e.g.*, Bjornlund Decl. ¶ 11 (noting that Democracy International "had to cease all *operations*" and furlough employees "*pending resolution of stop work/suspension orders*" (emphasis added)). Simply claiming the prospect of an "existential threat" does not make it so. *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 51–52.

Notably, Plaintiffs try to expand the scope of the first exception, asserting that "[o]bstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission . . . provide injury for purposes . . . of irreparable harm." *GHC* Pls.' Mot. at 20 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). But *Newby* involved *statutory* obstacles, not economic harm. Here, Defendants have not enacted or enforced laws that make it more legally or logistically difficult for Plaintiffs to execute the missions they have identified. Defendants have instead paused the government's *sponsorship* of those activities. Plaintiffs' reliance on *Newby* is therefore misplaced.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply. As discussed above, *supra* at 14–19, Plaintiffs' economic injuries are reparable through the Tucker Act or CDA channel for contract disputes concerning monetary payments. While Plaintiffs are correct that the APA does not offer them monetary damages, that does not mean that monetary relief is unavailable through other channels. Indeed, the recognized function of the Tucker Act and the CDA is to afford aggrieved contractors an opportunity to recover money damages. *See A & S Council Oil Co.*, 56 F.3d at 241 ("a single, uniquely qualified forum for the resolution of contractual disputes" (citation omitted)). Sovereign

immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of those statutes. *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

The *GHC* Plaintiffs also claim "severe reputational harm" because of Defendants' conduct. *GHC* Pls.' Mot. at 24–25. But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable. *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013). Here, it also requires speculation regarding those expected reactions, which may well be blamed on Defendants rather than Plaintiffs. *Cf.* AFSA Order at 14 (noting that the Court did not "find it likely that a partner agency would attribute a contract modification, whether unlawful or not, to any USAID employee in his or her personal capacity").

Additionally, Plaintiffs identify other forms of harm—like security risks and harm to their employees or individuals served by their missions. But Plaintiffs have not shown that the vague security risks they identify are "actual[] and imminent," *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d at 11; rather, they identify the *possibility* of such risk. *E.g.*, *GHC* Pls.' Mot. at 24 ("security . . . could be threatened" (quoting Bjornlund Decl. ¶ 14)). A mere possibility of harm is not enough to warrant injunctive relief. As to the harms Plaintiffs claim their employees or beneficiaries will face, *see AVAC* Pls.' Mot. at 19 (citing increased health risks to people who consume AVAC services); *GHC* Pls.' Mot at 22 (citing risk that furloughed employees will be unable to pay bills), Plaintiffs may not assert claims based on harm to someone else—they are

limited to injuries for which they (or their members) have standing. *See supra* at 20–23. And as the Supreme Court has made clear, loss of employment is only irreparable in "genuinely extraordinary situation[s]." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Loss of income—even combined with "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual" does not qualify as such an extraordinary situation. *Id.*

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding suspensions or terminations or particular stop-work orders. Their declarations do not establish the need for broad injunctive relief in a single lawsuit.

### III. THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis*, 571 F.3d at 1295.

But even if Plaintiffs could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). The public has an interest in ensuring that tax dollars are not spent towards foreign aid projects that "are not aligned with American interests and in many cases [are]

antithetical to American values" and have "serve[d] to destabilize world peace." *See* Exec. Order No. 14,169, § 1, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025). The government is thus undertaking a "thorough review of USAID's operations" in order to determine "which [aid] programs continue[] to make sense for the American people, and which d[o] not." 2/10 Marocco Decl. ¶ 9. And it has determined that the best way to conduct that review is by first "pausing a substantial portion of [USAID's] ongoing work," so as to fully "examine USAID's processes and the manner by which [it] funds its programs." *Id.*

A preliminary injunction would displace and frustrate the President's decision and process about how to best address the threat to foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). To be sure, Defendants are acting this quickly and decisively to "gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States." *See* 2/10 Marocco Decl. ¶ 9.

By contrast, Plaintiffs voluntarily contracted with USAID and the Department of State that they knew contained clauses or were controlled by relevant regulations and law that permitted Defendants to withdraw from them. Any pecuniary harm they now have allegedly suffered is because of them taking on that risk, and in any event, such pecuniary harm can later be remedied should they prevail on the merits.

Because the public has an interest in the Executive effectuating foreign affairs, this final factor tips in favor of Defendants.  At minimum, the harms to the public counterbalance any irreparable harm to Plaintiffs, making an injunction improper.  As another Court in this District recognized in declining to issue a preliminary injunction against a different aspect of USAID's and State's operations, "[w]here one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or disfavors an injunction."  AFSA Order at 25-26.  The Court should accordingly deny Plaintiffs' requested preliminary injunctive relief.  *See Kim*, 698 F. Supp. 3d at 172.

