## DECLARATION OF ERIC C. BJORNLUND

I, Eric C. Bjornlund, declare as follows:

1.      I am President and CEO of Democracy International, Inc. ("Democracy International" or "DI"). I submit this declaration in support of Plaintiffs' motion to enforce the Court's temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at DI.

2.      Democracy International is a U.S.-based small business headquartered in Bethesda, Maryland. DI is an international development consulting firm that supports active citizens, responsive governments, and engaged civil society and political organizations to achieve a more peaceful, democratic world. The company provides technical assistance, analytical services, and project implementation for democracy, human rights, governance, peace and resilience, youth empowerment, and other international development programs worldwide. By developing and using new knowledge, tools, and approaches, DI works to change people's lives and improve the effectiveness and efficiency of development assistance.

3.      Approximately 96 percent of Democracy International's approximately $41.7 million in revenues in 2024 came from prime cooperative agreements and contracts from USAID and an additional approximately 2 percent came indirectly from USAID through subawards and subcontracts, for a total of approximately 98 percent directly or indirectly from USAID.

4.      Between January 24 and 27, 2025, DI received stop work orders for all of its USAID contracts and suspension notices for all of its USAID and State Department cooperative agreements. Between February 10 and 13, 2025, DI received purported termination notices for

1

11 contracts and cooperative agreements.

5.      DI has not received any payments from USAID or the State Department since the
TRO was issued in this case on February 13, 2025. DI has over $3 million in invoices and draws
submitted to USAID and the State Department for work completed prior to January 24, 2025.

6.      Because DI's invoices and draws for work completed before receipt of stop work
orders and suspension notices have not been paid, DI had to cease all operations as of January
31, 2025 (except for one program in Bangladesh which is not funded by USAID or the State
Department). We furloughed 100 percent of our 95 U.S.-based home office employees and
placed 209 of 219 employees (over 95 percent) in overseas offices on "administrative leave"
without pay; in the absence of payments for past invoices and draws and for legitimate expenses
associated with compliance with stop work/suspension orders or terminations, "administrative
leave" without pay is equivalent to furloughs or layoffs. We cancelled all benefits, including
health insurance, for employees and terminated all consultants.

7.      If USAID does not pay invoices for contracts and permit draws for cooperative
agreements by February 26 for reimbursement of expenses incurred before January 24 for duly
authorized programs, the company, its owners, and some of its employees will be subject to
serious legal jeopardy in the U.S. and in all the countries in which we work. Specifically, if we
do not transfer funds to our 16 field-based programs by February 26 for payment of February
salaries, benefits, and withholding taxes, they will be late, and we will be in violation of local
labor laws in all or virtually all of those countries.

8.      Some employees have retained lawyers and threatened lawsuits for failure to pay
legally and/or contractually mandated salary, benefits, and taxes, as well as legally mandated
termination and severance costs. For example, we have 17 staff members in Tunisia who have
already formally notified us they will be seeking legal action against DI for violating local labor

2

law if such salaries, taxes, and other mandated benefits are not paid by Monday, March 3; to meet that deadline, we would have to transfer funds no later than this Thursday, February 27. Similarly, because we did not have funds to pay employees past January 31, we furloughed all of our U.S.-based employees, but if we do not pay by February 28 termination costs owed, such as for accrued leave and applicable withholding taxes, we will be in violation of U.S. labor laws.

9.      In addition, if USAID does not pay invoices for contracts and permit draws for cooperative agreements by February 26 for reimbursement of expenses incurred before January 24 for duly authorized programs, we will default on numerous contracts with vendors around the world, including for services such as corporate insurance (e.g., Executive Risk/Management Liability Coverage, Cyber security, Business Travel Accident, Excess Liability) and legal services, leaving us without critical support and coverage for the extensive liability and numerous legal challenges stemming from the other harms detailed herein. If we receive payment by February 26, we would have time to transfer funds by the last day of the month, February 28, and so we would no longer be in default.

10.     Also, if USAID does not pay invoices for contracts and permit draws for cooperative agreements by the end of the month for reimbursement of expenses incurred before January 24 for duly authorized programs, we will be in breach of the terms of our home office lease, which will trigger rights for the landlord to initiate eviction proceedings and leave us at risk of losing equipment, furniture, and other assets worth hundreds of thousands of dollars. If we receive payment in time for us to pay the rent by March 1, we will avoid being in default.

11.     Because of these problems, the security of our overseas program leads (chiefs of party) and some senior staff in the countries in which we work is threatened. Unless we pay creditors, tax authorities, and others, by the end of the month, the company's ability to be legally registered and to operate in many of the countries in which we have operated is in serious

3

jeopardy. If overdue invoices are not paid immediately, critical relationships cannot be repaired.

12.     Similarly, until USAID pays invoices for contracts and permits draws for cooperative agreements for reimbursement of expenses incurred before January 24 for duly authorized programs, we are unable to repatriate our expatriate staff members or ensure they have support for secure movements in countries where that is required; in several countries they have begun to receive threats from local vendors and other creditors, including from landlords, vehicle rental agencies, government officials, and others.

13.     In Tunisia, for example, our senior staff/representatives are being threatened by vendors and other creditors with legal jeopardy or physical harm for failure to pay, but we believe that this risk will be substantially mitigated if we pay by the end of this month.

14.     In the Kyrgyz Republic, our legal representatives have warned that we will be subject to their legal action and will lose our legal registration with the government if we do not pay within days.

15.     We have not been able to pay any of our local legal counsel, which has meant we cannot get their advice and assistance in responding to threatened legal action by local employees, vendors, partners, government agencies, and others.

16.     All of these risks are worsening by the day, which exposes DI to lawsuits, fines, and other local legal jeopardy as well as additional risk that our staff might suffer a security incident or medical emergency that DI would not be able to support financially or respond to with assistance from outside security firms.

17.     Moreover, the freeze on payment has undermined the credibility of our staff and partners in their communities and with their stakeholders. It has caused them personally serious legal and financial problems and has put some in danger of arrest or reprisals due to their inextricable association with these USAID programs that are suddenly not keeping promises or

meeting their obligations. We believe, however, that we would be able to mitigate these risks if we pay overdue invoices and obligations by the end of the month rather than allow it to drag into another month.

18.    Due to the additional harms detailed in this declaration, if the company is unable to make payments immediately for past-due expenses to employees, creditors, tax authorities, and others, its ability to continue in business is now at risk and it may have to seek bankruptcy protection in the U.S. and in other countries in which it operates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025, in Bethesda, Maryland.

Eric C. Bjornlund
President and CEO
Democracy International, Inc.