IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00402 (AHA) |

**DEFENDANTS' MOTION TO STAY THE COURT'S
FEBRUARY 25 ORDER PENDING APPEAL**

Defendants respectfully seek a stay pending emergency appellate relief of the Court's oral ruling and minute order of February 25, 2025, granting Plaintiffs' emergency motions to enforce the Court's temporary restraining order (Plaintiffs' oral Emergency Motion to Enforce Temporary Restraining Order, Civil Action No. 25-cv-400; Plaintiffs' Emergency Motion to Enforce Temporary Restraining Order, ECF No. 36, Civil Action No. 25-cv-402). Because the Court's order requires Defendants to disburse nearly $2 billion dollars by 11:59 PM tomorrow, including payments that Defendants may have a reasonable basis to dispute, a stay is warranted pending requests for immediate appellate relief. *See* Fed. R. App. P. 8(a) ("A party must ordinarily move

1

first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").[1]

In particular, by prohibiting Defendants from conducting a payment integrity review process (including pursuant to statutorily or contractually conferred authority to suspend or terminate contracts or grants) and by ordering the United States to make specific payments amounting to monetary damages in violation of the United States's sovereign immunity, the Court's orders raise serious constitutional concerns and infringe on the Government's interests in a manner that amply warrant a short stay.[2]

"[T]he factors regulating the issuance of a stay are . . . (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, each of the factors favor a stay as to two aspects of the February 25 Order: Its unreasonably short time limitation for compliance, and its failure to grapple with the limits on the Court's subject-matter jurisdiction.

In an oral ruling following today's hearing on Plaintiffs' motions to enforce, the Court ordered Defendants to pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO on February 13, 2025, and to permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements for work completed prior to the entry of the Court's TRO on February 13— all by 11:59 p.m. on February 26, 2025. Defendants are likely to succeed on appeal from the Court's order for several reasons.

To start, it is not possible for Defendants to comply. As the attached declaration explains,

---

[1] Pursuant to Local Rule 7(m), counsel for Defendants conferred with counsel for Plaintiffs before filing this motion. Plaintiffs oppose the relief requested herein.

[2] Defendants did not have an opportunity to brief sovereign immunity at an earlier stage of the proceeding because the Court ruled on Plaintiffs' TRO motions before Defendants submitted any written response. *See Woodyard v. Harper*, 162 F. Supp. 3d 3, 6 (D.D.C. 2016) ("[D]oubts about subject matter jurisdiction may be raised at any time[.]").

2

"[t]hese payments cannot be accomplished in the time allotted by the Court and would instead take multiple weeks." Marocco 2/25 Decl. ¶ 4, attached hereto as Exhibit A. "Restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet." *Id.* ¶ 14. "Rather, the payment systems of USAID and State are complicated and require various steps before payments are authorized to be disbursed by the U.S. Treasury, Department of Health and Human Services, and/or the Department of State, involving multiple agencies." *Id.* The payment system has five steps and "takes time." *Id.*

In addition, the February 25 Order vastly undermines and hence irreparably injures the President's authority. Although Defendants disagree with the court's original orders, those orders at least appeared to respect the Executive Branch's authority to decline to award federal funds based on considerations separate from the President's Executive Order and the Secretary's memorandum. Although those orders stated that the government was "temporarily enjoined from enforcing or giving effect" to relevant portions of the Secretary's memorandum, "including by" "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds," they nonetheless also made clear the government was not prohibited "from enforcing the terms of contracts or grants." ECF No. No. 17, at 14-15; *see also* ECF No. 30, at 5-6; ECF No. No. 34, at 2-3. And none of those orders required the government to fulfill any specific reimbursement requests, much less to do so on a specific timeline.

The February 25 Order is far different. When informed that the government had not immediately provided all of the funds that plaintiffs have requested, the district court concluded that the government had violated the court's earlier restraining order. But in the Secretary's memorandum announcing the pause, the Secretary also made clear that the pause would not apply to payments for "legitimate expenses incurred prior to the date of" the memorandum "under existing awards" or to "legitimate expenses associated with stop-work orders." 25 STATE 6828, at ¶ 12. To the extent that the bulk of plaintiffs' complaints relate to invoices seeking payments for such expenses, any delay in processing the relevant payments is thus not attributable to the pause—and not implicated by the court's order enjoining that pause.

