## DECLARATION OF ZAHRA DOE

I, Zahra Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a Contracting and Agreement Officer at USAID.

3. I have been working for the Agency for over a decade and am charged with carrying out the operational work of USAID, a primarily procurement agency, as we implement our mission through federal assistance mechanisms including contracts and grants.

4. On February 13, 2025, a Temporary Restraining Order (TRO) was put in place in the case of *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-cv-400 and *Global Health Council v. Trump*, No. 25-cv-402. I understood the restraining order to mean that USAID could no longer enforce stop-work orders or suspensions, and should rescind terminations. All the Contracting and Agreement Officers eagerly awaited guidance from the USAID Senior Procurement Executive (SPE) Jami Rodgers on how to implement this court order.

5. On February 14, 2025, emails began to come in from Contracting Officers (COs) around the world. They included attachments about how partners were contacting their procurement officials asking for immediate information and discussing the payment issues that still had not been resolved.

6. One Contracting Officer requested "urgent guidance" as to whether to rescind termination letters that were not yet effective. The same CO also noted that his mission had dozens of outstanding vouchers, most of which were for work prior to the stop work worker, and some of which included waived PEPFAR activities. None of these invoices had been paid. The CO stated that waived activities could not restart in the absence of funding. The CO asked for Agency-wide

guidance on how the Agency was dealing with the payment issues and explanations as to when they would be resolved so that we could communicate that to partners.

7.     On Saturday February 15, 2025, the USAID Industry Liaison sent out a "Special Notice to All Foreign Assistance Recipients," quoting language from the TRO. The only additional information was "We will provide further guidance on this TRO as soon as we are able to do so."

8.     On [date], I received notification from four implementing partners (IPs) either (1) explaining that all terminations should be rescinded under the TRO, including their own, (2) stating that they were moving forward to continue work under their award, as they understood that they could do so under the TRO, or (3) asking for confirmation to continue work.

9.     Given that TROs are issued in response to emergency requests for injunctions, all the CO workforce assumed we would get immediate guidance from SPE Rodgers.

10.    It wasn't until February 17, 2025, at 6:43PM EST, that SPE Rodgers finally issued guidance. This was four days after the TRO was issued. The guidance, though, was far from clear. It gave no instructions. It largely quoted or restated language from the court order. SPE Rodgers stated: "The Court's order does not 'prohibit [USAID] from enforcing the terms of contracts and grants.'" The message continued, in bold print: "Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires that generalized stop work, suspension, or pause of Agency contracts, grants or other federal assistance awards." This statement did not provide specific information upon which COs could act, and it notably did not include any direction with respect to terminations or disbursements.

11.    The notice from SPE Rodgers also said that the "Front Office" would be adding a new review process for payments to ensure integrity and prevent fraud. I found this statement

extremely surprising because in my many years with the Agency, I had never seen any instances of fraud or lack of payment integrity. USAID's payment systems are robust and secure, and to my knowledge the Agency has never had an auditor, GAO report, or voucher examiner find any evidence of payment problems. There are significant systems in place to prevent mistaken or fraudulent payments; payments are regularly audited; and USAID has one of the best track records in government for recovering overpayments.

12. Because the notice lacked critical details regarding how personnel should give effect to the TRO, I and most other Agency personnel I communicated with believed further guidance was forthcoming.

13. On the morning of Tuesday, February 18, 2025, USAID General Counsel's Office provided information to all Regional Legal Advisors that templates would be coming to lift stop work orders and suspensions and will send guidance for AO/COs to restart awards, and more guidance to be distributed on how to handle terminations. The General Counsel's Office A&A advisor told COs that the TRO does not apply to terminations, the language I received was that the TRO had "[n]o effect on terminated awards."

14. At 9:45AM, One CO asked for clarification of SPE Rodger's email. The CO framed this as a simple binary, asking should COs (1) *not* take any action or (2) *take* action.

15. Another CO asked whether Contracting Officer Representatives or Agreement Officer Representatives (CORs/AORs), who help implement activities, could now talk to implementing partners to continue activities. Likely guessing that there would be no answer to our many questions, as had been the case so far since the initial Secretary of State cable, the CO said, "If I don't hear from you, I will assume it's ok."

16. On February 19, 2025, another CO asked for clarification again, copying SPE Rodgers on an email and stating that "Additional detailed guidance was promised last week. . . . and so far we've received only an ambiguous email about not enforcing stop work or terminations. In the absence of additional guidance, most probably I will maintain the terminations and also maintain the stop work orders."

17. The lack of guidance regarding the implementation of the TRO had the predicable effect of causing paralysis within the Agency. COs waited for more guidance and templates. Most never acted.

18. On February 19, 2025, a three-email chain came out telling us to terminate Personal Services Contractors (PSCs). PSCs are agency employees who fill numerous roles that are essential to USAID's operations, including acting as CORs and AORs. In the first email, SPE Rodgers told us a list would be coming. Thirty minutes later, the list came in from the Industry Liaison. Thirty minutes after that, the same individual told us to NOT terminate PSCs, just to peruse the list to make sure it was accurate. Many PSC information was outdated, we had at least one person on the list who hadn't been with us for a long time.

19. On February 19, 2025, a new cable from Secretary of State came out on "Processing Mission Essential 12c Expenses Under State 6828." This allowed us to process Operating Expenses (OE) through our operating units (PSUs). It was meant to facilitate payments in accordance with the Executive Order Reevaluating and Realigning United States Foreign Aid, and the cable specifically referred to the implementing Executive Order 14,169. For example, in the cable it says "to facilitate compliance with the executive order to pause financial assistance, CGFS [the Bureau of the Comptroller and Global Financial Services] introduced a number of relationship edits to control the spending of foreign assistance funding in both GFMS [Global Financial

4

Management System] and RFMS [Regional Financial Management System]." While we heard that our operating unit payment system would start working again, we had also heard that those able to certify payments had been stripped of their authorities so that only five regions were going to be able to certify payments by only 20 officials worldwide. To this day, I still have not received my past due OE payments per this new process.

