## FIRST DECLARATION OF DELLA DOE

I, Della Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a member of the American Foreign Service Association.

3. I have worked for USAID for over a decade. I currently serve overseas as a financial manager, and in that role I am responsible for making payments to USAID foreign assistance partners (contractors and grantees), vendors and USAID employees.

4. Normally many of USAID's U.S. implementing partners would have access to a letter of credit (LOC) system to be able to draw cash for 10-day activity needs. Once this access is set, a partner can draw on the cash through the LOC system swiftly without additional approvals, within certain parameters set up in the system. Such expedited access to cover the activity needs is important to successful activity implementation, especially for Humanitarian Assistance activities. To my knowledge the access to LOC facilities was interrupted for some partners sometime the week of January 20, and still has not been fully restored even after the TRO in Case Nos. 25-cv-400 and 25-cv-402 took effect on February 13.

5. Additionally, for those partners not operating under an LOC, USAID/Washington and missions directly process payments on an advance and/or reimbursement basis. The invoice and respective payment are reviewed and approved by the Agreement/Contracting Officer Representative (AOR/COR), voucher examiners, and Authorized Certifying Officer (often a Controller or other designated U.S. staff). The payment review process normally takes between 15–28 days and payment gets disbursed to a partner under 30 days in compliance with the Prompt Payment Act.

6.      I have read the declaration of Walter Doe filed in Case No. 25-cv-352 (Exhibit 1) and his experience of interruptions in the USAID payment process starting on January 20th is consistent with my experience. On or about January 27 Certifying Officers worldwide noticed that the certified payments wouldn't go through the Agency accounting system (Phoenix) to the U.S. Treasury for disbursement, and on or about February 3 we lost the ability to certify payments in Phoenix. At that time this ability was lost for all payments, even those that fell under the waivers/exceptions specified in the State Department Cable 25 State 6828 issued on January 24, which included legitimate expenses for programmatic activities incurred before the date of the Cable.

7.      On February 5 the State Department issued a follow-on cable 25 State 10948 which provided technical guidance on obtaining additional approvals when making Agency's administrative payments, as well as programmatic payments for expenses incurred before January 24, 2025 (so-called 12(d) payments), and instructions on how to seek exceptions for activities (so-called 12(e) exceptions). The necessary approvals include Director of State Department's Bureau for Foreign Assistance for programmatic payments, and USAID's Senior Bureau Official for both programmatic and administrative payments. Both approvals are an additional layer to a regular USAID payment process. The role of the Senior Bureau Official (SBO) was assigned to only one person, Chief of Staff Kenneth Jackson. However as on February 5 and almost two weeks afterwards, Phoenix disbursement function was unavailable to the Agency's staff, the process outlined in the cable was meaningless.

8.      The TRO was issued on February 13; however, there was no official or unofficial guidance released to the Agency's Authorized Certifying Officers since then on how the TRO is to be implemented. The only new official guidance the Agency issued to Certifying officers

2

since TRO was on February 20 and concerned the Agency's own administrative payments such as staff salaries and benefits, rent, utilities, security services and such. The Agency has issued no guidance regarding payments to implementing partners.

9. The Agency has restored access to Phoenix for a very limited number of staff on or about February 18. In a normal course of operations the Agency would have by my estimates between 50–80 Certifying Officers who would facilitate timely processing of all types of payments, and hundreds of voucher examiners to log in and review the payments. My understanding is that currently the access is restored only to a very reduced number of Certifying staff worldwide, less than 20, and only 40 or so voucher examiners. This highly reduced staff was charged with processing mostly the Agency's own administrative payments across many missions and Washington. The SBO has been responsive to approval requests for those internal administrative payments. This in stark contrast to requests for payments to implementing partners, for which we received no SBO approvals or new guidance.

10. Since there was no new official guidance since the TRO, missions' only reference remains State Cable 10948, which predates the TRO. Even following that guidance, I was not able to obtain all necessary approvals for any programmatic payments, including legitimate expenses incurred prior to January 24 under existing awards. To my knowledge numerous missions including mine tried to obtain approvals from the Director of State Department's Bureau for Foreign Assistance and USAID Senior Bureau Official for 12(d) and 12(e) payments, and very few obtained just one approval but not both as required by the cable 10948. We also tried unsuccessfully to obtain guidance on what is the payment process in the absence of Cable-prescribed approvals but with the TRO in place. Though the waiver process is described in the pre-TRO cable, in reality all USAID funds have remained undisbursed because

of deliberate unresponsiveness of officials charged with implementing the TRO and/or the same officials not providing approvals for programmatic payments under existing waivers.

11. Currently my mission has more than $30 million in unpaid invoices for 2 months of implementing partners' work, with half of those past Prompt Payment Act due date (30 days) and incurring interest every day. If one were to extrapolate the numbers across all of the missions and USAID/Washington, given that annual USAID appropriation is $40 billion, the total dollar amount of unpaid invoices would certainly surpass $1billion at the most conservative estimate.

12. On February 23 the Agency notice placed the majority of Agency personnel on administrative leave, and left only a few hundred (mostly administrative) staff as essential. This decimation is in addition to the Agency's prior dismissal of institutional contractors and PSC staff. This leaves the Agency with no sufficient personnel to review and approve thousands of programmatic payments that are due to hundreds of implementing partners for work performed prior to January 24. Even if the TRO is properly implemented the Agency has no adequate staff remaining on duty to process the payments.

13. Arbitrary withholding of due payments to U.S. and non-U.S. based partners does grave damage to the reputation and reliability of the U.S. government both domestically and internationally. USAID is a USG Agency which signed the contracts and grants in line with the Code of Federal Regulations and other statutes; USG refusal to pay for the past performed work and non-compliance with the TRO can shatter Americans' certainty in the rule of law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                                                    */s/ Della Doe*
                                                                    Della Doe