## DECLARATION OF ELLIE DOE

I, Ellie Doe, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a United States Personal Services Contractor at USAID, and I currently serve overseas.

3.      I have been working for the Agency for over five years and in my current role, I am charged with overseeing the implementation of USAID programming in the country where I am assigned, in particular providing oversight, technical guidance, and policy direction for USAID contractors under awards in place prior to January 19, 2025.

4.      On February 13, 2025, a Temporary Restraining Order (TRO) was put in place in the case of *AIDS Vaccine Advocacy Coalition v. U.S. Department of State,* No. 25-cv-400, and *Global Health Council v. Trump*, No. 25-cv-402. I understood the restraining order to mean that USAID could no longer enforce stop-work orders or suspensions, and should rescind terminations. All the USAID staff at my mission eagerly awaited guidance on how to implement this court order, waiting for further details from our chains of command, and for formal guidance from Contracting Officers who serve as authorized agents of the U.S. Government for managing the grants and contracts we help to oversee.

5.      Prior to the date the TRO was issued, on January 24, 2025, the State Department issued a cable, 25 STATE 6828, with the subject "Executive Order on Review of Foreign Assistance Programs." This unclassified cable, sent in the form of an ALDAC (meaning it is sent to All Diplomatic and Consular Posts worldwide), stated in paragraph 12 that "the Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to

further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance"

Based on this cable, specifically paragraph 12(d), I believed State Department and USAID intended to pay our implementing partners and contractors, including those under my purview, for their work performed prior to January 24, 2025, which by definition could be considered "legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders."

6.      Since January 24, 2025, I have frequently raised the issue of USAID implementing partners needing to receive payment for work that was completed prior to the original stop work orders. I have repeatedly reminded my leadership in Washington, D.C. that the agency's continued failure to issue payments is actively shattering the reputation and reliability of both USAID and the American people, a reputation that has been built over decades of intentional development and assistance work in over 100 countries worldwide.

7.      Additionally, I have warned my leadership that the ongoing failure to provide

payments to our partners is creating an increasingly severe cash flow crisis for their organizations, the majority of which are private American companies who collectively employ tens of thousands of American tax-paying citizens. As each day passes without payment, USAID and the State Department are rapidly and irreparably eroding each of these companies' ability to operate much longer, as they increasingly struggle to maintain bare minimum operations (office rent, staff salaries, utilities, internet) while adhering to the stop-work orders. In particular, I was advocating for the payment of an outstanding December 2024 invoice for work completed under a contract I had personally overseen and could verify had been completed with high quality performance. In response, my bureau leadership informed me that they were aware of the issue and that no other existing contracts managed by our bureau had received payments for work they had completed in November and/or December 2024, which were all considered expenses incurred prior to the stop work orders.

8.      On February 18, 2025, my office leadership in Washington, D.C. forwarded a notice issued to USAID Acquisition and Assistance staff that stated, "stop-work orders and suspensions will need to be lifted" and there would be "more to follow tomorrow". My bureau's office leadership forwarded this notification and informed us to await further guidance.

9.      On February 19, 2025,  the regional bureau's financial services team in Washington, D.C. sent out a comprehensive spreadsheet titled "12(d) USAID Exception Memo Request Sheet" requesting teams within the regional bureau to review and update the list of outstanding payments owed to implementing partners. The spreadsheet was created from the Exception Memo Request template, which was attached with guidance outlined in an unclassified global ALDAC cable from State Department, 25 STATE 10948, dated February 5, 2025. The spreadsheet listed all outstanding payments that fell under the category referenced in both 25

STATE 10948 and 25 STATE 6828 as "12(d) - legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders." Country teams promptly responded to this request the same business day, verifying details on the spreadsheet, including the award number, implementing partner, fund code and fund account, amount due, program name, program description, intended programmatic outcomes, and justification/rationale for exception to the pause on foreign assistance. Additionally, we were asked to indicate for each entry on the spreadsheet whether the request was to expend (i.e., disburse current obligations) or obligate additional funds.

10.     When I viewed this spreadsheet on February 25, 2025, it included over 150 payment requests for work completed and services performed under my regional bureau, totaling more than $70 million in outstanding payments across Washington, D.C. and several different countries. I confirm that every one of the entries I viewed on the spreadsheet was a request to expend funds which were both already obligated and congressionally appropriated, and to the best of my knowledge, all of these requested payments are reimbursement due for work or services already approved and performed prior to the stop work orders.

11.     Additionally, all the payments listed on the spreadsheet which were due to implementing partners under a USAID contract had already been reviewed by at least three different technical officials, per a standard internal USAID procedure by which USAID/Washington and missions normally process payments on an advance and/or reimbursement basis. Per this process, implementing partners send USAID an invoice, including detailed line items of every single expense - to the penny - for which they are requesting payment for work and services rendered under contract. Contract invoices are first reviewed by a Contracting Officer Representative (COR), a trained technical official who is familiar with the

contractor's work and verifies that all costs are reasonable and allowable. When providing administrative approval for an invoice, the COR certifies they have reviewed the invoice and supporting documents and indicates the method by which they have inspected the costs - for instance, by certifying they have physically visited the project site recently, or by certifying the number of meetings held with contractor counterparts within the last three months to discuss project implementation and contractor's level of performance. The COR also indicates if any invoiced costs should be suspended for further review and potentially disallowed for reimbursement by USAID. After the COR's approval, the payment is further reviewed by technical financial specialists who serve as voucher examiners, and then reviewed further by an authorized certifying officer, before final approval for the payment to be processed. In sum, every invoice received by USAID is fully reviewed and approved by at least three different trained USAID technical officers before the invoice can receive final approval and be processed for payment to the implementing partner through Phoenix, the agency's accounting and payment financial system. This review system is in place to ensure all costs are reviewed thoroughly by multiple officials, to ensure costs are reasonable and allowable, and that expenses paid are accurate and in compliance with government regulations.

