# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| AIDS VACCINE ADVOCACY | ) | |
| COALITION, et al., | ) | |
| | ) | |
| _Plaintiffs_, | ) | Civil Action No. 25-cv-400 (AHA) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF STATE, et al., | ) | |
| | ) | |
| _Defendants_. | ) | |
| _____ | ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF</u>

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

   I.   Plaintiffs are likely to succeed on the merits of their claims. .............................................1

      A.   No jurisdictional barrier bars relief. ...................................................................... 1

      B.   Plaintiffs have standing. ......................................................................................... 3

      C.   Defendants' argument that the relevant instruments permit suspension and termination is both pretextual and incorrect. .............................................. 4

      D.   Plaintiffs are likely to prevail on their constitutional claims. ..................................... 6

      E.   Plaintiffs are likely to prevail on their APA claims. .................................................. 12

         1.   Plaintiffs' APA claims challenge final agency action for which there is no alternative remedy. ..................................................................................... 12

         2.   The State Department Memo and implementing agency actions are contrary to law. ..................................................................................... 14

         3.   The State Department Memo and implementing agency actions are arbitrary and capricious .............................................................................. 17

   II.   Absent a preliminary injunction, Plaintiffs will continue to experience irreparable harm. .......................................................................................................18

   III.   The balance of equities markedly favors injunctive relief .................................................19

   IV.   The scope of the preliminary injunction should mirror that in the TRO. .........................21

CONCLUSION ...................................................................................................... 25

i

# INTRODUCTION

In the two weeks since Plaintiffs filed their motion for preliminary relief, the necessity of a preliminary injunction has come into ever-sharper relief. Defendants have wreaked an unprecedented humanitarian catastrophe and are responsible for the loss of thousands of American jobs—facts they do not contest. The death toll attributable to Defendants' actions continues to mount.[1] And in the last few days, even while this Court's temporary restraining order has been in effect, Defendants have drastically accelerated the pace of this crisis and deepened its impact by issuing mass terminations of foreign assistance awards, resulting in—to date—the termination of over 90% of USAID awards and 60% of State awards. ECF 40 at 16. These actions were both unconscionable and unlawful. This Court should enter a preliminary injunction.

# ARGUMENT

## I.     Plaintiffs are likely to succeed on the merits of their claims.

### A.     No jurisdictional barrier bars relief.

Plaintiffs receive foreign assistance funding through grants and cooperative agreements. *See* Compl., ECF 1 at ¶¶ 17–21. Defendants, however, spend a great deal of time making jurisdictional arguments that do not relate to either. Rather, the Contract Disputes Act—as the name suggests and as Defendants concede—governs federal procurement contracts. 41 U.S.C. § 7103(a)(1); Defs. Opp., ECF 33 at 13. Grants and cooperative agreements are, definitionally, not contracts. 31 U.S.C. § 6303 (stating that the "principal purpose" of a "procurement contract … is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government"); *id.* §§ 6304–05 (providing definitions and identifying purposes of

---

[1] A website tracking the deaths related *solely* to the partial suspension of PEPFAR funds estimates that, as of this morning, nearly fifteen thousand adults and 1,575 infants have died completely preventable deaths. PEPFAR Program Impact Tracker, https://pepfar.impactcounter.com/ (accessed 9:46 am, Feb. 27, 2025).

"grant agreements" and "cooperative agreements," respectively); *accord* 2 C.F.R. § 200.1 (defining terms). The CDA does not even arguably apply here.

Conceding that its CDA argument applies only to procurement contracts, Defendants try a different tack, arguing that the Tucker Act "may" route Plaintiffs' claims to the Court of Federal Claims. Defs. Opp. 14. But the Tucker Act applies, and the Court of Federal Claims has exclusive jurisdiction, only where each of three conditions are met: "(1) The claim 'is essentially a contract action,' (2) the claim 'explicitly or in essence seeks more than $10,000 in monetary relief from the federal government,' and (3) the Court of Federal Claims can exercise jurisdiction over the claim." *Am. Near E. Refugee Aid v. United States Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), and *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Plaintiffs' claims do not meet those conditions.

To start, Plaintiffs' claims are not contract actions. As explained above, Plaintiffs have grants and cooperative agreements—not contracts through which they provide property or services for the "direct benefit or use" of the government. Recent caselaw confirms that this distinction renders the Tucker Act inapplicable: In *American Near East Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023), the court confronted the question whether a USAID cooperative agreement to build water and sanitation infrastructure in the West Bank and Gaza constituted a "contract" for the purposes of Tucker Act jurisdiction. *Id*. at 134. Answering in the negative, the court reasoned: "Because the Cooperative Agreement did not confer a direct benefit on USAID, the consideration leg of the chair is missing, and USAID's argument that the Claims Court has jurisdiction topples over. And since the Claims Court lacks jurisdiction, the Tucker Act does not deprive this Court of jurisdiction." *Id.* (citing *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)).

