## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AIDS VACCINE ADVOCACY ) | |
| COALITION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

## DECLARATION OF LAUREN BATEMAN

I, Lauren Bateman, declare the following under penalties of perjury:

1.      This declaration is based on my personal knowledge, information, and belief.

2.      I am counsel to Plaintiffs AIDS Vaccine Advocacy Coalition and Journalism Development Network in this matter.

3.      On March 2, 2025, I received from a source within USAID a February 28 memorandum signed and approved by Nicolas Enrich, then-Acting Administrator of USAID for Global Health, titled, "Documentation of challenges and impediments to implementing the lifesaving humanitarian assistance waiver for the pause on foreign assistance (Jan 28 – Feb. 28)." That memorandum is attached as Exhibit A.

4.      On March 2, 2025, I also received from a source within USAID a February 28 memorandum signed and approved by then-Acting Administrator Enrich, titled "Documentation of Bureau for Global Health Workforce Reductions." That memorandum is attached as Exhibit B.

5.      Also on March 2, I received a third document—this one in draft form—from

another source. That document is titled, "Risks to U.S. National Security and Public Health: Consequences of Pausing Global Health Funding for Lifesaving Humanitarian Assistance" and bears a future date, March 4, 2025. That draft memorandum is attached as Exhibit C.

6.    *The New York Times* also received and has reported on these documents. *See* Apoorva Mandavilli, *U.S.A.I.D. Memos Detail Human Costs of Cuts to Foreign Aid*, N.Y. Times (Mar. 2, 2025), https://www.nytimes.com/2025/03/02/health/usaid-cuts-deaths-infections.html. According to that article, Mr. Enrich has confirmed that "he released the memos on Sunday afternoon, after an email arrived placing him on leave, to set the record straight on the gutting of U.S.A.I.D. staff and the termination of thousands of lifesaving grants." *Id.*

Executed on March 3, 2025.

/s/ Lauren Bateman
Lauren Bateman

EXHIBIT A



FOR OFFICIAL USE ONLY

**MEMORANDUM TO THE FILE**

**Date:**            **February 28, 2025**

**Subject:**       Documentation of challenges and impediments to implementing the lifesaving
                   humanitarian assistance waiver for the pause on foreign assistance (Jan 28 - Feb. 28)

**Approved:**   Nicholas Enrich, Acting Assistant Administrator for Global Health   *Nicholas Enrich*

**KEY TAKEAWAYS:**

- Successful implementation of Secretary Rubio's temporary waiver to the pause on foreign assistance for lifesaving humanitarian assistance was not possible due to administrative and bureaucratic challenges, including contradictory and shifting guidance regarding approval for required activities and failure of Agency leadership to process disbursement of funds for activities once approved.
- As a result of these challenges, the Bureau for Global Health (GH) has been wholly prevented from delivering life-saving activities under the waiver to date.

**BACKGROUND:**

On January 28, 2025, Secretary of State Rubio issued a temporary waiver to the pause on foreign assistance articulated in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO) for lifesaving humanitarian assistance (LHA) activities. A subsequent Agency Notice, issued January 29, instructed that "Implementing partners currently involved in lifesaving humanitarian assistance programs should continue, or resume activities if they have been halted, in accordance with the following guidelines" and defined the scope of the waiver to include "...essential medicines, medical services, food, shelter, and subsistence assistance, as well as necessary supplies and reasonable administrative costs to facilitate the delivery of such assistance."

USAID's failure to implement lifesaving humanitarian assistance under the waiver is the result of political leadership at USAID, the Department of State, and DOGE, who have created and continue to create intentional and/or unintentional obstacles that have wholly prevented implementation. These actions include the refusal to pay for assistance activities conducted or goods and services rendered, the blockage and restriction of access to USAID's payment systems followed by the creation of new and ineffective processes for payments, the ever-changing guidance as to what qualifies as "lifesaving" and whose approval is needed in making that decision, and most recently, the sweeping terminations of the most critical implementing mechanisms necessary for providing lifesaving services. These actions individually and in combination have resulted in the U.S. Government's failure to implement critical lifesaving activities. This will no doubt result in preventable death, destabilization, and threats to national security on a massive scale. This memo serves to document the LHA waiver process and challenges encountered by the Bureau for Global Health to date, excluding PEPFAR.

**LHA WAIVER IMPLEMENTATION SUMMARY:**

***January 29-31: Initial Waiver Plan and Guidance***

- On January 29th at the Agency Senior Management Meeting, GH Acting Senior Bureau Official Ramona Godbole articulated to then Deputy Chief of Staff (DCOS) Joel Borkert that GH would send an info memo describing a process and criteria by which GH would approve activities for and implement the waiver for qualifying global health activities, and would carefully identify and track activities within awards that fall under the waiver. DCOS Borkert indicated his support for this approach.
- Also on January 29th, GH sent stop work orders (SWO) to all GH-managed Public Interest Organizations (PIOs), and included the waiver language verbatim at the advice of USAID General Counsel (GC) to indicate

1

to these partners that there was guidance to continue lifesaving components of their programs[1]. All other GH-managed agreements had already been sent SWOs prior to the issuance of the waiver.

- In addition, on January 29 USAID Executive Secretariat (ES) released a new template for all Foreign Assistance Pause Waiver Requests, indicating that new waiver requests would only be considered for the same day if submitted by 1:00 p.m. ET. This guidance was subsequently revised and an updated version was shared on January 31. As the blanket waiver for LHA had already been issued,  GH interpreted this guidance to apply only to waiver requests outside of the blanket waiver for LHA and/or for LHA activities that required new obligations in addition to disbursements.
- January 29 - February 2: GH identified emergency outbreak response activities needed to respond to the Ebola outbreak in Uganda through PIOs (UNICEF, IFRC, IOM) under the LHA waiver - the first approved global health activities under the waiver.  Approval to move forward was obtained by DCOS.
    - Despite receiving approval to conduct these Ebola response activities approximately 1 month ago, the implementing partners were never able to draw down funds for these life-saving activities, and have not received any funds to date.
- On January 31st, Acting Assistant Administrator for Global Health (A/AA), Nick Enrich, sent an email summary of GH's process to efficiently implement the LHA waiver for GH activities to DCOS Borkert, copying Chief of Staff Matt Hopson and then-Acting Deputy Administrator Ken Jackson, and followed up on February 3rd after no response.

***February 1-7: Initial Waiver Approvals and Requests for Payment***

- On February 4th, A/AA Enrich and DCOS Joel Borkert talked via phone and followed up via email confirming that GH's proposed process should move forward immediately, with GH approving lifesaving humanitarian global health assistance judiciously in accordance with the guidance, and providing regular updates to the FO including a full accounting of activities and budget. In a shift from previous guidance, during this conversation, DCOS Borkert also directed GH to modify the timeline of lifesaving assistance requests to cover 30 days rather than 90 days.  DCOS Borkert also indicated that GH should be "draconian" in what is approved under the waiver.
- On February 4th, GH shared this memo for the Acting Administrator with the DCOS Borkert, who subsequently cleared the memo by email on February 6th.[2]
    - This memo defined Bureau for Global Health LHA programming as including 1) Direct Service Delivery, 2) Emergency Response to Infectious Disease Outbreaks, and 3) Essential Health Commodities & Supply Chain Management.
    - The memo also established that GH A-AA was responsible for approving activities that fall within the waiver, and for sharing updates regularly with the Agency Front Office and coordinating with M/OAA to communicate with implementing partners of GH centrally managed awards to restart approved activities.
- GH developed an internal tracker [Tab 1] to collect award and activity information for LHA activities. GH A-AA reviewed the tracker daily and approved activities that met the definition outlined in the cleared memo. GH collected information only on centrally-managed awards, including field support.  Regional Bureaus led the collection and approval of bilateral awards that met the LHA waiver criteria independently.

---

[1] PIOs that received suspension letters inclusive of waiver language are Food and Agriculture Organization of the United Nations (FAO) Global Health Security Project Agreement (Award # 7200GH22IO00005), Food and Agriculture Organization of the United Nations (FAO) Emerging Pandemic Threats Agreement 2 (Award # GHA-G-00-06-00001), UNOPS Agreement (Award # AID-GH-IO-15-00002), UNOPS Agreement (Award # 7200GH24IO00001), UNICEF Umbrella Agreement-II (Award # 7200GH21IO00004),UNICEF Polio and Immunization Agreement II (Award # 7200GH22IO00001),IFRC Agreement 2 (Award # AID-GH-IO-17-00002), Global Financing Facility (GFF) for Women, Children and Adolescents Single-Donor Trust Fund Agreement (Award # 7200GH23IO00003/Bank Trust Fund No. 074019), IOM Agreement (Award # 7200GH25IO00002), Joint United Nations Programme on HIV/AIDS (UNAIDS) UNAIDS Agreement IV (Award # 7200GH22IO00004), and International Federation of the Red Cross and Red Crescent Societies (IFRC) Agreement 3 (Award # 7200GH23IO00002)

[2] By nature, Info Memos do not require explicit approval but are cleared and shared for informational purposes. On Feb. 6, it was unclear who was the Acting Administrator of USAID. While an Agency-wide February 3rd email indicated that Secretary of State Marco Rubio had been appointed as USAID's Acting Administrator, this communication raised a number of legal and practical questions still awaiting resolution. Additionally, previous Agency-wide guidance on the implementation of executive orders (Jan 25 and Jan 26) had placed severe restrictions on communications between USAID and State, indicating that all communication with State must first go through the USAID Front Office. Therefore, GH included Ken Jackson, the highest ranking political official at USAID, in its circulation of the Info Memo.

