IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-cv-400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**JOINT STATUS REPORT**

The parties respectfully submit this joint status report pursuant to the Court's order issued on March 5, 2025. The parties jointly report that they were unable to come to an agreement with regard to a schedule for Defendants to come into compliance with the Court's temporary restraining order ("TRO") and the Court's February 25, 2025 order enforcing the TRO. The parties accordingly have set out their individual statements below.

**PLAINTIFFS' STATEMENT**

The Court entered its TRO on February 13, 2025. *GHC* ECF 21; *AVAC* ECF 17. Among other things, that order enjoins the Restrained Defendants from "suspending, pausing, or otherwise

1

preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.* at 14. It also enjoins the Restrained Defendants from "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.*

The TRO has never been stayed, and the government has been required to comply with it from the outset. Yet in the more than three weeks that have ensued—and even in the period between the entry of the Court's February 25, 2025 order enforcing it and the administrative stay entered by the Supreme Court (which was in effect from approximately 9:25 pm on February 26, 2025 to 8:58 am on March 5, 2025)—the government appears to have taken almost no steps to comply with either of these key obligations in the TRO.

First, with regard to payments for work already completed (the subject of this Court's February 25 order), there is no colorable argument that Defendants are not obligated to make those payments immediately. Defendants conceded to this Court that the TRO forecloses any suspensions and terminations that were issued between January 19 and February 13. Feb. 25 Hr'g Tr. 33-34. Defendants represented last night that since February 13, 2025, "Defendants have disbursed over … $20 million to Plaintiffs." ECF 49-1, at 5. Some Plaintiffs have indeed begun to receive payments, though some (including in particular DAI Global, LLC) have still received no payments at all.[1] It remains unclear whether payments are being made pursuant to the Court's

---

[1] In the short period of time available to prepare this status report, Plaintiffs were not able to prepare declarations attesting to information about payments they have received and the amounts information outstanding. Plaintiffs will submit declarations addressing such matters, as well as the issue of award terminations and rescission of terminations, if the Court deems such declarations necessary or useful.

orders, or whether Defendants are releasing funds based on their own timelines and criteria. In any event, Defendants still owe all Plaintiffs substantial sums on invoices even from before February 13, 2025, *see* ECF 29, at 5 & n.3, much of which remain unpaid. These ongoing payment delays continue to cause Plaintiffs severe irreparable harm. *See* ECF No. 46, at 4-5 (citing declarations); ECF 7, 29, 36, 42.

Far from taking meaningful steps toward compliance, Defendants have instead continued to erect barriers to compliance with their payment obligations. As Plaintiffs have previously reported, Defendants have limited access to payment systems to a fraction of the staff who had access before January 20 and placed numerous staff who process these payments on paid administrative leave. *See GHC* ECF 42, at 10 (citing sources). Mr. Marocco's own declarations also make clear that Defendants have added new layers of bureaucratic signoff to the payment review process, which require a small number of political appointees to confirm, not just that payments are valid, but that they comport with the President's policy priorities. *GHC* ECF 25-1 ("Feb. 18 Marocco Decl.") ¶¶ 6, 8 (describing "new Payment Integrity Review Process," which entails payment-by-payment processing); *GHC* ECF 43 ("Feb. 25 Marocco Decl."), ¶¶ 14-17; *accord GHC* ECF 42, at 5; ECF 42-3, ¶¶ 9-15; ECF 42-2, ¶¶ 10-11. Mr. Marocco's most recent declaration is clear evidence that these new policies and processes are impeding the disbursement of funds: Mr. Marocco states that the $250 million in payments that (as he had previously represented to this Court) had been authorized for release during the week of February 17 were subsequently withheld for "specific, independent, high-level policy decisions and events that postdated [his] declaration." *GHC* ECF 48-2 ("March 3 Marocco Decl.") ¶ 4.

In his February 26, 2025 declaration, Mr. Marocco asserted that "Secretary Rubio authorized a bypass of normal payment processing procedures within the USAID to pay the ten Plaintiffs' outstanding invoices from work performed before January 24, 2025," and while "certain

3

funds, exceeding $11 million, ha[d] been released for transfer … th[at] morning," it "[would] take two weeks for those payments to fully issue." *GHC* ECF 43-1 ("Feb. 26 Marocco Decl."), ¶ 3. Mr. Marocco stated that he understood that, in their motion to enforce, plaintiffs were requesting from USAID "more than $250 million across 200 separate payments to more than 10 individual entities," but beyond stating that "[c]reating new payments and verifying this information would not be possible today," gave no indication as to the expected timeline for those payments. *Id.* ¶ 8.

