```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   AIDS VACCINE ADVOCACY        )
     COALITION, et al.,           )
 4                                )
               Plaintiffs,        )
 5                                )
         vs.                      )  CASE NO. 1:25-cv-00400-AHA
 6                                )
     UNITED STATES DEPARTMENT OF  )
 7   STATE, et al.,               )
                                  )
 8             Defendants.        )
     _____)
 9   GLOBAL HEALTH COUNCIL, et    )
     al.,                         )
10                                )
               Plaintiffs,        )
11                                )
         vs.                      )  CASE NO. 1:25-cv-00402-AHA
12                                )
     DONALD J. TRUMP, et al.,     )
13                                )
               Defendants.        )
14   _____)

15

16                 TRANSCRIPT OF MOTION HEARING
             ORAL ARGUMENT ON PRELIMINARY INJUNCTION
17      BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE
                 Thursday - March 6, 2025
18                 2:01 p.m. - 6:13 p.m.
                     Washington, DC
19

20

21
     _____
22                       SONJA L. REEVES
                  Registered Diplomate Reporter
23                  Certified Realtime Reporter
                  Federal Official Court Reporter
24                333 Constitution Avenue, NW
                     Washington, DC 20001
25        Transcript Produced from the Stenographic Record
```

**FOR THE PLAINTIFFS**
**Case No. 25-0400:**
        Public Citizen Litigation Group
        BY:  LAUREN BATEMAN, ALLISON ZIEVE and NICOLAS SANSONE
        1600 20th Street, NW
        Washington, DC 20009

**FOR THE PLAINTIFFS**
**Case No. 25-0402:**
        Arnold & Porter Kaye Scholer LLP
        BY:  STEPHEN WIRTH, WILLIAM PERDUE, DANIEL YABLON
        and SALLY PEI
        601 Massachusetts Avenue, NW
        Washington, DC 20001

**FOR DEFENDANTS:**
        U.S. Department of Justice
        BY:  INDRANEEL SUR and LAUREN WETZLER
        1100 L Street, NW
        Washington, DC 20530

1               (Call to Order of the Court at 2:01 p.m.)

2               DEPUTY CLERK:  We're here today for a motion hearing

3    in Civil Action 25-400, *AIDS Vaccine Advocacy Coalition, et al.*

4    *versus the United States Department of State, et al.*, as well

5    as Civil Action 25-402, *Global Health Council, et al. versus*

6    *President Donald J. Trump, et al.*

7               Beginning with counsel for the plaintiff, in the first

8    matter, if you could please approach the lectern and identify

9    yourself for the record.

10              MS. BATEMAN:  Good afternoon, Your Honor.  Lauren

11   Bateman for plaintiffs in Case 400.

12              THE COURT:  Good afternoon.

13              MR. WIRTH:  Good afternoon, Your Honor.  Steven Wirth

14   for plaintiffs in 402.

15              THE COURT:  Good afternoon, Mr. Wirth.

16              MR. PERDUE:  Good afternoon, Your Honor.  William

17   Perdue also on behalf of plaintiffs in the Global Health

18   Council case.

19              THE COURT:  Good afternoon.

20              MR. SUR:  Good afternoon, Your Honor.  Indraneel Sur

21   with the United States Department of Justice for the defendants

22   in both actions.

23              THE COURT:  Good afternoon, Mr. Sur.

24              DEPUTY CLERK:  Plaintiffs in the second action,

25   25-402?

1          THE COURT:  I think we have been through them all.

2    Thank you.

3          All right.  Nice to see everyone.  Nice to be here in

4    person.  I know we have had to do a couple of teleconferences

5    because they are on quick turnaround, but it's always my

6    preference to see all of you.

7          I'm not sure if there are any parties present here in

8    addition to counsel, but I always like to say, if you are --

9    looks like maybe there are -- I appreciate you making the time

10   to come for the hearing.  And you're always welcome in my

11   courtroom.  This is your case after all, whether it's on the

12   plaintiffs' side or the defense side.  Very much always welcome

13   to be here.

14         A note to counsel in particular that in this

15   particular case I have opened up a public audio line.  I think

16   you have already gotten some of the cautions about that, but

17   make sure you're speaking into the microphone so that it is

18   captured by the public audio line.  And also just ask for the

19   sake of the court reporter that you speak at a reasonable pace.

20   And I'm giving the court reporter license to intervene if she

21   needs to slow anyone down.  And no problem, it happens all the

22   time.

23         So the purpose of today's hearing, first and foremost,

24   is to have argument on plaintiffs' motions for preliminary

25   injunction in both cases.  I can tell you that I don't hold

1    argument unless I'm actually genuinely still wrestling with

2    some issues, and this case has some tough issues and some

3    important issues, so I'll obviously have a lot of questions.

4         We do have a TRO that has been entered since

5    February 13th in the case.  The TRO and two subsequent orders

6    have been in effect since that date.  There is also my

7    February 25th order, which was stayed pending the Supreme

8    Court's consideration of the case.

9         I understand the argument that was made on appeal that

10   there was not feasible time to disburse the funds and that the

11   Supreme Court has lifted the stay as of yesterday morning.  And

12   particularly given that the deadline to comply with that

13   February 25th order has now passed, they have instructed me to

14   clarify what obligations the government must fulfill to ensure

15   compliance with the temporary restraining order, giving due

16   regard for the feasibility of any compliance timelines.  I

17   intend to heed that instruction very seriously, and I expect

18   the parties to as well.

19        I know I asked the parties to submit a joint status

20   report, and I understand that the parties weren't able to reach

21   agreement on the proposed schedule for compliance.  While it's

22   unfortunate, I do appreciate having the parties' positions on

23   that.  You know, in addition -- let me just say this.  In

24   addition to being helpful to -- as a start for getting us to

25   compliance on the TRO, which is important, I also believe the

1    discussion is relevant to the preliminary injunction because I

2    want to craft a scope of relief, to the extent there is any

3    relief granted, that makes sense in light of what's actually

4    happening on the ground, in light of what's feasible, so I will

5    come to that today, but my plan is to start with the issues in

6    the preliminary injunction briefing.

7          I'll start with plaintiffs.  I'll ask you to tell me

8    in a moment whether you guys have come up with a division

9    between the two cases, but my hope is to start with standing,

10   move into the APA, separation of powers, and then talk about

11   irreparable harm.  There will be some time to raise anything I

12   haven't covered as well, but then I would like to hear from

13   defendants too on each of those issues.

14         You can have an opportunity to make submissions.  I'm

15   going to have a lot of questions.  And then I want to come back

16   to the issue of scope of relief, and that will be the time for

17   us to maybe also discuss some of the different parties'

18   positions and help me understand where the parties are in terms

19   of proposed compliance schedules.

20         So that will be the plan.  Depending on how long it

21   takes, I may take a brief recess between kind of the first part

22   of what I described and the scope of relief part, but I'll let

23   you know in that instance, obviously.

24         So can I hear from counsel of the plaintiffs, is there

25   a proposed division?

1          MR. WIRTH:  Yes, Your Honor, there is.  Steven Wirth

2    on behalf of the plaintiffs in 402.  We have discussed amongst

3    ourselves, and in order to divide the issues up in a way that

4    makes sense and so that we can share some of the burden, we'll

5    kind of be ping-ponging around today a little bit.

6          I'll be starting us off with brief discussion of sort

7    of where we are in the case, how we got here.  I'll address

8    irreparable harm and standing together.  And after that, we'll

9    hear from Ms. Bateman to address our arbitrary and capricious

10   arguments.  Mr. Perdue has our arguments on the Impoundment

11   Control Act and Antideficiency Act and Appropriations Act, so

12   contrary to law arguments.

13         Ms. Bateman will then address constitutional claims.

14   Mr. Perdue will do jurisdictional issues, and I'll be here to

15   discuss the scope of relief.  So we'll be ping-ponging a little

16   bit, but we're happy to obviously go with the Court's

17   direction, and we're very flexible.

18         THE COURT:  Okay.  I think we probably will have

19   argument up here.  I was going to see whether it was possible

20   to have a microphone for everyone, but I think, given the

21   public line, it's best to just have one microphone where one

22   counsel is speaking at a time.

23         I'm fine with that division.  I'll defer to you all on

24   the division.  I may take you in a different order, and so if

25   we need to have a swap at who's at the podium, that's fine.  My

1    hope is for you to start with standing.  If you feel the need

2    to address harm kind of as a precursor to that, that's fine,

3    but, otherwise, I will come back to irreparable harm.

4            MR. WIRTH:  I would prefer, if the Court is amenable,

5    to just first start with a brief sort of discussion of the case

6    and where we are right now, I think just to set --

7            THE COURT:  That's fine.

8            MR. WIRTH:  If you're getting bored, I can move on.

9            So on January 20th, the president issued an executive

10   order, 14169.  That order did three primary things.  It

11   directed the agency to pause all foreign assistance funds.  It

12   directed them to review each foreign assistance program.  And

13   it directed after that review to determine whether to continue,

14   modify or cease each foreign assistance program.

15           The defendants here quickly worked to implement the

16   executive order by issuing directives to pause all foreign

17   assistance funds.  That includes stopping all payments for work

18   already completed and cutting off funds to programs that were

19   in mid-swing.

20           The result has been catastrophic, as billions of

21   dollars in lifesaving humanitarian aid have, without warning,

22   been shut off, literally overnight.

23           Defendants then began a program of terminating

24   contracts, grants and assistance agreements.  Agency leadership

25   pushed out tranches of award terminations ordering personnel to

1    terminate hundreds of awards as quickly as possible.  Without

2    going through the usual termination process, without going

3    through any individualized review of the awards, they ordered

4    hundreds of awards terminated literally overnight.

5         And when pressed for the legal basis for these mass

6    terminations, leadership responded that they were carrying out

7    the executive order.

8         Plaintiffs filed suit to enjoin the implementation of

9    the executive order and this mass termination program under

10   both the APA and the Constitution, and this Court entered a TRO

11   on February 13th.  The TRO had two primary operative

12   provisions; it enjoined the agencies implementation of the

13   executive order in both respect to the funding freeze and with

14   respect to both past and ongoing terminations.

15        Defendants didn't comply with the Court's TRO.  First,

16   as we have set forth in our motions to enforce and in status

17   reports, defendants never lifted the pause on foreign

18   assistance funding; instead, they doubled down.  They added new

19   approval processes while simultaneously terminating all of the

20   employees and essential staff necessary to actually operate

21   these payment systems.  They created an artificial bottleneck,

22   with political appointees at the top deciding individual

23   payments.

24        The result of that is they have continued to withhold

25   funds owed --

1          THE COURT:  I think at this point, can I move you to

2     standing?  All of this will come up, I'm sure, throughout the

3     hearing, but I think it's most helpful for me to kind of be

4     hearing it in the context of the particular legal issues I'm

5     called to apply in the case.

6          I do appreciate it.  It's helpful to be reminded.  I

7     remember my TRO, and so -- but I do appreciate you making the

8     points.

9          So tell me, the government has made a standing

10    argument, and let's start there.  Can you address it?

11         MR. WIRTH:  So I think standing is pretty easily

12    addressed by the irreparable harms in this case.  First of all,

13    the first prong of standing, injury in fact, we have plaintiffs

14    here who have been irreparably harmed by the government's

15    actions in all sorts of ways from direct financial harms to

16    harms to their reputation and businesses, their livelihoods.

17         THE COURT:  This is one part -- I mean, I very much

18    appreciate the parties' briefing in the case.  I think it's at

19    a much more developed place now than it was at the TRO phase,

20    which is not at all a surprise, because time passes and so

21    there has been more opportunity.  And I think the government in

22    particular in its brief raises some issues that we really need

23    to work through in this hearing and hash out.

24         That said, one I'm a bit confused by, and I have to

25    admit plaintiffs' response really in both cases didn't help me

1    that much on standing, is this notion of a, quote, "pocketbook

2    injury."  I had always understood a financial injury, a

3    pocketbook injury, to be like the prototypical injury in fact.

4         And I looked at the case the government cited here,

5    *Collins v. Yellen*, and it seemed to kind of be saying the same

6    thing.  So I understand 100 percent that you have other alleged

7    injury and your clients' missions, and I'm not -- but kind of,

8    I couldn't tell from your brief, are you intending to run away

9    from the pocketbook injury?  Is there a reason why that --

10        MR. WIRTH:  No, absolutely not, Your Honor.  I think

11   the pocketbook injuries are very real here.  There is no

12   question that there are pocketbook injuries, but there are also

13   other injuries.  I think we easily tick the box for injury, in

14   fact, constitutional injury in fact, both with respect to the

15   actual financial harms to these institutions and organizations,

16   but also all of the harms to their programming, the harms to

17   the relationship with their business partners, with the

18   communities that they work in, reputations, et cetera, et

19   cetera.  I think all of those count as harms.

20        THE COURT:  I assume that, at least insofar as we're

21   talking about the original implementation, the EO and the

22   original implementations, that the standing argument you would

23   make is just that these harms flowed directly from those

24   policies?

25        MR. WIRTH:  Absolutely.

1          THE COURT:  And the invalidation of those policies

2  would begin to redress?

3          MR. WIRTH:  Right.  Exactly.  So I think all of our

4  harms flow from the defendants' implementation of the executive

5  order and also the January 24th ALDAC from the Department of

6  State.  Those directives did two things; they paused funding

7  overnight, which caused immediate disruption to --

8          THE COURT:  And I don't think the government makes

9  this argument, but the Court has to assure itself of

10  jurisdiction.  Just focusing on redress ability, I think we

11  have talked about in past hearings when I have asked you

12  questions, and to some degree I think your brief accepts that

13  any relief here might never make the plaintiffs whole.

14          Let's suppose, for instance, I mean, even if you take

15  an expansive view of what you're looking for to invalidate the

16  EO, invalidate terminations, at some point, you know, the

17  government may well be able to terminate agreements with your

18  clients.

19          Does the fact that relief may never make your client

20  fully whole or redress the full extent of the damages matter

21  here?

22          MR. WIRTH:  No, I don't think it does, because

23  whatever may eventually happen, those would be subsequent acts

24  by the government.  And certainly the government may take

25  subsequent acts that disadvantage my clients or others, but

1   with respect to the harm that they are currently suffering,

2   absolutely the relief that we are seeking will redress those.

3        To the extent the government turns around and does

4   other things, whether they are legal or illegal, we may have

5   claims with respect to those subsequent actions, but at least

6   with respect to the harms that we're currently suffering,

7   absolutely.

8        THE COURT:  Do you mean currently to mean today?  I

9   mean, what about if there were terminations that were based on

10  an independent legal authority, an independent of the directive

11  -- I understand you have arguments that it's the fruit or

12  pretext or whatever, but bracket those for a moment.  There

13  might just be a short period in which there is any sort of

14  relevant relief.

15       MR. WIRTH:  Certainly, but for the purposes of Article

16  III standing, that short period is more than enough.  I don't

17  think there is any -- there is no constitutional limit on the

18  ability of this Court to provide that relief, even if it is

19  fleeting.

20       THE COURT:  That makes sense.  And then similar

21  redress ability question, if the -- you have a separation of

22  powers argument that you make separate from your APA arguments.

23  And as I understand the separation of powers argument, I'm not

24  putting words in your mouth, I'm not trying to have you cede

25  anything in asking you this question, I'm just saying it's

1  about who gets to make the decision about whether and how much

2  money to spend versus how to spend the money, on what to spend

3  it on, and if the relief in that context, seems to me, if you

4  accept your argument, the kind of relief that would be offered

5  is to order the money to be spent, not necessarily order it to

6  be spent at all for your clients or for the plaintiffs.

7          Again, I know the government doesn't make this

8  argument, but I want to understand how does that factor in when

9  it comes to redress ability?  Is there standing there for you

10  to raise that type of claim?

11          MR. WIRTH:  I believe there is still standing, but

12  it's a -- I think at least with respect to -- so I guess there

13  is some factual questions here that are raised by the spending

14  clause type of argument.

15          As of right now, the only way for the government to

16  spend this money prior to the lapse of appropriations would be

17  to spend it in the ways that it has already been obligated.

18  And they will not be able to -- basically, what I'm saying is

19  the only way for them to spend the money is to spend it on us.

20          THE COURT:  Okay.  I mean, I guess one question I have

21  is if this is where the mission component comes in too, is it

22  enough -- that does seem like it depends on some facts on the

23  ground that I'm not sure I have the facts for that argument,

24  but is it enough that the plaintiffs here are engaged in their

25  core missions of humanitarian aid and that that's what this

1    money would be going to, or that some portion of this money

2    would be going to them?  I guess that's what I'm trying to ask.

3         MR. WIRTH:  I think there is a lot of different types

4    of harm here, and so if, for example, the harm to our

5    plaintiffs' reputations and to the communities in which they

6    work, all of that is -- it is derivative of this sort of

7    pocketbook injury, it can be redressed by it.  If the

8    government -- there is no way for the government essentially to

9    obligate all of the funds that it needs to obligate without

10   addressing at least in some respect those types of harms.

11        Obviously, standing can be a fact-intensive problem.

12   I think to the extent that there are outstanding factual

13   questions, then the Court needs to -- would potentially need to

14   resolve those facts.  I don't think we have the record to

15   resolve those facts necessarily right now.

16        I think certainly with respect to some of our

17   injuries, absolutely, there is no question there is standing

18   right now, there is redress ability right now.  But the extent

19   that the Court needs to -- so, yeah, all right.  One note from

20   my colleague would be to point the Court to *Humane Society*

21   *against Vilsack*.  That's the case that held that standing

22   ordered funds be made available for which plaintiff would be

23   eligible, even if not guaranteed to get them, so I think that's

24   a perfect example of this type of harm.

25        THE COURT:  That's helpful.  Can we turn to the APA?

1    I can't remember who was going to talk about that.  Just in

2    case it's helpful, I want to start by talking about agency

3    action, and then we'll talk about scope of the APA as it

4    relates to the Contract Dispute Act and the Tucker Act.

5            MR. WIRTH:  I'm prepared to speak about the agency

6    action issues, and then we have arbitrary and capricious

7    arguments, so happy to field your questions.

8            THE COURT:  Let's start with agency action.  I think

9    one thing that I'm wrestling with here is the agency action you

10   are challenging, and I think this gets to what the government

11   is arguing in a variety of ways, for example, in saying that

12   the APA doesn't apply, which it frames as a lack of sovereign

13   immunity waiver and perhaps also in its proposed sur-reply when

14   the government talks about mootness, although I'm not sure

15   that's the right word here.

16           But I think the challenge for you is this.  Your

17   complaint is clear that your APA claims challenge the initial

18   implementing directives.  It's explicit in both cases that

19   that's what is being challenged.  I think one focuses more on

20   the Rubio memorandum, one lists other memoranda in addition to

21   the Rubio memorandum.  It's not a criticism.  It's required of

22   you under the APA to point to an agency action, and typically

23   that's some sort of rule or policy.

24           So first let me just say a record issue.  Those other

25   memoranda, I couldn't find them in the record, so if they are

1    somewhere, if you have them, please make sure to file them with

2    the Court or point me to them.

3            MR. WIRTH:  Yes, we can submit those.

4            THE COURT:  Okay.  But on the substance of agency

5    action, I enjoined the initial orders, the implementations of

6    the executive order on February 13th.  And as I understand it,

7    since then, the administration has then terminated contracts,

8    retained contracts, and they say it's based on other

9    authorities or contractual terms.

10           Can you break down for me like how does your -- first

11   of all, do you disagree that that's what you identified as the

12   agency action here?  And then I think it would be hard to, but

13   I'll give you the opportunity, and if you don't disagree, how

14   does your APA claim apply beyond February 13th?

15           MR. WIRTH:  I believe you're accurately describing how

16   we pleaded this case.  I think it's important however to note

17   that we sought to enjoin all actions by the Secretary, by the

18   restrained defendants, to implement the executive order, and so

19   I think what we have seen since this Court's February 13th

20   order is that the defendants here have continued the exact same

21   program or policy that they implemented immediately prior to

22   the TRO.  I think what we saw was the government pushing out

23   tranches of mass terminations.

24           Then Your Honor's TRO was entered on the 13th.  And in

25   the days following, the government continued that exact same

1   program of mass terminations.  They did it at what they said

2   was an accelerated pace.

3        THE COURT:  You're using the word "mass terminations,"

4   and I'm not going to speak for the government here, but let's

5   just posit that the response would be, well, there have been

6   bunches of terminations based on the terms that are allowed.

7   That's different, isn't it, than the initial complete blanket

8   suspension pending review?

9        I mean, I think the government would go maybe even

10  further and say the review is complete, or I know there is a

11  few contracts that keep popping up here or there that are

12  missed, but that the review is complete and now they have been

13  terminated based on their terms.

14       MR. WIRTH:  I think there is actually two distinct

15  parts to the government's program here.  The first thing they

16  did was they paused all funding, right, but that was in

17  conjunction with a program of mass terminations.  That started

18  before the Court's TRO and it continued past the TRO.

19       I consider the pause to be separate from the

20  terminations.  The terminations is actually -- it's legally

21  terminating the government's obligations under contracts,

22  grants, et cetera.  That is separate from pausing the flow --

23       THE COURT:  Is the mass terminations, is that

24  something that's explicitly spelled out in the implementing

25  memoranda, or is it something that you're saying was a

1  consequence of it and therefore it's kind of --

2      MR. WIRTH:  So I believe it is explicitly contemplated

3  in the implementing memoranda that we identify.  And I think it

4  was then continued under the same authorities after the Court

5  entered the TRO.

6      THE COURT:  And so the idea is that -- is it

7  essentially like -- is it a pretext argument at the end of the

8  day, because the government is saying it's independently

9  reviewing the contracts and concluding that they are invalid

10  for other reasons.

11      MR. WIRTH:  No.  I mean, I think it could be conceived

12  as a pretext argument, but I don't think it has to be.  I don't

13  think we need to look underneath at the motives of the

14  government in what they are doing.  I think we can examine

15  their conduct, and we see that they were engaged in a mass

16  termination of these tranches of contracts based on very

17  cursory review as an implementation of the executive order.

18      Your Honor's TRO then was entered on the 13th, and the

19  government continued mass implementation -- or mass termination

20  program afterward using the exact same sorts of processes,

21  including basically as the --

22      THE COURT:  The kind of evidence I could rely on that

23  these terminations are still tied to that initial mass

24  terminations, as you put it as cursory review, it's happening

25  too fast you think for it to be plausible.  What else?

 1         MR. WIRTH:  I think you could look directly at the

 2    Marocco declarations.  I think the Marocco declarations

 3    describe this as a process, as a program.  I believe he uses

 4    the word "process."  I believe that you could refer especially

 5    to the February 25th --

 6         THE COURT:  I mean, this is kind -- I'm sorry.  Do

 7    finish.  Give me the rest.

 8         MR. WIRTH:  The February 25th declaration, I think

 9    especially in paragraphs 5 and 6 explains what the government

10    was doing.  It's the same type of conduct that was occurring

11    before the Court's TRO was entered.  One line review of

12    thousands of contracts at a breakneck pace.

13         I think all of this is evidence that in fact the

14    government had one objective from the start, which was to

15    terminate as many contracts as possible, and it pursued that

16    objective at all costs as fast as possible in the weeks that

17    they were enjoined.

18         THE COURT:  Is there a difference in your view if the

19    directive is "go find ways to terminate contracts" versus "go

20    terminate contracts if we can under their terms"?

21         MR. WIRTH:  No, I don't think there is a difference.

22         THE COURT:  Let me give you an example.  So as I

23    understand it, in one of the Marocco declarations, he lays out

24    different considerations that he or the administration would

25    view as, I believe, inconsistent with the national interests,

1    so lays out various topics.

2         Are you familiar with what I'm referring to?  So this

3    isn't to say that you couldn't have a challenge to that, but

4    you haven't challenged that, right?  That would be a different

5    APA challenge.  And I realize that's frustrating, but the APA

6    often when the government changes its action, there is new

7    agency action, requires you to specify the action.

8         And so I think one of the orders talks about how

9    things like DEI and other topics would be inconsistent with the

10   national interest.  You may have reasons why you think that's

11   arbitrary and capricious or contrary to law, but I think they

12   would be different, at least different than the ones identified

13   in the TRO.

14        MR. WIRTH:  I don't think that they are different in

15   type from the agency actions that we identified in the

16   complaint.  What we challenged was the government's

17   implementation of the executive order.  We think that all of

18   this flows from -- is essentially implementation of the

19   executive order.

20        I think Your Honor makes, I think, a good point about

21   when the government changes course, but I don't think here that

22   the government has ever changed course.  They had a project of

23   terminating contracts that they started before the TRO and have

24   continued all throughout this litigation.

25        THE COURT:  Okay.  I do have your point on that.  I

1    appreciate it.  Maybe we could talk about scope of the APA and

2    Tucker Act, unless you have any final thought you want to throw

3    out.

4          So maybe -- if you want to start somewhere else for a

5    moment, you can, but what would be helpful for me, probably

6    what you might have been about to do anyway, if you could just

7    lay out for me your position on how the APA, CDA and Tucker Act

8    fit together.  I'm interested in the intersection with the

9    APA's provision saying that there is no relief if there is

10   another adequate remedy.  That's not the exact language it

11   uses, but that's how it's been interpreted.  And also the

12   provision saying that it's not waiving sovereign immunity for

13   money damages.

14         MR. PERDUE:  Absolutely, Your Honor.  I think the way

15   we would conceive of it is that the government has basically

16   two jurisdictional arguments here.  One is that the Contract

17   Disputes Act and the Tucker Act impliedly preclude this Court

18   from exercising jurisdiction, and then the second is that our

19   claims are barred by sovereign immunity, and that goes to the

20   waiver of sovereign immunity within the APA.

21         So sounds like you wanted to start with the Contract

22   Disputes Act and the Tucker Act, so I'll start there.

23         THE COURT:  Either order is fine.

24         MR. PERDUE:  I think the DC Circuit's precedent on

25   this, I think that the key cases are *Megapulse*, *Kidwell* and

1  *Crowley*.  They hold that the Contract Disputes Act and the

2  Tucker Act do not preclude jurisdiction in district court,

3  unless our claims are in essence contractual.

4        And the way that you evaluate whether our claims are

5  contractual is you look at the source of the rights we're

6  seeking to enforce, and you look at the relief we're asking

7  for.

8        So here the source of the rights that we're seeking to

9  enforce is statutory and constitutional.  It is not

10  contractual.  Our claims are under the APA.  They reference the

11  Impoundment Control Act, the Antideficiency Act, the 2024

12  Appropriations Act, those statutes and the relevant

13  constitutional provisions.

14        It may well be that the government is violating the

15  terms and conditions of particular award instruments in the

16  things that it is doing in this case.  That is not the basis

17  for our claims here.  Indeed, we are claiming that the

18  defendants' actions are unlawful, even if they are fully

19  authorized by provisions in particular award instruments.

20        I do think that at times it seems like what the

21  government is saying is that our claims are contractual in

22  nature because our contracts are the source of our pocketbook

23  injury, to go back to what you were talking about with standing

24  earlier, but I think if you look at the DC Circuit's decision

25  in *Crowley*, it is very clear --

1          THE COURT:  Maybe it's that end, maybe it's the

2    pocketbook injury.  Maybe it's more than that, too.  I mean, I

3    think one of the core things you point to for why you can bring

4    the action and bring the claim is that you have agreements and

5    contracts.

6          MR. PERDUE:  Yes.  I agree that the agreements and

7    contracts are one source of our standing for sure, but *Crowley*

8    expressly holds that the mere fact that adjudicating a claim

9    requires reference to a contract or even interpretation of a

10   disputed provision in a contract does not mean --

11         THE COURT:  Would there be -- I don't want to come

12   back to standing, but if you didn't have a contract and maybe

13   there was a pending application, negotiations for a contract

14   and so there wasn't a breach alleged, but it was some sort of

15   concrete interest, and then suddenly all the programs are gone,

16   all the funding is gone, would that be enough?  Do you have to

17   have a contract?

18         MR. PERDUE:  I think it could be.  We have both of

19   those things.  Our clients all have current awards, but this is

20   what they do and they certainly intend to seek additional

21   awards later, so I think either of those would be sufficient in

22   our view.

23         THE COURT:  Can I ask you about one argument you make

24   in this context?  I think you make the argument, correct me if

25   I'm wrong, that essentially, like, procurement contracts or

1  certain types of contracts fall under the CDA and the Tucker

2  Act, and you say that some of the types of agreements the

3  plaintiffs have are definitely not those procurement contracts

4  or whatever else you might call them.  And I think you're

5  referring to cooperative agreements.

6       If you can be specific about that and why you know

7  they don't fall under that would be very helpful to me, but, in

8  addition, I'm just -- actually, why don't we start with that.

9  What exactly is it that doesn't fall within the CDA or the

10 Tucker Act, and can you point me to exactly why that is and

11 what we have in the record about that?

12      MR. PERDUE:  If I can set the stage to orient

13 ourselves as to how our arguments fit together.  We think the

14 proper analysis is the one in *Megapulse*, *Kidwell* and *Crowley*

15 about whether our claims are contractual in nature.  You look

16 at the basis of our rights and you look at the relief, none of

17 that is contractual here.

18      I think then there is a second-layer argument, which

19 is I think what you're getting to, which is that even if we

20 were suing directly under the particular award instruments that

21 our clients have, that still would not impliedly preclude

22 jurisdiction here, because those -- the nature of those award

23 instruments does not allow us to sue under the CDA or the

24 Tucker Act.

25      THE COURT:  Which award instruments are you talking

1    about?

2            MR. PERDUE:  So it's different for the two statutes.

3    I'll start with the CDA.  The CDA has administrative exhaustion

4    provisions, but they only apply to procurement contracts,

5    contracts for the procurement of goods and services.

6            That is just one of several types of award instruments

7    that are at issue in this case.  The main -- I don't think --

8    the text I give you may not cover the waterfront in terms of

9    government contracting in general, but I think it covers the

10   waterfront here for this case.

11           So I think in addition to procurement contracts, we

12   also have cooperative agreements.  We also have grants.  And we

13   also have sub-awards, so subcontracts or sub-grants.

14           THE COURT:  Is the idea that, correct me if I'm wrong,

15   but is the idea that a grant could never be for procurement of

16   services?

17           MR. PERDUE:  Correct.  So the difference between these

18   different award instruments is that -- so procurement contracts

19   are contracts.  They are with mutual intent to contract,

20   consideration, all of that.

21           Cooperative agreements actually are not contracts at

22   all.  This sort of gets more to the Tucker Act end of things,

23   but if you allow me, just focus on the CDA for the time being,

24   not procurement contracts.  Procurement contract is where the

25   government itself, the federal government, is buying goods and

1   services for its own direct use and benefit.

2          Cooperative agreements are arrangements where the

3   government reaches an agreement with an implementing partner to

4   provide benefits to other beneficiaries.  The difference

5   between a cooperative agreement and a grant just has to do with

6   how involved the government is in the activity that the

7   implementing partner is going to be doing.

8          If the government is substantially involved, it's

9   called a cooperative agreement.  If the government is more

10  hands-off, it's called a grant.  There is a statute that lays

11  out these different categories.  I believe it's cited in the

12  AVAC briefing.  I don't have the citation at hand.

13          THE COURT:  You're relying on the text of the statute.

14  Is there kind of a body of precedent specifically where people

15  have tried to bring these types of claims?

16          MR. PERDUE:  Sure.  I think that gets -- let me get to

17  that in one moment, if that's all right, Your Honor.  Let me

18  finish up with the CDA, because that goes more to the Tucker

19  Act.

20          With respect to the CDA, it's very clear that there

21  are agreements here that are not --

22          THE COURT:  Those are you said cooperative agreements

23  and grants?

24          MR. PERDUE:  Also sub-awards, where there is no direct

25  privity between the recipient and the government.  There is a

1    prime in between.

2        THE COURT:  This is like there is a grantee and then

3    the grantee makes an additional grant?

4        MR. PERDUE:  Yes, or there's a contractor who makes an

5    additional contract with somebody else, with a subcontractor.

6        The key point for the CDA purposes, and I think this

7    is undisputed, is that there are many instruments here that are

8    not procurement contracts.  You had a submission of

9    supplemental authority this morning about the decision in the

10   *PSCA* case by Judge Nichols.  In that case he found that

11   administrative exhaustion under the CDA was required.

12       I think it's telling that case is all about personal

13   service contractors, so these are contractors where the

14   government is procuring personal services from an individual.

15   So that is the only type of award that was at issue in that

16   case.

17       I think the argument for having to go through CDA

18   exhaustion there is much stronger than it is here where we just

19   have totally different types of awards.

20       THE COURT:  Take me through the Tucker Act.

21       MR. PERDUE:  That provides a forum for suits for

22   breach of contract.  Some of the award types we have here are

23   not contracts that are -- that can be enforced under the Tucker

24   Act.

25       So if you start with cooperative agreements and

grants, to begin with, those are not contracts because there is

no direct tangible contractual consideration to the government.

Instead, the benefits are to the third-party recipients of the

activities that the implementing partner is going to undertake.

There is case law on this.  I think the most direct

case is cited in the AVAC briefing.  I have forgotten the name

of the case offhand, but it's in the reply briefing in the --

I'm sorry, I have it in my notes.  It's the *American Near East*

*Refugee Aid* case, talks about a cooperative agreement that is

not a contract for Tucker Act purposes.

In addition to cooperative agreements and grants, we

have the sub-awards.  Those are not contracts that can be sued

on under the Tucker Act either because there is no privity

between the award --

THE COURT:  I want to be mindful that you said this

was the second layer, but let me ask you still maybe a more

fundamental question about the arguments you're making right

now.

So let's say -- and I do want you to point me to the

best things in the record as to the fact that your plaintiffs

in either case have these cooperative agreements and sub-awards

and grants, but let me come back to that in a moment.

Let's say that the record contains a few of those,

whether it's a sub-award or a cooperative agreement, and I

guess my question is, is that really enough?

1          So you have got this huge universe of mass

2    terminations.  Let's accept that those could be brought under

3    the Tucker Act or under the CDA, and there is like a handful or

4    fewer.  I realize that's not what you're going to describe, not

5    how you would necessarily describe it.  How does that affect

6    things?

7          MR. PERDUE:  So I'll try to answer both of your

8    questions at once.  In terms of the record, I think the best

9    place, at least in the Global Health Council docket is the

10   declarations that are attached to ECF 7.  These are our client

11   declarations, and there are a number of them there.

12         THE COURT:  They describe with specificity --

13         MR. PERDUE:  The different types of awards that the

14   different clients in the GHC case have.  So that's that.

15         If I understood you, the second half, the other part

16   of your question, it was what do we do if some of the award

17   agreements, you could sue under the CDA or Tucker Act, but

18   others you can't.  If I understand your question --

19         THE COURT:  Is that enough to afford relief as to

20   everything, because you would be looking for relief as to all

21   of the Tucker Act-type cases as well?

22         MR. PERDUE:  It's certainly -- if we have one award

23   instrument here that's not covered by the CDA and Tucker Act,

24   then we have got jurisdiction here for something.  The question

25   at that point is just what's the scope of relief on that

1  something.

2        I think it may be best -- most helpful to Your Honor

3  if we discuss the scope of relief all at once at the end by my

4  colleague.

5        THE COURT:  But is a high level version, just so I'm

6  not missing the point, the idea is, okay, you have got somebody

7  for whom sovereign immunity has been waived, I guess, there is

8  no alternative remedy, at least under that piece, we can come

9  to the money damages piece, and that the relief under the APA

10  is vacatur?

11        MR. PERDUE:  That's absolutely a piece of it, Your

12  Honor.

13        THE COURT:  The fact that it might benefit people who

14  could sue the government for breach of contract is of no

15  moment, they get the benefit from vacatur?  You don't have to

16  look at who benefits from the vacatur and figure out whether

17  most of them could have done this or not?

18        MR. PERDUE:  Absolutely.  I think that's correct.  I

19  think mostly the scope of relief is a question about your

20  balancing of the equities, and so -- at this preliminary stage,

21  and so you could balance the equities and determine how broad

22  to --

23        THE COURT:  I get that.  We'll have that conversation

24  afterwards based on the different types of claims, and that's

25  the reason I want to do this is you have got different claims.

1    We'll have that conversation about tailoring, but I'm having a

2    conversation about kind of entitlement in the first place right

3    now.

4         MR. PERDUE:  I do want to preview for Your Honor that

5    I think we also have arguments that as a factual matter full

6    vacatur is necessary to give complete relief to just the

7    plaintiffs in this case, so any one plaintiff.

8         THE COURT:  I don't want to get to the kind of

9    balancing.  I'm just saying your argument though right now is

10   if you have got one cooperative agreement and that doesn't have

11   to go through the Tucker Act and CDA, very clearly, I know that

12   we're in your second layer, I get it, your first layer is we're

13   challenging a policy.

14        But in your second layer, if I have got one

15   cooperative agreement, then I have -- I get in the door, and I

16   get in the door for an APA claim, and the relief under the APA

17   claim is to get to challenge the rule.

18        MR. PERDUE:  I think that's well stated.

19        THE COURT:  I think you have already gone through

20   *Megapulse* sufficiently, unless there is something I'm missing.

21   Can you talk about the exclusion of money damages?

22        MR. PERDUE:  Sure.  Just to make sure we close the

23   loop on *Megapulse*, we didn't talk about the relief that we're

24   seeking there, and that sort of ties into -- so the two aspects

25   of the *Megapulse* line of cases, the rights and the relief

1   sought.  I think a lot of what I would say about that I would

2   also say when we're talking about whether we fall within the

3   APA's waiver of sovereign immunity.

4         Just put a pin in that.  These points for the most

5   part would apply to that part of the analysis as well.

6         So I think when we're talking about the waiver of

7   sovereign immunity in the APA, that waiver waives sovereign

8   immunity for claims seeking relief other than money damages.

9   And the key point is just we are not seeking money damages in

10  this case.

11        The case law from the Supreme Court and from the DC

12  Circuit is very clear that money damages has a very narrow

13  meaning in this context.  The leading case here is the Supreme

14  Court's decision is *Bowen*.  It holds very clearly that money

15  damages does not mean just any relief that results in the

16  government paying money to the plaintiff.

17        Money damages is a particular retrospective form of

18  relief that compensates for a past injury, and it does not

19  include specific relief, which simply gives the plaintiff what

20  they are entitled to in the first place.

21        It may be best to describe this through examples.  So

22  in Bowen, Bowen is a case about a federal state program where

23  the states were suing for declaratory and injunctive relief to

24  enforce a statutory mandate for the federal government to pay

25  -- to actually grant money in particular to the states.

1          The result of a judgment in their favor would be for

2    money to be paid to them, but the square holding of the Supreme

3    Court in that case is that that relief was not money damages.

4          THE COURT:  Is there room for you to win on this

5    argument?  I mean, I understand it was only four justices

6    yesterday, but there was a construction of the Bowen case in

7    the dissenting opinion.  Can you comment on that?

8          MR. PERDUE:  Sure.  I mean, I think there are a number

9    of things to say about it.  First, it was a dissent.  Second,

10   it was talking about likely jurisdiction.  They were not

11   actually reaching things, they were deciding things on a very

12   emergency basis.

13         And I think that even the dissent was really talking

14   about the particular kind of relief that this Court ordered in

15   its TRO enforcement order, it was not necessarily tailored

16   toward the relief we are seeking in this lawsuit as a whole.

17         And I think the cases that the dissent relied on I

18   think are very distinguishable.  The main case they relied on

19   is this *Maine Community Health Options* case, which is just

20   diametrically opposed from this case.  That is a case in which

21   the plaintiffs expressly sought money damages.  They were -- it

22   was an expressly retrospective relief because the program at

23   issue had been defunded.  There was no ongoing relationship

24   between the plaintiff and the defendant because the program had

25   been defunded.

1          And they were not seeking to get access to funds that

2     had been appropriated on an ongoing basis because those

3     appropriations had been discontinued.  So this case is just

4     really diametrically opposed from that case.

5          THE COURT:  Appreciate it, Mr. Perdue.  I do want to

6     talk about arbitrary and capriciousness next.  Probably spend a

7     brief amount of time on that, given where we are, and then I do

8     want to spend some time on separation of powers.

9          Don't worry, Mr. Sur, you'll get the chance to respond

10    in plenty of time as well

11         MS. BATEMAN:  Thank you, Your Honor.  Lauren Bateman.

12         I'll start very briefly with the benefits of foreign

13    assistance, because they are not meaningfully contested by the

14    government in this case.

15         Foreign assistance has historically served extremely

16    important interests for very little financial outlay.  It saves

17    lives.  It protects global health and the health of Americans.

18    It supports democracy.  It employs American workers and

19    supports American businesses, including by providing a stable

20    source of income to American farmers.  And all these benefits

21    are for less than one percent of the total federal budget.

22         In contrast to the substantial and uncontested

23    benefits, the executive has offered hardly any explanation for

24    its actions, let alone a satisfactory one, and has offered no

25    rational connection between whatever facts it has supposedly

 1    found and the choices it has made.

 2         So I'll start with one justification that defendants

 3    have offered throughout the course of this litigation, and

 4    that's that their actions have been necessary to prevent waste,

 5    fraud and abuse, but they have presented no evidence that that

 6    has historically been a problem with State and USAID foreign

 7    assistance awards.  They have presented --

 8         THE COURT:  I mean, I want to be careful, because, and

 9    I'll let the government make its own arguments, but as I

10    reviewed the PI briefing, that wasn't really one of the

11    arguments they were making in defense of this in the first

12    place.  I know they have raised it in various contexts and they

13    raised it on appeal, but I didn't take them in their arbitrary

14    and capriciousness defense to be asserting that.

15         And I have kind of said throughout other orders there

16    is no evidence of that.  I'm not sure you want to open the door

17    to that.  I assume your argument is that the arbitrary and

18    capriciousness should be decided as to the administrative

19    record, the agency action, and can't just have post hoc

20    explanations, but you tell me if I'm wrong about that.

21         MS. BATEMAN:  No, you're absolutely right, Your Honor.

22    I'm happy to focus on the one justification that they did give

23    in their preliminary injunction briefing, which is that these

24    actions were necessary to ensure consistency with presidential

25    priorities.

1          To start on that point, to the extent presidential

2    priorities conflict with Congress's legislation, that's not a

3    valid objective to begin with, and we can talk about that more

4    and in greater detail when we talk about the constitutional

5    claims, but we should start there.

6          In any event, that explanation is likewise pretextual,

7    and the reason I say that is because we aren't seeing a shift

8    in focus from pursuing projects in pursuit of one agenda to

9    pursuing projects in pursuit of another agenda.  We saw a

10   complete shutdown of virtually all projects indiscriminately.

11         THE COURT:  That may be true in the future, but,

12   again, your APA agency action identified was the initial

13   executive order and implementing -- I guess it wasn't the

14   executive order, but it was the implementing memoranda,

15   everything implementing the executive order.

16         And the executive order was a suspension pending

17   review under which some could be retained and some could be

18   terminated.

19         MS. BATEMAN:  That's right, Your Honor, but as your

20   colloquy with Mr. Wirth revealed, that shift is based on

21   pretext as well.  And I would add two pieces from the

22   evidentiary record to support that the shift was pretextual,

23   and that's the Jessica Doe declaration.  That's ECF 26-3 in the

24   AVAC case, and the Clara Doe declaration, among others.  They

25   showed that the Court's TRO didn't alter the government's

1    approach at all, and that the government had issued a series of

2    terminations, both prior and subsequent to the TRO.

3         So it's all -- they are all actions stemming from the

4    initial executive order and State Department.

5         THE COURT:  This is the kind of there is still

6    the fruit of or the traces of or pretext.  Can I ask you a

7    question?  Just assume that's not the case for the moment and

8    there was an independent review of the agreements, and

9    independent authorities were invoked.

10        In my TRO, I found that the plaintiffs were likely to

11   succeed as it related to the blanket freeze, and that was based

12   in part on obviously -- well, it was based in part on the

13   failure to consider the massive reliance interests that you

14   have described and the plaintiffs have submitted evidence for

15   on irreparable harm.

16        And I guess one of the challenges is if the

17   terminations of aid are now based on contractual provisions, it

18   bears directly on consideration of interests, the idea being

19   you can only rely insofar as you haven't contracted away the

20   ability to rely on something.  To the extent that it's premised

21   on either legal authorities or contractual provisions, doesn't

22   that go directly to kind of the consideration of reliance

23   interest?

24        I'm moving away from kind of time one of the executive

25   order and the implementing orders to this kind of middle ground

1  right now where we're trying to figure out what the agency

2  action would be that you're challenging.

3          MS. BATEMAN:  Yes, Your Honor.  Aside from all of our

4  arguments that these are pretextual terminations, just because

5  the government may be able to terminate grants and contracts,

6  that doesn't provide a rationale for why the government should

7  be abruptly backing out of thousands of agreements it once saw

8  fit to enter, especially without any individualized assessment

9  of the benefits of those contracts or their track record.

10         THE COURT:  But doesn't that walk into the challenge

11  with the government, like that should be assessed on a

12  contract-by-contract basis where you would look at the

13  interests, being national interests, I'll use that word that

14  comes up in some of the agreements, balancing the national

15  interests versus the value of the contracts?

16         You're kind of presupposing in that case you could

17  still bring that individual claim under the APA as opposed to

18  another avenue, but still wouldn't that be an individual

19  contract-by-contract-type claim?

20         MS. BATEMAN:  I think there is room, and no one

21  disputes that the government has the right to review individual

22  awards and make individualized determinations.  I think the

23  tension here is that all evidence suggests that those

24  individualized determinations weren't in fact made and

25  certainly not in a good faith basis.

1          THE COURT:  Understand.  And I asked you to accept

2    that premise, and I know you're not ceding that or waiving any

3    objection to that argument.  I just want to make sure there is

4    nothing I'm missing beyond that.

5          I would like to switch to separation of powers, unless

6    there is something critical you want to say about arbitrary and

7    capriciousness before we move.

8          MS. BATEMAN:  I just offer very briefly two additional

9    points on this related to the supplemental memoranda

10   authorities that we filed.

11         First, defendants claim that they have completed their

12   individualized review, but recently the OMB issued a memorandum

13   stating that it's launching the next stage of the review, and

14   so we suggest that both things cannot possibly be true,

15   particularly because our clients have begun to receive a list

16   of questions that State and USAID are asking them consistent

17   with OMB's memorandum, and these questions are highly unlikely

18   to yield any determinations that aren't completely arbitrary

19   and capricious.

20         THE COURT:  This is the second round of review for

21   agreements that were continued or for ones that were

22   terminated?

23         MS. BATEMAN:  Our clients who have had terminated

24   contracts -- or rather awards that have not been terminated

25   have received this series of questions as to both.

1          THE COURT:  So some are ones that are terminated, some

2   are ones that aren't?

3          MS. BATEMAN:  That's right.

4          THE COURT:  I'm trying to figure out if that helps you

5   or hurts you.  This is part of the challenge with the APA.  You

6   have got to figure out what agency action you're challenging

7   and if it's a moving ground, the notion that they are going to

8   do a second review somehow makes it harder to evaluate how

9   arbitrary or capricious this could be.

10          MS. BATEMAN:  I don't think so in the sense that the

11   broad arbitrariness of the actions, the initial actions is

12   illustrated by the fact that they are now instituting a

13   separate review asking questions that were not asked in

14   whatever the first review was.

15          THE COURT:  How would they -- let's just assume, take

16   kind of whatever pretext you think there might have been or

17   taint from the initial executive order might have been.  Let's

18   just assume totally new people and the -- whatever it takes you

19   to get kind of mentally over that.  I know that's your

20   position, so it can be hard to.

21          They are just like we just want to do a review of the

22   contracts, and we also have different policy positions, but we

23   don't want to have that baggage of the thing that the Court

24   enjoined.  What do they have to do to free themselves from

25   that?

1          MS. BATEMAN:  I think there is no dispute that the

2     government can conduct an otherwise lawful review.  The dispute

3     is whether they can suspend all awards pending --

4          THE COURT:  I mean, like they have really -- just

5     assume they have vastly different policy -- understandings of

6     policies than previous administrations and it would come out to

7     basically the same number as we had today, but I want you to

8     assume it's not based on pretext, and they just want to engage

9     in a genuine review of contracts and it's going to reach

10    basically the same number as they got to today in terms of how

11    many are suspended or terminated.  What would they have to do

12    to kind of free themselves from that?

13         MS. BATEMAN:  I see.  I would think historical

14    practice has revealed what an actual individualized review

15    would look like.  It would involve consultation with

16    contracting officers and agreement officers, as well as the

17    lower level officers, the AORs and CORs who actually are the

18    technical experts on those contracts.  Those are the

19    individuals who have access to data about how effective

20    contracts, cooperative agreements, and grants have been in the

21    past.

22         THE COURT:  That's helpful, because it comes back to

23    the evidence that I think your co-counsel made about kind of

24    the cursory review, the nature of it, that's the indication.

25    Okay.  Understood.

 1          MS. BATEMAN:  That's right.  Thank you, Your Honor.

 2          And the last point on arbitrary and capriciousness --

 3     and I'll be extremely brief -- is just as it relates to the

 4     Enrich memoranda that were filed.  We would suggest that

 5     defendants' repeated attempts to suggest that a waiver creates

 6     non-arbitrariness in this process is foreclosed by the

 7     revelations in the Enrich memoranda that the waiver actually

 8     was not effective at all.

 9          THE COURT:  Got it.  Thank you.

10          Who can address separation of powers?

11          MS. BATEMAN:  And I'll be brief on this point as well.

12     I think the fundamental areas of disagreement between the

13     government and plaintiffs is whether these actions were in the

14     executive's discretion to take, and they emphatically were not.

15     The order granting the preliminary injunction this morning in

16     federal court in Rhode Island is extremely instructive on this

17     point I would say.  There the Court held that the executive

18     imposed a categorical mandate on the spending of

19     congressionally appropriated and obligated funds without regard

20     to Congress's authority to control spending, and that the

21     executive's discretion to impose its own policy preferences on

22     appropriated funds can be exercised only if it is authorized by

23     the congressionally approved appropriations statutes.

24          THE COURT:  This is the domestic funding freeze case?

25          MS. BATEMAN:  That's right, the State of New York case

1   in the District of Rhode Island.

2          THE COURT:  Obviously, this case takes place in the

3   context of foreign affairs, which the government has brought up

4   a number of times, and we'll hear from the government in a

5   moment.

6          Let me ask you, this is a pretty specific question,

7   but it seems like some of these are important ones, so I'm

8   going to probably move you forward in your argument a little

9   bit here.

10          So the executive order by its terms, focusing on that

11   for the moment, was a 90-day pause.  And I believe counsel for

12   one of the plaintiffs, sets of plaintiffs, argued during the

13   TRO hearing that at least some funds appropriated would expire

14   during that 90-day period.

15          Have you looked into that?  Can you provide further

16   clarity on exactly the state of that?

17          MS. BATEMAN:  I personally have not, but perhaps my

18   co-counsel can.

19          THE COURT:  I would like to hear about that.

20          MR. PERDUE:  Sorry for playing popcorn here, Your

21   Honor.

22          THE COURT:  That's okay.  It's more efficient, so --

23          MR. PERDUE:  Just a moment; if you allow me to find

24   the correct spot in my notes.

25          Yes, I want to clarify, because I think that what I

said, it was I who said that at the TRO hearing, and there is

some statements similar to that in a reply brief and they may

give a misleading impression, so I'm happy to have the

opportunity to correct and make sure that it's clear.

For the March 14th deadline that's upcoming, my

understanding is that is a deadline mostly for the operating

funds of the agency, so that's what they use to just pay

people, keep the lights on, that kind of thing.

The program funds, those are the funds that actually

go out to implementing partners, are appropriated on a

different schedule.  Most of the program funds are -- there

is -- the appropriations deadline is September 30th of this

year.

There is some of those funds that have longer

deadlines.  For example, PEPFAR is funded on a five-year

schedule, so its funds go out longer.  I don't remember the

exact date, but its funds go out longer.  The deadlines go out

longer than that.  My understanding is that most of the program

funds, the deadline is in September.

That said, I don't think --

THE COURT:  These are all -- I'm sorry to cut you off,

but these are funds that were appropriated in March of 2024

that go through September?  Is that your understanding, or

before then?

MR. PERDUE:  I believe that's correct.  I'm not sure

1    about exactly when they were -- there have been a number of
2    overlapping authorities that have been -- or appropriation
3    statutes that have been passed, so I don't want to misspeak as
4    to exactly when these were appropriated.

5         THE COURT:  Just to be clear, the reason -- I mean, if
6    the argument is that there are -- it kind of ties right into I
7    think some of the quotations from the Rhode Island case this
8    morning.  If the argument is there are funds being unspent, it
9    would be helpful to understand what's in the record about what
10   funds are going to be unspent.

11        The EO says a pause, right, and so there is at least
12   kind of a facial argument that it's not going to go unspent.  I
13   understand that some of the initial PI motion contained
14   statements suggesting this was not a pause and that publicly
15   the statement has been that it's cuts, but it would still be
16   helpful to understand exactly what you can point me to in the
17   record.

18        MR. PERDUE:  Sure.  I think one of the Enrich
19   memoranda that my colleague referenced, I believe it's at ECF
20   46-1 in the AVAC docket, there are three memoranda there, one
21   of them is entitled, I believe it's "Risks to U.S. National
22   Security and Public Health."  That memoranda I believe is in
23   draft form.

24        It has an annex that talks specifically about the
25   appropriations.  So this memoranda is just about one bureau

within USAID.  It's not the whole -- it's not all of everything
here.  It's one bureau, and that's the Global Health Bureau.
And the annex explains that the terminations have blocked about
$2.5 billion or 64 percent of the funds that are appropriated
for global health programs for fiscal year 2024, which is, I
believe what -- those are authorities that expire in September.

THE COURT:  Can you say that last part again?

MR. PERDUE:  The annex to this risk memoranda explains
that the terminations have blocked the obligation of $2.5
billion or 64 percent of the funds that were appropriated for
global health programs for fiscal year 2024, so it's a large
amount of money that we're talking about.

And my understanding is that there is no possible way
that the --

THE COURT:  That annex is here?

MR. PERDUE:  It's at the end of that memorandum.  We
have not heard from the government -- the government has not
said that it intends to reobligate this money.  In fact, they
have publicly defended their actions on the theory that it's
saving money somehow, but even if they wanted to reobligate the
funds, there just isn't time.  The procurement timelines are
too long and --

THE COURT:  This is with the backstop being September?

MR. PERDUE:  Even to September.  If they were trying
to enter into new awards to get that amount of money out the

1   door, it's just not possible.

2          THE COURT:  Is that in the record?

3          MR. PERDUE:  I think the best evidence you have for

4   that in the record is the Enrich memorandum, the risk

5   memorandum.

6          THE COURT:  The memorandum mentions things like, "If

7   the pause" -- there is a line in front of me here, "If the

8   pause leads to permanent contract terminations" -- I'm at 46-1,

9   page 18.  "If the pause leads to permanent contract

10  terminations, the $7.7 billion in resources appropriated by

11  Congress are no longer to be used to support these lifesaving

12  global health programs." I'll end the quote there.

13         But I'm not exactly sure what that refers to.  Sounds

14  like it's not March.  Is it September?  Is it the 2024

15  appropriations?  Is it built up over other appropriations?

16         MR. PERDUE:  I don't know the context of that specific

17  statement in there, so I can't tell you that precisely.  I do

18  think that -- I appreciate the Court is looking for things in

19  the record, and that certainly makes sense.

20         THE COURT:  It's the plaintiffs' burden to put the

21  relevant kind of evidence in the record or seek it or --

22         MR. PERDUE:  I think it's very relevant that the

23  government doesn't even dispute this point.  They have never

24  claimed that they intend to reobligate these funds.

25         You can ask them when they get up whether that's what

1    they plan to do, but I don't think that's what they will tell
2    you because what they are saying in public is that the purpose
3    of these terminations is to save money.
4        THE COURT:  Okay.  Understood.  I was hoping to kind
5    of go through and get an understanding.  There is a number of
6    different figures in here about amounts appropriated for
7    different purposes that aren't going to be spent, but it sounds
8    like we don't have the kind of specificity to understand
9    exactly.
10        MR. PERDUE:  I think that document is the best I can
11   point you to, and the appropriations statute itself, which
12   outlines -- I think it outlines -- I think the other thing we
13   can say on this is the appropriation statute itself doesn't
14   just dispense this money in gross, it directs particular
15   amounts of money to be spent towards particular purposes.
16        The appropriations statute references a table of --
17   it's literally a table of items, purposes with dollar amounts
18   attached so the statute references that.  There is a hyperlink
19   to that table in the Enrich memorandum, and you can see exactly
20   how it's all laid out.
21        THE COURT:  I'll defer to you on when to kick it back
22   to Ms. Bateman, but I did have questions about the
23   Appropriations Act.  I guess I'm trying to understand is it the
24   2024 Appropriations Act?  I mean, part of the argument here, I
25   think -- I mean, I know there is the kind of constitutional

1  component of it of Congress has the spending power and the

2  president has the executive power and defining that, but you

3  also rely on statutory violations, expressions of Congress's

4  spending power, and it would be helpful to know exactly what

5  those are.

6        I know you cite the Appropriations Act, and there are

7  some to go on in the briefing, but if you have a more detailed

8  explanation of kind of the price provisions that are relevant

9  or which specific appropriations are not going to be fulfilled.

10        MR. PERDUE:  I was prepared to talk about the

11  statutory argument, so I think you're talking to the right

12  person on that point, so I can give you an example.

13        One of the things that the appropriations statute

14  appropriates money for is democracy promotion.  One of the

15  tranches of terminations was an en masse termination of

16  democracy promotion programs.  I believe that is stated in one

17  of the Marocco declarations.

18        And so this is just Congress appropriated this money

19  to be spent for that purpose, and they have terminated all

20  programs that are directed towards that purpose.  And it is

21  just a direct contravention of the appropriation statute.

22        THE COURT:  Is the failure to spend contravening only

23  that 2024 appropriation for democracy, or is it prior

24  appropriations acts?

25        MR. PERDUE:  There is a provision in the 2024

1    Appropriations Act that is specifically for democracy

2    promotion.  We have the statutory cite in our briefing, so it's

3    there.  It's a particular amount of money, and --

4         THE COURT:  You don't know, at least standing here,

5    whether there are funds from the 2023 appropriations.  I assume

6    there were 2023 appropriations that went -- are going unspent

7    here.

8         MR. PERDUE:  So I don't know which -- sometimes these

9    appropriated funds get held over for multiple years, so I don't

10   know what's still available, but the important point is that

11   they have cut off all funding -- as far as we can tell they

12   have cut off all funding for democracy promotion programs, even

13   though Congress directed that a specific amount of money be

14   spent on that, and that's a just direct contravention of the

15   statute.

16        THE COURT:  This is a different statute.  If you want

17   to finish your sentence, go ahead.

18        MR. PERDUE:  I was going to go to the other statutes

19   anyway.

20        THE COURT:  I wanted to talk briefly about the Foreign

21   Assistance Act.  And the defendants make an argument that the

22   president has discretion, significant discretion, they do say

23   in how to spend the funds, but in the background section they

24   do refer to some language that is more permissive than it is

25   mandatory.

1    I think it says something like, "The president is
2    authorized to furnish assistance on condition he may
3    determine," or "on terms that he may determine."  Can you
4    respond to that and help me understand how to think about that?
5    MR. PERDUE:  Absolutely.  So I think those are
6    generalized provisions of authority to furnish foreign
7    assistance.  Those authorities have to be read in conjunction
8    with the appropriations statutes, which direct how much money
9    has to be spent towards particular purposes.
10    And they do not -- the general language in the --
11    THE COURT:  I'm sorry.  I guess as I think about this,
12    whether you think about it as statutory or constitutional,
13    Congress has the spending power and also the power to make
14    laws.  The statute that's being violated -- bracket the
15    Impoundment Control Act for a moment and the procedural
16    component of it -- but I assume if I said, "Which statute is it
17    that's being violated, the FAA or the Appropriations Act," you
18    tell me.
19    MR. PERDUE:  The appropriations statute.
20    THE COURT:  The idea being if Congress hadn't
21    appropriated any money, even if you had the FAA, there would be
22    no violation here because there would be nothing for the
23    president to spend anyway or not spend?
24    MR. PERDUE:  Absolutely agree.  I think the other
25    thing that may be useful to the Court is that another judge in

1  this district recently, in the domestic funding freeze case

2  that is in this district rather than Rhode Island, did issue a

3  decision that generalized funding authority does not -- is not

4  sufficient to allow the executive branch to engage in wholesale

5  funding freezes, and specifically under the major questions

6  doctrine.

7       So a funding freeze like this is a major question.

8  It's a highly significant social and political issue.  It

9  therefore requires clear congressional authorization, and this

10  exact type of generalized authority simply isn't sufficient.

11  So that's the *Council of Nonprofits* case from this district.

12       THE COURT:  I assume we're in hypothetical land here,

13  but I'll say "we," this is a hypothetical, but if tomorrow the

14  executive, you know, sufficiently senior person in the

15  executive branch said, "We're going to spend this money, we're

16  going to spend everything that's appropriated by the deadlines,

17  but we're not going to spend a cent of it on the plaintiffs and

18  the current agreement people, and we're going to come up with

19  processes to do it fast enough, would there be a separation of

20  powers violation?

21       MR. PERDUE:  They would have to come up with an actual

22  plan to do that.

23       THE COURT:  I realize that hasn't been said.  I'm just

24  trying to understand.  I'm not using that as I think that's

25  going to happen, I would have no idea, but I'm using it as a

1    trying to understand what your claim is.

2         MR. PERDUE:  So they would have to come up with a

3    plan.

4         THE COURT:  The answer is?

5         MR. PERDUE:  The answer is I think it would still be a

6    violation, and I think that may be a good transition to the

7    Impoundment Control Act, because the Impoundment Control Act

8    does say that there can't be a deferral of budget authority,

9    which is a delay in the obligation or disbursement of funds.

10         If they are halting obligations, even temporarily,

11    based on policy rationales, that is still a deferral under the

12    ICA.

13         THE COURT:  Even if that halt happens kind of midway

14    through?

15         MR. PERDUE:  Correct.  So the way that the Impoundment

16    Control Act has been interpreted, you can look at the GAO

17    report on the Ukraine funding issue.  You can also look at DC

18    Circuit's decision in the City of New Haven case.  There is a

19    distinction that's drawn between a programmatic pause, which

20    does not trigger the Impoundment Control Act, and a deferral,

21    which does.  The key distinction is whether it's externally

22    caused or voluntarily chosen by the agency.

23         A programmatic pause is something that is externally

24    caused.  If there is, for example, funds are appropriated to an

25    agency, agency has to spend them, but there is another law that

1    says that they have to go through rule making first.  The delay

2    that happens while they are going through rule making is not a

3    deferral, doesn't trigger the Impoundment Control Act.

4         However, if for policy reasons they pause the

5    obligation of appropriated funds even temporarily, that can

6    only be done for one of the three reasons.

7         THE COURT:  I think you said, kind of still doesn't

8    get quite to the question, but even if it's still spent within

9    that appropriations period?

10        MR. PERDUE:  Absolutely.  A deferral is a delay.  So

11   the idea is that obligation -- funds need to be available for

12   obligations.  They need to be kind of continuously obligated

13   throughout the period, and there can't be a delay in obligation

14   for pure policy reasons.

15        THE COURT:  Just coming back to one point that I think

16   I referenced.  I saw there is a quote from one of the

17   President's advisors about how this isn't a pause and it's a --

18   I don't remember the exact wording used, but cuts or ending the

19   aid.

20        Where else in the record is there for that point,

21   because I think you said it's not disputed, maybe that's

22   enough, but where is the factual record for that this is more

23   than a pause?

24        MR. PERDUE:  I don't have that at my fingertips at the

25   moment, Your Honor.  I will try to come up with it now, and, if

1    necessary, we can submit something after the hearing to point

2    you to that.

3              THE COURT:  That would be helpful.  Thanks.

4              MR. PERDUE:  Did you have further questions or do you

5    want to hear further on the Impoundment Control Act or the

6    Antideficiency Act or the appropriations statute?

7              THE COURT:  I don't have questions for plaintiff on

8    the Impoundment Control.  I have a couple for the government,

9    but if there's a key point you want to point me to, you can do

10   it concisely.

11             MR. PERDUE:  Just very quickly, the Rhode Island case

12   that the decision issued this morning did find a likelihood of

13   success on an APA contrary to law claim under the Impoundment

14   Control Act, so I would recommend that decision to Your Honor.

15             And there is -- I think the main point I would like to

16   make on the Impoundment Control Act is that the government's

17   main argument seems to be that it's only enforceable by the

18   comptroller general and not by private parties.  The Rhode

19   Island case rejects that argument.  I think this Court should

20   do the same.

21             And the key, I think, point for this Court on that

22   issue is just that an alternative enforcement mechanism does

23   not preclude suit under the APA unless it allows the party to

24   seek redress for the same grievance.  That's the *El Paso*

25   *Natural Gas* case from the DC Circuit.

1          Here, the comptroller general can redress a kind of

2    institutional grievance that Congress may have, but only

3    private parties can redress private pocketbook grievance.

4          THE COURT:  I think I have your point on that.

5          MR. PERDUE:  There is a point about the comptroller

6    general can only sue for failure to obligate and not failure to

7    disburse, so it is an incomplete enforcement mechanism.  If

8    that were the exclusive mechanism, it would render half of the

9    statute unenforceable by anyone.

10          THE COURT:  Go ahead, Ms. Bateman.  And then I know we

11    didn't discuss irreparable harm.  I'll give you a moment.  And

12    then I do want to hear from the government after that.

13          MS. BATEMAN:  Thank you, Your Honor.  And thank you

14    also, Mr. Perdue, for your fulsome articulation of the

15    statutory bases that sort of undergird our constitutional

16    arguments.

17          I wanted to offer to Your Honor one record citation

18    for the proposition that funding has been prevented.  On page 3

19    of the complaint in the AVAC case, footnote one, there is a

20    citation to a State Department press release that said, "As of

21    January 29, $1 million in spending has been prevented," and

22    that those efforts remain ongoing.

23          THE COURT:  You said $1 million?

24          MS. BATEMAN:  As of January 29th.  I'm sorry, $1

25    billion.

```
 1          THE COURT:  We can come to irreparable harm then.  And
 2   I really just want to hear if there is anything you would like
 3   to offer on irreparable harm that I don't already know.  I have
 4   seen the record.  We have been through irreparable harm in the
 5   TRO and subsequent orders.
 6          MR. WIRTH:  I think you're fully aware of all the
 7   irreparable harms.  They continue.  They are ongoing for our
 8   clients.  Some clients now are receiving some funds just very
 9   recently, and so some of those harms are lessening, but many of
10   those --
11          THE COURT:  These are some funds from agreements that
12   were at some point suspended or terminated?
13          MR. WIRTH:  Some of them, yes.  But some of them have
14   still received no funds whatsoever.  Many of the associational
15   plaintiffs' members have received no funds whatsoever.  So
16   those harms remain, and some of the other harms with respect to
17   the threats that our clients are receiving abroad, all of those
18   laid out in our most recent declarations, all of those remain
19   true to this day.  Those harms are ongoing, and they are truly
20   irreparable and devastating.  I know that you know that.
21          THE COURT:  I appreciate it.
22          I'll hear from the government.  I was going to ask
23   some questions about the defendants' sur-reply, but maybe we
24   can come back to that in the scope of relief to the extent
25   there is time.
```

1          Mr. Sur, you have got the floor.

2          MR. SUR:  Before I do that, Your Honor, may I ask if

3   we can take a break?

4          THE COURT:  How much time do you need?

5          MR. SUR:  Five minutes is fine.

6          THE COURT:  Five minutes is fine.  Why don't we recess

7   for five minutes and I'll be back.

8      (Recessed from 3:24 p.m. to 3:32 p.m.)

9          THE COURT:  Thank you.  Mr. Sur, the floor is yours.

10  I'll let you get started, and I'll let you know if it's helpful

11  to move to other points.

12         MR. SUR:  Thank you, Your Honor.  Good afternoon.

13         So as the Court began the discussions with plaintiffs

14  with Article III, I will start at Article III also, but from a

15  slightly different angle, which is the doctrine of mootness.

16  The preliminary injunction here was sought and a TRO obtained

17  against a blanket pause, but the TRO as to the blanket pause,

18  in our view, should not be turned into a preliminary

19  injunction, because the funding freeze is essentially not

20  continuing, it's over.

21         The State Department and USAID, in response to the

22  TRO, accelerated the review.  They shifted resources,

23  recognizing that the Court's concern was essentially that the

24  entities with the federal funds contracts, grants, and other

25  awards were in a waiting period.  And for that waiting period

1   to endure for 90 days was inflicting what the Court analyzed as

2   the harm that the TRO we understood to be addressing.

3        So the agencies moved quickly to complete the

4   individualized review of the funding awards, and they decided

5   to retain some several thousand of them.  The numbers are in

6   the record.  And the others were terminated.  But at this

7   point, there is really no meaningful relief that would be

8   available against the pause.

9        And for those funding recipients who are aggrieved by

10   how, for example, their costs incurred for work performed were

11   handled, they would go through the established closeout

12   procedures that are provided for either in the written

13   instruments or in the regulations that those instruments refer

14   to.  So those would be individual actions that essentially are

15   separate and apart from the challenge brought here against the

16   freeze.

17        THE COURT:  Can I ask you about that?  Is it true that

18   it's moot in the constitutional sense if there is an APA

19   challenge?  Let's just think about the APA for the moment.

20   That seemed to be what you were describing in terms of the

21   challenge to the blanket pause.

22        So APA challenge to a policy as arbitrary and

23   capricious.  Let's just simplify it as that.  Assume it's

24   brought by someone who has standing, because you're arguing

25   mootness at the moment, at least, not standing.  And then the

1    rule -- let's say you're in a landscape where the rule has

2    changed.  Maybe the new rule is unlawful, maybe it's not, but

3    you're in a new landscape.  Or maybe it's not a new rule and

4    there is just a bunch of different terminations that make up

5    the new landscape.

6         Is that really mootness?  There have been cases that

7    have challenged APA policies that are no longer in effect that

8    have continued to go on.  Is your point that whenever a policy

9    is changed or you get to a new landscape, the APA claim

10   constitutionally moots out?

11        MR. SUR:  I think our understanding of it is a little

12   bit narrower than that, not merely a change in policy, but

13   essentially to use the phrase in one of the DC Circuit's cases,

14   it's the *Beethoven, LLC* case, but it uses the phrase "events

15   have outrun the controversy."

16        We point in our supplemental brief to cases that are

17   along those lines.  There is a 2005 case.  The defendant there

18   was the Secretary of the Interior, Gail Norton.

19        THE COURT:  Can you speak up a little bit?

20        MR. SUR:  We do point to some cases from 2005 in our

21   supplemental brief on that, but I think the idea here is not

22   just a change, but that what is -- the gravamen of the

23   complaint and what was the subject of the TRO was this blanket

24   pause, and that now -- the function of the pause as stated was

25   to allow a review to take place over 90 days.

1          But by shifting the resources, the agencies met the

2     TRO by doing the review much more quickly to address the

3     concerns that reflected the TRO, reserving their objection, of

4     course, to enter the TRO itself.  But because that work is now

5     done, any continuing issues or relief that the affected

6     individuals --

7          THE COURT:  The reason I use the example of a change

8     in policy is because it seemed like if any case were to be moot

9     it would be that one.  If you have a policy that is, and again,

10    there is standing, so whether it's an existential crisis, some

11    sort of concrete injury to the plaintiff and it's being

12    challenged, and then they change the policy completely, and it

13    wouldn't moot it out, I mean, maybe it would limit the amount

14    invalidating that earlier action would help, because there is

15    now another policy, but does it moot it out constitutionally?

16         MR. SUR:  I think it depends on the circumstance.  For

17    example, there are situations where the policy will expire or a

18    constitutionally challenged statute has a defined sunset

19    clause, and after the sunset clause, I think in those settings,

20    there are cases that say that the challenge is moot.

21         THE COURT:  So if there's an arbitrary and capricious

22    policy that has a sunset clause and the litigation takes longer

23    than the sunset clause, it's gone, it's constitutionally moot.

24         MR. SUR:  I think that would be the case.  And that's

25    more an answer to Your Honor's question than I think to the

1    situation here, because I'm not saying that we have that kind

2    of a firm expiration.

3        But if there is an entity that had challenged the

4    previous, let's say, rule, the rule expires, that claim may be

5    moot.  Now, it may be that -- maybe this frequently happens,

6    that that rule that expired is replaced with something similar

7    that the previously regulated entity can now bring a new case

8    against.

9        Here, the pause is essentially finished, and if there

10   are lingering effects, those would, in our view, appropriately

11   be treated through the individual contracts, grants and awards,

12   and whatever remedies those provide.

13       THE COURT:  Okay.  I think I have your argument.  I

14   appreciate that.  Can we come to standing for a moment?  Can

15   you explain the pocketbook injury argument to me so I have it?

16       MR. SUR:  Yes.  I think our point was that we were

17   trying to show that we understand the plaintiffs to be coming

18   to the Court with something that is recognized as an Article

19   III injury in part, and that's the pocketbook injury.  That's

20   the situation where, for example, during the pause, someone who

21   had a contract, who thought that they would be paid money under

22   the contract, was not being paid.  And so I think that's a

23   pocketbook injury, and we recognize that.

24       Where we have an argument about Article III beyond

25   that is the effort by some of plaintiffs to use their

1    descriptions of increased risk to non-parties, especially

2    non-parties who are not within the technical jurisdiction of

3    the Court or are actually like overseas governments or overseas

4    residents that essentially many of those risks are matters of

5    foreign policy that are not the traditional --

6         THE COURT:  I think that's a little different than

7    what I understand the argument to be.  I think it's -- you

8    know, for better or for worse, maybe it's sometimes more

9    natural in the context of industry where a lot of APA cases

10   come up to understand that, like, incredible disruption of an

11   industry and mission of whether it might be environmental area

12   or maybe it's crude oil, whatever it might be, significant

13   disruption to the missions of these organizations, the

14   viability of those organizations is a harm.

15        And I think the argument they are making, as I

16   understand it at least, is the humanitarian component of this,

17   the use of the aid, is part of the plaintiffs' missions in

18   various ways.  And so it's not so much that it's some

19   third-party who they are trying to assert an injury on behalf

20   of; it's an injury to their very kind of purpose.

21        MR. SUR:  Your Honor, if that means that we should be

22   looking at the plaintiffs as organizations asserting

23   organizational injury, I think their burdens would be even more

24   of a challenge under DC Circuit precedent, because the

25   organizations have to show a harm to their mission, but they

1    can't use the challenge as the basis for their standing.

2           THE COURT:  It's the industry that they are in, and,

3    obviously, just in the more commercial examples, there would

4    also probably be pocketbook injuries that they are concerned

5    about and maybe they could point to specific ones.

6           Again, I'm not putting words in the plaintiffs'

7    mouths, but to give them a fair kind of characterization of the

8    argument it's they have got the full scope of the mission

9    disruption to the industry and pocketbook examples.

10          MR. SUR:  I think because -- in our view, it's the

11   pocketbook injury that gets them through Article III.  They

12   have to be challenging -- the pocketbook injury results from a

13   concrete application of the challenged secretarial memorandum

14   to them, and so there is -- that's where the link is broken

15   essentially.

16          For them to claim that it's the memo that's injuring

17   them as opposed to the pause that implements the memo, that's

18   where that causal link is broken.  So the purpose of

19   recognizing that they have pocketbook injury is only to sort of

20   point out that their injuries don't extend so far for Article

21   III purposes as to allow them to make sort of the sweeping

22   claims that they have for invalidating everything.

23          I will also briefly if I could point out that we think

24   the Article III problems are especially sharp for the

25   associational plaintiffs because they are not themselves

1    funding recipients.  So they don't have contracts or grants or

2    awards that were paused.  They have members who do.  And there

3    is really no justification or explanation given for why the

4    members couldn't be before the Court.

5         And in fact, insofar as they are seeking relief that's

6    specific to those contracts and awards, the members'

7    participations would be required under the third prong of the

8    associational standing test.  So that's --

9         THE COURT:  I have that argument in your brief as

10   well.  You know, I was trying to parse out whether you think

11   there is -- you go to the organizational standing because you

12   think that's actually where the standing is -- I guess I'm

13   curious how far you think that gets you on the organizational

14   standing if the direct funding recipients would have a concrete

15   harm.  I know that's not your position, but is there a

16   significance of that I should be aware of?

17        MR. SUR:  The associational plaintiffs, as a practical

18   matter, for remedy purposes, and sort of just for ongoing case

19   administration purposes, do make a difference.  So it's one

20   thing to be dealing with eight individual funding recipients

21   and trying to analyze their claims and their underlying

22   agreements, for example, if those were in the record, which

23   they are not, but it becomes a whole other kettle of fish, if

24   you will, when the association has multiple members and those

25   aren't identified for us.

1          THE COURT:  I don't want to get too far, because we

2    will talk about the arguments you have about individual

3    contract claims, of course.

4          But if you accept the complaint as they have pled it

5    to be, and let's talk in the APA fashion, because I think it's

6    the clearest, that they are seeking vacatur of a policy, does

7    it really change anything if vacatur of the policy -- I

8    understand the government has an argument that's it's been

9    making to the Supreme Court several times about how the remedy

10   under the APA shouldn't be vacatur and should be plaintiff

11   specific.  I don't think the Supreme Court has accepted that,

12   or at least not a majority of the Court, but kind of bracketing

13   that, which is not the law, if you have plaintiffs with a

14   concrete harm and the remedy under the APA is vacatur and it's

15   not about the individual contracts, I think the plaintiffs

16   haven't asked for this to become a review of individual

17   contracts, then what is the difference?  Give me one more time.

18         MR. SUR:  So maybe from my perspective I'm blending

19   too much of the inquiry under the sovereign immunity.

20         THE COURT:  We can go there if you want to.  I want to

21   make sure I'm not missing something on the standing front.

22         MR. SUR:  I think from the Article III perspective,

23   the associational standing test under *Hunt*, that third prong

24   says basically that if you need individualized inquiry, even if

25   the relief sought is not monetary, but if you need some

1    individualized inquiry into the circumstances of the

2    association's members, that's enough to bring you out of the

3    associational standing test and just have the members bring

4    those suits rather than have the association bring it.

5          THE COURT:  Understood.  100 percent I understand that

6    for organizational standing we have to apply the organizational

7    standing test, which is going to require application of those

8    prongs, for sure.  I was just trying to understand how far that

9    goes, if there are some -- before we go to the sovereign

10   immunity, can I get you to talk briefly just about agency

11   action?

12         So I put to the plaintiffs that seems like at least on

13   the terms of their complaint the agency action challenged,

14   obviously, I'm talking about the APA here by definition, is the

15   implementing memoranda, the Secretary of State's memoranda and

16   the other ones that they refer to.  I assume you don't disagree

17   with that?

18         MR. SUR:  We understand the gravamen of the complaints

19   to be a challenge to the Secretary's memorandum.

20         THE COURT:  Maybe it took place over the course of a

21   week, but those implementing memoranda.  One thing in the

22   various back and forth of the TRO that has been trying to

23   figure out, and I put to plaintiffs a little bit, but I'll put

24   to you, what is the directive currently?  I know that the TRO

25   was shared throughout the agency and the message was further

1    guidance will be provided.

2        It seemed at least -- correct me if I'm wrong if this

3    was to everybody.  It seemed like at least in some instances

4    there was a communication that any actions taken pursuant to

5    the executive order and the Secretary's memorandum should not

6    be given effect.

7        But what is the -- and then part of the reason I'm

8    confused is there is also the declaration from Mr. Marocco that

9    talks about certain types of policies that are inconsistent

10   with the national interest, so I'm just trying to understand,

11   what is the directive currently?

12       MR. SUR:  I may be repeating myself, but the pause

13   after it was subject to the TRO led the agencies to do an

14   individualized inquiry, because, again, the government objected

15   to the TRO, but recognized that, and we think quite rightly,

16   the TRO preserved individualized contract analysis.

17       So the agencies then did the work of making the

18   decisions quickly, right, so not under, of course, the 90-day

19   timetable.

20       THE COURT:  It kind of begs the question of reviewing

21   for what?  Was it, look, the administration wants to terminate

22   any grant it can, so let's review and terminate any grant we

23   can?

24       MR. SUR:  No, I mean, so what's in the record is the

25   Marocco declaration.  I believe it's the one of February 25th,

1    has a two- or three-paragraph description of the process.  And

2    the factors that are described there are the sorts of factors

3    that are the stuff of foreign policy judgments.

4         And the particular conditions and what is the nature

5    of the work done, what are the countries that those entities

6    are operating in, so it's a multilevel review with multiple

7    officials involved.

8         THE COURT:  The idea is that some sort of guidance is

9    being provided as to what they are reviewing for, and if these

10   sorts of things are present, then we should terminate, because

11   it would violate -- again, there might be different tranches or

12   batches, but is that a rough approximation of how it's working?

13        MR. SUR:  I'm sorry, Your Honor.  I think that roughly

14   describes the process that's described in those paragraphs,

15   with the caveat that there were situations where a

16   recommendation went up to the Secretary and the recommendation

17   was rejected for foreign policy reasons.  So the process was

18   not one that can be described in the way the plaintiffs would

19   like to as a mass termination, because it does reflect these

20   individualized considerations.  And the fact that some

21   recommendations were not accepted, I think just confirms that.

22        THE COURT:  Recommendations made by the reviewing

23   program officer?

24        MR. SUR:  Correct.

25        THE COURT:  Was that in both directions,

1    recommendations made to terminate where it wasn't terminated

2    and recommendations made not to terminate where it was?  Is

3    that the idea?

4              MR. SUR:  Without going back to the declaration, I'm

5    not certain what the breakdown was.

6              THE COURT:  This is a pretty specific question, but

7    I'm just realizing in my mind it might be helpful, even if

8    there is no immediate connection to what we're talking about,

9    but I think there is.

10             So the TRO -- we had this discussion last time in the

11   telephonic hearing -- foreclosed giving effect to any of the

12   suspensions or terminations before February 13th.  And I know

13   you agreed with that characterization of the TRO, even if it

14   wasn't your preference coming into the arguments.

15             I guess my question for you is, for those terminations

16   and suspensions, of which I understand there were many, if

17   there was a -- if you're currently considering those to be

18   terminated, is that because there was a subsequent review and

19   termination of those, or are you somehow relying still on those

20   terminations in any sort of way, the pre-February 13th

21   terminations?

22             MR. SUR:  I'm not sure that the record has the answer

23   to that.

24             THE COURT:  I'm asking you for the government's kind

25   of what's actually happened on that.

 1          MR. SUR:  My understanding is that it was an analysis

 2     after the TRO.

 3          THE COURT:  If someone had received -- like, maybe a

 4     practical way -- not asking you to be -- the point here, it's

 5     not a gotcha question, it's to understand the circumstances

 6     question.  Like if there is a hypothetical grant recipient who

 7     received a termination on February 10th or a suspension or a

 8     stop work or whatever it was, that person, to the extent there

 9     is any sort of termination or suspension that the government is

10     now saying is in effect, received something after February 13th

11     saying that, the government is not just saying, "Well, we did

12     an individual review back then and we're going to somehow give

13     it effect"?

14          MR. SUR:  Again, I can only give you my understanding.

15     I don't think the record answers it maybe with the clarity that

16     the Court would like.

17          THE COURT:  That's your understanding?

18          MR. SUR:  After the TRO, resources shifted to make the

19     determinations on an individual basis.

20          THE COURT:  Right.  Okay.  Why don't we talk about

21     whether the APA applies and the sovereign immunity argument.

22          MR. SUR:  Yes.

23          THE COURT:  Maybe I could lay it out for you and you

24     can tell me what I have wrong, kind of dangerous I guess, but

25     I'll try.

1          As I understand it, the APA waives sovereign immunity

2     as to certain types of claims.  I assume you won't disagree

3     with that.  There is an exception where there is another

4     adequate remedy.  We have got the CDA, which covers contracts

5     for procurement of services, and those have to go through the

6     civilian board or the Court of Federal Claims.

7          And we have got the Tucker Act, which requires

8     contracts that are more than -- if there is a breach of

9     contract claim of more than $10,000 to go through the claims

10    court.  And then there is also an APA provision that limits the

11    waiver of sovereign immunity to claims that aren't for money

12    damages.

13         Have I summarized those together?  Do you want to kind

14    of stitch it together in a way that's different?

15         MR. SUR:  I think all of that is consistent with my

16    understanding as well.

17         THE COURT:  Okay.

18         MR. SUR:  May I elaborate on one of those points?

19         THE COURT:  Yes.

20         MR. SUR:  We heard a great deal today about how the

21    Tucker Act apparently, in the plaintiffs' view, doesn't provide

22    them with access to the Court of Federal Claims, but our

23    understanding is that the plaintiffs seem to be announcing a

24    conclusion based on the labels that are maybe assigned to their

25    particular agreements.

1          So they have announced the conclusion that they can't

2    resort to the Tucker Act remedy because they have a grant, or

3    they can't resort to that remedy because they have a

4    cooperative agreement, but the precedent from the federal

5    circuit is quite to the contrary.  It recognizes that the label

6    that applies to a particular agreement is not what decides

7    whether you can go to the court under the Tucker Act and bring

8    a breach of contract claim against the government.

9          So in some of these cases, it's the government that's

10   trying to say that this person's grant actually doesn't allow

11   them to go into court and get money damages, but the court has

12   said emphatically that, no, we have to go agreement by

13   agreement.

14         THE COURT:  Specifically for the types that were

15   discussed by plaintiffs, specifically for cooperative

16   agreements?

17         MR. SUR:  So I don't have -- I have seen a case that

18   describes the Tucker Act remedy for an agreement that is styled

19   somewhat like a cooperative agreement.  I'm not certain that

20   it's exactly the same, because, again, the plaintiffs have not

21   put the underlying instruments into the record, so I haven't

22   been able to review those.  I do have a case --

23         THE COURT:  I take that point in some contexts where

24   you're saying if they want to engage in kind of a challenge of

25   the individualized review it would be helpful to have the

1    contracts, but you represent the federal government.  You could

2    see a cooperative agreement.

3            MR. SUR:  Right, but I think the point is that --

4            THE COURT:  Including plaintiffs' cooperative

5    agreements.  I think you have started to pay some of these, so

6    you have access to them.

7            MR. SUR:  But looking at one cooperative agreement

8    wouldn't necessarily dispose of the entire category.  And so,

9    for example, the federal circuit has said that even if an

10   agreement is labeled a grant, if that agreement tells the grant

11   recipient that they are subject to a large body of regulations

12   that the agency attaches to the grant, then those regulations

13   may put the grantee in a situation that the breach of the grant

14   instrument can be for money damages.

15           So I think the only point I'm making is that we can't

16   use the label --

17           THE COURT:  100 percent, and that's helpful for me

18   because I wasn't familiar with the labels, so one of the

19   exercises I tried to go through with plaintiffs' counsel is

20   what is underlying those labels, what do they mean?  And I

21   understood them -- I mean, maybe it's helpful to go through it

22   the way I did with plaintiffs' counsel.  Do you want to start

23   with the Tucker Act or the CDA?

24           MR. SUR:  I think the Tucker Act is fine.  I mean, the

25   CDA is a little bit narrower from what I understand from the

1     Tucker Act in that the CDA has an exhaustion requirement, so

2     the contractor would have to first go through the agency's

3     processes.

4          THE COURT:  I'm only smiling because I think you

5     wanted to say you were going to start with the Tucker Act, but

6     now you're going into the CDA.  Finish that thought.  I think

7     that's helpful.

8          MR. SUR:  The difference, as I understand it, the

9     practical difference is that the CDA has an exhaustion

10    requirement.

11         THE COURT:  I think the additional point that

12    plaintiffs' counsel was making is that the exhaustion

13    requirement applies to procurement contracts and that a

14    cooperative agreement, the definition that was provided was

15    procurement of services for the government, and the idea here

16    is these are cooperative agreement grants to provide services

17    for other people, as you noted at the outset in talking about

18    the third-parties.  And so I think that's the idea, as I

19    understood it at least, of why not just the label, but the

20    actual services that are at issue aren't the type that would go

21    through the CDA.

22         MR. SUR:  It may well be that the cooperative

23    agreements would not lend themselves to CDA jurisdiction.  I

24    think the point I was trying to make about the label not being

25    dispositive about Tucker Act jurisdiction is about the Tucker

1    Act rather than the CDA.

2              THE COURT:  Do you want to talk about Tucker Act?

3              MR. SUR:  If I may cite a case.  We cited in the

4    papers a case called *Boaz Housing Authority versus United*

5    *States*.  And in the brief, if I remember correctly, we made an

6    error in the citation, so it's actually 994 F.3d 1359, and this

7    is from page 1368.

8              So what the Court is basically saying is when the

9    government has implemented a grant program by using contracts

10   to set the terms of and receive commitments from the

11   recipients, then the proper course for the asserted violation

12   of the grant terms may be a suit in the claims court for

13   damages relating to an alleged breach.

14             And the *Boaz* case cites an earlier case, so I will

15   give that citation to you because I think that one is a good

16   example, although we didn't cite it in the brief, because it's

17   jurisdictional, I hope the Court will indulge me, it's *San Juan*

18   *City College versus United States*.  That's 391 F.3d 1357.  It's

19   a federal circuit case from 2004, and the relevant passage is

20   1360 to 1361.

21             But essentially, that was also a situation where the

22   grant recipient had what was labeled a program participation

23   agreement, but the number of governing regulations and

24   provisions of that participation agreement got to the point

25   that the Court said you can go under the Tucker Act to get

1  damages for breach.

2       So I offer those cases to sort of illustrate this

3  point that categorically labeling the plaintiffs' claims as

4  arising from grants or cooperative agreements will not solve

5  the sovereign immunity problem that they have largely skirted

6  over.

7       THE COURT:  Can we just cover I think what is the

8  other category, which was I think they called them sub-awards.

9  I guess the point is that the kind of foreign aid landscape,

10  like a lot of other complex landscapes, has an industry of

11  subcontractors essentially who wouldn't be in direct privity.

12       Can you address those?  Is there an avenue under the

13  Tucker Act there?

14       MR. SUR:  I am not able to address them because I

15  don't recall having looked at the declarations which of the

16  declarations specified that they had a sub-award.

17       THE COURT:  It was in the PI briefing, I believe.

18       Okay.  That's helpful.  If you can't address it on the

19  spot, that's fine.

20       Any other points you want to offer me on Tucker Act

21  before we move on?

22       MR. SUR:  No.  I think -- as long as we go to monetary

23  relief.

24       THE COURT:  Why don't we go there next.

25       MR. SUR:  As the Court pointed out, then there is this

1   other question about whether the claim that's being asserted is

2   one that would appropriately go to the Court of Federal Claims

3   eventually.  And the --

4          THE COURT:  I hate to pause, but I just want to make

5   sure I have the structure here right, and I think I do.

6          Kind of the CDA and the Tucker Act, I mean, maybe you

7   wouldn't need this, but those kind of tie to the availability

8   of other relief in the APA.  That kind of all goes together.

9          The argument -- this is how I think plaintiff

10  understood it as well.  The argument you're making about

11  monetary damages, you'd make that argument even if the Tucker

12  Act or CDA didn't exist?  It's an independent argument you're

13  making about the waiver of sovereign immunity or nonwaiver of

14  sovereign immunity?  Is that right or is it all together?

15         MR. SUR:  I think they can be treated as independent

16  questions, because there are some decisions that I have read

17  that address one and not the other.  So they --

18         THE COURT:  Obviously, they probably come up often

19  pretty similarly, for obvious reasons.

20         MR. SUR:  So on the money damages, I mean, I think,

21  from our perspective, maybe this is again the same concept as

22  what I was saying before about not using the labels of grant or

23  cooperative agreement to make the jurisdictional determination,

24  the mere fact that the plaintiff has labeled their claim as one

25  for injunctive relief doesn't sort of solve the problem about

1    whether in fact they are looking for something that's money

2    damages.

3         THE COURT:  Is there a case you can point me to where

4    the claim, as styled by the plaintiff, was to invalidate

5    something that is accepted as a rule or policy under the

6    definition of the APA, but the Court still finds that it was

7    for monetary damages?

8         I have kind of the other Tucker Act, the *Megapulse*,

9    but under the monetary damages piece, is there any case out

10   there that does that.

11        MR. SUR:  So I mean, for example, there is a

12   discussion about *Maine Community Health Options versus United*

13   *States*.

14        THE COURT:  As I understood it there, they actually

15   did seek damages.

16        MR. SUR:  So that was -- I was going to offer that

17   case as the one that sharpens the line between being in a

18   complex ongoing relationship as the states are with the federal

19   government and seeking prospective relief about managing that

20   relationship as being separate from seeking relief that

21   remedies particular categories of past injuries or laborers.

22        THE COURT:  Okay.  That still doesn't involve kind of

23   like challenging an agency policy.

24        MR. SUR:  Right.  It may also be helpful, since it's

25   come up, the examples we heard from the podium were *Kidwell* and

1    *Crowley*.  So *Kidwell* is a military service person who goes to

2    the agency that maintains military records and seeks to change

3    the category of the discharge that the service person received.

4    And the holding is that no, it may be that in some subsequent

5    proceeding the change in the serviceman's discharge status

6    would result in increased pay, I think maybe disability pay in

7    that particular example, but because that's a separate suit,

8    it's down the road, the Court doesn't use that monetary

9    recovery as a reason to think that the claim before the Court

10   right now is not within the APA.  That's very different from

11   what we here.

12        THE COURT:  Does it say that?  Does it say "because

13   it's a separate suit"?

14        MR. SUR:  It doesn't use those terms, but that's

15   essentially what I think the Court is implying when it says,

16   oh, you can just hint at a monetary remedy and you will be

17   okay.  I think by "hint at" they mean that there may be some

18   downstream separate legal proceeding.  I'm not saying that

19   every case fits into that pattern, but I think to take from

20   *Kidwell* the lesson that the plaintiffs in this particular

21   instance where they have come to the Court explicitly saying

22   that they are aggrieved by improper delays alleged in contract

23   payments, for them to put themselves in the same boat as the

24   *Kidwell* serviceman I think stretches that beyond what it would

25   bear.

1          Similarly, in *Crowley*, there is really no contract

2     between the plaintiff and the government agency that the

3     plaintiff in that case was suing.  The *Crowley* configuration is

4     that, according to *Crowley's* allegation --

5          THE COURT:  Can I ask you, I know you use your

6     language in your brief as well, you talk about kind of the

7     delayed payment as a way of kind of characterizing the claim,

8     but a moment ago we were talking about the agency action that's

9     being challenged under the APA claim as being the policy

10    itself.

11         So can you square those two things for me?  It seems

12    like those -- I get that there is the kind of like the where we

13    are today piece and like part of your argument is we're in a

14    different world today and so there is a cutoff as to at least

15    the financial consequences of invalidating the order, and so

16    that allows you to say, if you take that for granted, you're

17    really just about can I get this money now or later.

18         But I want to be kind of faithful to the agency action

19    that's being challenged, which is the suspension of funds, and

20    along with that just no one being paid, as I understand it,

21    until my TRO, and still, right.  We're going to work that piece

22    out.

23         So can you help me square that characterization with

24    the agency action that's being alleged in the claim?

25         MR. SUR:  So the plaintiffs, both under the APA and

1    under Article III have to look to a concrete application of the

2    challenge rule to them, so a plaintiff who received a stop work

3    order, where the stop work order was implementing the pause,

4    would be challenging as the concrete application of that stop

5    work order.

6         THE COURT:  That's the injury.

7         MR. SUR:  That's where I think we recognize that that

8    would be a -- the quote, "pocketbook injury" that we were

9    talking about earlier.

10        THE COURT:  But the claim is to invalidate, to vacate

11   the policy, right, because of the other injuries too?

12        MR. SUR:  Right, but without the concrete application,

13   they wouldn't -- it would just be a generalized grievance-type

14   situation.  Like it has to be applied to them, and how is it

15   applied to them?  It's applied to them through the stop work

16   order.  And so when the stop work order is resulting in --

17        THE COURT:  Kind of is another version of this, like,

18   the only harm you want to acknowledge is the kind of pocketbook

19   injury, and the kind of other types of harms aren't there?

20        MR. SUR:  Well, again, I mean, I think the plaintiffs

21   have sincerely asserted those in their declarations, so I'm not

22   saying that our position is it's not there, but it's more that

23   for the purely analytical purposes of Article III and

24   irreparable harm and then the high standards for PI --

25        THE COURT:  That's what it takes to get you through

1    the door, right?  Standing gets you in the door.  It allows you

2    to have a sufficiently cognizable harm that's redressible by

3    courts to get through the door.

4        And then we ask what are your claims once you're

5    through the door.  And the claim here is that this was

6    arbitrary and capricious or contrary to law, at least some of

7    the claims under the APA.

8        And so that claim is not a deferred -- maybe it's just

9    a matter of like that's a good characterization for your side

10   and consistent with your Tucker Act claim, which is fine, but

11   am I missing something else?

12       MR. SUR:  No, I don't think so, but I do think there

13   has to be a concrete application of the policy that's

14   challenged, and partly that's under the APA itself.  So this is

15   where we get into cases like -- maybe this will shift --

16       THE COURT:  Is this the final component?

17       MR. SUR:  Discrete under *Norton* and before *Norton*,

18   *Lujan against National Wildlife Federation*, but there those

19   cases foreclosed wholesale broad programmatic changes.

20       THE COURT:  This is like coming in and saying just

21   improve the agency-type claims.

22       Can I ask you, this is what plaintiffs described as

23   kind of their second layer here on the Tucker Act piece.

24   Accept for me, you're not waiving any objections or ceding any

25   territory, but accept for me that there is some sort of

1  agreement that there is a factual basis in the record that

2  couldn't go through the Tucker Act, couldn't go through the

3  CDA.  Does that mean sovereign immunity would be waived as to

4  that claim?

5      MR. SUR:  I think that we understand there to be a

6  potential category of claims that would meet the requirements,

7  and our problem is, because it's the plaintiffs' burden to

8  establish subject matter jurisdiction, and because the PI is

9  such an extraordinary remedy area, it's a heavy burden, and an

10 even heavier burden when it involves the foreign affair powers,

11 that putting all of those burdens together, the answer can't be

12 by the plaintiffs that it's possible they have some agreement

13 that might meet --

14     THE COURT:  That's why I baked into my question a

15 factual basis in the record for it and I have asked plaintiffs

16 about that too.  You may have given me this, but just give me a

17 break here and tell me, you said there is particular contracts

18 that wouldn't meet the requirements.  Can you tell me what

19 those are, like describe what you mean by that.

20     MR. SUR:  As in what's the test for --

21     THE COURT:  You said our position is that there are

22 some particular contracts that wouldn't meet the requirements

23 for the Tucker Act and the CDA for which sovereign immunity

24 would be waived.

25     MR. SUR:  There may be.  We just don't know.

1            THE COURT:  Okay.  So it's not that you have defined

2      that universe.  You just accept that there is a universe and

3      you just don't know?

4            MR. SUR:  Yeah.

5            THE COURT:  Understood.  Okay.  So if that's true,

6      let's just posit -- and, again, there has to be a factual

7      basis, burden is on plaintiffs and none of this waives any of

8      your arguments to that effect -- if it can then be brought

9      under the APA, the relief would be invalidation of the rule if

10     they proved the APA violation?

11            I guess I'm just stating the APA out loud, but I just

12     want to see where there is disagreement and not.

13            MR. SUR:  That gets into the scope of the remedy

14     question, right, but --

15            THE COURT:  Does it get into the scope -- I don't want

16     to get into the tailoring of the remedy, which I think is

17     important separate and apart from what you're entitled to.

18     Does it get into the entitlement to vacatur aside from the

19     argument that you all have been pushing in the Supreme Court

20     about plaintiffs versus full vacatur?  Let's bracket that.  You

21     would be entitled to vacatur, and I know you want to argue also

22     that it actually shouldn't be vacatur, but is that fair?

23            MR. SUR:  With that argument bracketed, I think that's

24     right.

25            THE COURT:  I just want to understand where all the

1    different land mines are.  Okay.  So can I -- one other

2    important clarification for me, and I'm again probably just

3    stating the obvious of the APA here.

4         The sovereign immunity arguments you're making are

5    kind of explicitly grounded in the text of the APA, which is a

6    good thing to be focused on the text, so they wouldn't apply --

7    if they foreclosed the APA claims, they wouldn't apply to the

8    separation of powers claims?  I know you have standing, you

9    have other arguments as to the constitutional claims, but the

10   sovereign immunity argument here is about the APA waiver; is

11   that fair?

12        MR. SUR:  Yes, that's right.

13        THE COURT:  Okay.  Can we talk arbitrary and

14   capricious, unless there is anything else.  I think we probably

15   covered the bases of the Tucker Act.

16        MR. SUR:  I think we covered it.  I think the only

17   thing I will say, just to wrap up the discussion on that second

18   prong, is, from our perspective, the monetary relief is not

19   just something that's hinted at here.  And so the plaintiffs'

20   efforts to label themselves as seeking only non-monetary relief

21   and then seeking the delayed contract payments as kind of an

22   aside, really would strain beyond all recognition the

23   requirement that you pierce the label that the plaintiff has

24   attached to their particular relief to figure out whether or

25   not they could have proceeded in the Court of Federal Claims.

1          THE COURT:  Got it.  Okay.

2          So let's talk about particularly the arbitrary and

3    capricious argument.  Obviously, you have seen my analysis in

4    the TRO, if you want to respond to that.  I have your briefing

5    as well, so you shouldn't feel the need to repeat it.

6          I think one of the pieces I'm most interested in, and

7    it was kind of repeated here today, is obviously the TRO's

8    analysis was as to that kind of time one, those implementations

9    of the EO.  I know a big part of your argument is that's the

10   past, this is now.

11         And plaintiffs have made arguments that the

12   terminations here don't actually comply with the regulations

13   even that you cite because there is no evidence of

14   noncompliance or there was no opportunity to object.

15         Can you respond to that type of argument?  There is

16   also the kind of it happened really fast and it was very

17   cursory.  Can I give you the chance to address that?

18         MR. SUR:  I appreciate that.  Thank you.  I did look

19   at the regulations that the, I think it's the AVAC plaintiffs

20   who cited it in their reply brief on that point.  In my view,

21   none of those regulations by their terms suggested that the

22   terminations that occurred here were contrary to regulation.

23         So let me give you two examples that come to mind.

24   One of them -- one of their arguments was that the decision has

25   to be rendered by the line level officer and couldn't have come

1  from someone else.  Again, it may be true that in the vast

2  majority of actual practical cases it's the line level officer

3  who renders that decision, but the existence of the regulation

4  does not foreclose the head of the agency or appropriate person

5  who is wielding the authority delegated by the head of the

6  agency to do the same task that at some point in the past was

7  assigned to that officer.

8       There is a DDC case, I believe it's from 2000, it's

9  *Heggestad against Department of Justice*, that made that point

10  clear.  It was relying on a 1979 Fifth Circuit case called

11  *Andress*.  I don't have that cite memorized.  This is an

12  established principle, which is that --

13       THE COURT:  It sounded like you were going to give me

14  another example.

15       MR. SUR:  Another example that they give is this

16  opportunity to cure.  That one also I found puzzling for this

17  reason.  There may be situations where the reason that the

18  termination has been announced is something that the person who

19  is the contracting party could never correct.  It may be

20  something so obvious as shifting from one sector of the economy

21  to another.

22       So an example that comes to mind is if the agency had

23  decided that it was going to prioritize shipping by sea lane

24  rather than by air transportation, then it would make no sense

25  to say the air transportation company that previously had the

1    contract had to be given some cure opportunity.

2        So, again, I offer that hypothetical just to

3    illustrate that I don't think the regulations that they pointed

4    to, even by their terms, are ones --

5        THE COURT:  You would say there is not even a

6    requirement to tell them that, hey, this is why we're canceling

7    it and it's not something that can be cured?

8        MR. SUR:  That may go to the sufficiency of the

9    notice, but I'm not certain that you would say that a notice

10   that was imprecise hadn't effectuated the underlying decision

11   to terminate.

12       THE COURT:  To be clear, what I'm really trying not to

13   get into, and I think can't get into is like a

14   contract-by-contract analysis and trying to figure out this

15   sort of stuff.  I just don't think that's what the case is

16   about.  I don't think that's what my role would be.

17       I think the point that plaintiffs are trying to make

18   is that it's evidence that this isn't kind of a true

19   independent analysis.  It's still just we're going to do a

20   blanket termination, that that's the directive, go terminate.

21       MR. SUR:  So again, I think the discussion we had

22   earlier, I pointed to the parts of the declaration that

23   explain --

24       THE COURT:  The Marocco declaration?

25       MR. SUR:  The Marocco declaration.  And I don't think

1    that pointing to these regulations and offering the farfetched

2    interpretation that the plaintiffs have somehow suggests that

3    there was anything improper about that process.

4        THE COURT:  I will say, just speaking out loud, one

5    concern I have is both parties are pointing to the Marocco

6    declaration.  I think when I asked this question to plaintiffs,

7    they said the best evidence is to go look at, I think they said

8    paragraph 5 and 6 of the Marocco declaration to show you this

9    is just continuation of the same, basically saying it's to

10   terminate.  And you're pointing me to the Marocco declaration

11   to say we got a new brand-new policy, brand-new approach to

12   this.

13       So may just be what it is, but just pointing that out

14   to the parties, that seems to be a dispute as to what

15   Mr. Marocco actually means or is saying here.

16       MR. SUR:  May I address another aspect of the

17   arbitrary and capricious point that the Court had previously

18   raised?  So the Court was concerned about reliance interests,

19   and I just -- I do want to take a second to note that while we

20   understand the concern, respectfully, we disagree with the

21   TRO's analysis of the reliance interest, and also note that

22   even if it were true for the blanket pause, it shouldn't govern

23   the analysis about the terminations.

24       And that's basically -- and again, maybe a common

25   refrain today for me is about the contract and agreement,

1    specific nature of any analysis that we have to do in this

2    case, that the plaintiffs largely have bypassed, but to have a

3    reliance interest in an agreement, you would naturally look to

4    the terms of that agreement to figure out what you could rely

5    on it for.

6        So for example, in the *Department of Homeland Security*

7    *versus Regents of the University of California* case, the

8    specific group of individuals who had reliance interest there,

9    they were beneficiaries of a program to provide particular

10   immigration benefits.  And so you would naturally look to the

11   program to see what benefits it offered to assess the reliance

12   interest.

13       I think here the plaintiffs certainly can't claim

14   reasonable reliance on contracts or agreements without pointing

15   at a minimum to what it was in the agreement that they say they

16   are relying on.  And this may also kind of relate to other

17   analytical arguments in the case, but the plaintiffs also don't

18   have a reliance interest on the appropriations statute, because

19   the appropriations statute doesn't specify that these

20   particular plaintiffs are to receive the appropriated funds,

21   right.

22       Looking at the language, it goes to purposes.  And so

23   there also, they can't have a reliance interest.  And if you go

24   one level beyond that, if you go to the statutes that describe

25   the foreign aid of 1961 and those provisions, the colloquy

1    earlier that you had with the plaintiffs I think touched on

2    this point that there Congress explicitly wrote into those

3    statutes broad authority in the president about how foreign aid

4    terminations --

5            THE COURT:  I don't want to cut you off.  I think that

6    point is well taken, and I have kind of raised it with

7    plaintiffs.  I think the response I heard was one we have been

8    discussing, which is, sure, if there is a purely independence

9    that goes through the proper procedures, I know you all dispute

10   what those procedures are and what is required, but that would

11   make sense, that argument about reliance would make sense.

12           And maybe I can get you to respond to one thing then,

13   because this is one of the examples of I think why the

14   plaintiffs say they had a reliance interest and kind of this is

15   all part of the blanket nature, is there is an argument that

16   this review is just happening way too fast to be plausible and

17   to frankly respect that reliance interest.

18           MR. SUR:  Well, the difficulty there, Your Honor, is

19   that the reason the review happened quickly after --

20           THE COURT:  Are you going to blame me?  I'm just

21   joking.  You can blame me.

22           MR. SUR:  Standing in front of the Court, I wouldn't

23   blame the Court, but I would blame the plaintiffs.  Their

24   premise was that they are harmed by the pause, so with the

25   injunction preventing the pause from being implemented, the

1  agency shifted their resources and did the work more quickly.

2          So now then to say that the reallocation of resources

3  and doing the analytical work quickly was too quick by the

4  standards of the plaintiffs, I think at a minimum has a problem

5  that is of their own litigation choices.

6          But even beyond that, I think we have to -- and again,

7  this may go to the other areas of the case, but the plaintiffs

8  have largely attempted to bypass the fact that we're in the

9  foreign affairs powers of the president and executive branch,

10  and we're operating in a situation where, as I was discussing

11  with you before, and as you discussed with the plaintiffs, the

12  foreign affairs -- the Foreign Assistance Act of 1961 and its

13  provisions provide congressional confirmation rather than

14  deprivation of agreement with the broad discretion that the

15  president would ordinarily have in this area.

16          THE COURT:  This starts to veer into separation of

17  powers, if that's okay.  I was going to start with the Foreign

18  Assistance Act.  I asked plaintiffs to specify exactly which

19  expressions of this constitutional -- Congress's constitutional

20  powers they were saying were violated.  It sounds like they

21  weren't relying so much on the FAA.

22          I do think it's worth raising maybe for the reasons

23  you're raising.  So there is discretionary language in there,

24  no question, about how the president administers aid, but we

25  have Congress, which is an elected branch and does have a role

1    in foreign policy that's been reaffirmed over and over by the

2    Court.   What meaning does the Foreign Assistance Act have?

3    What's the administration -- what's the defendants' position on

4    that?

5           And let me just kind of unpack this a little bit.

6    Like it sets forth goals and it sets forth categories, and

7    specifically says, the quote I have is, "The pursuit of these

8    goals requires that development concerns be fully reflected in

9    United States foreign policy and the United States development

10   resources be effectively and efficiently utilized," end quote,

11   and the goals are things like alleviation of poverty, promoting

12   growth, combatting corruption, others that it lists.

13          What significance does that have here that Congress

14   has enacted that?

15          MR. SUR:  I think it's a reminder, because of the

16   broad nature of that phrasing -- well, it's two reminders.  One

17   is that Congress is agreeing with the broad authority the

18   president has over foreign affairs, lead role, as the Supreme

19   Court says.  And Congress isn't writing a hyper-fine statute

20   that defines in that authorizing statute exactly all the metes

21   and bounds, but instead is spelling out these broad goals.

22          So it's just a whole different type of setting of --

23          THE COURT:  Does the president get to disagree with

24   those goals, any president?  I mean, this was -- let me just

25   say it was passed by Congress, an elected branch, signed by a

 1    president, an elected actor.  Does any next president get to

 2    just say, "No, those aren't the goals"?

 3         MR. SUR:  I think that the statute seemed to be

 4    broadly enough written that there are tradeoffs that the

 5    president is left to make and that the Congress in writing

 6    those broad goals recognized that you would have to make

 7    tradeoffs between and among them as the circumstances change,

 8    you know, from one year to another.

 9         So there is that part of it that I think the statute

10    allows for certainly choices to be made among the goals,

11    because they are so broadly written, and then I think the other

12    part of it is that the important lesson is, again, these are in

13    the separation of powers context.  It doesn't provide a

14    judicially manageable standard by where some private litigant

15    could come to the court and ask for adjudication of one goal

16    being subordinated somehow improperly to another, and that's

17    essentially what is happening here.  There are layers that the

18    plaintiffs point to that separate them from that scenario, but

19    fundamentally, it's presidential -- foreign policy choices

20    about how the foreign assistance funds are used.

21         THE COURT:  That may actually be consistent with what

22    the plaintiffs are saying, which was that the -- so we should

23    turn to that in a moment.  But the FAA does say that, this is

24    another quote I have from it, "The president is authorized to

25    furnish assistance," end quote, and it talks about on terms and

1    conditions.

2         So then, of course, we'll get to the Appropriations

3    Act.  Congress appropriates money for that.  Does it not have

4    any meaning that Congress is saying in this act that what the

5    president has authority over is terms and conditions of

6    pursuing those goals?

7         MR. SUR:  So I think the statute is written at such a

8    broad level of generality that there wouldn't be some standard

9    that you could extract from it that would allow you to --

10        THE COURT:  Yeah, I don't even understand there to

11   be -- I'm just trying to understand how the defendants'

12   position and the administration's position on how it interacts

13   with the FAA.

14        MR. SUR:  I think in the hypothetical that Your Honor

15   is presenting there would be possibly valid letters to be sent

16   between the executive branch and the legislative branch, but

17   beyond that, I don't see how that could be --

18        THE COURT:  Maybe that's enough, given that it's not

19   being asserted anyway as the claim here.  Fair enough.

20        So let's talk about a few other acts.  Again, you have

21   the next layer, which is Congress, a democratically elected

22   branch, then appropriating specific amounts to be spent.  And,

23   you know, as I read the appropriations, it is tying it back to

24   these goals, and sometimes in the Foreign Assistance Act,

25   sometimes in other acts or subsequent amendments, but it is

1    tying them to those goals and it's saying, "Here is X millions

2    or X billions of dollars to be spent towards this aim."

3        Can you state your position on the significance of the

4    appropriations as it relates to your conception of executive

5    power?

6        MR. SUR:  Executive power in the context of this case,

7    maybe if I could bring it down a little bit.

8        THE COURT:  That's fine.

9        MR. SUR:  If I may, the plaintiffs point as their lead

10   example of an appropriations case that is good for them, to

11   *Train against City of New York*.  And in *Train*, the EPA

12   administrator was directed by a statute to, quote, "allot

13   certain funds to the states," and then from the state allotment

14   would follow money to the municipalities for their water

15   pollution control efforts.

16       So the City of New York as a municipality was

17   specified in a relationship between appropriation and statute

18   as the beneficiary of the appropriated funds.  This case

19   only -- the *Train* case only underscores the weakness of the

20   plaintiffs' case here about the appropriations laws, because

21   the appropriations laws, while, as Your Honor points out, they

22   effectuate the identified goals in the Foreign Assistance Act,

23   they don't say that these plaintiffs are the persons who will

24   be carrying out those purposes.

25       THE COURT:  To be fair, is that kind of standing, are

1    they the right person to bring this challenge argument?

2           MR. SUR:  It's all of those, all of those and more.

3    They have come to the court with a claim of a separation of

4    powers violation, but there isn't one because they are not

5    the --

6           THE COURT:  I guess I want to know, like, I mean

7    another case that I found, and is both binding and instructive

8    is the *Aiken County* case where Justice Kavanaugh talks about

9    the spending authority, and he talks about it in pretty plain

10   terms, about the president not being free to, on policy bases,

11   not spend money that's appropriated.  Are you familiar with the

12   case?

13          MR. SUR:  I have seen the case cited, but I haven't

14   studied it.  The only thing I will offer, if I remember

15   correctly, the context was the Yucca Mountain nuclear waste

16   process.  I would just say that I think in the domestic realm

17   the relationship is very different.

18          THE COURT:  We should come to that in a moment because

19   I want to understand exactly how -- because there is the

20   foreign affairs component of this and there is a spending

21   clause and the underlying constitutional provisions for it.

22          But just on the understanding of appropriations, and

23   that's why I bring up *Aiken County*, I think *Train*, as I

24   understand it, was the same year, was decided on facts that

25   preceded the Impoundment Control Act, but is it the executive's

1    position here that the appropriations are optional to spend?

2         MR. SUR:  Again, because we're in the context of a

3    lawsuit, I think the position is -- or implicit in what we're

4    saying, that this would not be for the Court to decide that

5    these particular plaintiffs have a right to a determination

6    that the spending had to be otherwise.

7         THE COURT:  Well, I guess I'm just -- in this lawsuit

8    there is in the record, there is in the initial executive order

9    about a pause, and there is in the public sphere, some of which

10   has been pointed to by plaintiffs in the record, cuts and this

11   is going to save taxpayers money, suggesting it's not going to

12   be spent, the appropriations.  I guess my position is how do

13   you reconcile that with the appropriations statutes?

14        MR. SUR:  Again, I can only stand on my answer that

15   that would be possibly a matter for interbranch conversation,

16   i.e., the legislature and executive, but not for the plaintiffs

17   who are before the Court today to obtain some remedy for.

18        THE COURT:  Is there anything in the record that you

19   can point me to that would suggest that there is an intention

20   to spend the amount that's been sidelined by terminating the

21   large majority of agreements that were how the appropriations

22   were spent in past years and at the time the appropriations law

23   was passed?

24        Again, I do take -- I'm making a long question, but I

25   do take your point that the appropriations laws don't say they

1  go to any particular person.  I'm just asking about anything in

2  the record that indicates anything objective you can point me

3  to an intent to spend it.

4          MR. SUR:  Because I concentrated on other aspects of

5  the case, I am not familiar with somewhere in the record that

6  there is, but if the Court would indulge us, we could look and

7  send you a letter after the hearing.

8          THE COURT:  Yeah.  I mean, I think having an

9  understanding of whether the administration's position is it

10  can cut this, which is what has been said publicly, according

11  to what's cited by plaintiffs, and so I'm not asking you to --

12  well, in asking these questions, I'm not -- I'm just trying to

13  understand what the state of the world is, is the plan to spend

14  it, is the plan that they are cuts, and then, obviously, that

15  bears on my question, is the interpretation that the

16  appropriations laws are just optional?  But it sounds like you

17  don't have an answer for me on that.

18          MR. SUR:  Again, if that's in the record, I'm not

19  certain where it is, but I would appreciate a chance to consult

20  and look for it.

21          THE COURT:  Okay.  Yeah, I would appreciate that.

22          I'll say that in the appropriations laws there is a

23  lot of language that is not phrased as optional, but even to

24  the extent that were the position, it would be kind -- it would

25  seem to me pretty earthshaking, country-shaking proposition

1   that appropriations are optional.

2        And I would direct you to the *Aiken County* case.  It

3   is in a domestic context, but it is in a context where the

4   decision not to spend appropriated funds was in a policy

5   objection, basically kind of a program that was going to be

6   discontinued in a way, a step even removed further from this,

7   and it was a case that arose in a mandamus context, and the

8   court granted -- then Judge, now Justice Kavanaugh's opinion,

9   granted mandamus based specifically on Congress's spending

10  authority and the separation of powers.

11       So let me add one final layer and we're still kind of

12  talking about this mostly in the domestic context, and I know

13  you want to make foreign powers submissions too.  I think it

14  will be helpful.

15       One final layer is the Impoundment Control Act.  This

16  is kind of just understanding exactly what's here in the record

17  and any positions related to it.  Is there any argument that

18  the government has complied with the Impoundment Control Act

19  here?  It's not a gotcha tricky question.  The act requires a

20  special message to go to Congress.  I assume it's safe to say

21  there has been no special message sent.

22       MR. SUR:  So the two arguments we have made are that,

23  consistent with precedent from this district, that there is no

24  private right of action, and then the second argument we have

25  made is a remedial one, which is that the appropriate remedy in

1    that instance would be to direct the secretary to prepare the

2    letter to Congress that is -- so in the record there is the

3    notification by Secretary Rubio, but we haven't argued in the

4    brief that that notification has the precise wording that would

5    be appropriate under the Impoundment Control Act.  Those are

6    the arguments that we have made.

7         THE COURT:  That's helpful.  I'm trying to understand

8    what's in play and what's not.

9         Maybe we could turn -- I want to give you the chance

10   to talk about the context that we have here, which is a foreign

11   affairs context, but let me lay some groundwork for you to

12   respond to.

13        You know, so one of the more recent cases from the

14   Supreme Court on this is the *Zivotofsky* case, and in that case,

15   there were similar arguments about plenary executive power in

16   the foreign affairs context.  And the majority, even though in

17   that case it actually did allow the executive action based on a

18   kind of history of that particular decision being committed and

19   precedent, it went out of its way to reject this notion, and I

20   think some of the similar ways that defendants are citing in

21   the *Curtiss-Wright* case for that plenary foreign aid power, and

22   in pretty strong terms said there is a role for Congress,

23   Congress makes the law, and that includes in the foreign

24   affairs context.

25        You had the majority saying that.  You had Justice

1    Scalia's dissent, very strongly saying that as well and

2    contrasting that with having the laws of England and a king and

3    saying that the division between Congress and the president,

4    the two political branches here, was core to the founding of

5    the Constitution in the foreign context, and the chief justice

6    making similar points with Justice Alito.

7            Can you address that for me?  I understand that you're

8    asserting a broad foreign affairs power, but I want to do it in

9    the context of the Supreme Court's case law that I need to

10   apply.

11           MR. SUR:  So again, I may be saying to you what I was

12   trying to get at earlier, but from a different angle.  I think

13   we would be in a different situation if the plaintiffs were

14   pointing to an appropriations statute that specified them as

15   the recipients of the funds in the way the City of New York

16   credibly could in *Train* by pointing to the appropriations

17   statute and the surrounding statutory scheme.  That's not the

18   situation here.

19           And so in some sense they are saying there is a

20   separation of powers problem, but there isn't one, because

21   there isn't a command by the Article I power that these

22   particular plaintiffs receive the federal funds.  And so the

23   larger question is about the relationship between the

24   appropriations laws and the president's Article II authorities

25   are appropriate for another day.

1          I think it's interesting to think about them, but I

2   don't think that these particular plaintiffs are in a position

3   to make those arguments.  Again, it would be a different

4   situation, and there are situations, *Train* is an example, but

5   there are others where the appropriations statute itself --

6          THE COURT:  I have your argument.  I thought you

7   wanted to go to the foreign affairs context, so that's why I

8   was bringing us there is to understand exactly the relation

9   there.  You had kind of suggested that, well, these domestic

10  cases about spending power -- *Aiken County*, I know you haven't

11  had the chance to review it, but it probably would be worth it

12  because I think some of the arguments you are making now would

13  be inconsistent there and with the plaintiff being able to

14  raise the challenge they did there, it's not like the

15  appropriations specifically named the plaintiff in that case

16  either, but it seemed to be the way you were looking at it was,

17  okay, you may have your domestic spending clause-type stuff,

18  but this is a foreign affairs context and the president has a

19  lot of power.

20          But it seems to me that there is at least a plausible

21  argument that it's actually the reverse, because the Supreme

22  Court in *Zivotofsky* was dealing with a foreign affairs context

23  and said there is a role for both, and specifically actually

24  gave examples of spending powers.  I think he gave an example

25  of setting up -- the president may retain the recognition

1    power, but setting up an embassy in another county, can't do it

2    without Congress, because Congress has the spending power.

3          Again, the chief justice's dissent in the case and

4    Justice Scalia, which reinforced that kind of point of the

5    majority went through the degree to which the Constitution has

6    express powers for Congress in the foreign affairs context, and

7    so it seems to me like it's almost the *Zivotofsky* plus

8    potentially, right, where you have the foreign affairs context

9    where Congress maintains powers, and here we're talking about a

10   core congressional power of spending.

11         So I just -- I'm trying to understand whether the

12   right way to look at it is, okay, you have got your domestic

13   spending stuff, but this is foreign affairs, totally different,

14   or whether, in light of what the Supreme Court said Congress

15   and the president both have core rules in the foreign affairs

16   context, and here we're dealing with a core congressional

17   power, unlike the recognition power that was at issue in

18   *Zivotofsky* where there was a history of that being placed in

19   the president.

20         MR. SUR:  We do cite in the brief a memorandum by

21   then, I believe, OLC head William Rehnquist where he addresses

22   impoundment as a concept and says it would be a very different

23   situation if we were talking about foreign affairs.

24         So I do think -- we cite it in the brief for this

25   reason that it does require a different analysis.  I have made

1   my point about the plaintiffs not being really in a position to

2   raise this question, but the other thing that comes to mind, so

3   I will mention it, is that there are -- you could imagine

4   situations where there are clashes between the appropriations

5   powers and some Article II power.

6        We're nowhere near that, but you could imagine them.

7   And one place that that's imagined, if I remember it correctly,

8   is in *OPM against Richmond*.  There is a concurrence by Justice

9   White where he says that Congress couldn't regulate the pardon

10  power by depriving the president of a pen.  So all that to say

11  there are situations that one could imagine --

12       THE COURT:  I think that kind of begs the question

13  here, right.  Maybe this is the next question I was going to

14  ask anyway.  I was reading your briefing about the kind of

15  expansive executive power here, but it kind of obviously jumped

16  out at me that you never once cited Article II of the

17  Constitution.  So where is this power coming from?  Like in

18  *Zivotofsky*, for example, there was the long history of

19  recognition power, both in case law and just throughout

20  history.

21       Here I get you want to say foreign affairs power,

22  president, lead executive, that's important.  But on this

23  particular question, this particular -- the context of this

24  case when it comes to foreign aid, which is what we're talking

25  about, where is that in the Constitution or any of those other

1  sources?

2      MR. SUR:  I take it to be related to the foreign

3  relations, and so you would be looking to receiving the

4  ambassadors and the consuls from the foreign nations.  You

5  would be looking to the more general terms of the take care

6  clause, so it's from those clauses.  There isn't a specific

7  clause that's narrowly trained on foreign aid that I'm thinking

8  of.

9      And when it comes to international commerce, sure,

10  there is Article I powers and Article II role and powers, but I

11  think it is drawn from all of those.  Obviously, the

12  relationship that you have with a foreign country may bear on

13  what appropriate aid is directly or indirectly directed to the

14  population of that country.  So it does in that respect

15  implicate the decisions about diplomatic relations.

16      THE COURT:  So the Article II authority you're relying

17  on is the take care clause, and say again, and ministers?

18      MR. SUR:  The consuls and the ambassadors.  There are

19  other clauses I think of Article II that are historically

20  relied on on which the Supreme Court has built that doctrine

21  about deference to the executive in the foreign policy area,

22  but those are the ones that are coming to mind.

23      THE COURT:  The other piece that was missing for me is

24  Article I, which is important here.  Well, could you give me an

25  analysis of that, because it's not just a situation where there

1    is the executive and a court?  The whole point of this

2    argument, right, is that there are actually two political

3    branches that share the foreign affairs power.

4          So I think that requires an analysis of Article II,

5    which I have just asked you for, and what about Article I.

6          MR. SUR:  So I mean, the spending clause is obviously

7    there, but, I guess, I just have to go back to my earlier

8    answer.

9          THE COURT:  I have the Constitution with me.  Right.

10   Article I, Section 8, gives Congress the power to, quote,

11   "regulate commerce with foreign nations," end quote.

12         Includes the power to define and punish piracies and

13   felonies committed on the high seas, offenses against the law

14   of nations.  It includes the power to declare war.  It includes

15   the power to raise and support armies.  It includes the power

16   to make rules for the government and regulation of the land of

17   naval forces or other foreign-related powers there.

18         These are -- again, that's why I asked.  Without an

19   analysis of the actual constitutional powers here, how can it

20   be that you say this is plainly the president's power?

21         MR. SUR:  Again, I may be repeating myself, but I will

22   go back to the point that the plaintiffs in this particular

23   action are not well situated to be raising this notion of a

24   clash between any of those Article I powers and the Article II

25   authorities because it's not as though Congress directed funds

1    for them.  Congress appropriated in the appropriations --

2            THE COURT:  I'm responding to your argument, which was

3    that the president has, I think it was this vast and

4    unreviewable foreign affairs power.

5            MR. SUR:  I think we're trying to set the plaintiffs'

6    arguments in the foreign affairs setting to clarify the

7    analysis, right, so that we're not talking about a domestic

8    policy.

9            THE COURT:  That's why I'm trying to take us to the

10   provisions of the Constitution dealing with the foreign affairs

11   context, which involves both Congress and the president.  The

12   question I'm asking you is where are you getting this from, the

13   constitutional document?

14           MR. SUR:  I think the point that we're -- I think the

15   point that we're making to be that judicial deference to the

16   executive in the foreign policy area is a longstanding

17   tradition based on the Constitution practical realties, the

18   nature of the judicial process being very different from the

19   being problem solving by the executive, and that that requires

20   just a different mindset, if you will, from the kinds of cases

21   that the plaintiffs seem to be drawing on.

22           Even holding aside for one moment the point that I

23   have maybe repeated too often today, which is they are unnamed

24   in the appropriations statute, but holding that to one side,

25   the Supreme Court cases that we're pointing to are cautioning

1    courts, I think, against second guessing the executive in the
2    foreign policy area, because the judicial task is so different
3    from the exercise of responsibilities that the Article II
4    authorities have to grapple with when they are dealing with
5    foreign policy problems.  That to me is the role of our
6    discussion of Article II in this setting.
7              THE COURT:  Could you repeat that one more time?
8              MR. SUR:  I'm just offering my view of how our
9    reliance on Article II fits into this.
10             THE COURT:  Okay.  I don't want -- I think I have your
11   point on this.
12             MR. SUR:  May I make one more point?
13             THE COURT:  Sure.
14             MR. SUR:  So we include in the brief in our discussion
15   of the separation of powers section, we include in the brief a
16   citation to *Heckler against Chaney*.  Again, sort of to my mind
17   as I was preparing for argument, the point of that is to say
18   that a lot of decisions about spending in the foreign affairs
19   area would be nonreviewable under the APA because there would
20   essentially be no standard that you could use to measure in the
21   same way that in *Heckler against Chaney* you had the executive's
22   law enforcement discretion, so there is no law to apply for APA
23   purposes.
24             THE COURT:  Okay.  And I was mostly thinking about
25   this in the context of just kind of separation of powers

1    constitutional claim, but I appreciate that.  And I do think

2    going back to *Zivotofsky*, the first time it went up to the

3    Court, the Court made clear when it was argued that there is no

4    role for the Court, that the role for the Court is in

5    interpreting the Constitution, and there are two branches here

6    and there are powers allocated, and rejected the notion the

7    courts couldn't -- I mean, kind of laid out that courts are

8    required to and remanded for the court, which the lower court

9    had found a political question there, and the Supreme Court

10   said, no, you got to decide this issue because it involves two

11   elected branches and there is another branch at issue here.

12          I do want to talk about scope of relief.  I realize

13   we're at 5 o'clock.  I think it would be important to take a

14   brief recess and then come back and talk about scope of relief,

15   in part so I can consult with the courtroom deputy and court

16   reporter to make sure that we'll have coverage going forward.

17   So let's recess for 7 to 10 minutes, and I'll be back.

18       (Recessed from 4:59 p.m. to 5:11 p.m.)

19          THE COURT:  All right.  Thanks, everyone.  I

20   appreciate -- I know this has been a long hearing, but it has

21   been an extremely helpful one and I have appreciated the

22   argument and submissions of the parties.

23          I think that the final thing to talk about, and it's

24   one or two final things, because I think they are related, is I

25   just want to talk about and understand all parties' positions

1    on scope of relief as it relates to certain claims.

2          It's something I have mentioned in my TRO and have

3    stuck to and still find very important.  We're at a preliminary

4    phase, but it's critical that I think relief be tailored to the

5    claim that any claim that is likely to succeed and not

6    otherwise.

7          So is there one plaintiffs' counsel who is going to

8    speak for the plaintiffs?

9          I think, Mr. Sur, just to give you a preview, I'm

10   going to ask you to do the same exact thing here.  Some of it

11   may be questions that people don't want to answer, but I do

12   want to work through the permutations to understand how this

13   could work out.

14         MS. BATEMAN:  I don't mean to interrupt you.

15   Mr. Wirth will take the bulk of that.  I just had a quick point

16   to add into the record very briefly, which is that as we have

17   been sitting here, new evidence on pretext has been sent to us.

18   Jani Rogers sent an email to contracting officers and agreement

19   officers directing them to review lists of already terminated

20   foreign assistance awards and tailor new termination notices

21   with references to provisions and clauses in the awards.

22         Plaintiffs view this as evidence that there was no

23   actual review of any specific award of provisions when

24   defendants issued their initial terminations.

25         And I'd be happy to submit that into the record as

1  soon as we get back to the office.

2      THE COURT:  That will be fine.  I obviously can't

3  evaluate it right now without knowing more.

4      I do want to talk about scope of relief, and I want to

5  work through the permutations, and then we'll come to the

6  submissions from this morning and the parties' positions

7  because I want to understand how to heed the instruction from

8  the Supreme Court about giving the necessary clarity for

9  compliance.

10     But I do see these as very much connected, because I

11 want -- obviously, the point of a TRO is to provide relief

12 pending the PI, but also any PI would have relief attached to

13 it, and I want that to be mindful of the actual feasibility of

14 compliance.

15     So let me just start, we'll work through the

16 permutations.  I'll do the easy one.  If the APA and the

17 constitutional claims fail, there is no injunction at the end

18 of the day.  There is no relief.  It's easy.

19     I want you to tell me how you see the relief in the

20 event that only the APA -- one of the APA claims you bring,

21 either arbitrary and capricious or contrary to law succeeds,

22 but the separation of powers claim fails.

23     MR. WIRTH:  So I think even if the relief is limited

24 to our APA claims, plaintiffs are still entitled to the broad

25 relief that we have outlined in our submission that was

1    submitted, along with our reply brief, which is -- I'll explain

2    why that's necessary.

3         I think, first of all, the Court is aware that vacatur

4    is the proper remedy under the APA, and, as a matter of equity,

5    I think that it's important that the Court broadly enjoin

6    defendants' unlawful conduct and that that broad relief is in

7    fact tailored to defendants' broadly unlawful conduct.

8         THE COURT:  Maybe I can simplify it for you this way.

9    The TRO was premised on the APA.  Are there differences from

10   the TRO relief?

11        MR. WIRTH:  No.  So there might be more specificity

12   with respect to the relief that we're asking for with our

13   proposed preliminary injunction order, but I think what I'm

14   getting at is that the Court's order should not be limited to

15   the specific plaintiffs at issue here.  It needs to be broader.

16   I think there is a couple of reasons why.  There is both

17   equitable reasons and then there is also reasons why our

18   plaintiffs will not get full relief unless the relief is broad.

19        With respect to equity, I think there is the

20   equitable -- there is the fact that these were a broad funding

21   freeze and mass termination program.  As the Court is aware,

22   that affected the entire sector.  Many organizations in the

23   sector were unable to bring lawsuits because things moved too

24   fast, they lost funding too quickly, they lost access to

25   counsel, they were unable to bring a lawsuit, and they were

1    legitimately afraid of retaliation.

2         Some are operating with really skeleton staffs or lost

3    all their staff entirely, and they were not in a position to be

4    able to bring a lawsuit when we did, so extending relief to

5    them is both equitable and it also just.

6         I would also say that confidently there are many,

7    many, many, many parties who are waiting in the wings if the

8    relief here is drawn narrowly.  We have heard from folks who

9    are interested in intervening.  We have heard from many folks

10   who are interested in being joined as parties, in joining as

11   plaintiffs if we were to amend our complaint.

12        THE COURT:  You're speaking specifically if APA relief

13   were limited to the plaintiffs in the case?

14        MR. WIRTH:  Yes.

15        THE COURT:  Understood.  I think I have your point on

16   that.  You don't want it limited to the plaintiffs.

17        MR. WIRTH:  Absolutely.  To be clear, I just want to

18   also explain why our plaintiffs can only get relief if the

19   relief is broad.  I think there is a couple important points on

20   this in that regard.

21        First of all, the government's failure to pay its

22   debts to all of these plaintiffs, but also across the whole

23   sector, has completely disrupted the financing for these

24   organizations across the entire sector.  It used to be the case

25   that an invoice from the federal government was as good as cash

1    and that could be collateralized for financing.  It is not the

2    case anymore, and now our plaintiffs and everyone else in the

3    industry has been left having go to seek alternative credit

4    arrangements that have been highly, highly disfavorable because

5    the banking sector does not believe that the government will in

6    fact pay its debts.

7         If only our plaintiffs are given relief that won't

8    solve the problem of the industry facing true irreparable harm,

9    which also hurts our plaintiffs.  And beyond that, our

10    plaintiffs are also subcontractors and sub-grantees, so they

11    need relief to their grantees.

12         THE COURT:  Can I pin you down on specifically what

13    I'm interested in.  Presumably you would say vacate the

14    implementations, and, what, anything else flow from the APA?

15    Terminations?  Which terminations?

16         MR. WIRTH:  It would be all of the terminations.  I

17    would point the Court to --

18         THE COURT:  Through when?

19         MR. WIRTH:  Through if there were any during the

20    course of this hearing, through the course of this hearing as

21    well.  I think absolutely it would cover all of the --

22         THE COURT:  You mean essentially through the PI?

23    We're talking about the scope of the relief, not the end of

24    this hearing, but at the PI.

25         MR. WIRTH:  I guess what we would ask for is, one,

1    rescission of all terminations that have already happened up

2    until this point, and then going forward, the government would

3    be enjoined from terminating contracts pursuant to the

4    executive order, implementing the executive order, et cetera.

5         THE COURT:  Essentially everything flowing from the

6    executive order, which is invalidated?

7         MR. WIRTH:  Yes.

8         THE COURT:  If the APA claims fail, or likely to fail,

9    and you're likely to succeed on separation of powers, what does

10   relief look like that in that instance?

11        MR. WIRTH:  I think it is equally as broad.

12        THE COURT:  How?  Tell me more.

13        MR. WIRTH:  If we are likely to succeed on our

14   separation of powers claims, then the government's actions with

15   respect to all of the same things that have happened, the

16   funding freeze and the unlawful terminations, all of those

17   would fall within the relief necessary, so I think it would be

18   essentially co-extensive.

19        THE COURT:  How about the argument that the

20   appropriations, right, the separation of powers argument, as I

21   understand it is that Congress has appropriated money, gets to

22   decide whether and how much, and that the president hasn't

23   spent it.  What is it that allows relief to require any money

24   to be sent to your clients under the separation of powers

25   argument or to currently contracting?

1              MR. WIRTH:  So I think it would -- I think in order to

2       afford us relief in a preliminary posture, which also includes

3       the irreparable harms that we're facing, et cetera, et cetera,

4       it would have to be broad enough to cover our particular harms

5       here.  I think that those harms flow from --

6              THE COURT:  I get that.  I get that you want all of

7       your irreparable harm.  I think it's got to be tailored to the

8       claim.  If spending the money on appropriated categories would

9       cure the problem, the constitutional problem, and restore the

10      balance between Congress and the president, why isn't that the

11      relief?

12             MR. WIRTH:  So I think that this does go a little bit

13      back to the *Vilsack* case.  I think we do -- we are eligible for

14      this funding, and the fact that we are eligible for the funding

15      is enough for purposes of, for example, standing.  I think it's

16      also that the relief needs to be tailored to that as well.  We

17      need to be -- the eligibility for funding I think entails -- I

18      guess let me put it this way.  To the extent that the Court

19      finds that the funding pause, which we believe is ongoing, and

20      the terminations, the mass terminations were unlawful, then the

21      preliminary injunction should, first of all, enjoin the

22      government from giving any legal effect to those, and so that

23      would give us specific relief.

24             Going forward, to the extent that the government

25      engages in continued violations of the separation of powers, I

1    think still the Court would be -- would have to tailor its

2    relief to the spending, and the Court -- and the government

3    would have to spend those funds.

4         THE COURT:  But that component of the relief would be

5    to spend the funds?

6         MR. WIRTH:  Yes.  That would be going forward, but I

7    guess I would say that there is both retrospective and

8    prospective relief involved there.

9         THE COURT:  I think maybe you jumped ahead to my last

10   one, which is I assume you give that same answer if I said

11   both, if likely to succeed to get to the final permutation on

12   APA and separation of powers, there would be the kind of T1,

13   looking back at the implementing order and the fallout, and

14   then I guess the separation of powers part would be the kind of

15   failure to spend component.

16        MR. WIRTH:  Right, I think that's right.  To the

17   extent that the government continues to give effect to

18   terminations or to issue more terminations, and, for example,

19   we understand now that OMB is engaging in a process that is

20   flowing from the executive order that is in addition to all of

21   the terminations, the 10,000 terminations that Aid and State

22   have already done, to the extent that the agencies then now

23   engage in more review, pursuant to those unlawful policies,

24   then we would say that that would be enjoined.

25             To the extent that the government just decides not to

1    spend the money, then that would be enjoined.  And I think that

2    would still go to plaintiffs' benefit because they are eligible

3    for that spending for those appropriations and they have a

4    reasonably good shot of getting them.

5            THE COURT:  Understood.

6            Can I hear from Mr. Sur on the same questions?

7    Mr. Sur, as you come up, I'll insert the question that you're

8    probably most eager to answer again for you, which is if

9    plaintiffs are not likely to succeed on either APA or

10   separation of powers claims, relief is clear, there is none.

11           But it's helpful to get your position to understand

12   how you're looking at the claims.  And so give me -- if the

13   Court were to find plaintiffs likely to succeed under the APA

14   on either of the theories under the APA, what do you see as the

15   appropriate scale of relief?

16           I'm going to take one off the table for you that I

17   know you want to say, and you're not in any way waiving your

18   objection to this, but, you know, again, I know there is the

19   position the administration has taken before the Supreme Court

20   several times now that there is no vacatur and it's just as to

21   specific plaintiffs, which has not been adopted by the Court.

22   I know there has been some support for it, but not a majority.

23           So take that off the table and assume that it is

24   vacatur.  What does the actual relief read in that instance?

25           MR. SUR:  So we have a number of layers here in

1  addition to APA, because we're in the PI phase and on top of

2  that, the *Adams against Vance* precedent, which is that in the

3  DC Circuit when you are going to issue an injunction against

4  Secretary of State involving the use of powers, that involves

5  an extra kind of strong layer of proof that the plaintiff has

6  to meet.  So I would ask to kind of factor those in.

7        On the APA question, if we went back in time and said

8  -- if we took the reasoning in the TRO analysis of insufficient

9  attention to reliance interest, then one might have thought

10  that one could have done a garden variety vacate and remand for

11  a better explanation from the secretary.

12        Where we are in time now is that wouldn't really work,

13  because we can still do that, but it wouldn't I think address

14  the point that the Court is trying to make, because, as we say,

15  the response to the TRO was to expedite and to reach the

16  decisions that the plaintiffs were complaining were not being

17  reached with sufficient celerity to enable to them to be

18  prevented from harm.

19        THE COURT:  Baked into that is that the government

20  already plans to pay the period between the implementation and

21  the TRO at least.

22        MR. SUR:  Right, so that is already in the record.

23  There the dispute is about the feasibility of the timeline.

24  But as to the back liability, I don't think that at this

25  point --

 1          THE COURT:  So in other words, kind of the

 2    government's position is saying the original memorandum was

 3    invalidated or not invalidated as of no moment because we're at

 4    a new time, where there has been the independent review and

 5    terminations, and the government is already on record saying

 6    it's going to pay that period?  Is that right?

 7          MR. SUR:  That's essentially what I was trying to

 8    convey.  As I understand the scenario, I do want to just make

 9    sure that we sever, at least from our perspective, the

10    terminations from the insufficiently explained, if that's what

11    the conclusion is, secretarial memorandum, because, again, from

12    our perspective, the plaintiffs tell their version of events.

13          THE COURT:  The post February 13th terminations?

14          MR. SUR:  You know, we view it as the prior to

15    individualized review consistent with the terms and conditions

16    of the contracts.

17          THE COURT:  The only clarification -- I have your

18    point on that, but you're saying after February 13th, the ones

19    that happened after February 13th?

20          MR. SUR:  I think that's right.  I'm using the TRO as

21    the measuring for the remedy in this scenario that you're

22    describing.  That's why I'm saying -- because you said that the

23    government hadn't sufficiently accounted for reliance interest.

24    Ordinarily what you would do is vacate and remand for a better

25    explanation.

1          I want to make clear what I think should be obvious,

2    but the sweeping and expansive proposed order from the GHC

3    plaintiffs is nowhere near what would be an appropriate remedy

4    for an APA, SRP, or any other violation actually.  They seek to

5    restructure the agency's operations.  They essentially

6    disregard all the Article II authorities we have been

7    discussing.

8          THE COURT:  Can I ask you one question on that?  I do

9    want to come to kind of the scope of relief under the different

10   permutations, but they do make that argument.  When I crafted

11   the TRO, I rejected it.  I said I don't need to get into the

12   details of personnel and furloughing and it should be enough

13   for a court to say that you have to take all steps necessary to

14   implement, so I guess, and maybe this kind of jumps into the

15   compliance conversation a little bit right now, but I think

16   that would be what plaintiffs would say in response is that

17   there has got to be people there working to execute this.  And

18   I would like to think that that doesn't need to be said and

19   that there could be just general statements, but then we run

20   into feasibility issues.  So we'll come to that.

21         But can you respond to that component of it, because

22   orders do need to be complied with and answering we have got

23   zero employees so we can give zero aid -- that's an

24   exaggeration of the position, of course, but can you address

25   that component because I think why it's in there again.

1          MR. SUR:  If I could get a note card.

2          THE COURT:  Of course.

3      (Pause)

4          MR. SUR:  To bring the TRO compliance example to the

5  floor and Your Honor's point about the personnel, as we stated

6  in the TRO compliance report today, this was paragraph 10,

7  "Overnight the defendants certified approximately $70.3 million

8  in additional payments to the plaintiffs which should be

9  released today."

10         That $70.3 million number was something that the

11  defendants were able to achieve in their processing because at

12  USAID they very recently brought from administrative leave 100

13  certifying officers and granted systems access to additional

14  back-end workers, like 300 of those, to address with greater

15  speed this problem, and this is -- the numbers that I'm

16  reciting are post lifting of the stay.

17         THE COURT:  Do you happen to know how many payments

18  they were able to process with that many people?

19         MR. SUR:  I don't think I have it broken down by

20  number.

21         THE COURT:  It was 70 million was the number?

22         MR. SUR:  The number that I'm describing, it's in

23  paragraph 10, and it's about the 70.3 additional in payments

24  today for relief.  The only point I was trying to illustrate

25  with that fact I think here is that rather than having a court

1    order superintending personnel choices, which would be

2    inconsistent with the separation of powers and contrary to

3    public interests and all of the other things as you can imagine

4    we would have to spell out, there is just no need for it.

5         THE COURT:  Isn't it fair to say then that you're

6    representing that personnel is not the feasibility issue here?

7    You, when you needed to, brought personnel in to do this.

8         MR. SUR:  The agencies are addressing this.

9         THE COURT:  I appreciate that.  Can we -- we'll come

10   back to the compliance, because I want to understand the

11   positions and get us to a, I would hope maybe an agreed upon

12   place, but either way clarity as the Supreme Court instructed

13   me on compliance.

14        Can we talk about -- I know you have your arguments.

15   We went through them.  We spent a lot of time today.  I'm

16   hearing submissions and going back and forth on all of the

17   defenses you have to separation of powers and whether it's a

18   claim that plaintiffs can bring, but just accept for me what

19   you don't want to accept is if we assume likelihood of success

20   only on separation of powers, no APA, what's the government's

21   position on what the appropriate relief would be there?

22        MR. SUR:  So at a minimum under *Mississippi against*

23   *Johnson*, there can't be an injunction against the president, so

24   that's off the table.  And the DC Circuit's precedent applying

25   *Mississippi against Johnson*, there is no declaratory relief

1  against the president either.

2        With that being said, I think the Court can announce

3  its legal conclusions and let the branches sort out in the

4  interbranch process how to work out what the Court has come to

5  a conclusion about, but the remedy for separation of powers

6  violation in and of itself can't be a separation of powers

7  violation, and I think it would be to be essentially

8  directing -- I mean, to direct the subordinates of the

9  president to spend, if that's --

10        THE COURT:  How do you reconcile that with *Train*, and

11  maybe -- I know it's hard because you said you're not super

12  familiar with it, but then Judge Kavanaugh in *Aiken County*,

13  like I said, it was a mandamus.  That's extraordinary relief

14  and the order was spend.

15        MR. SUR:  So I mean, I take it from your description

16  that you have an order that would be directing the agencies to

17  spend the funds?

18        THE COURT:  Well, I think you were just saying it

19  would be inappropriate for a court to do that, and I'm pointing

20  to Supreme Court precedent and DC Circuit precedent which did

21  that.

22        MR. SUR:  I haven't looked at *Aiken County* underlying

23  statute, but to go back to my point about *Train*, the plaintiffs

24  before the Court are not specified in the appropriations

25  statutes as the recipient of the federal funds.

1        THE COURT:  So would the right scope of relief be

2  spend, but not spend on plaintiffs?

3        MR. SUR:  Yes, for certain, because in that situation,

4  like *Train*, right, the City of New York came to the court

5  saying that it needed to spend money on water pollution control

6  efforts that the EPA administrator was withholding from the

7  states, which in turn were supposed to disburse those moneys to

8  the municipalities.  So it's a whole different situation when

9  you have here plaintiffs who are not specified in the

10  appropriations statute as the recipient of federal funds.

11        THE COURT:  If you want to address any differences

12  that there would be if there is a likelihood of success on

13  both, I'll just kind of give you the final permutation that you

14  wouldn't want to hear, but it would be helpful to have your

15  analysis.

16        MR. SUR:  I will point out, maybe which is baked into

17  into your question, but just to make it clear, that the Court

18  issuing an injunction, of course, has to weigh the other

19  factors.  The public interest merges with sort of here the

20  government is the opponent of the relief, but the Court would

21  have to factor in the consequences, re-spout some of those out.

22        I think in some ways the consequences of the

23  particular order that the GHC plaintiffs have put in are too

24  numerous to mention.

25        THE COURT:  To be clear, my view on this seems to me

1    just flows from logic is that absolutely have to consider all

2    the factors.  I didn't allow plaintiffs' counsel when he

3    started to invoke the irreparable harm here to do that, because

4    it doesn't seem to me that greater irreparable harm can justify

5    relief that's not justified by the cause of action.

6         But I do agree with your point, I think, that you

7    tailor it both in terms of the cause of actions and the harm

8    and the other factors, so I do think that's right.

9         MR. SUR:  So insofar as, for example, the relief would

10   be depriving executive branch agencies of their spending

11   latitude.  That would be a harm that the Court would have to

12   weigh, and public interest is part of that.  So just underscore

13   not only the question of --

14        THE COURT:  In other words, I don't want to put words

15   in your mouth, but if the point -- if the constitutional

16   violation is one between Congress and the president in terms of

17   the two political branches, their division and Congress has

18   appropriated certain funds, a court better be pretty careful to

19   heed that division and not require to, as much as possible, not

20   require the executive to spend anywhere that he's not required

21   to spend by Congress.

22        MR. SUR:  I think that's right.

23        THE COURT:  Thank you.  Can we turn then to talk about

24   the filing this morning, the joint status report and make some

25   progress on that?

 1          So maybe I could start -- I guess here each of the

 2    plaintiffs should -- sets of plaintiffs should represent

 3    themselves.  I'll call you up again, Mr. Sur, and I hope we can

 4    do this efficiently.  It is important for me to understand

 5    where everyone is.

 6          While it's a wish, of course, the parties could come

 7    in and say here is the schedule we have all agreed upon.  I

 8    know sometimes that doesn't happen.  And one of the reasons I

 9    want to go through this is to make sure I have kind of all the

10    facts and relevant considerations here.

11          And I would like to -- my goal in this is to do what

12    the Supreme Court instructed me to do, which is provide clarity

13    as to how to get into compliance.  I do, like I said, think

14    it's critical we take into account the feasibility question.

15    I'm going to be focused on that very much.  And I would like to

16    leave today with at least a plan to get that initial concrete

17    showing of moving things forward, even if it means we have got

18    together again frankly whenever you all want.  I'll get

19    together tomorrow, over weekend, on Monday, and I'll talk about

20    how to get to more of a concrete benchmark plan of payments

21    being processed.

22          So I'm going to lay out what I understand to be kind

23    of the universe based on -- and maybe it's actually just worth

24    having everybody give me their positions on this.  My

25    understanding is that when the case was appealed, the

1    representation was made that this is about $2 billion in funds.

2    I also understand there is a representation about it's 2,000

3    invoices to be paid.  Is that right?

4         MR. WIRTH:  Yes.

5         THE COURT:  What's the source of that representation?

6         MR. WIRTH:  I think it's the February 25th Marocco

7    declaration, either that, or maybe the 26th.

8         THE COURT:  And that 2,000 encompasses what exactly,

9    in your understanding?

10         MR. WIRTH:  My understanding is that is vouchers and

11    other sort of reimbursements that remain in the system to be

12    processed.

13         THE COURT:  Is that kind of all outstanding up

14    until --

15         MR. WIRTH:  I believe so.

16         THE COURT:  Up until the TRO or that date?

17         MR. WIRTH:  The declarations are not precise on this

18    point, and I think they are speaking in somewhat broad

19    generalities, so I'm not certain exactly what it refers to, but

20    I would say there is two buckets -- there is several buckets.

21    But there is vouchers and reimbursements for past work, and

22    also letters of credit, which to our understanding could be

23    turned on immediately.

24         THE COURT:  Your understanding is also those aren't

25    included in the 2,000?

 1           MR. WIRTH:  I don't believe so.

 2           THE COURT:  Mr. Sur, could I hear from you on this,

 3    because understanding the scale would be helpful.  My

 4    understanding is, I guess, the source of the Marocco

 5    declaration talks about about 2,000 to be paid.  Is that

 6    consistent with your rough understanding of what we're working

 7    with here?

 8           MR. SUR:  I would be going by the same one.  It's the

 9    February 25th declaration, paragraph four.  In the 400 case,

10    that's 37-1.

11           THE COURT:  Could you just read it so I make sure I

12    have it?

13           MR. SUR:  Sure.  "For USAID, I estimate the Court's

14    order would require the payment of, at a minimum, $1.5 billion

15    across approximately 2,000 outstanding and newly created

16    payment requests.  For State, I estimate the Court's order

17    would require the payment of, at a minimum, $400 million in

18    outstanding payment requests."

19           THE COURT:  Does it say how many -- I know State

20    sounds like is able to move a lot faster than USAID, and that's

21    in the record.  Does it say how many invoices for State?

22           MR. SUR:  It doesn't here.

23           THE COURT:  It doesn't.  Okay.  And is it consistent

24    with your understanding as well that the letter of credit and

25    drawdowns is kind of a separate category?

1          MR. SUR:  I do think they are separate, yes.

2          THE COURT:  Let me trade back with plaintiffs.  Thanks

3   for tolerating that.  That's just helpful to have some sense of

4   the scale.

5          So let me just see.  Let's start with the GHC case and

6   the proposal there.  As I understand it -- well, rather than me

7   tell you, why don't you give it to me, but give it to me brief

8   in terms of like the core of the proposal and what would be

9   spent.

10         MR. WIRTH:  The core of the proposal is we would

11  expect the government to be able to make these payments

12  quickly.  I think looking at the record in this case we see

13  that prior to January 20th, they were able to process thousands

14  of payments a day.  They are able to bring people back to

15  process payments.

16         THE COURT:  Where is that in the record?

17         MR. WIRTH:  That's in the Marocco declaration as well.

18  I believe it's the February 25th Marocco declaration.  This is

19  paragraph 15, "At times, both State and USAID could process

20  several thousands payments each day."

21         We have heard today from Mr. Sur that the government

22  can bring people back.  For example, there are many people

23  today who are on paid furlough, paid administrative leave who

24  could be brought back to do this work, and we think it should

25  be done extremely quickly.  The Court's order ordered 36 hours

1   for compliance last time.  We don't think that that necessarily

2   needs to be the compliance time this time, but we are asking

3   that this would be a couple of business days from the lifting

4   of the administrative stay yesterday.  If the government could

5   make those payments by Monday, we think that would be

6   acceptable.

7           THE COURT:  My understanding your "by Monday" to be

8   for the plaintiffs' invoices; is that right?

9           MR. WIRTH:  So yes, we would say to the extent that

10  the Court wants to stage things at all, we would ask that our

11  plaintiffs be paid with all deliberate speed.  It appears,

12  based on the government's representations, about the

13  $70 million that they have begun that process.  Until we see it

14  in the bank accounts, we'll withhold judgment.

15          THE COURT:  When you say "done that process," you mean

16  that would take care of all the plaintiffs, that 70 million?

17          MR. WIRTH:  No, it would not.

18          THE COURT:  You mean they made a concrete step with

19  the additional staff they brought in?

20          MR. WIRTH:  Exactly.  There have been some payments

21  that have come in over the last couple of days, so clearly the

22  government is able to make and authorize these payments.  To

23  the extent that these are being held up by specific --

24          THE COURT:  Do you happen to know roughly how many

25  payments were processed to make that up overnight?

1    MR. WIRTH:  It was -- to make up the 70 that is

2  represented?

3    THE COURT:  I'm trying to get a sense of how many.

4    MR. WIRTH:  I don't know.  I can point to just in the

5  last couple of days, several of my clients have gotten five

6  payments or two payments, or it's been relatively small numbers

7  of invoices, with some of them large amounts of money in them.

8    THE COURT:  But total could be in the kind of hundred

9  range of payments being processed?

10    MR. WIRTH:  I don't believe so.  I don't imagine --

11  it's certainly not going to be half of all the outstanding

12  payments.  This is going to be a small portion.  My clients,

13  some of them are quite large and have many outstanding

14  invoices, some of which have not been paid at all, but it's

15  only six individual clients and then their members.

16    THE COURT:  Okay.  And then I know you also mentioned

17  kind of your understanding that the letter of credit and

18  drawdown requests could just be implemented immediately.

19    MR. WIRTH:  I believe so.  I'm not aware of anything

20  that would hold up the ability of the government to allow

21  access to those credit facilities.

22    THE COURT:  And then I guess the second component of

23  your proposal is just to -- I guess this is more a scope of

24  relief question about rescinding all the terminations by

25  March 10th.

1          MR. WIRTH:  Yes.

2          THE COURT:  Did you have a timeline in there?  I know

3   you state the plaintiffs by Monday.  What was the timeline you

4   proposed for everybody else?  I guess what you had proposed --

5   now, I have it.  I remember.  It was basically proposing it at

6   a rate consistent with the kind of pre-January 17th.

7          MR. WIRTH:  We didn't give a specific date certain.

8          THE COURT:  It's more about a processing schedule.

9          MR. WIRTH:  We're cognizant of the fact that the

10  government will have to undertake significant efforts to do

11  that.  We would expect them to move very deliberately, but we

12  do think that --

13         THE COURT:  I have to say, as it sounds like they did

14  overnight, with respect to some of these.

15         MR. WIRTH:  Exactly.

16         THE COURT:  Appreciate that.  Maybe I could hear from

17  the AIDS vaccine plaintiffs in number 400.  I understand you're

18  seeking slightly broader or faster pace relief.

19         MR. SANSONE:  That's correct, Your Honor.  Nick

20  Sansone on behalf of AVAC plaintiffs.  I think the only thing I

21  would really add to what my colleagues have said is that the

22  scope of the TRO was certainly broader than payments.

23         The Court restrained the government from initiating

24  new suspensions, terminations, et cetera, based on the

25  challenged executive order and the State Department memo.  So

1    what one would have expected to see in the wake of that TRO

2    would be rescissions of previously issued terminations,

3    suspensions, lifting of stop work orders, a return to the

4    status quo before January 20th.

5         And then, you know, if there were individualized

6    determinations later on that specific projects needed to be

7    terminated to come in line with presidential priorities, you

8    would have seen those go out in an individualized capacity.

9    That's not what we saw.  The government has not pointed to any

10   kind of evidence of sort of reinstating the work and the

11   projects that had been unlawfully or -- I should say that were

12   the subject of the temporary restraining order prior to

13   February 13th.

14        We would emphasize that, just as the government was

15   able to send out waves and waves and waves of contract and

16   grant terminations following entry of the temporary restraining

17   order, it shouldn't be, we would expect, a feasibility

18   constraint on the government to send out waves and waves and

19   waves of rescissions of the sort of terminations and

20   suspensions that were entered into during the course of the

21   temporary restraining order.

22        THE COURT:  On the question of kind of what I

23   understood the Supreme Court to be pointing out is that the

24   deadline for the February 25th order has now been passed -- has

25   now passed, and I understand that -- I take your point that

1    that was just a part of the TRO, I made that very clear, but I

2    do want to act on what the Supreme Court has sent back to me,

3    and so providing clarity in terms of those payments, accepting

4    that it's a part of it, is your proposal any different than the

5    other plaintiffs?

6          MR. SANSONE:  In terms of the payments, I don't think

7    we really differ on our proposed timeline.

8          THE COURT:  I appreciate you adding the other

9    components of this, which are important to consider for full

10   TRO compliance.  When the Supreme Court speaks, I want to take

11   that action as soon as possible to give that clarity, so that's

12   why my mind is focused on that, but it's not to the exclusion

13   of the rest of the TRO.

14         Maybe I could hear then from Mr. Sur on this question.

15         MR. SUR:  Thank you, Your Honor.

16         THE COURT:  Start with kind of the government's

17   proposal here.  Well, let me just say, I thought it was helpful

18   for you to lay out kind of different periods in which you have

19   made steps, and that in particular the steps, and especially as

20   you have just described it with more detail, to staff up to

21   just kind of get this done and get it moving, I think is

22   actually extremely helpful.  So I appreciate that.

23         MR. SUR:  Going to that point, the estimate that's in

24   paragraph 10 about the ability to process the payments to the

25   plaintiffs -- I'm sorry, I guess our number 10, so --

1          THE COURT:  I have that.

2          MR. SUR:  So it's Docket 49 in Case Number 400.  So

3   there we said that it is currently anticipated that all

4   legitimate payments owed to the plaintiffs will be processed

5   within days and not more than ten working days.

6          As I understand it, that is factoring in this increase

7   in staff that the agencies have made available.  They are

8   working as best as they can.  Some of the limitations are

9   outside of the agency's control.  One example I will point out

10  is that we don't actually have the associational plaintiffs'

11  names, so there are two associational plaintiffs.

12         We know the names of the associations, but we don't

13  know the names of the members, so that presumably is a solvable

14  problem.  But --

15         THE COURT:  I appreciate that point.  I'm not going to

16  call plaintiffs' counsel up right now, but I'll assume that

17  plaintiffs can provide that information extremely promptly to

18  defendants.

19         MR. SUR:  I think there is a footnote in the report

20  that says that, but I'm just pointing out that there are a

21  number of logistical problems that have to be solved.  And the

22  estimate that we provided here of not more than ten working

23  days is the product of having the additional staffing power

24  that I was talking about before.

25         There are assertions you will see in the plaintiffs'

1    share of the report that they are being subjected to other

2    processes they have challenged as invalid.  And from what I

3    understand, that is not the case.  So there are allegations

4    that you will see from them about what they call, quote, "a

5    bottleneck."  You will not be surprise that the defendants

6    dispute the existence of a bottleneck.

7            From our perspective, the agency leadership put a

8    separate review process in place to enhance payment integrity,

9    but that is not a process that's being applied to these

10   plaintiffs' payments for the purpose of this ten-working day

11   deadline.

12           THE COURT:  It presumably wasn't for the overnight

13   payments?

14           MR. SUR:  Yeah.

15           THE COURT:  And the other payments following -- there

16   was a brief period there after the February 25th order when

17   there was a status report, and I think there was some payments

18   made too.  I think those might have been State ones that we're

19   bypassing.  There was a reference to the Secretary of State

20   bypassing.

21           MR. SUR:  As I understand it, the plaintiffs are

22   currently benefiting from the secretarial bypass.  Asking for

23   additional secretarial bypass would not accelerate --

24           THE COURT:  That bypass to applies to both the State

25   and USAID payments?

1          MR. SUR:  As far as I understand, but I'm not entirely

2    certain.

3          THE COURT:  That's helpful to know.  Thank you.  I

4    appreciate that.

5          MR. SUR:  Just to go then to our paragraph 12, which

6    there is an intervening paragraph, which is paragraph 11 and

7    important for our purposes, because of the Article III problems

8    that it presents, we don't think that it's appropriate for the

9    Court or within Article III limit for the Court to order the

10   payments to the non-plaintiffs who are not here parties.

11         But that said, just as having made that point, there

12   is an expectation about how long those payments will take, and

13   there we aren't able -- I think quite the same way that we can

14   with a limited number of plaintiffs who are before the Court,

15   for example, I can't make a clarifying call to counsel if that

16   had become necessary on a particular invoice, so we're talking

17   about a very large set of payment requests that have to undergo

18   more processing, right.

19         So this -- again, I think two weeks for State and 30

20   to 45 business days for USAID reflects the agency's hard

21   analytical work in tackling the problem and trying to come up

22   with a -- to use the word, feasible compliance deadline.  I

23   understand in some theoretical sense that plaintiffs want

24   faster, but that doesn't account for what is feasible.

25         And then if I may briefly on the terminations, I just

1    have to fight the premise that it is appropriate, the notion of

2    canceling the terminations is predicated on the plaintiffs'

3    assertions that the terminations somehow were procedurally

4    defective.

5         Two things from our perspective are that the

6    plaintiffs consistently ignored those clauses of the TRO and

7    the subsequent orders, which quite clearly preserved --

8         THE COURT:  I really don't want to cut you off, but

9    the only reason I am is that I have your -- you have made

10   arguments, and I think I have your argument on that.  I'm

11   familiar with the cutoff from the TRO.

12        I understand the arguments on both sides on this, and

13   I do, again, just given the Court focusing on clarifying the

14   February 25th order, which was the payment portion of this, I

15   want to kind of zero in on that.

16        Do you know -- one thing that occurs to me as I look

17   at this, I know the parties probably feel they are pretty far

18   apart on this and maybe in some ways they are, plaintiffs I

19   think proposed payment to the plaintiffs as a first tranche, in

20   I think we're looking at four days, and the government is at

21   days, and no more than ten days.

22        So in that respect, at least for that first -- like I

23   said, what I would like to do is walk out today with a first

24   kind of commitment of processing payments.  I think it sounds

25   like everyone is using language now of like how many payments

1    can be processed in a feasible manner, and I do think the

2    government has made a good showing by staffing up and getting

3    that many out overnight.

4        I guess we don't have the number of payments

5    processed, which would be helpful.  That information would be

6    very welcome from both the government in terms of how many were

7    processed in that $70.4 million that was done overnight, and

8    also to know from the plaintiffs how many are we talking about

9    for all of the members and associational members.  Between the

10   two parties, you all can come up with those numbers, because I

11   do want to be mindful of feasibility.

12       To the extent what I decide on here today isn't

13   feasible, I'll talk about it.  I want a good faith approach to

14   it, and I think we're pretty close on this.  What I would like

15   to do is leave today giving clarity as to a first step by what

16   will be done by Monday, end of day Monday, and then the start

17   of coming up with a benchmark for the non-plaintiffs, for the

18   rest.  I understand the government's position, the two weeks

19   and 30 to 45 days.  I think the plaintiffs had put it at kind

20   of a clip that mirrors January 17th or before, and maybe it

21   needs to be somewhere in between those two.

22       But I think we'll be able to figure that out based on

23   what is unfolding in the payments that can be processed per

24   day.

25       MR. SUR:  In light of your point on that, may I make a

1    further observation, which is that you have set an expiration

2    for the TRO and you have announced when you would essentially,

3    within which time you would rule for the PI purposes.

4        If I understand correctly -- the relationship between

5    those correctly, for clarity, because the PI is what would be

6    going forward, if the time is something that is a deadline that

7    is outside of the TRO scope, but it may be just clearer in

8    terms of everyone's understanding if that's in the PI rather

9    than the TRO component.  Of course, that --

10        THE COURT:  Your point is well taken.  I'm not

11    going -- let me reserve judgment.  That makes intuitive sense

12    to me, and that's why maybe it does make sense for us to leave

13    with, again, a concrete understanding of what would happen

14    until the PI is out, and then what I would like to have is the

15    information I need to figure out what a feasible pace would be

16    for the PI to require.  I think that is a sensible way to think

17    about it.  I appreciate that.

18        Here is what I would like to do, and I'm trying to be

19    as mindful as I possibly can with the information I have in

20    constructing something that's feasible, and I'm being mindful

21    also that, as the government just noted, there is going to be a

22    portion of this that extends past the Monday deadline, and

23    there will be further opportunity to figure out a benchmark for

24    processing, but it's still in light of the fact that the

25    Supreme Court wants clarity, and I think it's important that

1  the TRO be complied with as well, and the February 25th order

2  to leave today with something.

3        And so as I understand it, and this is based on

4  evidence that's in the record, that prior to January 17th, the

5  government was able to process several thousands per day, and I

6  don't understand plaintiffs to be insisting on that right out

7  of the gate, and I appreciate that, because I do think it's

8  important that all the parties be mindful of the feasibility

9  requirement.

10       So that's several thousands per day.  We're looking at

11  a much smaller universe than that as I understand it, at least

12  as to relates to the payment invoices.  There is 2,000.  So I'm

13  actually not even going to do this, but if we divided the 2,000

14  by the four days remaining, that would be 500 per day, so we're

15  still already at a fraction of the speed to pay everything by

16  Monday.  And my understanding is that the payments to

17  plaintiffs would even be a fraction of that.  I'm assuming

18  we're kind of -- just based on kind of the proportions that are

19  in front of us, that we're talking about kind of like a couple

20  hundred payment invoices a day to get the payments paid, maybe

21  it's fewer even.

22       So we're at kind of somewhere between, as I understand

23  it, like 1 to 10 percent of what the agency was able to process

24  even at that point per day by Monday.  So that leads me to

25  believe that it should be feasible to get the plaintiffs paid

1    by Monday on all of their invoices.  And I understand the

2    government has taken steps already to kind of bring folks back

3    to get that done, and my understanding is that this is fairly

4    consistent with perhaps not even the degree of the pace that

5    happened overnight.

6         And so I think it's reasonable to rule that the

7    plaintiffs' invoices be paid by, let's say, 6:00 p.m. on

8    Monday.

9         Mr. Sur, the understanding I have from the plaintiffs'

10   representations is that that doesn't include the kind of

11   drawdowns, which themselves I guess don't have a payment

12   processing component, and that that's more of a kind of just

13   releasing it instantly, immediately.  Is that accurate, in your

14   understanding?

15        MR. SUR:  I thinks that's right.  I think it's a

16   separate process.

17        THE COURT:  What I'll order today is just that the

18   first concrete step, this is just the first tranche be that

19   plaintiffs have their invoices and letters of credit, drawdown

20   requests, for work completed prior to February 13th, because

21   that's what the February 25th order was, be paid by 6:00 p.m.

22   on Monday, March 10th.

23        As the government mentioned, it can't do that unless

24   it knows who all of the people it needs to pay are, and so, you

25   know, I'm going to say by 11:59 p.m. tonight, but really

1    faster, get it to the government, because they need to have

2    that information to be able to have this be feasible.

3         I see plaintiffs' counsel nodding.  I won't force you

4    to come forward and say that.

5         And then what I would like to do is understand a

6    benchmark going forward, likely to be part of the PI, and I

7    think thinking about it in terms of payment invoices that could

8    be processed per day, you know, as a benchmark would be

9    helpful.  We have got a couple of benchmarks here.  Some

10   information I'm going to get from you all as soon as possible,

11   but we have got the kind of pre-January 17th several thousands

12   per day, which is in the Marocco declaration.  We have got the

13   fact that we're already even just at 2,000, so it's something

14   that I know there is also some State contracts here, but it's,

15   as I understand it, significantly fewer than the 2,000, so

16   2,000 plus some, which takes us to a manageable amount.  But I

17   do want to come up with a benchmark that would be appropriate.

18        What would be helpful for me is to understand how many

19   payment invoices the government was able to make up the

20   $70.4 million.  And then similarly, it would be helpful for me

21   to know how many payment invoices are outstanding for the

22   plaintiffs and their members total.  I don't know which party

23   is in best position to give me that, the government who has the

24   invoices or the plaintiffs who presumably can talk to their

25   clients and get the numbers, but those numbers will be helpful

1  toward building that benchmark.

2         I would like those as soon as possible, but if you

3  need to take until, why don't we say, if you get them to me by

4  noon tomorrow that would be give me some time to consider it

5  for the purposes of how it factors in the PI.  If it's not the

6  right metric for feasibility, let's discuss it and figure out

7  what the right metric for feasibility is.

8         MR. SUR:  If I may, Your Honor.  I think the

9  concern -- so twofold concern.  One is that I'm not certain --

10  I think I understand the extrapolation that the Court did from

11  the numbers that were in the Marocco declaration.  One concern

12  I have is that the relationship may not be linear, so that

13  there may be some claims, especially when we're talking about

14  records from work performed overseas, the intensity of labor

15  that's involved in completing the various validation processes

16  that are described in the declarations, for one, that's from a

17  hard to reach country.  Again, I don't have those facts in

18  hand, but I'm very concerned about the non-linearity of that

19  problem.

20         And the other part that I think I should mention is

21  that because there is a weekend in between, I don't know that

22  it's feasible, to use the word of the day, for staffing to do

23  the same transactions, especially in the financial world,

24  because I mean, I just happen to know the stock market doesn't

25  work on weekends.  It's possible that some banking transactions

1   also can't take place on the weekends.

2          I'm just not certain that the four days, including the

3   weekends would be the same as four business days.

4          THE COURT:  Yeah.

5          MR. SUR:  I appreciate the Court considering those

6   aspects of the problem as well.

7          THE COURT:  You know, the reason that I think that

8   that should be feasible is, as I understand it, the work was

9   done overnight to get the $70.4 million out, not during

10  business hours.  If there is some reason why it can be done

11  overnight but not over the weekend, you can let me know,

12  obviously, some sort of infeasibility of that type where there

13  is certain time here that's excluded that it's not possible,

14  then you can file something and let me know.

15         I don't take that to be kind of a staffing issue,

16  because you're able to kind of staff it overnight, the folks

17  you just mentioned, the type of contract work and people who

18  are on leave and can be brought back in.  I do appreciate the

19  government's taking action on that front.

20         And then I think the other piece that just gives me

21  hope that this would be feasible and comfort ruling this way is

22  that we're talking about a really small fraction of invoices.

23  So I thought about that, and one question I had in my mind is I

24  know a lot of the submissions here were in terms of dollar

25  amounts, and is the right way, dollar amount or payment

1  processing, but this conversation with each of you all has been

2  very much focused on processing payments, and so I think if we

3  need to ultimately come up with a range or something like that

4  to allow for some differences in complexity, I think that makes

5  sense, or maybe it's a combination of payment processing plus

6  dollar amount as we discuss further as we get closer to the

7  TRO, then I'm open to those discussions.

8         I want to make sure that it's feasible, but also a

9  piece of this that's really important is it's clear, and the

10 clarity is what's going to allow it to be easily administered

11 by the government and easily satisfied by the plaintiffs and

12 that has the benefit of also making my job easier in this

13 context too.

14        So let's go with that.  But if you want to come back

15 and tell me that there is some reason that markets can't work,

16 but, again, you need to reconcile it with the fact that you

17 were able to kind of do this overnight as well.

18        Okay.  All right.  So we have our concrete step.

19 You're going to get me some more information, any information

20 about that kind of pacing and the payments that can be

21 processed.  If someone wants to make a submission that dollar

22 amount is the better way to think about this, that's fine.

23        I really want to take seriously this notion of being

24 clear and it being feasible, and I'm open to further

25 submissions, but based on what I have right now, that's going

1    to be my ruling.

2        I very, very much appreciate this.  I know it's gone

3    on for four hours and 12 minutes today, but it was a productive

4    hearing, and I appreciate the efforts of the parties to confer,

5    and to get us this far.  We'll adjourn.

6        (Proceedings concluded at 6:13 p.m.)

7

8                         CERTIFICATE

9        I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
10   Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
11   record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
12   Judicial Conference of the United States.

13       Dated this 7th day of March, 2025.

14

15                        /s/ Sonja L. Reeves
                          SONJA L. REEVES, RDR-CRR
16                        FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 73:9
**$400** [1] - 132:17
**$70** [1] - 134:13

## /

**/s** [1] - 151:15

## 1

**1** [4] - 57:21, 57:23, 57:24, 145:23
**1.5** [1] - 132:14
**10** [6] - 112:17, 125:6, 125:23, 138:24, 138:25, 145:23
**10,000** [1] - 120:21
**100** [4] - 11:6, 68:5, 75:17, 125:12
**10th** [3] - 72:7, 135:25, 146:22
**11** [1] - 141:6
**1100** [1] - 2:10
**11:59** [1] - 146:25
**12** [2] - 141:5, 151:3
**1357** [1] - 77:18
**1359** [1] - 77:6
**1360** [1] - 77:20
**1361** [1] - 77:20
**1368** [1] - 77:7
**13th** [15] - 5:5, 9:11, 17:6, 17:14, 17:19, 17:24, 19:18, 71:12, 71:20, 72:10, 123:13, 123:18, 123:19, 137:13, 146:20
**14169** [1] - 8:10
**14th** [1] - 45:5
**15** [1] - 133:19
**1600** [1] - 2:3
**17th** [4] - 136:6, 143:20, 145:4, 147:11
**18** [1] - 48:9
**1961** [2] - 92:25, 94:12
**1979** [1] - 89:10
**1:25-cv-00400-AHA** [1] - 1:5
**1:25-cv-00402-AHA** [1] - 1:11

## 2

**2** [1] - 131:1
**2,000** [10] - 131:2, 131:8, 131:25, 132:5, 132:15, 145:12,
145:13, 147:13, 147:15, 147:16
**2.5** [2] - 47:4, 47:9
**2000** [1] - 89:8
**20001** [2] - 1:24, 2:7
**20009** [1] - 2:3
**2004** [1] - 77:19
**2005** [2] - 61:17, 61:20
**2023** [2] - 51:5, 51:6
**2024** [8] - 23:11, 45:22, 47:5, 47:11, 48:14, 49:24, 50:23, 50:25
**2025** [2] - 1:17, 151:13
**20530** [1] - 2:10
**20th** [4] - 2:3, 8:9, 133:13, 137:4
**24th** [1] - 12:5
**25-0400** [1] - 2:1
**25-0402** [1] - 2:5
**25-400** [1] - 3:3
**25-402** [2] - 3:5, 3:25
**25th** [13] - 5:7, 5:13, 20:5, 20:8, 69:25, 131:6, 132:9, 133:18, 137:24, 140:16, 142:14, 145:1, 146:21
**26-3** [1] - 37:23
**26th** [1] - 131:7
**29** [1] - 57:21
**29th** [1] - 57:24
**2:01** [2] - 1:18, 3:1

## 3

**3** [1] - 57:18
**30** [2] - 141:19, 143:19
**300** [1] - 125:14
**30th** [1] - 45:12
**333** [1] - 1:24
**36** [1] - 133:25
**37-1** [1] - 132:10
**391** [1] - 77:18
**3:24** [1] - 59:8
**3:32** [1] - 59:8

## 4

**400** [4] - 3:11, 132:9, 136:17, 139:2
**402** [2] - 3:14, 7:2
**45** [2] - 141:20, 143:19
**46-1** [2] - 46:20, 48:8
**49** [1] - 139:2
**4:59** [1] - 112:18

## 5

**5** [3] - 20:9, 91:8, 112:13
**500** [1] - 145:14
**5:11** [1] - 112:18

## 6

**6** [3] - 1:17, 20:9, 91:8
**601** [1] - 2:7
**64** [2] - 47:4, 47:10
**6:00** [2] - 146:7, 146:21
**6:13** [2] - 1:18, 151:6

## 7

**7** [2] - 30:10, 112:17
**7.7** [1] - 48:10
**70** [3] - 125:21, 134:16, 135:1
**70.3** [3] - 125:7, 125:10, 125:23
**70.4** [3] - 143:7, 147:20, 149:9
**7th** [1] - 151:13

## 8

**8** [1] - 109:10

## 9

**90** [2] - 60:1, 61:25
**90-day** [3] - 44:11, 44:14, 69:18
**994** [1] - 77:6

## A

**ability** [8] - 12:10, 13:18, 13:21, 14:9, 15:18, 38:20, 135:20, 138:24
**able** [24] - 5:20, 12:17, 14:18, 39:5, 74:22, 78:14, 105:13, 116:4, 125:11, 125:18, 132:20, 133:11, 133:13, 133:14, 134:22, 137:15, 141:13, 143:22, 145:5, 145:23, 147:2, 147:19, 149:16, 150:17
**above-entitled** [1] - 151:11

**abroad** [1] - 58:17
**abruptly** [1] - 39:7
**absolutely** [14] - 11:10, 11:25, 13:2, 13:7, 15:17, 22:14, 31:11, 36:21, 52:5, 52:24, 55:10, 116:17, 117:21, 129:1
**Absolutely** [1] - 31:18
**abuse** [1] - 36:5
**accelerate** [1] - 140:23
**accelerated** [2] - 18:2, 59:22
**accept** [9] - 14:4, 30:2, 40:1, 67:4, 84:24, 84:25, 86:2, 126:18, 126:19
**acceptable** [1] - 134:6
**accepted** [3] - 67:11, 70:21, 80:5
**accepting** [1] - 138:3
**accepts** [1] - 12:12
**access** [7] - 35:1, 42:19, 73:22, 75:6, 115:24, 125:13, 135:21
**according** [2] - 82:4, 101:10
**account** [2] - 130:14, 141:24
**accounted** [1] - 123:23
**accounts** [1] - 134:14
**accurate** [2] - 146:13, 151:10
**accurately** [1] - 17:15
**achieve** [1] - 125:11
**acknowledge** [1] - 83:18
**act** [3] - 97:4, 102:19, 138:2
**Act** [79] - 7:11, 16:4, 22:2, 22:7, 22:17, 22:22, 23:1, 23:2, 23:11, 23:12, 25:2, 25:10, 25:24, 26:22, 27:19, 28:20, 28:24, 29:10, 29:13, 30:3, 30:17, 30:21, 30:23, 32:11, 49:23, 49:24, 50:6, 51:1, 51:21, 52:15, 52:17, 54:7, 54:16, 54:20, 55:3, 56:5, 56:6, 56:14, 56:16, 73:7, 73:21,
74:2, 74:7, 74:18, 75:23, 75:24, 76:1, 76:5, 76:25, 77:1, 77:2, 77:25, 78:13, 78:20, 79:6, 79:12, 80:8, 84:10, 84:23, 85:2, 85:23, 87:15, 94:12, 94:18, 95:2, 97:3, 97:24, 98:22, 99:25, 102:15, 102:18, 103:5
**Act-type** [1] - 30:21
**action** [28] - 3:24, 16:3, 16:6, 16:8, 16:9, 16:22, 17:5, 17:12, 21:6, 21:7, 24:4, 36:19, 37:12, 39:2, 41:6, 62:14, 68:11, 68:13, 82:8, 82:18, 82:24, 102:24, 103:17, 109:23, 129:5, 138:11, 149:19
**Action** [2] - 3:3, 3:5
**actions** [18] - 3:22, 10:15, 13:5, 17:17, 21:15, 23:18, 35:24, 36:4, 36:24, 38:3, 41:11, 43:13, 47:19, 60:14, 69:4, 118:14, 129:7
**activities** [1] - 29:4
**activity** [1] - 27:6
**actor** [1] - 96:1
**acts** [5] - 12:23, 12:25, 50:24, 97:20, 97:25
**actual** [9] - 11:15, 42:14, 53:21, 76:20, 89:2, 109:19, 113:23, 114:13, 121:24
**Adams** [1] - 122:2
**add** [4] - 37:21, 102:11, 113:16, 136:21
**added** [1] - 9:18
**adding** [1] - 138:8
**addition** [9] - 4:8, 5:23, 5:24, 16:20, 25:8, 26:11, 29:11, 120:20, 122:1
**additional** [11] - 24:20, 28:3, 28:5, 40:8, 76:11, 125:8, 125:13, 125:23, 134:19, 139:23, 140:23
**address** [18] - 7:7, 7:9, 7:13, 8:2, 10:10, 43:10, 62:2, 78:12, 78:14, 78:18, 79:17,

88:17, 91:16, 104:7, 122:13, 124:24, 125:14, 128:11
**addressed** [1] - 10:12
**addresses** [1] - 106:21
**addressing** [3] - 15:10, 60:2, 126:8
**adequate** [2] - 22:10, 73:4
**adjourn** [1] - 151:5
**adjudicating** [1] - 24:8
**adjudication** [1] - 96:15
**administered** [1] - 150:10
**administers** [1] - 94:24
**administration** [6] - 17:7, 20:24, 66:19, 69:21, 95:3, 121:17
**administration's** [2] - 97:12, 101:9
**administrations** [1] - 42:6
**administrative** [6] - 26:3, 28:11, 36:18, 125:12, 133:23, 134:4
**administrator** [2] - 98:12, 128:6
**admit** [1] - 10:25
**adopted** [1] - 121:21
**advisors** [1] - 55:17
**ADVOCACY** [1] - 1:3
**Advocacy** [1] - 3:3
**affair** [1] - 85:10
**affairs** [23] - 44:3, 94:9, 94:12, 95:18, 99:20, 103:11, 103:16, 103:24, 104:8, 105:7, 105:18, 105:22, 106:6, 106:8, 106:13, 106:15, 106:23, 107:21, 109:3, 110:4, 110:6, 110:10, 111:18
**affect** [1] - 30:5
**affected** [2] - 62:5, 115:22
**afford** [2] - 30:19, 119:2
**afraid** [1] - 116:1
**afternoon** [9] - 3:10, 3:12, 3:13, 3:15, 3:16, 3:19, 3:20, 3:23, 59:12
**afterwards** [1] - 31:24

**agencies** [10] - 9:12, 60:3, 62:1, 69:13, 69:17, 120:22, 126:8, 127:16, 129:10, 139:7
**agency** [36] - 8:11, 8:24, 16:2, 16:5, 16:8, 16:9, 16:22, 17:4, 17:12, 21:7, 21:15, 36:19, 37:12, 39:1, 41:6, 45:7, 54:22, 54:25, 68:10, 68:13, 68:25, 75:12, 80:23, 81:2, 82:2, 82:8, 82:18, 82:24, 84:21, 89:4, 89:6, 89:22, 94:1, 140:7, 145:23
**agency's** [4] - 76:2, 124:5, 139:9, 141:20
**agency-type** [1] - 84:21
**agenda** [2] - 37:8, 37:9
**aggrieved** [2] - 60:9, 81:22
**ago** [1] - 82:8
**agree** [3] - 24:6, 52:24, 129:6
**agreed** [3] - 71:13, 126:11, 130:7
**agreeing** [1] - 95:17
**agreement** [33] - 5:21, 27:3, 27:5, 27:9, 29:9, 29:24, 32:10, 32:15, 42:16, 53:18, 74:4, 74:6, 74:12, 74:13, 74:18, 74:19, 75:2, 75:7, 75:10, 76:14, 76:16, 77:23, 77:24, 79:23, 85:1, 85:12, 91:25, 92:3, 92:4, 92:15, 94:14, 113:18
**agreements** [29] - 8:24, 12:17, 24:4, 24:6, 25:2, 25:5, 26:12, 26:21, 27:2, 27:21, 27:22, 28:25, 29:11, 29:21, 30:17, 38:8, 39:7, 39:14, 40:21, 42:20, 58:11, 66:22, 73:25, 74:16, 75:5, 76:23, 78:4, 92:14, 100:21
**ahead** [3] - 51:17, 57:10, 120:9
**Aid** [2] - 29:9, 120:21
**aid** [14] - 8:21, 14:25, 38:17, 55:19, 64:17, 78:9, 92:25, 93:3, 94:24, 103:21,

107:24, 108:7, 108:13, 124:23
**AIDS** [3] - 1:3, 3:3, 136:17
**Aiken** [6] - 99:8, 99:23, 102:2, 105:10, 127:12, 127:22
**aim** [1] - 98:2
**air** [2] - 89:24, 89:25
**al** [8] - 1:3, 1:7, 1:9, 1:12, 3:3, 3:4, 3:5, 3:6
**ALDAC** [1] - 12:5
**ALI** [1] - 1:17
**Alito** [1] - 104:6
**allegation** [1] - 82:4
**allegations** [1] - 140:3
**alleged** [5] - 11:6, 24:14, 77:13, 81:22, 82:24
**alleviation** [1] - 95:11
**ALLISON** [1] - 2:2
**allocated** [1] - 112:6
**allot** [1] - 98:12
**allotment** [1] - 98:13
**allow** [13] - 25:23, 26:23, 44:23, 53:4, 61:25, 65:21, 74:10, 97:9, 103:17, 129:2, 135:20, 150:4, 150:10
**allowed** [1] - 18:6
**allows** [5] - 56:23, 82:16, 84:1, 96:10, 118:23
**almost** [1] - 106:7
**alone** [1] - 35:24
**alter** [1] - 37:25
**alternative** [3] - 31:8, 56:22, 117:3
**ambassadors** [2] - 108:4, 108:18
**amenable** [1] - 8:4
**amend** [1] - 116:11
**amendments** [1] - 97:25
**American** [4] - 29:8, 35:18, 35:19, 35:20
**Americans** [1] - 35:17
**AMIR** [1] - 1:17
**amount** [11] - 35:7, 47:12, 47:25, 51:3, 51:13, 62:13, 100:20, 147:16, 149:25, 150:6, 150:22
**amounts** [6] - 49:6, 49:15, 49:17, 97:22, 135:7, 149:25
**analysis** [18] - 25:14,

33:5, 69:16, 72:1, 88:3, 88:8, 90:14, 90:19, 91:21, 91:23, 92:1, 106:25, 108:25, 109:4, 109:19, 110:7, 122:8, 128:15
**analytical** [4] - 83:23, 92:17, 94:3, 141:21
**analyze** [1] - 66:21
**analyzed** [1] - 60:1
**Andress** [1] - 89:11
**angle** [2] - 59:15, 104:12
**annex** [4] - 46:24, 47:3, 47:8, 47:15
**announce** [1] - 127:2
**announced** [3] - 74:1, 89:18, 144:2
**announcing** [1] - 73:23
**answer** [12] - 30:7, 54:4, 54:5, 62:25, 71:22, 85:11, 100:14, 101:17, 109:8, 113:11, 120:10, 121:8
**answering** [1] - 124:22
**answers** [1] - 72:15
**anticipated** [1] - 139:3
**Antideficiency** [3] - 7:11, 23:11, 56:6
**anyway** [5] - 22:6, 51:19, 52:23, 97:19, 107:14
**AORs** [1] - 42:17
**APA** [70] - 6:10, 9:10, 13:22, 15:25, 16:3, 16:12, 16:17, 16:22, 17:14, 21:5, 22:1, 22:7, 22:20, 23:10, 31:9, 32:16, 33:7, 37:12, 39:17, 41:5, 56:13, 56:23, 60:18, 60:19, 60:22, 61:7, 61:9, 64:9, 67:5, 67:10, 67:14, 68:14, 72:21, 73:1, 73:10, 79:8, 80:6, 81:10, 82:9, 82:25, 84:7, 84:14, 86:9, 86:10, 86:11, 87:3, 87:5, 87:7, 87:10, 111:19, 111:22, 114:16, 114:20, 114:24, 115:4, 115:9, 116:12, 117:14, 118:8, 120:12, 121:9, 121:13, 121:14,

122:1, 122:7, 124:4, 126:20
**APA's** [2] - 22:9, 33:3
**apart** [3] - 60:15, 86:17, 142:18
**appeal** [2] - 5:9, 36:13
**appealed** [1] - 130:25
**application** [7] - 24:13, 65:13, 68:7, 83:1, 83:4, 83:12, 84:13
**applied** [4] - 83:14, 83:15, 140:9
**applies** [4] - 72:21, 74:6, 76:13, 140:24
**apply** [10] - 10:5, 16:12, 17:14, 26:4, 33:5, 68:6, 87:6, 87:7, 104:10, 111:22
**applying** [1] - 126:24
**appointees** [1] - 9:22
**appreciate** [27] - 4:9, 5:22, 10:6, 10:7, 10:18, 22:1, 35:5, 48:18, 58:21, 63:14, 88:18, 101:19, 101:21, 112:1, 112:20, 126:9, 136:16, 138:8, 138:22, 139:15, 141:4, 144:17, 145:7, 149:5, 149:18, 151:2, 151:4
**appreciated** [1] - 112:21
**approach** [4] - 3:8, 38:1, 91:11, 143:13
**appropriate** [11] - 89:4, 102:25, 103:5, 104:25, 108:13, 121:15, 124:3, 126:21, 141:8, 142:1, 147:17
**appropriated** [25] - 35:2, 43:19, 43:22, 44:13, 45:10, 45:22, 46:4, 47:4, 47:10, 48:10, 49:6, 50:18, 51:9, 52:21, 53:16, 54:24, 55:5, 92:20, 98:18, 99:11, 102:4, 110:1, 118:21, 119:8, 129:18
**appropriately** [2] - 63:10, 79:2
**appropriates** [2] - 50:14, 97:3
**appropriating** [1] -

97:22
**appropriation** [5] -
46:2, 49:13, 50:21,
50:23, 98:17
**Appropriations** [8] -
7:11, 23:12, 49:23,
49:24, 50:6, 51:1,
52:17, 97:2
**appropriations** [47] -
14:16, 35:3, 43:23,
45:12, 46:25, 48:15,
49:11, 49:16, 50:9,
50:13, 50:24, 51:5,
51:6, 52:8, 52:19,
55:9, 56:6, 92:18,
92:19, 97:23, 98:4,
98:10, 98:20, 98:21,
99:22, 100:1, 100:12,
100:13, 100:21,
100:22, 100:25,
101:16, 101:22,
102:1, 104:14,
104:16, 104:24,
105:5, 105:15, 107:4,
110:1, 110:24,
118:20, 121:3,
127:24, 128:10
**approval** [1] - 9:19
**approved** [1] - 43:23
**approximation** [1] -
70:12
**arbitrariness** [2] -
41:11, 43:6
**arbitrary** [17] - 7:9,
16:6, 21:11, 35:6,
36:13, 36:17, 40:6,
40:18, 41:9, 43:2,
60:22, 62:21, 84:6,
87:13, 88:2, 91:17,
114:21
**area** [7] - 64:11,
85:9, 94:15, 108:21,
110:16, 111:2, 111:19
**areas** [2] - 43:12,
94:7
**argue** [1] - 86:21
**argued** [3] - 44:12,
103:3, 112:3
**arguing** [2] - 16:11,
60:24
**ARGUMENT** [1] -
1:16
**argument** [68] - 4:24,
5:1, 5:9, 7:19, 10:10,
11:22, 12:9, 13:22,
13:23, 14:4, 14:8,
14:14, 14:23, 19:7,
19:12, 24:23, 24:24,
25:18, 28:17, 32:9,
34:5, 36:17, 40:3,

44:8, 46:6, 46:8,
46:12, 49:24, 50:11,
51:21, 56:17, 56:19,
63:13, 63:15, 63:24,
64:7, 64:15, 65:8,
66:9, 67:8, 72:21,
79:9, 79:10, 79:11,
79:12, 82:13, 86:19,
86:23, 87:10, 88:3,
88:9, 88:15, 93:11,
93:15, 99:1, 102:17,
102:24, 105:6,
105:21, 109:2, 110:2,
111:17, 112:22,
118:19, 118:20,
118:25, 124:10,
142:10
**arguments** [31] -
7:10, 7:12, 13:11,
13:22, 16:7, 22:16,
25:13, 29:17, 32:5,
36:9, 36:11, 39:4,
57:16, 67:2, 71:14,
86:8, 87:4, 87:9,
88:11, 88:24, 92:17,
102:22, 103:6,
103:15, 105:3,
105:12, 110:6,
126:14, 142:10,
142:12
**arising** [1] - 78:4
**armies** [1] - 109:15
**Arnold** [1] - 2:5
**arose** [1] - 102:7
**arrangements** [2] -
27:2, 117:4
**Article** [30] - 13:15,
59:14, 63:18, 63:24,
65:11, 65:20, 65:24,
67:22, 83:1, 83:23,
104:21, 104:24,
107:5, 107:16,
108:10, 108:16,
108:19, 108:24,
109:4, 109:5, 109:24,
111:3, 111:6, 111:9,
124:6, 141:7, 141:9
**article** [1] - 109:10
**articulation** [1] -
57:14
**artificial** [1] - 9:21
**aside** [4] - 39:3,
86:18, 87:22, 110:22
**aspect** [1] - 91:16
**aspects** [3] - 32:24,
101:4, 149:6
**assert** [1] - 64:19
**asserted** [4] - 77:11,
79:1, 83:21, 97:19
**asserting** [3] - 36:14,

64:22, 104:8
**assertions** [2] -
139:25, 142:3
**assess** [1] - 92:11
**assessed** [1] - 39:11
**assessment** [1] -
39:8
**assigned** [2] - 73:24,
89:7
**assistance** [14] -
8:11, 8:12, 8:14, 8:17,
8:24, 9:18, 35:13,
35:15, 36:7, 52:2,
52:7, 96:20, 96:25,
113:20
**Assistance** [6] -
51:21, 94:12, 94:18,
95:2, 97:24, 98:22
**association** [2] -
66:24, 68:4
**association's** [1] -
68:2
**associational** [9] -
58:14, 65:25, 66:8,
66:17, 67:23, 68:3,
139:10, 139:11, 143:9
**associations** [1] -
139:12
**assume** [18] - 11:20,
36:17, 38:7, 41:15,
41:18, 42:5, 42:8,
51:5, 52:16, 53:12,
60:23, 68:16, 73:2,
102:20, 120:10,
121:23, 126:19,
139:16
**assuming** [1] -
145:17
**assure** [1] - 12:9
**attached** [4] - 30:10,
49:18, 87:24, 114:12
**attaches** [1] - 75:12
**attempted** [1] - 94:8
**attempts** [1] - 43:5
**attention** [1] - 122:9
**audio** [2] - 4:15, 4:18
**authorities** [12] -
17:9, 19:4, 38:9,
38:21, 40:10, 46:2,
47:6, 52:7, 104:24,
109:25, 111:4, 124:6
**authority** [14] -
13:10, 28:9, 43:20,
52:6, 53:3, 53:10,
54:8, 89:5, 93:3,
95:17, 97:5, 99:9,
102:10, 108:16
**Authority** [1] - 77:4
**authorization** [1] -
53:9

**authorize** [1] -
134:22
**authorized** [4] -
23:19, 43:22, 52:2,
96:24
**authorizing** [1] -
95:20
**AVAC** [7] - 27:12,
29:6, 37:24, 46:20,
57:19, 88:19, 136:20
**availability** [1] - 79:7
**available** [5] - 15:22,
51:10, 55:11, 60:8,
139:7
**avenue** [1] - 39:18,
78:12
**Avenue** [2] - 1:24,
2:7
**award** [16] - 8:25,
23:15, 23:19, 25:20,
25:22, 25:25, 26:6,
26:18, 28:15, 28:22,
29:14, 29:24, 30:16,
30:22, 78:16, 113:23
**awards** [24] - 9:1,
9:3, 9:4, 24:19, 24:21,
26:13, 27:24, 28:19,
29:12, 29:21, 30:13,
36:7, 39:22, 40:24,
42:3, 47:25, 59:25,
60:4, 63:11, 66:2,
66:6, 78:8, 113:20,
113:21
**aware** [5] - 58:6,
66:16, 115:3, 115:21,
135:19

# B

**back-end** [1] -
125:14
**background** [1] -
51:23
**backing** [1] - 39:7
**backstop** [1] - 47:23
**baggage** [1] - 41:23
**baked** [3] - 85:14,
122:19, 128:16
**balance** [2] - 31:21,
119:10
**balancing** [3] -
31:20, 32:9, 39:14
**bank** [1] - 134:14
**banking** [1] - 117:5,
148:25
**barred** [1] - 22:19
**based** [23] - 13:9,
17:8, 18:6, 18:13,
19:16, 31:24, 37:20,
38:11, 38:12, 38:17,

42:8, 54:11, 73:24,
102:9, 103:17,
110:17, 130:23,
134:12, 136:24,
143:22, 145:3,
145:18, 150:25
**bases** [3] - 57:15,
87:15, 99:10
**basis** [12] - 9:5,
23:16, 25:16, 34:12,
35:2, 39:12, 39:25,
65:1, 72:19, 85:1,
85:15, 86:7
**batches** [1] - 70:12
**Bateman** [6] - 3:11,
7:9, 7:13, 35:11,
49:22, 57:10
**BATEMAN** [20] - 2:2,
3:10, 35:11, 36:21,
37:19, 39:3, 39:20,
40:8, 40:23, 41:3,
41:10, 42:1, 42:13,
43:1, 43:11, 43:25,
44:17, 57:13, 57:24,
113:14
**bear** [2] - 81:25,
108:12
**bears** [2] - 38:18,
101:15
**become** [2] - 67:16,
141:16
**becomes** [1] - 66:23
**Beethoven** [1] -
61:14
**BEFORE** [1] - 1:17
**began** [2] - 8:23,
59:13
**begin** [3] - 12:2,
29:1, 37:3
**beginning** [1] - 3:7
**begs** [2] - 69:20,
107:12
**begun** [2] - 40:15,
134:13
**behalf** [4] - 3:17, 7:2,
64:19, 136:20
**benchmark** [7] -
130:20, 143:17,
144:23, 147:6, 147:8,
147:17, 148:1
**benchmarks** [1] -
147:9
**beneficiaries** [2] -
27:4, 92:9
**beneficiary** [1] -
98:18
**benefit** [5] - 27:1,
31:13, 31:15, 121:2,
150:12
**benefiting** [1] -

140:22
  **benefits** [9] - 27:4, 29:3, 31:16, 35:12, 35:20, 35:23, 39:9, 92:10, 92:11
  **best** [10] - 7:21, 29:20, 30:8, 31:2, 33:21, 48:3, 49:10, 91:7, 139:8, 147:23
  **better** [5] - 64:8, 122:11, 123:24, 129:18, 150:22
  **between** [28] - 6:9, 6:21, 26:17, 27:5, 27:25, 28:1, 29:14, 34:24, 35:25, 43:12, 54:19, 80:17, 82:2, 96:7, 97:16, 98:17, 104:3, 104:23, 107:4, 109:24, 119:10, 122:20, 129:16, 143:9, 143:21, 144:4, 145:22, 148:21
  **beyond** [9] - 17:14, 40:4, 63:24, 81:24, 87:22, 92:24, 94:6, 97:17, 117:9
  **big** [1] - 88:9
  **billion** [6] - 47:4, 47:10, 48:10, 57:25, 131:1, 132:14
  **billions** [2] - 8:20, 98:2
  **binding** [1] - 99:7
  **bit** [12] - 7:5, 7:16, 10:24, 44:9, 61:12, 61:19, 68:23, 75:25, 95:5, 98:7, 119:12, 124:15
  **blame** [4] - 93:20, 93:21, 93:23
  **blanket** [9] - 18:7, 38:11, 59:17, 60:21, 61:23, 90:20, 91:22, 93:15
  **blending** [1] - 67:18
  **blocked** [2] - 47:3, 47:9
  **board** [1] - 73:6
  **boat** [1] - 81:23
  **Boaz** [2] - 77:4, 77:14
  **body** [2] - 27:14, 75:11
  **bored** [1] - 8:8
  **bottleneck** [3] - 9:21, 140:5, 140:6
  **bounds** [1] - 95:21
  **Bowen** [4] - 33:14, 33:22, 34:6

  **box** [1] - 11:13
  **bracket** [3] - 13:12, 52:14, 86:20
  **bracketed** [1] - 86:23
  **bracketing** [1] - 67:12
  **branch** [10] - 53:4, 53:15, 94:9, 94:25, 95:25, 97:16, 97:22, 112:11, 129:10
  **branches** [6] - 104:4, 109:3, 112:5, 112:11, 127:3, 129:17
  **brand** [2] - 91:11
  **brand-new** [2] - 91:11
  **breach** [8] - 24:14, 28:22, 31:14, 73:8, 74:8, 75:13, 77:13, 78:1
  **break** [3] - 17:10, 59:3, 85:17
  **breakdown** [1] - 71:5
  **breakneck** [1] - 20:12
  **brief** [26] - 6:21, 7:6, 8:5, 10:22, 11:8, 12:12, 35:7, 43:3, 43:11, 45:2, 61:16, 61:21, 66:9, 77:5, 77:16, 82:6, 88:20, 103:4, 106:20, 106:24, 111:14, 111:15, 112:14, 115:1, 133:7, 140:16
  **briefing** [12] - 6:6, 10:18, 27:12, 29:6, 29:7, 36:10, 36:23, 50:7, 51:2, 78:17, 88:4, 107:14
  **briefly** [7] - 35:12, 40:8, 51:20, 65:23, 68:10, 113:16, 141:25
  **bring** [21] - 24:3, 24:4, 27:15, 39:17, 63:7, 68:2, 68:3, 68:4, 74:7, 98:7, 99:1, 99:23, 114:20, 115:23, 115:25, 116:4, 125:4, 126:18, 133:14, 133:22, 146:2
  **bringing** [1] - 105:8
  **broad** [19] - 31:21, 41:11, 84:19, 93:3, 94:14, 95:16, 95:17, 95:21, 96:6, 97:8, 104:8, 114:24, 115:6, 115:18, 115:20, 116:19, 118:11, 119:4, 131:18

  **broader** [3] - 115:15, 136:18, 136:22
  **broadly** [4] - 96:4, 96:11, 115:5, 115:7
  **broken** [3] - 65:14, 65:18, 125:19
  **brought** [10] - 30:2, 44:3, 60:15, 60:24, 86:8, 125:12, 126:7, 133:24, 134:19, 149:18
  **buckets** [1] - 131:20
  **budget** [2] - 35:21, 54:8
  **building** [1] - 148:1
  **built** [2] - 48:15, 108:20
  **bulk** [1] - 113:15
  **bunch** [1] - 61:4
  **bunches** [1] - 18:6
  **burden** [6] - 7:4, 48:20, 85:7, 85:9, 85:10, 86:7
  **burdens** [2] - 64:23, 85:11
  **bureau** [2] - 46:25, 47:2
  **Bureau** [1] - 47:2
  **business** [5] - 11:17, 134:3, 141:20, 149:3, 149:10
  **businesses** [2] - 10:16, 35:19
  **buying** [1] - 26:25
  **BY** [3] - 2:2, 2:6, 2:9
  **bypass** [4] - 94:8, 140:22, 140:23, 140:24
  **bypassed** [1] - 92:2
  **bypassing** [2] - 140:19, 140:20

  **C**

  **California** [1] - 92:7
  **canceling** [2] - 90:6, 142:2
  **cannot** [1] - 40:14
  **capacity** [1] - 137:8
  **capricious** [12] - 7:9, 16:6, 21:11, 40:19, 41:9, 60:23, 62:21, 64:6, 87:14, 88:3, 91:17, 114:21
  **capriciousness** [5] - 35:6, 36:14, 36:18, 40:7, 43:2
  **captured** [1] - 4:18
  **card** [1] - 125:1
  **care** [3] - 108:5,

  108:17, 134:16
  **careful** [2] - 36:8, 129:18
  **carrying** [2] - 9:6, 98:24
  **CASE** [2] - 1:5, 1:11
  **case** [112] - 2:1, 3:18, 4:11, 4:15, 5:2, 5:5, 5:8, 7:7, 8:5, 10:5, 10:12, 10:18, 11:4, 15:21, 16:2, 17:16, 23:16, 26:7, 26:10, 28:10, 28:12, 28:16, 29:5, 29:6, 29:7, 29:9, 29:21, 30:14, 32:7, 33:10, 33:11, 33:13, 33:22, 34:3, 34:6, 34:18, 34:19, 34:20, 35:3, 35:4, 35:14, 37:24, 38:7, 39:16, 43:24, 43:25, 44:2, 46:7, 53:1, 53:11, 54:18, 56:11, 56:19, 56:25, 57:19, 61:14, 61:17, 62:8, 62:24, 63:7, 66:18, 74:17, 74:22, 77:3, 77:4, 77:14, 77:19, 80:3, 80:9, 80:17, 81:19, 82:3, 89:8, 89:10, 90:15, 92:2, 92:7, 92:17, 94:7, 98:6, 98:10, 98:18, 98:19, 98:20, 99:7, 99:8, 99:12, 99:13, 101:5, 102:2, 102:7, 103:14, 103:17, 103:21, 104:9, 105:15, 106:3, 107:19, 107:24, 116:13, 116:24, 117:2, 119:13, 130:25, 132:9, 133:5, 133:12, 140:3
  **Case** [3] - 2:5, 3:11, 139:2
  **cases** [23] - 4:25, 6:9, 10:25, 16:18, 22:25, 30:21, 32:25, 34:17, 61:6, 61:13, 61:16, 61:20, 62:20, 64:9, 74:9, 78:2, 84:15, 84:19, 89:2, 103:13, 105:10, 110:20, 110:25
  **cash** [1] - 116:25
  **catastrophic** [1] - 8:20
  **categorical** [1] - 43:18
  **categorically** [1] -

  78:3
  **categories** [4] - 27:11, 80:21, 95:6, 119:8
  **category** [5] - 75:8, 78:8, 81:3, 85:6, 132:25
  **causal** [1] - 65:18
  **caused** [3] - 12:7, 54:22, 54:24
  **cautioning** [1] - 110:25
  **cautions** [1] - 4:16
  **caveat** [1] - 70:15
  **CDA** [29] - 22:7, 25:1, 25:9, 25:23, 26:3, 26:23, 27:18, 27:20, 28:6, 28:11, 28:17, 30:3, 30:17, 30:23, 32:11, 73:4, 75:23, 75:25, 76:1, 76:6, 76:9, 76:21, 76:23, 77:1, 79:6, 79:12, 85:3, 85:23
  **cease** [1] - 8:14
  **cede** [1] - 13:24
  **ceding** [2] - 40:2, 84:24
  **celerity** [1] - 122:17
  **cent** [1] - 53:17
  **certain** [17] - 25:1, 69:9, 71:5, 73:2, 74:19, 90:9, 98:13, 101:19, 113:1, 128:3, 129:18, 131:19, 136:7, 141:2, 148:9, 149:2, 149:13
  **certainly** [11] - 12:24, 13:15, 15:16, 24:20, 30:22, 39:25, 48:19, 92:13, 96:10, 135:11, 136:22
  **CERTIFICATE** [1] - 151:8
  **certified** [1] - 125:7
  **Certified** [1] - 1:23
  **certify** [1] - 151:10
  **certifying** [1] - 125:13
  **cetera** [7] - 11:18, 11:19, 18:22, 118:4, 119:3, 136:24
  **challenge** [9] - 16:16, 16:17, 21:3, 21:5, 32:17, 39:10, 41:5, 60:15, 60:19, 60:21, 60:22, 62:20, 64:24, 65:1, 68:19, 74:24, 83:2, 99:1, 105:14

**challenged** [14] - 16:19, 21:4, 21:16, 61:7, 62:12, 62:18, 63:3, 65:13, 68:13, 82:9, 82:19, 84:14, 136:25, 140:2
**challenges** [1] - 38:16
**challenging** [7] - 16:10, 32:13, 39:2, 41:6, 65:12, 80:23, 83:4
**chance** [5] - 35:9, 88:17, 101:19, 103:9, 105:11
**Chaney** [2] - 111:16, 111:21
**change** [8] - 61:12, 61:22, 62:7, 62:12, 67:7, 81:2, 81:5, 96:7
**changed** [3] - 21:22, 61:2, 61:9
**changes** [3] - 21:6, 21:21, 84:19
**characterization** [4] - 65:7, 71:13, 82:23, 84:9
**characterizing** [1] - 82:7
**chief** [2] - 104:5, 106:3
**choices** [5] - 36:1, 94:5, 96:10, 96:19, 126:1
**chosen** [1] - 54:22
**Circuit** [6] - 33:12, 56:25, 64:24, 89:10, 122:3, 127:20
**circuit** [3] - 74:5, 75:9, 77:19
**Circuit's** [5] - 22:24, 23:24, 54:18, 61:13, 126:24
**circumstance** [1] - 62:16
**circumstances** [3] - 68:1, 72:5, 96:7
**citation** [6] - 27:12, 57:17, 57:20, 77:6, 77:15, 111:16
**cite** [8] - 50:6, 51:2, 77:3, 77:16, 88:13, 89:11, 106:20, 106:24
**cited** [8] - 11:4, 27:11, 29:6, 77:3, 88:20, 99:13, 101:11, 107:16
**cites** [1] - 77:14
**citing** [1] - 103:20
**Citizen** [1] - 2:2

**City** [6] - 54:18, 77:18, 98:11, 98:16, 104:15, 128:4
**Civil** [2] - 3:3, 3:5
**civilian** [1] - 73:6
**claim** [37] - 14:10, 17:14, 24:4, 24:8, 32:16, 32:17, 39:17, 39:19, 40:11, 54:1, 56:13, 61:9, 63:4, 65:16, 73:9, 74:8, 79:1, 79:24, 80:4, 81:9, 82:7, 82:9, 82:24, 83:10, 84:5, 84:8, 84:10, 85:4, 92:13, 97:19, 99:3, 112:1, 113:5, 114:22, 119:8, 126:18
**claimed** [1] - 48:24
**claiming** [1] - 23:17
**claims** [39] - 7:13, 13:5, 16:17, 22:19, 23:3, 23:4, 23:10, 23:17, 23:21, 25:15, 27:15, 31:24, 31:25, 33:8, 37:5, 65:22, 66:21, 67:3, 73:2, 73:9, 73:11, 77:12, 78:3, 84:4, 84:7, 84:21, 85:6, 87:7, 87:8, 87:9, 113:1, 114:17, 114:20, 114:24, 118:8, 118:14, 121:10, 121:12, 148:13
**Claims** [4] - 73:6, 73:22, 79:2, 87:25
**Clara** [1] - 37:24
**clarification** [2] - 87:2, 123:17
**clarify** [3] - 5:14, 44:25, 110:6
**clarifying** [2] - 141:15, 142:13
**clarity** [11] - 44:16, 72:15, 114:8, 126:12, 130:12, 138:3, 138:11, 143:15, 144:5, 144:25, 150:10
**clash** [1] - 109:24
**clashes** [1] - 107:4
**clause** [11] - 14:14, 62:19, 62:22, 62:23, 99:21, 105:17, 108:6, 108:7, 108:17, 109:6
**clause-type** [1] - 105:17
**clauses** [4] - 108:6, 108:19, 113:21, 142:6
**clear** [18] - 16:17,

23:25, 27:20, 33:12, 45:4, 46:5, 53:9, 89:10, 90:12, 112:3, 116:17, 121:10, 124:1, 128:17, 128:25, 138:1, 150:9, 150:24
**clearer** [1] - 144:7
**clearest** [1] - 67:6
**clearly** [4] - 32:11, 33:14, 134:21, 142:7
**CLERK** [3] - 3:2, 3:24
**client** [2] - 12:19, 30:10
**clients** [16] - 12:18, 12:25, 14:6, 24:19, 25:21, 30:14, 40:15, 40:23, 58:8, 58:17, 118:24, 135:5, 135:12, 135:15, 147:25
**clients'** [1] - 11:7
**clip** [1] - 143:20
**close** [2] - 32:22, 143:14
**closeout** [1] - 60:11
**closer** [1] - 150:6
**co** [3] - 42:23, 44:18, 118:18
**co-counsel** [2] - 42:23, 44:18
**co-extensive** [1] - 118:18
**COALITION** [1] - 1:3
**Coalition** [1] - 3:3
**cognizable** [1] - 84:2
**cognizant** [1] - 136:9
**collateralized** [1] - 117:1
**colleague** [3] - 15:20, 31:4, 46:19
**colleagues** [1] - 136:21
**College** [1] - 77:18
**Collins** [1] - 11:5
**colloquy** [2] - 37:20, 92:25
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 151:10
**combatting** [1] - 95:12
**combination** [1] - 150:5
**comfort** [1] - 149:21
**coming** [7] - 55:15, 63:17, 71:14, 84:20, 107:17, 108:22, 143:17

**command** [1] - 104:21
**comment** [1] - 34:7
**commerce** [2] - 108:9, 109:11
**commercial** [1] - 65:3
**commitment** [1] - 142:24
**commitments** [1] - 77:10
**committed** [2] - 103:18, 109:13
**common** [1] - 91:24
**communication** [1] - 69:4
**communities** [2] - 11:18, 15:5
**Community** [2] - 34:19, 80:12
**company** [1] - 89:25
**compensates** [1] - 33:18
**complaining** [1] - 122:16
**complaint** [7] - 16:17, 21:16, 57:19, 61:23, 67:4, 68:13, 116:11
**complaints** [1] - 68:18
**complete** [6] - 18:7, 18:10, 18:12, 32:6, 37:10, 60:3
**completed** [3] - 8:18, 40:11, 146:20
**completely** [3] - 40:18, 62:12, 116:23
**completing** [1] - 148:15
**complex** [2] - 78:10, 80:18
**complexity** [1] - 150:4
**compliance** [17] - 5:15, 5:16, 5:21, 5:25, 6:19, 114:9, 114:14, 124:15, 125:4, 125:6, 126:10, 126:13, 130:13, 134:1, 134:2, 138:10, 141:22
**complied** [3] - 102:18, 124:22, 145:1
**comply** [3] - 5:12, 9:15, 88:12
**component** [13] - 14:21, 50:1, 52:16, 64:16, 84:16, 99:20, 120:4, 120:15, 124:21, 124:25,

135:22, 144:9, 146:12
**components** [1] - 138:9
**comptroller** [3] - 56:18, 57:1, 57:5
**conceive** [1] - 22:15
**conceived** [1] - 19:11
**concentrated** [1] - 101:4
**concept** [2] - 79:21, 106:22
**conception** [1] - 98:4
**concern** [6] - 59:23, 91:5, 91:20, 148:9, 148:11
**concerned** [3] - 65:4, 91:18, 148:18
**concerns** [2] - 62:3, 95:8
**concisely** [1] - 56:10
**concluded** [1] - 151:6
**concluding** [1] - 19:9
**conclusion** [4] - 73:24, 74:1, 123:11, 127:5
**conclusions** [1] - 127:3
**concrete** [15] - 24:15, 62:11, 65:13, 66:14, 67:14, 83:1, 83:4, 83:12, 84:13, 130:16, 130:20, 134:18, 144:13, 146:18, 150:18
**concurrence** [1] - 107:8
**condition** [1] - 52:2
**conditions** [5] - 23:15, 70:4, 97:1, 97:5, 123:15
**conduct** [3] - 19:15, 20:10, 42:2, 115:6, 115:7
**confer** [1] - 151:4
**Conference** [1] - 151:12
**confidently** [1] - 116:6
**configuration** [1] - 82:3
**confirmation** [1] - 94:13
**confirms** [1] - 70:21
**conflict** [1] - 37:2
**conformance** [1] - 151:11
**confused** [2] - 10:24, 69:8

**Congress** [37] - 48:11, 50:1, 50:18, 51:13, 52:13, 52:20, 57:2, 93:2, 94:25, 95:13, 95:17, 95:19, 95:25, 96:5, 97:3, 97:4, 97:21, 102:20, 103:2, 103:22, 103:23, 104:3, 106:2, 106:6, 106:9, 106:14, 107:9, 109:10, 109:25, 110:1, 110:11, 118:21, 119:10, 129:16, 129:17, 129:21

**Congress's** [5] - 37:2, 43:20, 50:3, 94:19, 102:9

**congressional** [4] - 53:9, 94:13, 106:10, 106:16

**congressionally** [2] - 43:19, 43:23

**conjunction** [2] - 18:17, 52:7

**connected** [1] - 114:10

**connection** [2] - 35:25, 71:8

**consequence** [1] - 19:1

**consequences** [3] - 82:15, 128:21, 128:22

**consider** [5] - 18:19, 38:13, 129:1, 138:9, 148:4

**consideration** [5] - 5:8, 26:20, 29:2, 38:18, 38:22

**considerations** [3] - 20:24, 70:20, 130:10

**considering** [2] - 71:17, 149:5

**consistency** [1] - 36:24

**consistent** [10] - 40:16, 73:15, 84:10, 96:21, 102:23, 123:15, 132:6, 132:23, 136:6, 146:4

**consistently** [1] - 142:6

**Constitution** [10] - 1:24, 9:10, 104:5, 106:5, 107:17, 107:25, 109:9, 110:10, 110:17, 112:5

**constitutional** [20] - 7:13, 11:14, 13:17, 23:9, 23:13, 37:4,

49:25, 52:12, 57:15, 60:18, 87:9, 94:19, 99:21, 109:19, 110:13, 112:1, 114:17, 119:9, 129:15

**constitutionally** [4] - 61:10, 62:15, 62:18, 62:23

**constraint** [1] - 137:18

**constructing** [1] - 144:20

**construction** [1] - 34:6

**consuls** [2] - 108:4, 108:18

**consult** [2] - 101:19, 112:15

**consultation** [1] - 42:15

**contained** [1] - 46:13

**contains** [1] - 29:23

**contemplated** [1] - 19:2

**contested** [1] - 35:13

**context** [31] - 10:4, 14:3, 24:24, 33:13, 44:3, 48:16, 64:9, 96:13, 98:6, 99:15, 100:2, 102:3, 102:7, 102:12, 103:10, 103:11, 103:16, 103:24, 104:5, 104:9, 105:7, 105:18, 105:22, 106:6, 106:8, 106:16, 107:23, 110:11, 111:25, 150:13

**contexts** [2] - 36:12, 74:23

**continuation** [1] - 91:9

**continue** [2] - 8:13, 58:7

**continued** [10] - 9:24, 17:20, 17:25, 18:18, 19:4, 19:19, 21:24, 40:21, 61:8, 119:25

**continues** [1] - 120:17

**continuing** [2] - 59:20, 62:5

**continuously** [1] - 55:12

**Contract** [4] - 16:4, 22:16, 22:21, 23:1

**contract** [32] - 24:9, 24:10, 24:12, 24:13, 24:17, 26:19, 26:24,

28:5, 28:22, 29:10, 31:14, 39:12, 39:19, 48:8, 48:9, 63:21, 63:22, 67:3, 69:16, 73:9, 74:8, 81:22, 82:1, 87:21, 90:1, 90:14, 91:25, 137:15, 149:17

**contract-by-contract** [2] - 39:12, 90:14

**contract-by-contract-type** [1] - 39:19

**contracted** [1] - 38:19

**contracting** [5] - 26:9, 42:16, 89:19, 113:18, 118:25

**contractor** [2] - 28:4, 76:2

**contractors** [2] - 28:13

**contracts** [54] - 8:24, 17:7, 17:8, 18:11, 18:21, 19:9, 19:16, 20:12, 20:15, 20:19, 20:20, 21:23, 23:22, 24:5, 24:7, 24:25, 25:1, 25:3, 26:4, 26:5, 26:11, 26:18, 26:19, 26:21, 26:24, 28:8, 28:23, 29:1, 29:12, 39:5, 39:9, 39:15, 40:24, 41:22, 42:9, 42:18, 42:20, 59:24, 63:11, 66:1, 66:6, 67:15, 67:17, 73:4, 73:8, 75:1, 76:13, 77:9, 85:17, 85:22, 92:14, 118:3, 123:16, 147:14

**contractual** [10] - 17:9, 23:3, 23:5, 23:10, 23:21, 25:15, 25:17, 29:2, 38:17, 38:21

**contrary** [8] - 7:12, 21:11, 56:13, 74:5, 84:6, 88:22, 114:21, 126:2

**contrast** [1] - 35:22

**contrasting** [1] - 104:2

**contravening** [1] - 50:22

**contravention** [2] - 50:21, 51:14

**Control** [16] - 7:11, 23:11, 52:15, 54:7,

54:16, 54:20, 55:3, 56:5, 56:8, 56:14, 56:16, 99:25, 102:15, 102:18, 103:5

**control** [4] - 43:20, 98:15, 128:5, 139:9

**controversy** [1] - 61:15

**conversation** [6] - 31:23, 32:1, 32:2, 100:15, 124:15, 150:1

**convey** [1] - 123:8

**cooperative** [26] - 25:5, 26:12, 26:21, 27:2, 27:5, 27:9, 27:22, 28:25, 29:9, 29:11, 29:21, 29:24, 32:10, 32:15, 42:20, 74:4, 74:15, 74:19, 75:2, 75:4, 75:7, 76:14, 76:16, 76:22, 78:4, 79:23

**core** [4] - 14:25, 24:3, 104:4, 106:10, 106:15, 106:16, 133:8, 133:10

**correct** [12] - 24:24, 26:14, 26:17, 31:18, 44:24, 45:4, 45:25, 54:15, 69:2, 70:24, 89:19, 136:19

**correctly** [5] - 77:5, 99:15, 107:7, 144:4, 144:5

**corruption** [1] - 95:12

**CORs** [1] - 42:17

**costs** [2] - 20:16, 60:10

**Council** [4] - 3:5, 3:18, 30:9, 53:11

**COUNCIL** [1] - 1:9

**counsel** [17] - 3:7, 4:8, 4:14, 6:24, 7:22, 42:23, 44:11, 44:18, 75:19, 75:22, 76:12, 113:7, 115:25, 129:2, 139:16, 141:15, 147:3

**count** [1] - 11:19

**countries** [1] - 70:5

**country** [4] - 101:25, 108:12, 108:14, 148:17

**country-shaking** [1] - 101:25

**county** [1] - 106:1

**County** [6] - 99:8, 99:23, 102:2, 105:10, 127:12, 127:22

**couple** [9] - 4:4,

56:8, 115:16, 116:19, 134:3, 134:21, 135:5, 145:19, 147:9

**course** [17] - 21:21, 21:22, 36:3, 62:4, 67:3, 68:20, 69:18, 77:11, 97:2, 117:20, 124:24, 125:2, 128:18, 130:6, 137:20, 144:9

**court** [21] - 4:19, 4:20, 23:2, 43:16, 73:10, 74:7, 74:11, 77:12, 96:15, 99:3, 102:8, 109:1, 112:8, 112:15, 124:13, 125:25, 127:19, 128:4, 129:18

**COURT** [254] - 1:1, 3:12, 3:15, 3:19, 3:23, 4:1, 7:18, 8:7, 10:1, 10:17, 11:20, 12:1, 12:8, 13:8, 13:20, 14:20, 15:25, 16:8, 17:4, 18:3, 18:23, 19:6, 19:22, 20:6, 20:18, 20:22, 21:25, 22:23, 24:1, 24:11, 24:23, 25:25, 26:14, 27:13, 27:22, 28:2, 28:20, 29:15, 30:12, 30:19, 31:5, 31:13, 31:23, 32:8, 32:19, 34:4, 35:5, 36:8, 37:11, 38:5, 39:10, 40:1, 40:20, 41:1, 41:4, 41:15, 42:4, 42:22, 43:9, 43:24, 44:2, 44:19, 44:22, 45:21, 46:5, 47:7, 47:15, 47:23, 48:2, 48:6, 48:20, 49:4, 49:21, 50:22, 51:4, 52:20, 53:12, 53:23, 54:4, 54:13, 55:7, 55:15, 56:3, 56:7, 57:4, 57:10, 57:23, 58:1, 58:11, 58:21, 59:4, 59:6, 59:9, 60:17, 61:19, 62:7, 62:21, 63:13, 64:6, 65:2, 66:9, 67:1, 67:20, 68:5, 68:20, 69:20, 70:8, 70:22, 70:25, 71:6, 71:24, 72:3, 72:17, 72:20, 72:23, 73:17, 73:19, 74:14, 74:23, 75:4, 75:17, 76:4, 76:11, 77:2, 78:7, 78:17,

78:24, 79:4, 79:18, 80:3, 80:14, 80:22, 81:12, 82:5, 83:6, 83:10, 83:17, 83:25, 84:16, 84:20, 85:14, 85:21, 86:1, 86:5, 86:15, 86:25, 87:13, 88:1, 89:13, 90:5, 90:12, 90:24, 91:4, 93:5, 93:20, 94:16, 95:23, 96:21, 97:10, 97:18, 98:8, 98:25, 99:6, 99:18, 100:7, 100:18, 101:8, 101:21, 103:7, 105:6, 107:12, 108:16, 108:23, 109:9, 110:2, 110:9, 111:7, 111:10, 111:13, 111:24, 112:19, 114:2, 115:8, 116:12, 116:15, 117:12, 117:18, 117:22, 118:5, 118:8, 118:12, 118:19, 119:6, 120:4, 120:9, 121:5, 122:19, 123:1, 123:13, 123:17, 124:8, 125:2, 125:17, 125:21, 126:5, 126:9, 127:10, 127:18, 128:1, 128:11, 128:25, 129:14, 129:23, 131:5, 131:8, 131:13, 131:16, 131:24, 132:2, 132:11, 132:19, 132:23, 133:2, 133:16, 134:7, 134:15, 134:18, 134:24, 135:3, 135:8, 135:16, 135:22, 136:2, 136:8, 136:13, 136:16, 137:22, 138:8, 138:16, 139:1, 139:15, 140:12, 140:15, 140:24, 141:3, 142:8, 144:10, 146:17, 149:4, 149:7, 151:16

**Court** [99] - 1:23, 3:1, 5:11, 8:4, 9:10, 12:9, 13:18, 15:13, 15:19, 15:20, 17:2, 19:4, 22:17, 33:11, 34:3, 34:14, 41:23, 43:17, 48:18, 52:25, 56:19, 56:21, 59:13, 60:1, 63:18, 64:3, 66:4, 67:9, 67:11, 67:12, 72:16, 73:6, 73:22, 77:8, 77:17, 77:25,

78:25, 79:2, 80:6, 81:8, 81:9, 81:15, 81:21, 86:19, 87:25, 91:17, 91:18, 93:22, 93:23, 95:2, 95:19, 100:4, 100:17, 101:6, 103:14, 105:22, 106:14, 108:20, 110:25, 112:3, 112:4, 112:9, 114:8, 115:3, 115:5, 115:21, 117:17, 119:18, 120:1, 120:2, 121:13, 121:19, 121:21, 122:14, 126:12, 127:2, 127:4, 127:20, 127:24, 128:17, 128:20, 129:11, 130:12, 134:10, 136:23, 137:23, 138:2, 138:10, 141:9, 141:14, 142:13, 144:25, 148:10, 149:5, 151:9, 151:9

**Court's** [14] - 5:8, 7:16, 9:15, 17:19, 18:18, 20:11, 33:14, 37:25, 59:23, 104:9, 115:14, 132:13, 132:16, 133:25

**courtroom** [2] - 4:11, 112:15

**courts** [4] - 84:3, 111:1, 112:7

**cover** [4] - 26:8, 78:7, 117:21, 119:4

**coverage** [1] - 112:16

**covered** [4] - 6:12, 30:23, 87:15, 87:16

**covers** [2] - 26:9, 73:4

**craft** [1] - 6:2

**crafted** [1] - 124:10

**created** [2] - 9:21, 132:15

**creates** [1] - 43:5

**credibly** [1] - 104:16

**credit** [6] - 117:3, 131:22, 132:24, 135:17, 135:21, 146:19

**crisis** [1] - 62:10

**critical** [3] - 40:6, 113:4, 130:14

**criticism** [1] - 16:21

**Crowley** [7] - 23:1, 23:25, 24:7, 25:14, 81:1, 82:1, 82:3

**Crowley's** [1] - 82:4

**CRR** [1] - 151:15

**crude** [1] - 64:12

**cure** [3] - 89:16, 90:1, 119:9

**cured** [1] - 90:7

**curious** [1] - 66:13

**current** [2] - 24:19, 53:18

**cursory** [4] - 19:17, 19:24, 42:24, 88:17

**Curtiss** [1] - 103:21

**Curtiss-Wright** [1] - 103:21

**cut** [6] - 45:21, 51:11, 51:12, 93:5, 101:10, 142:8

**cutoff** [2] - 82:14, 142:11

**cuts** [4] - 46:15, 55:18, 100:10, 101:14

**cutting** [1] - 8:18

## D

**damages** [22] - 12:20, 22:13, 31:9, 32:21, 33:8, 33:9, 33:12, 33:15, 33:17, 34:3, 34:21, 73:12, 74:11, 75:14, 77:13, 78:1, 79:11, 79:20, 80:2, 80:7, 80:9, 80:15

**dangerous** [1] - 72:24

**DANIEL** [1] - 2:6

**data** [1] - 42:19

**date** [4] - 5:6, 45:17, 131:16, 136:7

**Dated** [1] - 151:13

**days** [17] - 17:25, 60:1, 61:25, 134:3, 134:21, 135:5, 139:5, 139:23, 141:20, 142:20, 142:21, 143:19, 145:14, 149:2, 149:3

**DC** [15] - 1:18, 1:24, 2:3, 2:7, 2:10, 22:24, 23:24, 33:11, 54:17, 56:25, 61:13, 64:24, 122:3, 126:24, 127:20

**DDC** [1] - 89:8

**deadline** [10] - 5:12, 45:5, 45:6, 45:12, 45:19, 137:24, 140:11, 141:22, 144:6, 144:22

**deadlines** [3] - 45:15, 45:17, 53:16

**deal** [1] - 73:20

**dealing** [5] - 66:20, 105:22, 106:16, 110:10, 111:4

**debts** [2] - 116:22, 117:6

**decide** [4] - 100:4, 112:10, 118:22, 143:12

**decided** [4] - 36:18, 60:4, 89:23, 99:24

**decides** [2] - 74:6, 120:25

**deciding** [2] - 9:22, 34:11

**decision** [13] - 14:1, 23:24, 28:9, 33:14, 53:3, 54:18, 56:12, 56:14, 88:24, 89:3, 90:10, 102:4, 103:18

**decisions** [5] - 69:18, 79:16, 108:15, 111:18, 122:16

**declaration** [19] - 20:8, 37:23, 37:24, 69:8, 69:25, 71:4, 90:22, 90:24, 90:25, 91:6, 91:8, 91:10, 131:7, 132:5, 132:9, 133:17, 133:18, 147:12, 148:11

**declarations** [12] - 20:2, 20:23, 30:10, 30:11, 50:17, 58:18, 78:15, 78:16, 83:21, 131:17, 148:16

**declaratory** [2] - 33:23, 126:25

**declare** [1] - 109:14

**defective** [1] - 142:4

**defendant** [2] - 34:24, 61:17

**Defendants** [1] - 1:8

**DEFENDANTS** [1] - 2:8

**defendants** [18] - 1:13, 3:21, 6:13, 8:15, 8:23, 9:15, 9:17, 17:18, 17:20, 36:2, 40:11, 51:21, 103:20, 113:24, 125:7, 125:11, 139:18, 140:5

**defendants'** [8] - 12:4, 23:18, 43:5, 58:23, 95:3, 97:11, 115:6, 115:7

**defended** [1] - 47:19

**defense** [4] - 4:12, 36:11, 36:14

**defenses** [1] -

126:17

**defer** [2] - 7:23, 49:21

**deference** [2] - 108:21, 110:15

**deferral** [5] - 54:8, 54:11, 54:20, 55:3, 55:10

**deferred** [1] - 84:8

**define** [1] - 109:12

**defined** [2] - 62:18, 86:1

**defines** [1] - 95:20

**defining** [1] - 50:2

**definitely** [1] - 25:3

**definition** [3] - 68:14, 76:14, 80:6

**defunded** [2] - 34:23, 34:25

**degree** [3] - 12:12, 106:5, 146:4

**DEI** [1] - 21:9

**delay** [4] - 54:9, 55:1, 55:10, 55:13

**delayed** [2] - 82:7, 87:21

**delays** [1] - 81:22

**delegated** [1] - 89:5

**deliberate** [1] - 134:11

**deliberately** [1] - 136:11

**democracy** [6] - 35:18, 50:14, 50:16, 50:23, 51:1, 51:12

**democratically** [1] - 97:21

**DEPARTMENT** [1] - 1:6

**Department** [10] - 2:9, 3:4, 3:21, 12:5, 38:4, 57:20, 59:21, 89:9, 92:6, 136:25

**deprivation** [1] - 94:14

**depriving** [2] - 107:10, 129:10

**deputy** [1] - 112:15

**DEPUTY** [2] - 3:2, 3:24

**derivative** [1] - 15:6

**describe** [7] - 20:3, 30:4, 30:5, 30:12, 33:21, 85:19, 92:24

**described** [8] - 6:22, 38:14, 70:2, 70:14, 70:18, 84:22, 138:20, 148:16

**describes** [2] - 70:14, 74:18

describing [4] - 17:15, 60:20, 123:22, 125:22
description [2] - 70:1, 127:15
descriptions [1] - 64:1
detail [2] - 37:4, 138:20
detailed [1] - 50:7
details [1] - 124:12
determination [2] - 79:23, 100:5
determinations [5] - 39:22, 39:24, 40:18, 72:19, 137:6
determine [4] - 8:13, 31:21, 52:3
devastating [1] - 58:20
developed [1] - 10:19
development [2] - 95:8, 95:9
diametrically [2] - 34:20, 35:4
differ [1] - 138:7
difference [8] - 20:18, 20:21, 26:17, 27:4, 66:19, 67:17, 76:8, 76:9
differences [3] - 115:9, 128:11, 150:4
different [46] - 6:17, 7:24, 15:3, 18:7, 20:24, 21:4, 21:12, 21:14, 26:2, 26:18, 27:11, 28:19, 30:13, 30:14, 31:24, 31:25, 41:22, 42:5, 45:11, 49:6, 49:7, 51:16, 59:15, 61:4, 64:6, 70:11, 73:14, 81:10, 82:14, 87:1, 95:22, 99:17, 104:12, 104:13, 105:3, 106:13, 106:22, 106:25, 110:18, 110:20, 111:2, 124:9, 128:8, 138:4, 138:18
difficulty [1] - 93:18
Diplomate [1] - 1:22
diplomatic [1] - 108:15
direct [13] - 10:15, 27:1, 27:24, 29:2, 29:5, 50:21, 51:14, 52:8, 66:14, 78:11, 102:2, 103:1, 127:8
directed [8] - 8:11,

8:12, 8:13, 50:20, 51:13, 98:12, 108:13, 109:25
directing [3] - 113:19, 127:8, 127:16
direction [1] - 7:17
directions [1] - 70:25
directive [5] - 13:10, 20:19, 68:24, 69:11, 90:20
directives [3] - 8:16, 12:6, 16:18
directly [6] - 11:23, 20:1, 25:20, 38:18, 38:22, 108:13
directs [1] - 49:14
disability [1] - 81:6
disadvantage [1] - 12:25
disagree [6] - 17:11, 17:13, 68:16, 73:2, 91:20, 95:23
disagreement [2] - 43:12, 86:12
disburse [1] - 5:10, 57:7, 128:7
disbursement [1] - 54:9
discharge [2] - 81:3, 81:5
discontinued [2] - 35:3, 102:6
Discrete [1] - 84:17
discretion [6] - 43:14, 43:21, 51:22, 94:14, 111:22
discretionary [1] - 94:23
discuss [6] - 6:17, 7:15, 31:3, 57:11, 148:6, 150:6
discussed [3] - 7:2, 74:15, 94:11
discussing [3] - 93:8, 94:10, 124:7
discussion [9] - 6:1, 7:6, 8:5, 71:10, 80:12, 87:17, 90:21, 111:6, 111:14
discussions [2] - 59:13, 150:7
disfavorable [1] - 117:4
dispense [1] - 49:14
dispose [1] - 75:8
dispositive [1] - 76:25
Dispute [1] - 16:4
dispute [7] - 42:1, 42:2, 48:23, 91:14,

93:9, 122:23, 140:6
disputed [2] - 24:10, 55:21
disputes [1] - 39:21
Disputes [3] - 22:17, 22:22, 23:1
disregard [1] - 124:6
disrupted [1] - 116:23
disruption [4] - 12:7, 64:10, 64:13, 65:9
dissent [5] - 34:9, 34:13, 34:17, 104:1, 106:3
dissenting [1] - 34:7
distinct [1] - 18:14
distinction [2] - 54:19, 54:21
distinguishable [1] - 34:18
DISTRICT [3] - 1:1, 1:1, 1:17
district [5] - 23:2, 53:1, 53:2, 53:11, 102:23
District [3] - 44:1, 151:9
divide [1] - 7:3
divided [1] - 145:13
division [7] - 6:8, 6:25, 7:23, 7:24, 104:3, 129:17, 129:19
docket [2] - 30:9, 46:20
Docket [1] - 139:2
doctrine [3] - 53:6, 59:15, 108:20
document [2] - 49:10, 110:13
Doe [2] - 37:23, 37:24
dollar [5] - 49:17, 149:24, 149:25, 150:6, 150:21
dollars [2] - 8:21, 98:2
domestic [9] - 43:24, 53:1, 99:16, 102:3, 102:12, 105:9, 105:17, 106:12, 110:7
Donald [1] - 3:6
DONALD [1] - 1:12
done [14] - 31:17, 55:6, 62:5, 70:5, 120:22, 122:10, 133:25, 134:15, 138:21, 143:7, 143:16, 146:3, 149:9, 149:10
door [8] - 32:15,

32:16, 36:16, 48:1, 84:1, 84:3, 84:5
doubled [1] - 9:18
down [7] - 4:21, 9:18, 17:10, 81:8, 98:7, 117:12, 125:19
downstream [1] - 81:18
draft [1] - 46:23
drawdown [2] - 135:18, 146:19
drawdowns [2] - 132:25, 146:11
drawing [1] - 110:21
drawn [3] - 54:19, 108:11, 116:8
due [1] - 5:15
during [6] - 44:12, 44:14, 63:20, 117:19, 137:20, 149:9

**E**

eager [1] - 121:8
earthshaking [1] - 101:25
easier [1] - 150:12
easily [4] - 10:11, 11:13, 150:10, 150:11
East [1] - 29:8
easy [2] - 114:16, 114:18
ECF [1] - 36:10, 37:23, 46:19
economy [1] - 89:20
effect [9] - 5:6, 61:7, 69:6, 71:11, 72:10, 72:13, 86:8, 119:22, 120:17
effective [2] - 42:19, 43:8
effectively [1] - 95:10
effects [1] - 63:10
effectuate [1] - 98:22
effectuated [1] - 90:10
efficient [1] - 44:22
efficiently [2] - 95:10, 130:4
effort [1] - 63:25
efforts [6] - 57:22, 87:20, 98:15, 128:6, 136:10, 151:4
eight [1] - 66:20
either [13] - 22:23, 24:21, 29:13, 29:21, 38:21, 60:12, 105:16, 114:21, 121:9, 121:14, 126:12,

127:1, 131:7
El [1] - 56:24
elaborate [1] - 73:18
elected [5] - 94:25, 95:25, 96:1, 97:21, 112:11
eligibility [1] - 119:17
eligible [4] - 15:23, 119:13, 119:14, 121:2
email [1] - 113:18
embassy [1] - 106:1
emergency [1] - 34:12
emphasize [1] - 137:14
emphatically [2] - 43:14, 74:12
employees [2] - 9:20, 124:23
employs [1] - 35:18
en [1] - 50:15
enable [1] - 122:17
enacted [1] - 95:14
encompasses [1] - 131:8
end [13] - 19:7, 24:1, 26:22, 31:3, 47:16, 48:12, 95:10, 96:25, 109:11, 114:17, 117:23, 125:14, 143:16
ending [1] - 55:18
endure [1] - 60:1
enforce [4] - 9:16, 23:6, 23:9, 33:24
enforceable [1] - 56:17
enforced [1] - 28:23
enforcement [4] - 34:15, 56:22, 57:7, 111:22
engage [4] - 42:8, 53:4, 74:24, 120:23
engaged [2] - 14:24, 19:15
engages [1] - 119:25
engaging [1] - 120:19
England [1] - 104:2
enhance [1] - 140:8
enjoin [4] - 9:8, 17:17, 115:5, 119:21
enjoined [7] - 9:12, 17:5, 20:17, 41:24, 118:3, 120:24, 121:1
Enrich [5] - 43:4, 43:7, 46:18, 48:4, 49:19
ensure [2] - 5:14,

36:24

**entails** [1] - 119:17

**enter** [3] - 39:8, 47:25, 62:4

**entered** [7] - 5:4, 9:10, 17:24, 19:5, 19:18, 20:11, 137:20

**entire** [3] - 75:8, 115:22, 116:24

**entirely** [2] - 116:3, 141:1

**entities** [2] - 59:24, 70:5

**entitled** [6] - 33:20, 46:21, 86:17, 86:21, 114:24, 151:11

**entitlement** [2] - 32:2, 86:18

**entity** [2] - 63:3, 63:7

**entry** [1] - 137:16

**environmental** [1] - 64:11

**EO** [4] - 11:21, 12:16, 46:11, 88:9

**EPA** [2] - 98:11, 128:6

**equally** [1] - 118:11

**equitable** [3] - 115:17, 115:20, 116:5

**equities** [2] - 31:20, 31:21

**equity** [2] - 115:4, 115:19

**error** [1] - 77:6

**especially** [8] - 20:4, 20:9, 39:8, 64:1, 65:24, 138:19, 148:13, 148:23

**essence** [1] - 23:3

**essential** [1] - 9:20

**essentially** [23] - 15:8, 19:7, 21:18, 24:25, 59:19, 59:23, 60:14, 61:13, 63:9, 64:4, 65:15, 77:21, 78:11, 81:15, 96:17, 111:20, 117:22, 118:5, 118:18, 123:7, 124:5, 127:7, 144:2

**establish** [1] - 85:8

**established** [2] - 60:11, 89:12

**estimate** [4] - 132:13, 132:16, 138:23, 139:22

**et** [15] - 1:3, 1:7, 1:9, 1:12, 3:3, 3:4, 3:5, 3:6, 11:18, 18:22, 118:4, 119:3, 136:24

**evaluate** [3] - 23:4,

41:8, 114:3

**event** [2] - 37:6, 114:20

**events** [2] - 61:14, 123:12

**eventually** [2] - 12:23, 79:3

**evidence** [16] - 19:22, 20:13, 36:5, 36:16, 38:14, 39:23, 42:23, 48:3, 48:21, 88:13, 90:18, 91:7, 113:17, 113:22, 137:10, 145:4

**evidentiary** [1] - 37:22

**exact** [8] - 17:20, 17:25, 19:20, 22:10, 45:17, 53:10, 55:18, 113:10

**exactly** [21] - 12:3, 25:9, 25:10, 44:16, 46:1, 46:4, 46:16, 48:13, 49:9, 49:19, 50:4, 74:20, 94:18, 95:20, 99:19, 102:16, 105:8, 131:8, 131:19, 134:20, 136:15

**exaggeration** [1] - 124:24

**examine** [1] - 19:14

**example** [31] - 15:4, 15:24, 16:11, 20:22, 45:15, 50:12, 54:24, 60:10, 62:7, 62:17, 63:20, 66:22, 75:9, 77:16, 80:11, 81:7, 89:14, 89:15, 89:22, 92:6, 98:10, 105:4, 105:24, 107:18, 119:15, 120:18, 125:4, 129:9, 133:22, 139:9, 141:15

**examples** [7] - 33:21, 65:3, 65:9, 80:25, 88:23, 93:13, 105:24

**exception** [1] - 73:3

**excluded** [1] - 149:13

**exclusion** [2] - 32:21, 138:12

**exclusive** [1] - 57:8

**execute** [1] - 124:17

**executive** [48] - 8:9, 8:16, 9:7, 9:9, 9:13, 12:4, 17:6, 17:18, 19:17, 21:17, 21:19, 35:23, 37:13, 37:14, 37:15, 37:16, 38:4,

38:24, 41:17, 43:17, 44:10, 50:2, 53:4, 53:14, 53:15, 69:5, 94:9, 97:16, 98:4, 98:6, 100:8, 100:16, 103:15, 103:17, 107:15, 107:22, 108:21, 109:1, 110:16, 110:19, 111:1, 118:4, 118:6, 120:20, 129:10, 129:20, 136:25

**executive's** [4] - 43:14, 43:21, 99:25, 111:21

**exercise** [1] - 111:3

**exercised** [1] - 43:22

**exercises** [1] - 75:19

**exercising** [1] - 22:18

**exhaustion** [6] - 26:3, 28:11, 28:18, 76:1, 76:9, 76:12

**exist** [1] - 79:12

**existence** [1] - 89:3, 140:6

**existential** [1] - 62:10

**expansive** [3] - 12:15, 107:15, 124:2

**expect** [4] - 5:17, 133:11, 136:11, 137:17

**expectation** [1] - 141:12

**expected** [1] - 137:1

**expedite** [1] - 122:15

**experts** [1] - 42:18

**expiration** [2] - 63:2, 144:1

**expire** [3] - 44:13, 47:6, 62:17

**expired** [1] - 63:6

**expires** [1] - 63:4

**explain** [4] - 63:15, 90:23, 115:1, 116:18

**explained** [1] - 123:10

**explains** [3] - 20:9, 47:3, 47:8

**explanation** [6] - 35:23, 37:6, 50:8, 66:3, 122:11, 123:25

**explanations** [1] - 36:20

**explicit** [1] - 16:18

**explicitly** [5] - 18:24, 19:2, 81:21, 87:5, 93:2

**express** [1] - 106:6

**expressions** [2] - 50:3, 94:19

**expressly** [3] - 24:8, 34:21, 34:22

**extend** [1] - 65:20

**extending** [1] - 116:4

**extends** [1] - 144:22

**extensive** [1] - 118:18

**extent** [18] - 6:2, 12:20, 13:3, 15:12, 15:18, 37:1, 38:20, 58:24, 72:8, 101:24, 119:18, 119:24, 120:17, 120:22, 120:25, 134:9, 134:23, 143:12

**externally** [2] - 54:21, 54:23

**extra** [1] - 122:5

**extract** [1] - 97:9

**extraordinary** [2] - 85:9, 127:13

**extrapolation** [1] - 148:10

**extremely** [7] - 35:15, 43:3, 43:16, 112:21, 133:25, 138:22, 139:17

---

# F

**F.3d** [2] - 77:6, 77:18

**FAA** [5] - 52:17, 52:21, 94:21, 96:23, 97:13

**facial** [1] - 46:12

**facilities** [1] - 135:21

**facing** [2] - 117:8, 119:3

**fact** [27] - 10:13, 11:3, 11:14, 12:19, 15:11, 20:13, 24:8, 29:20, 31:13, 39:24, 41:12, 47:18, 66:5, 70:20, 79:24, 80:1, 94:8, 115:7, 115:20, 117:6, 119:14, 125:25, 136:9, 144:24, 147:13, 150:16

**fact-intensive** [1] - 15:11

**factor** [3] - 14:8, 122:6, 128:21

**factoring** [1] - 139:6

**factors** [6] - 70:2, 128:19, 129:2, 129:8, 148:5

**facts** [8] - 14:22,

14:23, 15:14, 15:15, 35:25, 99:24, 130:10, 148:17

**factual** [7] - 14:13, 15:12, 32:5, 55:22, 85:1, 85:15, 86:6

**fail** [3] - 114:17, 118:8

**fails** [1] - 114:22

**failure** [6] - 38:13, 50:22, 57:6, 116:21, 120:15

**fair** [6] - 65:7, 86:22, 87:11, 97:19, 98:25, 126:5

**fairly** [1] - 146:3

**faith** [2] - 39:25, 143:13

**faithful** [1] - 82:18

**fall** [5] - 25:1, 25:7, 25:9, 33:2, 118:17

**fallout** [1] - 120:13

**familiar** [6] - 21:2, 75:18, 99:11, 101:5, 127:12, 142:11

**far** [8] - 51:11, 65:20, 66:13, 67:1, 68:8, 141:1, 142:17, 151:5

**farfetched** [1] - 91:1

**farmers** [1] - 35:20

**fashion** [1] - 67:5

**fast** [6] - 19:25, 20:16, 53:19, 88:16, 93:16, 115:24

**faster** [4] - 132:20, 136:18, 141:24, 147:1

**favor** [1] - 34:1

**feasibility** [11] - 5:16, 114:13, 122:23, 124:20, 126:6, 130:14, 137:17, 143:11, 145:8, 148:6, 148:7

**feasible** [15] - 5:10, 6:4, 141:22, 141:24, 143:1, 143:13, 144:15, 144:20, 145:25, 147:2, 148:22, 149:8, 149:21, 150:8, 150:24

**February** [27] - 5:5, 5:7, 5:13, 9:11, 17:6, 17:14, 17:19, 20:5, 20:8, 69:25, 71:12, 71:20, 72:7, 72:10, 123:13, 123:18, 123:19, 131:6, 132:9, 133:18, 137:13, 137:24, 140:16, 142:14, 145:1,

146:20, 146:21
**Federal** [5] - 73:6,
73:22, 79:2, 87:25,
151:9
**federal** [16] - 1:23,
26:25, 33:22, 33:24,
35:21, 43:16, 59:24,
74:4, 75:1, 75:9,
77:19, 80:18, 104:22,
116:25, 127:25,
128:10
**FEDERAL** [1] -
151:16
**Federation** [1] -
84:18
**felonies** [1] - 109:13
**few** [3] - 18:11,
29:23, 97:20
**fewer** [3] - 30:4,
145:21, 147:15
**field** [1] - 16:7
**Fifth** [1] - 89:10
**fight** [1] - 142:1
**figure** [12] - 31:16,
39:1, 41:4, 41:6,
68:23, 87:24, 90:14,
92:4, 143:22, 144:15,
144:23, 148:6
**figures** [1] - 49:6
**file** [2] - 17:1, 149:14
**filed** [3] - 9:8, 40:10,
43:4
**filing** [1] - 129:24
**final** [8] - 22:2,
84:16, 102:11,
102:15, 112:23,
112:24, 120:11,
128:13
**financial** [6] - 10:15,
11:2, 11:15, 35:16,
82:15, 148:23
**financing** [2] -
116:23, 117:1
**fine** [14] - 7:23, 7:25,
8:2, 8:7, 22:23, 59:5,
59:6, 75:24, 78:19,
84:10, 95:19, 98:8,
114:2, 150:22
**fingertips** [1] - 55:24
**finish** [2] - 20:7,
27:18, 51:17
**Finish** [1] - 76:6
**finished** [1] - 63:9
**firm** [1] - 63:2
**first** [29] - 3:7, 4:23,
6:21, 8:5, 9:15, 10:12,
10:13, 16:24, 17:10,
18:15, 32:2, 32:12,
33:20, 34:9, 36:11,
40:11, 41:14, 55:1,

76:2, 112:2, 115:3,
116:21, 119:21,
142:19, 142:22,
142:23, 143:15,
146:18
**fiscal** [2] - 47:5,
47:11
**fish** [1] - 66:23
**fit** [3] - 22:8, 25:13,
39:8
**fits** [2] - 81:19, 111:9
**five** [4] - 45:15, 59:5,
59:7, 135:5
**Five** [1] - 59:6
**five-year** [1] - 45:15
**fleeting** [1] - 13:19
**flexible** [1] - 7:17
**floor** [3] - 59:1, 59:9,
125:5
**flow** [4] - 12:4, 18:22,
117:14, 119:5
**flowed** [1] - 11:23
**flowing** [2] - 118:5,
120:20
**flows** [2] - 21:18,
129:1
**focus** [3] - 26:23,
36:22, 37:8
**focused** [4] - 87:6,
130:15, 138:12, 150:2
**focuses** [1] - 16:19
**focusing** [3] - 12:10,
44:10, 142:13
**folks** [4] - 116:8,
116:9, 146:2, 149:16
**follow** [1] - 98:14
**following** [3] - 17:25,
137:16, 140:15
**footnote** [2] - 57:19,
139:19
**FOR** [4] - 1:1, 2:1,
2:4, 2:8
**force** [1] - 147:3
**forces** [1] - 109:17
**foreclose** [1] - 89:4
**foreclosed** [4] - 43:6,
71:11, 84:19, 87:7
**foregoing** [1] -
151:10
**Foreign** [6] - 51:20,
94:12, 94:17, 95:2,
97:24, 98:22
**foreign** [58] - 8:11,
8:12, 8:14, 8:16, 9:17,
35:12, 35:15, 36:6,
44:3, 52:6, 64:5, 70:3,
70:17, 78:9, 85:10,
92:25, 93:3, 94:9,
94:12, 95:1, 95:9,
95:18, 96:19, 96:20,

99:20, 102:13,
103:10, 103:16,
103:21, 103:23,
104:5, 104:8, 105:7,
105:18, 105:22,
106:6, 106:8, 106:13,
106:15, 106:23,
107:21, 107:24,
108:2, 108:4, 108:7,
108:12, 108:21,
109:3, 109:11,
109:17, 110:4, 110:6,
110:10, 110:16,
111:2, 111:5, 111:18,
113:20
**foreign-related** [1] -
109:17
**foremost** [1] - 4:23
**forgotten** [1] - 29:6
**form** [2] - 33:17,
46:23
**format** [1] - 151:11
**forth** [5] - 9:16,
68:22, 95:6, 126:16
**forum** [1] - 28:21
**forward** [9] - 44:8,
112:16, 118:2,
119:24, 120:6,
130:17, 144:6, 147:4,
147:6
**founding** [1] - 104:4
**four** [7] - 34:5, 132:9,
142:20, 145:14,
149:2, 149:3, 151:3
**fraction** [3] - 145:15,
145:17, 149:22
**frames** [1] - 16:12
**frankly** [2] - 93:17,
130:18
**fraud** [1] - 36:5
**free** [3] - 41:24,
42:12, 99:10
**freeze** [9] - 9:13,
38:11, 43:24, 53:1,
53:7, 59:19, 60:16,
115:21, 118:16
**freezes** [1] - 53:5
**frequently** [1] - 63:5
**front** [5] - 48:7,
67:21, 93:22, 145:19,
149:19
**fruit** [2] - 13:11, 38:6
**frustrating** [1] - 21:5
**fulfill** [1] - 5:14
**fulfilled** [1] - 50:9
**full** [6] - 12:20, 32:5,
65:8, 86:20, 115:18,
138:9
**fully** [4] - 12:20,
23:18, 58:6, 95:8

**fulsome** [1] - 57:14
**function** [1] - 61:24
**fundamental** [2] -
29:17, 43:12
**fundamentally** [1] -
96:19
**funded** [1] - 45:15
**funding** [27] - 9:13,
9:18, 12:6, 18:16,
24:16, 43:24, 51:11,
51:12, 53:1, 53:3,
53:5, 53:7, 54:17,
57:18, 59:19, 60:4,
60:9, 66:1, 66:14,
66:20, 115:20,
115:24, 118:16,
119:14, 119:17,
119:19
**funds** [54] - 5:10,
8:11, 8:17, 8:18, 9:25,
15:9, 15:22, 35:1,
43:19, 43:22, 44:13,
45:7, 45:9, 45:11,
45:14, 45:16, 45:17,
45:19, 45:22, 46:8,
46:10, 47:4, 47:10,
47:21, 48:24, 51:5,
51:9, 51:23, 54:9,
54:24, 55:5, 55:11,
58:8, 58:11, 58:14,
58:15, 59:24, 82:19,
92:20, 96:20, 98:13,
98:18, 102:4, 104:15,
104:22, 109:25,
120:3, 120:5, 127:17,
127:25, 128:10,
129:18, 131:1
**furlough** [1] - 133:23
**furloughing** [1] -
124:12
**furnish** [3] - 52:2,
52:6, 96:25
**future** [1] - 37:11

**G**

**Gail** [1] - 61:18
**GAO** [1] - 54:16
**garden** [1] - 122:10
**Gas** [1] - 56:25
**gate** [1] - 145:7
**general** [7] - 26:9,
52:10, 56:18, 57:1,
57:6, 108:5, 124:19
**generalities** [1] -
131:19
**generality** [1] - 97:8
**generalized** [4] -
52:6, 53:3, 53:10,
83:13

**genuine** [1] - 42:9
**genuinely** [1] - 5:1
**GHC** [4] - 30:14,
124:2, 128:23, 133:5
**given** [10] - 5:12,
7:20, 35:7, 66:3, 69:6,
85:16, 90:1, 97:18,
117:7, 142:13
**GLOBAL** [1] - 1:9
**Global** [4] - 3:5,
3:17, 30:9, 47:2
**global** [4] - 35:17,
47:5, 47:11, 48:12
**goal** [2] - 96:15,
130:11
**goals** [12] - 95:6,
95:8, 95:11, 95:21,
95:24, 96:2, 96:6,
96:10, 97:6, 97:24,
98:1, 98:22
**goods** [2] - 26:5,
26:25
**gotcha** [2] - 72:5,
102:19
**govern** [1] - 91:22
**governing** [1] -
77:23
**government** [106] -
5:14, 10:9, 10:21,
11:4, 12:8, 12:17,
12:24, 13:3, 14:7,
14:15, 15:8, 16:10,
16:14, 17:22, 17:25,
18:4, 18:9, 19:8,
19:14, 19:19, 20:9,
20:14, 21:6, 21:21,
21:22, 22:15, 23:14,
23:21, 26:9, 26:25,
27:3, 27:6, 27:8, 27:9,
27:25, 28:14, 29:2,
31:14, 33:16, 33:24,
35:14, 36:9, 38:1,
39:5, 39:6, 39:11,
39:21, 42:2, 43:13,
44:3, 44:4, 47:17,
48:23, 56:8, 57:12,
58:22, 67:8, 69:14,
72:9, 72:11, 74:8,
74:9, 75:1, 76:15,
77:9, 80:19, 82:2,
102:18, 109:16,
116:25, 117:5, 118:2,
119:22, 119:24,
120:2, 120:17,
120:25, 122:19,
123:5, 123:23,
128:20, 133:11,
133:21, 134:4,
134:22, 135:20,
136:10, 136:23,

137:9, 137:14, 137:18, 142:20, 143:2, 143:6, 144:21, 145:5, 146:2, 146:23, 147:1, 147:19, 147:23, 150:11
**government's** [15] - 10:14, 18:15, 18:21, 21:16, 37:25, 56:16, 71:24, 116:21, 118:14, 123:2, 126:20, 134:12, 138:16, 143:18, 149:19
**governments** [1] - 64:3
**grant** [19] - 26:15, 27:5, 27:10, 28:3, 33:25, 69:22, 72:6, 74:2, 74:10, 75:10, 75:12, 75:13, 77:9, 77:12, 77:22, 79:22, 137:16
**granted** [5] - 6:3, 82:16, 102:8, 102:9, 125:13
**grantee** [3] - 28:2, 28:3, 75:13
**grantees** [2] - 117:10, 117:11
**granting** [1] - 43:15
**grants** [15] - 8:24, 18:22, 26:12, 26:13, 27:23, 29:1, 29:11, 29:22, 39:5, 42:20, 59:24, 63:11, 66:1, 76:16, 78:4
**grapple** [1] - 111:4
**gravamen** [2] - 61:22, 68:18
**great** [1] - 73:20
**greater** [3] - 37:4, 125:14, 129:4
**grievance** [4] - 56:24, 57:2, 57:3, 83:13
**grievance-type** [1] - 83:13
**gross** [1] - 49:14
**ground** [4] - 6:4, 14:23, 38:25, 41:7
**grounded** [1] - 87:5
**groundwork** [1] - 103:11
**group** [1] - 92:8
**Group** [1] - 2:2
**growth** [1] - 95:12
**guaranteed** [1] - 15:23
**guess** [31] - 14:12,

14:20, 15:2, 29:25, 31:7, 37:13, 38:16, 49:23, 52:11, 66:12, 71:15, 72:24, 78:9, 86:11, 99:6, 100:7, 100:12, 109:7, 117:25, 119:18, 120:7, 120:14, 124:14, 130:1, 132:4, 135:22, 135:23, 136:4, 138:25, 143:4, 146:11
**guessing** [1] - 111:1
**guidance** [2] - 69:1, 70:8
**guys** [1] - 6:8

## H

**half** [3] - 30:15, 57:8, 135:11
**halt** [1] - 54:13
**halting** [1] - 54:10
**hand** [2] - 27:12, 148:18
**handful** [1] - 30:3
**handled** [1] - 60:11
**hands** [1] - 27:10
**hands-off** [1] - 27:10
**happy** [5] - 7:16, 16:7, 36:22, 45:3, 113:25
**hard** [5] - 17:12, 41:20, 127:11, 141:20, 148:17
**harder** [1] - 41:8
**hardly** [1] - 35:23
**harm** [28] - 6:11, 7:8, 8:2, 8:3, 13:1, 15:4, 15:24, 38:15, 57:11, 58:1, 58:3, 58:4, 60:2, 64:14, 64:25, 66:15, 67:14, 83:18, 83:24, 84:2, 117:8, 119:7, 122:18, 129:3, 129:4, 129:7, 129:11
**harmed** [2] - 10:14, 93:24
**harms** [20] - 10:12, 10:15, 10:16, 11:15, 11:16, 11:19, 11:23, 12:4, 13:6, 15:10, 58:7, 58:9, 58:16, 58:19, 83:19, 119:3, 119:4, 119:5
**hash** [1] - 10:23
**hate** [1] - 79:4
**Haven** [1] - 54:18
**head** [3] - 89:4, 89:5, 106:21

**health** [5] - 35:17, 47:5, 47:11, 48:12
**Health** [7] - 3:5, 3:17, 30:9, 34:19, 46:22, 47:2, 80:12
**HEALTH** [1] - 1:9
**hear** [14] - 6:12, 6:24, 7:9, 44:4, 44:19, 56:5, 57:12, 58:2, 58:22, 121:6, 128:14, 132:2, 136:16, 138:14
**heard** [7] - 47:17, 73:20, 80:25, 93:7, 116:8, 116:9, 133:21
**hearing** [17] - 3:2, 4:10, 4:23, 10:3, 10:4, 10:23, 44:13, 45:1, 56:1, 71:11, 101:7, 112:20, 117:20, 117:24, 126:16, 151:4
**HEARING** [1] - 1:16
**hearings** [1] - 12:11
**heavier** [1] - 85:10
**heavy** [1] - 85:9
**Heckler** [2] - 111:16, 111:21
**heed** [3] - 5:17, 114:7, 129:19
**Heggestad** [1] - 89:9
**held** [4] - 15:21, 43:17, 51:9, 134:23
**help** [5] - 6:18, 10:25, 52:4, 62:14, 82:23
**helpful** [36] - 5:24, 10:3, 10:6, 15:25, 16:2, 22:5, 25:7, 31:2, 42:22, 46:9, 46:16, 50:4, 56:3, 59:10, 71:7, 74:25, 75:17, 75:21, 76:7, 78:18, 80:24, 102:14, 103:7, 112:21, 121:11, 128:14, 132:3, 133:3, 138:17, 138:22, 141:3, 143:5, 147:9, 147:18, 147:20, 147:25
**helps** [1] - 41:4
**hereby** [1] - 151:10
**high** [3] - 31:5, 83:24, 109:13
**highly** [4] - 40:17, 53:8, 117:4
**hint** [2] - 81:16, 81:17
**hinted** [1] - 87:19
**historical** [1] - 42:13
**historically** [3] - 35:15, 36:6, 108:19

**history** [4] - 103:18, 106:18, 107:18, 107:20
**hoc** [1] - 36:19
**hold** [3] - 4:25, 23:1, 135:20
**holding** [4] - 34:2, 81:4, 110:22, 110:24
**holds** [2] - 24:8, 33:14
**Homeland** [1] - 92:6
**Honor** [32] - 3:10, 3:13, 3:16, 3:20, 7:1, 11:10, 21:20, 22:14, 27:17, 31:2, 31:12, 32:4, 35:11, 36:21, 37:19, 39:3, 43:1, 44:21, 55:25, 56:14, 57:13, 57:17, 59:2, 59:12, 64:21, 70:13, 93:18, 97:14, 98:21, 136:19, 138:15, 148:8
**Honor's** [4] - 17:24, 19:18, 62:25, 125:5
**HONORABLE** [1] - 1:17
**hope** [6] - 6:9, 8:1, 77:17, 126:11, 130:3, 149:21
**hoping** [1] - 49:4
**hours** [3] - 133:25, 149:10, 151:3
**Housing** [1] - 77:4
**huge** [1] - 30:1
**Humane** [1] - 15:20
**humanitarian** [3] - 8:21, 14:25, 64:16
**hundred** [2] - 135:8, 145:20
**hundreds** [2] - 9:1, 9:4
**Hunt** [1] - 67:23
**hurts** [2] - 41:5, 117:9
**hyper** [1] - 95:19
**hyper-fine** [1] - 95:19
**hyperlink** [1] - 49:18
**hypothetical** [5] - 53:12, 53:13, 72:6, 90:2, 97:14

## I

**i.e** [1] - 100:16
**ICA** [1] - 54:12
**idea** [13] - 19:6, 26:14, 26:15, 31:6, 38:18, 52:20, 53:25, 55:11, 61:21, 70:8,

71:3, 76:15, 76:18
**identified** [6] - 17:11, 21:12, 21:15, 37:12, 66:25, 98:22
**identify** [2] - 3:8, 19:3
**ignored** [1] - 142:6
**II** [12] - 104:24, 107:5, 107:16, 108:10, 108:16, 108:19, 109:4, 109:24, 111:3, 111:6, 111:9, 124:6
**III** [13] - 13:16, 59:14, 63:19, 63:24, 65:11, 65:21, 65:24, 67:22, 83:1, 83:23, 141:7, 141:9
**illegal** [1] - 13:4
**illustrate** [3] - 78:2, 90:3, 125:24
**illustrated** [1] - 41:12
**imagine** [5] - 107:3, 107:6, 107:11, 126:3, 135:10
**imagined** [1] - 107:7
**immediate** [2] - 12:7, 71:8
**immediately** [4] - 17:21, 131:23, 135:18, 146:13
**immigration** [1] - 92:10
**immunity** [20] - 16:13, 22:12, 22:19, 22:20, 31:7, 33:3, 33:7, 33:8, 67:19, 68:10, 72:21, 73:1, 73:11, 78:5, 79:13, 79:14, 85:3, 85:23, 87:4, 87:10
**implement** [3] - 8:15, 17:18, 124:14
**implementation** [9] - 9:8, 9:12, 11:21, 12:4, 19:17, 19:19, 21:17, 21:18, 122:20
**implementations** [4] - 11:22, 17:5, 88:8, 117:14
**implemented** [4] - 17:21, 77:9, 93:25, 135:18
**implementing** [16] - 16:18, 18:24, 19:3, 27:3, 27:7, 29:4, 37:13, 37:14, 37:15, 38:25, 45:10, 68:15, 68:21, 83:3, 118:4, 120:13

**implements** [1] - 65:17

**implicate** [1] - 108:15

**implicit** [1] - 100:3

**impliedly** [2] - 22:17, 25:21

**implying** [1] - 81:15

**important** [21] - 5:3, 5:25, 17:16, 35:16, 44:7, 51:10, 86:17, 87:2, 96:12, 107:22, 108:24, 112:13, 113:3, 115:5, 116:19, 130:4, 138:9, 141:7, 144:25, 145:8, 150:9

**impose** [1] - 43:21

**imposed** [1] - 43:18

**Impoundment** [16] - 7:10, 23:11, 52:15, 54:7, 54:15, 54:20, 55:3, 56:5, 56:8, 56:13, 56:16, 99:25, 102:15, 102:18, 103:5

**impoundment** [1] - 106:22

**imprecise** [1] - 90:10

**impression** [1] - 45:3

**improper** [2] - 81:22, 91:3

**improperly** [1] - 96:16

**improve** [1] - 84:21

**inappropriate** [1] - 127:19

**include** [4] - 33:19, 111:14, 111:15, 146:10

**included** [1] - 131:25

**includes** [7] - 8:17, 103:23, 109:12, 109:14, 109:15, 119:2

**including** [4] - 19:21, 35:19, 75:4, 149:2

**income** [1] - 35:20

**incomplete** [1] - 57:7

**inconsistent** [5] - 20:25, 21:9, 69:9, 105:13, 126:2

**increase** [1] - 139:6

**increased** [2] - 64:1, 81:6

**incredible** [1] - 64:10

**incurred** [1] - 60:10

**indeed** [1] - 23:17

**independence** [1] - 93:8

**independent** [8] - 13:10, 38:8, 38:9, 79:12, 79:15, 90:19,

123:4

**independently** [1] - 19:8

**indicates** [1] - 101:2

**indication** [1] - 42:24

**indirectly** [1] - 108:13

**indiscriminately** [1] - 37:10

**individual** [14] - 9:22, 28:14, 39:17, 39:18, 39:21, 60:14, 63:11, 66:20, 67:2, 67:15, 67:16, 72:12, 72:19, 135:15

**individualized** [16] - 9:3, 39:8, 39:22, 39:24, 40:12, 42:14, 60:4, 67:24, 68:1, 69:14, 69:16, 70:20, 74:25, 123:15, 137:5, 137:8

**individuals** [3] - 42:19, 62:6, 92:8

**Indraneel** [1] - 3:20

**INDRANEEL** [1] - 2:9

**indulge** [2] - 77:17, 101:6

**industry** [7] - 64:9, 64:11, 65:2, 65:9, 78:10, 117:3, 117:8

**infeasibility** [1] - 149:12

**inflicting** [1] - 60:1

**information** [8] - 139:17, 143:5, 144:15, 144:19, 147:2, 147:10, 150:19

**initial** [12] - 16:17, 17:5, 18:7, 19:23, 37:12, 38:4, 41:11, 41:17, 46:13, 100:8, 113:24, 130:16

**initiating** [1] - 136:23

**injunction** [14] - 4:25, 6:1, 6:6, 36:23, 43:15, 59:16, 59:19, 93:25, 114:17, 115:13, 119:21, 122:3, 126:23, 128:18

**INJUNCTION** [1] - 1:16

**injunctive** [2] - 33:23, 79:25

**injuries** [8] - 11:11, 11:12, 11:13, 15:17, 65:4, 65:20, 80:21, 83:11

**injuring** [1] - 65:16

**injury** [27] - 10:13,

11:2, 11:3, 11:7, 11:9, 11:13, 11:14, 15:7, 23:23, 24:2, 33:18, 62:11, 63:15, 63:19, 63:23, 64:19, 64:20, 64:23, 65:11, 65:12, 65:19, 83:6, 83:8, 83:19

**inquiry** [4] - 67:19, 67:24, 68:1, 69:14

**insert** [1] - 121:7

**insisting** [1] - 145:6

**insofar** [4] - 11:20, 38:19, 66:5, 129:9

**instance** [6] - 6:23, 12:14, 81:21, 103:1, 118:10, 121:24

**instances** [1] - 69:3

**instantly** [1] - 146:13

**instead** [3] - 9:18, 29:3, 95:21

**instituting** [1] - 41:12

**institutional** [1] - 57:2

**institutions** [1] - 11:15

**instructed** [3] - 5:13, 126:12, 130:12

**instruction** [2] - 5:17, 114:7

**instructive** [2] - 43:16, 99:7

**instrument** [2] - 30:23, 75:14

**instruments** [11] - 23:15, 23:19, 25:20, 25:23, 25:25, 26:6, 26:18, 28:7, 60:13, 74:21

**insufficient** [1] - 122:8

**insufficiently** [1] - 123:10

**integrity** [1] - 140:8

**intend** [3] - 5:17, 24:20, 48:24

**intending** [1] - 11:8

**intends** [1] - 47:18

**intensity** [1] - 148:14

**intensive** [1] - 15:11

**intent** [2] - 26:19, 101:3

**intention** [1] - 100:19

**interacts** [1] - 97:12

**interbranch** [2] - 100:15, 127:4

**interest** [16] - 21:10, 24:15, 38:23, 69:10, 91:21, 92:3, 92:8,

92:12, 92:18, 92:23, 93:14, 93:17, 122:9, 123:23, 128:19, 129:12

**interested** [5] - 22:8, 88:6, 116:9, 116:10, 117:13

**interesting** [1] - 105:1

**interests** [9] - 20:25, 35:16, 38:13, 38:18, 39:13, 39:15, 91:18, 126:3

**Interior** [1] - 61:18

**international** [1] - 108:9

**interpretation** [3] - 24:9, 91:2, 101:15

**interpreted** [2] - 22:11, 54:16

**interpreting** [1] - 112:5

**interrupt** [1] - 113:14

**intersection** [1] - 22:8

**intervene** [1] - 4:20

**intervening** [2] - 116:9, 141:6

**intuitive** [1] - 144:11

**invalid** [2] - 19:9, 140:2

**invalidate** [4] - 12:15, 12:16, 80:4, 83:10

**invalidated** [3] - 118:6, 123:3

**invalidating** [3] - 62:14, 65:22, 82:15

**invalidation** [2] - 12:1, 86:9

**invoice** [2] - 116:25, 141:16

**invoices** [15] - 131:3, 132:21, 134:8, 135:7, 135:14, 145:12, 145:20, 146:1, 146:7, 146:19, 147:7, 147:19, 147:21, 147:24, 149:22

**invoke** [1] - 129:3

**invoked** [1] - 38:9

**involve** [2] - 42:15, 80:22

**involved** [5] - 27:6, 27:8, 70:7, 120:8, 148:15

**involves** [4] - 85:10, 110:11, 112:10, 122:4

**involving** [1] - 122:4

**irreparable** [17] -

6:11, 7:8, 8:3, 10:12, 38:15, 57:11, 58:1, 58:3, 58:4, 58:7, 58:20, 83:24, 117:8, 119:3, 119:7, 129:3, 129:4

**irreparably** [1] - 10:14

**Island** [6] - 43:16, 44:1, 46:7, 53:2, 56:11, 56:19

**issue** [18] - 6:16, 16:24, 26:7, 28:15, 34:23, 53:2, 53:8, 54:17, 56:22, 76:20, 106:17, 112:10, 112:11, 115:15, 120:18, 122:3, 126:6, 149:15

**issued** [6] - 8:9, 38:1, 40:12, 56:12, 113:24, 137:2

**issues** [12] - 5:2, 5:3, 6:5, 6:13, 7:3, 7:14, 10:4, 10:22, 16:6, 62:5, 124:20

**issuing** [2] - 8:16, 128:18

**items** [1] - 49:17

**itself** [9] - 12:9, 26:25, 49:11, 49:13, 62:4, 82:10, 84:14, 105:5, 127:6

## J

**Jani** [1] - 113:18

**January** [10] - 8:9, 12:5, 57:21, 57:24, 133:13, 136:6, 137:4, 143:20, 145:4, 147:11

**Jessica** [1] - 37:23

**job** [1] - 150:12

**Johnson** [2] - 126:23, 126:25

**joined** [1] - 116:10

**joining** [1] - 116:10

**joint** [2] - 5:19, 129:24

**joking** [1] - 93:21

**Juan** [1] - 77:17

**JUDGE** [1] - 1:17

**Judge** [3] - 28:10, 102:8, 127:12

**judge** [1] - 52:25

**judgment** [3] - 34:1, 134:14, 144:11

**judgments** [1] - 70:3

**judicial** [3] - 110:15, 110:18, 111:2

**Judicial** [1] - 151:12
**judicially** [1] - 96:14
**jumped** [2] - 107:15, 120:9
**jumps** [1] - 124:14
**jurisdiction** [10] - 12:10, 22:18, 23:2, 25:22, 30:24, 34:10, 64:2, 76:23, 76:25, 85:8
**jurisdictional** [4] - 7:14, 22:16, 77:17, 79:23
**Justice** [9] - 2:9, 3:21, 89:9, 99:8, 102:8, 103:25, 104:6, 106:4, 107:8
**justice** [1] - 104:5
**justice's** [1] - 106:3
**justices** [1] - 34:5
**justification** [3] - 36:2, 36:22, 66:3
**justified** [1] - 129:5
**justify** [1] - 129:4

## K

**Kavanaugh** [2] - 99:8, 127:12
**Kavanaugh's** [1] - 102:8
**Kaye** [1] - 2:5
**keep** [2] - 18:11, 45:8
**kettle** [1] - 66:23
**key** [6] - 22:25, 28:6, 33:9, 54:21, 56:9, 56:21
**kick** [1] - 49:21
**Kidwell** [6] - 22:25, 25:14, 80:25, 81:1, 81:20, 81:24
**kind** [117] - 6:21, 7:5, 8:2, 10:3, 11:5, 11:7, 14:4, 19:1, 19:22, 20:6, 27:14, 32:2, 32:8, 34:14, 36:15, 38:5, 38:22, 38:24, 38:25, 39:16, 41:16, 41:19, 42:12, 42:23, 45:8, 46:6, 46:12, 48:21, 49:4, 49:8, 49:25, 50:8, 54:13, 55:7, 55:12, 57:1, 63:1, 64:20, 65:7, 67:12, 69:20, 71:24, 72:24, 73:13, 74:24, 78:9, 79:6, 79:7, 79:8, 80:8, 80:22, 82:6, 82:7, 82:12, 82:18, 83:17, 83:18, 83:19,

84:23, 87:5, 87:21, 88:7, 88:8, 88:16, 90:18, 92:16, 93:6, 93:14, 95:5, 98:25, 101:24, 102:5, 102:11, 102:16, 103:18, 105:9, 106:4, 107:12, 107:14, 107:15, 111:25, 112:7, 120:12, 120:14, 122:5, 122:6, 123:1, 124:9, 124:14, 128:13, 130:9, 130:22, 131:13, 132:25, 135:8, 135:17, 136:6, 137:10, 137:22, 138:16, 138:18, 138:21, 142:15, 142:24, 143:19, 145:18, 145:19, 145:22, 146:2, 146:10, 146:12, 147:11, 149:15, 149:16, 150:17, 150:20
**kinds** [1] - 110:20
**king** [1] - 104:2
**knowing** [1] - 114:3
**knows** [1] - 146:24

## L

**label** [6] - 74:5, 75:16, 76:19, 76:24, 87:20, 87:23
**labeled** [3] - 75:10, 77:22, 79:24
**labeling** [1] - 78:3
**labels** [4] - 73:24, 75:18, 75:20, 79:22
**labor** [1] - 148:14
**laborers** [1] - 80:21
**lack** [1] - 16:12
**laid** [3] - 49:20, 58:18, 112:7
**land** [3] - 53:12, 87:1, 109:16
**landscape** [5] - 61:1, 61:3, 61:5, 61:9, 78:9
**landscapes** [1] - 78:10
**lane** [1] - 89:23
**language** [8] - 22:10, 51:24, 52:10, 82:6, 92:22, 94:23, 101:23, 142:25
**lapse** [1] - 14:16
**large** [6] - 47:11, 75:11, 100:21, 135:7,

135:13, 141:17
**largely** [3] - 78:5, 92:2, 94:8
**larger** [1] - 104:23
**last** [7] - 43:2, 47:7, 71:10, 120:9, 134:1, 134:21, 135:5
**latitude** [1] - 129:11
**launching** [1] - 40:13
**LAUREN** [2] - 2:2, 2:9
**Lauren** [1] - 3:10, 35:11
**law** [16] - 7:12, 21:11, 29:5, 33:11, 54:25, 56:13, 67:13, 84:6, 100:22, 103:23, 104:9, 107:19, 109:13, 111:22, 114:21
**lawful** [1] - 42:2
**laws** [8] - 52:14, 98:20, 98:21, 100:25, 101:16, 101:22, 104:2, 104:24
**lawsuit** [5] - 34:16, 100:3, 100:7, 115:25, 116:4
**lawsuits** [1] - 115:23
**lay** [5] - 22:7, 72:23, 103:11, 130:22, 138:18
**layer** [10] - 25:18, 29:16, 32:12, 32:14, 84:23, 97:21, 102:11, 102:15, 122:5
**layers** [2] - 96:17, 121:25
**lays** [3] - 20:23, 21:1, 27:10
**lead** [3] - 95:18, 98:9, 107:22
**leadership** [3] - 8:24, 9:6, 140:7
**leading** [1] - 33:13
**leads** [3] - 48:8, 48:9, 145:24
**least** [25] - 11:20, 13:5, 14:12, 15:10, 21:12, 30:9, 31:8, 44:13, 46:11, 51:4, 60:25, 64:16, 67:12, 68:12, 69:2, 69:3, 76:19, 82:14, 84:6, 105:20, 122:21, 123:9, 130:16, 142:22, 145:11
**leave** [7] - 125:12, 130:16, 133:23, 143:15, 144:12,

145:2, 149:18
**lectern** [1] - 3:8
**led** [1] - 69:13
**left** [2] - 96:5, 117:3
**legal** [8] - 9:5, 10:4, 13:4, 13:10, 38:21, 81:18, 119:22, 127:3
**legally** [1] - 18:20
**legislation** [1] - 37:2
**legislative** [1] - 97:16
**legislature** [1] - 100:16
**legitimate** [1] - 139:4
**legitimately** [1] - 116:1
**lend** [1] - 76:23
**less** [1] - 35:21
**lessening** [1] - 58:9
**lesson** [2] - 81:20, 96:12
**letter** [4] - 101:7, 103:2, 132:24, 135:17
**letters** [3] - 97:15, 131:22, 146:19
**level** [6] - 31:5, 42:17, 88:25, 89:2, 92:24, 97:8
**liability** [1] - 122:24
**license** [1] - 4:20
**lifesaving** [2] - 8:21, 48:11
**lifted** [2] - 5:11, 9:17
**lifting** [3] - 125:16, 134:3, 137:3
**light** [5] - 6:3, 6:4, 106:14, 143:25, 144:24
**lights** [1] - 45:8
**likelihood** [3] - 56:12, 126:19, 128:12
**likely** [10] - 34:10, 38:10, 113:5, 118:8, 118:9, 118:13, 120:11, 121:9, 121:13, 147:6
**likewise** [1] - 37:6
**limit** [3] - 13:17, 62:13, 141:9
**limitations** [1] - 139:8
**limited** [5] - 114:23, 115:14, 116:13, 116:16, 141:14
**limits** [1] - 73:10
**line** [10] - 4:15, 4:18, 7:21, 20:11, 32:25, 48:7, 80:17, 88:25, 89:2, 137:7
**linear** [1] - 148:12

**linearity** [1] - 148:18
**lines** [1] - 61:17
**lingering** [1] - 63:10
**link** [2] - 65:14, 65:18
**list** [1] - 40:15
**lists** [3] - 16:20, 95:12, 113:19
**literally** [3] - 8:22, 9:4, 49:17
**litigant** [1] - 96:14
**litigation** [4] - 21:24, 36:3, 62:22, 94:5
**Litigation** [1] - 2:2
**livelihoods** [1] - 10:16
**lives** [1] - 35:17
**LLC** [1] - 61:14
**LLP** [1] - 2:5
**logic** [1] - 129:1
**logistical** [1] - 139:21
**longstanding** [1] - 110:16
**look** [23] - 19:13, 20:1, 23:5, 23:6, 23:24, 25:15, 25:16, 31:16, 39:12, 42:15, 54:16, 54:17, 69:21, 83:1, 88:18, 91:7, 92:3, 92:10, 101:6, 101:20, 106:12, 118:10, 142:16
**looked** [4] - 11:4, 44:15, 78:15, 127:22
**looking** [15] - 12:15, 30:20, 48:18, 64:22, 75:7, 80:1, 92:22, 105:16, 108:3, 108:5, 120:13, 121:12, 133:12, 142:20, 145:10
**looks** [1] - 4:9
**loop** [1] - 32:23
**lost** [3] - 115:24, 116:2
**loud** [2] - 86:11, 91:4
**lower** [2] - 42:17, 112:8
**Lujan** [1] - 84:18

## M

**main** [4] - 26:7, 34:18, 56:15, 56:17
**Maine** [2] - 34:19, 80:12
**maintains** [2] - 81:2, 106:9
**major** [2] - 53:5, 53:7
**majority** [7] - 67:12,

89:2, 100:21, 103:16, 103:25, 106:5, 121:22
**manageable** [2] - 96:14, 147:16
**managing** [1] - 80:19
**mandamus** [3] - 102:7, 102:9, 127:13
**mandate** [2] - 33:24, 43:18
**mandatory** [1] - 51:25
**manner** [1] - 143:1
**March** [7] - 1:17, 45:5, 45:22, 48:14, 135:25, 146:22, 151:13
**market** [1] - 148:24
**markets** [1] - 150:15
**Marocco** [18] - 20:2, 20:23, 50:17, 69:8, 69:25, 90:24, 90:25, 91:5, 91:8, 91:10, 91:15, 131:6, 132:4, 133:17, 133:18, 147:12, 148:11
**mass** [15] - 9:5, 9:9, 17:23, 18:1, 18:3, 18:17, 18:23, 19:15, 19:19, 19:23, 30:1, 70:19, 115:21, 119:20
**Massachusetts** [1] - 2:7
**masse** [1] - 50:15
**massive** [1] - 38:13
**matter** [9] - 3:8, 12:20, 32:5, 66:18, 84:9, 85:8, 100:15, 115:4, 151:11
**matters** [1] - 64:4
**mean** [43] - 10:17, 12:14, 13:8, 13:9, 14:20, 18:9, 19:11, 20:6, 24:2, 24:10, 33:15, 34:5, 34:8, 36:8, 42:4, 46:5, 49:24, 49:25, 62:13, 69:24, 75:20, 75:21, 75:24, 79:6, 79:20, 80:11, 81:17, 83:20, 85:3, 85:19, 95:24, 99:6, 101:8, 109:6, 112:7, 113:14, 117:22, 127:8, 127:15, 134:15, 134:18, 148:24
**meaning** [3] - 33:13, 95:2, 97:4
**meaningful** [1] - 60:7
**meaningfully** [1] - 35:13

**means** [3] - 64:21, 91:15, 130:17
**measure** [1] - 111:20
**measuring** [1] - 123:21
**mechanism** [3] - 56:22, 57:7, 57:8
**meet** [5] - 85:6, 85:13, 85:18, 85:22, 122:6
**Megapulse** [6] - 22:25, 25:14, 32:20, 32:23, 32:25, 80:8
**members** [11] - 58:15, 66:2, 66:4, 66:24, 68:2, 68:3, 135:15, 139:13, 143:9, 147:22
**members'** [1] - 66:6
**memo** [3] - 65:16, 65:17, 136:25
**memoranda** [16] - 16:20, 16:25, 18:25, 19:3, 37:14, 40:9, 43:4, 43:7, 46:19, 46:20, 46:22, 46:25, 47:8, 68:15, 68:21
**memorandum** [15] - 16:20, 16:21, 40:12, 40:17, 47:16, 48:4, 48:5, 48:6, 49:19, 65:13, 68:19, 69:5, 106:20, 123:2, 123:11
**memorized** [1] - 89:11
**mentally** [1] - 41:19
**mention** [3] - 107:3, 128:24, 148:20
**mentioned** [4] - 113:2, 135:16, 146:23, 149:17
**mentions** [1] - 48:6
**mere** [2] - 24:8, 79:24
**merely** [1] - 61:12
**merges** [1] - 128:19
**message** [3] - 68:25, 102:20, 102:21
**met** [1] - 62:1
**metes** [1] - 95:20
**metric** [2] - 148:6, 148:7
**microphone** [3] - 4:17, 7:20, 7:21
**mid** [1] - 8:19
**mid-swing** [1] - 8:19
**middle** [1] - 38:25
**midway** [1] - 54:13
**might** [15] - 12:13, 13:13, 22:6, 25:4,

31:13, 41:16, 41:17, 64:11, 64:12, 70:11, 71:7, 85:13, 115:11, 122:9, 140:18
**military** [2] - 81:1, 81:2
**million** [11] - 57:21, 57:23, 125:7, 125:10, 125:21, 132:17, 134:13, 134:16, 143:7, 147:20, 149:9
**millions** [1] - 98:1
**mind** [8] - 71:7, 88:23, 89:22, 107:2, 108:22, 111:16, 138:12, 149:23
**mindful** [6] - 29:15, 114:13, 143:11, 144:19, 144:20, 145:8
**mindset** [1] - 110:20
**mines** [1] - 87:1
**minimum** [5] - 92:15, 94:4, 126:22, 132:14, 132:17
**ministers** [1] - 108:17
**minutes** [5] - 59:5, 59:6, 59:7, 112:17, 151:3
**mirrors** [1] - 143:20
**misleading** [1] - 45:3
**missed** [1] - 18:12
**missing** [6] - 31:6, 32:20, 40:4, 67:21, 84:11, 108:23
**mission** [4] - 14:21, 64:11, 64:25, 65:8
**missions** [4] - 11:7, 14:25, 64:13, 64:17
**Mississippi** [2] - 126:22, 126:25
**misspeak** [1] - 46:3
**modify** [1] - 8:14
**moment** [21] - 6:8, 13:12, 22:5, 27:17, 29:22, 31:15, 38:7, 44:5, 44:11, 44:23, 52:15, 55:25, 57:11, 60:19, 60:25, 63:14, 82:8, 96:23, 99:18, 110:22, 123:3
**Monday** [12] - 130:19, 134:5, 134:7, 136:3, 143:16, 144:22, 145:16, 145:24, 146:1, 146:8, 146:22
**monetary** [9] - 67:25, 78:22, 79:11, 80:7, 80:9, 81:8, 81:16,

87:18, 87:20
**money** [51] - 14:2, 14:5, 14:16, 14:19, 15:1, 22:13, 31:9, 32:21, 33:8, 33:9, 33:12, 33:14, 33:16, 33:17, 33:25, 34:2, 34:3, 34:21, 47:12, 47:18, 47:20, 47:25, 49:3, 49:14, 49:15, 50:14, 50:18, 51:3, 51:13, 52:8, 52:21, 53:15, 63:21, 73:11, 74:11, 75:14, 79:20, 80:1, 82:17, 97:3, 98:14, 99:11, 100:11, 118:21, 118:23, 119:8, 121:1, 128:5, 135:7
**moneys** [1] - 128:7
**moot** [7] - 60:18, 62:8, 62:13, 62:15, 62:20, 62:23, 63:5
**mootness** [4] - 16:14, 59:15, 60:25, 61:6
**moots** [1] - 61:10
**morning** [7] - 5:11, 28:9, 43:15, 46:8, 56:12, 114:6, 129:24
**most** [10] - 10:3, 29:5, 31:2, 31:17, 33:4, 45:11, 45:18, 58:18, 88:6, 121:8
**mostly** [4] - 31:19, 45:6, 102:12, 111:24
**MOTION** [1] - 1:16
**motion** [2] - 3:2, 46:13
**motions** [2] - 4:24, 9:16
**motives** [1] - 19:13
**Mountain** [1] - 99:15
**mouth** [2] - 13:24, 129:15
**mouths** [1] - 65:7
**move** [9] - 6:10, 8:8, 10:1, 40:7, 44:8, 59:11, 78:21, 132:20, 136:11
**moved** [2] - 60:3, 115:23
**moving** [4] - 38:24, 41:7, 130:17, 138:21
**MR** [230] - 3:13, 3:16, 3:20, 7:1, 8:4, 8:8, 10:11, 11:10, 11:25, 12:3, 12:22, 13:15, 14:11, 15:3, 16:5, 17:3, 17:15, 18:14,

19:2, 19:11, 20:1, 20:8, 20:21, 21:14, 22:14, 22:24, 24:6, 24:18, 25:12, 26:2, 26:17, 27:16, 27:24, 28:4, 28:21, 30:7, 30:13, 30:22, 31:11, 31:18, 32:4, 32:18, 32:22, 34:8, 44:20, 44:23, 45:25, 46:18, 47:8, 47:16, 47:24, 48:3, 48:16, 48:22, 49:10, 50:10, 50:25, 51:8, 51:18, 52:5, 52:19, 52:24, 53:21, 54:2, 54:5, 54:15, 55:10, 55:24, 56:4, 56:11, 57:5, 58:6, 58:13, 59:2, 59:5, 59:12, 61:11, 61:20, 62:16, 62:24, 63:16, 64:21, 65:10, 66:17, 67:18, 67:22, 68:18, 69:12, 69:24, 70:13, 70:24, 71:4, 71:22, 72:1, 72:14, 72:18, 72:22, 73:15, 73:18, 73:20, 74:17, 75:3, 75:7, 75:24, 76:8, 76:22, 77:3, 78:14, 78:22, 78:25, 79:15, 79:20, 80:11, 80:16, 80:24, 81:14, 82:25, 83:7, 83:12, 83:20, 84:12, 84:17, 85:5, 85:20, 85:25, 86:4, 86:13, 86:23, 87:12, 87:16, 88:18, 89:15, 90:8, 90:21, 90:25, 91:16, 93:18, 93:22, 95:15, 96:3, 97:7, 97:14, 98:6, 98:9, 99:2, 99:13, 100:2, 100:14, 101:4, 101:18, 102:22, 104:11, 106:20, 108:2, 108:18, 109:6, 109:21, 110:5, 110:14, 111:8, 111:12, 111:14, 114:23, 115:11, 116:14, 116:17, 117:16, 117:19, 117:25, 118:7, 118:11, 118:13, 119:1, 119:12, 120:6, 120:16, 121:25, 122:22, 123:7, 123:14, 123:20, 125:1, 125:4, 125:19, 125:22, 126:8,

126:22, 127:15, 127:22, 128:3, 128:16, 129:9, 129:22, 131:4, 131:6, 131:10, 131:15, 131:17, 132:1, 132:8, 132:13, 132:22, 133:1, 133:10, 133:17, 134:9, 134:17, 134:20, 135:1, 135:4, 135:10, 135:19, 136:1, 136:7, 136:9, 136:15, 136:19, 138:6, 138:15, 138:23, 139:2, 139:19, 140:14, 140:21, 141:1, 141:5, 143:25, 146:15, 148:8, 149:5
**MS** [1] - 3:10, 35:11, 36:21, 37:19, 39:3, 39:20, 40:8, 40:23, 41:3, 41:10, 42:1, 42:13, 43:1, 43:11, 43:25, 44:17, 57:13, 57:24, 113:14
**multilevel** [1] - 70:6
**multiple** [1] - 51:9, 66:24, 70:6
**municipalities** [2] - 98:14, 128:8
**municipality** [1] - 98:16
**must** [1] - 5:14
**mutual** [1] - 26:19

## N

**name** [1] - 29:6
**named** [1] - 105:15
**names** [3] - 139:11, 139:12, 139:13
**narrow** [1] - 33:12
**narrower** [2] - 61:12, 75:25
**narrowly** [2] - 108:7, 116:8
**national** [5] - 20:25, 21:10, 39:13, 39:14, 69:10
**National** [2] - 46:21, 84:18
**nations** [3] - 108:4, 109:11, 109:14
**Natural** [1] - 56:25
**natural** [1] - 64:9
**naturally** [2] - 92:3, 92:10
**nature** [9] - 23:22, 25:15, 25:22, 42:24,

70:4, 92:1, 93:15, 95:16, 110:18
**naval** [1] - 109:17
**near** [2] - 107:6, 124:3
**Near** [1] - 29:8
**necessarily** [6] - 14:5, 15:15, 30:5, 34:15, 75:8, 134:1
**necessary** [10] - 9:20, 32:6, 36:4, 36:24, 56:1, 114:8, 115:2, 118:17, 124:13, 141:16
**need** [24] - 7:25, 8:1, 10:22, 15:13, 19:13, 55:11, 55:12, 59:4, 67:24, 67:25, 79:7, 88:5, 104:9, 117:11, 119:17, 124:11, 124:18, 124:22, 126:4, 144:15, 147:1, 148:3, 150:3, 150:16
**needed** [3] - 126:7, 128:5, 137:6
**needs** [9] - 4:21, 15:9, 15:13, 15:19, 115:15, 119:16, 134:2, 143:21, 146:24
**negotiations** [1] - 24:13
**never** [7] - 9:17, 12:13, 12:19, 26:15, 48:23, 89:19, 107:16
**New** [6] - 43:25, 54:18, 98:11, 98:16, 104:15, 128:4
**new** [17] - 9:18, 21:6, 41:18, 47:25, 61:2, 61:3, 61:5, 61:9, 63:7, 91:11, 113:17, 113:20, 123:4, 136:24
**newly** [1] - 132:15
**next** [6] - 35:6, 40:13, 78:24, 96:1, 97:21, 107:13
**nice** [2] - 4:3
**Nichols** [1] - 28:10
**Nick** [1] - 136:19
**NICOLAS** [1] - 2:2
**NO** [2] - 1:5, 1:11
**non** [7] - 43:6, 64:1, 64:2, 87:20, 141:10, 143:17, 148:18
**non-arbitrariness** [1] - 43:6
**non-linearity** [1] - 148:18
**non-monetary** [1] - 87:20

**non-parties** [2] - 64:1, 64:2
**non-plaintiffs** [2] - 141:10, 143:17
**noncompliance** [1] - 88:14
**none** [4] - 25:16, 86:7, 88:21, 121:10
**Nonprofits** [1] - 53:11
**nonreviewable** [1] - 111:19
**nonwaiver** [1] - 79:13
**noon** [1] - 148:4
**Norton** [3] - 61:18, 84:17
**note** [6] - 4:14, 15:19, 17:16, 91:19, 91:21, 125:1
**noted** [2] - 76:17, 144:21
**notes** [2] - 29:8, 44:24
**nothing** [2] - 40:4, 52:22
**notice** [2] - 90:9
**notices** [1] - 113:20
**notification** [2] - 103:3, 103:4
**notion** [7] - 11:1, 41:7, 103:19, 109:23, 112:6, 142:1, 150:23
**nowhere** [2] - 107:6, 124:3
**nuclear** [1] - 99:15
**number** [18] - 30:11, 34:8, 42:7, 42:10, 44:4, 46:1, 49:5, 77:23, 121:25, 125:10, 125:20, 125:21, 125:22, 136:17, 138:25, 139:21, 141:14, 143:4
**Number** [1] - 139:2
**numbers** [7] - 60:5, 125:15, 135:6, 143:10, 147:25, 148:11
**numerous** [1] - 128:24
**NW** [4] - 1:24, 2:3, 2:7, 2:10

## O

**o'clock** [1] - 112:13
**object** [1] - 88:14
**objected** [1] - 69:14
**objection** [4] - 40:3,

62:3, 102:5, 121:18
**objections** [1] - 84:24
**objective** [4] - 20:14, 20:16, 37:3, 101:2
**obligate** [3] - 15:9, 57:6
**obligated** [3] - 14:17, 43:19, 55:12
**obligation** [5] - 47:9, 54:9, 55:5, 55:11, 55:13
**obligations** [4] - 5:14, 18:21, 54:10, 55:12
**observation** [1] - 144:1
**obtain** [1] - 100:17
**obtained** [1] - 59:16
**obvious** [4] - 79:19, 87:3, 89:20, 124:1
**obviously** [18] - 5:3, 6:23, 7:16, 15:11, 38:12, 44:2, 65:3, 68:14, 79:18, 88:3, 88:7, 101:14, 107:15, 108:11, 109:6, 114:2, 114:11, 149:12
**occurred** [1] - 88:22
**occurring** [1] - 20:10
**occurs** [1] - 142:16
**OF** [3] - 1:1, 1:6, 1:16
**offenses** [1] - 109:13
**offer** [8] - 40:8, 57:17, 58:3, 78:2, 78:20, 80:16, 90:2, 99:14
**offered** [5] - 14:4, 35:23, 35:24, 36:3, 92:11
**offering** [2] - 91:1, 111:8
**offhand** [1] - 29:7
**office** [1] - 114:1
**officer** [4] - 70:23, 88:25, 89:2, 89:7
**officers** [6] - 42:16, 42:17, 113:18, 113:19, 125:13
**Official** [2] - 1:23, 151:9
**OFFICIAL** [1] - 151:16
**officials** [1] - 70:7
**often** [3] - 21:6, 79:18, 110:23
**oil** [1] - 64:12
**OLC** [1] - 106:21
**OMB** [2] - 40:12, 120:19

**OMB's** [1] - 40:17
**ON** [1] - 1:16
**once** [5] - 30:8, 31:3, 39:7, 84:4, 107:16
**one** [110] - 7:21, 10:17, 10:24, 14:20, 15:19, 16:9, 16:19, 16:20, 20:11, 20:14, 20:23, 21:8, 22:16, 24:3, 24:7, 24:23, 25:14, 26:6, 27:17, 30:22, 32:7, 32:10, 32:14, 35:21, 35:24, 36:2, 36:10, 36:22, 37:8, 38:16, 38:24, 39:20, 44:12, 46:18, 46:20, 46:25, 47:2, 50:13, 50:14, 50:16, 55:6, 55:15, 55:16, 57:17, 57:19, 61:13, 62:9, 66:19, 67:17, 68:21, 69:25, 70:18, 73:18, 75:7, 75:18, 77:15, 79:2, 79:17, 79:24, 80:17, 82:20, 87:1, 88:6, 88:8, 88:24, 89:16, 89:20, 91:4, 92:24, 93:7, 93:12, 93:13, 95:16, 96:8, 96:15, 99:4, 102:11, 102:15, 102:25, 103:13, 104:20, 107:7, 107:11, 110:22, 110:24, 111:7, 111:12, 112:21, 112:24, 113:7, 114:16, 114:20, 117:25, 120:10, 121:16, 122:9, 122:10, 124:8, 129:16, 130:8, 132:8, 137:1, 139:9, 142:16, 148:9, 148:11, 148:16, 149:23
**ones** [11] - 21:12, 40:21, 41:1, 41:2, 44:7, 65:5, 68:16, 90:4, 108:22, 123:18, 140:18
**ongoing** [9] - 9:14, 34:23, 35:2, 57:22, 58:7, 58:19, 66:18, 80:18, 119:19
**open** [3] - 36:16, 150:7, 150:24
**opened** [1] - 4:15
**operate** [1] - 9:20
**operating** [4] - 45:6, 70:6, 94:10, 116:2

**operations** [1] - 124:5

**operative** [1] - 9:11

**opinion** [2] - 34:7, 102:8

**OPM** [1] - 107:8

**opponent** [1] - 128:20

**opportunity** [8] - 6:14, 10:21, 17:13, 45:4, 88:14, 89:16, 90:1, 144:23

**opposed** [4] - 34:20, 35:4, 39:17, 65:17

**optional** [4] - 100:1, 101:16, 101:23, 102:1

**Options** [2] - 34:19, 80:12

**ORAL** [1] - 1:16

**order** [66] - 5:7, 5:13, 5:15, 7:3, 7:24, 8:10, 8:16, 9:7, 9:9, 9:13, 12:5, 14:5, 17:6, 17:18, 17:20, 19:17, 21:17, 21:19, 22:23, 34:15, 37:13, 37:14, 37:15, 37:16, 38:4, 38:25, 41:17, 43:15, 44:10, 69:5, 82:15, 83:3, 83:5, 83:16, 100:8, 115:13, 115:14, 118:4, 118:6, 119:1, 120:13, 120:20, 124:2, 126:1, 127:14, 127:16, 128:23, 132:14, 132:16, 133:25, 136:25, 137:12, 137:17, 137:21, 137:24, 140:16, 141:9, 142:14, 145:1, 146:17, 146:21

**Order** [1] - 3:1

**ordered** [4] - 9:3, 15:22, 34:14, 133:25

**ordering** [1] - 8:25

**orders** [9] - 5:5, 17:5, 21:8, 36:15, 38:25, 58:5, 124:22, 137:3, 142:7

**ordinarily** [2] - 94:15, 123:24

**organizational** [5] - 64:23, 66:11, 66:13, 68:6

**organizations** [7] - 11:15, 64:13, 64:14, 64:22, 64:25, 115:22, 116:24

**orient** [1] - 25:12

**original** [4] - 11:21, 11:22, 123:2, 151:10

**otherwise** [4] - 8:3, 42:2, 100:6, 113:6

**ourselves** [2] - 7:3, 25:13

**outlay** [1] - 35:16

**outlined** [1] - 114:25

**outlines** [1] - 49:12

**outrun** [1] - 61:15

**outset** [1] - 76:17

**outside** [2] - 139:9, 144:7

**outstanding** [7] - 15:12, 131:13, 132:15, 132:18, 135:11, 135:13, 147:21

**overlapping** [1] - 46:2

**Overnight** [1] - 125:7

**overnight** [13] - 8:22, 9:4, 12:7, 134:25, 136:14, 140:12, 143:3, 143:7, 146:5, 149:9, 149:11, 149:16, 150:17

**overseas** [3] - 64:3, 84:14

**owed** [2] - 9:25, 139:4

**own** [4] - 27:1, 36:9, 43:21, 94:5

---

# P

**p.m** [11] - 1:18, 3:1, 59:8, 112:18, 146:7, 146:21, 146:25, 151:6

**pace** [6] - 4:19, 18:2, 20:12, 136:18, 144:15, 146:4

**pacing** [1] - 150:20

**page** [4] - 48:9, 57:18, 77:7, 151:11

**paid** [14] - 34:2, 63:21, 63:22, 82:20, 131:3, 132:5, 133:23, 134:11, 135:14, 145:20, 145:25, 146:7, 146:21

**papers** [1] - 77:4

**paragraph** [10] - 70:1, 91:8, 125:6, 125:23, 132:9, 133:19, 138:24, 141:5, 141:6

**paragraphs** [2] - 20:9, 70:14

**pardon** [1] - 107:9

**parse** [1] - 66:10

**part** [26] - 6:21, 6:22, 10:17, 30:15, 33:5, 38:12, 41:5, 47:7, 49:24, 63:19, 64:17, 69:7, 82:13, 88:9, 93:15, 96:9, 96:12, 112:15, 120:14, 129:12, 138:1, 138:4, 147:6, 148:20

**participation** [2] - 77:22, 77:24

**participations** [1] - 66:7

**particular** [37] - 4:14, 4:15, 10:4, 10:22, 23:15, 23:19, 25:20, 33:17, 33:25, 34:14, 49:14, 49:15, 51:3, 52:9, 70:4, 73:25, 74:6, 80:21, 81:7, 81:20, 85:17, 85:22, 87:24, 92:9, 92:20, 100:5, 101:1, 103:18, 104:22, 105:2, 107:23, 109:22, 119:4, 128:23, 138:19, 141:16

**particularly** [3] - 5:12, 40:15, 88:2

**parties** [21] - 4:7, 5:18, 5:19, 5:20, 6:18, 56:18, 57:3, 64:1, 64:2, 76:18, 91:5, 91:14, 112:22, 116:7, 116:10, 130:6, 141:10, 142:17, 143:10, 145:8, 151:4

**parties'** [5] - 5:22, 6:17, 10:18, 112:25, 114:6

**partly** [1] - 84:14

**partner** [3] - 27:3, 27:7, 29:4

**partners** [2] - 11:17, 45:10

**parts** [2] - 18:15, 90:22

**party** [5] - 29:3, 56:23, 64:19, 89:19, 147:22

**Paso** [1] - 56:24

**passage** [1] - 77:19

**passed** [6] - 5:13, 46:3, 95:25, 100:23, 137:24, 137:25

**passes** [1] - 10:20

**past** [11] - 9:14, 12:11, 18:18, 33:18, 42:21, 80:21, 88:10,

89:6, 100:22, 131:21, 144:22

**pattern** [1] - 81:19

**Pause** [1] - 125:3

**pause** [32] - 8:11, 8:16, 9:17, 18:19, 44:11, 46:11, 46:14, 48:7, 48:8, 48:9, 54:19, 54:23, 55:4, 55:17, 55:23, 59:17, 60:8, 60:21, 61:24, 63:9, 63:20, 65:17, 69:12, 79:4, 83:3, 91:22, 93:24, 93:25, 100:9, 119:19

**paused** [3] - 12:6, 18:16, 66:2

**pausing** [1] - 18:22

**pay** [11] - 33:24, 45:7, 75:5, 81:6, 116:21, 117:6, 122:20, 123:6, 145:15, 146:24

**paying** [1] - 33:16

**payment** [18] - 9:21, 82:7, 132:14, 132:16, 132:17, 132:18, 140:8, 141:17, 142:14, 142:19, 145:12, 145:20, 146:11, 147:7, 147:19, 147:21, 149:25, 150:5

**payments** [40] - 8:17, 9:23, 81:23, 87:21, 125:8, 125:17, 125:23, 130:20, 133:11, 133:14, 133:15, 133:20, 134:5, 134:20, 134:22, 134:25, 135:6, 135:9, 135:12, 136:22, 138:3, 138:6, 138:24, 139:4, 140:10, 140:13, 140:15, 140:17, 140:25, 141:10, 141:12, 142:24, 142:25, 143:4, 143:23, 145:16, 145:20, 150:2, 150:20

**PEI** [1] - 2:6

**pen** [1] - 107:10

**pending** [6] - 5:7, 18:8, 24:13, 37:16, 42:3, 114:12

**people** [14] - 27:14, 31:13, 41:18, 45:8, 53:18, 76:17, 113:11, 124:17, 125:18,

133:14, 133:22, 146:24, 149:17

**PEPFAR** [1] - 45:15

**per** [7] - 143:23, 145:5, 145:10, 145:14, 145:24, 147:8, 147:12

**percent** [7] - 11:6, 35:21, 47:4, 47:10, 68:5, 75:17, 145:23

**Perdue** [5] - 3:17, 7:10, 7:14, 35:5, 57:14

**PERDUE** [49] - 2:6, 3:16, 22:14, 22:24, 24:6, 24:18, 25:12, 26:2, 26:17, 27:16, 27:24, 28:4, 28:21, 30:7, 30:13, 30:22, 31:11, 31:18, 32:4, 32:18, 32:22, 34:8, 44:20, 44:23, 45:25, 46:18, 47:8, 47:16, 47:24, 48:3, 48:16, 48:22, 49:10, 50:10, 50:25, 51:8, 51:18, 52:5, 52:19, 52:24, 53:21, 54:2, 54:5, 54:15, 55:10, 55:24, 56:4, 56:11, 57:5

**perfect** [1] - 15:24

**performed** [2] - 60:10, 148:14

**perhaps** [3] - 16:13, 44:17, 146:4

**period** [10] - 13:13, 13:16, 44:14, 55:9, 55:13, 59:25, 122:20, 123:6, 140:16

**periods** [1] - 138:18

**permanent** [2] - 48:8, 48:9

**permissive** [1] - 51:24

**permutation** [2] - 120:11, 128:13

**permutations** [4] - 113:12, 114:5, 114:16, 124:10

**person** [10] - 4:4, 50:12, 53:14, 72:8, 81:1, 81:3, 89:4, 89:18, 99:1, 101:1

**person's** [1] - 74:10

**personal** [2] - 28:12, 28:14

**personally** [1] - 44:17

**personnel** [6] - 8:25, 124:12, 125:5, 126:1,

126:6, 126:7
**persons** [1] - 98:23
**perspective** [8] -
67:18, 67:22, 79:21,
87:18, 123:9, 123:12,
140:7, 142:5
**phase** [3] - 10:19,
113:4, 122:1
**phrase** [2] - 61:13,
61:14
**phrased** [1] - 101:23
**phrasing** [1] - 95:16
**PI** [17] - 36:10, 46:13,
78:17, 83:24, 85:8,
114:12, 117:22,
117:24, 122:1, 144:3,
144:5, 144:8, 144:14,
144:16, 147:6, 148:5
**piece** [10] - 31:8,
31:9, 31:11, 80:9,
82:13, 82:21, 84:23,
108:23, 149:20, 150:9
**pieces** [2] - 37:21,
88:6
**pierce** [1] - 87:23
**pin** [2] - 33:4, 117:12
**ping** [2] - 7:5, 7:15
**ping-ponging** [2] -
7:5, 7:15
**piracies** [1] - 109:12
**place** [12] - 10:19,
30:9, 32:2, 33:20,
36:12, 44:2, 61:25,
68:20, 107:7, 126:12,
140:8, 149:1
**placed** [1] - 106:18
**plain** [1] - 99:9
**plainly** [1] - 109:20
**plaintiff** [19] - 3:7,
15:22, 32:7, 33:16,
33:19, 34:24, 56:7,
62:11, 67:10, 79:9,
79:24, 80:4, 82:2,
82:3, 83:2, 87:23,
105:13, 105:15, 122:5
**Plaintiffs** [2] - 1:4,
1:10
**PLAINTIFFS** [2] -
2:1, 2:4
**plaintiffs** [132] - 3:11,
3:14, 3:17, 3:24, 6:7,
6:24, 7:2, 9:8, 10:13,
12:13, 14:6, 14:24,
25:3, 29:20, 32:7,
34:21, 38:10, 38:14,
43:13, 44:12, 53:17,
59:13, 63:17, 63:25,
64:22, 65:25, 66:17,
67:13, 67:15, 68:12,
68:23, 70:18, 73:23,

74:15, 74:20, 81:20,
82:25, 83:20, 84:22,
85:12, 85:15, 86:7,
86:20, 88:11, 88:19,
90:17, 91:2, 91:6,
92:2, 92:13, 92:17,
92:20, 93:1, 93:7,
93:14, 93:23, 94:4,
94:7, 94:11, 94:18,
96:18, 96:22, 98:9,
98:23, 100:5, 100:10,
100:16, 101:11,
104:13, 104:22,
105:2, 107:1, 109:22,
110:21, 113:8,
113:22, 114:24,
115:15, 115:18,
116:11, 116:13,
116:16, 116:18,
116:22, 117:2, 117:7,
117:9, 117:10, 121:9,
121:13, 121:21,
122:16, 123:12,
124:3, 124:16, 125:8,
126:18, 127:23,
128:2, 128:9, 128:23,
130:2, 133:2, 134:11,
134:16, 136:3,
136:17, 136:20,
138:5, 138:25, 139:4,
139:11, 139:17,
140:21, 141:10,
141:14, 141:23,
142:6, 142:18,
142:19, 143:8,
143:17, 143:19,
145:6, 145:17,
145:25, 146:19,
147:22, 147:24,
150:11
**plaintiffs'** [30] - 4:12,
4:24, 10:25, 15:5,
48:20, 58:15, 64:17,
65:6, 73:21, 75:4,
75:19, 75:22, 76:12,
78:3, 85:7, 87:19,
98:20, 110:5, 113:7,
121:2, 129:2, 134:8,
139:10, 139:16,
139:25, 140:10,
142:2, 146:7, 146:9,
147:3
**plan** [9] - 6:5, 6:20,
49:1, 53:22, 54:3,
101:13, 101:14,
130:16, 130:20
**plans** [1] - 122:20
**plausible** [3] - 19:25,
93:16, 105:20
**play** [1] - 103:8

**playing** [1] - 44:20
**pleaded** [1] - 17:16
**pled** [1] - 67:4
**plenary** [2] - 103:15,
103:21
**plenty** [1] - 35:10
**plus** [3] - 106:7,
147:16, 150:5
**pocketbook** [19] -
11:1, 11:3, 11:9,
11:11, 11:12, 15:7,
23:22, 24:2, 57:3,
63:15, 63:19, 63:23,
65:4, 65:9, 65:11,
65:12, 65:19, 83:8,
83:18
**podium** [2] - 7:25,
80:25
**point** [97] - 10:1,
12:16, 15:20, 16:22,
17:2, 21:20, 21:25,
24:3, 25:10, 28:6,
29:19, 30:25, 31:6,
33:9, 37:1, 43:2,
43:11, 43:17, 46:16,
48:23, 49:11, 50:12,
51:10, 55:15, 55:20,
56:1, 56:9, 56:15,
56:21, 57:4, 57:5,
58:12, 60:7, 61:8,
61:16, 61:20, 63:16,
65:5, 65:20, 65:23,
72:4, 74:23, 75:3,
75:15, 76:11, 76:24,
77:24, 78:3, 78:9,
80:3, 88:20, 89:6,
89:9, 90:17, 91:17,
93:2, 93:6, 96:18,
98:9, 100:19, 100:25,
101:2, 106:4, 107:1,
109:1, 109:22,
110:14, 110:15,
110:22, 111:11,
111:12, 111:17,
113:15, 114:11,
116:15, 117:17,
118:2, 122:14,
122:25, 123:18,
125:5, 125:24,
127:23, 128:16,
129:6, 129:15,
131:18, 135:4,
137:25, 138:23,
139:9, 139:15,
141:11, 143:25,
144:10, 145:24
**pointed** [5] - 78:25,
90:3, 90:22, 100:10,
137:9
**pointing** [11] - 91:1,

91:5, 91:10, 91:13,
92:14, 104:14,
104:16, 110:25,
127:19, 137:23,
139:20
**points** [9] - 10:8,
33:4, 40:9, 59:11,
73:18, 78:20, 98:21,
104:6, 116:19
**policies** [6] - 11:24,
12:1, 42:6, 61:7, 69:9,
120:23
**policy** [39] - 16:23,
17:21, 32:13, 41:22,
42:5, 43:21, 54:11,
55:4, 55:14, 60:22,
61:8, 61:12, 62:8,
62:9, 62:12, 62:15,
62:17, 62:22, 64:5,
67:6, 67:7, 70:3,
70:17, 80:5, 80:23,
82:9, 83:11, 84:13,
91:11, 95:1, 95:9,
96:19, 99:10, 102:4,
108:21, 110:8,
110:16, 111:2, 111:5
**political** [6] - 9:22,
53:8, 104:4, 109:2,
112:9, 129:17
**pollution** [2] - 98:15,
128:5
**ponging** [2] - 7:5,
7:15
**popcorn** [1] - 44:20
**popping** [1] - 18:11
**population** [1] -
108:14
**Porter** [1] - 2:5
**portion** [4] - 15:1,
135:12, 142:14,
144:22
**posit** [2] - 18:5, 86:6
**position** [24] - 22:7,
41:20, 66:15, 83:22,
85:21, 95:3, 97:12,
98:3, 100:1, 100:3,
100:12, 101:9,
101:24, 105:2, 107:1,
116:3, 121:11,
121:19, 123:2,
124:24, 126:21,
143:18, 147:23
**positions** [8] - 5:22,
6:18, 41:22, 102:17,
112:25, 114:6,
126:11, 130:24
**possible** [13] - 7:19,
9:1, 20:15, 20:16,
47:13, 48:1, 85:12,
129:19, 138:11,

147:10, 148:2,
148:25, 149:13
**possibly** [4] - 40:14,
97:15, 100:15, 144:19
**post** [3] - 36:19,
123:13, 125:16
**posture** [1] - 119:2
**potential** [1] - 85:6
**potentially** [2] -
15:13, 106:8
**poverty** [1] - 95:11
**power** [33] - 50:1,
50:2, 50:4, 52:13,
98:5, 98:6, 103:15,
103:21, 104:8,
104:21, 105:10,
105:19, 106:1, 106:2,
106:10, 106:17,
107:5, 107:10,
107:15, 107:17,
107:19, 107:21,
109:3, 109:10,
109:12, 109:14,
109:15, 109:20,
110:4, 139:23
**powers** [44] - 6:10,
13:22, 13:23, 35:8,
40:5, 43:10, 53:20,
85:10, 87:8, 94:9,
94:17, 94:20, 96:13,
99:4, 102:10, 102:13,
104:20, 105:24,
106:6, 106:9, 107:5,
108:10, 109:17,
109:19, 109:24,
111:15, 111:25,
112:6, 114:22, 118:9,
118:14, 118:20,
118:24, 119:25,
120:12, 120:14,
121:10, 122:4, 126:2,
126:17, 126:20,
127:5, 127:6
**practical** [5] - 66:17,
72:4, 76:9, 89:2,
110:17
**practice** [1] - 42:14
**pre** [3] - 71:20,
136:6, 147:11
**pre-February** [1] -
71:20
**pre-January** [2] -
136:6, 147:11
**preceded** [1] - 99:25
**precedent** [10] -
22:24, 27:14, 64:24,
74:4, 102:23, 103:19,
122:2, 126:24, 127:20
**precise** [2] - 103:4,
131:17

**precisely** [1] - 48:17
**preclude** [4] - 22:17, 23:2, 25:21, 56:23
**precursor** [1] - 8:2
**predicated** [1] - 142:2
**prefer** [1] - 8:4
**preference** [2] - 4:6, 71:14
**preferences** [1] - 43:21
**preliminary** [12] - 4:24, 6:1, 6:6, 31:20, 36:23, 43:15, 59:16, 59:18, 113:3, 115:13, 119:2, 119:21
**PRELIMINARY** [1] - 1:16
**premise** [3] - 40:2, 93:24, 142:1
**premised** [2] - 38:20, 115:9
**prepare** [1] - 103:1
**prepared** [2] - 16:5, 50:10
**preparing** [1] - 111:17
**present** [2] - 4:7, 70:10
**presented** [2] - 36:5, 36:7
**presenting** [1] - 97:15
**presents** [1] - 141:8
**preserved** [2] - 69:16, 142:7
**President** [1] - 3:6
**president** [33] - 8:9, 50:2, 51:22, 52:1, 52:23, 93:3, 94:9, 94:15, 94:24, 95:18, 95:23, 95:24, 96:1, 96:5, 96:24, 97:5, 99:10, 104:3, 105:18, 105:25, 106:15, 106:19, 107:10, 107:22, 110:3, 110:11, 118:22, 119:10, 126:23, 127:1, 127:9, 129:16
**President's** [1] - 55:17
**president's** [2] - 104:24, 109:20
**presidential** [4] - 36:24, 37:1, 96:19, 137:7
**press** [1] - 57:20
**pressed** [1] - 9:5
**presumably** [4] -

117:13, 139:13, 140:12, 147:24
**presupposing** [1] - 39:16
**pretext** [8] - 13:12, 19:7, 19:12, 37:21, 38:6, 41:16, 42:8, 113:17
**pretextual** [3] - 37:6, 37:22, 39:4
**pretty** [10] - 10:11, 44:6, 71:6, 79:19, 99:9, 101:25, 103:22, 129:18, 142:17, 143:14
**prevent** [1] - 36:4
**prevented** [3] - 57:18, 57:21, 122:18
**preventing** [1] - 93:25
**preview** [2] - 32:4, 113:9
**previous** [2] - 42:6, 63:4
**previously** [4] - 63:7, 89:25, 91:17, 137:2
**price** [1] - 50:8
**primary** [2] - 8:10, 9:11
**prime** [1] - 28:1
**principle** [1] - 89:12
**priorities** [3] - 36:25, 37:2, 137:7
**prioritize** [1] - 89:23
**private** [5] - 56:18, 57:3, 96:14, 102:24
**privity** [3] - 27:25, 29:13, 78:11
**problem** [17] - 4:21, 15:11, 36:6, 78:5, 79:25, 85:7, 94:4, 104:20, 110:19, 117:8, 119:9, 125:15, 139:14, 141:21, 148:19, 149:6
**problems** [4] - 65:24, 111:5, 139:21, 141:7
**procedural** [1] - 52:15
**procedurally** [1] - 142:3
**procedures** [3] - 60:12, 93:9, 93:10
**proceeded** [1] - 87:25
**proceeding** [2] - 81:5, 81:18
**Proceedings** [1] - 151:6
**process** [24] - 9:2,

20:3, 20:4, 43:6, 70:1, 70:14, 70:17, 91:3, 99:16, 110:18, 120:19, 125:18, 127:4, 133:13, 133:15, 133:19, 134:13, 134:15, 138:24, 140:8, 140:9, 145:5, 145:23, 146:16
**processed** [11] - 130:21, 131:12, 134:25, 135:9, 139:4, 143:1, 143:5, 143:7, 143:23, 147:8, 150:21
**processes** [6] - 9:19, 19:20, 53:19, 76:3, 140:2, 148:15
**processing** [9] - 125:11, 136:8, 141:18, 142:24, 144:24, 146:12, 150:1, 150:2, 150:5
**procurement** [14] - 24:25, 25:3, 26:4, 26:5, 26:11, 26:15, 26:18, 26:24, 28:8, 47:21, 73:5, 76:13, 76:15
**procuring** [1] - 28:14
**Produced** [1] - 1:25
**product** [1] - 139:23
**productive** [1] - 151:3
**program** [23] - 8:12, 8:14, 8:23, 9:9, 17:21, 18:1, 18:15, 18:17, 19:20, 20:3, 33:22, 34:22, 34:24, 45:9, 45:11, 45:18, 70:23, 77:9, 77:22, 92:9, 92:11, 102:5, 115:21
**programmatic** [3] - 54:19, 54:23, 84:19
**programming** [1] - 11:16
**programs** [8] - 8:18, 24:15, 47:5, 47:11, 48:12, 50:16, 50:20, 51:12
**progress** [1] - 129:25
**project** [1] - 21:22
**projects** [5] - 37:8, 37:9, 37:10, 137:6, 137:11
**promoting** [1] - 95:11
**promotion** [4] - 50:14, 50:16, 51:2, 51:12

**promptly** [1] - 139:17
**prong** [4] - 10:13, 66:7, 67:23, 87:18
**prongs** [1] - 68:8
**proof** [1] - 122:5
**proper** [4] - 25:14, 77:11, 93:9, 115:4
**proportions** [1] - 145:18
**proposal** [6] - 133:6, 133:8, 133:10, 135:23, 138:4, 138:17
**proposed** [10] - 5:21, 6:19, 6:25, 16:13, 115:13, 124:2, 136:4, 138:7, 142:19
**proposing** [1] - 136:5
**proposition** [2] - 57:18, 101:25
**prospective** [2] - 80:19, 120:8
**protects** [1] - 35:17
**prototypical** [1] - 11:3
**proved** [1] - 86:10
**provide** [13] - 13:18, 27:4, 39:6, 44:15, 63:12, 73:21, 76:16, 92:9, 94:13, 96:13, 114:11, 130:12, 139:17
**provided** [5] - 60:12, 69:1, 70:9, 76:14, 139:22
**provides** [1] - 28:21
**providing** [2] - 35:19, 138:3
**provision** [5] - 22:9, 22:12, 24:10, 50:25, 73:10
**provisions** [15] - 9:12, 23:13, 23:19, 26:4, 38:17, 38:21, 50:8, 52:6, 77:24, 92:25, 94:13, 99:21, 110:10, 113:21, 113:23
**PSCA** [1] - 28:10
**Public** [2] - 2:2, 46:22
**public** [8] - 4:15, 4:18, 7:21, 49:2, 100:9, 126:3, 128:19, 129:12
**publicly** [3] - 46:14, 47:19, 101:10
**punish** [1] - 109:12
**pure** [1] - 55:14

**purely** [2] - 83:23, 93:8
**purpose** [7] - 4:23, 49:2, 50:19, 50:20, 64:20, 65:18, 140:10
**purposes** [18] - 13:15, 28:6, 29:10, 49:7, 49:15, 49:17, 52:9, 65:21, 66:18, 66:19, 83:23, 92:22, 98:24, 111:23, 119:15, 141:7, 144:3, 144:5
**pursuant** [3] - 69:4, 118:3, 120:23
**pursued** [1] - 20:15
**pursuing** [3] - 37:8, 37:9, 97:6
**pursuit** [3] - 37:8, 37:9, 95:7
**pushed** [1] - 8:25
**pushing** [2] - 17:22, 86:19
**put** [14] - 19:24, 33:4, 48:20, 68:12, 68:23, 74:21, 75:13, 81:23, 119:18, 128:23, 129:14, 140:7, 143:19
**putting** [3] - 13:24, 65:6, 85:11
**puzzling** [1] - 89:16

## Q

**questions** [20] - 5:3, 6:15, 12:12, 14:13, 15:13, 16:7, 30:8, 40:16, 40:17, 40:25, 41:13, 49:22, 53:5, 56:4, 56:7, 58:23, 79:16, 101:12, 113:11, 121:6
**quick** [3] - 4:5, 94:3, 113:15
**quickly** [12] - 8:15, 9:1, 56:11, 60:3, 62:2, 69:18, 93:19, 94:1, 94:3, 115:24, 133:12, 133:25
**quite** [6] - 55:8, 69:15, 74:5, 135:13, 141:13, 142:7
**quo** [1] - 137:4
**quotations** [1] - 46:7
**quote** [12] - 11:1, 48:12, 55:16, 83:8, 95:7, 95:10, 96:24, 96:25, 98:12, 109:10, 109:11, 140:4

# R

**raise** [5] - 6:11, 14:10, 105:14, 107:2, 109:15
**raised** [5] - 14:13, 36:12, 36:13, 91:18, 93:6
**raises** [1] - 10:22
**raising** [3] - 94:22, 94:23, 109:23
**range** [2] - 135:9, 150:3
**rate** [1] - 136:6
**rather** [9] - 40:24, 53:2, 68:4, 77:1, 89:24, 94:13, 125:25, 133:6, 144:8
**rational** [1] - 35:25
**rationale** [1] - 39:6
**rationales** [1] - 54:11
**RDR** [1] - 151:15
**RDR-CRR** [1] - 151:15
**re** [1] - 128:21
**re-spout** [1] - 128:21
**reach** [4] - 5:20, 42:9, 122:15, 148:17
**reached** [1] - 122:17
**reaches** [1] - 27:3
**reaching** [1] - 34:11
**read** [5] - 52:7, 79:16, 97:23, 121:24, 132:11
**reading** [1] - 107:14
**reaffirmed** [1] - 95:1
**real** [1] - 11:11
**realize** [4] - 21:5, 30:4, 53:23, 112:12
**realizing** [1] - 71:7
**reallocation** [1] - 94:2
**really** [27] - 10:22, 10:25, 29:25, 34:13, 35:4, 36:10, 42:4, 58:2, 60:7, 61:6, 66:3, 67:7, 82:1, 82:17, 87:22, 88:16, 90:12, 107:1, 116:2, 122:12, 136:21, 138:7, 142:8, 146:25, 149:22, 150:9, 150:23
**realm** [1] - 99:16
**realties** [1] - 110:17
**Realtime** [1] - 1:23
**reason** [15] - 11:9, 31:25, 37:7, 46:5, 62:7, 69:7, 81:9, 89:17, 93:19, 106:25, 142:9, 149:7, 149:10,

150:15
**reasonable** [3] - 4:19, 92:14, 146:6
**reasonably** [1] - 121:4
**reasoning** [1] - 122:8
**reasons** [12] - 19:10, 21:10, 55:4, 55:6, 55:14, 70:17, 79:19, 94:22, 115:16, 115:17, 130:8
**receive** [4] - 40:15, 77:10, 92:20, 104:22
**received** [4] - 40:25, 58:14, 58:15, 72:3, 72:7, 72:10, 81:3, 83:2
**receiving** [3] - 58:8, 58:17, 108:3
**recent** [2] - 58:18, 103:13
**recently** [4] - 40:12, 53:1, 58:9, 125:12
**recess** [4] - 6:21, 59:6, 112:14, 112:17
**Recessed** [2] - 59:8, 112:18
**recipient** [6] - 27:25, 72:6, 75:11, 77:22, 127:25, 128:10
**recipients** [7] - 29:3, 60:9, 66:1, 66:14, 66:20, 77:11, 104:15
**reciting** [1] - 125:16
**recognition** [4] - 87:22, 105:25, 106:17, 107:19
**recognize** [2] - 63:23, 83:7
**recognized** [3] - 63:18, 69:15, 96:6
**recognizes** [1] - 74:5
**recognizing** [2] - 59:23, 65:19
**recommend** [1] - 56:14
**recommendation** [2] - 70:16
**recommendations** [4] - 70:21, 70:22, 71:1, 71:2
**reconcile** [3] - 100:13, 127:10, 150:16
**record** [46] - 3:9, 15:14, 16:24, 16:25, 25:11, 29:20, 29:23, 30:8, 36:19, 37:22, 39:9, 46:9, 46:17, 48:2, 48:4, 48:19,

48:21, 55:20, 55:22, 57:17, 58:4, 60:6, 66:22, 69:24, 71:22, 72:15, 74:21, 85:1, 85:15, 100:8, 100:10, 100:18, 101:2, 101:5, 101:18, 102:16, 103:2, 113:16, 113:25, 122:22, 123:5, 132:21, 133:12, 133:16, 145:4, 151:11
**Record** [1] - 1:25
**records** [2] - 81:2, 148:14
**recovery** [1] - 81:9
**redress** [10] - 12:2, 12:10, 12:20, 13:2, 13:21, 14:9, 15:18, 56:24, 57:1, 57:3
**redressed** [1] - 15:7
**redressible** [1] - 84:2
**Reeves** [2] - 151:9, 151:15
**REEVES** [2] - 1:22, 151:15
**refer** [4] - 20:4, 51:24, 60:13, 68:16
**reference** [3] - 23:10, 24:9, 140:19
**referenced** [2] - 46:19, 55:16
**references** [3] - 49:16, 49:18, 113:21
**referring** [2] - 21:2, 25:5
**refers** [2] - 48:13, 131:19
**reflect** [1] - 70:19
**reflected** [2] - 62:3, 95:8
**reflects** [1] - 141:20
**refrain** [1] - 91:25
**Refugee** [1] - 29:9
**regard** [3] - 5:16, 43:19, 116:20
**Regents** [1] - 92:7
**Registered** [1] - 1:22
**regulate** [2] - 107:9, 109:11
**regulated** [1] - 63:7
**regulation** [3] - 88:22, 89:3, 109:16
**regulations** [10] - 60:13, 75:11, 75:12, 77:23, 88:12, 88:19, 88:21, 90:3, 91:1, 151:11
**Rehnquist** [1] - 106:21

**reimbursements** [2] - 131:11, 131:21
**reinforced** [1] - 106:4
**reinstating** [1] - 137:10
**reject** [1] - 103:19
**rejected** [3] - 70:17, 112:6, 124:11
**rejects** [1] - 56:19
**relate** [1] - 92:16
**related** [6] - 38:11, 40:9, 102:17, 108:2, 109:17, 112:24
**relates** [5] - 16:4, 43:3, 98:4, 113:1, 145:12
**relating** [1] - 77:13
**relation** [1] - 105:8
**relations** [2] - 108:3, 108:15
**relationship** [10] - 11:17, 34:23, 80:18, 80:20, 98:17, 99:17, 104:23, 108:12, 144:4, 148:12
**relatively** [1] - 135:6
**release** [1] - 57:20
**released** [1] - 125:9
**releasing** [1] - 146:13
**relevant** [8] - 6:1, 13:14, 23:12, 48:21, 48:22, 50:8, 77:19, 130:10
**reliance** [16] - 38:13, 38:22, 91:18, 91:21, 92:3, 92:8, 92:11, 92:14, 92:18, 92:23, 93:11, 93:14, 93:17, 111:9, 122:9, 123:23
**relied** [3] - 34:17, 34:18, 108:20
**relief** [96] - 6:2, 6:3, 6:16, 6:22, 7:15, 12:13, 12:19, 13:2, 13:14, 13:18, 14:3, 14:4, 22:9, 23:6, 25:16, 30:19, 30:20, 30:25, 31:3, 31:9, 31:19, 32:6, 32:16, 32:23, 32:25, 33:8, 33:15, 33:18, 33:19, 33:23, 34:3, 34:14, 34:16, 34:22, 58:24, 60:7, 62:5, 66:5, 67:25, 78:23, 79:8, 79:25, 80:19, 80:20, 86:9, 87:18, 87:20, 87:24, 112:12,

112:14, 113:1, 113:4, 114:4, 114:11, 114:12, 114:18, 114:19, 114:23, 114:25, 115:6, 115:10, 115:12, 115:18, 116:4, 116:8, 116:12, 116:18, 116:19, 117:7, 117:11, 117:23, 118:10, 118:17, 118:23, 119:2, 119:11, 119:16, 119:23, 120:2, 120:4, 120:8, 121:10, 121:15, 121:24, 124:9, 125:24, 126:21, 126:25, 127:13, 128:1, 128:20, 129:5, 129:9, 135:24, 136:18
**rely** [5] - 19:22, 38:19, 38:20, 50:3, 92:4
**relying** [6] - 27:13, 71:19, 89:10, 92:16, 94:21, 108:16
**remain** [4] - 57:22, 58:16, 58:18, 131:11
**remaining** [1] - 145:14
**remand** [2] - 122:10, 123:24
**remanded** [1] - 112:8
**remedial** [1] - 102:25
**remedies** [2] - 63:12, 80:21
**remedy** [19] - 22:10, 31:8, 66:18, 67:9, 67:14, 73:4, 74:2, 74:3, 74:18, 81:16, 85:9, 86:13, 86:16, 100:17, 102:25, 115:4, 123:21, 124:3, 127:5
**remember** [8] - 10:7, 16:1, 45:16, 55:18, 77:5, 99:14, 107:7, 136:5
**reminded** [1] - 10:6
**reminder** [1] - 95:15
**reminders** [1] - 95:16
**removed** [1] - 102:6
**render** [1] - 57:8
**rendered** [1] - 88:25
**renders** [1] - 89:3
**reobligate** [1] - 47:18, 47:20, 48:24
**repeat** [2] - 88:5,

111:7
**repeated** [3] - 43:5, 88:7, 110:23
**repeating** [2] - 69:12, 109:21
**replaced** [1] - 63:6
**reply** [6] - 16:13, 29:7, 45:2, 58:23, 88:20, 115:1
**report** [7] - 5:20, 54:17, 125:6, 129:24, 139:19, 140:1, 140:17
**REPORTER** [1] - 151:16
**Reporter** [4] - 1:22, 1:23, 1:23, 151:9
**reporter** [3] - 4:19, 4:20, 112:16
**reports** [1] - 9:17
**represent** [2] - 75:1, 130:2
**representation** [3] - 131:1, 131:2, 131:5
**representations** [2] - 134:12, 146:10
**represented** [1] - 135:2
**representing** [1] - 126:6
**reputation** [1] - 10:16
**reputations** [2] - 11:18, 15:5
**requests** [5] - 132:16, 132:18, 135:18, 141:17, 146:20
**require** [8] - 68:7, 106:25, 118:23, 129:19, 129:20, 132:14, 132:17, 144:16
**required** [6] - 16:21, 28:11, 66:7, 93:10, 112:8, 129:20
**requirement** [6] - 76:1, 76:10, 76:13, 87:23, 90:6, 145:9
**requirements** [3] - 85:6, 85:18, 85:22
**requires** [8] - 21:7, 24:9, 53:9, 73:7, 95:8, 102:19, 109:4, 110:19
**rescinding** [1] - 135:24
**rescission** [1] - 118:1
**rescissions** [2] - 137:2, 137:19
**reserve** [1] - 144:11

**reserving** [1] - 62:3
**residents** [1] - 64:4
**resolve** [2] - 15:14, 15:15
**resort** [2] - 74:2, 74:3
**resources** [7] - 48:10, 59:22, 62:1, 72:18, 94:1, 94:2, 95:10
**respect** [18] - 9:13, 9:14, 11:14, 13:1, 13:5, 13:6, 14:12, 15:10, 15:16, 27:20, 58:16, 93:17, 108:14, 115:12, 115:19, 118:15, 136:14, 142:22
**respectfully** [1] - 91:20
**respond** [7] - 35:9, 52:4, 88:4, 88:15, 93:12, 103:12, 124:21
**responded** [1] - 9:6
**responding** [1] - 110:2
**response** [6] - 10:25, 18:5, 59:21, 93:7, 122:15, 124:16
**responsibilities** [1] - 111:3
**rest** [3] - 20:7, 138:13, 143:18
**restore** [1] - 119:9
**restrained** [2] - 17:18, 136:23
**restraining** [4] - 5:15, 137:12, 137:16, 137:21
**restructure** [1] - 124:5
**result** [4] - 8:20, 9:24, 34:1, 81:6
**resulting** [1] - 83:16
**results** [2] - 33:15, 65:12
**retain** [2] - 60:5, 105:25
**retained** [2] - 17:8, 37:17
**retaliation** [1] - 116:1
**retrospective** [3] - 33:17, 34:22, 120:7
**return** [1] - 137:3
**revealed** [2] - 37:20, 42:14
**revelations** [1] - 43:7
**reverse** [1] - 105:21
**review** [43] - 8:12, 8:13, 9:3, 18:8, 18:10, 18:12, 19:17, 19:24,

20:11, 37:17, 38:8, 39:21, 40:12, 40:13, 40:20, 41:8, 41:13, 41:14, 41:21, 42:2, 42:9, 42:14, 42:24, 59:22, 60:4, 61:25, 62:2, 67:16, 69:22, 70:6, 71:18, 72:12, 74:22, 74:25, 93:16, 93:19, 105:11, 113:19, 113:23, 120:23, 123:4, 123:15, 140:8
**reviewed** [1] - 36:10
**reviewing** [4] - 19:9, 69:20, 70:9, 70:22
**Rhode** [6] - 43:16, 44:1, 46:7, 53:2, 56:11, 56:18
**Richmond** [1] - 107:8
**rightly** [1] - 69:15
**rights** [4] - 23:5, 23:8, 25:16, 32:25
**risk** [3] - 47:8, 48:4, 64:1
**risks** [1] - 64:4
**Risks** [1] - 46:21
**road** [1] - 81:8
**Rogers** [1] - 113:18
**role** [9] - 90:16, 94:25, 95:18, 103:22, 105:23, 108:10, 111:5, 112:4
**room** [2] - 34:4, 39:20
**rough** [2] - 70:12, 132:6
**roughly** [2] - 70:13, 134:24
**round** [1] - 40:20
**Rubio** [3] - 16:20, 16:21, 103:3
**rule** [16] - 16:23, 32:17, 55:1, 55:2, 61:1, 61:2, 61:3, 63:4, 63:6, 80:5, 83:2, 86:9, 144:3, 146:6
**rules** [2] - 106:15, 109:16
**ruling** [1] - 149:21, 151:1
**run** [2] - 11:8, 124:19

## S

**safe** [1] - 102:20
**sake** [1] - 4:19
**SALLY** [1] - 2:6
**San** [1] - 77:17

**Sansone** [1] - 136:20
**SANSONE** [3] - 2:2, 136:19, 138:6
**satisfactory** [1] - 35:24
**satisfied** [1] - 150:11
**save** [2] - 49:3, 100:11
**saves** [1] - 35:16
**saving** [1] - 47:20
**saw** [5] - 17:22, 37:9, 39:7, 55:16, 137:9
**scale** [3] - 121:15, 132:3, 133:4
**Scalia** [1] - 106:4
**Scalia's** [1] - 104:1
**scenario** [3] - 96:18, 123:8, 123:21
**schedule** [5] - 5:21, 45:11, 45:16, 130:7, 136:8
**schedules** [1] - 6:19
**scheme** [1] - 104:17
**Scholer** [1] - 2:5
**scope** [23] - 6:2, 6:16, 6:22, 7:15, 16:3, 22:1, 30:25, 31:3, 31:19, 58:24, 65:8, 86:13, 86:15, 112:12, 112:14, 113:1, 114:4, 117:23, 124:9, 128:1, 135:23, 136:22, 144:7
**sea** [1] - 89:23
**seas** [1] - 109:13
**second** [16] - 3:24, 22:18, 25:18, 29:16, 30:15, 32:12, 32:14, 34:9, 40:20, 41:8, 84:23, 87:17, 91:19, 102:24, 111:1, 135:22
**second-layer** [1] - 25:18
**secretarial** [4] - 65:13, 123:11, 140:22, 140:23
**secretary** [2] - 103:1, 122:11
**Secretary** [7] - 17:17, 61:18, 68:15, 70:16, 103:3, 122:4, 140:19
**Secretary's** [2] - 68:19, 69:5
**Section** [1] - 109:10
**section** [2] - 51:23, 111:15
**sector** [6] - 89:20, 115:22, 115:23, 116:23, 116:24, 117:5
**Security** [2] - 46:22, 92:6

**see** [20] - 4:3, 4:6, 7:19, 19:15, 42:13, 49:19, 75:2, 86:12, 92:11, 97:17, 114:10, 114:19, 121:14, 133:5, 133:12, 134:13, 137:1, 139:25, 140:4, 147:3
**seeing** [1] - 37:7
**seek** [6] - 24:20, 48:21, 56:24, 80:15, 117:3, 124:4
**seeking** [15] - 13:2, 23:6, 23:8, 32:24, 33:8, 33:9, 34:16, 35:1, 66:5, 67:6, 80:19, 80:20, 87:20, 87:21, 136:18
**seeks** [1] - 81:2
**seem** [5] - 14:22, 73:23, 101:25, 110:21, 129:4
**send** [3] - 101:7, 137:15, 137:18
**senior** [1] - 53:14
**sense** [16] - 6:3, 7:4, 13:20, 41:10, 48:19, 60:18, 89:24, 93:11, 104:19, 133:3, 135:3, 141:23, 144:11, 144:12, 150:5
**sensible** [1] - 144:16
**sent** [6] - 97:15, 102:21, 113:17, 113:18, 118:24, 138:2
**sentence** [1] - 51:17
**separate** [15] - 13:22, 18:19, 18:22, 41:13, 60:15, 80:20, 81:7, 81:13, 81:18, 86:17, 96:18, 132:25, 133:1, 140:8, 146:16
**separation** [29] - 6:10, 13:21, 13:23, 35:8, 40:5, 43:10, 53:19, 87:8, 94:16, 96:13, 99:3, 102:10, 104:20, 111:15, 111:25, 114:22, 118:9, 118:14, 118:20, 118:24, 119:25, 120:12, 120:14, 121:10, 126:2, 126:17, 126:20, 127:5, 127:6
**September** [7] - 45:12, 45:19, 45:23, 47:6, 47:23, 47:24, 48:14
**series** [2] - 38:1,

40:25
**seriously** [2] - 5:17, 150:23
**served** [1] - 35:15
**service** [3] - 28:13, 81:1, 81:3
**serviceman** [1] - 81:24
**serviceman's** [1] - 81:5
**services** [8] - 26:5, 26:16, 27:1, 28:14, 73:5, 76:15, 76:16, 76:20
**set** [7] - 8:6, 9:16, 25:12, 77:10, 110:5, 141:17, 144:1
**sets** [4] - 44:12, 95:6, 130:2
**setting** [5] - 95:22, 105:25, 106:1, 110:6, 111:6
**settings** [1] - 62:19
**sever** [1] - 123:9
**several** [10] - 26:6, 60:5, 67:9, 121:20, 131:20, 133:20, 135:5, 145:5, 145:10, 147:11
**shaking** [1] - 101:25
**share** [3] - 7:4, 109:3, 140:1
**shared** [1] - 68:25
**sharp** [1] - 65:24
**sharpens** [1] - 80:17
**shift** [4] - 37:7, 37:20, 37:22, 84:15
**shifted** [3] - 59:22, 72:18, 94:1
**shifting** [2] - 62:1, 89:20
**shipping** [1] - 89:23
**short** [2] - 13:13, 13:16
**shot** [1] - 121:4
**show** [3] - 63:17, 64:25, 91:8
**showed** [1] - 37:25
**showing** [2] - 130:17, 143:2
**shut** [1] - 8:22
**shutdown** [1] - 37:10
**side** [4] - 4:12, 84:9, 110:24
**sidelined** [1] - 100:20
**sides** [1] - 142:12
**signed** [1] - 95:25
**significance** [3] - 66:16, 95:13, 98:3

**significant** [4] - 51:22, 53:8, 64:12, 136:10
**significantly** [1] - 147:15
**similar** [6] - 13:20, 45:2, 63:6, 103:15, 103:20, 104:6
**similarly** [3] - 79:19, 82:1, 147:20
**simplify** [2] - 60:23, 115:8
**simply** [2] - 33:19, 53:10
**simultaneously** [1] - 9:19
**sincerely** [1] - 83:21
**sitting** [1] - 113:17
**situated** [1] - 109:23
**situation** [13] - 63:1, 63:20, 75:13, 77:21, 83:14, 94:10, 104:13, 104:18, 105:4, 106:23, 108:25, 128:3, 128:8
**situations** [6] - 62:17, 70:15, 89:17, 105:4, 107:4, 107:11
**six** [1] - 135:15
**skeleton** [1] - 116:2
**skirted** [1] - 78:5
**slightly** [2] - 59:15, 136:18
**slow** [1] - 4:21
**small** [3] - 135:6, 135:12, 149:22
**smaller** [1] - 145:11
**smiling** [1] - 76:4
**social** [1] - 53:8
**Society** [1] - 15:20
**solvable** [1] - 139:13
**solve** [3] - 78:4, 79:25, 117:8
**solved** [1] - 139:21
**solving** [1] - 110:19
**someone** [5] - 60:24, 63:20, 72:3, 89:1, 150:21
**sometimes** [5] - 51:8, 64:8, 97:24, 97:25, 130:8
**somewhat** [2] - 74:19, 131:18
**somewhere** [5] - 17:1, 22:4, 101:5, 143:21, 145:22
**Sonja** [2] - 151:9, 151:15
**SONJA** [2] - 1:22, 151:15

**soon** [4] - 114:1, 138:11, 147:10, 148:2
**sorry** [8] - 20:6, 29:8, 44:20, 45:21, 52:11, 57:24, 70:13, 138:25
**sort** [27] - 7:6, 8:5, 13:13, 15:6, 16:23, 24:14, 26:22, 32:24, 57:15, 62:11, 65:19, 65:21, 66:18, 70:8, 71:20, 72:9, 78:2, 79:25, 84:25, 90:15, 111:16, 127:3, 128:19, 131:11, 137:10, 137:19, 149:12
**sorts** [4] - 10:15, 19:20, 70:2, 70:10
**sought** [5] - 17:17, 33:1, 34:21, 59:16, 67:25
**sounded** [1] - 89:13
**sounds** [8] - 22:21, 48:13, 49:7, 94:20, 101:16, 132:20, 136:13, 142:24
**source** [7] - 23:5, 23:8, 23:22, 24:7, 35:20, 131:5, 132:4
**sources** [1] - 108:1
**sovereign** [20] - 16:12, 22:12, 22:19, 22:20, 31:7, 33:3, 33:7, 67:19, 68:9, 72:21, 73:1, 73:11, 78:5, 79:13, 79:14, 85:3, 85:23, 87:4, 87:10
**speaking** [5] - 4:17, 7:22, 91:4, 116:12, 131:18
**speaks** [1] - 138:10
**special** [2] - 102:20, 102:21
**specific** [21] - 25:6, 33:19, 44:6, 48:16, 50:9, 51:13, 65:5, 66:6, 67:11, 71:6, 92:1, 92:8, 97:22, 108:6, 113:23, 115:15, 119:23, 121:21, 134:23, 136:7, 137:6
**specifically** [12] - 27:14, 46:24, 51:1, 53:5, 74:14, 74:15, 95:7, 102:9, 105:15, 105:23, 116:12, 117:12
**specificity** [3] -

30:12, 49:8, 115:11
**specified** [5] - 78:16, 98:17, 104:14, 127:24, 128:9
**specify** [3] - 21:7, 92:19, 94:18
**speed** [3] - 125:15, 134:11, 145:15
**spell** [1] - 126:4
**spelled** [1] - 18:24
**spelling** [1] - 95:21
**spend** [35] - 14:2, 14:16, 14:17, 14:19, 35:6, 35:8, 50:22, 51:23, 52:23, 53:15, 53:16, 53:17, 54:25, 99:11, 100:1, 100:20, 101:3, 101:13, 102:4, 120:3, 120:5, 120:15, 121:1, 127:9, 127:14, 127:17, 128:2, 128:5, 129:20, 129:21
**spending** [23] - 14:13, 43:18, 43:20, 50:1, 50:4, 52:13, 57:21, 99:9, 99:20, 100:6, 102:9, 105:10, 105:17, 105:24, 106:2, 106:10, 106:13, 109:6, 111:18, 119:8, 120:2, 121:3, 129:10
**spent** [15] - 14:5, 14:6, 49:7, 49:15, 50:19, 51:14, 52:9, 55:8, 97:22, 98:2, 100:12, 100:22, 118:23, 126:15, 133:9
**sphere** [1] - 100:9
**spot** [2] - 44:24, 78:19
**spout** [1] - 128:21
**square** [3] - 34:2, 82:11, 82:23
**SRP** [1] - 124:4
**stable** [1] - 35:19
**staff** [6] - 9:20, 116:3, 134:19, 138:20, 139:7, 149:16
**staffing** [4] - 139:23, 143:2, 148:22, 149:15
**staffs** [1] - 116:2
**stage** [4] - 25:12, 31:20, 40:13, 134:10
**stand** [1] - 100:14
**standard** [2] - 96:14, 97:8, 111:20
**standards** [2] - 83:24, 94:4
**standing** [38] - 6:9,

7:8, 8:1, 10:2, 10:9, 10:11, 10:13, 11:1, 11:22, 13:16, 14:9, 14:11, 15:11, 15:17, 15:21, 23:23, 24:7, 24:12, 51:4, 60:24, 60:25, 62:10, 63:14, 65:1, 66:8, 66:11, 66:12, 66:14, 67:21, 67:23, 68:3, 68:6, 68:7, 84:1, 87:8, 93:22, 98:25, 119:15
**start** [29] - 5:24, 6:5, 6:7, 6:9, 8:1, 8:5, 10:10, 16:2, 16:8, 20:14, 22:4, 22:21, 22:22, 25:8, 26:3, 28:25, 35:12, 36:2, 37:1, 37:5, 59:14, 75:22, 76:5, 94:17, 114:15, 130:1, 133:5, 138:16, 143:16
**started** [5] - 18:17, 21:23, 59:10, 75:5, 129:3
**starting** [1] - 7:6
**starts** [1] - 94:16
**state** [6] - 33:22, 44:16, 98:3, 98:13, 101:13, 136:3
**STATE** [1] - 1:7
**State** [20] - 3:4, 12:6, 36:6, 38:4, 40:16, 43:25, 57:20, 59:21, 120:21, 122:4, 132:16, 132:19, 132:21, 133:19, 136:25, 140:18, 140:19, 140:24, 141:19, 147:14
**State's** [1] - 68:15
**statement** [2] - 46:15, 48:17
**statements** [3] - 45:2, 46:14, 124:19
**States** [9] - 3:4, 3:21, 77:5, 77:18, 80:13, 95:9, 151:9, 151:12
**states** [5] - 33:23, 33:25, 80:18, 98:13, 128:7
**STATES** [2] - 1:1, 1:6
**stating** [3] - 40:13, 86:11, 87:3
**status** [6] - 5:19, 9:16, 81:5, 129:24, 137:4, 140:17
**statute** [31] - 27:10, 27:13, 49:11, 49:13, 49:16, 49:18, 50:13,

50:21, 51:15, 51:16, 52:14, 52:16, 52:19, 56:6, 57:9, 62:18, 92:18, 92:19, 95:19, 95:20, 96:3, 96:9, 97:7, 98:12, 98:17, 104:14, 104:17, 105:5, 110:24, 127:23, 128:10

**statutes** [10] - 23:12, 26:2, 43:23, 46:3, 51:18, 52:8, 92:24, 93:3, 100:13, 127:25

**statutory** [8] - 23:9, 33:24, 50:3, 50:11, 51:2, 52:12, 57:15, 104:17

**stay** [3] - 5:11, 125:16, 134:4

**stayed** [1] - 5:7

**stemming** [1] - 38:3

**Stenographic** [1] - 1:25

**stenographic** [1] - 151:10

**step** [5] - 102:6, 134:18, 143:15, 146:18, 150:18

**STEPHEN** [1] - 2:6

**steps** [4] - 124:13, 138:19, 146:2

**Steven** [2] - 3:13, 7:1

**still** [28] - 5:1, 14:11, 19:23, 25:21, 29:16, 38:5, 39:17, 39:18, 46:15, 51:10, 54:5, 54:11, 55:7, 55:8, 58:14, 71:19, 80:6, 80:22, 82:21, 90:19, 102:11, 113:3, 114:24, 120:1, 121:2, 122:13, 144:24, 145:15

**stitch** [1] - 73:14

**stock** [1] - 148:24

**stop** [7] - 72:8, 83:2, 83:3, 83:4, 83:15, 83:16, 137:3

**stopping** [1] - 8:17

**strain** [1] - 87:22

**Street** [2] - 2:3, 2:10

**stretches** [1] - 81:24

**strong** [2] - 103:22, 122:5

**stronger** [1] - 28:18

**strongly** [1] - 104:1

**structure** [1] - 79:5

**stuck** [1] - 113:3

**studied** [1] - 99:14

**stuff** [4] - 70:3,

90:15, 105:17, 106:13

**styled** [2] - 74:18, 80:4

**sub** [9] - 26:13, 27:24, 29:12, 29:21, 29:24, 78:8, 78:16, 117:10

**sub-award** [2] - 29:24, 78:16

**sub-awards** [5] - 26:13, 27:24, 29:12, 29:21, 78:8

**sub-grantees** [1] - 117:10

**sub-grants** [1] - 26:13

**subcontractor** [1] - 28:5

**subcontractors** [2] - 78:11, 117:10

**subcontracts** [1] - 26:13

**subject** [5] - 61:23, 69:13, 75:11, 85:8, 137:12

**subjected** [1] - 140:1

**submission** [3] - 28:8, 114:25, 150:21

**submissions** [7] - 6:14, 102:13, 112:22, 114:6, 126:16, 149:24, 150:25

**submit** [4] - 5:19, 17:3, 56:1, 113:25

**submitted** [2] - 38:14, 115:1

**subordinated** [1] - 96:16

**subordinates** [1] - 127:8

**subsequent** [10] - 5:5, 12:23, 12:25, 13:5, 38:2, 58:5, 71:18, 81:4, 97:25, 142:7

**substance** [1] - 17:4

**substantial** [1] - 35:22

**substantially** [1] - 27:8

**succeed** [7] - 38:11, 113:5, 118:9, 118:13, 120:11, 121:9, 121:13

**succeeds** [1] - 114:21

**success** [3] - 56:13, 126:19, 128:12

**suddenly** [1] - 24:15

**sue** [4] - 25:23, 30:17, 31:14, 57:6

**sued** [1] - 29:12

**suffering** [2] - 13:1, 13:6

**sufficiency** [1] - 90:8

**sufficient** [4] - 24:21, 53:4, 53:10, 122:17

**sufficiently** [4] - 32:20, 53:14, 84:2, 123:23

**suggest** [4] - 40:14, 43:4, 43:5, 100:19

**suggested** [2] - 88:21, 105:9

**suggesting** [2] - 46:14, 100:11

**suggests** [2] - 39:23, 91:2

**suing** [3] - 25:20, 33:23, 82:3

**suit** [5] - 9:8, 56:23, 77:12, 81:7, 81:13

**suits** [2] - 28:21, 68:4

**summarized** [1] - 73:13

**sunset** [4] - 62:18, 62:19, 62:22, 62:23

**super** [1] - 127:11

**superintending** [1] - 126:1

**supplemental** [4] - 28:9, 40:9, 61:16, 61:21

**support** [4] - 37:22, 48:11, 109:15, 121:22

**supports** [2] - 35:18, 35:19

**suppose** [1] - 12:14

**supposed** [1] - 128:7

**supposedly** [1] - 35:25

**Supreme** [25] - 5:7, 5:11, 33:11, 33:13, 34:2, 67:9, 67:11, 86:19, 95:18, 103:14, 104:9, 105:21, 106:14, 108:20, 110:25, 112:9, 114:8, 121:19, 126:12, 127:20, 130:12, 137:23, 138:2, 138:10, 144:25

**SUR** [124] - 2:9, 3:20, 59:2, 59:5, 59:12, 61:11, 61:20, 62:16, 62:24, 63:16, 64:21, 65:10, 66:17, 67:18, 67:22, 68:18, 69:12, 69:24, 70:13, 70:24, 71:4, 71:22, 72:1,

72:14, 72:18, 72:22, 73:15, 73:18, 73:20, 74:17, 75:3, 75:7, 75:24, 76:8, 76:22, 77:3, 78:14, 78:22, 78:25, 79:15, 79:20, 80:11, 80:16, 80:24, 81:14, 82:25, 83:7, 83:12, 83:20, 84:12, 84:17, 85:5, 85:20, 85:25, 86:4, 86:13, 86:23, 87:12, 87:16, 88:18, 89:15, 90:8, 90:21, 90:25, 91:16, 93:18, 93:22, 95:15, 96:3, 97:7, 97:14, 98:6, 98:9, 99:2, 99:13, 100:2, 100:14, 101:4, 101:18, 102:22, 104:11, 106:20, 108:2, 108:18, 109:6, 109:21, 110:5, 110:14, 111:8, 111:12, 111:14, 121:25, 122:22, 123:7, 123:14, 123:20, 125:1, 125:4, 125:19, 125:22, 126:8, 126:22, 127:15, 127:22, 128:3, 128:16, 129:9, 129:22, 132:8, 132:13, 132:22, 133:1, 138:15, 138:23, 139:2, 139:19, 140:14, 140:21, 141:1, 141:5, 143:25, 146:15, 148:8, 149:5

**Sur** [13] - 3:20, 3:23, 35:9, 59:1, 59:9, 113:9, 121:6, 121:7, 130:3, 132:2, 133:21, 138:14, 146:9

**sur** [2] - 16:13, 58:23

**sur-reply** [2] - 16:13, 58:23

**surprise** [2] - 10:20, 140:5

**surrounding** [1] - 104:17

**suspend** [1] - 42:3

**suspended** [2] - 42:11, 58:12

**suspension** [5] - 18:8, 37:16, 72:7, 72:9, 82:19

**suspensions** [5] - 71:12, 71:16, 136:24,

137:3, 137:20

**swap** [1] - 7:25

**sweeping** [2] - 65:21, 124:2

**swing** [1] - 8:19

**switch** [1] - 40:5

**system** [1] - 131:11

**systems** [2] - 9:21, 125:13

## T

**T1** [1] - 120:12

**table** [6] - 49:16, 49:17, 49:19, 121:16, 121:23, 126:24

**tackling** [1] - 141:21

**tailor** [3] - 113:20, 120:1, 129:7

**tailored** [5] - 34:15, 113:4, 115:7, 119:7, 119:16

**tailoring** [2] - 32:1, 86:16

**taint** [1] - 41:17

**talks** [9] - 16:14, 21:8, 29:9, 46:24, 69:9, 96:25, 99:8, 99:9, 132:5

**tangible** [1] - 29:2

**task** [2] - 89:6, 111:2

**taxpayers** [1] - 100:11

**technical** [2] - 42:18, 64:2

**teleconferences** [1] - 4:4

**telephonic** [1] - 71:11

**temporarily** [2] - 54:10, 55:5

**temporary** [4] - 5:15, 137:12, 137:16, 137:21

**ten** [4] - 139:5, 139:22, 140:10, 142:21

**ten-working** [1] - 140:10

**tension** [1] - 39:23

**terminate** [14] - 9:1, 12:17, 20:15, 20:19, 20:20, 39:5, 69:21, 69:22, 70:10, 71:1, 71:2, 90:11, 90:20, 91:10

**terminated** [16] - 9:4, 17:7, 18:13, 37:18, 40:22, 40:23, 40:24, 41:1, 42:11, 50:19,

58:12, 60:6, 71:1,
71:18, 113:19, 137:7
**terminating** [6] -
8:23, 9:19, 18:21,
21:23, 100:20, 118:3
**termination** [13] -
9:2, 9:9, 19:16, 19:19,
50:15, 70:19, 71:19,
72:7, 72:9, 89:18,
90:20, 113:20, 115:21
**terminations** [57] -
8:25, 9:6, 9:14, 12:16,
13:9, 17:23, 18:1,
18:3, 18:6, 18:17,
18:20, 18:23, 19:23,
19:24, 30:2, 38:2,
38:17, 39:4, 47:3,
47:9, 48:8, 48:10,
49:3, 50:15, 61:4,
71:12, 71:15, 71:20,
71:21, 88:12, 88:22,
91:23, 93:4, 113:24,
117:15, 117:16,
118:1, 118:16,
119:20, 120:18,
120:21, 123:5,
123:10, 123:13,
135:24, 136:24,
137:2, 137:16,
137:19, 141:25,
142:2, 142:3
**terms** [34] - 6:18,
17:9, 18:6, 18:13,
20:20, 23:15, 26:8,
30:8, 42:10, 44:10,
52:3, 60:20, 68:13,
77:10, 77:12, 81:14,
88:21, 90:4, 92:4,
96:25, 97:5, 99:10,
103:22, 108:5,
123:15, 129:7,
129:16, 133:8, 138:3,
138:6, 143:6, 144:8,
147:7, 149:24
**territory** [1] - 84:25
**test** [5] - 66:8, 67:23,
68:3, 68:7, 85:20
**text** [4] - 26:8, 27:13,
87:5, 87:6
**THE** [256] - 1:1, 1:17,
2:1, 2:4, 3:12, 3:15,
3:19, 3:23, 4:1, 7:18,
8:7, 10:1, 10:17,
11:20, 12:1, 12:8,
13:8, 13:20, 14:20,
15:25, 16:8, 17:4,
18:3, 18:23, 19:6,
19:22, 20:6, 20:18,
20:22, 21:25, 22:23,
24:1, 24:11, 24:23,

25:25, 26:14, 27:13,
27:22, 28:2, 28:20,
29:15, 30:12, 30:19,
31:5, 31:13, 31:23,
32:8, 32:19, 34:4,
35:5, 36:8, 37:11,
38:5, 39:10, 40:1,
40:20, 41:1, 41:4,
41:15, 42:4, 42:22,
43:9, 43:24, 44:2,
44:19, 44:22, 45:21,
46:5, 47:7, 47:15,
47:23, 48:2, 48:6,
48:20, 49:4, 49:21,
50:22, 51:4, 51:16,
51:20, 52:11, 52:20,
53:12, 53:23, 54:4,
54:13, 55:7, 55:15,
56:3, 56:7, 57:4,
57:10, 57:23, 58:1,
58:11, 58:21, 59:4,
59:6, 59:9, 60:17,
61:19, 62:7, 62:21,
63:13, 64:6, 65:2,
66:9, 67:1, 67:20,
68:5, 68:20, 69:20,
70:8, 70:22, 70:25,
71:6, 71:24, 72:3,
72:17, 72:20, 72:23,
73:17, 73:19, 74:14,
74:23, 75:4, 75:17,
76:4, 76:11, 77:2,
78:7, 78:17, 78:24,
79:4, 79:18, 80:3,
80:14, 80:22, 81:12,
82:5, 83:6, 83:10,
83:17, 83:25, 84:16,
84:20, 85:14, 85:21,
86:1, 86:5, 86:15,
86:25, 87:13, 88:1,
89:13, 90:5, 90:12,
90:24, 91:4, 93:5,
93:20, 94:16, 95:23,
96:21, 97:10, 97:18,
98:8, 98:25, 99:6,
99:18, 100:7, 100:18,
101:8, 101:21, 103:7,
105:6, 107:12,
108:16, 108:23,
109:9, 110:2, 110:9,
111:7, 111:10,
111:13, 111:24,
112:19, 114:2, 115:8,
116:12, 116:15,
117:12, 117:18,
117:22, 118:5, 118:8,
118:12, 118:19,
119:6, 120:4, 120:9,
121:5, 122:19, 123:1,
123:13, 123:17,
124:8, 125:2, 125:17,

125:21, 126:5, 126:9,
127:10, 127:18,
128:1, 128:11,
128:25, 129:14,
129:23, 131:5, 131:8,
131:13, 131:16,
131:24, 132:2,
132:11, 132:19,
132:23, 133:2,
133:16, 134:7,
134:15, 134:18,
134:24, 135:3, 135:8,
135:16, 135:22,
136:2, 136:8, 136:13,
136:16, 137:22,
138:8, 138:16, 139:1,
139:15, 140:12,
140:15, 140:24,
141:3, 142:8, 144:10,
146:17, 149:4, 149:7
**themselves** [8] -
41:24, 42:12, 65:25,
76:23, 81:23, 87:20,
130:3, 146:11
**theoretical** [1] -
141:23
**theories** [1] - 121:14
**theory** [1] - 47:19
**therefore** [2] - 19:1,
53:9
**thinking** [3] - 108:7,
111:24, 147:7
**thinks** [1] - 146:15
**third** [5] - 29:3,
64:19, 66:7, 67:23,
76:18
**third-parties** [1] -
76:18
**third-party** [2] - 29:3,
64:19
**thousand** [1] - 60:5
**thousands** [7] -
20:12, 39:7, 133:13,
133:20, 145:5,
145:10, 147:11
**threats** [1] - 58:17
**three** [4] - 8:10,
46:20, 55:6, 70:1
**three-paragraph** [1]
- 70:1
**throughout** [7] -
10:2, 21:24, 36:3,
36:15, 55:13, 68:25,
107:19
**throw** [1] - 22:2
**Thursday** [1] - 1:17
**tick** [1] - 11:13
**tie** [1] - 79:7
**tied** [1] - 19:23
**ties** [2] - 32:24, 46:6

**timeline** [4] - 122:23,
136:2, 136:3, 138:7
**timelines** [2] - 5:16,
47:21
**timetable** [1] - 69:19
**today** [26] - 3:2, 6:5,
7:5, 13:8, 42:7, 42:10,
73:20, 82:13, 82:14,
88:7, 91:25, 100:17,
110:23, 125:6, 125:9,
125:24, 126:15,
130:16, 133:21,
133:23, 142:23,
143:12, 143:15,
145:2, 146:17, 151:3
**today's** [1] - 4:23
**together** [10] - 7:8,
22:8, 25:13, 73:13,
73:14, 79:8, 79:14,
85:11, 130:18, 130:19
**tolerating** [1] - 133:3
**tomorrow** [3] -
53:13, 130:19, 148:4
**tonight** [1] - 146:25
**took** [2] - 68:20,
122:8
**top** [2] - 9:22, 122:1
**topics** [2] - 21:1,
21:9
**total** [3] - 35:21,
135:8, 147:22
**totally** [3] - 28:19,
41:18, 106:13
**touched** [1] - 93:1
**tough** [1] - 5:2
**toward** [2] - 34:16,
148:1
**towards** [4] - 49:15,
50:20, 52:9, 98:2
**traces** [1] - 38:6
**track** [1] - 39:9
**trade** [1] - 133:2
**tradeoffs** [2] - 96:4,
96:7
**tradition** [1] - 110:17
**traditional** [1] - 64:5
**Train** [9] - 98:11,
98:19, 99:23, 104:16,
105:4, 127:10,
127:23, 128:4
**trained** [1] - 108:7
**tranche** [2] - 142:19,
146:18
**tranches** [5] - 8:25,
17:23, 19:16, 50:15,
70:11
**transactions** [2] -
148:23, 148:25
**TRANSCRIPT** [1] -
1:16

**Transcript** [1] - 1:25
**transcript** [3] -
151:10, 151:10,
151:11
**transition** [1] - 54:6
**transportation** [2] -
89:24, 89:25
**treated** [2] - 63:11,
79:15
**tricky** [1] - 102:19
**tried** [2] - 27:15,
75:19
**trigger** [2] - 54:20,
55:3
**TRO** [67] - 5:4, 5:5,
5:25, 9:10, 9:11, 9:15,
10:7, 10:19, 17:22,
17:24, 18:18, 19:5,
19:18, 20:11, 21:13,
21:23, 34:15, 37:25,
38:2, 38:10, 44:13,
45:1, 58:5, 59:16,
59:17, 59:22, 60:2,
61:23, 62:2, 62:3,
62:4, 68:22, 68:24,
69:13, 69:15, 69:16,
71:10, 71:13, 72:2,
72:18, 82:21, 88:4,
113:2, 114:11, 115:9,
115:10, 122:8,
122:15, 122:21,
123:20, 124:11,
125:4, 125:6, 131:16,
136:22, 137:1, 138:1,
138:10, 138:13,
142:6, 142:11, 144:2,
144:7, 144:9, 145:1,
150:7
**TRO's** [2] - 88:7,
91:21
**true** [10] - 37:11,
40:14, 58:19, 60:17,
86:5, 89:1, 90:18,
91:22, 117:8, 151:10
**truly** [1] - 58:19
**Trump** [1] - 3:6
**TRUMP** [1] - 1:12
**try** [3] - 30:7, 55:25,
72:25
**trying** [33] - 13:24,
15:2, 39:1, 41:4,
47:24, 49:23, 53:24,
54:1, 63:17, 64:19,
66:10, 66:21, 68:8,
68:22, 69:10, 74:10,
76:24, 90:12, 90:14,
90:17, 97:11, 101:12,
103:7, 104:12,
106:11, 110:5, 110:9,
122:14, 123:7,

125:24, 135:3, 141:21, 144:18

**Tucker** [43] - 16:4, 22:2, 22:7, 22:17, 22:22, 23:2, 25:1, 25:10, 25:24, 26:22, 27:18, 28:20, 28:23, 29:10, 29:13, 30:3, 30:17, 30:21, 30:23, 32:11, 73:7, 73:21, 74:2, 74:7, 74:18, 75:23, 75:24, 76:1, 76:5, 76:25, 77:2, 77:25, 78:13, 78:20, 79:6, 79:11, 80:8, 84:10, 84:23, 85:2, 85:23, 87:15

**turn** [5] - 15:25, 96:23, 103:9, 128:7, 129:23

**turnaround** [1] - 4:5

**turned** [2] - 59:18, 131:23

**turns** [1] - 13:3

**two** [29] - 5:5, 6:9, 9:11, 12:6, 18:14, 22:16, 26:2, 32:24, 37:21, 40:8, 70:1, 82:11, 88:23, 95:16, 102:22, 104:4, 109:2, 112:5, 112:10, 112:24, 129:17, 131:20, 135:6, 139:11, 141:19, 142:5, 143:10, 143:18, 143:21

**twofold** [1] - 148:9

**tying** [1] - 97:23, 98:1

**type** [17] - 14:10, 14:14, 15:24, 20:10, 21:15, 28:15, 30:21, 39:19, 53:10, 76:20, 83:13, 84:21, 88:15, 95:22, 105:17, 149:12, 149:17

**types** [14] - 15:3, 15:10, 25:1, 25:2, 26:6, 27:15, 28:19, 28:22, 30:13, 31:24, 69:9, 73:2, 74:14, 83:19

**typically** [1] - 16:22

## U

**U.S** [2] - 2:9, 46:21

**Ukraine** [1] - 54:17

**ultimately** [1] - 150:3

**unable** [2] - 115:23,

115:25

**uncontested** [1] - 35:22

**under** [53] - 9:9, 16:22, 18:21, 19:4, 20:20, 23:10, 25:1, 25:7, 25:20, 25:23, 28:11, 28:23, 29:13, 30:2, 30:3, 30:17, 31:8, 31:9, 32:16, 37:17, 39:17, 53:5, 54:11, 56:13, 56:23, 63:21, 64:24, 66:7, 67:10, 67:14, 67:19, 67:23, 69:18, 74:7, 77:25, 78:12, 80:5, 80:9, 82:9, 82:25, 83:1, 84:7, 84:14, 84:17, 86:9, 103:5, 111:19, 115:4, 118:24, 121:13, 121:14, 124:9, 126:22

**undergird** [1] - 57:15

**undergo** [1] - 141:17

**underlying** [6] - 66:21, 74:21, 75:20, 90:10, 99:21, 127:22

**underneath** [1] - 19:13

**underscore** [1] - 129:12

**underscores** [1] - 98:19

**understandings** [1] - 42:5

**understood** [14] - 11:2, 30:15, 42:25, 49:4, 60:2, 68:5, 75:21, 76:19, 79:10, 80:14, 86:5, 116:15, 121:5, 137:23

**undertake** [2] - 29:4, 136:10

**undisputed** [1] - 28:7

**unenforceable** [1] - 57:9

**unfolding** [1] - 143:23

**unfortunate** [1] - 5:22

**UNITED** [2] - 1:1, 1:6

**United** [9] - 3:4, 3:21, 77:4, 77:18, 80:12, 95:9, 151:9, 151:12

**universe** [5] - 30:1, 86:2, 130:23, 145:11

**University** [1] - 92:7

**unlawful** [7] - 23:18, 61:2, 115:6, 115:7,

118:16, 119:20, 120:23

**unlawfully** [1] - 137:11

**unless** [9] - 5:1, 22:2, 23:3, 32:20, 40:5, 56:23, 87:14, 115:18, 146:23

**unlike** [1] - 106:17

**unlikely** [1] - 40:17

**unnamed** [1] - 110:23

**unpack** [1] - 95:5

**unreviewable** [1] - 110:4

**unspent** [4] - 46:8, 46:10, 46:12, 51:6

**up** [44] - 4:15, 6:8, 7:3, 7:19, 10:2, 18:11, 27:18, 39:14, 44:3, 48:15, 48:25, 53:18, 53:21, 54:2, 55:25, 61:4, 61:19, 64:10, 70:16, 79:18, 80:25, 87:17, 99:23, 105:25, 106:1, 112:2, 118:1, 121:7, 130:3, 131:13, 131:16, 134:23, 134:25, 135:1, 135:20, 138:20, 139:16, 141:21, 143:2, 143:10, 143:17, 147:17, 147:19, 150:3

**upcoming** [1] - 45:5

**USAID** [10] - 36:6, 40:16, 47:1, 59:21, 125:12, 132:13, 132:20, 133:19, 140:25, 141:20

**useful** [1] - 52:25

**uses** [3] - 20:3, 22:11, 61:14

**usual** [1] - 9:2

**utilized** [1] - 95:10

## V

**vacate** [4] - 83:10, 117:13, 122:10, 123:24

**vacatur** [15] - 31:10, 31:15, 31:16, 32:6, 67:6, 67:7, 67:10, 67:14, 86:18, 86:20, 86:21, 86:22, 115:3, 121:20, 121:24

**Vaccine** [1] - 3:3

**VACCINE** [1] - 1:3

**vaccine** [1] - 136:17

**valid** [2] - 37:3, 97:15

**validation** [1] - 148:15

**value** [1] - 39:15

**Vance** [1] - 122:2

**variety** [2] - 16:11, 122:10

**various** [5] - 21:1, 36:12, 64:18, 68:22, 148:15

**vast** [2] - 89:1, 110:3

**vastly** [1] - 42:5

**veer** [1] - 94:16

**version** [3] - 31:5, 83:17, 123:12

**versus** [10] - 3:4, 3:5, 14:2, 20:19, 39:15, 77:4, 77:18, 80:12, 86:20, 92:7

**viability** [1] - 64:14

**view** [13] - 12:15, 20:18, 20:25, 24:22, 59:18, 63:10, 65:10, 73:21, 88:20, 111:8, 113:22, 123:14, 128:25

**Vilsack** [2] - 15:21, 119:13

**violate** [1] - 70:11

**violated** [3] - 52:14, 52:17, 94:20

**violating** [1] - 23:14

**violation** [10] - 52:22, 53:20, 54:6, 77:11, 86:10, 99:4, 124:4, 127:6, 127:7, 129:16

**violations** [2] - 50:3, 119:25

**virtually** [1] - 37:10

**voluntarily** [1] - 54:22

**vouchers** [2] - 131:10, 131:21

**vs** [2] - 1:5, 1:11

## W

**waiting** [3] - 59:25, 116:7

**waived** [3] - 31:7, 85:3, 85:24

**waiver** [10] - 16:13, 22:20, 33:3, 33:6, 33:7, 43:5, 43:7, 73:11, 79:13, 87:10

**waives** [3] - 33:7, 73:1, 86:7

**waiving** [4] - 22:12, 40:2, 84:24, 121:17

**wake** [1] - 137:1

**walk** [2] - 39:10, 142:23

**wants** [4] - 69:21, 134:10, 144:25, 150:21

**war** [1] - 109:14

**warning** [1] - 8:21

**Washington** [5] - 1:18, 1:24, 2:3, 2:7, 2:10

**waste** [2] - 36:4, 99:15

**water** [2] - 98:14, 128:5

**waterfront** [2] - 26:8, 26:10

**waves** [6] - 137:15, 137:18, 137:19

**ways** [8] - 10:15, 14:17, 16:11, 20:19, 64:18, 103:20, 128:22, 142:18

**weakness** [1] - 98:19

**week** [1] - 68:21

**weekend** [3] - 130:19, 148:21, 149:11

**weekends** [3] - 148:25, 149:1, 149:3

**weeks** [3] - 20:16, 141:19, 143:18

**weigh** [2] - 128:18, 129:12

**welcome** [3] - 4:10, 4:12, 143:6

**WETZLER** [1] - 2:9

**whatsoever** [2] - 58:14, 58:15

**White** [1] - 107:9

**whole** [9] - 12:13, 12:20, 34:16, 47:1, 66:23, 95:22, 109:1, 116:22, 128:8

**wholesale** [2] - 53:4, 84:19

**wielding** [1] - 89:5

**Wildlife** [1] - 84:18

**WILLIAM** [1] - 2:6

**William** [3] - 3:16, 106:21

**win** [1] - 34:4

**wings** [1] - 116:7

**WIRTH** [58] - 2:6, 3:13, 7:1, 8:4, 8:8, 10:11, 11:10, 11:25, 12:3, 12:22, 13:15, 14:11, 15:3, 16:5, 17:3, 17:15, 18:14, 19:2, 19:11, 20:1,

20:8, 20:21, 21:14, 58:6, 58:13, 114:23, 115:11, 116:14, 116:17, 117:16, 117:19, 117:25, 118:7, 118:11, 118:13, 119:1, 119:12, 120:6, 120:16, 131:4, 131:6, 131:10, 131:15, 131:17, 132:1, 133:10, 133:17, 134:9, 134:17, 134:20, 135:1, 135:4, 135:10, 135:19, 136:1, 136:7, 136:9, 136:15

**Wirth** [5] - 3:13, 3:15, 7:1, 37:20, 113:15

**wish** [1] - 130:6

**withhold** [2] - 9:24, 134:14

**withholding** [1] - 128:6

**word** [6] - 16:15, 18:3, 20:4, 39:13, 141:22, 148:22

**wording** [2] - 55:18, 103:4

**words** [5] - 13:24, 65:6, 123:1, 129:14

**workers** [2] - 35:18, 125:14

**world** [3] - 82:14, 101:13, 148:23

**worry** [1] - 35:9

**worse** [1] - 64:8

**worth** [3] - 94:22, 105:11, 130:23

**wrap** [1] - 87:17

**wrestling** [2] - 5:1, 16:9

**Wright** [1] - 103:21

**writing** [2] - 95:19, 96:5

**written** [4] - 60:12, 96:4, 96:11, 97:7

**wrote** [1] - 93:2

## Y

**YABLON** [1] - 2:6

**year** [6] - 45:13, 45:15, 47:5, 47:11, 96:8, 99:24

**years** [2] - 51:9, 100:22

**Yellen** [1] - 11:5

**yesterday** [3] - 5:11, 34:6, 134:4

**yield** [1] - 40:18

**York** [5] - 43:25, 98:11, 98:16, 104:15, 128:4

**yourself** [1] - 3:9

**Yucca** [1] - 99:15

## Z

**zero** [3] - 124:23, 142:15

**ZIEVE** [1] - 2:2

**Zivotofsky** [6] - 103:14, 105:22, 106:7, 106:18, 107:18, 112:2