IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**JOINT STATUS REPORT**

The parties respectfully submit this joint status report pursuant to the Court's Memorandum Opinion and Order issued March 10, 2025. The parties jointly report that they were unable to come to an agreement with regard to Defendants' compliance with the Court's preliminary injunction or a schedule for next steps in this case.

**PLAINTIFFS' STATEMENT**

The Court directed the parties to "apprise[] the Court of Defendants' compliance with [the preliminary injunction] and propose[] a schedule for next steps in this matter." *GHC* ECF 60, at 48. Plaintiffs address those issues in turn.

1

I.      **Plaintiffs' Position on Defendants' Compliance with the Preliminary Injunction**

As relevant here, the Court's preliminary injunction has three main components—(1) it enjoins Defendants from giving effect to any terminations, suspensions, or stop-work orders issued between January 20 and February 13, 2025; (2) it enjoins Defendants from withholding payments or letter-of-credit drawdowns for work completed before February 13 and directs Defendants to process at least roughly 300 payments per day; and (3) it enjoins Defendants from impounding congressionally appropriated foreign-assistance funds and directs Defendants to make available for obligation the full amount of foreign-assistance funds appropriated in the Further Consolidated Appropriations Act of 2024.

1. With respect to pre-February 13 terminations, suspensions, and stop-work orders, it appears to Plaintiffs that Defendants are continuing to give effect to such terminations, suspensions, and stop-work orders notwithstanding the Court's preliminary injunction. Plaintiffs generally have not received notice indicating that such terminations, suspensions, and stop-work orders have been rescinded. No guidance has been given on restarting work under these contracts. No USAID staff have been designated as Contract Office Representatives (to replace staff placed on administrative leave). Nor, in general, have Plaintiffs received any indication from Defendants that they may properly submit invoices or otherwise seek payment for work performed after such terminations, suspensions, or stop-work orders were sent. Plaintiffs raised these issues to Defendants during the meet-and-confer process, but Defendants had no response, and their section of this Joint Status Report does not address this issue either. Although Defendants represent that they "provided notification of the Court's order of March 10, 2025" by posting notice on a government website and sending emails to their "distribution lists," counsel for Defendants was unable to state during the meet-and-confer that Defendants had made any effort to identify or contact individual recipients of foreign-assistance funding who had received terminations,

2

suspensions, or stop-work orders between January 20 and February 13 to notify them that the termination, suspension, or stop-work order had been rescinded. As far as Plaintiffs are aware, no such efforts have in fact been made.

2. With respect to processing payments, Plaintiffs are not in a position to state definitively whether or not Defendants are continuing to withhold foreign-assistance payments or whether they are processing roughly 300 payments per day, as the Court directed.

Plaintiffs can state, however, that, since the preliminary injunction, the named Plaintiffs in *GHC* collectively have received approximately 262 payments totaling approximately $213 million, and they are still awaiting approximately $228 million in payments for work performed before February 13. At least one named plaintiff in *GHC* (DAI Global LLC) still has received no drawdown payments on its letters of credit. Global Health Council surveyed its members, who collectively report that 25 members received approximately $44 million in payments since the preliminary injunction, with approximately $173 million outstanding for work performed before February 13. (Not all Global Health Council members reported the number of payments received, but the number of payments that Global Health Council members collectively have received since March 10 is more than 350.) Similarly, SBAIC also surveyed its members, who collectively report that 32 members received approximately 57 payments totaling approximately $12.8 million since the preliminary injunction, with approximately $47 million outstanding for work performed before February 13. Plaintiffs in *AVAC* report having received four payments totaling approximately $1.5 million, with one request outstanding. Finally, InterAction—a non-Plaintiff association whose members include USAID and State Department implementing partners—has reported to Plaintiffs' counsel that 37 member organizations received approximately 85 payments totaling approximately $19 million since March 10, with approximately $19 million outstanding for work performed before February 13.

In sum, therefore, as of today, Plaintiffs are currently aware of 758 payments that funding recipients have received since March 10. That is approximately 190 payments per day, which would appear to fall significantly short of 300 payments per day. Plaintiffs recognize that they do not have insight into the full universe of payments that Defendants may be processing, and that the number of payments made may be higher.

