**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

——————————————————    )
                                        )
AIDS VACCINE ADVOCACY                   )
COALITION,                              )
      125 Broad Street           )    Case No. 25-cv-400 (AHA)
      9th Floor                  )
      New York, NY 10004,        )    **FIRST AMENDED COMPLAINT**
                                        )    **FOR DECLARATORY AND**
JOURNALISM DEVELOPMENT                  )    **INJUNCTIVE RELIEF**
NETWORK, INC.,                          )
      7 Saint Paul Street        )
      Suite 820                  )
      Baltimore, MD 21202,       )
                                        )
and                                     )
                                        )
THE CENTER FOR VICTIMS OF               )
TORTURE,                                )
      2356 University Ave. West  )
      Suite 430                  )
      Saint Paul, MN 55114,      )
            *Plaintiffs*,   )
                                        )
          v.            )
                                        )
UNITED STATES DEPARTMENT                )
OF STATE,                               )
      2201 C Street NW           )
      Washington, DC 20520,      )
                                        )
UNITED STATES AGENCY FOR                )
INTERNATIONAL DEVELOPMENT,              )
      1300 Pennsylvania Avenue NW )
      Washington, DC 20004,      )
                                        )
MARCO RUBIO, Secretary of State,        )
      and Acting Administrator of )
      United States Agency for   )
      International Development,  )
      United States Department of )
      State,                     )
      2201 C Street NW           )
      Washington, DC 20520,      )
                                        )

OFFICE OF MANAGEMENT AND          )
BUDGET,                           )
    725 17th Street NW         )
    Washington, DC 20503,      )
                               )
RUSSELL VOUGHT, Director,          )
    Office of Management and   )
    Budget,                    )
    725 17th Street NW         )
    Washington, DC 20503,      )
                               )
and                                )
                               )
DONALD TRUMP, President of the      )
    United States of America,  )
    1600 Pennsylvania Avenue NW )
    Washington, DC 20050,      )
                               )
               *Defendants*.    )
_____ )

## INTRODUCTION

1.      This action seeks declaratory and injunctive relief with respect to a series of orders issued by President Donald Trump and his administration that—illegally and unconscionably—froze funding and work related to nearly every United States foreign assistance award before unlawfully terminating the vast majority of those awards. The Executive Order titled "Reevaluating and Realigning United States Foreign Aid," Exec. Order. No. 14169, 90 Fed. Reg. 8619 (hereafter, Foreign Aid Executive Order), issued on January 20, 2025, exceeds President Trump's constitutional authority and violates his duty under the Take Care Clause of the Constitution. Similarly, subsequent orders by federal agencies to implement the Foreign Aid Executive Order's directives and to terminate thousands of awards following a spurious "review" process have resulted in unlawful actions that are harming and will harm countless individuals and entities, including plaintiffs.

2.      The Foreign Aid Executive Order directs the Office of Management and Budget (OMB) to effectuate a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* The funding freeze applied "immediately" to all "obligations and disbursements of development assistance funds." *Id.* After that 90-day period, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations … whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.*

3.      Four days after the January 20 Executive Order, the Secretary of State directed his staff to halt "new obligations" for foreign assistance and required the "immediate[ ]" issuance of "stop-work orders" for existing foreign assistance awards.  ECF 1-10.

4.      The Department of State and the United States Agency for International Development (USAID) then issued orders to recipients of foreign assistance funding including plaintiffs, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.

5.      This Court issued a Temporary Restraining Order on February 13, 2025, enjoining certain defendants from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or any other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any … federal foreign assistance award that was in existence as of January 19, 2025." ECF 17 at 14.

6.      In response, defendants *accelerated* their lawless course of action. Rather than merely suspend foreign assistance awards, they illegally and improperly terminated the vast majority of them.

7.      Those terminations were arbitrary and were largely, if not entirely, effectuated via form letters that included little-to-no reasoning.

8.      Congress has neither cancelled appropriated foreign assistance funds nor permitted deferral of grant awards and cooperative agreements. It has not authorized blanket stop-work directives. And it has not authorized blanket terminations of foreign assistance awards.