## IV. ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, it would be inappropriate for the Court to issue any preliminary injunction in any form.  However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown."  *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, at most, Plaintiffs have attempted to show that they would personally suffer harm in the absence of preliminary relief.  As such, any preliminary injunction should apply no more broadly than to the funding-recipient Plaintiffs in these two actions whose contract-specific terminations or suspensions are challenged.  And should the Court decide to issue a preliminary injunction, the Government respectfully requests that the Court stay its order for a short time to permit the Government to consider whether to appeal.

Extending relief to individuals not properly before the Court would violate the teaching (noted above in addressing Article III standing) that judicial remedies "must be tailored to redress the plaintiff's particular injury."  *Gill*, 585 U.S. at 73.  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Id.* at 66 (citation omitted).

45

Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).  Indeed, nationwide injunctions "take a toll on the federal court system," and "prevent[] legal questions from percolating through the federal courts." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring).

The presence of two associational plaintiffs (GHC and SBAIC) does not change those principles and cannot justify awarding relief to nonparties to this case who are "not the proper object of th[e court's] remediation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996).  Instead, at a minimum, equitable principles preclude granting relief to any member who has not been identified in Plaintiffs' filings and agreed to be bound by the judgment.  *Alliances*, 602 U.S. at 401–02 (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members are "legally and historically dubious" (citation omitted)).  Moreover, providing relief to any *unidentified* members of the associational plaintiffs in these circumstances undermines basic principles of preclusion and claim splitting.  *See id.*, 602 U.S. at 402 (Thomas, J., concurring) (noting that broad associational standing "subverts the class-action mechanism" by allowing an organization to "effectively bring a class action without satisfying any of the ordinary requirements").

The TRO provisions apparently extending beyond the named Plaintiffs also cause harm to the Government and are inconsistent with the teaching that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  The relief awarded therefore is properly narrowed to address only the contract-specific decisions concerning each Plaintiffs' funding awards—not to the conduct of any Defendants concerning other parties or other

decisions.  The burdens on Defendants that would result from extension or expansion of the TRO are *especially* serious in these actions because the challenged foreign assistance funding determinations stem from the President's exercise of his Article II authorities over foreign affairs—authorities that Congress has confirmed, not undermined, through various provisions of the foreign assistance statutes conferring marked discretion on Executive Branch agencies in such funding determinations.  *See, e.g.*, 22 U.S.C. § 2151t(a).

Moreover, the requested equitable and declaratory relief is categorically unavailable against the President, named as a Defendant in both actions here.  Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  There is no such tradition of equitable relief against the President.  To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).[3]  The Supreme Court reaffirmed that principle more recently in *Franklin*, 505 U.S. at 800–01, where the Court declined to construe the APA to supply a cause of

---

[3] Rejection of the demand for injunctive and declaratory relief against the President is correct whether viewed as a jurisdictional or merits determination.  To be sure, D.C. Circuit and Supreme Court precedent indicates that the restriction in *Mississippi* is jurisdictional.  The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in character.  *See Franklin*, 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. (4 Wall) at 501).  And the D.C. Circuit has noted that "[w]ith regard to the President, *courts do not have jurisdiction to enjoin him*, . . . and have never submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (emphasis added).  Moreover, even if that bar were to be classified as non-jurisdictional, it still would be a "threshold" basis for ending the case without further inquiry into the merits.  *Cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*, 92 U.S. 105 (1876), prohibiting suits based on covert espionage agreements, is sort of "threshold question" court may "resolve[] *before* addressing jurisdiction") (emphasis added).

action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"). On that point, Justice Scalia's separate opinion in *Franklin* is instructive:

> The apparently unbroken historical tradition supports the view, which I think implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested— *viz*., the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary. For similar reasons, I think we cannot issue a declaratory judgment against the President.

*Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief "are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.* ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is

48

left to discretion." *Mississippi*, 71 U.S. at 498.  "It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Id.*  Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931) ("The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." (citation omitted)).  But the alleged acts of the President here in issuing the Executive Order cannot be characterized, as a matter of law, as "ministerial."  Rather, the Executive Order entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion, not direct the President to carry out a "ministerial" task.

Nor could Plaintiffs' invocation of the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction.  *AVAC* Compl., Prayer for Relief (A); *GHC* Compl., Prayer for Relief, Item 1.  The D.C. Circuit's observation that courts "have never submitted the President to declaratory relief," *Newdow*, 603 F.3d at 1013, built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).  Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable against the President.

**CONCLUSION**

For those reasons, the Court should deny both the *AIDS Vaccine Advocacy Coalition* and

*Global Health Council* Plaintiffs' motions for preliminary injunctions.  For the same reasons, the

TRO should be dissolved.

Dated: February 21, 2025

Respectfully submitted,

BRETT A. SHUMATE
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ INDRANEEL SUR*
INDRANEEL SUR (D.C. Bar 978017)
CHRISTOPHER D. EDELMAN
Senior Counsels
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

51