Nonetheless, in the name of enforcing its earlier order, the district court ordered the government to, "[b]y 11:59 p.m." tomorrow, "pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO on February 13." Hearing Tr. 57-58. And the court ordered the government to "permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements." *Id.* at 58.

By requiring payment of enormous sums in less than 36 hours, the February 25 Order intrudes deeply into the prerogatives of the Executive Branch and the discretion committed to the President under Article II. The order apparently requires the Government to expend taxpayer dollars without regard to any processes for ensuring that the expenses are legitimate—even though Executive Branch leadership harbors concerns about the possibility of waste and fraud and is in the process of developing revised payment processing systems to address those concerns.

As the record explains, relevant agency leadership have determined that, "[h]istorically, USAID had limited and insufficient payments control or review mechanisms," which led to payments being made "without sufficient opportunity for payments integrity or program review." ECF No. 22-1, at 2. Agency leadership has determined that those "system deficiencies and inability to provide complete information" has "led to serious questions about waste, fraud, abuse, and even illegal payments." *Id.* As a result, "USAID is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud." *Id.* at 3. Agency leadership has determined that payments "will be released as they processed through" this comprehensive review structure. *Id.*[3]

Similarly, agency leadership has "implemented revisions to the system for disbursements

---

[3] Defendants respectfully disagree that, in the hearing, "Counsel for defendants . . . acknowledged that the Court's TRO forecloses giving effect at least to any suspension or termination which took place before the Court's temporary restraining order on February 13, 2025." 2/25 Hrg. Tr. 56:18-21. Defendants understand the TRO to apply to the pause policy of the Executive Order and Secretary of State's directive. *Id.* 40:1-5 ("I thought I was responding to the Court's question about the concept of a blanket."). Defendants further understand the TRO to not apply to exercises of authority under legal authority like statutes and regulations or contractual and grant rights.

4

of foreign assistance funds" from the State Department. ECF No. 22-1, at 7. Those "new procedures" are intended to "ensure payments are both in compliance with policy and have the appropriate management controls"—controls that "are intended to assure payment integrity and determine that payments under existing contracts and grants are not subject to fraud or other bases for termination." *Id.* As with USAID, the record reflects that the State Department has begun processing legitimate payments through these new systems—including "authoriz[ing] or request[ing] the disbursement of $112.9 million" between January 24 and February 18. *Id.* at 8.

The February 25 Order has now entirely disregarded the Executive Branch's serious interest in ensuring that payments are made only for legitimate expenses and in curbing any waste, fraud, and abuse. By requiring that the Government make payments by 11:59 p.m. tomorrow—less than 36 hours after entry of the court's order—the February 25 Order has effectively precluded the Government from scrutinizing the relevant invoices or conducting a payment-by-payment analysis to ensure the legitimacy of all payments. As a result, the Government faces the possibility of being forced to expend enormous sums of taxpayer dollars without knowing whether those payments are for legitimate expenses—and with no sure possibility of the Government's recovering the funds if it later determines that particular payments did reflect waste, fraud, or abuse.

By contrast, the February 25 Order is not necessary to protect Plaintiffs from irreparable harm. To the contrary, if Plaintiffs believe that the government has failed to timely make payments on contracts or quasi-contractual funding instruments, Plaintiffs may be able to pursue monetary claims through specified administrative processes and in the Court of Federal Claims. Plaintiffs thus have a potential opportunity to recover whatever damages they may suffer if Defendants wrongly fail to make prompt payment on their legitimate claims. Such a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Defendants are also likely to succeed on the merits because the February 25 Order requiring

the Government to fulfill specific requests for payments on contracts and grants within the next day was not jurisdictionally proper. The Court's earlier orders—and Plaintiffs' underlying claims in these actions—relate only to the permissibility of the Government's implementation of an asserted "blanket" funding "freeze." Defendants have significant concerns about whether there is any proper basis for the exercise of jurisdiction over those claims, as necessary to support the Court's earlier orders. See ECF No. 33, at 11-21. But regardless of the answer to that question, there can be no doubt that the February 25 Order—which requires Defendants to make *specific* payments on *particular* contracts and grants—is not a proper exercise of this Court's subject-matter jurisdiction.