20. This new process did not include any payments to implementing partners.

21. On February 20, 2025, the Senior Technical Advisor – Africa from the Foreign Operations division in Agency headquarters explained that if we were to receive any claims from our partners related to late payments, we should work with legal counsel and policy to deal with them.

22. On February 21, 2025, I heard from my financial management staff that, because of all the issues, new processes, signatures required, and delays on getting through OE payments, it may be another week before we could even begin to pay partners.

23. On February 23, 2025, SPE Rodgers issued a new list of contract terminations. This list was Tranche 5. The email did not explain why we were moving forward despite the TRO. It did not provide any information on the "review" process that had determined these awards should be terminated. There was no justification. On February 10, 2025, SPE Rodgers stated in an email that "Action Memorandums" for each tranche of termination would be shared. And that this "documentation along with this email can be used to support the terminations." These memos have still never been shared.

24. The Tranche 5 email also included updated "FAQ" dated February 20, 2025, but did not discuss the TRO at all and continued to refer to the Executive Order on Reevaluating and Realigning United States Foreign Aid. Specifically, the FAQ stated:

5

**Q10. Under whose authority is the Office of Acquisition and Assistance terminating these awards? What should be used as the basis for determinations to issue termination notices?**

**Response** The termination authority is delegated to the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the <u>President's Executive Order on Reevaluating and Realigning United States Foreign Aid</u>. Please refer to the M/OAA Director's email to A&A staff dated February 10, 2025.

25. The final sentence of the response above was highlighted, indicating that the language had been added or updated on February 20, 2025.

26. One hour after the Tranche 5 email came out, USAID Industry Liaison Matthew Johnson sent an email stating that the FAQ had been retracted: "The Q&A document sent around earlier has been withdrawn and will be updated. That document reflected an outdated and now inaccurate version with several citations that indicated that President Trump's Executive Orders were the basis for termination actions."

27. The email continued: "For the avoidance of doubt, Tranche 5 termination authority has no relationship to any Executive Order. These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities."

28. The email continued: "Accordingly, USAID has elected to enforce termination authorities in the relevant instruments. Similarly, Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID."

29. The constant confusion has never stopped since the initial Secretary of State cable was issued.

30. The Agency has still never shared any guidance from legal counsel explaining the legality of any of the terminations, nor has the Agency identified the termination authorities that

Secretary Rubio relied on in deciding to enforce these terminations. Nor has the Agency shared any Action Memorandums or other documents explaining the basis for these decisions.

31. On February 24, 2025, I was placed on Administrative Leave through an unsigned unauthorized posting on the website.

32. The same day, a screenshot was shared with me of an email from Senior Technical Advisor (STA) Adam Cox, stating that "we've [he and remaining COs in Washington] been instructed by DOGE and [SPE] Jami [Rodgers] to terminate several awards tonight, so you may see some awards of yours that have been terminated. You should be CC'd on any emails that are going out. This of course will have to be officially done later in time through a GLAAS action from someone [else] in the Mission/Region covering that portfolio, but I wanted to give you a heads up."

33. The email continued: "There are MANY more terminations coming, so please gear up!"

34. I have also seen messages by STA Cox that were made in private communications, rather than proper channels. He stated that DOGE had originally planned to call COs around the world "in the middle of the night" and force them to terminate the awards. This was considered but rejected as not "feasible." He also stated, "Supposedly these [new terminations] do not violate the TRO because they were individually reviewed by Rubio and this was overseen by DOJ." He further stated, "Rubio reviewed and wants action." Again, none of these messages came through proper channels.

35. Nor did the Agency share any new memorandums or justifications from these individual reviews that Secretary Rubio supposedly conducted.

36. As a CO who manages a portfolio of less than 50 awards, the claims of "individual reviews" by Secretary Rubio are completely implausible. Contracts and awards are lengthy, technical, and complicated documents. They often include technical specifications that are dozens of pages long, as well as lengthy technical appendices. It would take a single person weeks and weeks of work to substantively review hundreds of contracts and awards, especially if that person was not already familiar with the programs at issue. For example, when the Agency asked COs to review the Scopes of Work and Program Descriptions contained in our awards to determine whether provisions regarding Diversity, Equity, and Inclusion were incorporated, it took me and my team a week to review fewer than 50 awards. Not only did we have a team of people doing this work, but these were awards which I manage and have significant foundational knowledge about.

37. Beyond that, without consulting the COs and CORs/OARs who manage a specific contract or award, it would be impossible in most cases to understand whether a specific award could be terminated, effective immediately, without incurring even greater termination costs or causing even greater harms to the national interest or Agency priorities. For example, the COs and CORs/OARs have specific information about the status of ongoing work, whether immediate termination would incur sunk costs (for example, by allowing already-purchased food and medicine to expire), whether immediate termination would risk the health or safety of Agency personnel or implementing partners, among many other award-specific factors.

38. As of February 23, 2025, at 11:59 pm, when I was put on Administrative Leave, none of the questions about violating the TRO were answered and no further guidance related to justifying the legality of our actions, the lifting of stop-work orders and suspensions, or terminations had been issued.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2025.

                                                               */s/ Zahra Doe*
                                                               Zahra Doe