12.     Therefore, when asked to review and verify the details of these still already reviewed yet still unpaid expenses listed on the aforementioned spreadsheet, I found the process to be unfathomably duplicative. Nevertheless, I complied with the request, hoping that by yet again confirming the details of outstanding invoices already reviewed and approved for payment, our partners would soon begin to receive payments owed for work conducted prior to the stop work orders.

13.     However, to my great dismay, today on February 25, 2025, I received another

request that was forwarded to me, this time asking for my input on more detailed justifications for each of the payment requests on the aforementioned spreadsheet. The request, which came from the same representative of the regional bureau's financial services team, informed all mission directors in the region and requisite functional units that additional information was needed before the spreadsheet and full Exception Memo Request could be submitted to the USAID Front Office (meaning the Office of the USAID Administrator, currently Marco Rubio in an acting capacity). The request asked mission teams to provide additional information for each individual payment by answering questions such as: "What is this program for or do? What is the benefit of these programs? What exactly are we paying for?" The requestor provided examples such as "the project offers U.S. companies expansion opportunities . . . into the broader region . . . . This results in a stronger and more prosperous global business environment benefiting both the U.S. and [redacted country name]." Additionally the requestor provided examples for how we might respond to the question "What exactly are we paying for?" by including such details as "Supported 96 primary health care centers in [redacted location] serving 3.1 million patients".

14.    Earlier today, I responded to the request dutifully, answering the questions and providing the requested details about the specific payments which fall under my purview.

15.    Based on all the information I have repeatedly provided about outstanding payments owed to USAID implementing partners to date, and based on my own years of firsthand experience witnessing the Agency's rigorous internal review process for invoices as described above, it is my sincere belief that the sole reason implementing partners still have not received payments is because USAID and the State Department are willfully choosing not to pay their bills.

16.    It is now my firm belief that the Agency, under the leadership of Secretary of State and Acting USAID Administrator Marco Rubio and the State Department Director of the Office

6

of Foreign Assistance and Acting USAID Deputy Administrator Peter Marocco, is actively directing subordinates to sit on a mountainous backlog of outstanding payments even though these payments have been repeatedly reviewed, approved, certified, and justified through a series of both normal business practices and extraordinary, repetitive processes. Perhaps most perplexing after conducting multiple reviews of payments and repeatedly reaffirming that the expenses are indeed legitimate, is that the U.S. Government has all the funds available and the full authority to make payments for all of its approved outstanding invoices.  These funds have already been authorized by Congress and appropriated to USAID to be spent for the specific purposes of the work that was performed prior to the January 24, 2025 issuance of stop work orders.   Furthermore, the implementing partners requesting reimbursement for expenses incurred prior to the stop-work orders spent this money on legitimate expenses expressly under the direction of the U.S. Government.

17.    I am increasingly alarmed that the entire process for reviewing expenses incurred under USAID activities, which began with the aforementioned cable issued on January 24, 2025, is a harrowing attempt by the U.S. Government to illegally and wrongfully reject payments for approved, legitimate work completed and services performed before the stop work orders took effect. Further, it is my firm belief that the sole purpose of rejecting payments is to deliberately bring injury and irreparable harm to USAID's activities, reputation, and—to my deepest regret—the many thousands of partners and local organizations and grantees around the world who chose to partner with USAID. Our partners willingly entered into an agreement with the U.S. Government, trusting fully in its reliability and integrity, and the U.S. Government has not only breached hundreds of legally binding contracts. It has failed its partnerships around the globe and broken their trust.

18.     At the time of writing this declaration, I am currently aware of only one single invoice that has been paid to an implementing partner since January 24, 2025, across the entire Agency. I have repeatedly requested updates from my chain of command on this issue. Today, I received confirmation from my bureau's leadership team in Washington that they have not, to date, received any confirmation or proposed timeline for when State Department or USAID intends to disburse payments on outstanding invoices, including for the more than 150 outstanding payments which were listed in the "12(d) USAID Exception Memo Request Sheet" that I reviewed for my regional bureau.

19.     Whether by active efforts to thwart these payments or by a series of woefully complicit acts, I personally view Secretary Rubio and Mr. Morocco's actions to be in direct defiance of the February 13, 2025 TRO put in place which ordered the U.S. payments to be unfrozen.

20.     Further, the aforementioned cable 25 STATE 6828 stated, "Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository."

21.     I affirm that today is February 25, 2025, and despite repeatedly asking for additional information and clarification, neither I nor my bureau leadership in Washington, D.C., have received any information about these "appropriate review standards" and what the review process might entail to better align foreign assistance with the President's priorities. Despite offering

program briefings and other information to help the review process, I have not been asked a single question about the programming which I directly oversee.

22.    It is my personal view and firm belief that the purported assistance review, outlined under 25 STATE 6828 and repeatedly referenced in public by State Department leadership, is a complete and total farce.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 25, 2025.

/s/ Ellie Doe
Ellie Doe