2

Importantly, Plaintiffs seek injunctive and declaratory relief—forms of relief the Supreme Court has "categorically" determined the Court of Federal Claims has no power to grant. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). As a result, when plaintiffs seek such remedies, courts "respect the plaintiff's choice" and may hear those claims as long as that relief is not "negligible in comparison" to potential monetary recovery. *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995). That holds true even if a plaintiff "file[s] the complaint with an eye to future monetary awards." *Id.* Again, *American Near East Refugee Aid* is instructive. There, plaintiff pled a claim under the APA and sought "an order that USAID's interpretation of federal law was incorrect." 703 F. Supp. 3d at 135. And though success on that claim might have resulted in "receiving authorization to draw on USAID funds," the crux of the complaint was enforcement of statutory and regulatory mandates, so the Tucker Act did not strip the court of jurisdiction and the APA's waiver of sovereign immunity for claims against agencies seeking relief other than money damages applied. *Id.*; *see also* 5 U.S.C. § 702.

## B. Plaintiffs have standing.

Plaintiffs AVAC and JDN have explained in detail, and the Court has acknowledged, *see* Order, ECF 17 at 5–6, that they are experiencing severe injury directly attributable to the challenged actions: the Executive Order, the Rubio memorandum, and the stop-work orders. Notwithstanding the undisputed evidence of harm, Defendants suggest that Plaintiffs lack Article III standing to pursue declaratory and injunctive relief because they allege only "pocketbook injuries" to themselves. Defs. Opp. 18. This Court should reject that reframing of Plaintiffs' injuries, which ignores undisputed evidence that Plaintiffs' concrete injuries extend well beyond non-payment.

AVAC's mission is critically compromised by the suspension and stop-work orders: Its cooperative agreement with USAID facilitated its work in Africa to roll out lenacapavir, a long-

3

acting pre-exposure prophylaxis regimen for individuals at high risk of exposure to HIV. Decl. of Mitchell Warren, ECF 1-11 at ¶¶ 4–8. Defendants' actions have forced AVAC to halt that work entirely, resulting in disruption to HIV prevention research and development and to clinical trials. *Id.* ¶ 11. And because AVAC made staffing decisions in reliance on the cooperative agreement, Defendants' actions have resulted in substantial layoffs. *Id.* ¶ 12.

JDN likewise continues to reel from the impact of Defendants' actions. It has been forced to make severe cuts to its journalism programming around the world and will not be able to continue support for anti-corruption reporting in places like Cambodia, Cyprus, Malta, the Pacific Islands, Paraguay, and Russia. Decl. of Andrew Sullivan, ECF 1-12 at ¶¶ 8, 11. And, because staff have been laid off at these programs, JDN is suffering from holes in its global investigative journalism network, making it difficult to do cross-border investigations. *Id.* ¶ 11. Yesterday, Defendants inflicted yet greater injury: JDN received a wave of termination notices for its awards. Fourth Decl. of Andrew Sullivan, Ex. A, ECF 44.

In short, because Plaintiffs' injuries cannot properly be described as "pocket-book" injures, the harm inflicted by Defendants' unlawful actions can be fully redressed only through injunctive relief.

**C.    Defendants' argument that the relevant instruments permit suspension and termination is both pretextual and incorrect.**

Building on their attempt to recast Plaintiffs' challenge to Defendants' blanket actions as a challenge to individualized determinations under the terms of specific grants, contracts, and cooperative agreements, Defendants also argue that the terms of Plaintiffs' grants and cooperative agreements permit Defendants' actions. This pretextual argument should be rejected out of hand. Not a shred of evidence suggests that Defendants had the terms and conditions of award agreements in mind when they initiated blanket suspensions and terminations of foreign assistance

4

grants, contracts, and cooperative agreements. *See Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (agency action "must be set aside" when it "rest[s] on a pretextual basis"). Indeed, the termination notices received by JDN state that they were issued for the "convenience" of the U.S. Government—a termination basis that does *not* apply to grants or cooperative agreements. *See* Fourth Decl. of Andrew Sullivan, Ex. A, ECF 44.

In any event, Defendants are also wrong about the terms and conditions of foreign assistance awards. Start with Department of State grants and cooperative agreements. Those awards are subject to regulatory provisions that permit suspension of an award for noncompliance with the U.S. Constitution, federal statutes or regulations, or the terms and conditions of the award, only after an agency "determines that noncompliance cannot be remedied by imposing specific conditions," 2 C.F.R. § 200.339, such as requiring more detailed financial reports or project monitoring, *see* 2 C.F.R. § 200.208. Defendants have introduced no evidence whatsoever suggesting noncompliance on any of the suspended or terminated awards, let alone evidence that they attempted to remedy that noncompliance through the imposition of specific conditions before suspension. Defendants' argument thus does not even arguably excuse the State Department's blanket suspension of grants and cooperative agreements, and Defendants do not directly argue otherwise.

As for the termination of awards, Defendants miss that regulations require the State Department to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," 2 C.F.R. § 200.340(b). While it is true that State may terminate grants and cooperative agreements "if an award no longer effectuates the program goals or agency priorities[,]" 2 C.F.R. § 200.340(a)(4), a termination on that basis must be consistent with clear and unambiguous provisions in the award—not based on an unreasoned say-so, as happened here.

5

*See* Dec. of Pete Marocco, ECF 22-1 at ¶ 27. And State Department suspensions and terminations are subject to a general requirement that the recipient be given an "opportunity to object and provide information challenging the action[,]" 2 C.F.R. § 200.342—a requirement clearly not followed here. No evidence suggests that there were reasoned termination determinations, or an opportunity to object, as to *any* of the terminated grants or cooperative agreements.