FOR OFFICIAL USE ONLY

- Consistent with the process established in the approved Info Memo, on February 7th, GH sent the first batch of GH-approved waivers for the Agency Front Office's visibility and to request their action to authorize expenditures/disbursements, given that access to Agency financial systems (Phoenix, GLAAS) was severed for GH and other financial management staff across the Agency. GH provided an updated list of GH-approved waivers on February 10 to Paul Seong (detailee to Agency FO), copying DCOS Borkert. At this point, there was no clear pathway to submit waiver requests, and GH personnel (Nida Parks, Ramona Godbole, and Nick Enrich) had been verbally told by DCOS Borkert to email Paul Seong copying the DCOS. Concurrently, M/OAA sent letters to the relevant implementing partners/awards to restart work on specific lifesaving activities, based on GH approval.
    - While the specified partners received letters indicating certain activities could restart as they were approved under the LHA waiver, several indicated that they could not restart these activities without getting paid by USAID for past invoices (prior to January 20th) and/or access to funds for the waived activities. Other partners restarted lifesaving activities using residuals, but even that work was short-lived. With USAID having failed to make payment on past due invoices or to provide access to funds for newly approved activities, and with residual funds fully extinguished, partners had no funding to continue the work, so it stopped. Communications documenting these challenges can be found here.
- Beginning around February 7th, members of GH leadership participated in a Department of State-led "Coordination Support Team," as part of the "Programs Working Group," which was charged with addressing challenges related to implementing the LHA waiver. From the start, the Programs Group alerted Agency leadership that the lack of access to funds for implementing partners was a critical impediment to the ability to implement the waiver, as access to USAID financial systems (GLAAS and Phoenix) had been completely turned off by DOGE, per Bob Kingman and Daniel Gaush from Department of State ICASS Service Center, preventing the flow of any funds to implementing partners who were approved to implement LHA activities.

***February 8-14: Award Terminations and Changing Waiver Activity Approval Guidance***

- On February 8th, M/OAA notified GH of the first of several "tranches" of awards that the Secretary of State (S) had identified for termination. The list of awards slated to be terminated included awards that had been approved to implement activities under the LHA waiver. GH immediately alerted both DCOS Borkert and Assistant to the Administrator (AtA) Mark Lloyd both in writing and verbally that terminating the awards that were needed to implement lifesaving activities would undermine the ability of USAID to implement the LHA waiver.
    - OAA shared subsequent tranches of planned award terminations with GH centrally-managed awards - Tranche 2 (on or around February 9th), Tranche 3 (February 10th), and Tranche 5 (February 23), and OAA gave GH the opportunity to highlight awards with LHA before termination. Early in this process, one award with an LHA request (NTD West) was terminated before GH could effectively engage with OAA.
- On February 11th, Mark Lloyd asked A-AA Enrich for additional details on submitted waivers, including descriptions of awards from FACTSInfo and number of lives saved.
- On February 11th, DOGE advisor Jeremy Lewin emailed A-AA Enrich warning him to stop reviewing the awards slated for termination to identify if those awards were needed to implement activities under the waiver. Specifically Lewin stated: "I am hearing that Global Health is conducting supplemental reviews of awards slated for termination by Secretary Rubio and Acting Deputy Administrator Marocco. This is delaying the timely processing of these termination notices and is unacceptable" and specified that "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions." A-AA Enrich responded that GH was flagging for Agency consideration that the awards that were slated for termination included those needed to implement the LHA waiver, but would stop if told to stand down. Lewin did not respond.
- On February 11th, Paul Seong, a detailee to the Agency FO, instructed GH to pause further approvals of activities to be implemented under the LHA waiver. His email stated: "Please hold off on any more approvals until we have a conversation with Joel on this." On February 12, A/AA Enrich shared that

message with GH leadership and regional bureaus. Despite a growing list of lifesaving activities identified, GH paused on any further approvals.

- On February 13th, A-AA Enrich and Senior Deputy Assistant Administrator (SDAA) Julie Wallace were told by DCOS Borkert that there had been a false narrative spread in the media that GH had been told to pause on approving activities under the LHA waiver. A-AA Enrich stated that the Agency FO had in fact told GH to pause on further approvals, and reminded him of the previous day's email. DCOS Borkert as well as other senior advisors, including AtA Tim Meisburger and Senior FO Advisor Laken Rapier shouted at A-AA Enrich that there had never been a pause, and instructed him to immediately draft another Info Memo to correct the "false narrative in the media that there had ever been a pause."
- On February 13th, GH circulated the memo from AtA Mark Lloyd "performing the duties of Assistant Administrator, Global Health" which among other things, reiterated GH's approach to approval of waivers per the earlier February 4th memo.
  - While agency leadership previously told GH to only include requests for 30 days (articulated in the February 4th memo), GH was subsequently asked to shift to the original 90 days as articulated in the original waiver language.  This was updated in the February 13th memo.
- On February 14th, the Agency Front Office and ES circulated a new consolidated Foreign Assistance Pause Blanket Waiver and Exception Guidance which fully contradicted Mark Lloyd's memo from the previous day, and rendered the GH approval process for activities under the LHA waiver obsolete. Starting with the release of the February 14 guidance, GH was never again able to approve activities under the waiver, and from that point forward, zero lifesaving health activities have been approved by the Agency.
  - The February 14th guidance established a new process for approving LHA activities, and centralized the approval process with the Agency FO, and specifically required approval for all activities under the waiver by Ken Jackson as the named "Senior Bureau Official" for USAID. This new guidance contained several process updates, including two new templates (Blanket Waiver Request Sheet and the Obligation or Disbursement under Waiver of Foreign Assistance Pause) and articulated that all waiver requests needed to be sent through the Executive Secretariat (ES).
  - In addition, the guidance articulated that ES would inform the relevant Bureau and cc M/CFO POCs if/when activities were approved for payment, but was not responsible for working with M/CFO on coordinating the disbursement of funds for approved waivers.
- On February 14th, GH re-sent all approved activities under the waiver to date to ES, in the original GH-created format, clarifying that they had already been approved under the previous guidance.  All lifesaving activities that had not yet been approved as of the February 14th guidance, were subsequently submitted for approval in accordance with the new guidance. **No global health activities were ever approved under the updated guidance.**
  - GH considered submissions prior to February 14th approved to fall under the waiver, but not approved for payment until the Agency SBO signs the Obligation and Disbursement Form.
  - For submissions on or after February 14th, GH considered those requests as needing approval from the Agency SBO both for qualification under the waiver and for payment.
- On February 14th, a federal judge issued a temporary restraining order (TRO) prohibiting the freezing of foreign aid funds obligated prior to January 19. It was not immediately clear how the TRO pertained to LHA waivers, however, GH decided to continue to submit requests given the uncertainty of interpretation and implementation of the TRO.

### February 15-21: Unapproved Waiver Activity Requests and Ongoing Lack of Payment

- On February 18th, A-AA Enrich shared an action memo with Mark Lloyd recommending the utilization of an existing agreement with the WHO to utilize previously obligated funds to access a critical stockpile of PPE and lab supplies to support the Uganda Ebola outbreak response.  While the activities would normally be covered in the regular process for the lifesaving humanitarian assistance waiver, this memo was drafted for approval from State/F Director Pete Marocco, given that the implementing partner of the agreement is WHO, the subject of a separate Executive Order. Mark Lloyd cleared the memo on Feb. 19th and it was sent forward for COS Borkert clearance and DFA Pete Marocco signature. COS Borkert specified that DFA Marocco would not sign the memo and would not agree to utilizing the agreement with WHO to access the PPE stockpile, and instead ordered A-AA Enrich to "pick up the PPE and deliver it to the necessary

people and organizations in the region to respond to ongoing infectious disease outbreaks" without utilizing the agreement with WHO. DFA Marocco immediately responded to Borkert's email, threatening to the jobs of GH staff if an alternate plan was not carried out immediately, directing political appointees Borkert, Lloyd and Meisburger to "take all necessary personnel actions in the event this is not completed in the next 12 hours."