*Second*, with regard to terminations, stop-work orders, and suspensions, Mr. Marocco's February 25, February 26, and March 3 declarations make clear that, notwithstanding the Court's TRO, Defendants have continued to terminate contracts *en masse*. On February 26, 2025, Mr. Marocco suggested that all suspensions and stop work orders have been or will soon be lifted, Feb. 26 Marocco Decl. ¶ 1 ("no USAID obligations will remain in a suspended state"), but most of the previously suspended contracts and awards have now been terminated instead, *id.* ¶¶ 1, 2; *see also* March 3 Marocco Decl. ¶¶ 1, 2. Feb. 26 Marocco Decl. ¶¶ 1, 2; *GHC* ECF 48-1, at 4-5. While Defendants purport to have terminated these instruments pursuant to legal authority independent of Executive Order 14,169, Mr. Marocco's own declarations indicate that Defendants' "review" of these instruments is pure pretext. *See* Feb. 25 Marocco Decl. ¶¶ 5-6. No good faith analysis of the more than 13,000 awards that Mr. Marocco claims the agencies have reviewed (culminating with an individualized determination on each instrument by Secretary Rubio), *see* Feb. 26 Marocco Decl. ¶¶ 1, 2, could have occurred.

At the same time, in recent days, it appears that Defendants have decided to rescind certain terminations. In his March 3 declaration, Mr. Marocco stated that, since February 26, "the terminations for approximately 150 [State Department] awards were rescinded." March 3 Decl. ¶ 2. In this same time frame, Plaintiffs have been notified of a small number of rescinded terminations of USAID awards. The process for rescinding terminations, however, has been

4

haphazard, disorganized, and confusing. The notices Plaintiffs have received do not explain why any particular contract termination have been rescinded. Defendants previously terminated thousands of contracts, including hundreds of Plaintiffs' contracts; the vast majority of those terminations have not been rescinded.

      **A.**    ***GHC* Plaintiffs' Proposed schedule for compliance with the February 25, 2025 enforcement order**

GHC Plaintiffs propose that, as a first step to bring the Government into compliance with the Court's February 25, 2025 order, Defendants should be directed to:

> 1. **Pay, <u>no later than 5:59 pm on Monday, March 10, 2025</u>, all invoices and letter of credit drawdown requests from Plaintiffs and their members[2] on all contracts for work completed prior to the entry of the Court's TRO on February 13**

This timeline, which gives Defendants more than three business days from the Supreme Court's decision denying their motion to vacate the February 25, 2025 order, is reasonable. Mr. Marocco stated in his February 26 declaration that "[a]s to USAID and for the plaintiffs specifically, my understanding is that plaintiffs are requesting approximately … $250 million across 200 separate payments … ." Feb. 26 Marocco Decl. ¶ 8. Particularly given that Defendants have been under an obligation to make these payments since February 13 pursuant to the TRO, an order directing the Government to complete at least this limited set of payments by March 10 is fair and should not be unduly burdensome. Indeed, Mr. Marocco has testified that, before January 20, 2025, the State Department and USAID had systems in place that routinely processed thousands of payments per day. ECF 43-1 ("Feb. 25 Marocco Decl.") ¶ 15.

     To the extent that USAID and the State Department are no longer able to achieve those pre-January 20 rates of payment processing, that is because the government has tied its own hands

---

[2] Plaintiffs will provide Defendants' counsel a list of the associational Plaintiffs' members.

by reducing its workforce and imposing cumbersome new payment review processes. Removing these new artificial barriers would substantially accelerate the processing of payments. Mr. Marocco's February 26 declaration indicates that Secretary Rubio is able to authorize the "bypass" of payment processing procedures to facilitate prompt payment. Feb. 26 Marocco Decl. ¶ 3. The Court should require that such procedures be bypassed here.

Further, any protestations by the government about fraudulent or illegitimate payments are unsupported and can be addressed through the payment review systems that were in place before January 20. *See GHC* ECF 46, at 17-18; *GHC* ECF 29, at 10-11 (citing sources).

### 2. Thereafter, process all other payments for work performed before entry of the TRO at rates comparable to those achieved by the agency prior to January 20, 2025.

Once payments to Plaintiffs and Plaintiffs' members have been made, Plaintiffs propose that the Court direct the agencies to process all remaining payments for work performed before the entry of the TRO. Plaintiffs propose that the agencies prioritize (1) outstanding invoices will have already gone through the ordinary payment review and approval processes that were in place before January 20, (2) payments that are overdue, and (3) payments that are due (as they come due).