At the same time, the named Plaintiffs in this litigation and their members all have significant amounts outstanding. In this regard, Plaintiffs note that the Court previously ordered Defendants to pay all of Plaintiffs' and their identified members' pending invoices and requests for draws, covering work performed prior to February 13, 2025, by 6:00 pm on Monday, March 10. *See* March 6, 2025 Hr'g Tr. 148:17-22. Defendants have failed to comply with that order.

Finally, Defendants state in their section of this joint status report that "the processing rate is dependent on obtaining complete documentation from the funding recipients." This statement is troubling. Defendants already have all the information necessary to pay invoices and draw requests, and Defendants do not specify what other "documentation" they are missing. To the extent Defendants are suggesting that funding recipients must resubmit information or provide additional information to be paid, Plaintiffs are concerned that Defendants are creating new, unnecessary, and artificial roadblocks to prompt payment of these already long-overdue invoices and draw requests.

3. With respect to impoundment, Plaintiffs during the meet-and-confer process asked Defendants whether and how they intend to comply with the impoundment portion of the Court's preliminary injunction. Defendants responded with a general statement to the effect that, unless the preliminary injunction is stayed or reversed or vacated on appeal, they intend to comply. But Defendants declined to specify whether they intend to appeal or seek a stay, nor did they provide any explanation as to *how* they intend to comply. As Plaintiffs told Defendants during the meet-

and-confer process, a generalized statement by Defendants that they intend to comply is not sufficient to demonstrate and ensure actual compliance.

To begin with, this Court on February 13 issued a Temporary Restraining Order (TRO) barring Defendants from withholding foreign-assistance funding, but Defendants violated that TRO for weeks. Plaintiffs will not recount all of the evidence of Defendants' noncompliance with the TRO here, but for example, at the hearing on the *GHC* Plaintiffs' motion to enforce the TRO on February 25, Defendants were not able to identify a single step they had taken to release frozen funds in the twelve days since the TRO had issued. And even at the preliminary injunction hearing on March 6, Defendants did not claim that they responded to the TRO by unfreezing foreign-assistance funds. To the contrary, Defendants stated that they had accelerated their review of existing foreign-assistance programs, but they left the freeze in place while that review was in progress. While the TRO now has been superseded by the preliminary injunction, Defendants' persistent noncompliance with the TRO is highly relevant to the Court's evaluation of their conclusory claims of compliance with the preliminary injunction. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted).

In addition, the Court in its preliminary injunction order concluded that Plaintiffs "are likely to succeed" on their claims that "Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power, as expressed in multiple statutes whose constitutionality has not been questioned." *GHC* ECF 60, at 29. Those are weighty constitutional claims, and remedying them will require significant efforts by officials throughout USAID and the State Department to obligate and disburse all congressionally appropriated foreign-assistance funds in accordance with Congress's detailed directives, the agency's internal financial controls and procurement processes, and other legal and

practical requirements, and to do so within the time periods required for the appropriations. Generalized statements are not enough to ensure that officials from top to bottom at USAID and the State Department are taking all of the myriad steps that will be necessary to comply with the Court's preliminary injunction and the relevant appropriations laws.

To be clear, contrary to Defendants' statement in their section of this Joint Status Report, merely ensuring that appropriated funds are spent before their period of availability for obligation expires is *not* sufficient to comply with the Court's order and the relevant appropriations statutes. To avoid an unlawful "impound[ment]," *GHC* ECF 60, at 48, Defendants must make "reasonable efforts to obligate" appropriate funds throughout the period of availability. Gov't Accountability Office, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 7 (Jan. 16, 2020). Accordingly, even a temporary pause in obligations or disbursements that is voluntary on the part of an agency and not otherwise authorized by law or the result of some "external factor"—even if the funds ultimately are obligated and disbursed before they expire—is unlawful unless it is for one of the purposes specified in the Impoundment Control Act and is accompanied by a special message to Congress. *Id.*

Furthermore, there is substantial evidence in the public record, from before the Court's preliminary injunction and afterwards, indicating that Defendants do *not* intend to obligate and disburse all congressionally appropriated foreign-assistance funds—throughout the period of availability or before they expire. On January 29, for example, a State Department spokesperson stated that, "even at this early stage, over $1,000,000,000 in spending not aligned with an America First agenda has been prevented." Office of the Spokesperson, Dep't of State, *Prioritizing America's Interests One Dollar at a Time* (Jan. 29, 2025), https://www.state.gov/prioritizing-americas-national-interests-one-dollar-at-a-time/. On February 7, President Trump posted on social media about USAID: "CLOSE IT DOWN." @realDonaldTrump, Truth Social (Feb. 7,