9.      The January 20 Executive Order, the January 24 order of the Secretary of State, the stop work orders of the Department of State and USAID, and the orders directing the terminations of foreign assistance awards are unlawful. Implementation and enforcement of these orders should be enjoined.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

11.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

12.     Plaintiff AIDS Vaccine Advocacy Coalition (AVAC) is a New York-based 501(c)(3) non-profit corporation that works to hasten the end of the global HIV/AIDS epidemic by accelerating development and delivery of HIV prevention options.

13.     Plaintiff Journalism Development Network, Inc. (JDN) is a Maryland-based 501(c)(3) non-profit corporation that supports a global consortium of journalists from more than

70 non-profit investigative centers and regional news organizations across the world. JDN works to help people better understand how organized crime and corruption affect their lives.

14.      Plaintiff Center for Victims of Torture (CVT) is a Minnesota-based 501(c)(3) non-profit corporation whose mission is to heal the wounds of torture on individuals, their families, and their communities and to end torture worldwide

15.      Defendant United States Department of State is a federal agency headquartered in Washington, DC, with responsibility for United States foreign relations and foreign policy.

16.      Defendant USAID is a federal agency headquartered in Washington, DC, with responsibility for international development and humanitarian assistance.

17.      Defendant Marco Rubio is the Secretary of State and is the highest-ranking official within the Department of State and the Acting Administrator of USAID and highest-ranking official within USAID. Plaintiffs sue Secretary Rubio in his official capacity.

18.      Defendant OMB is a federal agency headquartered in Washington, DC, with responsibility for overseeing the management of federal financial assistance. OMB was directed by Defendant Trump to implement the Foreign Aid Executive Order.

19.      Defendant Russell Vought is the Director of OMB and is the agency's highest-ranking official. Plaintiffs sue Director Vought in his official capacity.

20.      Defendant Donald Trump is the President of the United States and issued the Foreign Aid Executive Order.

## BACKGROUND

**Plaintiffs' Federal Foreign Assistance Awards**

21.      Foreign assistance accounts for less than 1% of the United States federal budget. Yet that relatively small expenditure has outsized impact, thanks in large part to the work of

implementing partners, including plaintiffs. U.S. government programs have reduced extreme poverty worldwide, increased global life expectancy, and cut maternal, infant, and child mortality rates. They have helped to advance educational opportunities for children. And they have contributed to U.S. national security by supporting global stability. As Defendant Rubio stated in 2012, "We do these things because we're a compassionate people, but we also do it because it's in our national interest. Because perhaps more than any other nation on Earth, we understand that a world that is freer, more just, more peaceful and more prosperous poses less of a threat."[1]

22.    Through the President's Emergency Plan for Aids Relief (PEPFAR)—a program launched in 2003 to address the global HIV/AIDS epidemic—Plaintiff AVAC has received federal foreign assistance awards for global HIV prevention work for over a decade.

23.    In June 2016, USAID entered into a five-year cooperative agreement with AVAC to fund the organization's HIV Prevention and Biomedical Prevention Research Project. Through the cooperative agreement, AVAC receives federal PEPFAR funding to support a coalition, CASPR, that focuses on accelerating biomedical HIV prevention research.

24.    CASPR works in African countries with the highest burden of new HIV infections and performs critical roles in supporting and accelerating prevention research. Among other things, CASPR oversees HIV prevention research projects to ensure that clinical trial participants' rights

---

[1] *Is the American World Order Sustainable and Necessary in the 21st Century? An Address by Senator Marco Rubio (R-FL)* (Apr. 25, 2012) at 19–20, https://www.brookings.edu/wp-content/uploads/2012/04/20120425_rubio.pdf.

are protected, and it translates HIV prevention research into accessible resources for policymakers, clinical trial participants, and other community members affected by HIV prevention research.

25.    In 2021, USAID extended the agreement for five years—to June 19, 2026—and doubled the amount of funding provided to AVAC under the grant.