 As explained, Defendants intend to pay legitimate expenses incurred under contracts and grants before January 24.Defendants are attempting to ensure, prior to payment, that each request is legitimate. And to the extent that Plaintiffs believe that the Government has violated the terms of those instruments by delaying payment while it conducts this review—or to the extent that Plaintiffs ultimately have a dispute with the Government about whether any particular legitimacy determination is correct—they may well have a remedy. But that remedy is not a suit in District Court under the APA.

To the contrary, the Federal Government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* (quotation omitted).

In these actions, Plaintiffs failed to demonstrate that their request for an order requiring the Government to promptly make specific payments on grants or contracts is not foreclosed by those principles. To the contrary, although the specifics of the relevant funding instruments may differ among the Plaintiffs, it is generally the case that such requests for payment—even if cast as APA claims—may not be brought in District Court. Thus, to the extent that some of the funding

6

instruments at issue in this case are procurement contracts, any dispute about payment on those contracts would be governed by the Contract Disputes Act, which permits suit only following administrative exhaustion in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See* 41 U.S.C. §§ 7103, 7104, 7105. Those remedies operate to the exclusion of any suit in district court under the APA. *See A&S Council Oil Co. v. Lader*, 56 F.3d 234, 239-42 (D.C. Cir. 1995).

For other instruments, the Tucker Act may provide a remedy. That statute states that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). The D.C. Circuit "ha[s] held that the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). And indeed, the Tucker Act's preclusive effect may not be limited to funding instruments described by Plaintiffs as contracts. Instead, to the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for any asserted violation of those grant terms may also be a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In all events, the February 25 Order requiring Defendants to make specific contractual or grant-based payments exceeds the Court's subject-matter jurisdiction. Yet this Court declined to even consider those jurisdictional problems before entering its order. Instead, although the Court recognized that Defendants had articulated many of these principles in its "briefing at the preliminary injunction stage," it believed that the argument was "not sufficiently developed to be considered" before entering its order. Hearing Tr. 57; *see also* Hearing Tr. 46-47 (government pressing the jurisdictional argument at the hearing).

The District Court's refusal to consider its own jurisdiction before entering its order was incorrect. For one, the court scheduled a telephone hearing at 11 a.m. on February 25 after

receiving the GHC Plaintiffs' emergency motion on the evening of February 24; in those circumstances Defendants can hardly be faulted for failing to file a brief in advance of the hearing—particularly when, as the District Court recognized, Defendants had already developed this argument in its preliminary injunction brief, which was filed last week. Regardless, even if Defendants had failed to brief that issue at all, that would not have relieved the court of its "obligation to assure" itself that it "ha[d] jurisdiction" to enter its payment-requiring order. *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). That "obligation extends to sovereign immunity"—including issues regarding whether the APA's waiver applies or is impliedly displaced by other statutes like the Tucker Act—because that question "is jurisdictional in nature." *Id.* (quotation omitted).

At a minimum, the Court's order should be stayed as to parties who are not properly before the Court, and who have no valid claim to the enforcement of an injunction to which they have not demonstrated their own entitlement. *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (holding that judicial remedies "must be tailored to redress the plaintiff's particular injury"); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Whether framed as injunctions of 'nationwide,' 'universal,' or 'cosmic' scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case."); *see Trump v. Hawaii*, 585 U.S. 667, 712-21 (2018) (Thomas, J., concurring). And of course, that broad relief increases the amount of money that Defendants are effectively required to pay without regard to internal payment controls, making it substantially harder for Defendants to properly conduct a payment-by-payment analysis for waste, fraud, and abuse by increasing substantially the number of requests that Defendants must process within the next day.

## CONCLUSION

For the foregoing reasons, the Could should stay its February 25, 2025 order granting Plaintiffs' motion to enforce the TRO pending appeal.

Dated: February 25, 2025                    Respectfully submitted,

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General
                                            Civil Division

                                            ALEXANDER K. HAAS
                                            Director
                                            Federal Programs Branch

                                            LAUREN A. WETZLER
                                            Deputy Director
                                            Federal Programs Branch

                                            CHRISTOPHER R. HALL
                                            Assistant Branch Director

                                            */s/ Indraneel Sur*
                                            INDRANEEL SUR (D.C. Bar 978017)
                                            Senior Counsel
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L St. NW
                                            Washington, DC 20005
                                            Phone: (202) 616-8488
                                            Email: indraneel.sur@usdoj.gov

                                            *Counsel for Defendants*