The regulations pertaining to USAID awards are similar. The agency may suspend or terminate awards, only after it provides "notice to the recipient," when it determines that "such assistance would not be in the national interest of the United States or would be in violation of an applicable law." 2 C.F.R. § 700.14. Any such determinations are made in the first instance by a USAID Agreement Officer, who must furnish a written decision that the award recipient may then appeal. 2 C.F.R. § 700.15. Here, though, no Agreement Officers made determinations about individual awards, and no written decisions were provided to award recipients, prior to the blanket suspension and mass termination of awards. And no evidence suggests that award recipients were ever given the opportunity to challenge suspension or termination decisions.

### D.    Plaintiffs are likely to prevail on their constitutional claims.

**1.** Defendants initiated a blanket freeze and mass terminations "in the . . . absence of any statutory authority," *Dalton v. Specter*, 511 U.S. 462, 473 (1994), and, indeed, in direct contravention of congressional mandates to support and fund foreign assistance programs. Defendants respond that Plaintiffs' constitutional claims are not subject to judicial review because they amount to unreviewable claims that "the President has exceeded his statutory authority." Defs. Opp. 23 (quoting *Dalton*, 511 U.S. at 473). But Plaintiffs do not seek review of "[h]ow the President chooses to exercise the discretion Congress has granted him." *Dalton*, 511 U.S. at 476. They seek review of the President's refusal to implement particular statutory directives. As Plaintiffs have explained without rebuttal, *see* ECF 13-1 at 13, the Supreme Court has recognized

that judicial review of executive action is available under such circumstances. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (observing that "the President's actions may … be reviewed for constitutionality"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–86 (1952) (enjoining enforcement of an Executive Order that exceeded the President's inherent authority where "no statute … expressly authorize[d] the President" to take such action and there was no "act of Congress … from which such a power [could] fairly be implied"); *cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing an implied right of action under the Constitution to seek injunctive relief for a separation-of-powers violation).

Invoking the President's "broad authority to attend to the foreign affairs of the nation," Defs. Opp. 24, Defendants argue that the foreign assistance freeze is a constitutional exercise of this authority. The Supreme Court, however, has rejected the notion that the President enjoys "unbounded power" in the realm of foreign affairs, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015), and has cautioned that "it is essential the congressional role in foreign affairs be understood and respected," *id*. at 21. Accordingly, although "in foreign affairs the President has a degree of independent authority to act," Defs. Opp. 24 (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003)), that uncontroversial proposition does not resolve the constitutionality of executive action that runs headlong into Congress's own constitutional prerogative to legislate on matters that touch on foreign affairs. *See Zivotofsky*, 576 U.S. at 16 ("In foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring))).

By disregarding Congress's foreign affairs powers, Defendants erase the separation-of-powers conflict that gives rise to Plaintiffs' constitutional claims. Were this a case in which the "absence of either a congressional grant or denial of authority" created a "zone of twilight in which

[the President] and Congress may have concurrent authority," Congress's "inertia, indifference or quiescence" might leave space for the executive to take drastic actions with regard to foreign assistance funding, if those actions were otherwise lawful. *Id*. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). But this is not such a case. Here, the executive has "take[n] measures incompatible with the expressed or implied will of Congress," so the bounds of permissible executive action are defined by the President's "own constitutional powers minus any constitutional powers of Congress." *Id*. (emphasis added; quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)).

Defendants do not dispute that Congress has authority to direct how public funds are to be spent, irrespective of whether the exercise of Congress's spending power implicates foreign affairs. *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022) ("Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds."); *cf. Zivotofsky*, 576 U.S. at 30 (recognizing Congress's authority to "enact an embargo" on a foreign nation, even in the face of contrary presidential policy). And Defendants do not dispute that Congress has unambiguously appropriated funds for the executive to spend to support the sort of foreign assistance projects that Plaintiffs operate. *See* Pls. Mem. ECF 13-1 at 11 (citing the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460). Defendants' unilateral decision to abruptly suspend all such support in direct contravention of congressional will reflects executive power "at its lowest ebb" and violates the Constitution absent some source of "conclusive and preclusive" authority. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Defendants do not point to any source of constitutional authority for the President to override Congress's judgment that foreign assistance funds should be spent, and none exists. While

expressing concern over "[g]iving aid to projects that are inconsistent with American values" or receiving spending directives that "interfere with the President's authority," Defs. Opp. 25 (citation omitted), Defendants do not argue that the appropriations at issue impinge on an exclusive presidential power. Where the executive has discretion to make spending decisions that promote the President's view of American values, he must do so within the parameters set by Congress. What Defendants have done here, in contrast, is to effect a wholesale, indiscriminate shutdown of appropriate funding for foreign assistance, virtually in its entirety. This sweeping action usurps Congress's spending authority without any valid constitutional basis.

Offering an unelaborated "*cf.*" citation to *Heckler v. Chaney*, 470 U.S. 821 (1985), Defendants suggest that the executive has "unreviewable discretion not to take action." Opp. at 25, *Heckler* held that the APA does not authorize review of executive decisions where a statute "can be taken to have 'committed' … decisionmaking to [an] agency's judgment absolutely." 470 U.S. at 830. With respect to its appropriations for foreign assistance, though, Congress has limited executive discretion by requiring the executive to spend certain funds. As explained above, the executive has no authority to disregard that unambiguous directive. *Cf. Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838) (rejecting as "entirely inadmissible" the claim that the executive has "power to forbid … execution" of Congress's laws).