- On February 19th, DCOS Borkert sent an email to A-AA Enrich, AtA Lloyd, and A-AA for Africa Bureau Brian Frantz indicating that "life saving things like Marburg do not need a waiver (so there should be no pause). They do need to go through the payment approval process," contradicting the previously established processes described above.
- On February 20th, A-AA Enrich emailed AtA Mark Lloyd to request that he clarify the conflict between the guidance and DCOS email.  It was later confirmed verbally and documented via email that the existing Agency guidance continues to be the active guidance despite comments from DCOS Borkert.
- On February 20th, GH sent all waiver requests that had previously been approved by GH as well as additional waiver requests that had gone through technical review and concurrence at the GH/AA level in the new format to ES and M/CFO, including links to an Obligation / Disbursement Form for each.
  - The  GH Centrally Managed Award Blanket Waver Request Tracker can be found in Tab 2 and provides a running list of all submissions for approval and/or payment to the Agency FO.
- On February 21st, with no response to February 20th email (above), to help provide clarity around unclear and inconsistent guidance, GH again  proposed some minor revisions to ES guidance through Mark Lloyd. These proposed edits included clarification that GH can approve the applicability of the waiver for activities, while the ES guidance was to seek approval for payment. Mark Lloyd subsequently indicated that the proposed edits were not approved and that GH should follow the guidance as laid out by ES.

***February 22-28: No approved waivers, no funding, and widespread mechanism terminations***

- On February 21st, Mark Lloyd told GH leadership to update the waiver process by creating an additional layer of technical review for LHA waiver submissions from missions, a process which was previously managed entirely by the Regional Bureaus.
- On February 24, in an effort to move forward approvals and payments, the GH leadership team (A-AA Enrich and DAA Coles) walked through each waiver request with political leadership (Mark Lloyd and Tim Meisburger) in an effort to move forward approvals and payments.  Political leadership provided guidance instructing GH to narrow the focus of its requests and to deprioritize activities related to neglected tropical diseases, Mpox, polio, Ebola, and any monitoring and surveillance activities, as those would not be approved.  AtAs Lloyd and Meisburger stated at the meeting that even activities that had been approved by GH under the previous guidance needed to be re-approved, indicating that the Agency FO does not recognize any previous GH approvals for applicability of the LHA waiver under the Feb 6th info memo. At this meeting, AtA Lloyd and Meisburger informed GH leadership that all submissions would need to be cleared by AtA Lloyd prior to being submitted to SBO Jackson for approval.
- On Tuesday, February 25, GH provided a revised and prioritized list of GH centrally-managed awards/activities (none of which had been approved) to AtA Lloyd requesting approval of 16 urgent activities to support lifesaving commodities and services per the February 24 discussion.  AtA Lloyd never responded or provided clearance or non-clearance. GH had planned to re-submit these prioritized activities for SBO Jackson's formal approval for inclusion under the waiver and payment after receiving Mark Lloyd's concurrence.  To date, despite prompts at each daily meeting with AtA Lloyd, GH has not been given guidance to proceed.
- On Tuesday, February 25, through the Programs Working Group, GH was made aware of Frequently Asked Questions on the waiver developed by State and cleared by Pete Marocco.  Question 20 indicates the following specified the funding accounts that the LHA waiver applies to, and it explicitly excludes non-PEPFAR health funding, meaning that none of the proposed activities could be approved under the LHA waiver.
- On February 26, GH raised the above mentioned FAQ and implications at the Programs Working Group meeting. Political leadership in attendance (Timothy Meisburger) indicated that the FAQ was a mistake. GH subsequently followed up with leadership requesting a revision to FAQ via email, however, the

omission was never corrected before the final FAQs were widely shared later that day via an Agency Notice.

- Also on February 26th, ES released additional updates to waiver guidance including that for awards over $1 million a budget breakdown would be required before approval; GH was also told to include dollar amounts within the disbursement / obligation forms already submitted by ES staff member Jenn Hurley.
- Additionally, on February 26th, over 5,000 USAID awards were terminated globally; GH was not notified of this action before it happened. The terminated awards included almost all of the awards that were needed to implement lifesaving activities. A-AA Enrich informed COS Borkert, SBO Jackson, and AtAs Lloyd and Meisburger immediately of the grave impacts on lifesaving activities related to malaria, tuberculosis, and ebola. In an email following the February 26th terminations, DCOS Borkert indicated that the awards that were terminated should not have been, and had been terminated in error: "Please hold on these life saving programs and let us review in the morning. There is an acknowledgement some may have been sent out in error and we have the ability to rescind. We need to identify what those are."
- As of February 27th, GH has identified over 100 awards (excluding PEPFAR) that had submitted LHA waivers for approval. A-AA Enrich emailed the list of awards and described their lifesaving impact on February 27th; when GH leadership were told that the list needed to be ranked, DAA Coles responded with top priority awards that had been terminated.
- On February 27, GH sent an additional list of awards / activities to ES seeking SBO Jackson's approval to allow the activities to proceed pursuant to the LHA waiver and to allow program payment (see Tab 2)

Finally, significant staffing changes occurred within USAID/GH throughout the timeframe in question - including regularly affecting staff by terminating them without warning, turning on and off access to systems, placing and removing staff from administrative leave, etc. - severely limiting the ability to navigate and respond to the shifting guidance and bureaucratic hurdles outlined above. These staffing disruptions are too numerous and expansive for this memo, and are summarized in a separate memo for the record (Tab 3). In addition to staffing disruptions within GH, there were significant numbers of individuals put on administrative leave both at Missions and at Regional Bureaus, further exacerbating challenges.

**IMPLICATIONS:**

- In total, to date, the GH Bureau has identified 72 activities across 31 awards that entail Lifesaving Humanitarian Assistance, not including bilateral awards with LHA waiver requests. To date, none of these activities have been approved by the Agency FO and no payments have been released, fully preventing their implementation.
- All or nearly all of the awards needed to implement lifesaving humanitarian assistance were terminated on or before February 27th, rendering impossible any efforts to implement activities under the waiver, even if they had been approved.
- The number of deaths attributable to the loss of USAID funding and support is not known at this time. Additional details on the U.S. National Security and Public Health from the Temporary Pause in Foreign Aid and Delays in Approving Lifesaving Humanitarian Assistance can be found in a separate memo for the record (Tab 4)

Attachments:

    **Tab 1:** 🟩 Global Health Centrally Managed Mechanisms_USAID Lifesaving Exception Request 2/4 [ GH internal submission form for centrally-managed awards with potential LHA components for GH review/clearance prior to submission to Agency FO]

    **Tab 2:** 🟩 GH Centrally Managed_USAID Blanket Waiver Request Tracker [submissions of waiver requests for approval to Agency FO]

    **Tab 3:** 📘 Memo to File: Bureau for Global Health Workforce Reductions

    **Tab 4:** 📘 Info Memo on Risks to U.S. National Security and Public Health from the Temporary Pause in…

FOR OFFICIAL USE ONLY

**CLEARANCE PAGE**

**Drafter**:  Ramona Godbole, GH/Policy, Programs, and Planning (P3) Deputy Director
**Approved**: Nicholas Enrich, GH/Acting Assistant Administrator

| Bureau Level Clearances | Clearance Status | Date |
|---|---|---|
| GH/P3: AJernigan | Clear | 2/28/2025 |
| GH/PDMS | INFO | |
| GH/ID/TB | INFO | |
| GH/ID/Mal | INFO | |
| GH/ID/ETD | INFO | |
| GH/ID/NTD | INFO/No staff left to clear | |
| GH/MCHN: AThambinayagam | clear | 2/28/2025 |
| GH/PRH: MShort | Clear | 2/28/2025 |
| GH/OHS | No staff left to clear | |
| GH/OHA | INFO | |
| GH/OCS | No staff left to clear | |
| GH/FO: NParks | Clear | 2/28/2025 |

EXHIBIT B



**MEMORANDUM TO THE FILE**

**Date:** February 28, 2025

**Subject:** Documentation of Bureau for Global Health Workforce Reductions

**Approved:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health    *Nicholas Enrich*

**Background**
On January 20, 2025, the Bureau for Global Health (GH) workforce totaled 783 encumbered positions. The GH workforce was made up of multiple staffing mechanisms including civil service (CS), foreign service (FS), and foreign service limited (FSL), personal support contractors (PSC), institutional support contractors (ISCs), Administrative Determined (6), and Other (Fellows, Intergovernmental Personnel Act, and Intermittent PSCs).