The government indicated during the meet and confer that processing all outstanding payments (which the government represented amount to approximately 2000 invoices) could take 30-45 days. The government has asserted that this timeframe is necessary due to the volume of payments to process, as well as "certain additional control requirements currently in place." Plaintiffs consider, based on Defendants' own representations, that a much swifter timeline should be feasible. Again, Mr. Marocco has stated that, prior to January 20, 2025, each agency could process several thousand payments in a single day. Feb. 25 Marocco Decl. ¶ 15. Plaintiffs propose

that Defendants be ordered to complete processing of all invoices at rates comparable to those achieved by the agencies prior to January 20, 2025.

> **3. Immediately permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements, for work completed prior to the entry of the Court's TRO on February 13.**

By design, drawdown and reimbursement requests do not require any pre-approval process by the government; they are reviewed after the fact. The government should be able to restore access immediately.

Plaintiffs further propose that Defendants be required to file regular status reports apprising the Court of their progress in processing payments of invoices and restoring access to letter of credit drawdown and reimbursement requests.

### B.  *GHC* Plaintiffs' proposed schedule for compliance with the TRO

As the Court noted, the February 25, 2025 Order, which addressed a specific request to "enforc[e] specific aspects of the TRO," did not narrow the scope of the TRO or limit or modify its terms. Feb. 25 Hr'g Tr. 55:21-56:1, 53:13-15. The steps set forth in the preceding section would thus help the government achieve only *partial* compliance with the TRO in the few days remaining before that order expires.

As a further step to achieving full compliance with the TRO itself, *GHC* Plaintiffs submit that Defendants should be ordered to pay all other invoices during the period that the TRO was in effect within 30 days of receipt, and to continue to support and fulfill all drawdown requests for necessary operating funds under grants and cooperative agreements, following processes that were in place prior to January 20, 2025 (or their functional equivalents).

Furthermore, *GHC* Plaintiffs submit that Defendants should be directed to immediately cease their blanket terminations of foreign assistance awards and to take all necessary steps to

7

honor the terms of the awards that were in existence as of January 19, 2025. The Court should direct the government to rescind all mass terminations issued since January 20, 2025 **by 5:59 pm on March 10, 2025**. Defendants apparently have been able to terminate contracts within a matter of days; they should be able to rescind those terminations within the same timeframe. It is also absolutely essential that payments are made to plaintiffs to support all work that is resumed.

The Court has indicated that the TRO will expire at 11:59 pm on Monday, March 10, 2025, or the date when the Court resolves the preliminary injunction motions, whichever is earlier. If granted, the relief that Plaintiffs are requesting that the Court enter in the form of a preliminary injunction would encompass and carry forward all of the obligations set forth in the TRO. The proposed order in Case No. 25-cv-400 sets forth, where appropriate, time frames for Defendants to comply with particular obligations, as well as measures intended to facilitate the Court's ability to assess the government's compliance with its order. *GHC* ECF 46-6.

C.   *AVAC* **Plaintiffs' proposed schedule for compliance**

The government has remained under an obligation to comply with the entirety of this Court's TRO since it was issued more than three weeks ago, on February 13. Among other things, the TRO enjoined the agency defendants from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025," and "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *AVAC* ECF No. 17 at 14. Although the TRO did not "prohibit the Restrained Defendants from enforcing the terms of contracts or grants," *id.* at 15, the clear import of the TRO—as this Court has repeatedly emphasized—is that the government must restore the status

quo that prevailed prior to January 20, 2025, and take any further lawful action with respect to individual projects, grants, or contracts from that preexisting baseline. In light of the government's rapid work to freeze all foreign assistance funds and to issue stop-work orders and terminations e*n masse*, the government has not offered any credible reason why it cannot, on a similarly rapid timeframe, reverse those decisions, issue payments, and rescind stop-work orders and terminations already issued. Further, the government's application to vacate the February 25 order was denied by the Supreme Court; it was not determined to be moot simply because the deadline had passed. This Court's power to compel compliance is therefore not in question.

With respect to funding, then, *AVAC* Plaintiffs propose that the agency defendants immediately make frozen funds on all foreign assistance awards available for drawdown or reimbursement pursuant to the ordinary procedures that were in effect prior to January 20, 2025, and that the agency defendants honor all legitimate requests for drawdown or reimbursement submitted for work performed prior to the entry of this order no later than **5:59 PM on March 10, 2025**. *AVAC* Plaintiffs similarly propose that the agency defendants make all contractually obligated payments for foreign-assistance work performed prior to the entry of this order no later than **5:59 PM on March 10, 2025**.