6

2025). On February 18, Defendant Pete Marocco submitted a declaration in these cases stating that USAID had terminated numerous contracts, grants, and other instruments on the ground that they were for "Democracy Promotion," *GHC* ECF 25-1, ¶ 16—even though, as the Court's preliminary injunction later noted, the Further Consolidated Appropriations Act of 2024 expressly appropriates certain funds to USAID "for the promotion of democracy globally." *GHC* ECF 60, at 5 (citation omitted). On March 10, the day of the preliminary injunction, Defendant Marco Rubio posted on social media that "we are officially cancelling 83% of the programs at USAID," and "we intend for the remaining 18% of programs we are keeping … to now be administered more effectively under the State Department." @marcorubio, X (March 10, 2025). On March 11, the day after the preliminary injunction, USAID employees were told to burn or shred documents stored at the agency's former headquarters, further indicating that they intend to dismantle the agency. *See* Edward Wong, *U.S.A.I.D. Official Orders Employees to Shred or Burn Classified and Personnel Records*, N.Y. Times (Mar. 11, 2025). And even today, the so-called Department of Government Efficiency lists thousands of terminated USAID contracts on its "Wall of Receipts," representing that terminating these contracts is providing millions of dollars in "savings" to taxpayers, clearly indicating Defendants' intent to refrain from spending the impounded funds. Dep't of Gov't Efficiency, *Savings*, https://doge.gov/savings (last visited Mar. 14, 2025).

Perhaps most importantly, USAID currently has no operational headquarters, and thousands of USAID staff have been terminated or remain on administrative leave. Defendants have not explained how they possibly could comply with the Court's preliminary injunction and the relevant appropriations laws without a physical space and only a skeleton staff.

Under these circumstances, Defendants' generalized statements of intent to comply are woefully insufficient, as they fail to identify *any* initial steps toward good faith compliance. The Court should direct Defendants to explain with specificity what concrete steps they are taking and

7

will take, by what date, to comply with the impoundment provisions of the Court's preliminary injunction. To the extent Defendants do not do so, the Court ultimately may have no choice but to order Defendants to rescind the terminations of all contracts, grants, and cooperative agreements since January 20, as honoring the contracts, grants, and cooperative agreements in place before that date is one known way to carry out Congress's directives in the appropriations laws.[1] Because of the lengthy timeline required to design, procure, and issue any alternate awards, such rescissions may be the only way, as a practical matter, that Defendants will be able to comply. Rescinding the terminations alone would not ensure full compliance with the impoundment provisions of the Court's preliminary injunction, but in the absence of any other plan articulated by Defendants, Plaintiffs submit that it is an appropriate and judicially manageable way to begin ensuring substantial compliance.

## II.     Plaintiffs' Proposed Schedule for Next Steps

The Court's preliminary injunction suggested multiple ways in which Plaintiffs could press their claims moving forward. For example, Plaintiffs could further develop the record to support the claims as pled in their respective original complaints. *See, e.g.*, *GHC* ECF 60, at 24, 28 (concluding that Plaintiffs are unlikely to prevail on their claims challenging the terminations "on this record"). Alternatively, Plaintiffs could reframe their claims in an amended complaint. *See, e.g.*, *id.* at 27 n.11.

Plaintiffs are still evaluating how they intend to proceed. But in the immediate term, Plaintiffs believe it is appropriate for Defendants to produce a limited number of critical documents

---

[1] This is of particular significance for cooperative agreements and grants since, per 31 U.S.C. § 1501, these obligations are required to be recorded against the Congressional appropriation upon signature of the award document. In other words, unlike contracts, all obligated portions of cooperative agreements and grants are deemed appropriated as soon as the award documents are executed.

that are referenced in the existing record. In particular, Defendants should provide Plaintiffs with (1) the "Action Memorandum" for each tranche of terminations effected from January 20 through March 10, which are described in then-Special Procurement Executive Jami Rodgers' email of February 11, 2025, *GHC* ECF 19-2, at 3; and (2) all "spreadsheets" and "lists" directly or indirectly referenced in paragraphs 5 and 6 of Pete Marocco's declaration dated February 25, 2025, *GHC* ECF 39-1, ¶¶ 5-6. It is appropriate for Defendants to produce these documents for at least three reasons.