26.    AVAC's cooperative agreement comes from funds appropriated by Congress. In the Further Consolidated Appropriations Act of 2024 (FCAA), Congress appropriated funding to carry out PEPFAR work like AVAC's, including, specifically, to fund "programs for the prevention, treatment, control of, and research on HIV/AIDS … and for assistance to communities severely affected by HIV/AIDS." Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 740 (2024).

27.    Plaintiff JDN is the recipient of a range of grants and cooperative agreements from the State Department to help investigative news outlets across the world succeed and serve the public. Among its award-funded efforts are those that build and sustain local journalist networks in places ranging from the Pacific Islands to Paraguay by providing journalists with access to reporting partners, investigative technology and data, robust editing and fact-checking, digital and physical security support, and protection against harassment.

28.    Funding for JDN's awards is appropriated through the FCAA. In that statute, Congress directed that appropriated funds "should be made available for democracy programs," a category that includes "programs that support good governance, credible and competitive elections, freedom of expression, association, assembly, and religion, human rights, labor rights, independent media, and the rule of law, and that otherwise strengthen the capacity of democratic political parties, governments, nongovernmental organizations and institutions, and citizens to support the development of democratic states and institutions that are responsive and accountable to citizens." *Id.* at Div. F, tit. VII, 138 Stat. 786.

29.     The FCAA also directs that appropriated funds for democracy programs "shall be made available to support and protect civil society activists and journalists who have been threatened, harassed, or attacked[.]" *Id.* at Div. F, tit. VII, 138 Stat. 787.

30.     The FCAA further directs that appropriated funds for democracy programs "shall be made available for programs to protect international freedom of expression and independent media, including through multilateral initiatives." *Id.*

31.     Plaintiff CVT receives the majority of its funding through federal foreign assistance awards. The Torture Victims Relief Act (TVRA) specifically authorizes, pursuant to the Foreign Assistance Act of 1961, USAID to provide assistance annually to treatment centers for victims of torture to administer "direct services to victims of torture" and "to provide research and training to health care providers" to enable them to provide services to torture victims. The FCAA appropriated $12 million to USAID to fund the Victims of Torture Fund, which was established to administer the assistance authorized by the TVRA. Congressional Record, *Explanatory Statement*, 118th Cong., Vol. 170, No. 51, p. 591 (Mar. 22, 2024), https://www.congress.gov/118/crec/2024/03/22/170/51/CREC-2024-03-22-bk2.pdf#page=591.

32.     Every year since TVRA funding began in 2000, CVT has received funding from USAID's Victims of Torture Fund to organize technical assistance and training for treatment centers for victims of torture located outside the United States. The current iteration of this work— CVT's Helping Survivors Heal Project—provides subgrants to local institutions that deliver mental health and psychosocial support services to survivors of torture and also builds the efficacy, capacity, and impact of those services.

33.     CVT also receives a host of grants and cooperative agreements from the State Department and USAID for programs to address rehabilitation needs of survivors of torture, war, and gender-based violence, and to facilitate peace and stability in countries affected by conflict.

34.     Those agreements were funded by the FCAA appropriations to the State Department to carry out the Migration and Refugee Assistance Act of 1962, which authorizes assistance to or on behalf of refugees who are outside the United States, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 744 (2024); 22 U.S.C. § 2601, and other FCAA appropriations for State Department and USAID programs.

35.     The funding levels for foreign assistance set by the FCAA were extended without modification by the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. 119-4 (Mar. 15, 2025).

**The Executive Order and the State Department Communiqué**

36.     On January 20, 2025, defendant President Trump signed an Executive Order titled "Reevaluating and Realigning United States Foreign Aid." Exec. Order 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) (the Foreign Aid Executive Order).

37.     The Foreign Aid Executive Order directed defendant OMB to effectuate, purportedly through the agency's "apportionment authority," a 90-day freeze on "obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors."

38.     The Foreign Aid Executive Order further directed "department and agency heads, in consultation with the Director of OMB" to determine "whether to continue, modify, or cease each foreign assistance program."

39.     Then-USAID Acting Administrator Jason Gray issued instructions for implementing that Executive Order on January 22, directing USAID to "immediately pause all new program-funded commitments and new or incremental obligations" at "every level of programming." *Global Health Council v. Trump* (*GHC*), No. 1:25-cv-402, ECF 57-1 at 2.