Defendants also object that the form of requested relief is a "request that this Court step in to supervise Defendants' foreign assistance operations in some sort of receivership arrangement." Defs. Opp. 25. This rhetoric is off base. Plaintiffs ask this Court to enjoin Defendants' foreign assistance freeze and to order Defendants to take steps to preserve the status quo that existed prior to that unlawful executive action. *See* Compl. at 20–21. Unlike a case in which the relief sought would require the executive to stake out a specific policy position on a discrete matter of

international controversy, *see, e.g.*, *Adams v. Vance*, 570 F.2d 950, 952 (D.C. Cir. 1978) (per curiam), *cited in* Defs. Opp. 26, an injunction in this case would simply foreclose the executive from taking the unlawful and unprecedented step of refusing to spend foreign assistance funds that Congress has appropriated, while maintaining the executive's discretion to determine how to spend that money (within the parameters Congress has specified) to best effectuate presidential priorities. Injunctions of executive actions that implicate foreign affairs are hardly unusual. *See, e.g.*, *Louisiana v. CDC*, 603 F. Supp. 3d 406, 412 (W.D. La. 2022) (preliminarily enjoining the executive from terminating COVID-related immigration restrictions); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 308 (D.D.C. 2020) (preliminarily enjoining the executive from suspending the issuance of certain visas); *Saget v. Trump*, 375 F. Supp. 3d 280, 295 (E.D.N.Y. 2019) (preliminarily enjoining the termination of Temporary Protected Status for Haitian nationals lawfully residing in the United States); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1054–55 (W.D. Wash. 2017) (preliminarily enjoining implementation of two Executive Orders concerning refugee admissions). In any event, the issue of what equitable relief this Court can or should issue as a remedy for Defendants' unlawful foreign assistance freeze has no bearing on the predicate question whether that freeze is constitutional. As Plaintiffs have explained, it is not.

**2.** As to Plaintiffs' claim under the Take Care Clause, Defendants argue that the Clause "does not provide a cause of action" against any Defendant. Defs. Opp. 27. The Supreme Court's "established practice," however, is "to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution," *Bell v. Hood*, 327 U.S. 678, 684 (1946), and Defendants "offer[] no reason and cite[] no authority why" a Take Care Clause claim "should be treated differently than every other constitutional claim," *Free Enter. Fund*, 561 U.S. at 491 n.2. Courts have accordingly entertained such claims. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 855

F.3d 957, 976–77 (9th Cir. 2017); *Las Ams. Immigrant Advocacy Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1213 (D. Or. 2020) ("The case law, as it stands today, does not appear to provide any basis to find [a Take Care Clause] claim non-justiciable."); *cf. United States v. Texas*, 577 U.S. 1101 (2016) (order granting certiorari and asking parties to brief an issue under the Take Care Clause). Defendants string cite to cases for the proposition that courts lack authority to superintend "*the way*" the executive branch exercises discretion to "execute[] Congress's laws," Defs. Opp. at 28 (emphasis added), is inapposite, because Plaintiffs challenge the refusal to execute the law at all.

Defendants also contend that, even if Plaintiffs can maintain a Take Care Clause claim, there is no Defendant against whom Plaintiffs can secure relief. According to Defendants, *Dalton* establishes that this Court "has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims." Defs. Opp. 27. And because only the President can violate the Take Care Clause, Defendants continue, this Court cannot remedy a violation by enjoining his subordinates. *Id*. at 29. Neither contention holds up.

On the first point, *Dalton* does not stand for the proposition that equitable relief cannot run against the President to remedy a constitutional violation. The *Dalton* plaintiffs raised "not a constitutional claim, but a statutory one," and based on the Court's "interpretation" of the relevant statute, the Court concluded that the "statute … commit[ted] decisionmaking to the discretion of the President." 511 U.S. at 476–77; see id. at 477 (noting that "Congress ha[d] permissibly foreclosed" judicial review of the relevant executive action). Far from supporting Defendants, *Dalton* expressly recognized that "[t]he distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is … well established," and acknowledged that claims of the latter sort are an appropriate subject for judicial review. *Id.* at 474. Indeed, the D.C. Circuit has granted equitable relief directly

against the President in the past. *See Nat'l Treas. Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (recognizing that a federal court "possesses the authority to mandamus the President" but entering only declaratory relief "in order to show the utmost respect to the office of the Presidency").

As to the other Defendants, a declaration that the President's Executive Order is unlawful and an injunction barring executive officials from implementing it are appropriate remedies for the President's unlawful action. In *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), for example, the D.C. Circuit held that the plaintiffs were entitled to prevail in a non-statutory review action seeking declaratory and injunctive relief against agency implementation of an unlawful executive order. *Id*. at 1332. And in *Environmental Defense Fund v. Thomas*, 627 F. Supp. 566 (D.D.C. 1986), a district court in this Circuit ordered the EPA to fulfill its statutory mandate (there, issuance of a regulation by a statutory deadline), notwithstanding an executive order requiring OMB review, and declared that OMB could not use the executive order to interfere with EPA's compliance with the statute, *id*. at 571. Likewise here, declaratory and injunctive relief against the agency defendants are "necessary to ensure compliance with the clearly expressed will of Congress." *Id*. at 572.