The breakdown by staffing mechanisms was the following:

- Civil Service: 291
- Foreign Service: 32
- Foreign Service Limited: 54
- Personal Service Contracts: 10
- Institutional Support Contractors: 374
- Other (Fellows (4), Intergovernmental Personnel Act (5), Intermittent PSCs (13)): 22

**Documentation of GH Workforce Reductions**

**Executive Order 14151**
On January 23, 2025, in accordance with Executive Order 14151 ""Ending Radical And Wasteful Government DEI Programs And Preferencing", GH requested to end the services for diversity, equity, and inclusion (DEI) positions under Global Health Training, Advisory, and Support Contract (GHTASC) (Attachment 1) . This resulted in four positions being removed from the contract, of which 3 were filled and one was vacant.

**Executive Order 14169**
In accordance with Executive Order 14169 "Reevaluating and Realigning United States Foreign Aid" and the All Diplomatic and Consular Posts Collective (ALDAC) issued by State Department on January 25, 2025, USAID issued stop work orders for existing foreign assistance awards.

*Institutional Support Contractors*
On January 27, 2025 pursuant to the FAR 52.242-15 Stop-Work Order clause, GH's institutional support contract, GHTASC (Contract Number 7200AA21N00004) was directed to stop all work



([Attachment 2](#)). This resulted in the termination of a total of 405 institutional support contractors employed by GHTASC, of which 374 were assigned to GH and 31 were assigned to other USAID Bureaus. Institutional support contractors hired through GHTASC served in various technical and support roles. The GHTASC workforce was composed of senior technical experts, advisors, program analysts, program and special assistants throughout all GH offices.

*Intergovernmental Personnel Act*
On January 28, 2025 GH received a template to suspend Intergovernmental Personnel Act Agreements. These Action Memos were drafted and cleared by GH and HCTM's Human Chief Capital Officer on January 30, 2025 ([Attachment 3](#)). This resulted in the suspension of 5 Intergovernmental Personnel Act Agreements with 4 Universities.

*Personal Services Contracts*
GH contracted 10 individuals under personal services contracts (PSCs) to provide services in GH and 23 intermittent PSCs to provide services overseas. To date, 20 PSCs have been terminated. There are 3 remaining PSCs in GH, all are on Administrative Leave.

*Fellowships*
GH hosted 3 Science for Development Fellows and 1 Institute of Electrical and Electronics Engineers USA fellow. These awards were not managed by GH and received stop work orders.

**Administrative Leave**

On January 27, 2025, the GH Front Office members were placed on Administrative Leave. These included five personnel including GH's Senior Deputy Assistant Administrator, Deputy Assistant Administrator, two Acting Deputy Assistant Administrators, and the GH Chief Medical Officer. On January 28, 2025, acting leadership for USAID Bureaus and Independent Offices was appointed via an Agency Notice ([Attachment 4](#)).

On January 31, 2025, nineteen GH workforce members were placed on Administrative Leave in relation with Executive Order 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government". On February 3, 2025 the majority of GH staff lost system access and subsequently regained it between the evening and throughout the following day. On February 4, 2025 the majority of GH received Administrative Leave Notices and lost system access. On February 5, there were 151 workforce members who retained network access. The widespread Administrative Leave resulted in confusion, uncertainty, broken chains of command, and lack of operational staff needed to perform essential roles such as timekeepers and GovTA certifiers. GH's ability to operate was vastly affected between February 4, 2025 and February 10, 2025.

All GH staff that were placed on Administrative Leave returned to active work status on February 10, 2025, pursuant to a temporary restraining order issued by the U.S. District Court for the District of Columbia.



On February 24, 2025, after the Court dissolved its temporary restraining order, the majority of the remaining staff under CS, FS, and FSL staffing mechanisms was put on Administrative Leave. The total number of GH personnel on Administrative Leave before terminations occurred was 314 (Attachment 5).

**Essential Personnel Designation**

On February 4, GH Leadership was asked to make a "draconian" list of essential personnel (Attachment 6). Subsequently, additional requests for lists of essential personnel were requested by Agency Leadership.

On February 23, 2025 a total of 70 GH staff received an Essential Personnel Designation of which 59 are CS, 4 are FS, 7 are FSLs. There are 3 PCSs that have not been terminated and per the Agency Notice on Administrative Leave they have continued to report to work (Attachment 7). There is one individual who is designated essential who lost account access on February 24, 2025 and has not been able to regain account access. There's one CS individual who was terminated.

**Reduction in Force**

On February 24, 2025, 71 personnel assigned to four GH Offices received Reduction in Force (RIF) letters. The offices are 1) GH's Front Office, 2) Office of Policy, Programs, and Planning, 3) Office of Professional Development and Management Support, and 4) Office of Population and Reproductive Health. Five staff out of the 71 that received RIF letters subsequently received termination letters on February 24, 2025. Fifteen staff that received RIF letters had also received an Essential Personnel Designation the previous day.

**Terminations**

On February 24, 2025, termination letters were issued throughout USAID. GH has not been able to verify the total number of terminations due to account inactivations. To date, GH is tracking a total of 46 CS personnel that received termination letters. GH is aware of 20 PSC terminations. Since January 20, 2025 the GH workforce has been reduced by 449 workforce members.

**Current State**

There are 69 GH personnel that received Essential Personnel Designations, of which 15 received RIF letters. In addition to the 69 essential staff, 3 PSCs have not been terminated. The current number of GH staff is 72. Accounting for the 46 terminations that GH is currently tracking, there are 262 GH staff on administrative leave, of which many have lost access to their USAID accounts. These drastic staffing reductions have severely impacted GH's ability to function. GH has outlined the risks by current staffing levels to Agency Leadership (Attachment 8).



*Attachments*

1. Request to stop DEI-related services
   📄 1. USAID Mail - Urgent_ Immediate action needed.pdf
2. Credence Management Solutions Stop Work Order
   📄 7200AA21N00004  Stop-Work Order - Credence Management Solutions.pdf
3. Action Memo for Suspension Letters for GH IPA Agreements
   📄 Action Memo for IPA Suspensions.docx - Google Docs.pdf
4. Agency Notice - Correction_Leadership in USAID Bureaus and Independent Offices
   📄 4. USAID Mail - CORRECTION_ Leadership in USAID Bureaus and Independent …
5. GH Current State Tracker (February 28, 2025)
   📄 5. GH - Feb Current State - Table Data.pdf
6. Essential Personnel Lists  📄 6. USAID Mail - Fwd_ In person meeting tomorrow.pdf
7. Instructions During Administrative Leave
   📄 7. USAID Mail - Instructions During Administrative Leave.pdf
8. Risks posed by staffing levels
   📄 8. USAID Mail - Registering concern re_ risks posed by proposed staffing levels.pdf



**CLEARANCE PAGE**

**Drafter:** Natalia Machuca, Deputy Director, Office of Professional Development and Management Support, Bureau for Global Health

**Approver:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health

| Bureau Level Clearances | Clearance Status |
|---|---|
| GH/FO | INFO |
| GH/P3 | INFO |
| GH/PDMS | INFO |
| GH/ID | INFO |
| GH/MCHN | INFO |
| GH/PRH | INFO |
| GH/OHS | INFO |
| GH/OHA | INFO |
| GH/OCS | INFO |

EXHIBIT C



**INFO MEMO FOR THE USAID ADMINISTRATOR AND DEPUTY ADMINISTRATOR**

**Date:**        March 4, 2025

**To:**          XXX

**From:**        Nicholas Enrich, Acting Assistant Administrator for Global Health

**CC:**          Assistant to the Administrator Mark Lloyd
                 Assistant to the Administrator Tim Meisburger
                 Assistant to the Administrator Ken Jackson
                 Acting Chief of Staff Joel Borkert

                 **Subject:**      Risks to U.S. National Security and Public Health: Consequences of
                 Pausing Global Health Funding for Lifesaving Humanitarian Assistance

**Key Takeaway:** The temporary pause on foreign aid and delays in approving lifesaving
humanitarian assistance (LHA) for global health will lead to increased death and disability,
accelerate global disease spread, contribute to destabilizing fragile regions, and heightened
security risks—directly endangering American national security, economic stability, and public
health.  If the pause leads to permanent contract terminations, the  $7.7B in resources
appropriated by Congress are no  longer be  used to support these lifesaving global health
programs, which could potentially result  in wasted resources.  The impacts on mortality and
morbidity are summarized in the tables below. While the Foreign Assistance Review is set to
take place in the coming weeks, it is important to recognize that a mechanism-by-mechanism
approach may overlook the broader impact of these programs across global health program
areas. This includes missed opportunities to enhance efficiency and cost-effectiveness within
LHA program areas.