With respect to terminations, suspensions, or stop-work orders, Plaintiffs propose that the agency defendants rescind all terminations, suspension, or stop-work orders issued between January 19, 2025, and the entry of this order no later than **5:59 PM on March 10, 2025**.

*AVAC* Plaintiffs further propose that this Court reiterate that any terminations, suspensions, or stop-work orders that the agency defendants initiate between the entry of this order and the expiration of the TRO must be based on articulable, project-specific rationales that are communicated to the subject of the termination, suspension, or stop-work order and that are consistent with the terms of the authorizing instrument. Finally, *AVAC* Plaintiffs propose that this

Court reiterate that the agency defendants must promptly pay out any legitimate drawdown or reimbursement requests, and any contractually obligated payments, for work performed between the entry of this order and the expiration of the TRO.

## **DEFENDANTS' STATEMENT**

1.  After the Court issued a TRO on February 13, 2025, the Department of State and USAID issued notice, via the sam.gov website, that the TRO was in effect. That notice quoted the operative terms of that Order. Doc. 22-2 & 22-3 (AVAC). The Department of State and USAID likewise provided notice of the TRO—quoting the Order's operative terms—to the counterparties to their various contracts, grants and other federal assistance awards. *Id.*

2.  Separately, the Department of State and USAID issued directives to contracting officers and grant officers notifying them of the TRO. *Id.* Doc 22-4 & 22-5. For example, USAID's Chief Acquisition Officer and Senior Procurement Executive instructed: "Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards."

3.  Consistent with the TRO, the agencies proceeded to "expeditiously examin[e] each USAID and State foreign assistance award on an individual basis and through a multi-step process to determine whether, beyond the directives to the contract and grant officers to comply with the TRO, USAID and State will" terminate funding under their independent authorities (namely, under contract or grant terms or applicable regulations). *See*, *e.g.*, Doc. 48-1 (GHC) at 3–4; *see also* Doc. 37-1 (AVAC) ¶¶ 5–7. At this time, most of Defendants' foreign aid contracts, grants and other federal assistance awards, including all those of Plaintiffs, have been individually reviewed and either have been retained (with funding continuing) or terminated (with funding to

permanently cease, subject to award close out procedures). Therefore, none of the reviewed instruments is in a paused state.

4. After individualized determinations were made regarding whether to retain or terminate existing foreign assistance contracts, grants, and other federal assistance awards, Defendants began processing termination letters and notifications regarding retained awards. Doc. 41-1 (AVAC) ¶ 1. Many of these letters have since been dispatched, and the defendants are making concerted efforts to ensure the dispatch of the remainder, although the timing of receipt will vary based on foreign conditions.

5. After the Court's Order of February 25, 2025, granting a motion to enforce the TRO, Secretary Rubio authorized State and USAID Comptrollers to expedite payment in accordance with 31 U.S. Code Subtitle III financial management procedures to the ten Plaintiffs' outstanding invoices from work performed before January 24, 2025.On or about February 26, 2025, funds exceeding $11 million were processed to certain of the Plaintiffs, including approximately $4 million to Plaintiffs HIAS and the American Bar Association. It is our understanding that those payments have been disbursed.

6. Between February 13, 2025 and February 26, 2025, Defendants disbursed approximately $21 million in foreign assistance funding. *See* Doc. 41-1 (AVAC) ¶ 9.

7. Notwithstanding the Supreme Court's administrative stay of this Court's February 25 Order, Defendants continued to process foreign assistance payments, including to Plaintiffs. Between February 26, 2025 and March 3, 2025, Defendants disbursed approximately $87 million in additional foreign assistance funding. *See* Doc. 47-2 (AVAC) ¶ 5.

8. On March 1, 2025, following the completion of the review of what was then

believed to be the last 329 contracts,[3] the State Department issued Acquisition Alert (AA) 25-05-02 and Federal Assistance Management Advisory (FAMA) 2025-05 (B), which directed Contracting Officers and Grants Officers to lift the previously imposed stop work orders and suspensions on all contracts and federal assistance awards that were selected for retention. The AA and FAMA also directed Contracting Officers and Grants Officers to "expeditiously process payment requests ... for both awards where work has now resumed and for terminated awards," including for legitimate expenses awardees incurred in connection with stop work orders and suspensions. Doc. 47-2 (AVAC) ¶ 3.