First, these documents form part of the administrative record for the agency actions challenged in Plaintiffs' respective original complaints, which challenged any agency actions to implement Executive Order 14,169. The Court has discretion to set the time for production of the administrative record, and ordering the government to produce a small subset of that record at an earlier date would be an appropriate exercise of that discretion and the Court's general case-management authority. *See* LCvR 7(n)(1) (setting a default time for production of the administrative record of 30 days following a defendant's answer "*unless otherwise ordered by the Court*" (emphasis added)). Courts in other pending cases challenging related agency actions have ordered similar limited discovery. *See, e.g.*, *J. Does 1-26 v. Musk*, 8:25-cv-462, ECF 66 (D. Md. Mar. 10, 2025). Here, the action memoranda are limited in number and apparently were "filed in a shared drive," *GHC* ECF 19-2, at 3, and the spreadsheets and lists are referenced in a declaration Defendants themselves already filed in this case. Defendants thus cannot credibly claim that locating and producing these documents would unfairly burden the agencies. And prompt production of these documents would assist in developing the record and pointing the most efficient and appropriate path forward in these cases.

Second, even if these documents did not form a part of the administrative record, the Court could appropriately order their production in light of the significant "questions" plaintiffs have

9

raised about potential pretext and the scope of the relevant agency actions in this case. *GHC* ECF 60, at 27-28. Although the Court concluded that Plaintiffs had made an insufficient showing to carry their burden at the preliminary-injunction stage that Defendants' review process was a sham, it acknowledged that there is already "evidence that supports [Plaintiffs'] allegation of pretext." *Id.* at 28. Plaintiffs are entitled to continue to develop those arguments, including by obtaining known documents that purportedly memorialize the agencies' review processes. Production of this limited set of documents also would be appropriate to ensure compliance with the terms of the preliminary injunction—that is, to ensure that Defendants are not papering over noncompliance by implementing the enjoined blanket funding freeze with pretextual post-hoc rationalizations. *Cf. GHC* ECF 35, at 6 (directing the parties to identify appropriate "expedited discovery that would assist the parties and the Court in assessing compliance").

Third, Plaintiffs are entitled to these documents to develop their *non-APA* claims, regardless whether they form part of the administrative record or a permissible supplement thereto under the APA. As the Court found in its order granting the preliminary injunction, Plaintiffs are likely to succeed on their constitutional claims. But to obtain a final judgment in their favor, Plaintiffs must support that claim with evidence—including evidence that Defendants withheld appropriated funds for "policy reasons." *GHC* ECF 60, at 33. Defendants have also asserted that their conduct "does not qualify as an impoundment" because it was intended only to operate as a pause on funding rather than a refusal to make that funding available for specific purposes. *GHC* ECF 34, at 35. The action memoranda, spreadsheets, and lists go directly to those disputed questions and fall squarely within the bounds of relevant discovery permitted under the Federal Rules of Civil Procedure. And expedited discovery of this limited set of documents—which, again, would impose at most a de minimis burden on the government—is appropriate to allow the parties

the narrow any disputes in advance of motions for summary judgment or broader discovery, if necessary.

While Defendants claim in their section of this Joint Status Report that Plaintiffs' request for particular documents is premature, they do not claim that production would be unduly burdensome, that Plaintiffs are not entitled to these documents eventually, or that the Court somehow lacks authority to order production now. Nor do they dispute that producing this limited set of documents already referenced in the existing record would materially advance this litigation. Accordingly, Plaintiffs respectfully request that Defendants produce the identified documents to Plaintiffs no later than March 19.

## DEFENDANTS' STATEMENT

1. As to the Plaintiffs identified by name in the instant two suits and the members of the two associational Plaintiffs in the GHC action, Defendants are continuing to process payments as to work completed before February 13, 2025, and expect to finish processing those payments by March 21, 2025. To date for those Plaintiffs, USAID has processed approximately 1,100 invoices, and the Department of State (State) has processed approximately 150 transactions.