40.     On January 24, 2025, defendants State Department and Secretary Rubio issued a communiqué to all U.S. diplomatic and consular posts implementing the Executive Order by directing them to "pause[ ] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." ECF 1-10. For existing foreign assistance awards, contracting officers and grant officers were directed to "immediately issue stop-work orders … until such time as the Secretary shall determine, following a review." *Id.*

41.     Although the communiqué framed the suspension of federal assistance as a temporary "pause," defendants State Department and Rubio stated even as the "pause" was underway that spending on obligated funds has been "prevented" and that many recipients of foreign assistance will not receive the funding to which they are entitled under the terms of the grants.[2]

42.     Stop-work orders were rapidly issued in the following days to nearly every recipient of foreign assistance awards. *GHC*, ECF 57-2 (directive to USAID contracting and agreement officers to "immediately issue stop-work orders").

---

[2] Office of the Spokesperson, Dep't of State, *Prioritizing America's Interests One Dollar at a Time* (Jan. 29, 2025), https://www.state.gov/prioritizing-americas-national-interests-one-dollar-at-a-time/ ("[E]ven at this early stage, over $1,000,000,000 in spending not aligned with an America First agenda has been prevented.").

43.     On January 27, 2025, plaintiff AVAC received a stop-work order from USAID, directing AVAC to "immediately suspend work" and to "cease implementation immediately" of the programs funded by its cooperative agreement.

44.     Beginning on January 24, 2025, plaintiff JDN received a flurry of stop-work orders, often without any indication of what awards they were in reference to. The stop-work orders contained vague and, at times, contradictory statements. One letter terminating an award provided that "all foreign assistance awards are immediately suspended" in one sentence, and in the next indicated that the specific award was suspended on the basis that it "no longer effectuates agency priorities." Other stop-work orders provided that that the suspension was "not due to any actions by your organization" but rather to "give the new administration time to review the use of Foreign Assistance Funds."

45.     Between January 24 and January 27, 2025, CVT's federally funded programs were also abruptly suspended.  As with plaintiff JDN, the stop-work orders received by CVT were vague and confusing. Some suspensions claimed that the award "no longer effectuates agency priorities." Others indicated that the award "*may* no longer effectuate agency priorities" and consequently was suspended pursuant to an agency-wide "review of foreign assistance programs." Some were issued multiple times, seemingly in error. One of CVT's programs—a one-year grant from USAID to provide and enhance trauma-focused, life-saving mental health care to internally displaced persons in Northern Ethiopia—was never formally suspended. Given the sweeping language in Executive Order 14169 pausing foreign assistance, however, CVT repeatedly sought to clarify with USAID whether it could continue work on the award. USAID offered no official guidance. CVT therefore stopped work on the award rather than risk incurring prohibited costs.

**The OMB Memorandum**

46.     On January 27, 2025, defendant OMB and then-OMB Acting Director Matthew Vaeth issued a memorandum titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs."[3]  The memorandum identified several executive orders issued by defendant Trump, including the Foreign Aid Executive Order, and directed all federal agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [those] executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

47.     The OMB order was stayed and later enjoined. *See* Minute Entry for Emergency Hearing Held on 1/28/2025, *Nat'l Council of Nonprofits v. OMB*, 1:25-cv-00239 (D.D.C.); Memorandum Opinion and Order, Feb. 3, 2025, *Nat'l Council of Nonprofits v. OMB*, 1:25-cv-00239 (D.D.C.); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).  On January 29, OMB rescinded the memorandum. *See* OMB Mem. M25-14, Rescission of M-25-13 (Jan. 29, 2025).

48.     Despite the rescission of the OMB memorandum, White House Press Secretary Karoline Leavitt has stated that "[t]he President's [executive orders] on federal funding remain in full force and effect, and will be rigorously implemented."[4]

---

[3]     OMB     Mem-25-13     (Jan.     27,     2025),     *available     at* https://www.nytimes.com/interactive/2025/01/27/us/omb-memo.html.