    **E.**    **Plaintiffs are likely to prevail on their APA claims**.

The APA directs a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs have shown why the State Department Memo, as well as the stop-work orders and other agency actions taken to implement it, are both contrary to law and arbitrary and capricious. Pls. Mem. 15–18. Defendants do not persuasively challenge either showing.

        **1.**    **Plaintiffs' APA claims challenge final agency action for which there is no alternative remedy.**

Plaintiffs have alleged claims under the APA against the agency defendants, defendant Rubio, and defendant Vought. *See* Compl. 18–20. Yet Defendants start their discussion of Plaintiffs' APA claims by arguing that the Executive Order cannot be challenged under the APA. That argument gains them no purchase because Plaintiffs do not bring APA claims against the President, but rather challenge final agency actions effectuating the Executive Order. Defendants' suggestion that final agency action is not reviewable under the APA when an agency "act[s] on behalf of the President," Defs. Opp. 31, "does not have support in precedent." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (rejecting an "attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to the State Department"); *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[W]e doubt the validity of [this] unsupported interpretation of the APA; that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."). In any event, Defendants can hardly, in one breath, insist that the challenged agency actions merely effectuate the Executive Order and, in the next, suggest that their actions stem from their perceived "authorities under statutes, regulations, and other legal authorities (*not including the Executive Order* …)." Defs. Status Rep. ECF 22 at 4 (emphasis added).

In the guise of addressing the APA claims, Defendants reprise their suggestion that Plaintiffs APA claims state "contract-specific grievances," while also suggesting, conversely, that they wage a programmatic attack on agencies. Defs. Opp. 32; *see supra* at 18 (addressing Defendants' contract theory). Yet the APA causes of action challenge specific agency actions— the State Department Memo and subsequent implementing directives. The Court had no trouble identifying those specific actions and events in its TRO enjoining them. *See* Order, ECF 17. And

13

because the claims are not contract grievances, the argument that Plaintiffs have an adequate alternative remedy, Defs. Opp. 32–33, fails as well.

### 2. The State Department Memo and implementing agency actions are contrary to law.

The State Department Memo purports to implement an unlawful Executive Order. *See supra* I.D.; Pls. Mem. 10–14. Defendants have not disputed that the State Department Memo is necessarily contrary to law if this Court concludes (as it should) that the Executive Order is itself unlawful. *See* Pls. Mem. 15. The illegality of the Executive Order thus forms an independent basis for setting aside the Memo.

The State Department Memo is also inconsistent with the Further Consolidated Appropriations Act (FCAA), Pub. L. No. 118-47, 138 Stat. 460 (2024). As Plaintiffs have explained, Pls. Mem. 11, and as Defendants acknowledge, Defs. Opp. 33, the FCAA allocates specified funds for projects of the sort that Plaintiffs operate, and it directs that the funds "shall" be made available to support those projects. Although Defendants emphasize that the FCAA "grants the President significant discretion in *how* to use these funds," *id.* (emphasis added), they rightly do not contend that the FCAA grants the President discretion *not* to use the funds at all. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting that "Congress use[s] 'shall' to impose discretionless obligations"). The FCAA makes "a firm commitment of substantial sums" to particular categories of foreign assistance, and its mandatory statutory language makes plain that Congress did not "scuttle[] the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation." *Train v. City of N.Y.*, 420 U.S. 35, 45–46 (1975). Accordingly, Defendants' suggestion (for which they cite no authority) that "the issue of whether Defendants appropriately used Congressionally allocated federal funds is a political question," Defs. Mem. 34, is both beside the point and incorrect. Plaintiffs do not

14

challenge a particular use of appropriated funds. They challenge Defendants' unlawful decision to withhold the funds entirely.

Defendants are also wrong to state that the foreign assistance freeze is consistent with the FCAA merely because they labeled the freeze temporary. As Plaintiffs have explained, executive branch officials and advisors have been forthright about their aim of "prevent[ing]" foreign assistance spending and causing USAID to "die." Pls. Mem. 12–13. Consistent with these statements, Defendants have continued to suspend or terminate large tranches of foreign assistance awards at a rapid-fire pace, including many of Plaintiff JDN's awards, even after this Court entered a temporary restraining order against Defendants' blanket foreign assistance freeze. Meanwhile, Defendants offer no evidence that they are or soon will be making funds available in accordance with the FCAA. To the contrary, they have touted their actions as saving money. And even if Defendants do intend to restore foreign assistance funding at the end of 90 days—all evidence to the contrary—the Antideficiency Act provides that appropriated funds can be apportioned in a way that creates a reserve only under specified circumstances. *See* 31 U.S.C. § 1512(c)(1). Defendants make no effort to explain how the State Department Memo is consistent with the Antideficiency Act, although Plaintiffs expressly invoked it. *See* Pls. Mem. 17.