**Illustrative quantifiable impacts of halting global health programing on the mortality and
morbidity of lives can be summarized as follows (see full table here):**

| Program Area | Global Case Increase over one year if Programs are permanently halted |
|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional |

1

**Deleted:** being

| | 71,000-166,000 deaths (39.1% increase)  annually |
|---|---|
| MDR-TB | 28-32% Increase in estimated incidence globally |
| TB | 28-32% increase in estimated incidence globally |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases |
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops |

**Estimated number of people impacted annually in the absence of global health LHA (see full table here):**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services |
|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition |

**Policy Recommendation**: Resume all mechanisms with submitted life-saving waivers to avert crisis-level expenditures, prevent mortality and morbidity, and protect national security. Upholding these programs is not only a legal and humanitarian obligation but also a critical strategic investment to make America safer, more secure, and more prosperous.

**Background**

On January 20, 2025, the President issued an executive order mandating a 90-day pause on most foreign assistance activities to allow for a comprehensive review. Eight days later, on January 28, Secretary of State Rubio issued a temporary waiver to this pause, as outlined in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO),

2

allowing lifesaving humanitarian assistance (LHA) activities to proceed. While this temporary pause is intended to assess and realign foreign aid priorities, delaying approvals for LHA programs presents serious risks to national security, public health, and decades of progress in global health.  Americans consider it a moral strength to not only protect their fellow citizens but to also ensure U.S. medical innovations are made available to those less fortunate, particularly those in extreme poverty. The suspension of essential LHA during this review period is disrupting a range of critical health services, including maternal and child health and nutrition programs, malaria and tuberculosis treatment, and polio eradication efforts. Additionally, the canceling of critical contracts, prevents the ability to respond to the most pressing and urgent life-threatening challenges in the near-term.

As a result of the pause and programming delays, millions of individuals now face heightened risks of preventable diseases such as malaria, HIV/AIDS, TB, and multidrug-resistant tuberculosis (MDR-TB). Furthermore, setbacks in maternal and child health and nutrition initiatives threaten overall health outcomes in affected regions. Beyond the immediate consequences, these disruptions weaken critical disease surveillance and health supply chain systems, increasing the likelihood of unchecked outbreaks of emerging infectious diseases such as avian influenza, Ebola, and mpox—threats that can spread globally and endanger American citizens.

Historical data demonstrate that reductions in funding for global health initiatives and lifesaving health programming correlate with surges in disease incidence, reinforcing the urgency of sustained support for these programs to protect both global stability and domestic security. A failure to contain infectious diseases at their source heightens the risk of transmission to the United States, posing a direct threat to public health and economic stability. The consequences extend beyond human health, impacting American businesses and families by increasing healthcare costs, disrupting international trade, and straining domestic resources.

This memorandum outlines the critical consequences of withholding global health funding for LHA activities, emphasizing how this decision undermines the congressionally mandated efforts of USAID and jeopardizes American security by allowing preventable diseases to spread unchecked. USAID's Congressional legislative mandate per foreign assistance law and current funding status can be found in the Annex 1 of this memorandum.

**Impact of Terminating Lifesaving Humanitarian Aid (LHA) Awards in Global Health**

While we are currently in a 90-day review period regarding lifesaving humanitarian aid (LHA) awards, this section outlines the potential consequences should all LHA activities be permanently suspended. Such a suspension is expected to deteriorate public health outcomes

3

both domestically and globally, burden the U.S. economy and healthcare system, and escalate national security risks, including increased vulnerability to biothreats

***Deterioration of American Public Health and Increased Global Mortality***

**Key Impact 1:** Resurgence of preventable diseases: Domestic and global implications.

- **Halted interventions and treatments fuel the rise of preventable diseases:** The suspension of critical global health funding for lifesaving humanitarian assistance threatens not just global health but also the well-being of American communities. Without essential services—such as antiretroviral treatments, malaria prevention, routine immunization, and tuberculosis control—preventable diseases like HIV/AIDS, malaria, TB/MDR-TB, measles, diphtheria, pertussis and others will surge, undoing years of progress. As outbreaks spread unchecked, the consequences will extend beyond borders, increasing the risk of infections reaching the U.S., straining healthcare systems, and endangering American lives.
    - A systematic review of malaria resurgence events in 61 countries between the 1930s and 2000s, indicated 91% were due to a weakening of malaria control programs of which resource constraints contributed to over half of these[1]. Following the end of the 14-year Global Malaria Eradication Program in 1969, there was a global resurgence of the disease during the 1970s and 1980s[2].
- **Resurgence of MDR-TB: A growing American public health threat:** Tuberculosis programs worldwide keep drug-resistant TB in check. If these efforts collapse, the U.S. will see more cases of hard-to-treat TB arriving at its doorstep. Treating one patient with multidrug-resistant TB (MDR-TB) in the U.S. costs over $154,000 (and an average $494,000 for an extensively drug-resistant TB case)[3]. Without timely and effective treatment, multidrug-resistant tuberculosis (MDR-TB) cases will surge, posing a direct threat to both American and global public health. As international travel and migration increase, uncontrolled MDR-TB outbreaks abroad heighten the risk of transmission to the U.S., where containment efforts would require significant federal and state funding. The escalating burden of MDR-TB will not only drive up healthcare costs but also endanger frontline workers, making prevention and early intervention an urgent national priority.
- **Prevention Is More Cost-Effective Than Emergency Funding of Programs:** The 2014–16 Ebola outbreak cost the U.S. approximately $4.3 billion in response efforts, highlighting

---

[1] Institute for Health Metrics and Evaluation. https://www.healthdata.org/research-analysis/library/malaria-resurgence-systematic-review-and-assessment-its-causes
[2] https://www.ncbi.nlm.nih.gov/books/NBK525190/
[3] https://www.csis.org/analysis/protecting-united-states-health-security-risk-global-tuberculosis#:~:text=Treatment%20of%20a%20typical%20patient,of%20XDR%2DTB%20costs%20$494%2C000.

4

that reactive spending far exceeds proactive prevention costs. The COVID-19 pandemic further underscored how unplanned emergency spending can lead to trillions in economic losses. USAID-funded programs have historically curbed disease spread, saving lives and billions in economic costs. For example, immunization is among the most cost effective interventions in public health, saving an estimated 2-3 million deaths each year; for every dollar invested in immunization, up to $52 ROI is generated from saved costs of treating illnesses[4]. Sustaining these programs is crucial to avoiding costly, reactive crisis management. There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid due to deaths prevented and improvements in the health status of populations in poor countries.

- **Reduced disease surveillance and undetected outbreaks:** Cuts in humanitarian assistance compromise surveillance systems essential for early detection of emerging infectious diseases. The diminished capacity to monitor and respond swiftly enables the unchecked spread of deadly outbreaks such as avian influenza and mpox. This lack of surveillance risks turning localized outbreaks into widespread public health emergencies, further endangering both local populations and global health security.

**Key Impact 2:** Humanitarian and regional instability fueled by worsening health crises.

- **Increased instability in fragile states through disease outbreaks:** Weak governance and poor infrastructure leave fragile states highly vulnerable to disease outbreaks, which can quickly escalate crises. In the Democratic Republic of Congo (DRC), ongoing violence and an aid cutoff have led to the collapse of health services, worsening malnutrition and cholera and measles outbreaks. Over 400 mpox patients were left stranded after fleeing overwhelmed clinics, while more than one million displaced people around Goma—and another 150,000 near Bukavu—face critical shortages of shelter, clean water, and medical care. In Burkina Faso, where 100% of the 23 million total population is at risk for malaria, "30 percent of health care facilities were either partially or fully non-functional due to frequent attacks on facilities and equipment, medical personnel, and medication shortages, adversely affecting 4 million people[5]." Additionally, in FY2024 over 34 million seasonal malaria chemoprevention doses were procured with PMI/USAID funds to protect children under five in three Sahel countries (Burkina Faso, Mali and Niger); these vulnerable children are now at greater risk with the high transmission malaria season rapidly approaching. In such conditions, the risk of a new pandemic looms large. From the Sahel to South Asia, cutting off health aid in fragile states threatens to turn crises into full-scale humanitarian disasters.