9. Defendants are continuing to process payments for legitimate invoices for past work; however, the payment systems of USAID and State are complicated and require multiple steps before payments are authorized to be disbursed by the U.S. Treasury, which is not a party to this litigation. The approval process must comply with the Federal Managers Financial Integrity Act and the Federal Financial Management Improvement Act. At a high level, their payment system is: (1) working with vendors, (2) creating new payment requests, (3) certification of the expenses as proper by a certifying officer, (4) getting them re-certified, and (5) effectuating payments electronically through the Department of the Treasury or if overseas through the Department of State. Doc. 39-1 (GHC) ¶ 14.

10. Overnight, Defendants certified approximately $70.3 million in additional payments to the Plaintiffs which should be released today. It will take another day or so for those payments to be received vendors accounts. It is currently anticipated that all legitimate payments

---

[3] After Pete Marocco executed his March 3, 2025 declaration explaining that a final batch of 329 State Department contracts had been reviewed, Doc. 48-2 (GHC) ¶ 1, the State Department discovered 162 additional contracts that required review. None of these 162 contracts are held by funding recipient Plaintiffs. And as Plaintiffs concede, they have not identified their association members to Defendants.

owed to the Plaintiffs will be processed within days, and not more than ten working days. Defendants reiterate that any disputes over particular payments are not properly before the Court. *See infra* ¶ 13.

11.     The Court's February 25 order was not expressly limited to Plaintiffs. However, under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Similarly, traditional principles of equity require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Accordingly, Defendants strongly object to any enforcement order that would require payments to non-parties. The court lacks jurisdiction to order such relief.

12.     Nevertheless, it is expected that payments already requested by non-Plaintiffs will be processed within 2 weeks for State and 30-45 business days for USAID. For context, USAID estimates that the Court's February 25 order would require the payment of at a minimum $1.5 billion dollars across approximately 2,000 payment requests, including many that need to be newly created in the agency's payment systems. For each of these payments, and independent of any "pause," Defendants must review the invoices, ensure that the work was performed pursuant to a contract, and verify the documentation to show that the work was done. Defendants intend to proceed expeditiously but also hold an obligation to the public to ensure that taxpayer funds are spent only for legitimate work that was actually performed. USAID payment processing will take longer than State due to the significantly higher volume of payments to process at this time, as well as certain additional control requirements currently in place. *See* 2/25 Marocco Decl. ¶¶ 14-20 (Doc. 37-1 (AVAC)) (describing system of new controls installed to address insufficiency of prior processes as to supporting documentation). Defendants understand Plaintiffs to dispute the sufficiency of prior processes, but that policy disagreement is not a proper basis for upending the

system now in place—which, if disrupted at Plaintiffs' request, would result in even longer delay of payments to Plaintiffs. Plaintiffs' contrary proposed deadlines for payments are not feasible and do not respect the Supreme Court's order that the courts act with "due regard for the feasibility of any compliance timelines" as to the TRO. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 24A831, 2025 WL 698083 (U.S. Mar. 5, 2025).

13.     Defendants respectfully submit that the exercise of Defendants' contractual and other rights following individual review of Plaintiffs' contracts and grants has mooted Plaintiffs' challenge to the pause implemented under Executive Order 14169 and the Secretary's Memorandum. *See Spirit of the Sage Council v. Norton*, 411 F. 3d 225, 228–29 (D.C. Cir 2005); *see also* Doc. 47 (AVAC). As to the payments for work performed prior to January 24, 2025, to the extent that any plaintiff or other counterparty wishes to dispute the amounts received, or Defendants' processing of a particular invoice, the proper mechanism and venue for those discrete challenges is to meet any applicable exhaustion requirement and ultimate seek review either in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); PI Opp'n 12–18; *cf. Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 24A831, 2025 WL 698083, at *3 (U.S. Mar. 5, 2025) (Alito, J., dissenting) ("[T]he proper remedy for an agency's recalcitrant failure to pay out may be to 'seek specific sums already calculated' and 'past due' in the Court of Federal Claims.") (quoting *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020).

Dated: March 6, 2025

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

/s/ Indraneel Sur
INDRANEEL SUR
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

Respectfully submitted,

/s/ Stephen K. Wirth
William C. Perdue (D.C. Bar 995365)*
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Dana Kagan McGinley (D.C. Bar 1781561)
Allison Gardner (D.C. Bar 888303942)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*application for admission pending

*Counsel for Plaintiffs in Case No. 25-402*

/s/ Lauren E. Bateman
Lauren E. Bateman (D.C. Bar 1047285)
Allison M. Zieve (D.C. Bar 424786)
Nicolas A. Sansone (D.C. Bar 1686810)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel: (202) 588-1000

*Counsel for Plaintiffs in Case No. 25-400*