2. Although Defendants are evaluating, at this time, the feasibility of the payment rate set in the Court's order of March 10, 2025, Defendants note that the processing rate is dependent on obtaining complete documentation from the funding recipients.

3. Defendants provided notification of the Court's order of March 10, 2025 to funding recipients via separate postings to the System for Award Management (SAM.gov) official website by State and by USAID, and, in addition, via e-mail to agency funding recipient distribution lists.

4. Plaintiffs' assertions about suspensions (*ante*, at 2-3) overlook Defendants' direction to Contracting Officers and Grants Officers to lift the previously imposed stop work orders and suspensions on all contracts and federal assistance awards that were selected for

retention. AVAC Doc. 49 ¶ 8 (Defs. Stmt.).

5. The Court's temporary restraining order of February 13, 2025 was directed to the generalized "pause" challenged in the instant suits, while preserving the Government's "enforce[ment] [of] the terms of contracts or grants." AVAC Doc. 17 at 14-15. Prior to entry of that order, as Defendants have explained, they had decided to terminate certain funding agreements as a result of a targeted, case-by-case review. *See, e.g.*, AVAC Doc. 22-1 ¶ 6. Nevertheless, in light of the Court's order of March 10, 2025, to determine on an individualized basis whether to stand by each such decision or reinstate the funding agreement, Defendants are conducting a fresh review which they expect to complete by April 1, 2025.

6. Defendants are analyzing the provision of the Court's order of March 10, 2025 concerning obligation and expenditure of funds appropriated to USAID and State and will do so in consultation with the Office of Management and Budget. Defendants understand the Court to have ruled that appropriated funds must be spent or lawfully rescinded by, for many of the funds at issue, September 30, 2025.

7. The Government is currently determining whether to seek appellate relief from the Court's order of March 10, 2025 and, if seeking such relief is appropriate, whether to seek a stay of further proceedings in this Court pending disposition of such an appeal. Accordingly, Defendants respectfully submit that further proceedings in this Court are not warranted other than those provided for by ordinary operation of the Federal Rules of Civil Procedure. Here, the next appropriate due date for a submission by Defendants would be their response to the AVAC Complaint 60 days after service of that pleading on the U.S. Attorney's Office, i.e., on or before April 14, 2025.

8. Additionally, because discovery would not properly commence before Defendants have responded to the Complaint, Plaintiffs' proposal seeking particular documents from

Defendants is premature.

* * *

Dated: March 14, 2025                                Respectfully submitted,

                                                     /s/ Stephen K. Wirth
ERIC J. HAMILTON                                     William C. Perdue (D.C. Bar 995365)*
Deputy Assistant Attorney General                    Sally L. Pei (D.C. Bar 1030194)
                                                     Samuel M. Witten (D.C. Bar 378008)
ALEXANDER K. HAAS                                    Stephen K. Wirth (D.C. Bar 1034038)
Director                                             Dana Kagan McGinley (D.C. Bar 1781561)
                                                     Allison Gardner (D.C. Bar 888303942)
LAUREN A. WETZLER                                    Daniel Yablon (D.C. Bar 90022490)
Deputy Director                                      ARNOLD & PORTER KAYE SCHOLER LLP
                                                     601 Massachusetts Ave., NW
CHRISTOPHER R. HALL                                  Washington, DC 20001-3743
Assistant Branch Director                            Tel: (202) 942-5000
                                                     stephen.wirth@arnoldporter.com

/s/ Indraneel Sur
INDRANEEL SUR (DC Bar 978017)                        *application for admission pending
Senior Counsel
United States Department of Justice                  *Counsel for Plaintiffs in Case No. 25-402*
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005                                 /s/ Lauren E. Bateman
Phone: (202) 616-8488                                Lauren E. Bateman (D.C. Bar 1047285)
Email: indraneel.sur@usdoj.gov                       Allison M. Zieve (D.C. Bar 424786)
                                                     Nicolas A. Sansone (D.C. Bar 1686810)
*Counsel for Defendants*                             PUBLIC CITIZEN LITIGATION GROUP
                                                     1600 20th Street, NW
                                                     Washington, DC 20009
                                                     Tel: (202) 588-1000

                                                     *Counsel for Plaintiffs in Case No. 25-400*

13