[4] @PressSec, X (Jan. 29, 2025), https://x.com/PressSec/status/1884672871944901034/.

**Consequences of Defendants' Funding Freeze and Stop Work Orders**

49.     In response to defendants' actions, U.S. programs ranging from provision of antiretroviral medications to HIV patients to efforts to combat international narcotrafficking to anti-corruption programming ground to an immediate halt. Predictably, chaos ensued. Non-governmental organizations across the world "began shutting doors, sending staff home and turning away their dependents."[5] Thousands of American employees working for organizations that receive federal grant funding were furloughed or laid off entirely.[6]

50.     The freeze had disastrous humanitarian consequences. Staff who operate humanitarian operations at refugee camps in Syria were told to stop work, leaving thousands of people vulnerable to instability and violence at the hands of ISIS.[7] Colombian anti-narcotrafficking helicopters were grounded for lack of fuel.[8] Soup kitchens that feed nearly a million people in famine-stricken Khartoum have shut down.[9] Clinical trials that had been underway in Uganda for

---

[5] Laura Kelly and Nathaniel Weixel, *Chaos and uncertainty swirl around Trump's foreign aid freeze*, The Hill (Jan. 30, 2025), https://thehill.com/homenews/administration/5114561-trump-rubio-foreign-aid-freeze/.

[6] Sara Cook, et al., *Rubio foreign aid freeze leads to USAID staff suspensions and contractor terminations*, CBS News (Jan. 28, 2025), https://www.cbsnews.com/news/rubio-foreign-aid-freeze-leads-to-usaid-staff-suspensions-contractor-terminations/.

[7] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://www.bbc.com/news/articles/c3604r84zjyo.

[8] David Pilling, et al., *Donald Trump's foreign aid freeze sparks global funding crisis*, Financial Times (Jan. 30, 2025), https://www.ft.com/content/59e008d2-ca81-4a31-9e4a-fa10f7497797/.

[9] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/world/asia/trump-usaid-freeze.html.

a potentially lifesaving children's tuberculosis treatment stopped.[10]  In the Ivory Coast, a program to collect intelligence on Al Qaeda shut down.[11] Toddlers in Zambia were deprived of rehydration salts to treat life-threatening diarrhea.[12] Doctors at U.S.-funded medical facilities in Sudan that treat severely malnourished children were forced to choose whether to obey defendants' orders and "immediately stop their operations or to let up to 100 babies and toddlers die."[13] They continued to administer their life-saving care, but it was "a matter of days, not weeks, before they run out" of funds for supplies like IV bags.[14]

51.    Defendants claim that the funding freeze was not comprehensive or undifferentiated because Defendant Rubio approved programmatic waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, legitimate expenses incurred before the pause went into effect, and legitimate expenses associated with stop-work orders. ECF 33, Def. Opp. at 5.

52.    Due to defendants' actions, however, the waivers were unsuccessful, and the blanket pause continued even for life-saving humanitarian assistance. As then-USAID Acting

---

[10] Stephanie Nolan, *Abandoned in the Middle of Clinical Trials, Because of a Trump Order*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/health/usaid-clinical-trials-funding-trump.html.

[11] *Id.*

[12] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/health/trump-aid-malaria-tuberculosis-hiv.html?smid=nytcore-ios-share&referringSource=articleShare.

[13] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://www.propublica.org/article/trump-state-department-usaid-humanitarian-aid-freeze-ukraine-gaza-sudan.

[14] *Id.*

Administrator for Global Health Nicolas Enrich stated, "USAID's failure to implement lifesaving humanitarian assistance under the waiver is the result of political leadership at USAID, the Department of State, and [the Department of Government Efficiency], who have created and continue to create intentional and/or unintentional obstacles that have wholly prevented implementation." ECF 46-1, Bateman Dec. Exh. A. at 1.

**This Court Issues a Temporary Restraining Order**

53.    Plaintiffs filed a motion for temporary restraining order, seeking to enjoin defendants from enforcing or implementing the Executive Order, the Rubio communiqué, and the stop work orders, and to enjoin defendants to administer foreign assistance awards to the same extent and manner as they did prior to January 20, 2025. ECF 13.