Plaintiffs have also explained why the Memo is contrary to the Impoundment Control Act of 1974 (ICA), *id.*, which provides that appropriated funds "shall be made available for obligation" absent further congressional action. 2 U.S.C. § 683(b). Citing *City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987), Defendants claim that "a pause does not qualify as an impoundment or a failure to make funds 'available for obligation.'" Defs. Opp. 35. Again, though, Defendants' statements and actions are inconsistent with their representation that the foreign assistance freeze is a temporary administrative measure. But even if the freeze were considered a "deferral[] of

budget authority" under 2 U.S.C. § 684(a), rather than a "recission," it would still be unlawful. As the D.C. Circuit explained nearly 40 years ago, the ICA leaves the President without statutory authority to implement "policy deferrals" that are "intended to *negate* the will of Congress by substituting the fiscal policies of the Executive Branch for those established by the enactment of budget legislation." *City of New Haven*, 809 F.2d 900, 901–02 (D.C. Cir. 1987). To be sure, the President may "implement routine programmatic deferrals," meaning "'trivial' impoundments relating to the 'normal and orderly operation of the government' that … present little controversy." *Id.* at 908–09. But he may not effect "impoundments designed to negate congressional budgetary *policies*." *Id.* at 908. Far from effecting a trivial deferral to better facilitate the administration of Congress's priorities, the State Department Memo effects a sweeping, enormously disruptive suspension of foreign assistance in order to implement an Executive Order that seeks to promote "the foreign policy of the President." Executive Order, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025). The ICA forbids precisely this type of policy-driven manipulation of appropriated funds.[2]

Finally, because the State Department Memo is contrary to law, so are the stop-work orders, terminations, and other agency actions that were taken to implement it. Defendants resist this conclusion because some grants and cooperative agreements allow for suspension or termination under certain circumstances. Defs. Opp. 36. Plaintiffs, though, do not challenge the suspension or termination of a particular grant or agreement pursuant to its particular terms. They challenge the executive branch's unlawful decision to cut off virtually all foreign assistance

---

[2] Defendants note that the ICA does not create a private right of action. Defs. Opp. 35. Plaintiffs, though, raise a claim under the APA, which *does* create a private right of action to challenge "final agency action" that is "not in accordance with law," such as the ICA, where "no other adequate remedy" is available pursuant to another statute. 5 U.S.C. §§ 704, 706(2) (A).

funding. Because that decision was contrary to law, so are the steps that Defendants have taken to carry it out.

### 3. The State Department Memo and implementing agency actions are arbitrary and capricious.

As this Court recognized in granting a temporary restraining order, Defendants' "blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests" and the lack of "any explanation for why a blanket suspension of all congressionally appropriated foreign aid … was a rational precursor to reviewing programs." Order, ECF 17 at 10. In the two pages that Defendants devote to this issue, they largely double down on the arguments that this Court has already found unpersuasive.

First, Defendants dispute the existence of a blanket suspension by pointing to a handful of foreign assistance projects that have continued to receive funding. Defs. Mem. 37. But as this Court has noted, unrebutted evidence shows that the possibility of receiving a waiver from the suspension is more theoretical than real. Order, ECF 17 at 7–8.  And Defendants' own submissions demonstrate the sweeping nature of their attack on foreign assistance. *See* ECF 22; ECF 40.

Second, Defendants contend that they "did explain" that the freeze was necessary "to allow [the President's] administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy." Defs. Opp. 37. This explanation, though, fails to draw "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Specifically, Defendants do not explain "why reviewing programs—many longstanding and taking place pursuant to contractual terms—required an immediate and wholesale suspension of appropriated foreign aid." Order, ECF 17 at 10.

Third, pointing to no record evidence, Defendants deny that they "failed to consider the harmful consequences of their actions" and state that the globally destabilizing impact of the foreign assistance freeze is simply a function of their "preferred policy approach." Defs. Opp. 38. It would render APA review nugatory if an agency's vague invocation of unspecified policy preferences were sufficient to justify a novel and devastating agency practice that served no articulable goal. To the contrary, when an agency changes its policies, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted). Defendants have not attempted to supply one.

Finally, Defendants explain that the foreign assistance freeze was necessary to "compl[y] with the President's directives." Defs. Opp. 38. The APA, however, creates a right to review of "final agency action," 5 U.S.C. § 704, and it directs a reviewing court to "set aside" such action if it is arbitrary and capricious, *id.* § 706(2)(A). Nothing in this straightforward language creates a safe harbor for arbitrary and capricious agency action that "[takes] place in accordance with Presidential policy and priorities, as agency action routinely does." Order, ECF 17 at 11.

## II.    Absent a preliminary injunction, Plaintiffs will continue to experience irreparable harm.

Defendants do not dispute that the suspension of foreign assistance funds has forced Plaintiffs to radically scale back operations, terminate their employees, and compromise their missions. *See* Pls. Mem. 18–21. Instead, they make the remarkable argument that there is no irreparable harm because the review process remains ongoing—even as nearly all foreign-assistance funding remains suspended. *See* Defs. Opp. 39. This argument ignores the ample evidence of irreparable harm stemming from the ongoing suspension itself, even setting aside the harm from mass staff terminations that have occurred and continue to occur, impeding Plaintiffs'

work on their grant projects. Indeed, since the issuance of the TRO, Defendants have on their own admission accelerated the infliction of irreparable harm at a staggering clip, now having terminated over 90% of USAID awards and 60% of State awards. Jt. Status Rpt. ECF 40 at 16. Defendants do not address Plaintiffs' argument that these severe and ongoing harms cannot be remediated by compensating Plaintiffs and other implementing partners after the fact. Pls. Mem. 20-21.