---

[4] https://immunizationevidence.org/immunization_terms/return-on-investment/
[5] https://reliefweb.int/report/burkina-faso/burkina-faso-complex-emergency-fact-sheet-1-fiscal-year-fy-2024

- **Amplification of migration pressures and regional destabilization:** Failing public health systems fuel migration crises, forcing people to flee when they can no longer access food, medicine, or basic security. Collapsing healthcare infrastructure not only displaces populations but also spreads disease across borders. This was evident in Venezuela in the late 2010s, where a breakdown of the health system—alongside economic collapse—led to resurgences of measles, diphtheria, and malaria, driving millions to flee and triggering a regional refugee crisis. The spread of Venezuela's measles outbreak into neighboring countries underscored the direct link between public health failures and migration. More recently, the COVID-19 pandemic and its economic fallout intensified migration pressures in Central America, particularly in Guatemala, Honduras, and El Salvador, where overwhelmed healthcare systems and food insecurity forced many to seek refuge in the U.S. Similarly, the ongoing conflict and health crises in Haiti—where gang violence has crippled hospitals and cholera has resurged—have led to a surge in migration to the U.S. and neighboring countries. As public health crises worsen, migration pressures will continue to rise, contributing to regional instability and humanitarian challenges. (citations documented)

**Key Impact 3:** Greater risk of disease spillover to the U.S.

- **A halt to global health aid programs increases the risk of dangerous diseases reaching the U.S.:** In a globally connected world, outbreaks abroad don't stay overseas. When public health systems fail to contain infectious diseases, the chances of U.S. exposure rise—whether through travel, military personnel, or migration.  Measles outbreaks in the U.S. in the past decade, for example, have often been traced to imported cases, as the disease was eliminated domestically. In 2023, the U.S. saw its first locally acquired malaria cases in 20 years, likely due to travelers introducing the parasite into mosquito-prone states like Florida and Texas[6]. 76% of US recorded TB cases annually are among foreign born individuals.
- **Uncontrolled epidemics abroad could trigger serious outbreaks in America:** Mathematical models illustrate this risk. For example, if global TB rates and drug resistance reached U.S. levels due to failed international control efforts, the consequences would be severe—over 33,000 TB deaths annually and treatment costs exceeding $11 billion[7].

***Economic and Healthcare System Strain***

**Key Point 1:** Costs of responding to outbreaks far exceed prevention investments.

---

[6] beatmalaria.org
[7] cgdev.org

- **Outbreak response costs dwarf prevention investments:** Historical data underscores that reactive spending on disease outbreaks significantly exceeds the costs of proactive prevention. For example, the U.S. response to the 2014-16 Ebola outbreak reached approximately $4.3 billion[8], covering direct healthcare expenditures and extensive economic disruptions from emergency measures and loss of productivity. If the U.S. elects not to provide aid for future outbreaks abroad, larger and less-contained epidemics may develop, ultimately necessitating even more costly domestic responses. This approach risks disrupting global trade, supply chains, and market stability, ultimately imposing far greater economic burdens on the U.S. than if robust prevention and early intervention measures had been maintained.
- **Unchecked pandemics trigger profound economic fallout:** The COVID-19 crisis vividly illustrated how insufficient preventive measures can precipitate widespread economic damage. Beyond overwhelming healthcare systems, the pandemic disrupted global supply chains, destabilized labor markets, and led to substantial declines in economic output. These impacts highlight the critical need for robust global health investments as a means of averting far greater future costs.

**Key Point 2:** Strain on U.S. healthcare infrastructure due to imported infectious disease cases.

- **Collapse of disease surveillance leads to more importations:** Global health programs fund disease surveillance networks that act as an early warning system for outbreaks. If these networks falter, the U.S. will frequently be flying blind until diseases show up at its own border. That scenario is a recipe for more imported outbreaks on U.S. soil. For instance, the quick detection and containment of Ebola in West Africa is what kept the 2014 outbreak from becoming a larger U.S. crisis. Even so, the few Ebola cases that did reach America illustrated the heavy burden of managing dangerous contagions: a single Ebola patient in New York in 2014 cost the city health department $4.3 million in response measures (contact tracing, specialized treatment, etc.), and no secondary cases occurred[9]. If global surveillance and response capacity erode, the U.S. could face multiple such cases or simultaneous threats (e.g. Ebola, drug-resistant malaria, novel coronaviruses). American hospitals and the public health system would be stretched by needs like isolation units, specialized diagnostics, and round-the-clock epidemiological investigations.
- **Maternal Health Emergencies and Medical Supply Shocks:** USAID programs have been pivotal in supporting maternal and neonatal care in low-income countries – from training midwives to supplying essential medicines (like oxytocin for hemorrhage or

---

[8] yalejournal.org
[9] cdc.gov

7

magnesium sulfate for eclampsia). A permanent aid halt means many of these supply chains and services will collapse[10]. The ripple effects can reach the U.S. in unexpected ways. For example, global supply disruptions during COVID-19 led to shortages of medical products in America; similarly, a breakdown in the international supply of maternal health commodities could affect availability of critical drugs or equipment domestically. Moreover, when maternal health crises escalate abroad, there can be secondary impacts such as increased medical evacuation cases, migration of high-risk patients, or calls on U.S. humanitarian responders, all of which ultimately put pressure on U.S. hospitals.

**Key Point 3:** Global economic repercussions impacting U.S. trade and markets.

- **Reduced productivity in key trade regions due to heightened disease burdens:**
  Diseases like malaria, HIV, and TB primarily strike working-age adults or their children, impairing productivity and economic output in Africa, Asia, and beyond. For example, malaria costs Africa an estimated $12 billion per year in lost GDP from worker absenteeism, lower productivity, and healthcare expenses[11]. Every $1 invested in malaria control returns $19 in economic growth.[12] Unchecked high rates of maternal and childhood morbidity or mortality can further exacerbate impacts on productivity. Undernutrition can reduce a nation's GDP by as much as 16.5 percent[13], as malnourished children perform worse in school and experience productivity losses as adults. Maternal and child health and nutrition foreign assistance makes America stronger by creating greater economic and political stability through improved family health, which increases the likelihood that children will attend school and grow into healthy, productive adults, thereby reducing conflicts, poverty, and radicalization of youth. Instability abroad risks affecting Americans - be it on our soil or by destabilizing markets from afar.[14],[15] Lower

---

[10] reuters.com
[11] archive.cdc.gov
[12] https://endmalaria2040.org/assets/Aspiration-to-Action-Dashboard.pdf
[13] Union, A. (2014). The cost of hunger in Africa: Social and economic impact of child undernutrition in Egypt, Ethiopia, Swaziland and Uganda background paper. *Abuja, Nigeria*. https://archive.uneca.org/sites/default/files/uploaded-documents/CoM/com2014/com2014-the_cost_of_hunger-english.pdf
[14] Each additional year of schooling can boost a girl's earnings as an adult by up to 20 per cent - https://www.unwomen.org/sites/default/files/2022-09/Progress-on-the-sustainable-development-goals-the-gender-snapshot-2022-en_0.pdf
**More girls in school = greater GDP:** If 10 percent more adolescent girls attend school, a country's GDP increases by an average of 3 percent.
**More school for girls = greater earnings:** An extra year of secondary school for girls can increase their future earnings by 10-20%.
**Education = more lives saved:** A child whose mother can read is 50 percent more likely to live past age five.
[15] "First, a 10 per cent increase in health expenditures boosts annual average real GDP per capita by 0.24 per cent. This is an economically meaningful result, given the average annual growth rate in the sample period of 2 per cent. Second, this paper also confirms the long-held view that health matters for economic growth. There is a statistically significant and economically

productivity in these regions weakens their economic output and trade capacity, thereby diminishing their ability to import U.S. goods and services. This contraction in trade not only limits market opportunities for U.S. businesses but also undermines the economic resilience of global supply networks that support U.S. markets.

- **Reduced partnerships with American farmers**: Through USAID's humanitarian assistance and nutrition programs, the U.S. engages American farmers and manufacturers in the delivery of commodities as part of food aid for food security and treatment of acute malnutrition in children[16]. Although USAID food aid programs account for less than 1% of current U.S. agricultural exports, they have historically provided American farmers and manufacturers with a stable $2 billion market[17], supporting an estimated 15,000–20,000 jobs. Permanently suspending these programs would likely reduce commodity prices, lower farm incomes, and trigger layoffs across food processing, manufacturing, and transportation sectors—ultimately weakening the global competitiveness of U.S. agriculture.

- **Global supply chain disruptions:** A strong global health system is essential for maintaining stable global trade. The COVID-19 pandemic vividly illustrated how health crises can cripple supply chains—factory shutdowns, travel restrictions, and worker illnesses in one region can quickly trigger shortages and price spikes worldwide. If U.S.-funded health programs that prevent outbreaks and strengthen health systems are halted, developing regions will face greater instability, increasing the risk of production disruptions. Key sectors of the U.S. economy remain vulnerable to such shocks. For example, a significant portion of pharmaceuticals and medical supplies—including generic drugs and personal protective equipment (PPE)—are manufactured in India, China, and other global hubs. A major epidemic in these regions could halt production, causing shortages that directly impact U.S. hospitals and pharmacies. Likewise, global health emergencies threaten agriculture and food supply chains; pandemic lockdowns in 2020 disrupted food processing and shipping worldwide, underscoring the far-reaching economic consequences of health crises[18].