54.    After a hearing on Plaintiffs' motion for a temporary restraining order, this Court granted the motion in substantial part, ordering that that "Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the 'Restrained Defendants') and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, 'Reevaluating and Realigning United States Foreign Aid' (Jan. 20, 2025), including by: suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants,

15

cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." ECF 17, 2/13 Order at 14.

**Defendants Accelerate Award Terminations**

55.    Despite the TRO, defendants continued to implement the Executive Order and its implementing directives.

56.    Defendants admitted in a February 18 status report that they searched for alternative justifications for the actions that they had taken and concluded that "at least substantially all" or a "large share" of the terminations, suspension, and stop work orders they already issued were allowed by the terms of the foreign assistance agreements. ECF 22 at ¶¶ 9–10.

57.    Meanwhile, defendants issued terminations of awards at a breakneck pace, ultimately terminating "roughly 9,900 of 13,100 USAID and State Department awards." ECF 60, 3/10 Order at 26.

58.    These terminations were neither based on meaningful review of the awards nor on the terms of the agreements or any particular legal authority.

**Consequences of the Mass Termination of Foreign Assistance Awards**

59.    The humanitarian crisis begotten by the freeze was worsened by the mass termination of foreign assistance awards.[15]

60.    The termination of funding to the United Nations World Food Program operations in Afghanistan, Syria, Yemen, and other countries struggling with impoverishment and conflict

---

[15] *See* Jennifer Hansler, *Trump administration terminated funding for aid programs it said were lifesaving*, CNN (Mar. 4, 2025), https://www.cnn.com/2025/03/04/politics/trump-terminated-lifesaving-aid/index.html?utm_medium=social&utm_source=blueskyCNN&utm_content=2025-03-04T12%3A02%3A47.

could "amount to a death sentence for millions of people facing extreme hunger and starvation."[16] HIV deaths attributable to defendants' policies have already been in the "tens of thousands."[17] The Administration's cuts have ravaged populations of vulnerable children, in particular, and could lead to "nearly 500,000 AIDS deaths among children and the orphaning of 2.8 million more."[18] Every 3.69 minutes, an additional child dies from diarrhea.[19] In Sudan, acutely malnourished

---

[16] Ellen Knickmeyer, et al., *The US ends lifesaving food aid for millions. The World Food Program calls it a 'death sentence'*, AP (Apr. 8, 2025), https://apnews.com/article/usaid-trump-humanitarian-aid-1167e0f64dde9ab6cafa0d5e0b812710 (quoting World Food Program social media post).

[17] Jan A.C. Hontelez, et al., *The impact of the PEPFAR funding freeze on HIV deaths and infections: a mathematical modelling study of seven countries in sub-Saharan Africa*, eClinicalMedicine (Apr. 25, 2025), https://www.thelancet.com/action/showPdf?pii=S2589-5370%2825%2900165-8.

[18] Poorva Mandavilli, *All Federal Experts on H.I.V. Prevention in Children Overseas Were Dismissed*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/health/cdc-hiv-mothers.html?smtyp=cur&smid=bsky-nytimes.

[19] Impact Metrics Dashboard, https://www.impactcounter.com/dashboard?view=table&sort=funding_status&order=asc (last viewed May 1, 2025).

infants are dying "one after the other."[20] Defendants terminated funding to organizations that assist child victims of human trafficking, leaving them without food and other assistance.[21]

**Injuries to Plaintiffs**

61.     For Plaintiff AVAC, the abrupt cessation of funding and the stop-work order were disastrous. As a result of the Executive Order and implementing directives, AVAC was forced to halt all CASPR work, resulting in disruption to HIV prevention research and development and to clinical trials.

62.     AVAC's award has not been terminated. But it has also not been funded. The stop-work order remains functionally in effect because defendants have arbitrarily demanded "certain revisions necessary for finalization and funding." ECF 77 at ¶ 5.