## III.    The balance of equities markedly favors injunctive relief.

There is no dispute whatsoever that Defendants' actions have led to death, impoverishment, sickness, and waste. *See* Pl.'s Memo. 6–7, 21–22; Pl.'s Emergency Mot. to Enforce, ECF 26 at 2; *see also* USAID, Off. of Inspector Gen., Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance at 3 (Feb. 10, 2025), https://tinyurl.com/3dmnuxmx. And due to Defendants' continued recalcitrance, the situation has become even more dire since this Court granted the TRO.   Famine has already been confirmed or is expected to take hold throughout Sudan.[3] Haiti, where half of the country already struggles with food insecurity and malnutrition, is "close to catastrophe."[4] Food to feed 2.1 million malnourished people in Ethiopia is trapped at a port in Djibouti because there is no money to deliver it.[5] Beyond the global humanitarian catastrophe, Americans are directly affected by the

___

[3] Jeremy Konyndyk, *'We Are Seeing Complete Destruction': The Damage Done by the U.S.A.I.D. Freeze*, N.Y. Times (Feb. 21, 2025), https://www.nytimes.com/2025/02/21/opinion/hiv-usaid-freeze-doge.html. Indeed, Defendants have publicly conceded that children in Sudan are starving as a direct result of their actions. Natalie Allison and Dan Diamond, *As federal workers and aid recipients reel, Trump's team is unmoved*, Washington Post (Feb. 15, 2025) (quoting a White House official, "They get the one starving kid in Sudan that isn't going to have a USAID bottle, and they make everything DOGE has done about the starving kid in Sudan.").

[4] Jennifer Rigby and Lisa Baertlein, US aid freeze sows disruption in HIV, malaria product supply chains, Reuters (Feb. 21, 2025), https://www.reuters.com/world/us/us-aid-freeze-sows-disruption-hiv-malaria-product-supply-chains-2025-02-21/.

[5] Fred Harter, *'The impact has been devastating': how USAid freeze sent shockwaves through Ethiopia*, The Guardian (Feb. 21, 2025), https://www.theguardian.com/global-

freeze: Defendants have halted a program aimed at stopping drug cartels from shipping fentanyl from Mexico into the United States.[6]

Even programs that ostensibly would be covered by waivers continue to be shuttered because Defendants refuse to make payments to implementing partners. *See* Decl. of Jessica Doe, ECF 26-3, ¶¶ 36–41. The consequences are lethal. For just one overseas mission, every single day the freeze continues, over 28,000 orphans and vulnerable children lose access to HIV prevention and treatment services and 5,000 people living with HIV lose access to anti-retroviral medication. *Id.* at ¶ 38. Every single day, 30 women will die from childbirth and 40 more newborns will be deprived of life-saving resuscitation. *Id.* at ¶ 39. An additional 250 newborns will die before reaching one-month old. *Id.* What is more, the blanket suspension has now resulted in deadly ripple effects: The supply chain for medicines, diagnostics, and malaria bed nets has been disrupted, meaning that life-threatening gaps in supplies could persist for months.[7]

Likewise, Defendants do not address the thousands of American jobs—and counting—that have been lost as a direct result of the blanket freeze. They do not even pay lip service to the impact on American workers of layoffs directly attributable to the freeze, let alone to the domino effect of consequences to impacted workers' families, to the local economies they contribute to, and to the broader national economy.[8]

---

development/ng-interactive/2025/feb/21/the-impact-has-been-devastating-how-usaid-freeze-sent-shockwaves-through-ethiopia.

[6] Stephen Eisenhammer and Laura Gottesdiener, *Trump aid freeze disrupts anti-narcotics program at Mexican ports*, Reuters (Feb. 24, 2025), https://www.reuters.com/world/americas/trump-aid-freeze-disrupts-anti-narcotics-program-mexican-ports-2025-02-24/.

[7] Rigby and Baertlein, *US aid freeze sows disruption in HIV, malaria product supply chains*, Reuters (Feb. 21, 2025),

[8] *See* Greg Iacurci, *How the Trump and DOGE terminations — perhaps the biggest job cuts in history — may affect the economy*, CNBC (Feb. 23, 2025), https://www.cnbc.com/2025/02/23/how-trump-doge-job-cuts-may-affect-the-us-economy.html.

Instead of confronting any of those equities, Defendants baselessly suggest that their actions serve the public interest by ensuring that tax dollars are not spent on projects that are "antithetical to American values." Defs. Opp. 43–44. Yet they offer no evidence whatsoever to support that any such projects are the targets of either the blanket suspension or the waves of terminations that they continue to issue. They likewise offer no evidence whatsoever of fraud, let alone evidence that could justify a blanket suspension that, as this Court recognized, "set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country." Order, ECF 17 at 10. And though they claim without citation that the public has an interest in the Executive effectuating foreign affairs, they miss that there is no public interest in *unlawful* Executive action. *See Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir, 2016)); *see also Zivotofsky,* 576 U.S. 1, 21 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue").