- **Weakened Trade Partners and Global Markets:** Over the longer term, the cumulative impact of widespread disease and reduced human capital in low- and middle-income countries will undermine global economic growth. America's prosperity is deeply intertwined with global markets – U.S. companies invest in and source from these countries, and emerging economies constitute important consumer bases. If those economies are continuously set back by health disasters, the global GDP will be smaller

---

meaningful negative relationship between economic growth on the one hand and maternal and infant/child mortality on the other hand. There is also a positive and significant impact of adult life expectancy on economic growth." Source
[16] How the United States Benefits from Agriculture and Food Security Investments in Developing Countries
[17] Betterworldcampaign.org
[18] pmc.ncbi.nlm.nih.gov

than it otherwise would be, acting as a brake on U.S. growth as well. Moreover, health-driven economic stresses can fuel political instability and conflict, which threaten U.S. interests. Indeed, abrupt surges in unemployment, poverty, food insecurity, and illness can spark unrest or migration waves, destabilizing regions. Such instability often demands U.S. humanitarian, diplomatic, or even military responses, all of which carry significant costs. In contrast, stable and healthy nations make good trade partners and contribute to a stable international system that benefits the U.S. economically. By preventing the collapse of health systems abroad, USAID programs help countries remain stable, keep their economies functioning, and continue trading with the United States.

### *National Security and Biothreat Vulnerabilities*

**Key Point 1:** Increased risk of bioterrorism and pandemic emergence.

- **Diminished surveillance increases vulnerability to undetected pathogen spread:** Weakened disease surveillance doesn't only jeopardize natural outbreak detection – it also creates openings for malicious actors. Global health monitoring systems serve as the "smoke alarm" for unusual disease patterns that could signal a bioterrorism event. If those alarms are switched off or muted due to lack of funding, a deliberate release of a pathogen could spread for weeks under the guise of a normal outbreak. Terrorists or rogue states might exploit surveillance gaps, targeting regions with poor monitoring to launch a biological attack, knowing it would take longer for the world to notice and respond. Indeed, the very technologies to engineer pathogens have become more accessible over time, lowering the bar for would-be bioterrorists (better citation? [citation](#)).
- **National Security Impacts:** Pandemics and biological threats don't respect borders, and their consequences extend beyond public health – they are national security concerns. An undetected pathogen can undermine military readiness, as disease spreads among troops or across bases before protective measures are in place. Widespread illness can also weaken domestic security forces and first responders, who fall ill in the line of duty. Moreover, adversaries could use a biological event to sow chaos: a sudden epidemic can destabilize economies, foment social unrest, and even be used as cover for disinformation or cyber attacks. The U.S. Department of Defense and intelligence community routinely list pandemic disease among top security threats, alongside bioterrorism, for these reasons. A collapse in global disease surveillance heightens these risks, as threats will be harder to see coming. As a recent analysis by global health experts warned, actions that *"undermine work to detect and contain disease outbreaks"*

10

could quickly **"roll back years of progress"** and *"put lives, the economy, and national security at risk[19]."*

**Quantified Impacts of Discontinued Aid by Disease Area - 2025**

| Disease Area | Global Case Increase (%) | Projected US Imported Cases | Estimated US Economic Impact ($) | Assumption/Notes/Data Sources |
|---|---|---|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional 71,000-166,000 deaths (39.1% increase) annually | 2000 cases/year | Reducing malaria burden could boost malaria endemic countries' economies by $142.73 billion and could generate $1.4 billion in US exports to Africa between 2023-2030; a 10% decrease in malaria incidence was associated with an increase in income per capita of nearly 0.3% | Data Sources: Malaria Atlas Project, Modeling Impact of PMI Funding Freeze Across 2025, February 27. 2025<br><br>Oxford Economics Africa<br><br>cdc/gov/malaria<br><br>The Economic Burden of Malaria: Revisiting the Evidence. Sarma et al., Am J Trop Med Hyg. 2019 Dec;101(6):1405-1415. doi: 10.4269/ajtmh.19-0386. https://pubmed.ncbi.nlm.nih.gov/31628735/ |
| MDR-TB | 28-32% Increase in estimated incidence globally | ~80 MDR cases/year | $40,000,000 only direct diagnosis, treatment and program costs (excludes larger societal, ie loss of productivity, costs) | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; costs per case are adjusted for inflation (3% average) |
| TB | 28-32% increase in estimated incidence | ~7,300 additional TB cases per year | $153,600,000 only direct diagnosis, treatment and | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; |

---

[19] cgdev.org

| | | | | |
|---|---|---|---|---|
| | globally | | program costs (excludes larger societal, ie loss of productivity, costs) | costs per case are adjusted for inflation (3% average) |
| Highly Pathogenic Avian Influenza (HPAI) | Worst Case Scenario: 775M cases globally | 105M cases in the USA. | Based on the known impact of the COVID-19 pandemic, a HPAI pandemic is likely to cost the US at least $14 trillion. The economic impact of just animal losses from bird flu in 2022 cost the US economy up to $3 billion. | Based on Global COVID case data and average Assumes current outbreak progresses to human-to-human spread pandemic |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases | 15 imported cases | >$2B and 10k jobs tied to exports. This was the cost of the WA Ebola Outbreak to the USA | Assumptions: Based on 2014-2016 West Africa Ebola epidemic |
| mpox | More than 127,000 cases | More than 34,000 cases in the US | Based on no intervention: USD 3,699,033 | Assumptions/Data Sources: Modeled off of mpox clade 2 pandemic |
| Immunization | 2-3 million deaths a year<br><br>89% increase in incidence in vaccine-preventable diseases among children alone (best case scenario) | | Every dollar spent on immunization saves America an estimated $54 in social and economic costs. | Data sources: CDC, UNICEF, WHO, USAID annual reports to Congress<br>- Immunization is a best buy: it is one of the most cost-effective ways to support a healthier, safer world for everyone, including Americans.<br>- Immunizing people routinely and when outbreaks strike prevents disease from spreading across borders, including to America. Routine childhood vaccines protect children from highly infectious but preventable diseases like Diphtheria, Haemophilus influenzae type b (Hib), Hepatitis B, Measles, Meningitis, |

| | | | | |
|---|---|---|---|---|
| | | | | Mumps, Pertussis (whooping cough), Polio, Rubella, and Tetanus. USAID supports countries to immunize against deadly and highly transmissible diseases. |
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops | ≥1 paralytic case/year over next 10 years, with potential sporadic outbreaks (assuming declining immunization coverage); increasing transmission risks over time | Incurred costs would include disease surveillance, multiple emergency outbreak responses, vaccination catch-up campaign, treatment, long-term disability (including for post-polio treatment), lost economic productivity and quality of life due to disability, reduced life expectancy (early mortality). | Data sources: CDC, Global Polio Eradication Initiative (GPEI) Investment Case 2022-2026<br>- Assumes reduced immunization coverage, termination of Gavi, UNICEF, WHO, and other funding<br>- Impacts include reduced access to quality, real-time data for action<br>- USAID's polio support has included surveillance, risk communication and community engagement, direct vaccination (including cross-border), laboratory testing networks, vaccine supply and cold chain support, and national/regional/global coordination<br>- With declining U.S. vaccination coverage, already millions of vulnerable Americans<br>- Immunity gaps in U.S. put Americans at risk for large outbreaks that can cause paralysis and death (e.g., 1/5 of adults 20-49 years old do not have poliovirus antibodies)<br>- Adults w/paralytic polio are more likely to die from paralysis than children<br>- Polio immunization coverage among U.S. children <2 years old already as low as 37% in some areas<br>- Estimates do not include potential new outbreaks of polio in large countries like India<br>- Up to 1/200 infected people can develop paralysis |

13

**Estimated number of people impacted annually in the absence of global health LHA-2025**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services | Estimated US Economic & Security Impacts | Assumption/Notes/Data Sources |
|---|---|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 | Destabilized families and communities; increased migration across borders, including to U.S., due to country destabilization; reduced economic productivity and GDP; weakened trade partners and global economies; takeover of malign foreign actors in countries and regions with high U.S. economic and national security interests; increased danger to Americans at home, and traveling and living abroad; **There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid** (including immunization but excluding nutrition interventions in this analysis) due to deaths prevented and | Data Sources/ Assumptions: - 2024 USAID reports to Congress - Total number of live births as a proxy for women who benefitted from live saving services |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 | | - 2024 USAID reports to Congress - National and subnational population estimates |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 | | Data sources: 2024 USAID reports to Congress - Population-based country surveys |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition | | Data Sources: - 2024 USAID reports to Congress - Cost estimates for treating a child for severe acute malnutrition vary depending on context, but range from $100-200/per child - The FY24 budget for GHP nutrition was $165 million |



**Conclusion and Policy Recommendations**

Any decision to halt or significantly reduce global health funding for lifesaving humanitarian assistance (LHA)—despite approved waivers—and USAID global health programming, despite congressional mandates, would have severe domestic and global consequences. Such an action could lead to a sharp increase in preventable diseases, substantial economic losses, and heightened security risks. The effects would be felt both in the United States and worldwide, as rising disease burdens strain healthcare systems, disrupt economies, and contribute to global instability.