63.     AVAC's funding through USAID constitutes forty percent of its total operating budget. As of today, AVAC has had to lay off a third of its staff because of the loss of USAID funding.

64.     The abrupt cessation of funding likewise devastated JDN's global operations. The funding freeze and stop-work orders meant that the organization's budget was suddenly slashed by 29 percent, forcing JDN to lay off 20 percent of its staff and reduce salaries and work time for the majority of the remaining employees.

---

[20] Declan Walsh and Ivor Prickett, *Trump's Aid Cuts Hit the Hungry in a City of Shellfire and Starvation*, N.Y. Times (Apr. 19, 2025), https://www.nytimes.com/2025/04/19/world/africa/sudan-usaid-famine.html?smid=nytcore-ios-share&referringSource=articleShare.

[21] Matt Burgess, *US Funding Cuts Are Helping Criminals Get Away with Child Abuse and Human Trafficking*, Wired (Feb. 10, 2025), https://www.wired.com/story/doge-usaid-state-department-child-exploitation/.

65.     Several of JDN's awards have since been arbitrarily terminated. For example, JDN received USAID funding for its Strengthening Transparency and Accountability Through Investigative Reporting (STAIR) program. Through that program, JDN supports collaborative investigative journalism networks in Europe and Eurasia. JDN first received a cooperative agreement for STAIR in 2022; subsequent agreements increased funding and lengthened the period of performance for the program through September 8, 2027. That award was terminated on February 26, 2025, through a form letter claiming that Defendant Rubio and Pete Marocco (who was then performing the duties and functions of the Deputy Administrator of USAID) "made a determination that continuing this program is not in the national interest."

66.     Likewise, JDN's State Department awards for work to strengthen journalistic capacity in Malta, Russia, and the Pacific Islands and its USAID award for work to improve the impact of investigative journalism in Paraguay were arbitrarily terminated.

67.     As a result of the funding suspension and stop-work orders, Plaintiff CVT was forced to halt most of its operations, including the provision of mental health and psychosocial services to victims of torture. CVT estimates that the sudden and senseless disruption of this care will result in several hundred deaths.

68.     After receiving the stop-work orders, CVT was forced to immediately furlough or terminate the employment of approximately 75% of its 580-person staff. These furloughs and terminations included programmatic staff, as well as staff in its human resources, technology, communications, finance, development, and risk management departments. Loss of these staff members has negatively impacted all of CVT's operations, even those that did not receive federal funding.

69. CVT's Helping Survivors Heal Project was arbitrarily terminated. As a result, local providers of mental health and psychosocial support services to victims of torture across the world are no longer receiving federal funding. The verbiage of the termination notice was the same as the notice received by JDN claiming that Defendant Rubio and Mr. Marocco "made a determination that continuing this program is not in the national interest."

70. Defendants likewise arbitrarily terminated CVT's one-year grant from USAID to provide and enhance trauma-focused, life-saving mental health care to internally displaced persons in Northern Ethiopia. CVT was notified on February 11 that the award was subject to a waiver for "lifesaving humanitarian assistance," but on February 25 the award was terminated. That termination was rescinded on March 3, but the award was once again terminated on March 10.

71. Defendants also arbitrarily terminated a one-year cooperative agreement from the Department of State to enable CVT to address the needs of Iraqi, Syrian, and other refugee survivors of torture, war trauma, and gender-based violence living in Jordan and a one-year cooperative agreement from the Department of State to address the trauma rehabilitation needs of South Sudanese survivors of torture living in the Nguenyyiel refugee camp.

## FIRST CAUSE OF ACTION
Violation of Separation of Powers (All Defendants)

72. Plaintiffs have a non-statutory right of action to declare unlawful official action that is unconstitutional or ultra vires.

73. The President of the United States has only those powers conferred on him by Article II of the Constitution and federal statutes.

74. Federal legislation must be passed by both chambers of Congress before it may be presented to the President and, if signed, become law. U.S. Const., art. I. The Executive Branch has no authority under the Constitution unilaterally to amend federal statutes.

75.    By withholding and/or terminating federal funding based on factors that are impermissible and arbitrary under the governing statutes, defendants exceed executive authority and usurp legislative authority conferred by the Constitution on the Congress, in violation of the separation of powers.