## IV.    The scope of the preliminary injunction should mirror that in the TRO.

This Court's TRO enjoined Defendants from suspending or otherwise preventing the obligation or disbursement of appropriated foreign assistance funds in connection with any grants and other foreign assistance agreements in existence as of January 19, 2025; and it enjoined Defendants from issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with grants or other foreign assistance agreements in existence as of January 19, 2025. Plaintiffs request that the Court issue a similar preliminary injunction.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citing *Winter v. National*

21

*Res. Def. Council*, 555 U.S. 7, 20, 24 (2008)). A federal district court has wide discretion to fashion appropriate injunctive relief." *Richardson v. Trump*, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (quoting *Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)).

As recently noted in *National Associaton of Diversity Officers in Higher Education v. Trump*, No. 25-333, __ F.Supp.3d __, 2025 WL 573764 (D. Md. Feb. 22, 2025), the "relevant question" when defining the scope of a preliminary injunction "is whether, in light of the claims and Plaintiffs' showing of likelihood of success on the merits, including similarly situated non-parties within the scope of an injunction would be appropriate." *Id.* at *29. An injunction that extends to non-parties may be "particularly appropriate" where "the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *Id.* (quoting *HIAS v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020))); *see also Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976) (stating that where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation" (citations and internal quotation marks omitted)); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) ("[W]here a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate.").

Thus, for example, in *International Refugee Assistance Project*, the Court affirmed the extension of an injunction against the Administration's Muslim travel ban to include "parties similarly situated to" the named plaintiffs, who had a connection to the United States, 582 at 582, while finding that the balance of interests weighed differently for non-parties who lacked those ties, *id*. And in *HIAS*, three resettlement agencies challenged an executive order that "altered the system by which the federal government resettles refugees across the United States" and a

Department of State notice implementing that order. 985 F.3d at 315. After determining that the plaintiffs were likely to succeed on their claim that the executive order and notice violated a federal statute, the Fourth Circuit affirmed an injunction prohibiting enforcement of the order and notice in their entirety, not only as to the three plaintiffs. As the court explained, the scope of the injunction was appropriate because "[t]he refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country." *Id*. at 326-27.

The same is true here, where Plaintiffs have challenged an executive order and agency action as violating federal law. The challenged "categorical" change in policy, and the implementing actions, "by [their] nature impact[ ]" all recipients of foreign assistance awards. A preliminary injunction prohibiting the agency defendants from implementing and enforcing the executive order, memo, and stop-work orders is therefore appropriate. *Cf. Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

In their opposition, Defendants argue that an injunction cannot extend relief beyond the specific Plaintiffs in this case and *Global Health Center*. The cases on which they rely do not support their conclusion. To begin, *Gulf Oil Corp. v. Brock*, 778 F.2d 934 (D.C. Cir. 1985), was a reverse Freedom of Information Act (FOIA) case, in which the plaintiff sought to prevent disclosure of a specific document requested by a FOIA requester but did not challenge the validity of the agency regulations that directed disclosure. The district court had enjoined disclosure of the requested document and "all similar documents." *Id*. at 835. On appeal, the D.C. Circuit held that injunction should not have extended beyond the specific document at issue, "particularly …

because Gulf did not challenge the validity of the regulations on their face." At the same time, the court of appeals noted that "in some circumstances case-by-case determinations of the applicability of FOIA exemptions are not desirable." *Id*. at 842; *see id*. at 842 n.45 (contrasting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) (holding that case-by-case determinations of the applicability of FOIA exemption 7(a) to witness statements was unnecessary)).

Defendants cite *Gill v. Whitford*, 585 U.S. 48 (2018), for the boilerplate point that, because "standing is not dispensed in gross," *id*. at 73, the remedy "must be tailored to redress the plaintiff's particular injury." Defs. Opp. 45 (quoting *Gill*, 585 U.S. at 73). *Gill*, however, and the case it cites, *see DaimlerChrysler Corp. v. Cuno* , 547 U.S. 332, 353 (2006), both concern relief addressing actions that the plaintiffs lacked standing to challenge. Here, there is no reasonable question that plaintiffs have standing to seek relief for the challenged actions. *See supra* I.B.

Next, Defendants (at 46) rely on concurrences expressing skepticism about universal injunctions. Those concurrences do not overrule the wealth of case law affirming district courts' discretion to determine the appropriate scope of injunctive relief or permitting injunctions against enforcement of agency action where plaintiffs have shown a likelihood of success on the merits and the balance of equities weigh in their favor.

Finally, the bulk of Defendants' argument as to the scope of a preliminary injunction contests the Court's ability to enjoin the President. *See* Defs. Opp. 47–49. Plaintiffs' motion does not request an injunction against the President. Accordingly, this Court need not address that argument to grant the requested relief.

**CONCLUSION**

For the forgoing reasons and the reasons set forth in Plaintiffs' motion for preliminary relief, ECF 13-1, the Court should issue a preliminary injunction extending the relief granted by the TRO.

Respectfully submitted,

/s/ Lauren E. Bateman
Lauren E. Bateman (D.C. Bar No. 1047285)
Allison M. Zieve (D.C. Bar No. 424786)
Nicolas A. Sansone (D.C. Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

On February 27, 2025, I caused the foregoing to be filed electronically via the Court's

CM/ECF system, which provides electronic notice to all counsel of record.

Dated: February 27, 2025                                    /s/ *Lauren Bateman*
                                                           Lauren Bateman