We recommend that the U.S. immediately resume life-saving humanitarian activities to prevent unnecessary mortality and morbidity, avert costly crisis-level expenditures, and safeguard national security. These programs are not only a legal and humanitarian obligation but also a vital strategic investment in America's safety, security, and economic prosperity. Failing to uphold them would undermine U.S. leadership, weaken global stability, and increase long-term costs.

15

16

**Annex 1**

**Congressional Legislative Mandate**

USAID operates under a comprehensive legal framework established by Congress to govern its global health assistance programs. This framework consists of both authorization and appropriation legislation, which define the agency's legal authorities, funding allocations, and programmatic requirements. The following sections outline the key legislative mandates shaping USAID's global health initiatives.

**Authorization Legislation:** USAID's global health assistance is primarily authorized under Section 104 of the Foreign Assistance Act of 1961 (FAA), as amended. Key amendments include the 2000 Global AIDS and Tuberculosis Relief Act and the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (PEPFAR Authorization), with subsequent reauthorizations in 2008, 2013, and 2018. Additionally, the annual State and Foreign Operations Appropriations Act (SFOAA) provides more specific authorizations and requirements for health assistance. Other relevant legislation includes the Global Malnutrition Prevention and Treatment Act of 2021 and various FAA provisions outside Section 104 that address global health programs. Furthermore, the annual SFOAA and select provisions of other legislation, such as the National Defense Authorization Act, define and grant additional legal authorities for USAID's global health efforts.

**Appropriation Legislation:** Funding for USAID's global health programs is appropriated annually through the SFOAA, which imposes specific legal requirements that must be met each fiscal year. USAID is not authorized to deviate from these funding allocations except in rare, exigent circumstances and only with statutory approvals and notifications. Additionally, certain Congressionally mandated disease-specific directives may not be fulfilled due to the termination of awards.

**Congressional Directive Categories[20]:**

- *HIV/AIDS,* which includes the following sub-activities identified by Congress: Global
- Fund to Fight AIDS, Tuberculosis and Malaria, Joint United Nations Programme on HIV/AIDS (UNAIDS), and Microbicides. **Associated Program Area: HL.1 HIV/AIDS.** *$330M appropriated for this purpose in FY24 alone.*

- *Tuberculosis,* which includes the following activities identified by Congress: Global TB Drug Facility. **Associated Program Area: HL.2 Tuberculosis.** *$394.5M*

---

[20] Congressional directive categories are outlined in the Global Health Programs account table included in the Joint Explanatory Statement accompanying each annual appropriations act. For example, for the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, P.L.118-47, Division F, the Joint Explanatory Statement is available at https://docs.house.gov/billsthisweek/20240318/Division%20F%20SFOPs.pdf.

17

*appropriated for this purpose in FY24 alone.*

- ***Malaria,*** **Associated Program Area: HL.3 Malaria.** *$795M appropriated for this purpose in FY24 alone.*

- ***Global Health Security,*** **Associated Program Area: HL.4 Global Health Security in Development (GHSD)** *$700M appropriated for this purpose in FY24 alone.*

- ***Other Public Health Threats,*** which includes the following sub-activities identified by Congress: Neglected Tropical Diseases, Global Health Workforce, Health Reserve Fund. **Associated Program Area: HL.5 Other Public Health Threats (NTDs).** *$130.5M appropriated for this purpose in FY24 alone.*

- ***Maternal and Child Health*** (MCH**),** which includes the following activities identified by Congress: Polio, Gavi, the Vaccine Alliance (Gavi), Water Supply, Sanitation and Hygiene (WASH), and Maternal and Neonatal Tetanu**s. Associated Program Area: HL.6 Maternal and Child Health.** *$915M appropriated for this purpose in FY24 alone.*

- ***Family Planning/Reproductive Health.*** **Associated Program Area: HL.7 Family Planning and Reproductive Health (FP/RH).** *$523.95M appropriated for this purpose in FY24 alone.*

- ***Nutrition,*** which includes the following activities identified by Congress: Iodine Deficiency Disorder, Micronutrients (of which, Vitamin A), and Ready-to-Use Therapeutic Foods. **Associated Program Area: HL.9 Nutrition.** *$165M appropriated for this purpose in FY24 alone.*

- ***Vulnerable Children,*** which includes the following activity identified by Congress: Blind Children. **Associated Program Area: ES.4.1 Education & Social Services - Vulnerable Children.** *$31.5M appropriated for this purpose in FY24 alone.*

**Funding Status**[21]

Of the $3.985B in Fiscal Year 2024 resources appropriated directly to USAID for Global Health Programs (GHP-USAID account) for the specific health objectives described above, approximately $2.559B (64%) has been blocked from obligation to partners.

**Estimated Amounts of FY24 GHP-USAID Funding Impacted by Obligation Pause, by Congressionally Directed Program Area**

---

[21] Funding data pulled from Phoenix Viewer/Enterprise Reporting Portal as of 2/27/2025. All figures are estimates based on high level data analysis.

18

| | Appropriated ($) | Pending Obligation ($) - Obligation Paused by EO | Percent (%) |
|---|---|---|---|
| HL.1 HIV/AIDS | 330,000,000 | 73,843,370 | 22.38% |
| HL.2 Tuberculosis | 394,500,000 | 307,064,905 | 77.84% |
| HL.3 Malaria | 795,000,000 | 669,862,736 | 84.26% |
| HL.4 Global Health Security | 700,000,000 | 675,948,708 | 96.56% |
| HL.5 Other Public Health Threats | 130,500,000 | 90,522,107 | 69.37% |
| HL.6 Maternal and Child Health | 915,000,000 | 514,965,280 | 56.28% |
| HL.7 Family Planning and Reproductive Health | 523,950,000 | 55,633,306 | 10.62% |
| HL.9 Nutrition | 165,000,000 | 144,297,173 | 87.45% |
| ES.4 Vulnerable Children | 31,500,000 | 31,500,000 | 100.00% |
| TOTAL | 3,985,450,000 | 2,563,637,585 | 64.32% |

*Notes: These figures are likely underestimates of the amounts planned but with obligation paused from moving to implementing partners, as they do not account for funds bilaterally obligated into a USAID Mission Development Objective Agreement, which are no longer able to be subobligated to partners. FY24 funds are the most recent year of health resources available to USAID, as no FY25 GHP-USAID resources have yet been appropriated, and the Agency has not sought access to any of these resources under the current Continuing Resolution. All GHP-USAID resources from appropriation years prior to FY24 were 100% obligated in advance of their expiration.*

Of the total GHP-USAID resources appropriated directly to USAID from all fiscal years, at least $5.143B is currently obligated to implementing partners but not yet expended/disbursed – this total (100%) has been suspended as a result of the foreign assistance pause and related terminations from further use towards the specific health objectives mandated by Congress and described above.

**Estimated Amounts of Previously Obligated GHP-USAID Funding (All FYs) Paused from Expenditure/Disbursement, by Congressionally Directed Program Area**

| | Obligated to Implementing Partners and Currently Paused from Expenditure/Disbursement ($) |
|---|---|
| *HL.1 HIV/AIDS* | 1,517,719,650 |
| *HL.2 Tuberculosis* | 432,931,737 |
| *HL.3 Malaria* | 536,862,171 |
| *HL.4 Global Health Security* | 645,082,469 |
| *HL.5 Other Public Health Threats* | 91,529,255 |
| *HL.6 Maternal and Child Health* | 669,510,301 |

19

| | |
|---|---|
| *HL.7 Family Planning and Reproductive Health* | 727,320,899 |
| *HL.9 Nutrition* | 229,327,337 |
| *ES.4 Vulnerable Children* | 37,706,284 |
| *Other, inc. Administrative and Program Oversight* | 254,755,321 |
| *TOTAL* | 5,142,745,424 |

*Notes: The figures above reflect total amounts of currently unexpended/undisbursed Global Health funding obligated to implementing partners. Virtually all expenditures, disbursements, and payments to partners have been halted due to lack of essential staff, lack of systems access, and foreign assistance review processes superimposed over regular procedures, impacting this full total. The total estimated amount of Global Health funds obligated to implementing partners from all fiscal years according to Phoenix data as of 2/27/2025 is $76,327,410,581. The ~$5.1B pending expenditure/disbursement represents 6.7 percent of these total obligations.*

20