76.    By eliminating foreign assistance programs established by Congress, defendants exceed executive authority and usurp legislative authority conferred by the Constitution on the Congress, in violation of the separation of powers.

## SECOND CAUSE OF ACTION
### Violation of Take Care Clause (Defendant Trump)

77.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is unconstitutional or ultra vires.

78.    Under the Constitution, the President has the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3

79.    The Take Care Clause limits the President's power and ensures that he will faithfully execute Congress's laws.

80.    Under the Constitution, the President lacks the authority to direct federal officers or agencies to act in derogation of a federal statute.

81.    Accordingly, the Executive Order and any other Presidential directive to withhold, suspend, or terminate federal foreign assistance awards in violation of federal statute violates the Take Care Clause.

## THIRD CAUSE OF ACTION
### Violation of the APA—Unlawful Suspension of Foreign Assistance, Issuance of Stop-Work Orders, and Termination of Foreign Assistance Awards
### (Defendants Department of State, USAID, Secretary Rubio, OMB, and Director Vought)

82.     The Administrative Procedure Act (APA) authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

83.     Defendants' suspension of foreign assistance funding, issuance of stop-work orders, and issuance of award terminations constitute final agency action under the APA.

84.     Those actions were arbitrary, capricious, unconstitutional, and not in accordance with law.

**FOURTH CAUSE OF ACTION**
Violation of the APA—Unlawful Impoundment of Appropriated Funds
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Director Vought)

85.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

86.     Defendants lack discretion to arbitrarily suspend or terminate existing foreign assistance awards for which Congress has appropriated funding.

87.     Defendants' actions with respect to plaintiffs' awards constitute the unlawful impoundment of appropriated funds, contrary to the Further Consolidated Appropriations Act of 2024, in violation of the APA.

**FIFTH CAUSE OF ACTION**
Violation of the APA—Violation of the Impoundment Control Act
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Director Vought)

88.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

89.    The Congressional Budget and Impoundment Control Act of 1974 (the Impoundment Control Act) requires the President to make appropriated funds "available for obligation," unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a rescission bill rescinding the funding. 2 U.S.C. § 683.

90.    The President has not transmitted a special message to Congress requesting that foreign assistance funding be rescinded, and Congress has not rescinded appropriations for foreign assistance. Defendants are thus required by the Impoundment Control Act to expend the appropriated funding.

91.    Defendants' termination of foreign assistance awards and statements that the money will not be spent run contrary to the Impoundment Control Act, in violation of the APA.

### SIXTH CAUSE OF ACTION
Violation of the APA—Violation of the Anti-Deficiency Act
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Director Vought)

92.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

93.    The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established *only*—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1) (emphasis added).

94.    Defendants' decisions to suspend, withhold, or terminate foreign assistance funding have resulted in an unlawful reserve, contrary to the Anti-Deficiency Act, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(A) Declare the Foreign Assistance Executive Order unlawful and unconstitutional;

(B) Enjoin defendants and their agents from enforcing or giving effect to the Foreign Assistance Executive Order, directives to implement that Executive Order, and the termination orders, by giving effect to any terminations, suspensions, or stop-work orders issued on or after January 20, 2025;

(C) Order defendants to immediately reinstate foreign assistance funding and to continue to administer all foreign aid assistance awards to the same extent and in the same manner as prior to the unlawful blanket suspension and mass terminations;

(D) Award plaintiffs their costs and reasonable attorney fees; and

(E) Grant such other relief as this Court may deem just and proper.

Dated: May 2, 2025                      Respectfully submitted,

                                        /s/ Lauren E. Bateman
                                        Lauren E. Bateman (D.C. Bar No. 1047285)
                                        Allison M. Zieve (D.C. Bar No. 424786)
                                        Nicolas A. Sansone (D.C. Bar No.1686810)
                                        Public Citizen Litigation Group
                                        1600 20th Street NW
                                        Washington, DC 20009
                                        (202) 588-1000

                                        *Counsel for Plaintiffs*