**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINTS

1.      Defendants respectfully move under Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, Rule 12(b)(6), for an order dismissing the Amended Complaints in No. 25-cv-400 (Doc. 86) and No. 25-cv-402 (Doc. 73).  The grounds for this Motion are set forth in the accompanying combined Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss and the supporting appendix containing exhibits.

2.      A proposed order is also attached.

Dated: June 3, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS'
MOTIONS TO DISMISS AMENDED COMPLAINTS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 4

I.     LEGAL BACKGROUND ............................................................................ 4

II.    FACTUAL AND PROCEDURAL BACKGROUND....................................... 11

LEGAL STANDARD.......................................................................................... 18

ARGUMENT ..................................................................................................... 19

I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS ............................................................................. 19

     A.    Because The "Funding Freeze" Has Ended, Plaintiffs Either Lack Standing To Seek Prospective Relief Against That Freeze, Or Their Claims For Such Relief Are Moot ..................................................... 19

     B.    Plaintiffs' termination-related claims are in essence contract claims and thus must be brought in the Court of Federal Claims.................................... 21

          1.    Because Plaintiffs' claims are contractual in nature, adherence to Congress's clear jurisdictional boundaries warrants dismissal................ 21

          2.    Plaintiffs' awards confirm they cannot avoid the Tucker Act ................. 30

     C.    The GHC Associational Plaintiffs Lack Standing Because the Claims Asserted Necessitate Individualized Findings. ..................................... 37

     D.    No Plaintiff Here Has Article III Standing To Seek Relief Based On Nonparties' Contracts Or Based On Speculation About How Nonparties Will Respond To The Challenged Conduct ........................................... 38

II.    PLAINTIFFS MAY NOT ENFORCE THE IMPOUNDMENT CONTROL ACT OR THE APPROPRIATIONS LAWS, WHICH DO NOT SUPPORT THEIR CLAIMS IN ANY EVENT .......................................................................... 42

     A.    The Impoundment Control Act Precludes Review By The Instant Plaintiffs, Who Are Outside The Pertinent Zone Of Interests In Any Event ....................... 43

     B.    The Relevant Statutes Do Not Support Plaintiff's Statutory Claims Predicated On Congressional Appropriations........................................ 48

1.     Neither the Further Consolidated Appropriations Act of 2024 Nor The Foreign Assistance Statutes Supply Plaintiffs' Alleged Specific Commands ................................................................ 49

2.     The Impoundment Control Act Cannot Sustain The Requested Injunctions Either ................................................................ 50

3.     The Injunctions Plaintiffs Seek Would Improperly Curtail Executive Discretion Given In The Impoundment Control Act ................................ 53

C.     Any Construction of the Relevant Statutes as Negating the Executive Branch's Discretion Over Specific Foreign Assistance Funds Would Raise Serious Constitutional Questions ................................................ 56

1.     Plaintiffs' Proposed Appropriations Directives Disrespect General Separation Of Powers Principles And Raise Unnecessary Constitutional Questions ................................................ 56

2.     History And Tradition Preclude The Restrictive Appropriations Remedies Plaintiffs Seek ................................................ 58

3.     Plaintiffs' Appropriations Remedies Improperly Disregard The Foreign Policy Context Of The Instant Suits ................................ 60

III.   DEFENDANTS' TERMINATION-RELATED CLAIMS UNDER THE APA ARE UNREVIEWABLE ................................................................ 62

A.     The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy for Terminations is Available to Plaintiffs ................ 62

B.     The Program Funding Decisions At Issue Are Committed To Agency Discretion By Law. ............................................................ 63

C.     Plaintiffs Do Not Allege "Discrete" Agency Action Apart From Terminations Of Their Individual Funding Instruments ........................ 64

IV.    THE TERMINATION-RELATED CLAIMS DO NOT PLAUSIBLY ALLEGE A VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ................................ 66

V.     PLAINTIFFS' ADDITIONAL CONSTITUTIONAL CLAIMS LACK FACIAL PLAUSIBILITY ................................................................ 76

A.     GHC Plaintiffs' Due Process Claim Fails Because They Lack A Legitimate Interest Or A Claim To Entitlement To Future Funding ........................ 76

B.     AVAC Plaintiffs' Take Care Clause Claim Fails ................................ 78

VI.    THE ULTRA VIRES CLAIM IS NOT PLAUSIBLY ALLEGED ................................ 79

VII.    THE MANDAMUS CLAIM IS NOT PLAUSIBLY ALLEGED .................................... 80

VIII.   THE AMENDED COMPLAINTS DO NOT PLAUSIBLY ALLEGE GROUNDS
        FOR GRANTING THE SWEEPING RELIEF SOUGHT ................................................ 83

IX.     COMPLIANCE WITH LOCAL CIVIL RULE 7(n) IS PROPERLY HELD IN
        ABEYANCE PENDING RESOLUTION OF THE MOTIONS TO DISMISS ............... 87

CONCLUSION ..................................................................................................................... 88

# TABLE OF AUTHORITIES

## CASES

*13th Regional Corp. v. Dep't of the Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ................................................................. 80

*Air Courier Conference of Am. v. Am. Postal Workers Union*,
    498 U.S. 517 (1991) ................................................................................. 44

*Air Transp. Ass'n of Am. v. Reno*,
    80 F.3d 477 (D.C. Cir. 1996) ................................................................... 37

*Alan Guttmacher Inst. v. McPherson*,
    597 F. Supp. 1530 (S.D.N.Y. 1984),
    *aff'd on other grounds*, 805 F.2d 1088 (2d Cir. 1986). .......................... 78

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) .............................................................. 22, 23

*Am. Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) ............................................................. 65, 66

\*   *Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ....................................................................... *passim*

*Am. Near East Refugee Aid (ANERA) v. U.S. A.I.D.*,
    703 F. Supp. 3d 126 (D.D.C. 2023) .......................................................... 35

*Arab v. Blinken*,
    600 F. Supp. 3d 59 (D.D.C. 2022) ............................................................ 88

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................................. 87

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 18

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ................................................................................... 79

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ................................................................................. 76

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 18, 71, 75

\*  *Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .................................................................................. *passim*

\*  *Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ................................................................ 31

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........................................................................ 24, 28, 63

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .................................................................................. 86

*Carney v. Adams*,
592 U.S. 53 (2020) .................................................................................... 85

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) .................................................................................. 59

*Chang v. Republic of S. Sudan*,
548 F. Supp. 3d 34 (D.D.C. 2021) ............................................................ 74

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .................................................................. 79

*Cheney v. U.S. Dist. Court for D.C.*,
542 U.S. 367 (2004) ............................................................................ 57, 80

*Chicago & S. Air Lines v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ............................................................................ 56, 85

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937) .................................................................................. 58

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .............................................................. 46, 54

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .................................................................... 65

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................. 40

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) .................................................................................. 44

*Clarke v. United States*,
    915 F.2d 699 (D.C. Cir. 1990) ................................................................ 19

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*,
    No. 14-cv-953, 2016 WL 7376847 (D.D.C. Dec. 19, 2016) .................. 38

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ................................................................ 65

\* *Columbus Reg'l Hosp. v. United States*,
    990 F.3d 1330 (Fed. Cir. 2021) ................................ 31, 33, 34, 35

*Connecticut v. U.S. Dep't of the Interior*,
    344 F. Supp. 3d 279 (D.D.C. 2018) ........................................................ 88

*Consol. Edison Co. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002) ................................................................ 81

*CREW v. U.S. DOJ*,
    846 F.3d 1235 (D.C. Cir. 2017) .............................................................. 63

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ............................ 21, 22, 29

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015) ................................................................ 37

*D.C. v. Doe*,
    611 F.3d 888 (D.C. Cir. 2010) ................................................................ 20

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................. 78

\* *Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ................................................................... *passim*

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ................................................................................. 72

*Dep't of State v. AIDS Vaccine Coal.*,
    145 S. Ct. 753 (2025) ............................................................................... 13

*Doe v. Von Eschenbach*,
    No. 06-cv-2131, 2007 WL 1848013 (D.D.C. June 27, 2007) ................. 74

*DOJ v. FLRA*,
    981 F.2d 1339 (D.C. Cir. 1993) ............................................................................ 79

*Dougherty v. United States*,
    18 Ct. Cl. 496 (1883) ............................................................................................. 53

*E.R. Mitchell Const. Co. v. Danzig*,
    175 F.3d 1369 (Fed. Cir. 1999) ............................................................................. 36

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................... 69

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................... 39

\* *FDA v. Wages & White Lion Invs., LLC*,
    145 S. Ct. 898 (2025) ............................................................................ 71, 72, 76, 86

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) .......................................................................... 79, 80

*Fla. Dep't of Ins. v. United States*,
    81 F.3d 1093 (Fed. Cir. 1996) ............................................................................... 76

\* *Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................... 87

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 65, 66

*Galvin v. Del Toro*,
    586 F. Supp. 3d 1 (D.D.C. 2022) ........................................................................... 63

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ............................................................................... 63

*Gen. Land Off. v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024) .................................................................... 45

\* *Gill v. Whitford*,
    585 U.S. 48 (2018) ........................................................................................... 39, 85

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ...................................................................... 77

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ............................................................................. 77

*Gonzalez v. Thaler*,
   565 U.S. 134 (2012) ............................................................................. 18

\*   *Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U. S. 204 (2002) ....................................................................... 28, 29

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ............................................................................. 87

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ............................................................................. 40

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................................. 70

*Hall v. McLaughlin*,
   864 F.2d 868 (D.C. Cir. 1989) ............................................................. 72

\*   *Heckler v. Chaney*,
   470 U.S. 821 (1985) ....................................................................... 64, 69

*Henke v. U.S. Dep't of Com.*,
   83 F.3d 1445 (D.C. Cir. 1996) ............................................................. 31

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................. 37

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................. 81

*In re Nat'l Nurses United*,
   47 F.4th 746 (D.C. Cir. 2022) ............................................................. 80

*In re Papandreou*,
   139 F.3d 247 (D.C. Cir. 1998) ............................................................. 18

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) ............................................................... 18

\*   *Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................... 22, 24, 26, 27

*Int'l Tech. Corp. v. Winter*,
   523 F.3d 1341 (Fed. Cir. 2008) ........................................................................ 36

*J.G.G. v. Trump*,
   No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) .................................... 87

*James v. Caldera*,
   159 F.3d 573 (Fed. Cir. 1998) .......................................................................... 22

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ........................................................................................ 56

*Jerome Stevens Pharms., Inc. v. FDA*,
   402 F.3d 1249 (D.C. Cir. 2005) ........................................................................ 18

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ........................................................................................ 57

*Jones v. United States*,
   526 U.S. 227 (1999) ........................................................................................ 56

*Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*,
   958 F.2d 1018 (10th Cir. 1992) ........................................................................ 38

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
   88 F.3d 1191 (D.C. Cir. 1996) .......................................................................... 75

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) ........................................................................ 18

*Kidwell v. Dep't of Army*,
   56 F.3d 279 (D.C. Cir. 1995) ........................................................................... 29

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) .................................................................................. 39, 40

*Lewis v. Casey*,
   518 U.S. 343 (1996) ........................................................................................ 85

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ........................................................................................ 39

\*  *Lincoln v. Vigil*,
   508 U.S. 182 (1993) .................................................................................. 63, 64

\* *Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................................................ 64, 65

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .......................................................................................................... 86

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) .......................................................................................................... 39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........................................................................................... 21, 28, 44

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*,
264 F.3d 52 (D.C. Cir. 2001) ........................................................................................... 19

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) ....................................................................................... 29

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
264 F. Supp. 3d 116 (D.D.C. 2017) ................................................................................. 88

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) .......................................................................................................... 28

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........................................................................... 22, 23, 27, 29

*Metlife, Inc. v. Fin. Stability Oversight Council*,
865 F.3d 661 (D.C. Cir. 2017) ......................................................................................... 74

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) .................................................................................... 83, 84

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ......................................................................................... 64

*Mil-Ka-Ko Research & Dev. Corp. v. Office of Economic*,
*Opp.*, 352 F. Supp. 169 (D.D.C. 1972), *aff'd*, 497 F.2d 684 (D.C. Cir. 1974) ........................ 77

\* *Mississippi v. Johnson*,
71 U.S. (4 Wall) 475 (1866) ...................................................................................... 79, 87

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) .......................................................................................................... 69

*Moms Against Mercury v. FDA*,
    483 F.3d 824 (D.C. Cir. 2007) ........................................................ 18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................... 67

*Mundo Verde Pub. Charter Sch. v. Sokolov*,
    315 F. Supp. 3d 374 (D.D.C. 2018) ................................................ 20

\*  *Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................ 19, 39, 40, 41

*N. Star Steel Co. v. United States*,
    477 F.3d 1324 (Fed. Cir. 2007) .................................................... 36

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
    489 F.3d 1221 (D.C. Cir. 2007) .................................................... 69

*Nat'l Consumer Info. Ctr. v. Gallegos*,
    549 F.2d 822 (D.C. Cir. 1977) ................................................ 76, 77

\*  *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*,
    842 F. Supp. 2d 127 (D.D.C. 2012) ............................................ 88

*Nat'l Urb. League v. Trump*,
    No. 25-cv-471, 2025 WL 1275613 (D.D.C. May 2, 2025) .................... 77

*New Vision Photography Program, Inc. v. D.C.*,
    54 F. Supp. 3d 12 (D.D.C. 2014) ................................................ 77

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) .................................................. 87

\*  *Norton v. Sw. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................ 48, 49, 65

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) .................................................... 79

*O'Hair v. White*,
    675 F.2d 680 (5th Cir. 1982) ...................................................... 38

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ................................................................ 19

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................. 63

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ............................................................................ 77

*Plains Commerce Bank* v. *Long Family Land & Cattle Co.*,
    554 U.S. 316 (2008) ............................................................................ 18

*Power v. Barnhart*,
    292 F.3d 781 (D.C. Cir. 2002) ............................................................. 80

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ............................................................................ 20

*Pub. Citizen v. Stockman*,
    528 F. Supp. 824 (D.D.C. 1981) ......................................................... 45

*Pub. Citizen, Inc. v. NHTSA*,
    489 F.3d 1279 (D.C. Cir. 2007) ........................................................... 41

*Qassim v. Trump*,
    927 F.3d 522 (D.C. Cir. 2019) ............................................................. 58

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ................................................................... 77

*Salazar v. Ramah Navajo Chapter*,
    567 U.S. 182 (2012) ............................................................................ 53

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ...................................................................... 69, 84

*San Antonio Hous. Auth. v. United States*,
    143 Fed. Cl. 425 (2019) ...................................................................... 31

\*   *San Juan City Coll. v. United States*,
    391 F.3d 1357 (Fed. Cir. 2004) ...................................................... 31, 36

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
    No. 23-975, 2025 WL 1520964 (U.S. May 29, 2025) .......................... 69

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ............................................................... 85

\* *Shinseki v. Sanders*,
556 U.S. 396 (2009) ................................................................................. 76

\* *Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ................................................ 23, 24, 26, 29

*Spirit of the Sage Council v. Norton*,
411 F.3d 225 (D.C. Cir 2005) ................................................................. 19

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ................................................................................. 18

*Tanner-Brown v. Haaland*,
105 F.4th 437 (D.C. Cir. 2024) ......................................................... 37, 38

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................................... 19

*Thermalon Indus., Ltd. v. United States*,
34 Fed. Cl. 411 (1995) ...................................................................... 30, 31

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011) ............................................................................... 44

*Thurston v. United States*,
696 F. Supp. 680 (D.D.C. 1988) ............................................................ 53

*Town of Castle Rock v. Gonzalez*,
545 U.S. 748 (2005) ............................................................................... 77

*Train v. City of New York*,
420 U.S. 35 (1975) ................................................................................. 49

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................................... 38, 39

*Trauma Serv. Grp. v. United States*,
104 F.3d 1321 (Fed. Cir. 1997) ..................................................... 32, , 35

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
761 F. Supp. 3d 97 (D.D.C. 2025) ......................................................... 37

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ............................................................... 80

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020) ................................................................................................ 47, 57

\*   *Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ......................................................................................................... 43

*Twin Metals Minn. LLC v. United States*,
   No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ............................................ 18, 66

*Tyler v. Judges of Court of Registration*,
   179 U.S. 405 (1900) ......................................................................................................... 39

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
   No. 25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025),
   *affirmed before appeal voluntarily dismissed*, No. 25-5066 (D.C. Cir. May 2, 2025) ....... 24, 29

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ............................................................................................ 31

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
   517 U.S. 544 (1996) ........................................................................................................ 37

*United States ex rel. Morsell v. Symantec Corp.*,
   471 F. Supp. 3d 257 (D.D.C. 2020) .................................................................................. 30

*United States v. Chem. Found.*,
   272 U.S. 1 (1926) ............................................................................................................ 72

*United States v. Hansen*,
   599 U.S. 762 (2023) .................................................................................................... 39, 56

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ........................................................................................................ 78

*Van Valin v. Gutierrez*,
   587 F. Supp. 2d 118 (D.D.C. 2008) .................................................................................. 20

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ............................................................................................ 65

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ........................................................................................................ 69

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................................... 37, 39

*Weingarten v. Devos,*
  468 F. Supp. 3d 322 (D.D.C. 2020) ........................................................ 38

*Widakuswara v. Lake,*
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ..................... 23

*Widakuswara v. Lake,*
  No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ................... 23

*Wilbur v. United States ex rel. Kadrie,*
  281 U.S. 206 (1930) ............................................................................... 81

*Wisc. Pub. Power, Inc. v. FERC,*
  493 F.3d 239 (D.C. Cir. 2007) ............................................................... 69

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) .................................................................................... 62

**CONSTITUTION**

Articles of Confederation of 1781 ............................................................ 59

U.S. Const. art. I ................................................................................... 58, 62

U.S. Const. art. II ...................................................................................... 78

**STATUTES**

2 U.S.C. § 681.............................................................................................. 47, 61

2 U.S.C. § 682.................................................................................................... 51

2 U.S.C. § 683............................................................................................... *passim*

2 U.S.C. § 684.................................................................................................. 8, 83

2 U.S.C. § 686....................................................................................... 8, 50, 51, 52

2 U.S.C. § 687.................................................................................................. 8, 45

2 U.S.C. § 688.................................................................................................. 8, 44

5 U.S.C. § 701................................................................................................ 43, 63

5 U.S.C. § 702.................................................................................................... 21

5 U.S.C. § 704................................................................................................ 62, 64

5 U.S.C. § 706.................................................................................................... 48

20 U.S.C. § 1022a............................................................................................... 24

22 U.S.C. § 2151.................................................................................................. 5

22 U.S.C. § 2151b............................................................................................. 5, 62

22 U.S.C. § 2151t................................................................................................ 85

22 U.S.C. § 2291.................................................................................................. 5

22 U.S.C. § 2346.................................................................................................. 5

22 U.S.C. § 2347.................................................................................................. 5

22 U.S.C. § 2348.................................................................................................. 5

22 U.S.C. § 2349aa............................................................................................... 5

22 U.S.C. § 2382........................................................................................... 5, 50, 62

22 U.S.C. § 2395........................................................................................... 5, 50, 62

28 U.S.C. § 1346................................................................................................. 35

28 U.S.C. § 1361 ................................................................................................ 80

28 U.S.C. § 1491 ................................................................................................ 22

31 U.S.C. § 1341 ................................................................................................ 54

31 U.S.C. § 1350 ................................................................................................ 54

31 U.S.C. § 1512 ........................................................................................... 52, 53

31 U.S.C. § 3605 ................................................................................................ 36

31 U.S.C. § 6304 ........................................................................................... 30, 31

31 U.S.C. § 6305 ........................................................................................... 30, 31

41 U.S.C. § 7103 ............................................................................................. 9, 31

41 U.S.C. § 7104 ............................................................................................. 9, 31

41 U.S.C. § 7105 .................................................................................................. 9

41 U.S.C. §§ 7101-7109 ..................................................................................... 30

42 U.S.C. § 10134 .............................................................................................. 81

Foreign Assistance Act of 1961,
    Pub. L. No. 87-195, 75 Stat. 424 ................................................................... 4

Impoundment Control Act of 1974,
    Pub. L. No. 93-344, 88 Stat. 297, 332 ........................................................... 7

Dep't of Def. Appropriations Act, 2019,
    Pub. L. No. 115-245, 132 Stat. 2981 (2018) ................................................ 82

Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 ........................................................ *passim*

**STATE STATUTES**

Pa. Const. of 1776, § 20. ................................................................................... 59

S.C. Const. of 1778, art. XVI. ........................................................................... 59

## LEGISLATIVE MATERIALS

4 Cong. Rec. 5628 (1876) .................................................................................. 60

H.R. Rep. No. 81-1797, at 9 (1950) ................................................................... 60

## RULES

Fed. R. Civ. P. 5.2 ............................................................................................ 74

Fed. R. Civ. P. 12 ...................................................................................... *passim*

Fed. R. Civ. P. 65 ............................................................................................ 84

Local Civ. R. 7(n) ............................................................................................ 88

## REGULATIONS

2 CFR pt. 200 ...................................................................................... 9, 10, 34

2 CFR § 200.340 ................................................................................. 9, 67, 73

2 CFR § 200.343 ....................................................................................... 9, 25

2 CFR § 200.344 ....................................................................................... 9, 10

2 CFR § 200.403 ............................................................................................ 25

2 CFR pt. 600 .................................................................................................. 34

2 CFR § 600.101 ............................................................................................... 9

2 CFR pt. 700 .................................................................................................. 10

2 CFR § 700.2 .................................................................................................. 10

2 CFR § 700.14 ................................................................................... 10, 67, 73

FAR § 52.233-1 .......................................................................................... 30, 31

FAR § 52.249-6 ............................................................................................... 30

E.O. 14,169 *Reevaluating and Realigning United States Foreign Aid*,
  90 Fed. Reg. 8619 (published Jan. 30, 2025) ............................... 11, 62, 66

## OTHER AUTHORITIES

Appropriation—Contracts,
    21 Op. Att'y Gen. 414 (1896) ................................................................................. 60

Bill of Rights Act 1689,
    1 W. & M. 2 ........................................................................................................... 59

Dep't of Homeland Sec.— Border Barrier Const. & Obligations,
    B-335747, 2024 WL 1740422 (Comp. Gen. Apr. 22, 2024) .................................. 54

Emily M. Morgenstern & Nick M. Brown, Cong. Research Serv., R40213,
    Foreign Assistance: An Introduction to U.S. Programs and Policy 1 (2022) ........... 4

Henry M. Jackson, U.S. Senate,
    B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980) ...................................... 81

Impoundment Control Act—Withholding of Funds through Their Date of Expiration,
    B-330330.1, 2018 WL 6445177 (Comp. Gen. Dec. 10, 2018) ................................. 55

Impoundment of the Advanced Research Projects Agency—Energy Appropriation Resulting
    from Legislative Proposals in the President's Budget Request for Fiscal Year 2018,
    B-329092, 2017 WL 6335684, at *1 (Comp. Gen. Dec. 12, 2017) .................................. 83, 85

James R. Jones, H.R.,
    B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ............................... 54

Letter from Mark R. Paoletta, Gen. Couns., OMB, to Tom Armstrong, Gen. Couns., U.S. Gov't
    Accountability Off. 1-2 (Dec. 11, 2019) ................................................................ 82

Letter from Russell Vought, Dir., OMB, & Mark Paoletta, Gen. Couns., OMB, to Chairman John
    Yarmuth, H. Comm. on the Budget (Jan. 19, 2021), https://trumpwhitehouse.archives.gov/wp-
    content/uploads/2021/01/Response-to-House-Budget-Committee-Investigation.pdf. ............. 82

Nile Stanton, History and Practice of Executive Impoundment of Appropriated Funds,
    53 Neb. L. Rev. 1 (1974) ...................................................................................... 60

Off. of Mgmt. & Budget—Withholding of Ukr. Sec. Assistance,
    B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020) .................................... 82

The President's Veto Power, 12 Op. O.L.C. 128 (1988) ............................................. 61

Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted
    Schools, 1 Op. O.L.C. Supp. 303 (1969) .......................................................... 49, 60

Special Message re: Proposed Rescissions of Budgetary Resources (June 3, 2025), available at https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.................................................................................................... 16

Thomas Jefferson, Third Annual Message to Congress (Oct. 17, 1803)..................................... 60

U.S. Dep't of State, 4 Foreign Affairs Manual 061.1, available at https://fam.state.gov/fam/04fam/04fam0060.html.................................................. 32

U.S. Dep't of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), https://perma.cc/J7EV-ESPG ..................................................................... 12

## INTRODUCTION

This Court rejected Plaintiffs' request for a preliminary injunction provision directing Defendants to reinstate all terminated awards, concluding that Plaintiffs had not enunciated a workable standard for adjudicating Plaintiffs' contention that the terminations were insufficiently individualized and instead flowed from the challenged pause. A separate PI provision, predicated on the Impoundment Control Act and the Court's construction of the constitutional separation of powers, required Defendants to make available for obligation the foreign assistance funds appropriated in the most recent appropriations law. Now, the Amended Complaints seek to make permanent the preliminary injunction's appropriations provision. And Plaintiffs again seek to mandate reinstatement of, and hence funding for, all awards terminated since the challenged pause. But Plaintiffs have not met their burden to show that the Court has subject-matter jurisdiction over the claims underlying that requested relief. And even if the Court were to reach the merits, Plaintiffs have not alleged facially plausible violations of any statutes (let alone the Constitution). The proper course is to dismiss the Amended Complaints in full.

To begin with, Plaintiffs have not met their burden to show this Court possesses subject-matter jurisdiction over their claims based on a waiver of sovereign immunity. They challenge termination of foreign assistance funds awarded them through contracts, grants, or other agreements, seeking reinstatement of those agreements and, hence, continued disbursement of millions of taxpayer dollars. Although styled as purported APA claims, Plaintiffs' claims are, under governing precedent, contract claims that must be brought in the Court of Federal Claims under the Tucker Act. Plaintiffs seek to vindicate a right to payment that arises from their awards, not from any statute or regulation, and the relief they seek—reversal of the award terminations and the resumption of payments under the written instruments—is specific performance, a classic contractual remedy. *Department of Education v. California*, 145 S. Ct. 966, 968-969 (2025) (per

curiam), confirms that Plaintiffs' claims are contract claims that belong in the Court of Federal Claims for which the remedy is limited to money damages.

Moreover, the two GHC Plaintiffs that are associations purporting to seek relief on behalf of their members lack standing to proceed because the award-specific nature of the asserted claim and relief sought requires participation of the individual members. And beyond the direct "pocketbook" injuries each Plaintiff alleges from the termination of particular awards, no Plaintiff has Article III standing to seek prospective relief based on harm to nonparties not before the Court under the rule against third-party standing. Nor does any Plaintiff have Article III standing to seek relief predicated on the independent choices of nonparties—including foreign persons who, according to Plaintiffs' convoluted theory of reputational harm and increased litigation risk, will erroneously blame Plaintiffs for Defendants' conduct.

In any event, even if Plaintiffs had met their burden to show subject-matter jurisdiction, their claims are legally insufficient on the merits.

As to the claims seeking to require obligation of appropriated funds: Plaintiffs identify no specific provision of the pertinent appropriations act—or of the underlying statutes governing foreign assistance funds—that confers on any Plaintiff the right to receive particular funds. Instead, they assert generally that the failure to obligate all of the appropriated funds would violate the Impoundment Control Act. Although the Impoundment Control Act provides a framework for guiding inter-Branch engagement regarding the obligation of appropriated funds, it confers no judicially enforceable rights on nongovernmental parties, such as Plaintiffs. Moreover, the relief Plaintiffs seek would cut off the inter-Branch engagement contemplated by the statute, requiring the Executive to make funds available for obligation—a requirement that the statute does not impose on its own terms until the end of the inter-Branch process—even though that inter-Branch

process has just begun (and has not concluded). And Plaintiffs fail to address the particularly sensitive area of foreign relations in which these suits arise, where the President has substantial constitutional authority and where any disagreements are best worked out between Congress and the President.

As to the claims seeking to require reinstatement of terminated awards: Plaintiffs lack a cause of action under the APA to obtain that relief. APA review is precluded because they have an available alternative remedy under the Tucker Act. Moreover, the challenged funding decisions are committed to agency discretion by law. And each Plaintiff could only challenge, at most, termination of that Plaintiff's agreements—not the entire set of award terminations, which do not count as "discrete" action for purposes of an APA challenge.

Moreover, even if Plaintiff did have a cause of action, Plaintiffs' claims are properly dismissed under Rule 12(b)(6) as a matter of law because they lack facially plausible allegations that the award terminations were unlawful or arbitrary and capricious under the APA. Defendants predicated the terminations on regulations incorporated by reference into USAID and State awards allowing the agencies to terminate agreements when they determine that is in the national interest or consistent with agency priorities. Plaintiffs have not challenged those regulations and all but ignore them, but the plain terms of those regulations are flexible and support explicitly confer authority for the challenged terminations.

In denying Plaintiffs' effort at the preliminary injunction stage to invalidate all of the award terminations post-dating the challenged pause, the Court recognized that Plaintiffs failed to identify a clear standard for distinguishing between valid, sufficiently individualized termination decisions and allegedly invalid, insufficiently individualized decisions. Plaintiffs have not only failed to rectify that error—they ignore the foreign affairs setting at issue here, where heightened

deference to the Executive Branch is appropriate even apart from the traditional deference the APA requires. Plaintiffs cannot compensate for that deficiency by exaggerating purported errors in the termination process and in the communications of termination decisions. The obvious alternative explanation for any such errors is that they resulted from the expeditious decisional process Defendants implemented after the originally planned 90-day pause was restrained. At any rate, any errors are inconsequential.

Plaintiffs' additional claims also lack facial plausibility. Especially in light of the flexible termination standards that are incorporated by reference into the awards, those instruments confer no property interest that could support Plaintiffs' claim under the procedural component of the Due Process Clause. And neither a nonstatutory ultra vires claim nor a mandamus claim is available to make up for the defects in Plaintiffs' APA allegations. In any event, the remedies Plaintiffs seek are overbroad and not supported by the facts alleged. Any such relief should be limited to the Plaintiffs in these particular suits, and any APA remedy should be limited to a remand for additional agency explanation, not invalidation of any terminations (especially the terminations of nonparties' contracts).

## BACKGROUND

## I.    LEGAL BACKGROUND

**1. *Foreign Aid Funds.*** Today, the "primary legislative basis" for foreign assistance programs is the Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424. Emily M. Morgenstern & Nick M. Brown, Cong. Research Serv., R40213, *Foreign Assistance: An Introduction to U.S. Programs and Policy* 1 (2022).[1] That statute generally confers on the President and his subordinates broad discretion to manage foreign aid. Thus, for many programs,

---

[1] Internal citations, quotation marks, and alterations are omitted in this brief unless noted.

Congress has expressly directed that any aid should be subject to the President's discretionary terms and conditions. For example, Congress permitted assistance for health programs "on such terms and conditions as [the President] may determine." 22 U.S.C. § 2151b(c)(1); *see also, e.g.*, *id.* § 2291(a)(4) (antinarcotic and other anticrime programs); *id.* § 2346(a) (economic and political stability assistance); *id.* § 2347(a) (military education and training assistance); *id.* § 2348 (peacekeeping operations); *id.* § 2349aa (antiterrorism assistance).

Similarly, Congress has generally sought to ensure that the President and his subordinates have flexibility to align foreign assistance programs with the President's foreign policy. Thus, Congress has provided generally that foreign assistance "may be furnished" on "such terms" as "may be determined to be best suited to the achievement of the purposes" of the Foreign Assistance Act. 22 U.S.C. § 2395(a). And Congress has tasked the Secretary of State, "[u]nder the direction of the President," with the responsibility for the "continuous supervision and general direction of economic assistance," to ensure that "the foreign policy of the United States is best served thereby." *Id.* § 2382(c); *see also, e.g.*, *id.* § 2382(a) ("Nothing contained in this chapter shall be construed to infringe upon the powers or functions of the Secretary of State."); *id.* § 2346(b) ("The Secretary of State shall be responsible for policy decisions and justifications for economic support programs under this part"). In short, while Congress has articulated various "goals" to guide the President's administration of foreign aid, 22 U.S.C. § 2151(a), Congress has generally deferred to the President regarding how best to implement foreign assistance programs consistent with the President's broader foreign policy goals and statutory requirements. This deference reflects the longstanding broad authority of the Executive Branch in conducting foreign affairs. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003). Since establishing the general statutory framework

governing foreign assistance programs, Congress has regularly appropriated funds to allow the Executive Branch to implement programmatic goals.

Congress recently appropriated foreign assistance funds in Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 729. There, Congress addressed various operational needs of the government's foreign assistance programs. In some circumstances, Congress appropriated large sums for carrying out types of foreign assistance programs, establishing only general constraints on the Executive Branch's discretion in how to use those funds. Thus, for example, Congress appropriated nearly $4 billion "[f]or necessary expenses to carry out the provisions of sections 103, 105, 106, 214, and sections 251 through 255, and chapter 10 of part I of the Foreign Assistance Act"—sections that generally relate to "development assistance," 138 Stat. at 742—subject to the conditions of the appropriations act and the Foreign Assistance Act. Congress also appropriated nearly $5 billion for "necessary expenses to carry out the provisions of section 491 of the Foreign Assistance Act of 1961 for international disaster relief, rehabilitation, and reconstruction assistance," *id.*, and nearly $4 billion for various activities "to meet refugee and migration needs," 138 Stat. at 744.

Similarly, Congress appropriated nearly $4 billion for global health programs—that is, for "such activities as" "child survival and maternal health programs," "immunization and oral rehydration programs," "family planning/reproductive health," and others. 138 Stat. at 740. In appropriating those funds, Congress included provisos restricting how those funds could be spent. For example, Congress prohibited the use of funds "to pay for the performance of abortion as a method of family planning" or "to lobby for or against abortion" and directed that any "voluntary family planning project" funded with the appropriation "shall meet" various requirements. 138 Stat. at 740-41. And sometimes, Congress earmarked funds for more specific purposes—or, in

some limited cases, for specific recipients.   Thus, for example, Congress appropriated more than $6 billion for expenses related to "the prevention, treatment, and control of, and research on, HIV/AIDS," including $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria."   138 Stat. at 742.   Beyond those appropriations for foreign assistance programming, Congress also appropriated funds to support the administration of foreign assistance programs.   For example, Congress appropriated funds to allow the President to finance the Executive Branch's operating expenses and capital expenditures necessary to implement foreign assistance programs.  138 Stat. at 739-40.

Some of the funds appropriated in the Further Consolidated Appropriations Act of 2024 remain available until September 30, 2025, whereas other funds remain available until later dates or until expended.  *See, e.g.*, 138 Stat. at 742 (containing four appropriations, two of which "remain available until expended"; one of which remains "available until September 30, 2028"; and one of which remains "available until September 30, 2025").

**2.  *Impoundment Control Act*.**   Congress has sought to impose certain requirements on the Executive's decisions whether to obligate and expend appropriated funds through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332 (ICA).   The statute provides that the President is required to "transmit to both Houses of Congress a special message" whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year." 2 U.S.C.  § 683(a).   That special message is required to contain various information about the

proposed rescission, such as "the amount of budget authority" involved and "the reasons why the budget authority should be rescinded." *Id.*

Once Congress receives a special message, it may proceed to consider a rescission bill to rescind some or all of the funds covered by the special message.    The statute provides particular procedures to ensure timely consideration of any such rescission bill.    *See* 2 U.S.C. § 688.   But if Congress has not "completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days, then the statute states that the amount proposed to be rescinded "shall be made available for obligation." *Id.* § 683(b).

In addition, the statute provides that the President should transmit a special message to Congress whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project."    2 U.S.C. § 684(a).    The statute states that such deferrals are "permissible only" for certain specified reasons.    *Id.* § 684(b).

Furthermore, the statute provides for various enforcement mechanisms by the Comptroller General, an official within the Legislative Branch.[2]

**3.  *State and USAID Awards*.**   Some of the funding instruments at issue in these suits are procurement contracts subject to the Contract Disputes Act and the Federal Acquisition Regulations, which spell out applicable termination standards for the convenience of State or of

---

[2] Thus, if the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, the Comptroller General is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress," which report "shall be considered a special message." 2 U.S.C. § 686(a).  And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court. *Id.* § 687.  Such a suit may be brought, however, only after "the expiration of 25 calendar days of continuous session of the Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been filed with the Speaker of the House of Representatives and the President of the Senate." *Id.*

USAID as pertinent.  2/18 Marocco Decl. ¶¶ 16, 23 (describing termination for convenience and other grounds); *cf.* GHC Am. Compl. ¶¶ 179-81 (Doc. 73), AVAC Am. Compl. ¶ 56 (Doc. 86) (incorporating by reference status report predicated on that declaration).  The statute and regulations also set procedures for resolving disputes and closing out terminated contracts.  *See*, *e.g.*, 41 U.S.C. §§ 7103, 7104, 7105.

For their part, Plaintiffs who have entered into federal assistance agreements (rather than CDA contracts) with State have agreed to comply with State's regulations and its Standard Terms and Conditions for Federal Awards.  State's regulations provide that the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 CFR part 200, generally apply to State's federal assistance awards.  2 CFR § 600.101.  One of those provisions authorizes terminations of federal assistance awards in specified circumstances.  2 CFR § 200.340.[3]

The regulations provide a mechanism for recipients with terminated federal assistance awards to pursue costs incurred in performance before termination.  They provide that "[c]osts to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient during a suspension or after the termination of a Federal award are . . . . allowable" under specified circumstances.  2 CFR § 200.343.  They also provide for a closeout process, including a requirement that the Federal agencies pay authorized costs.  2 CFR § 200.344(d).  State has also issued Standard Terms and Conditions for Federal Awards that are incorporated by reference into its agreements with Plaintiffs.  Exhibit A; *see, e.g.*, Exhibit D (JDN) at 3; Exhibit J (ABA) at 2.  They echo the termination authority in 2 CFR § 200.340.  Exhibit A.

---

[3] All citations in this motion to provisions in 2 CFR part 200 are to the 2024 version, unless otherwise specified.  The 2020 version of the provisions in part 200 cited herein were not substantively different from the 2024 version.

Similarly, Plaintiffs who have entered into federal assistance agreements with USAID have agreed to be bound by "the terms and conditions" contained in USAID-issued rules. *E.g.*, Exhibit F (AVAC); Exhibit H (HIAS). Such U.S.-based awardees of USAID must comply with regulations governing federal assistance awards. In particular, in 2 CFR § 700.2, USAID adopted subparts A through F of 2 CFR part 200 as policies and procedures for Federal financial assistance administration, as supplemented by 2 CFR part 700.[4] In 2 CFR part 700, USAID has issued supplemental regulations that govern the termination of federal assistance awards for U.S.-based entities. Those regulations expressly authorize USAID to suspend or terminate grants "[i]f at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be in violation of an applicable law[.]." 2 CFR § 700.14; *see also* Exhibit F (AVAC) at A.17 (similar provision). Under such circumstances, "USAID may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension." 2 CFR § 700.14. Additionally, USAID has issued "Standard Provisions for Non-U.S. Nongovernmental Organizations" that contain parallel provisions authorizing termination when a non-U.S. entity's funding agreement is terminated. Exhibit B.

USAID's U.S.-based federal assistance awardees are required to follow closeout procedures, including those contained in 2 CFR § 200.344(b). *See* Exhibit C at 303.3.1. For non-U.S. awardees, the Standard Provisions for Non-U.S. Nongovernmental Organizations, in Provision M13, "Disputes and Appeals (December 2022), allow an awardee post-termination to

---

[4] All citations in this motion to provisions in 2 CFR part 700 are to the 2024 version, unless otherwise specified. The 2015 version of the part 700 provisions cited herein were not substantively different from the 2024 version.

recover costs (and require the awardee to refund unexpended funds to USAID). *See* Exhibit B at M10(e).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

**1. *Challenged Pause*.**  Executive Order 14,169 of January 20, 2025, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (published Jan. 30, 2025) ("EO"), states that certain foreign assistance funds "are not aligned with American interests and in many cases antithetical to American values" in ways that "serve to destabilize world peace."  *Id.* § 1, 90 Fed. Reg. at 8619.  The EO declared that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President."  *Id.* § 2, 90 Fed. Reg. at 8619.

To provide time to review foreign assistance programs "for programmatic efficiency and consistency with United States foreign policy," the EO directed agencies to "immediately pause new obligations and disbursements of development assistance funds to foreign countries" and implementing organizations and contractors.    Exec. Order No. 14,169, § 3(a), 90 Fed. Reg. at 8619.  "[W]ithin 90 days," agencies were to conduct a review and determine "whether to continue, modify, or cease each foreign assistance program" in consultation with the Director of the Office of Management and Budget and with the concurrence of the Secretary of State.  *Id.* § 3(b), (c), 90 Fed. Reg. at 8619.  The Secretary of State had authority to waive the pause "for specific programs" and to approve new obligations or resume disbursements during the 90-day review period if review was completed sooner.  *Id.* § 3(d), (e), 90 Fed. Reg. at 8619.

The Secretary of State then directed a pause on foreign assistance programs funded by or through State and USAID.  AVAC Doc. 41, Ex. A.  The Secretary initially approved various waivers of the pause, including for foreign military financing for Israel and Egypt, emergency food assistance, and life-saving humanitarian assistance.  *Id*. at 4; U.S. Dep't of State, Emergency

Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), https://perma.cc/J7EV-ESPG. The Secretary also approved a waiver for legitimate expenses incurred before the pause went into effect and legitimate expenses associated with stop-work orders.  AVAC Doc. 41, Ex. A at 4.  The agencies completed a review of USAID and State foreign assistance awards, deciding to retain hundreds of preexisting USAID awards and thousands of preexisting State awards; the rest of the preexisting awards were terminated.  2025 WL 752378, at *4-5 (Mar. 10, 2025).

    **2.  *Interim Relief.***  Plaintiffs—organizations that receive, or have members who receive, federal funds for foreign assistance work—brought these suits, as originally framed, to challenge the Executive Branch's decision to pause foreign assistance funds pending further review as a violation of the Administrative Procedure Act (APA) and the Constitution.

    a.  The Court on February 13, 2025 granted Plaintiffs' motions for temporary restraining orders and enjoined Defendants from "enforcing or giving effect to" agency memoranda that imposed a pause on foreign-aid funding, "including by: suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any" instrument "that was in existence as of January 19, 2025."  2025 WL 485324, at *6-7. But the Court allowed Defendants to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions."  *Id.* at *6.

    As subsequently clarified, the TRO permitted the agencies to continue taking actions (including terminations) on individual awards, because the TRO "does not restrain Defendants from taking action with respect to agreements based on their 'exercise of authorities under statutes, regulations, and other legal authorities.'"  2025 WL 569381 at *2 (Feb. 20, 2025).  And the Court expressly disclaimed any intention of "supervising [agencies'] determinations as to whether to

continue or terminate individual grants based on their terms," or of requiring them to "'litigate every arguable breach of contract in a contempt posture.'" 2025 WL 577516, at *2 (Feb. 22, 2025).

b.  The parties engaged in various disputes regarding compliance with the TRO, including one that reached the Supreme Court regarding the Court's order of February 25, 2025, which required the immediate payment of money due and owing to Plaintiffs and non-Plaintiffs for work completed before February 13, 2025.  Though styled as an order to "enforce" the original TROs, the February 25, 2025 order newly compelled the Government to pay within 36 hours "*all* invoices and letter of credit drawdown requests on *all* contracts for work completed prior to the entry of the Court's [TRO] on February 13."  App. to Appl. for Stay 86a in No. 24A831 (U.S., Feb. 26, 2025) (emphasis added).  The D.C. Circuit dismissed the Government's appeal from that order for lack of appellate jurisdiction.  2025 WL 621396 (D.C. Cir. Feb. 26, 2025).  After the grant of an administrative stay, which allowed the Supreme Court to consider the Government's stay application, the Supreme Court denied that application and vacated the administrative stay.  145 S. Ct. 753 (2025).  The five Justices in the majority did not comment on the Government's arguments for the stay, including the argument concerning Tucker Act jurisdiction.

c.  This Court partially granted Plaintiffs' motions for a preliminary injunction on March 10, 2024.  The Court initially rejected Plaintiffs' request to enjoin the agencies' terminations of funding instruments post-dating the TROs (discussed below), explaining that Plaintiffs had not shown that those terminations arose "from the same agency action they challenged in this case." 2025 WL 752378, at *11-13.   Thus, the Court declined to order the agencies to revoke terminations and suspensions of previous funding instruments and to resume funding those instruments.  *Id.* at *13.

13

Nonetheless, the Court concluded that Plaintiffs were likely to succeed on their claims that, by not expending appropriated funds, the agency defendants "are acting in violation of the separation of powers" and "the expression of those powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds." *Id*. at *14. Although the Court recognized that the Constitution confers an "important role in foreign affairs" on the President, the Court emphasized that the Constitution also provides Congress with a "role in foreign affairs" and with the legislative power to "make law and control spending." *Id*. at *15-16. The Court thus concluded that Plaintiffs "are likely to succeed on their separation of powers claims" and, for the same reasons, their *ultra vires* claims. *Id*. at *18 & n.18.

Turning to the equitable factors, the Court next concluded that Plaintiffs would suffer irreparable harm in the absence of a preliminary injunction. *Id*. at *18-21. The Court concluded that the balance of the equities and the public interest tipped in Plaintiffs' favor. Although the Court recognized the Executive Branch's countervailing legitimate interest in "review[ing] foreign aid programs" for consistency with the President's policy priorities, the Court explained that the preliminary injunction would not prohibit the Executive Branch from conducting such a review. *Id*. at *21. The Court stated that the public interest weighs in favor of "ensuring" that the Executive Branch's actions "are carried out in accordance with law." *Id.*

As to the interim relief, the Court rejected Plaintiffs' requested decree "insofar as it would specifically order Defendants to continue to contract with" Plaintiffs. *Id*. at *22-23. The Court explained that the violation it had found stemmed from the decision "to unlawfully impound funds appropriated by Congress for specific foreign aid purposes" but that nothing required defendants to contract with Plaintiffs specifically. *Id*. at *23. To the contrary, "the Constitution and Congress's laws have traditionally afforded the Executive discretion on how to spend within the

14

constraints set by Congress." *Id*.  The Court ordered Defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." *Id*.

**3.  *Award Disposition*.**  Consistent with the TRO, USAID continued to exercise agency discretion to enforce award terms and conditions, including provisions contained in those awards allowing it to terminate awards.  2/18 Marocco Decl. ¶ 6.  State likewise terminated foreign assistance-funded contracts and grants.  2/18 Marocco Decl. ¶ 24.  In other words, "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project."  2/25 Marocco Decl. ¶ 5; *see* GHC Am. Compl. ¶¶ 105, 223 (incorporating by reference that declaration).  The agency leadership review in some instances disagreed with those initial recommendations:  For example, an agreement initially recommended for termination still "might be continued for a variety of foreign policy reasons, such as the location of the project or the general subject matter, or the judgment and foreign policy perspectives of the second line reviewer."  2/25 Marocco Decl. ¶ 5.  At the final stage, "[t]he Secretary of State's personal involvement confirmed that termination decisions were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs."  2/25 Marocco Decl. ¶ 5.[5]

---

[5] The Court's March 10, 2025 preliminary injunction order observed that "Defendants represented that they had completed an independent, individualized review process for over 13,000 USAID and State Department awards following the Court's TRO, which resulted in the termination of all but 500 USAID awards and all but 2,700 State Department awards."  2025 WL 752378 at *5.  Defendants' sur-reply of March 3, 2025 (GHC Doc. 48), which the Court ordered filed before deciding the preliminary injunction motions, was predicated on a declaration explaining that, as of

Secretary Rubio on March 28, 2025 notified Congress of the intent of State and USAID to undertake a reorganization that would involve realigning certain USAID functions and discontinue other USAID functions. *See* GHC Am. Compl. ¶ 126 (incorporating by reference 3/28 Notification). There, State also informed Congress of its intent to restructure certain State bureaus and offices that would implement programs and functions realigned from USAID. *See id.* The notification also stated that after review, USAID had "discontinued" "numerous programs," and providing an updated count of retained instruments by noting that "898 active grants, cooperative agreements, and contracts remain in place."

The President on June 3, 2025 transmitted to Congress a special message under 2 U.S.C. § 683(a) attaching rescission proposals, including proposals for accounts from which USAID previously obligated funds for the agreements at issue in these suits, such as the Development Assistance account and the Economic Support Fund account. The special message was made available at https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

**4.  *Amended Complaints.*** Plaintiffs on April 22, 2025 (GHC) and May 2, 2025 (AVAC) voluntarily amended their complaints to address some events subsequent to their original complaints. Among other things, they allege that Defendants' terminations post-dating the February 13, 2025 TROs were based on purportedly insufficient review of the underlying instruments, where the agencies announced the terminations "*en masse*" in several "tranches." *E.g.,* GHC Am. Compl. ¶¶ 95, 98-99, 107-08. They further allege that the decisional process was insufficient because they deem it "impossible" or "implausible that the Secretary himself or even

---

March 3, 2025, the review of all USAID and State foreign assistance awards had concluded, and in total, USAID terminated 5,800 awards and retained 500, while State terminated approximately 3,950 awards and retained 2,850. 3/3 Marocco Decl. ¶¶ 2-3.

a group of political appointees engaged *in a meaningful individualized review*" of contracts before reaching termination decisions.  GHC Am. Compl. ¶¶ 101-02, 104 (emphasis added); *see* AVAC Am. Compl. ¶ 58 (alleging terminations were not "based on *meaningful review*") (emphasis added).[6]

The amended complaints pray for similar relief.  They seek permanent injunctions matching the provision in the Court's preliminary injunction concerning obligation of appropriated funds.  AVAC Am. Compl., Prayer for Relief (C); GHC Am. Compl., Prayer for Relief (3)-(4), (8)-(10).  They also seek to undo the challenged terminations—no matter that the original TRO permitted individualized terminations and regardless whether the instruments expressly authorized termination.  AVAC Am. Compl., Prayer for Relief (B)-(C); GHC Am. Compl., Prayer for Relief (5)-(6).  For example, the GHC Amended Complaint alleges that "each tranche of award terminations" follows from an "action memorandum" by the Secretary, which allegedly "did not provide individualized information about the awards selected for termination," and seeks invalidation of those memorandums and "any award terminations issued pursuant to those action memorand[ums]."  GHC Am. Compl. ¶¶ 112-13; Prayer for Relief (6).

---

[6] Asserting various claims for relief, Plaintiffs raise allegations tracking the allegations on which they obtained the preliminary injunction provision as to obligation of appropriated funds. *See, e.g.*, GHC Am. Compl. ¶¶ 122-23, 168-69, 217, 224, 230; GHC Am. Compl. ¶¶ 244, 246 (GHC 2d Claim (APA—contrary to law)); GHC Am. Compl. ¶ 253 (GHC 3d Claim (separation of powers)); AVAC Am. Compl. ¶ 87 (AVAC 4th Claim (APA));  AVAC Am. Compl. ¶ 89 (AVAC 5th Claim (APA)).  And they also raise allegations to support their request for reinstatement of the terminated awards.  *See, e.g.*, GHC Am. Compl. ¶¶ 112-16, 188-95, 223; GHC Am. Compl. ¶¶ 234-35 (GHC 1st Claim (APA—arbitrary and capricious)); GHC Am. Compl. ¶¶ 241-42 (GHC 2d Claim (APA—contrary to law)); AVAC Am. Compl. ¶ 75 (AVAC 1st Claim (separation of powers)); AVAC Am. Compl. ¶ 81 (AVAC 2d Claim (Take Care Cl.)); AVAC Am. Compl. ¶ 83 (AVAC 3d Claim (APA)).

**LEGAL STANDARD**

The "first and fundamental" question for any Article III court is that of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *see Plains Commerce Bank* v. *Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008). Thus, "resolving a merits issue while jurisdiction is in doubt 'carries the courts beyond the bounds of authorized judicial action.'" *In re Papandreou*, 139 F.3d 247, 254-55 (D.C. Cir. 1998). The plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). If the plaintiff is unable to do so, the Court must dismiss the action. *See Steel Co.*, 523 U.S. at 94; *see also Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Under Rule 12(b)(1), a court may consider material beyond the allegations in the complaint. *See Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *3 (D.D.C. Sept. 6, 2023). Allegations of unlawful conduct are not facially plausible given an "'obvious alternative explanation'" that is "necessarily incompatible with the plaintiffs' versions of events." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) (per curiam); *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567. Where pleadings

18

incorporate numerous documents into them by reference (such as, here, declarations from the preliminary injunction record), the Court may consider those documents under Rule 12(b)(6). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

I.   **THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS**

   A.   **Because The "Funding Freeze" Has Ended, Plaintiffs Either Lack Standing To Seek Prospective Relief Against That Freeze, Or Their Claims For Such Relief Are Moot**

By the time Plaintiffs filed their amended complaints (in GHC, on April 22, 2025, and AVAC, on May 2, 2025), the foreign assistance funding "freeze" originally challenged—and against which the Court granted both a temporary restraining order and a preliminary injunction— had already come to an end, and Defendants had either terminated or retained Plaintiffs' awards. Hence, Plaintiffs lack Article III standing to seek prospective relief against the freeze, because there is no risk of the freeze being *repeated*.  *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("because the plaintiffs request forward-looking relief, they must face 'a real and immediate threat of repeated injury.'") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  Alternatively, Plaintiffs' challenge to the freeze is moot because it is "impossible for the court to grant any effectual relief" against purported agency action that concluded when Defendants terminated or retained the pertinent awards.  *See Spirit of the Sage Council v. Norton*, 411 F.3d 225, 228-29 (D.C. Cir 2005) (completion of rulemaking mooted original challenge). [7]

---

[7] In other words, "[i]f events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot."  *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001).  "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Clarke*

Plaintiffs reiterate allegations focusing on the "freeze." *See, e.g.*, AVAC Am. Compl. ¶ 1; GHC Am. Compl. ¶¶ 7, 42-60, 203, 207, 208, 211. But this Court temporarily restrained that "freeze" on February 13, 2025. And there is no dispute that each award has been either terminated or retained. So the "freeze" is over. Indeed, the agencies did not terminate *all* of Plaintiffs' agreements; rather, Plaintiffs' own allegations reflect that some of their agreements are retained: DAI "received termination notices for 85 of its 91 prime contracts and cooperative agreements." GHC Am. Compl. ¶ 135. MSH "received termination notices for 14 of its 19 USAID awards (four contracts and ten cooperative agreements)," while "remaining five" are in various states other than termination. GHC Am. Compl. ¶ 139. And AVAC's "award has not been terminated," although AVAC avers that "[D]efendants have arbitrarily demanded" revisions to the award requirements that AVAC apparently opposes for reasons not specified. AVAC Am. Compl. ¶ 62.

Similarly overtaken by events are remedial requests aimed at the "freeze." For example, Plaintiffs seek to "[e]njoin" agencies from "enforcing or giving effect to" the EO and implementing agency issuances. AVAC Am. Compl., Prayer for Relief, (B-C); *see also* GHC Am. Compl., Prayer for Relief (3-7). But, again, the dispute now concerns the validity of the terminations—not the "freeze," which is not at risk of being repeated now that decisions regarding termination and retention have been made. By centering their amended allegations of harm on economic losses purportedly stemming from terminations rather than the "freeze," Plaintiffs apparently grasp that the "freeze" cannot justify prospective relief. GHC Am. Compl. ¶ 133 (Democracy International),

---

*v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc); *D.C. v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010); *see Mundo Verde Pub. Charter Sch. v. Sokolov*, 315 F. Supp. 3d 374, 380-81 (D.D.C. 2018); *Van Valin v. Gutierrez*, 587 F. Supp. 2d 118, 120-21 (D.D.C. 2008). Nor have Plaintiffs shown that there remains a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Preiser v. Newkirk*, 422 U.S. 395, 402 (1975).

¶ 135 (DAI), ¶ 136 (Chemonics), ¶ 140 (MSH), ¶ 145 (HIAS), ¶ 146 (ABA), ¶ 150 (GHC

members), ¶ 152 (SBAIC members); AVAC Am. Compl. ¶¶ 65-66 (JDN), ¶¶ 69-71 (CVT).

Insofar as Plaintiffs seek relief concerning the now-concluded "freeze" as a means for

obtaining *retrospective* relief, that is misconceived.  Under the preliminary injunction, Defendants

have been making payments to Plaintiffs (and non-Plaintiffs) for work performed under the foreign

assistance awards between the date of the challenged EO and the issuance of the TRO (January

20, 2025 to February 13, 2025).  Only a small fraction of such payments remain to be made to

Plaintiffs, and no permanent injunction is necessary to require Defendants to finish the payments.

GHC Doc. 88 (Defs' Status Rpt. of May 29, 2025).  Beyond that, if Plaintiffs (or non-Plaintiffs)

incurred legitimate costs on terminated awards, such post-termination liabilities are properly

determined and paid through the "close out" procedures available under the terms and conditions

for each terminated award.  *See* pp. 8-11, *supra* (discussing, *inter alia*, 2 CFR § 200.344(d)).

**B. Plaintiffs' termination-related claims are in essence contract claims and thus must be brought in the Court of Federal Claims**

**1. Because Plaintiffs' claims are contractual in nature, adherence to Congress's clear jurisdictional boundaries warrants dismissal**

"[A]bsent a clear and unequivocal waiver of sovereign immunity," the "United States and

its agencies are generally immune from suit in federal court."  *Crowley Gov't Servs., Inc. v. GSA*,

38 F.4th 1099, 1105 (D.C. Cir. 2022).  Although the APA provides a limited waiver of the

Government's sovereign immunity for suits challenging final agency action and "seeking relief

other than money damages," it does not apply "if any other statute that grants consent to suit

expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  That carve-out

"prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in

other statutes."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.

209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Hence, "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional barrier is mandatory and for good reason. It ensures that contract claims against the Government are channeled into a court that has "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and (importantly here) that Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998)).

Courts consider two factors in assessing whether an action raises a contract claim governed by the Tucker Act. First, courts examine "the source of the rights upon which the plaintiff bases its claims." *See Crowley*, 38 F.4th at 1106. In answering that question, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107. Second, courts examine the "type of relief sought." *Id.* That inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a contract with the Government; depends on the Government's having breached that contract; and seeks to compel the Government to pay sums due under the contract—it is a Tucker Act claim, not an APA claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982).

Under those principles, Plaintiffs' terminated-related claims fall squarely within the Tucker Act. The written funding instruments are plainly "the source of the rights upon which" Plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. Plaintiffs overtly seek an order "to immediately reinstate foreign assistance funding and to continue to administer all foreign aid assistance awards" as was the situation pre-termination. AVAC Am. Compl., Prayer for Relief ¶ C. So what they want is "the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

Because the Tucker Act precludes a contract action against the Government in District Court under the APA, *Albrecht*, 357 F.3d at 67-68, this Court lacks subject-matter jurisdiction over the breach of contract claims—including an injunction barring Defendants from effectuating award terminations or an order to resume disbursement of foreign assistance funds under such awards. Plaintiffs must bring those claims in the Court of Federal Claims, where they may seek money damages for any breach.

To start, the asserted right to billions of dollars in taxpayer funds arises solely from the awards and "in no sense . . . exist[s] independently of" those contracts. *Spectrum*, 764 F.2d at 894. Plaintiffs would have no claim absent the Government's alleged breach of those agreements. No appropriations statute, no provision of the Foreign Assistance Act, and no agency regulation confers any right to payment on Plaintiffs. If Plaintiffs had no awards, they would have no claims. That reality makes the Tucker Act analysis even easier than in *Widakuswara v. Lake*, where the relevant statutes both established the entity plaintiffs and "required allocation of funds to those specific, named entities." *See Widakuswara* Panel Stay Order, No. 25-5144, 2025 WL 1288817, at *11 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see also Widakuswara* En Banc Order, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc).

Plaintiffs' allegations that the agencies did not sufficiently explain how their termination decisions complied with limitations in the awards confirms the point. GHC Am. Compl. ¶ 223; AVAC Am. Compl. ¶¶ 55-60. Even assuming that such termination provisions are both enforceable and not satisfied here, that would only mean the agencies violated contractual provisions—underscoring that these suits are breach-of-contract suits. Because "it is possible to conceive of this dispute as entirely contained within the terms of the contract," Plaintiffs' claims are contractual. *Ingersoll-Rand*, 780 F.2d at 78.

The relief that Plaintiffs seek is likewise contractual in nature. Plaintiffs seek an order barring the agencies from effectuating terminations of Plaintiffs' awards and requiring continuation of payments under those contracts. In other words, Plaintiffs seek to order Defendants to specifically perform contractual obligations, a "classic contractual remedy," and one that is generally unavailable against the Government. *Spectrum*, 764 F.2d at 894; *see also Ingersoll-Rand*, 780 F.2d at 79-80 (order "reinstating the original award of [a] contract . . . . amount[ed] to a request for specific performance"); *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 25-cv-465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying on similar grounds an injunction pending appeal), *affirmed before appeal voluntarily dismissed*, No. 25-5066 (D.C. Cir. May 2, 2025). The appropriate vehicle for a claim seeking damages for terminations allegedly undertaken in breach of contract is a "Tucker Act [suit] in" the CFC, not an APA action. *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13 (1988).

The Supreme Court's recent order in *California v. Department of Education* confirms the contractual nature of these suits. That case involved a statute that generally appropriated program funds and authorized the Department of Education to "award grants, on a competitive basis, to eligible partnerships" to carry out the program's purposes. 20 U.S.C. § 1022a(a). And like here,

plaintiffs in *California* challenged the agency decision to terminate their grant agreements as arbitrary and capricious. 2025 WL 945313, at *7. The District Court there purported to "enjoin[] the Government from terminating" those grants, effectively ordering the payment of money under the contracts. *California*, 145 S. Ct. at 968. The Supreme Court granted a stay of that order. In so doing, the Court found that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the District Court's order had, in effect, done. *Id.*

Plaintiffs urge repetition of the same error as the District Court in *California*. Invoking the APA, they pray for an order enjoining the agencies from implementing the termination of Plaintiffs' awards and compelling the agencies to resume the disbursement of foreign assistance funds to Plaintiffs under those awards. The APA's waiver of sovereign immunity does not extend to such relief given the availability of relief under the Tucker Act.

Although this Court attempted to distinguish the *California* ruling, 2025 WL 1380421, at *2-3, Defendants respectfully submit that any such distinction is inconsequential for purposes of the instant motions to dismiss. Plaintiffs are counterparties to agency instruments specifying conditions for payment of foreign assistance funds and allowable activities.[8] Plaintiffs have no

---

[8] *See* Standard Terms and Conditions for Federal Awards, U.S. Department of State (Oct. 1, 2024) ("State Standard Terms"); Standard Provisions for Non-U.S. Nongovernment Organizations, USAID (Oct. 1, 2024) ("USAID Standard Terms"). To be allowable, the expense must be necessary "for the performance of the Federal award" and, significantly, "[c]onform to any limitations or exclusions set forth ... in the Federal award." 2 CFR § 200.403(a)-(b). And financial obligations incurred after termination "are not allowable" unless expressly authorized by the agencies. *Id.* § 200.343; *see* State Standard Terms at 2 (2 CFR § 200.343 applies to domestic non-federal entities, foreign non-profit organizations, and for-profit organizations); *and* USAID Standard Terms at 5 (same for non-profit organizations contracting with USAID).

cognizable interest in foreign assistance funds apart from whatever rights to payment they have under their particular awards. So, as in *California*, it all comes down to the terms of those awards.

*Spectrum Leasing*, 764 F.2d 891, and *Ingersoll-Rand*, 780 F.2d at 76, are likewise instructive. In *Spectrum Leasing*, the plaintiff (Spectrum) entered a contract with an agency, under which it agreed to provide hardware and software in exchange for lease payments. 764 F.2d at 892. After Spectrum failed to provide the software, the agency stopped paying. *Id.* Spectrum sued under the APA, alleging that the agency violated the Debt Collection Act, and sought to compel resumption of payments. *Id.* The D.C. Circuit affirmed the dismissal of the suit, holding that the "right to these payments is created in the first instance by the contract, not the Debt Collection Act." *Id.* at 894-95. Although that Act "might impose procedural requirements on the government having some impact on the [parties'] contract," it "in no way create[d] the substantive right to the remedy" *Spectrum* sought. *Id.* at 894. And that relief sought—payment of money owed for goods provided—was the "classic contractual remedy of specific performance." *Id.*

The D.C. Circuit in *Ingersoll-Rand* reached the same conclusion. There, the Air Force terminated a contract with Ingersoll-Rand and solicited new bids for the contract. 780 F.2d at 76-77. Ingersoll-Rand sued, arguing that the termination violated two federal regulations and was arbitrary and capricious under the APA. Like Plaintiffs here, Ingersoll-Rand sought an injunction requiring that the agreeement be reinstated. *Id.* Affirming the dismissal, the D.C. Circuit concluded Ingersoll-Rand's claims were in essence contract claims that belonged in the Court of Federal Claims. *Id.* at 77-80. Ingersoll-Rand's suit boiled down to whether the contract permitted termination under the circumstances, and the dispute was thus "entirely contained within the terms of the contract." *Id.* at 78. "That the termination also arguably violates certain other regulations d [id] not transform the action into one based solely on those regulations." *Id.* The D.C. Circuit

further concluded that Ingersoll-Rand's request that the contract be reinstated "amount[ed] to a request for specific performance." *Id.* at 80.

So too here. Plaintiffs' claims seek reinstatement of terminated awards sound entirely in contract. Plaintiffs argue that the agencies' decisions to terminate was unreasonable because it allegedly exceeded the termination provisions of the awards, and Plaintiffs accordingly seek an order preventing the agencies from effectuating the terminations so that they may continue to receive payments under those awards. The source of that alleged right to payment is the awards, not any statutory or regulatory provisions. Like the Debt Collection Act in *Spectrum* and the regulations at issue in *Ingersoll-Rand*, the background statute and regulations may *inform* the parties' contractual relationship, but do not *create* the substantive right that Plaintiffs seek to vindicate in their amended pleadings. And the orders the amended pleadings seek, which would prevent the agencies from effectuating terminations and require them to disburse payments to Plaintiffs, are exactly the kind of order the D.C. Circuit recognized district courts likely lack jurisdiction to issue. Plaintiffs' asserted right to reinstatement and to payment flows from the awards, and claims seeking to vindicate that right, must be pursued in the Court of Federal Claims.

Plaintiffs' contrary position would have significant consequences for the Tucker Act. If the APA applied simply because a plaintiff challenges the reasonableness of an agency action, then every contract dispute could be reframed as an APA claim. The Tucker Act cannot be so easily circumvented. *See Megapulse*, 672 F.2d at 967 n.34.

Furthermore, this Court should not repeat its conclusion from the preliminary injunction phase that the Plaintiffs' APA claims "do not resemble a 'money damages' claim, for breach of contract or otherwise." 2025 WL 752378, at *8. As the Supreme Court recently reiterated, the "APA's limited waiver of immunity does not extend 'to orders to enforce a contractual obligation

to pay money.'" *California*, 145 S. Ct. at 968. That is exactly what Plaintiffs have requested. GHC Am. Compl., Prayer for Relief (3)-(6); AVAC Am. Compl., Prayer for Relief (B)-(C). Any concern that the Court of Federal Claims cannot order specific performance only further proves the Government's point: The APA cannot be used to evade limitations that Congress installed on permissible relief under other, more specific statutes. *See Patchak*, 567 U.S. at 215.

For at least two reasons, *Bowen*, 487 U.S. 879, is inapposite, and the Court's preliminary injunction order erred in relying on it. First, unlike the instant suits, *Bowen* did not involve a claim for breach of contract; rather, in holding the Tucker Act inapplicable to a State's claim under the Medicaid Act, the Court stressed both the statutory nature of the cause of action generally and features of the Medicaid Act specifically—underscoring that the case (unlike the instant suits) did not implicate the Tucker Act's application to contract claims. *Id.* at 900 n.31; *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 210-12 (2002) ("*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due"). Second, the Court emphasized that suits under the Medicaid Act generally arise between the Federal Government and a State, implicating federalism concerns that generally do not arise in disputes over the terms of grants to private parties. *Bowen*, 487 U.S. at 900 n.31, 904 n.39, 907-08; *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020) (suits involving "prospective declaratory and injunctive relief" amidst parties' "'complex ongoing relationship,'" such as Medicaid program, are permissible under APA, but suits that "'remedy[] particular categories of past injuries or labors'" instead proceed under the Tucker Act).

In addition to misapplying *Bowen*, the Court's preliminary injunction order primarily relied on four D.C. Circuit decisions addressing circumstances not found here. 2025 WL 752378, at *8-9. In two of those cases, plaintiffs were essentially bringing tort claims founded on a statute. *See*

*Crowley*, 38 F.4th at 1109 (analogizing Crowley's claim to a tortious interference claim based on audit conducted by General Service Administration, which was not party to Crowley's contract); *Megapulse*, 672 F.2d at 969 ("[a]ppellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act.").  In the other two cases, plaintiffs sought funds to which they claimed statutory entitlement. *See Kidwell v. Dep't of Army*, 56 F.3d 279, 285-86 (D.C. Cir. 1995) ("any monetary benefits that may flow from Kidwell's victory would not come from the district court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation when a servicemember's files change."); *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (appellant was not bringing claim for "money damages" under APA because "Maryland is seeking funds to which a statute allegedly entitles it").

Here, by contrast, Plaintiffs are not entitled to any funds except under the written instruments defining their awards.  Any and all money due flows solely from the terms of their agreements.  *See Catholic Bishops*, 2025 WL 763738, at *7 ("Sure, the [plaintiff] seeks to set aside agency action.  But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the [plaintiff].").  The source of their rights is thus contractual. *See Spectrum*, 764 F.2d at 894 (APA did not support exercise of district court's jurisdiction because the plaintiff's asserted right to payment "in no sense . . . exist[ed] independently of [its] contract" with the Government).  Further, their implicit demand for funding withheld under contractual agreements is in essence a request for monetary damages, which is not available under the APA. *See Great-West Life*, 534 U.S. at 210-211 ("[A]n injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity").

29

### 2.    Plaintiffs' awards confirm they cannot avoid the Tucker Act

Plaintiffs' claims here are based on awards that satisfy the elements of a contract with the United States. Because the claims here sound in contract, they are properly brought under the Tucker Act.

The elements of a contract with the United States are clear. There must be mutual intent to contract, offer and acceptance, consideration, and a government representative having actual authority to bind the United States. *United States ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 278 (D.D.C. 2020) (citing *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 414 (1995)). The agreements at issue here fall into different categories. Some are governed by the Contract Disputes Act, some are grants, and some are cooperative agreements. *See* 41 U.S.C. §§ 7101-7109 (Contract Disputes Act); 31 U.S.C. § 6304 (describing when grant agreements should be used); 31 U.S.C. § 6305 (describing when cooperative agreements should be used). But ultimately, the Tucker Act analysis is the same for each type of agreement. Because all elements of a contract with the United States are present in the agreements underlying Plaintiffs' claims, they all are contracts for which there is an adequate Tucker Act remedy.

a. *CDA Contracts*. Agreements entered into under the CDA contain a mandatory administrative exhaustion requirement. Moreover, appeals must be brought before either the CFC or the Board of Contract Appeals. For example, the award issued by USAID to Chemonics incorporates by reference the Disputes Clause, FAR § 52.233-1, which identifies the Contract Disputes Act as the relevant binding law governing any dispute, as well as the Terminations Clause, FAR § 52.249-6. *See* Exhibit G (Chemonics-USAID Contract at 102). The Disputes

Clause provides, "all disputes arising under or relating to [the] contract shall be resolved under this clause." FAR § 52.233-1.[9]

b. *Grants And Cooperative Agreements*. Although the grants and cooperative agreements at issue are not CDA contracts, they are nevertheless contracts subject to the Tucker Act. "[G]rant agreements [are] contracts when the standard conditions for a contract are satisfied[.]" *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract); *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450-51 (D.C. Cir. 1996) ("An NSF grant agreement includes the essential elements of a contract and establishes what would commonly be regarded as a contractual relationship between the government and the grantee."); *Thermalon*, 34 Fed. Cl. at 415. The Supreme Court's ruling in *California* confirms that claims for monetary remedies under grants are subject to the Tucker Act.

The same reasoning applies to cooperative agreements, which differ from grants in that the United States takes a more active role in administration. *Compare* 31 U.S.C. § 6304 *with id.* § 6305; *see San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 466 (2019) (rejecting argument that the CFC lacked Tucker Act jurisdiction over claim alleging breach of cooperative agreement).

---

[9] Any claims under the CDA must first be presented to the contracting officer for a final decision. *See* 41 U.S.C. § 7103. Once the contractor has received a final decision from the contracting officer (or the contractor's claim is deemed denied by the contracting officer's failure to issue a decision within the required period), the contractor can appeal to the CFC or to a contract board of appeals. 41 U.S.C. § 7104. Contractors are not permitted to elect a remedy different from those required by statute. *See United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1027-28 (9th Cir. 2023).

All contract elements are present in the agreements at issue here.  To begin with, the nature and structure of the agreements, including detailed performance specifications and pricing submissions, indicate that the parties mutually came to an understanding of their prospective performance.  *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.").

Moreover, the agreements each contained an offer.[10]  Those offers were then bilaterally signed and accepted by funding recipient representatives.  Additionally, they were signed by agreement officers (for USAID agreements) or grants officers (for State agreements), which had the effect of binding the Government.[11]

Furthermore, the agreements conferred consideration to both parties.  Each agreement contains the same material terms—an offer by USAID or State to fund a prospective awardee's project facilitating United States foreign policy objectives, in exchange for the prospective awardee's agreement to comply with the terms and conditions of funding.  For example, the cooperative agreement entered into between USAID and AVAC (which has not been terminated)

---

[10] *See, e.g.*, Exhibit D (State-JDN Grant Agreement at 1) ("By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award."); Exhibit E (State-JDN Cooperative Agreement at 1) (same); Exhibit F (USAID-AVAC Cooperative Agreement at 1) (after explaining that cooperative agreement is subject to terms and conditions "to which your organization has agreed[,]" instructing awardee to "[p]lease sign the second page of this cover letter to acknowledge your receipt of this award . . .").

[11] *See* Exhibits D-K; *see also* Dep't of State, 4 Foreign Affairs Manual 061.1, available at https://fam.state.gov/fam/04fam/04fam0060.html (discussing role of State Department grants officers) (last accessed April 7, 2025); Exhibit C at 303.3.7 (discussing finality of decision made by USAID agreement officer as to award decision).

concerned the "accelerat[ion of] biomedical HIV prevention research."  Exhibit F (USAID-AVAC Cooperative Agreement at 20).  The agreement imposed a broad variety of obligations on AVAC, including to expend funds in accordance with a detailed list of program objectives that became part of the agreement; to report on project results; and to make sub-awards to particular organizations.  *See id*.  The agreement also imposes obligations on the United States, including approval of subawards, and agreement to reimburse the recipient for the funding of work under the terms of the agreement.  *See id*.  These obligations constitute consideration.  *See Columbus Reg'l Hosp.*, 990 F.3d at 1340 ("The conditions attached to the disaster grants constitute consideration because they imposed a variety of duties on Indiana in implementing the FEMA-Indiana agreement.").  Similarly, the agreement between USAID and Management Sciences for Health (MSH) concerned the strengthening of health outcomes in Uganda.  The agreement imposed a broad variety of obligations upon MSH, including a requirement to develop a work plan; to report on project results; and make sub-awards under specified procedures.  *See* Exhibit I (USAID-MSH Agreement).

USAID's guidance manual, ADS Chapter 303 at 303.3.13 (Exhibit C), requires the AO, before the award is signed, to ensure that all elements of a binding agreement are present—namely, "[c]ompetent parties," "[p]roper subject matter," "[s]ufficient consideration," "[m]utual understanding," and "[a]greement on the terms of the assistance instrument."  *See also* ADS Chapter 303 at 303.6 (defining Agreement Officer as "[a] person with the authority to (1) enter into, administer, terminate, and close out assistance agreements, and (2) make related determinations and findings on behalf of USAID.").  Agreements must include all mandatory standard provisions and discretionary provisions into any such award, including provisions

governing termination procedure. *Id.*; *see id.* at 303.4 (incorporating External Mandatory References to 2 CFR § 200).

A similar analysis applies to State's awards. For example, the cooperative agreement with the ABA contained an offer and acceptance. *See* Exhibit J (ABA-State Award) ("The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions."); *see also* Exhibit K (same for ABA award labeled as grant). JDN's agreements with State are similar.[12]

And as for the ABA, its agreement (Exhibit J) also imposes obligations on the ABA, including to submit quarterly performance and financial reports on specified subject matters, and to perform in accordance with its proposal, which was incorporated by reference into the agreement. It further requires State to approve the ABA's work with a court in the pertinent foreign nation or "any other government institution not in the original proposal." *Id.* at 6. Again, the obligations imposed by these agreements constitute consideration. *See Columbus Reg'l Hosp.*, 990 F.3d at 1340.

Although Plaintiffs do not explicitly identify the amount of monetary relief they are seeking, given the dollar value of the agreements at issue, there is no reason to believe they are

---

[12] *See* Exhibit D (JDN-State Grant Agreement); Exhibit E (JDN-State Cooperative Agreement). Those agreements incorporate by reference State's Standard Terms and Conditions for Federal Awards, which impose obligations both on the awardee and State. *See* Exhibits D & E. The grant agreement to strengthen the capacity of investigative journalists in Malta and Cyprus, for example, imposes obligations upon JDN, including to submit quarterly performance and financial reports on specified subject matters, and to perform in accordance with a "scope of work" attached to the agreement. Exhibit D (JDN-State Grant Agreement). A cooperative agreement aiming to "cultivate an investigative reporting industry in the Pacific Islands" imposes similar obligations, incorporates JDN's proposal into the agreement by reference, and requires JDN to perform in accordance with that proposal. Exhibit E (JDN-State Cooperative Agreement).

seeking $10,000 or less. As a result, the remedy for their alleged harms from improper termination is purely monetary and beyond the $10,000 threshold requiring Plaintiffs to file suit in the CFC, unless Plaintiffs are willing to waive their damages to the extent that they exceed $10,000. *See* 28 U.S.C. § 1346(a)(2). Hence, this Court lacks subject-matter jurisdiction to entertain Plaintiffs' termination-related claims.

c. *The Preliminary Injunction Ruling Did Not Address The Foregoing Provisions.* In a footnote, the Court's order granting a preliminary injunction remarked that "the record also suggests that [Plaintiffs] have subawards and cooperative agreements that do not fall under the CDA or Tucker Act[,]" and that Plaintiffs thus "have agreements that would lack those alternative avenues and fall within the APA." 2025 WL 752378, at *9 n.7. For several reasons, the Court should not repeat that rationale as to the motions to dismiss the amended pleadings.

To begin with, the footnote cites *American Near East Refugee Aid (ANERA) v. U.S. Agency for International Development*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023), for the proposition that cooperative agreements may not be Government contracts. But so long as the elements of a Government contract outlined above are met, a cooperative agreement is no less a contract than any other type of agreement that satisfies these elements. *See Trauma Serv.*, 104 F.3d at 1326. The same principles apply to cooperative agreements as apply to other agreements. *ANERA* relied on the principle that Government contracts, unlike other types of contracts, require that the agreement confer a "direct, tangible benefit" on the Government to meet the element of consideration. 703 F. Supp. 3d at 133-34. But the Federal Circuit has concluded that the element of consideration can be satisfied in a Government contract based on the obligations imposed upon the awardee, regardless of whether there is a "direct benefit" to the Government—and that kind of consideration is present for the contracts at issue here. *See Columbus Reg'l Hosp.*, 990 F.3d at

1340 ("The conditions attached to the disaster grants constitute consideration because they imposed a variety of duties on Indiana in implementing the FEMA-Indiana agreement."); *San Juan City Coll.*, 391 F.3d at 1360-62 (rejecting argument that "special and different rules" must be applied to determine remedy for breach of Federal grant that was awarded under "formal written agreement").  The direction in 31 U.S.C. § 3605 to an agency to use a cooperative agreement when the relationship memorialized is not "for the direct benefit" of the United States does *not* preclude a cooperative agreement from being a contract *for Tucker Act purposes* when the agreement otherwise satisfies the required elements.

That footnote also indicates that the fact that some Plaintiffs have subawardees defeats jurisdiction in the Court of Federal Claims (and thus supports district-court jurisdiction).  *See* 2025 WL 752378, at *9 n.7.  But the Court of Federal Claims has jurisdiction over pass-through claims, which "allow[] a prime contactor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008).  The theory for such claims is that if the prime contractor "proves its liability to the subcontractor for the damages sustained by the latter, then the prime contractor itself can show injury to it from the government's action." *E.R. Mitchell Const. Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999).  Hence, if Plaintiffs are seeking to bring a claim against the United States based on their liability to subawardees, there is a procedural device in the Court of Federal Claims for such a claim.[13]

---

[13] Also, the Court pointed to the statement in Defendants' brief that "some Plaintiffs may have award documents that are not procurement contracts."  2025 WL 752378, at *9 n. 7.  But that reference to "procurement contracts" concerned contracts that are governed by the CDA—the Contract Disputes Act. *E.g.*, AVAC Doc. 33 at 13-14.  The CDA applies to particular kinds of executive agency contracts, including for "the procurement of services." *N. Star Steel Co. v. United States*, 477 F.3d 1324, 1331-32 (Fed. Cir. 2007).  But the Tucker Act also grants the Court

### C. The GHC Associational Plaintiffs Lack Standing Because the Claims Asserted Necessitate Individualized Findings.

Two GHC Plaintiffs also assert associational standing, requiring each to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)) (emphasis added). At issue here is the third, or "member-participation," prong. *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 118 (D.D.C. 2025). It is unsatisfied when "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975)). The member-participation prong thus concentrates on "whether the claim asserted and relief requested require individualized determinations," an inquiry that "is prudential and reflects a 'judicially self-imposed limit on the exercise of federal jurisdiction' rather than a 'constitutional mandate,' focusing instead on 'matters of administrative convenience and efficiency.'" *Tanner-Brown*, 105 F.4th at 447 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996)).

Here, the claims of the GHC associational plaintiffs, albeit purportedly for injunctive and declaratory relief, require "consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015), namely, individualized findings concerning the funding instruments of particular recipients. For

---

of Federal Claims jurisdiction over non-CDA contract disputes. *See, e.g.*, *id*. So although some of Plaintiffs' awards are not "procurement contracts" under the CDA, that does not control whether those awards are contracts for purposes of the Tucker Act.

example, Plaintiff GHC alleges and seeks relief based on its "membership" having "lost revenue from these 213 terminated programs is $7.2 billion," while Plaintiff SBAIC's "members report a total value of contract terminations of $1.98 billion ($1.68 billion in prime contracts and $300 million in subcontracts)."  GHC Am. Compl. ¶¶ 150, 152.  Without, at a minimum, considering the particular rationales for particular determinations, and the effects of those determinations on Plaintiffs, a court could not appropriately assess the members' claims.

Plaintiffs' mere styling of the relief sought as equitable does not obviate the need to analyze whether the claim asserted requires member participation because of the necessity for "individualized determinations":  In *Tanner-Brown*, for example, the D.C. Circuit concluded the prong was not satisfied because the association sought the equitable remedy of accounting, which could not issue "without making individualized findings."  105 F.4th at 447.  Similarly, here, although Plaintiffs purport to seek injunctive or declaratory relief, they cannot avoid the need for individualized inquiry into the many contracting decisions Plaintiffs dispute on which they seek award-specific monetary recovery.[14]

### D. No Plaintiff Here Has Article III Standing To Seek Relief Based On Nonparties' Contracts Or Based On Speculation About How Nonparties Will Respond To The Challenged Conduct

Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-424 (2021).

---

[14] *See Weingarten v. Devos*, 468 F. Supp. 3d 322, 335-36 (D.D.C. 2020) (member-participation prong unsatisfied for due process claim where union relied on member-specific evidence to prove asserted deficiencies despite purported character of relief sought) (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, No. 14-cv-953, 2016 WL 7376847, at *4 (D.D.C. Dec. 19, 2016)); *see also O'Hair v. White*, 675 F.2d 680, 691 (5th Cir. 1982) (association lacked standing to raise member's individual due process and equal protection claims affecting only the member who was "best representative of her personal interests"); *Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1021–22 (10th Cir. 1992) (denying associational standing because claim asserted required evidence particular to individual members).

To reach beyond the litigants and to enjoin the Executive Branch's actions toward nonparties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly" courts "do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923). "[S]tanding is not dispensed in gross," so Plaintiffs must establish standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61. And the Plaintiffs' remedy must be "limited to the inadequacy that produced" those Plaintiffs' "injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Hence, even if Plaintiffs have standing to seek an injunction for themselves against the termination of their own funding instruments, they lack standing to seek relief for nonparties, as to whom Plaintiffs cannot "sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423. And they lack standing to seek relief based on speculation about how nonparties will respond to Defendants' termination of Plaintiffs' funding instruments by taking various adverse measures against Plaintiffs.

*First*, as to nonparty funding recipients: Each party generally "must assert his own legal rights" and may not invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); *see, e.g.*, *Tyler v. Judges of Court of Registration*, 179 U.S. 405, 407 (1900). Although there is a question whether that doctrine is prudential or constitutional, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014), either way, "litigants typically lack standing to assert the constitutional rights of third parties," *United States v. Hansen*, 599 U.S. 762, 769 (2023); *see, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024); *Murthy*, 603 U.S. at 76. "[E]ven when the plaintiff has alleged" an Article III injury-in-fact, "the plaintiff generally must assert his own legal rights." *Warth*, 422 U.S. at 499. Thus, in *Kowalski*, attorneys lacked third-party standing to challenge a statute limiting the appointment of counsel for indigent

defendants. *See* 543 U.S. at 127. Although the statute inflicted pocketbook injury on those attorneys, *see id.* at 129 n.2, still they lacked "third-party standing to assert the [Sixth Amendment] rights" of nonparty defendants, *id.* at 134. So too here: Even if the termination of an instrument inflicts Article III injury-in-fact on the funding recipient who is party to that instrument, Plaintiffs lack third-party standing to invoke the rights (contractual, statutory, or constitutional) of nonparty funding recipients. That means the Prayers for Relief must be stricken under Rule 12(b)(1) insofar as they go beyond a remedy to the particular Plaintiffs before the Court.

*Second*, as to nonparties who allegedly might take adverse measures against Plaintiffs: The hypothetical future conduct by nonparties, including nonparties who Plaintiffs speculate will take various actions against Plaintiffs as a downstream result of the contract terminations, is insufficient to support standing to seek injunctive relief. A "federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *See Murthy*, 603 U.S. at 57. So the Court has "'been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,'" *id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)), and rejected theories of redressability that depend on such guesswork, *id.*, 603 U.S. at 73; *Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023).

Here, Plaintiffs lack standing to seek relief against Defendants predicated on harms that independent nonparties—including, of course, nonparties in foreign nations—would purportedly inflict on Plaintiffs as a result of those nonparties' independent choices. The problem is not only that Plaintiffs' assertions about *past* harm flowing from the acts of independent nonparties against Plaintiffs cannot support Article III standing to seek prospective relief against the Government, but also that relief against the Government would not constrain those independent nonparty choices. So, for example, the prospective relief sought would not redress DAI's allegedly

40

"damage[d] . . . reputation" among "vendors, landlords, and security providers" who apparently (and erroneously) blamed DAI for Defendants' terminations (GHC Am. Compl. ¶ 135); Chemonics' similar harm and its "*risk of* lawsuits around the world" from unnamed litigants (GHC Am. Compl. ¶ 137) (emphasis added); ABA's similar harms to its "reputation" and "international brand" (GHC Am. Compl. ¶ 148); or the "global reputational harm" to unspecified SBAIC members (GHC Am. Compl. ¶ 152).

Such conjectural harms as bare "risk of" litigation are insufficient to count as Article III injury-in-fact, *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1295-96 (D.C. Cir. 2007) (Kavanaugh, Cir. J., for the Court), and, in any event, Plaintiffs have "a redressability problem," *Murthy*, 603 U.S. at 73. An injunction compelling Defendants to reinstate Plaintiffs' funding agreements would do nothing to bolster any Plaintiff's reputation among nonparties, including nonparties overseas who apparently do not understand that Defendants, not Plaintiffs, terminated the awards, because those nonparties are allegedly "skeptical" of Plaintiffs "and their efforts" in "unstable, conflict-torn environments." GHC Am. Compl. ¶ 158.[15] Nor would such reinstatement shield Plaintiffs from vexatious litigation in foreign courts by any nonparties.

Hence the Court lacks subject-matter jurisdiction under Article III to address Plaintiffs' claims beyond their "pocketbook" injuries related to terminations of their own contracts, and

---

[15] Averments about the reactions of various banks to the terminations further undercut the plausibility of the allegations that the terminations are imposing reputational harm stemming from certain nonparties mistakenly blaming Plaintiffs for the terminations. Allegedly, certain "[c]ommercial banks no longer regard USAID as a reliable payer" (GHC Am. Compl. ¶ 152); Democracy International's "largest banks in the United States and the United Kingdom" "no longer believe that the U.S. government will meet its financial obligations" (GHC Am. Compl. ¶ 135); and Chemonics' "syndicate of national banks" now "view" "U.S. government receivables" as "no longer reliable" (GHC Am. Compl. ¶ 138). Those averments, taken as true, mean that those banks fault Defendants, not Plaintiffs, for the terminations and ensuing nonpayments. But Plaintiffs never explain why *non-bank* nonparties would fail to reach similar conclusions—let alone explain how relief against Defendants would correct any such misunderstandings.

cannot proceed to the merits of Plaintiffs' claims predicated on the contracts of parties not before the Court or on purported harm to Plaintiffs based on the independent decisions of nonparties.

## II. PLAINTIFFS MAY NOT ENFORCE THE IMPOUNDMENT CONTROL ACT OR THE APPROPRIATIONS LAWS, WHICH DO NOT SUPPORT THEIR CLAIMS IN ANY EVENT

Even if Plaintiffs had sufficiently alleged and proven subject-matter jurisdiction (which they have not), their claims predicated on the ICA and the 2024 appropriations laws are not plausibly alleged under Rule 12(b)(6). The arguments herein parallel the Government's arguments in the pending consolidated appeal from this Court's preliminary injunction in D.C. Circuit No. 25-5097, albeit concentrating here on the allegations in the Amended Complaint, which seek to make that preliminary injunction permanent.

The primary flaw in Plaintiff's claims is that they fail to respect the sensitive context in which these suits arise. Congress and the President share responsibility for enacting the law, including appropriations statutes, and the President has constitutional authority to implement the law. The ICA reflects Congress's attempt to engage with the Executive Branch regarding implementation of appropriations statutes, which fund programs across the federal government— all of which implicate different inter-Branch considerations. The statute thus establishes a reticulated notification and enforcement regime between the political branches, which allows Congress and the Executive Branch to engage over the expenditure of appropriated funds. The statute does not expressly direct the Executive Branch to make funds available for obligation until after it has transmitted to Congress a special message proposing rescission and Congress has failed to act.

Plaintiffs are attempting to improperly insert themselves into this inter-Branch dialogue, and the relief they seek would require the Executive Branch to make funds available for obligation—without any of the flexibility or back-and-forth that the ICA contemplates. That is

erroneous. At the outset, Plaintiffs have no cause of action to enforce the ICA's asserted requirements, which are intended to govern the relationship between the Executive Branch and Congress and not to provide judicially enforceable rights to private parties. Regardless, the injunction Plaintiffs seek is unjustified by the statute because it directs the Executive Branch to engage in conduct that the statute does not require at this point.

And Plaintiffs' improper attempt to hijack the dialogue that should play out between the political branches under the ICA is particularly unwarranted in the foreign affairs context at issue, where the President has substantial constitutional and statutory discretion to ensure that foreign assistance spending is aligned with his foreign policy priorities.

### A. The Impoundment Control Act Precludes Review By The Instant Plaintiffs, Who Are Outside The Pertinent Zone Of Interests In Any Event

The Amended Complaints, tracking the preliminary injunction, allege that the ICA requires the Executive Branch to make available for obligation all funds appropriated in the Further Consolidated Appropriations Act of 2024.  GHC Am. Compl. ¶ 244-246; AVAC Am. Compl. ¶¶ 85-91.  But those statutes do not confer any rights on plaintiffs that may be enforced through an APA suit.  *Cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of injunction pending appeal, including because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts).

Two related limitations restrict plaintiffs from using the APA's cause of action to enforce a statute where Congress did not intend such enforcement.

*First*, a plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).  By providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action.  *See, e.g.*, *Block v. Cmty. Nutrition Inst.*,

467 U.S. 340, 345 (1984).  Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme."  *Id.*

*Second*, to invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue.  *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991).  That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce.  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).  Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  And when a plaintiff attempts to use the APA's cause of action to challenge the government's compliance with a different statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated."  *Patchak*, 567 U.S. at 224.

As the ICA reflects, Congress has constructed a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriated funds.  That statute is built around give-and-take between the political branches.  Thus, the statute directs the President to send a special message to Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal.  And the statute specifies particular forms of legislative action that Congress may undertake to address proposed rescissions.  *See id.* § 688.

44

Moreover, insofar as the ICA contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch.  2 U.S.C. § 687.  And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the Executive's actions.  No such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse.  *Id.*  Regardless whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties.  And the statute certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General.  *See Pub. Citizen v. Stockman*, 528 F. Supp. 824, 827-30 & n.1 (D.D.C. 1981) (explaining why private enforcement of ICA "would represent a great disservice to the objectives which underlie" that statute); *see also Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024).

Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties.  For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed.  467 U.S. at 346.  In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any"

administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

So too here. The ICA provides a variety of mechanisms for legislative responses to any proposal by the Executive Branch to defer or rescind appropriated funds and, to the extent it contemplates litigation at all, it contemplates only suits brought by a Legislative Branch official and only after Congress has first had the opportunity to act. That scheme provides no role for third parties like plaintiffs to play in either the legislative or judicial enforcement processes.

In so doing, the scheme preserves the political branches' accountability for enacting and implementing the appropriations laws. And it accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons— some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government").

Given the many different contexts and justifications that may accompany such proposals— and given the sensitive nature of the dual authority that Congress and the President share in this sphere—it makes sense that the scheme provides Congress itself with the ability to determine how best to respond (if at all) to any particular proposal. Any disputes between the President and Congress in this sphere may be "hashed out in the hurly-burly, the give-and-take of the political

process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020). In that process, Congress has ample political tools to address any perceived problem itself, including by altering existing or future appropriations or engaging in its traditional oversight functions. And in determining whether and how to enlist these political tools in any particular dispute, Congress may properly calibrate any response depending on the specific context and Congress's particular views.

Moreover, emphasizing the point, the ICA expressly provides that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681. That provision makes clear Congress's intent that third parties *not* rely on the statute's provisions to generate a judicially enforceable right to compel spending that did not otherwise exist.

Hence, permitting Plaintiffs in the instant suits to challenge the Executive Branch's spending decisions through an APA suit would "severely disrupt" the statute's "complex and delicate" enforcement scheme. *Block*, 467 U.S. at 348. It is thus "clear that Congress intended that" any response to the Executive's actions in this sphere should "be confined to" the Legislative Branch-directed responses undertaken "in accordance with" the statute's scheme. *Id.*

For similar reasons, Plaintiffs are not within the zone of interests of the ICA. The Act is directed at regulating the relationship between Congress and the Executive Branch. Nothing in the statute suggests that Congress intended to permit enforcement by third parties like Plaintiffs, who hope to be awarded some of the appropriated funds. Rather, it is directed at the relationship between the Executive Branch and Congress. When applied to foreign assistance appropriations in particular, the statute ensures that judgments about foreign policy are reserved to the political branches.

As discussed below, neither the particular claims at issue here nor the relief sought can be properly seen to flow from the appropriations statutes themselves, isolated from the ICA. And even those statutes themselves, as a general matter, do not suggest that they give rise to an enforcement action by private parties. As discussed, they confer significant discretion on the Executive Branch in the conduct of foreign policy. When read together with the ICA, they contemplate inter-Branch dialogue when the President deems it inappropriate to obligate funds. Suits by private parties such as the instant suits would interfere with, rather than bolster, the congressional interests advanced by the appropriations statutes.

### B. The Relevant Statutes Do Not Support Plaintiff's Statutory Claims Predicated On Congressional Appropriations

Even if Plaintiffs had sufficiently alleged a basis to seek judicial enforcement of the relevant provisions of the ICA, their claims are unsupported by that statute, which instead contemplates inter-Branch dialogue that only just begun. Plaintiffs' prayers for permanent injunctions that Defendants make all appropriated funds available for obligation would improperly pretermit that dialogue and thus interfere with, rather than enforce, the ICA. And the appropriations statutes do not, of their own force, compel the Executive Branch to obligate every last dollar of appropriated funds.

To compel a federal agency to take a specific action—whether under the APA's provision permitting courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), or under traditional equitable principles—a court must first conclude that "an agency failed to take a discrete agency action that it is required to take," *Norton v. Sw. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted). Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunction remedy is "normally limited to enforcement

of a specific, unequivocal command"—that is, "the ordering of a precise, definite act about which an official had no discretion whatever." *Id.* at 63. Plaintiffs would transgress that limit.

### 1.  Neither the Further Consolidated Appropriations Act of 2024 Nor The Foreign Assistance Statutes Supply Plaintiffs' Alleged Specific Commands

The appropriations statute in many instances simply provides that Congress is appropriating large undifferentiated sums for various activities, such as "to carry out" specified provisions of the Foreign Assistance Act, 138 Stat. at 742, or "to meet refugee and migration needs," 138 Stat. at 744. And even where Congress included more specific directions in the appropriations statute, those directions often restrict the manner in which, or the purposes for which, the funds could be spent. *See, e.g.*, 138 Stat. at 740-41, 742. In general, they do not provide affirmative, unequivocal commands to provide specific funds on a specific timetable for specific recipients. And although the Court's preliminary injunction order noted one instance where the appropriations act specifies that the covered funds "shall be made available for" specific purposes, 138 Stat. at 740, cited at 2025 WL 752378, at *14, that specification appears in a list of provisos restricting the manner and purposes of expending the funds. In that context, it is best understood as a direction regarding the specific purposes and activities for which those funds may be used— not as a command (and certainly not an unequivocal one) to make all of the appropriated sums available, much less to do so on any particular timeline. And Plaintiffs have not supported their requested injunction with any more specific provision earmarking funds for particular recipients.

Thus, taken on their own, many of the appropriations provisions covered by Plaintiffs' requested relief simply "permit[] but do[] not require the Executive Branch to spend funds." Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C. Supp. 303, 309 (1969); *cf. Train v. City of New York*, 420 U.S. 35, 43-44 (1975) (similarly recognizing that an appropriations provision may permit, but not require,

expenditure "of the entire amounts authorized").  It is the ICA, in most cases, that governs circumstances in which the President makes a policy determination not to expend funds.

And although some provisions of the appropriations statute contain more specific commands regarding obligating funds to particular recipients or for particular purposes, Plaintiffs have not identified any such provisions that direct money to Plaintiffs, and those limited provisions could not in any event justify the permanent injunctions sought.  *See* GHC Am. Compl., Prayer For Relief (9); AVAC Am. Compl., Prayer for Relief (C).  Nor have Plaintiffs identified any unequivocal command in the underlying statutes authorizing foreign assistance programs that could support such injunctions.  As explained, those statutes generally authorize the Executive Branch to provide foreign assistance through particular programs, but they do not generally require the provision of specific funds to specific recipients.  Indeed, to the contrary, Congress has generally provided that the President and the Secretary of State have significant latitude to determine how best to provide foreign assistance to ensure that those programs best achieve foreign aid goals and align with the President's foreign policy.  *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a).  And for many specific programs, Congress has expressly given the President discretion to provide assistance on such terms and conditions as the President determines.  *See* pp. 4-7, *supra* (collecting provisions).

### 2.    The Impoundment Control Act Cannot Sustain The Requested Injunctions Either

The ICA establishes a structure to allow the President and Congress to engage in an inter-Branch dialogue when the President determines not to obligate appropriated funds.  At a high level, the President is directed to transmit a special message to Congress when he "determines" that "budget authority should be rescinded for fiscal policy or other reasons." 2 U.S.C. § 683(a); *see also id.* § 686(a).  After that message is sent, Congress may consider whether to rescind the budget

authority in question. And if Congress has not rescinded "all or part of the amount proposed to be rescinded" within "45 calendar days of continuous session of the Congress" after receipt of the message, *id.* §§ 682(3), 683(b), then the amount proposed to be rescinded "shall be made available for obligation," *id.* § 683(b). That final provision requiring the covered appropriations to be made available for obligation thus takes effect *only* following Congress's receipt of the contemplated message and the elapsing of 45 days.

But here, the President on June 3, 2025 sent a special message to Congress proposing to rescind specified budgetary authority. The Comptroller General has not reported to Congress that the President has improperly failed to send a special message and made a report in lieu of the special message. *Cf.* 2 U.S.C. § 686(a) (providing that if the Comptroller General finds that the President "proposes to defer budget authority" but "has failed to transmit a special message," the "Comptroller General shall make a report" to Congress that "shall be considered a special message"). Thus, at this point, the inter-Branch process contemplated by the statute has just begun, and has assuredly not concluded. As a result, the statute's provision requiring certain appropriations to be made available has no applicability to the instant suits, and cannot support Plaintiffs' requested injunctions.

At the preliminary injunction stage, this Court seemed to recognize that feature of the statute, explaining that the ICA only "prohibits the President from impounding appropriated funds" if he fails to "follow[] certain procedures." 2025 WL 752378, at *14. And the Court located its asserted violation of the statute in those procedural requirements, explaining that the agencies "have not undertaken the procedures required for the impoundment of congressionally appropriated aid." *Id*. at *15. But as explained, any affirmative injunction must be limited to directing the Government to comply with the specific, unambiguous statutory directive that the

51

Court believes was violated.  Here, Plaintiffs seek injunctions that would did not merely require Defendants to comply with any applicable procedural requirements; instead, the requested injunctions would skip over the procedural mechanisms laid out in the statute to broadly require the Executive Branch to make funds available for obligation.

Regardless, Plaintiffs' presupposition that the Government is required, but has failed, to send the requisite special message to Congress is unsupported.  That statutory obligation only attaches once the President "determines" that "budget authority should be rescinded for fiscal policy or other reasons," 2 U.S.C. § 683(a), and the President sent a pertinent special message to Congress on June 3, 2025.

Instead, the amended pleadings rely only on various statements in which the President and other officials have generally suggested that they wish to reduce foreign aid spending.  AVAC Am. Compl. ¶¶ 36-48; GHC Am. Compl. ¶¶ 4-6.  But a general intent to reduce spending is not the same as a final determination that specific budget authority should be rescinded.  Consistent with the conclusion that the agencies have not failed to comply with any special-message obligation, the Comptroller General— who is directed by statute to transmit a report to Congress if he finds that the President has improperly failed to send a special message, *see* 2 U.S.C. § 686(a)—has not sent any such report about the funds at issue in this case.  *Cf.* GAO, Search Decisions (last visited June 3, 2025), https://www.gao.gov/legal/appropriations-law/search (not including any reports related to the funds at issue here).

Recharacterizing Plaintiffs' claims as predicated on the Anti-Deficiency Act, 31 U.S.C. § 1512(c)(1), would change nothing.  GHC Am. Compl. ¶¶ 170-71, 218-19, 224, 244, 246, 253; AVAC Am. Compl. ¶¶ 92-94.  That statute provides that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only . . . to provide for contingencies; . . . to achieve

savings made possible by or through changes in requirements or greater efficiency of operations; or . . . as specifically provided by law." 31 U.S.C. § 1512(c)(1).  Even if Defendants' conduct were considered as having established a "reserve" of the pertinent Foreign Assistance Act funds under the Anti-Deficiency Act, Plaintiff has not shown that an exception to the general rule does not apply, such as whether the reserve was established "to achieve savings made possible by or through changes in requirements or greater efficiency of operations" or "as specifically provided by law." *Id.*

And regardless, the Anti-Deficiency Act "explicitly sets forth procedures for reporting violations of the Act and enforcing its provisions," none of which is a private suit. *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988).  "[T]e Anti–Deficiency Act's requirements 'apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) (quoting *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883)).  Thus, the comprehensive remedial scheme of the Anti-Deficiency Act serves to manage the internal affairs of Government, and there is no basis for allowing Plaintiffs or other private individuals to obtain judicial relief for alleged violation of that statute.

> ### 3.    The Injunctions Plaintiffs Seek Would Improperly Curtail Executive Discretion Given In The Impoundment Control Act

By ordering the government to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," 2025 WL 752378, at *23, Plaintiffs seek orders that would significantly interfere with the Executive Branch's ability to take lawful actions in at least three ways.

*First*, the permanent injunctions sought would require the Executive Branch to make available for obligation all of the funds in the covered appropriations.  *See* GHC Am. Compl.,

Prayer For Relief (8); AVAC Compl., Prayer for Relief (C).  But the ICA has never required the Executive Branch to obligate all of the funds in an appropriation.  To the contrary, temporary pauses and ultimate failures to obligate are commonplace and accepted by the Legislative Branch. The Government Accountability Office has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated."  *James R. Jones, H.R.*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981).  And GAO has further explained that agencies will often have "small remaining unobligated balances," which are "consistent with sound administrative funds control practices." *Dep't of Homeland Sec.— Border Barrier Const. & Obligations*, B-335747, 2024 WL 1740422, at *1 n.8 (Comp. Gen. Apr. 22, 2024).

The Government does not understand this Court's preliminary injunction to prohibit Defendants from such commonplace practices or to require that appropriations be obligated down to the penny—a reading that would be particularly implausible given that Government officials face a competing obligation, enforced by criminal penalties, not to expend more funds than have been appropriated, *see* 31 U.S.C. §§ 1341(a)(1), 1350.  But the line between a permissible delay or withholding and a deferral or impoundment subject to the ICA's procedures is not always clear—indeed, Congress and the Executive Branch may disagree about how to categorize particular actions in this space.  And the question arises with some regularity; the Executive Branch "necessarily withholds funds on hundreds of occasions during the course of a fiscal year," *City of New Haven*, 809 F.2d at 907.  Rather than properly leaving any such disputes to the inter-Branch process contemplated by the statute, the preliminary injunction, which Plaintiffs would make permanent, threatens judicial superintending of the agencies' many funding decisions and requires that the agencies correctly predict how the Court will view each specific decision, on pain of

contempt—with the criminal penalties of the Anti-Deficiency Act on the other side. That places agencies in an untenable position.

*Second*, even if the President were to propose that funds be rescinded, the permanent injunctions sought may require Defendants to make those funds available for obligation, at least if Congress had not enacted a rescission bill before the funds lapsed. *See* GHC Am. Compl., Prayer For Relief (8-10); AVAC Compl., Prayer for Relief (C).

But as GAO explained shortly after the enactment of the ICA, if the President transmits a special message "concerning amounts that [a]re near their date of expiration," the "President may withhold the budget authority from obligation for the duration of the 45-day period" contemplated in the statute, even if that means that the funds expire during that period. *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330.1, 2018 WL 6445177, at *9 (Comp. Gen. Dec. 10, 2018) (recounting various GAO opinions from 1975 and 1976). If Congress wishes for the funds to remain available, it "must take affirmative action to prevent the withheld funds from expiring." *Id.* Although GAO has more recently retreated from its contemporaneous understanding of the ICA and overruled those opinions, *id.*, any lingering dispute about the proper disposition of funds in that scenario should be left to the political branches rather than prejudged by the courts.

*Third*, as explained, the ICA regulates the interaction between Congress and the President in an area of substantive overlap between the constitutional authorities of the Legislative and Executive Branches. Consistent with that context, the statute provides for an inter-Branch process to work out any disputes between those two Branches. But Plaintiffs' requested relief would permanently install this Court in the middle of that process. Although the Government does not understand the Court's preliminary injunction to apply to any funds for which a rescission bill is

55

enacted, the injunction may continue to apply even if Congress were to receive a special message regarding a proposed rescission (such as the one sent on June 3, 2025) and were to acquiesce in the Executive's conduct by means short of a rescission bill. Particularly in the foreign affairs context, where Congress may recognize that the Executive Branch has a greater degree of constitutionally conferred discretion regarding how to implement appropriations statutes, *see* pp. 60-62, *infra*, precluding resort to that political resolution is improper.

### C. Any Construction of the Relevant Statutes as Negating the Executive Branch's Discretion Over Specific Foreign Assistance Funds Would Raise Serious Constitutional Questions

As discussed above, the Amended Complaints do not allege any plausible violation of the ICA or any other statute. But even if there were a plausible interpretation of that statute, or any other, that would call the Government's conduct here into question, any ambiguity should be read to preserve Executive Branch discretion in the sphere of foreign affairs because a contrary interpretation would present "grave and doubtful constitutional questions." *Jones v. United States*, 526 U.S. 227, 239 (1999); *see also United States v. Hansen*, 599 U.S. 762, 781 (2023) (even if an interpretation is "not the best one," if "the interpretation is at least 'fairly possible'" then "the canon of constitutional avoidance would still counsel [this Court] to adopt it" (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018))).

### 1. Plaintiffs' Proposed Appropriations Directives Disrespect General Separation Of Powers Principles And Raise Unnecessary Constitutional Questions

The "President's vast share of responsibility for the conduct of our foreign relations" derives from Article II of the Constitution, which vests all of the "executive Power" in the President. *Garamendi*, 539 U.S. at 414. The President thus possesses his own powers "as the Nation's organ in foreign affairs," *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948), to "decide what [the nation's foreign] policy should be," *Garamendi*, 539 U.S. at 414;

*see also Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) ("the President is exclusively responsible" for the "conduct of diplomatic and foreign affairs").  The statutes at issue in the instant suits must be read in light of that longstanding constitutional principle.  *See also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004) (the President's special constitutional role requires both "restraint" and "respect" from Congress and the courts).

In addition, the permanent injunctions sought would create significant separation-of-powers issues regarding the relationship between the judiciary and the political branches.  Note 6, *supra*.  Plaintiffs would inject the court into the middle of an ongoing conversation between the political branches.  Although the President has now sent a special message to Congress regarding a proposal to rescind appropriated funds, Plaintiffs seek to get ahead of those procedures and obtain a judicially enforceable requirement that the Executive Branch obligate funds.  Such an injunction could interfere with a political solution to any issues of foreign policy and federal expenditures.

Plaintiffs also ignore related principles of constitutional avoidance:  The President has submitted a pertinent special message to Congress proposing a rescission, and if Congress approves legislation to rescind funds, that would obviate the need to address whether those funds must be made available for obligation.  *See Mazars*, 591 U.S. at 869 ("Occasions for constitutional confrontation between the two branches should be avoided whenever possible.").  Thus, any dispute about the constitutionality of the ICA remains unripe.

In addition, no such dispute is directly presented by the parties.  The Government is not in these suits raising in this Court "any challenge to the constitutionality of the governing statutes, as applied or otherwise, including the appropriations act and Impoundment Control Act."  *See* 2025 WL 752378, at *16 n.16 (so characterizing Government's position at preliminary injunction stage).  Plaintiffs' efforts to nonetheless enforce the statute conflict with the judicial duty to "avoid the

premature adjudication of constitutional questions and not pass on questions of constitutionality unless such adjudication is unavoidable." *See Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019).

### 2. History And Tradition Preclude The Restrictive Appropriations Remedies Plaintiffs Seek

Although the President has significant authority in the area of foreign affairs, the Constitution provides a role for Congress as well, which the Executive Branch continues to honor.

The principal limitation on the President's constitutional power to conduct foreign affairs in the context of the expenditure of federal funds arises, of course, from the Constitution's provision that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. But that provision is not at issue here, as there has been no argument that the Executive Branch is attempting to expend funds that Congress has not appropriated. Rather, the issue here concerns the converse situation in which appropriated funds may not be expended.

Although Congress has acted in that area, chiefly through the ICA, as a constitutional matter there is no presumption that the Executive Branch must expend all funds that Congress appropriates. It was no accident that the Appropriations Clause was written as a negative constraint, not as an affirmative command. *See Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (describing the Appropriations Clause "as a restriction upon the disbursing authority of the Executive department"). The concept of appropriations grew out of a concern by the English Parliament in the 17th century about overspending by the King. As the King came to depend on revenue "financed through various forms of taxation" that "required parliamentary authorization," rather than on other sources of income, Parliament enacted measures placing limits on the King's spending. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd*., 601 U.S. 416, 427-28

(2024); *see also id.* at 439 (explaining that "Parliament secured fiscal supremacy and wielded that power to superintend the King").[16]   That practice also carried over to the American colonies. Before the ratification of the Constitution, "[m]any early state constitutions vested the legislative body with power over appropriations" to constrain executive spending.  *CFPB*, 601 U.S. at 430.[17]

Thus, at least in the absence of more specific legislation, there is no basis for presuming that the mere appropriation of funds compels the President to expend them.  Dating back to at least the early 1800s, there are numerous instances where the Executive Branch has declined to spend the full amount of funds appropriated by Congress, especially (although not only) in the context of foreign affairs.  President Jefferson in 1803 explained that $50,000 that had been "appropriated by Congress for providing gun-boats[] remain[ed] unexpended" because changed circumstances "rendered an immediate execution of that law unnecessary."  Thomas Jefferson, Third Annual Message to Congress (Oct. 17, 1803).  President Grant in 1876 refused to expend more than half of the total $5 million in funds appropriated for harbor and river improvements because some of the works would not adequately advance the national interest.  *See* 4 Cong. Rec. 5628 (1876). Other notable examples include that Presidents Hoover and Roosevelt withheld large sums of appropriated funds during the Great Depression and World War II, and that Presidents Truman,

---

[16]   For example, the English Bill of Rights and implementing legislation prohibited the King from spending money not granted by Parliament.  *See* Bill of Rights Act 1689, 1 W. & M. 2, c. 2 (Eng.) (declaring that "levying money for or to the use of the crown, by pretence of prerogative, without grant of parliament, for longer time, or in other manner than the same is or shall be granted, is illegal").

[17]   For example, the Pennsylvania Constitution allowed the Executive to "draw upon the treasury for such sums as shall be appropriated by the house."  Pa. Const. of 1776, § 20.  Similarly, the South Carolina Constitution directed that "no money be drawn out of the public treasury but by the legislative authority of the State."  S.C. Const. of 1778, art. XVI.  Under the Articles of Confederation, the Confederation Congress likewise served in the role of specifying through appropriations "the necessary sums of Money to be raised for the service of the united states." Articles of Confederation of 1781, art. IX, para. 5.

Eisenhower, and Kennedy declined to spend congressionally appropriated funds for various defense projects. *See* Nile Stanton, History and Practice of Executive Impoundment of Appropriated Funds, 53 Neb. L. Rev. 1, 10-13 (1974).

That history suggests a prevailing understanding that appropriations statutes confer implicit authority for the Executive Branch to forgo spending across a range of circumstances. Late 19th-century Attorney General opinions indicated that, even when an appropriation contained language providing that the funds "shall be expended" on a program, the appropriation should not be considered mandatory "to the extent that [executive officials] are bound to expend the full amount if the work can be done for less." Appropriation—Contracts, 21 Op. Att'y Gen. 414, 414-15 (1896). A House report in 1950 similarly recognized that "[a]ppropriation of a given amount for a particular activity constitutes only a ceiling upon the amount which should be expended for that activity." H.R. Rep. No. 81-1797, at 9 (1950).

That approach of preserving the Executive Branch's flexibility and optionality avoids encroaching on the Executive Branch's constitutional responsibilities and prerogatives in executing the laws. The historical and constitutional backdrop highlights the need to read the ICA as it is written, giving rise to a dialogue between the political branches regarding the need to expend appropriated funds rather than an enforceable right by private parties to compel expenditures that may or may not be warranted.

### 3. Plaintiffs' Appropriations Remedies Improperly Disregard The Foreign Policy Context Of The Instant Suits

The constitutional concerns are especially acute because Plaintiffs seek an order to the Executive Branch involving funds that touch on sensitive matters of foreign policy.

It should come as no surprise that the Executive Branch's discretion in determining how and whether to expend appropriated funds is particularly broad in the arena of foreign affairs.

Distinct constitutional problems that would arise if "a congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as . . . his authority over foreign affairs."  Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C. Supp. at 310-11.  Congressional enactments must be understood to respect the principle that "Congress does not have the power to compel the spending of funds" so as to infringe the President's "duties in the area of foreign affairs."  The President's Veto Power, 12 Op. O.L.C. 128, 168 n.56 (1988). The enactment of the ICA does not suggest that Congress was seeking to infringe on the President's foreign policy power, much less to allow private parties to do so.  Rather, the Act was primarily a response to President Nixon's impoundment of funds in the context of domestic programs.  *See* Stanton, 53 Neb. L. Rev. at 27-28.  Indeed, the Act itself makes clear that it "shall" not "be construed" as "asserting or conceding the constitutional powers or limitations of either the Congress or the President."  2 U.S.C. § 681.

Core foreign policy judgments are implicated here. The statutes at issue appropriate foreign assistance funds for causes like "refugee and migration needs," 138 Stat. at 744; international disaster relief, 138 Stat. at 742; and global health, 138 Stat. at 740.  Deciding how much money to devote to these causes can affect another country's perception of and rapport with the United States.  That delicate weighing of interests is at the heart of the President's "responsibility to maintain the Nation's relationships with other countries."  *Garamendi*, 539 U.S. at 420.  Here, the President made a judgment that certain foreign assistance awards may not be "aligned with American interests" and that continued payment of the awards could "serve to destabilize world peace."  EO 14,169, § 1, 90 Fed. Reg. at 8619.  As discussed above, that determination does not, in and of itself, constitute a conclusion that particular appropriated funds should not be obligated

or expended.  But the President's role in any future assessment of that possibility should not be undermined by the injunctions Plaintiffs seek.

While the Legislative Branch also plays an important role in the foreign policy sphere, the relevant authority at issue in this case belongs to the Executive Branch.  Neither the ICA nor the various appropriations of foreign assistance funds constitute exercises of Congress's power to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, or to "declare War," U.S. Const. art. I, § 8, cl. 11.

Furthermore, it is both commonplace and lawful for Congress to "grant the President substantial authority and discretion in the field of foreign affairs." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015).  Here, the President is statutorily empowered to set "such terms and conditions as he may determine," 22 U.S.C. § 2151b(c)(1), to best accomplish the general purposes of the Foreign Assistance Act, *id.* § 2395(a), and the Secretary of State is charged with overseeing implementation to best serve "the foreign policy of the United States," *id.* § 2382(c).  Those statutory provisions authorizing the country's foreign assistance programs confirm the Executive Branch's broad authority to manage foreign aid.

## III.   DEFENDANTS' TERMINATION-RELATED CLAIMS UNDER THE APA ARE UNREVIEWABLE

### A. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy for Terminations is Available to Plaintiffs

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903.  "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).  For example, "an

independent cause of action or alternative review procedure" will preclude APA review even if the arguments that can be raised in the alternative proceeding are not identical to those available in an APA suit. *See, e.g.*, *CREW v. U.S. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017). As long as there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Galvin v. Del Toro*, 586 F. Supp. 3d 1, 13 (D.D.C. 2022). As already described above in Point I, the instant suit is, in essence, an attempt to obtain mass adjudication of contract claims, and the Tucker Act remedy potentially available to Plaintiffs is an adequate alternative. Plaintiffs are therefore barred from bringing this suit in this Court in the first instance.

### B. The Program Funding Decisions At Issue Are Committed To Agency Discretion By Law.

Plaintiffs' challenges boil down to seeking judicial invalidation of agency decisions to fund particular programs, but those funding choices are not reviewable under the APA for the basic reason that they are committed to agency discretion by law, 5 U.S.C. § 701(a)(2), warranting dismissal of the termination-related APA claims. Note 6, *supra*.

An agency decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making that allocation, the agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best  spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program

'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  As long the agency abides by the relevant statutes and by whatever self-imposed obligations may arise from regulations or grant instruments, the APA "gives the courts no leave to intrude." *Id.*  That logic applies not just to lump-sum appropriations but to other funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute.  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).  Such decisions also "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752.

The foreign assistance programs at issue here are just such programs:  The FAA and the pertinent appropriations statutes recognize State and USAID have significant discretion in determining how best to allocate appropriated funds across applicants for contracts, grants, and cooperative agreements.  As explained above, Point II.B.1, *supra*, neither the authorizing nor the appropriating statutes require that any particular funds be awarded to Plaintiffs, and hence do not deprive the agencies of their flexibility to terminate Plaintiffs' awards based on changing priorities.

### C.  Plaintiffs Do Not Allege "Discrete" Agency Action Apart From Terminations Of Their Individual Funding Instruments

Review under the APA is available only for "agency action."  5 U.S.C. § 704.  But the Amended Complaints seek to use the APA as a vehicle to obtain relief not only for Plaintiffs' termination of their own funding instruments, but also for *every* funding instrument the agencies terminated since issuance of the challenged EO.  Note 6, *supra*.  Yet an APA plaintiff must plead and challenge "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  The agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete." *See Norton*, 542 U.S. at 62.  Hence, "courts cannot order

'programmatic improvements,' or 'compel compliance with broad statutory mandates.'" *Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 891, and *Norton*, 542 U.S. at 66). That "distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers" and prevents the courts from being injected into "day-to-day agency management" of agencies. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

APA review is unavailable for review of an agency's "constructing a building, operating a program, or *performing a contract*," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis added), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). *Cf. Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out" a statute's "general directives").

Here, insofar as Plaintiffs purport to challenge something other than termination of their particular awards, Plaintiffs' claims fail for lack of discreteness under *Lujan* and *Norton*, warranting Rule 12(b)(6) dismissal, because the APA precludes an amorphous, roving challenge to the entirety of USAID's and State's systems of contract administration. That is the exact type of broad programmatic or "blunderbuss" challenge seeking supervision of an agency's day-to-day activities the APA does not allow. *See Fund for Animals*, 460 F.3d at 20; *see also Am. Forest Res. Council*, 77 F.4th at 805.

**IV.    THE TERMINATION-RELATED CLAIMS DO NOT PLAUSIBLY ALLEGE A VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

In any event, Plaintiffs have not plausibly alleged that the contract terminations they seek to overturn under the APA were arbitrary and capricious, warranting Rule 12(b)(6) dismissal of their termination-related claims.

**1.** Plaintiffs thoroughly ignore the pertinent background. The Court's February 13, 2025 TRO *explicitly* permitted contract enforcement. Although the Court restrained agencies from "enforcing or giving effect to" implementation of EO 14,169, the TRO prominently allowed steps "to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." 2025 WL 485324, at *6. Properly relying on relevant contractual rights, and recognizing the Court's restraint against the challenged pause, the agencies returned to "expeditiously examining each USAID and State foreign assistance award on an individual basis and through a multi-step process to determine whether, beyond the directives to the contract and grant officers to comply with the TRO, USAID and State will" terminate funding under the authority conferred by the terms of the specific instrument. 2/26 Defs. Status Rpt. ¶ 2 (AVAC Doc. 40), *citing* 2/25 Marocco Decl. ¶ 3 (Doc. 37-1); *cf.* GHC Am. Compl. ¶¶ 94, 96 (incorporating that declaration by reference).

The termination-related claims alleged in the Amended Complaints (echoing Plaintiffs' preliminary injunction replies) would nullify what the TRO explicitly permitted, namely the clear contractual rights of State and USAID, including as to termination. Worse still, Plaintiffs' amended pleadings seek that sweeping relief based on nothing more than conclusory mischaracterization of the agencies' termination decisions as "pretextual" and not individualized. Note 6, *supra*; *see Twin Metals*, 2023 WL 5748624, at *10 (Rule 12(b)(6) dismissal warranted for failure "to provide more than labels or conclusions of pretext").

66

Crucially for Rule 12(b)(6) purposes, the amended pleadings ignore the particular provisions in the funding instruments.  *See, e.g.*, 2/18 Marocco Decl. ¶¶ 16, 23 (describing termination for convenience and other grounds).  Those provisions also include the USAID provision for terminations of agreements no longer in the "national interest" (2 CFR § 700.14, *cited in* 2/18 Marocco Decl. ¶ 10), and the State provision for termination of agreements no longer consistent with "agency priorities" (2 CFR § 200.340(a)(4), *cited in* 2/18 Marocco Decl. ¶ 23(b)).[18] Of course, phrases such as "national interest" in 2 CFR § 700.14 and "agency priorities" in 2 CFR § 200.340(a)(4) are exceptionally flexible, affording Defendants with expansive discretion. Plaintiffs do not purport to challenge those regulations in these suits, and they must be presumed valid.  By executing written instruments with the Government incorporating those flexible regulations, Plaintiffs accepted the risk that terminations of their contracts or federal assistance awards could arise from application of pertinent regulations.  For its part, the APA does not preclude agency understandings of the national interest and agency priorities or convenience to shift, for example, in keeping with a "change in administration brought about by the people casting their votes."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).

**2.**    Unable to grapple with the termination provisions in their awards and in pertinent regulations, Plaintiffs instead attempt to shift *their* burden to plausibly allege that the terminations were unlawful by labelling Defendants' explanations for the terminations as "implausible."  GHC Am. Compl. ¶¶ 101, 104.  But even if the funding instrument terminations decisions were not

---

[18] *See* AVAC Am. Compl. ¶¶ 65, 69 (communications regarding termination invoked "national interest"); GHC Am. Compl. ¶¶ 94, 98 (similar); *cf.* GHC Am. Compl. ¶ 96 (incorporating 2/18 Marocco Declaration by reference); AVAC Am. Compl. ¶ 56 (incorporating that declaration by reference in citing status report attaching and predicated on that declaration).

committed to agency discretion by law as explained above (Point III-B, *supra*), Plaintiffs still would be required to articulate a discernible, objectively manageable standard for deciding whether the agencies engaged in a sufficiently "meaningful" or individualized review of the contracts. GHC Am. Compl. ¶¶ 94, 104, 209; AVAC Am. Compl. ¶ 58. Plaintiffs have failed at that basic task—as the Court apprehended at the preliminary injunction stage. *See* 2025 WL 752378 at *11, 13.

As Defendants explained, the terminations resulted from "a rigorous multi-level review process that *began* with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project." 2/25 Marocco Decl. ¶ 5 (emphasis added). That process culminated in the "Secretary of State's personal involvement," which "confirmed that termination decisions were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs." *Id.*

Straining to puncture that explanation, GHC Plaintiffs allege "[o]n information and belief" that agency leadership did not account for "individualized information about the awards selected for termination," and that alleged internal spreadsheets describing those awards lacked "substantial information" on various aspects of the "programs at issue"—but Plaintiffs do not identify *any* objective way to measure what alternative amount of information would have been sufficiently "individual[]" or "substantial." GHC Am. Compl. ¶¶ 113, 117. Indeed, Plaintiffs do not attempt to ground their assertion that the review was insufficiently individualized in any particular terms of any particular funding instrument. Nor do Plaintiffs identify any statutes supplying an objective standard. That exposes Plaintiffs' challenge as incompatible with the APA.

Its arbitrary and capricious standard is "[h]ighly deferential," "presumes the validity of agency action," *see Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), and directs the reviewing court not to "substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). And that standard affords agencies leeway to design effective decisional processes—far from mandating, for example, that agencies use a particular level of detail in the spreadsheets Defendants used in their decisional process (*e.g.*, GHC Am. Compl. ¶ 223, selectively quoting 2/25 Marocco Decl. ¶ 5). Given that "reasonableness is a zone, not a pinpoint," *Wisc. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 266 (D.C. Cir. 2007) (per curiam), Plaintiffs necessarily lack plausible allegations that the APA required Defendants to use more detailed tools (such as more detailed spreadsheets) or that the APA required them to assign greater weight to *Plaintiffs'* preferred foreign policy considerations. *See, e.g.*, *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 214 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities.") (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978), and *Chaney*, 470 U.S. at 831-32)). The agencies are "better equipped to assess what facts are relevant to" their "own decision[s] than a court is." *Cf. Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, No. 23-975, 2025 WL 1520964, at *7 (U.S. May 29, 2025) (interpreting National Environmental Policy Act); *id.* at *17 (Sotomayor, J., concurring in the judgment).

Indeed, Plaintiffs not only ignore teachings about APA deference, but also utterly disregard the established role of the Executive Branch in formulating foreign policy. *See, e.g., Garamendi*, 539 U.S. at 414, 420; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Such foreign policy decisions for which the Executive (not any Plaintiff) is responsible necessarily include decisions about contracts for Government-funded activities overseas, such as in "Afghanistan,

Syria, and Yemen, as well as . . . Lebanon, Jordan, Niger, Somalia, and other[]" nations. GHC Am. Compl. ¶ 108. In formulating such decisions, it is the role of the Executive (not any Plaintiff) to account for such various and unquantifiable factors as the interest in supporting "Colombian anti-narcotrafficking" efforts or in "collect[ing] intelligence on Al Qaeda" in "the Ivory Coast." AVAC Am. Compl. ¶ 50. After all, "[p]rotection of the foreign policy of the United States[,] is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized." *Haig v. Agee*, 453 U.S. 280, 307 (1981).

In failing to describe an appropriate standard for the "individualized" or "meaningful" review requirement Plaintiffs purport to advance, their allegations not only ignore the constitutional separation of powers, but also ignore the Foreign Assistance Act. That statute describes the Executive's discretion to spend funds in remarkably open-ended terms, reflecting congressional recognition of the need for the Executive to have discretion to change priorities when addressing various problems in foreign policy.

The Amended Complaints therefore have not rectified the critical flaw this Court identified at the preliminary injunction stage when denying requested interim relief invalidating award terminations since January 20, 2025. "[W]ithout *articulating a meaningful standard* for the Court to distinguish between those terminations that are still affected by the original implementing directives and those that are not," Plaintiffs' proposed interim relief would have "devolve[d] into the type of intensive supervision of day-to-day agency activities, as well as inquiry into the terms of individual awards, that the Court has expressly rejected." 2025 WL 752378 at *13 (emphasis added). That is, the Court flagged Plaintiffs' "failure to offer *a clear and administrable standard* for determining when terminations would no longer be tainted by the original implementing directives without entangling the Court in supervision of Executive decisions as to individual

70

agreements." *Id.* at *11 (emphasis added).  Plaintiffs have doubled down on, rather than corrected, that essential mistake.

Yet requiring Plaintiffs to plausibly allege that the termination-related decisions they conclusorily describe as "blanket" (AVAC Am. Compl. ¶ 8) or "*en masse*" (GHC Am. Compl. ¶¶ 65, 95, 107, 184, 200) actually violate an objectively discernible and manageable standard is *especially* appropriate at this stage of these suits (no less than at the preliminary injunction stage). That is because Plaintiffs have already proposed to use their claims of "pretextual" terminations as a ground for proposing wide-ranging discovery into the subjective motivations of senior Executive Branch officials in exercising their lawful authorities to terminate funding instruments, while entirely ignoring the foreign-affairs context in which these suits arise.  *See FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 922-23 (2025) (declining to "peel back the curtain" on representations as it would invite "substantial intrusion into the Executive's functioning").  Indeed, Plaintiffs have already asked to depose the Secretary of State, and the Amended Complaints pray for orders invalidating all terminations since January 20, 2025 regardless of the legality of those terminations.  GHC Doc. 46-6, at 2.  Proper application of Rule 12(b)(6) to the Plaintiffs' APA claims is necessary to ensure that Plaintiffs sufficiently allege a claim for relief before they use discovery to again press for supervision of the Executive Branch's entire foreign-aid apparatus in clear contravention of the President's Article II powers.  *Cf. Twombly*, 550 U.S. at 559.

Contrary to Plaintiffs' conclusory allegations of "pretext[]" (GHC Am. Compl. ¶ 175), Defendants' explanation that they relied on award-specific termination authorities provided for in their regulations—regulations whose validity Plaintiffs have not purported to challenge—is entitled to respect and is not subject to "judicial inquiry into 'executive motivation,'" which "represents 'a substantial intrusion' into the workings of another branch of Government and should

normally be avoided." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). Rather, a "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926). The Supreme Court in *Department of Commerce* affirmed a lower court's remand to the agency on the ground that the proffered "explanation for agency action" was "incongruent with what the record reveals about the agency's priorities and decisionmaking process." 588 U.S. at 785. But there is no such "incongruent[ce]" here. Agency leadership rendered decisions about which awards were in the national interest or consistent with current agency priorities, resulting in some awards being retained (including some awards to the instant Plaintiffs)—the opposite of a "blanket" termination of all awards. GHC Am. Compl. ¶¶ 94, 211; AVAC Am. Compl. ¶ 8.

Additionally, the reality that State and USAID retained some awards (including some of Plaintiffs' awards) while terminating others further supports the validity of the termination decisions here. GHC Am. Compl. ¶¶ 135, 139; AVAC Am. Compl. ¶ 62. So too does the agencies' identification and termination of awards on the basis of common characteristics. Pp. 15-16, *supra*. Indeed, treating similarly situated awards in similar ways honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

Moreover, Plaintiffs' effort to paint their across-the-board challenge to every termination as supported by an alleged failure to "consider" the "effect" on contractors that "have relied on" the agencies' "longstanding policies" necessarily fails. GHC Am. Compl. ¶ 211. The "serious reliance interests" the APA requires agencies to "consider," *see Wages & White*, 145 S. Ct. at 917, cannot be taken to include Plaintiffs' *subjective* perceptions founded on their apparent failure to

appreciate the consequences of termination provisions in the  contracts they signed and in the related regulations whose validity they have not disputed and whose applicability they cannot deny.  Perhaps Plaintiffs assumed that the Government would not exercise its rights under the "national interest" provision in 2 CFR § 700.14 or "agency priorities" provision in 2 CFR § 200.340(a)(4).  But nothing in the amended pleadings describes an objectively reasonable basis for such an assumption.  Rather, any "reliance interests" in this contracting context are necessarily bounded by the contracts defining their relationship with the Government and the attendant regulations—regulations Plaintiffs pointedly decline to address.

**3.**  Unable to articulate (yet again) a pertinent legal standard in this sensitive foreign policy context, Plaintiffs instead rest on a welter of alleged process defects, none of which—whether considered individually or in combination—invalidates the decisions.  The conclusion that the Court reached at the PI stage about the Plaintiffs' failure on this point therefore applies in full as to the Rule 12(b)(6) plausibility of Plaintiffs' allegations.  2025 WL 752378, at *7-18.

For example, GHC Plaintiffs rely on declarations from fictitiously named "Doe" declarants who are former USAID employees and who maintain that because the underlying contracts are lengthy documents, and the relationship between the agency and the funding recipients has various practical complexities, agency leadership could not validly have reached decisions as quickly as they did.  *Compare, e.g.*, GHC Am. Compl. ¶¶ 94, 101 (alleging "it would be impossible" or "implausible" to "meaningfully review" awards within time stated), *with* GHC Pls.' PI Reply 17 n.7 (Doc. 46) (citing Zahra Doe Decl. ¶¶ 36-37 (Doc. 42-1), for same argument).  But Plaintiffs' resort to declarations by pseudonymous former or current lower-level agency staff without making

an appropriate showing that such an unusual step is warranted is procedurally flawed.[19]  And it would obviously be anomalous to allow Plaintiffs to circumvent that failure simply by relying on such declarations via citation in a complaint.

At any rate, even if the views in those declarations could be considered alongside the pleadings, those views are inconsequential and do not establish the facial plausibility of Plaintiffs' allegations.  When agency leadership evaluated whether the "national interest" or "agency priorities" called for termination or retention of an award, agency leadership was not required by a law to consider each and every clause of each and every contract, or each and every implementation detail.  Although Plaintiffs baldly assert that the agency leadership, in reaching those decisions, lacked "the experience and technical expertise necessary to conduct any meaningful review," GHC Am. Compl. ¶ 209—which they further assert resides only with the lower-level agency personnel "who manage a specific contract or award."  GHC Am. Compl. ¶ 102.  But those allegations reflect a fundamental legal error fatal to the validity of Plaintiffs' termination-related allegations.  The President and the Secretary of State have full authority to exercise their judgment and to make the ultimate decisions about how to evaluate the "national interest" or "agency priorities."  It is not for GHC Plaintiffs to second-guess those decisions based on their self-serving perceptions about who within the agencies has relevant "experience" or "expertise."

---

[19] Consistent with the "strong presumption in favor of public access to judicial proceedings," *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017), courts traditionally require a person seeking to use a pseudonym in court filings to make a showing akin to "good cause" for that course, *see Doe v. Von Eschenbach*, No. 06-cv-2131, 2007 WL 1848013 at *2 (D.D.C. June 27, 2007); *cf. Chang v. Republic of S. Sudan*, 548 F. Supp. 3d 34, 37 (D.D.C. 2021) ("court may . . . for good cause, 'require redaction of additional information'" from filings) (quoting Fed. R. Civ. P. 5.2(e)(1)).  But here, even after Defendants objected to that deficiency at the PI stage (AVAC Doc. 47-1 at 1-2), Plaintiffs again make no showing at all, let alone a "good cause" showing, to justify reliance on their pseudonymous declarations.

Additionally, GHC Plaintiffs err in faulting a cherrypicked sample of agency communications that continued to refer to the challenged EO after the Court issued the TROs. GHC Am. Compl. ¶¶ 97-99.  That is not a valid indication of "pretext."  It is simply an error that the agency swiftly corrected after GHC Plaintiffs identified it.  Other errors in the documents Defendants used to communicate the terminations are similarly unavailing.  The use of initial, shorter letters to communicate award terminations followed by longer, more detailed letters, as described in a USAID e-mail which, like the Doe declarations, Plaintiffs previously offered up at the PI stage, does not show any deficiency in the terminations.  *Compare* GHC Am. Compl. ¶ 100 (describing instructions to provide "detailed, expanded . . . notice[s]" following up on previous "expedited noticed"), *with* 2d Jessica Doe Decl. ¶¶ 3-4 (AVAC Doc. 55-1) (same).

And, in any event, the need to proceed expeditiously supplies the "obvious alternative explanation" for the errors Plaintiffs describe as well as the errors Defendants themselves have acknowledged.  *See Twombly*, 550 U.S. at 567.  Had Defendants taken the additional time to reach decisions that Plaintiffs now assert Defendants needed to take and also taken additional time to issue scholarly letters communicating those decisions, that would have entailed further delay— which would not have benefitted Plaintiffs because it would have perpetuated the asserted harm Plaintiffs described as the basis for their TRO motions seeking to invalidate the "pause" on funding.  That need to proceed expeditiously explains, for example, agency communication of terminations to some funding recipients operating "life saving programs," which USAID then retracted.  GHC Am. Compl. ¶ 107.  Such retracted communications cannot possibly show that the terminations as a whole were improper; instead, they show that agencies moved quickly, and that they changed course in those instances where they needed to "correct mistakes."  *Cf. Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1206 (D.C. Cir. 1996).

Moreover, even assuming the existence of errors in the communications to Plaintiffs of the decisions reached by agency leadership, the asserted errors are properly disregarded as harmless. And, at most, the proper remedy would be to remand for additional explanation for the agencies' decisions, *see, e.g.*, *Wages & White Lion*, 145 S. Ct. at 928, not for invalidation of any contract terminations (let alone all such terminations, as Plaintiffs seek), GHC Am. Compl., Prayer for Relief (5)-(6); AVAC Am. Compl., Prayer for Relief (B)-(C).  After all, under the "administrative law harmless error rule," *see Shinseki v. Sanders*, 556 U.S. 396, 406-07 (2009) (cleaned up), a court would not properly invalidate termination decisions based on the asserted defects in the agency documents communicating or effectuating those decisions, *see Fla. Dep't of Ins. v. United States*, 81 F.3d 1093, 1098 (Fed. Cir. 1996) ("To nullify this termination for default solely on the ground of these harmless technical defects would grant plaintiff an entirely unwarranted windfall.").

## V.        PLAINTIFFS' ADDITIONAL CONSTITUTIONAL CLAIMS LACK FACIAL PLAUSIBILITY

### A. GHC Plaintiffs' Due Process Claim Fails Because They Lack A Legitimate Interest Or A Claim To Entitlement To Future Funding

GHC Plaintiffs allege that the terminations of their funding instruments violated their right to procedural due process, which they contend is predicated on a purported "property interest" in maintenance of those funding instruments.  GHC Am. Compl. ¶¶ 266-74 (Claim 6).  Those allegations fail to state a valid claim because the funding instruments do not give rise to the alleged protected property interest—only, at most, "a 'unilateral expectation,' of continued funding which is not entitled to constitutional protection."  *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822, 828 (D.C. Cir. 1977) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must

have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *See Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005). Hence, only a constrained set of Government benefits are protected under the Due Process Clause. *See Perry v. Sindermann*, 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits). But the Due Process protections afforded for such entitlement-like benefits do not extend to "'ordinary' or 'routine' government contracts." *Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at \*18 (D.D.C. May 2, 2025) (quoting, in denying preliminary injunction, *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014)); *see Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("a simple breach of contract does not amount to an unconstitutional deprivation of property"). That is, the "Supreme Court has never held that government contracts for goods and services create property interests protected by due process." *See New Vision Photography Program, Inc. v. D.C.*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014). Notably, *Roth* involved a tenured *employment* contract. And "[o]utside of the employment context, courts have resisted application of due-process principles to government contracts because [w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *See id.*, 54 F. Supp. 3d at 29 (collecting cases). Indeed, inferring a property interest at GHC Plaintiffs' behest here would make little sense, given that the USAID and State agreements contain the explicit termination provisions described above. Pp. 8-11, *supra*.[20]

---

[20] Plaintiffs' reliance (GHC Am. Compl. ¶ 268) on *Mil-Ka-Ko Research & Dev. Corp. v. Office of Economic Opp.*, 352 F. Supp. 169, 172-73 (D.D.C. 1972), *aff'd*, 497 F.2d 684 (D.C. Cir. 1974), is misplaced. *Gallegos*, 549 F.2d at 828, cited that decision as supporting its conclusion that recurring annual "grants . . . even over a period of years, *cannot* create more than a 'unilateral

**B. AVAC Plaintiffs' Take Care Clause Claim Fails**

AVAC Plaintiffs attempt to circumvent the limitations of the APA by asserting a broad programmatic attack against the President under the Take Care Clause, U.S. Const. art. II, § 3. *See* AVAC Am. Compl. ¶¶ 77-81 (Claim II). That effort fails. To begin with, the AVAC Plaintiffs with terminated awards make no effort to show that their award termination satisfies the zone-of-interests requirement for such a constitutional claim. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (complaint must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"). They appear to assume that every Government contractor with a terminated contract falls within the zone of interests of the Take Care Clause. That would turn every Government contract dispute into a constitutional challenge, which should not be permitted, just as courts have not permitted such reasoning under the Due Process Clause, as explained above.

And, in any event, the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. AVAC Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton v. Specter*, 511 U.S. 462, 473-74 (1994); *see also* Point VIII, *infra* (addressing Plaintiffs' insufficient remedial allegations). Moreover, even if the Clause could furnish a basis for affirmative relief, AVAC Plaintiffs seek to rely on violations of purported duties that are based on

expectation,' of continued funding which is not entitled to constitutional protection." *See id.* (emphasis added). Rather, grantees "must point to some rules or statutes which distinguish their situation from the ordinary grant application process," which Plaintiffs have not done. *See Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1544-45 (S.D.N.Y. 1984) (rejecting USAID grantee's due process claim), *aff'd on other grounds*, 805 F.2d 1088 (2d Cir. 1986).

Plaintiffs' subjective views about how to best implement and administer USAID—which is not a permissible ground for equitable relief against the President. Rather, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson,* 71 U.S. (4 Wall) 475, 499 (1866). The discretionary nature of these programs makes them ill-suited for a Take Care Clause challenge because it is within the President's purview to interpret the statutory guidance Congress provides him as he sees fit in executing the duties of the executive branch.

## VI.    THE *ULTRA VIRES* CLAIM IS NOT PLAUSIBLY ALLEGED

Plaintiffs' *ultra vires* claims also fail. AVAC Am. Compl. ¶¶ 72, 77; GCH Am. Compl. ¶¶ 259-60. *Ultra vires* claims are generally limited to circumstances where a plaintiff is completely deprived of a means of vindicating its statutory rights and lacks any "alternative procedure" for judicial review. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022); *see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (*ultra vires* imposes a "demanding standard" because it is based on the assumption Congress has not statutorily barred judicial review of agency action).

The strict limitations on nonstatutory review are "nearly insurmountable." *DOJ v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993); *see Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (describing such a claim as "essentially a Hail Mary pass" that "rarely succeeds") (Kavanaugh, Cir. J., for the Court). Indeed, for such a claim Plaintiffs must plausibly allege that denial of judicial review would "wholly deprive [them] of a meaningful and adequate means of vindicating" their rights. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). But, as explained, Plaintiffs have an adequate means of vindicating their rights because they may raise their termination-related claims through the Tucker Act framework. *California*, 145 S. Ct. at 968; Point I-B, *supra*.

In any event, the *ultra vires* claims fail on their merits for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'" *See Fed. Express*, 39 F.4th at 766 (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).

**VII.     THE MANDAMUS CLAIM IS NOT PLAUSIBLY ALLEGED**

The GHC Amended Complaint seeks mandamus relief requiring Defendants to carry out "their clear duties… to spend appropriations enacted by Congress for [foreign aid] programs." GHC Am. Compl. ¶ 263.  Mandamus is "one of the most potent weapons in the judicial arsenal." *Cheney*, 542 U.S. at 380.  A "drastic" remedy, it is "to be invoked only in extraordinary circumstances." *See Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002).  The mandamus plaintiff must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022).  GHC Plaintiffs have not plausibly alleged those elements.

*First*, Plaintiffs do not have a clear right to relief.  28 U.S.C. § 1361 provides "original jurisdiction" in this Court "of any action in the nature of mandamus to compel" a Federal officer "to perform a duty *owed to the plaintiff*" (emphasis added).  But the purported duty owed to the particular Plaintiff before the Court must "be clear and compelling." *13th Regional Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).  Here, Plaintiffs contend that the Constitution, via the ICA and the Anti-Deficiency Act, create a generalized duty to carry out congressionally mandated foreign-assistance programs.  GHC Am. Compl. ¶¶ 160-74.  But, as explained above, the ICA does not provide an enforceable duty to private plaintiffs. *See* Point II-A, B, *supra*.

*Second*, Defendants do not have a clear duty to act. Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002); *see Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930). But the challenged actions here are not ministerial duties, given the Executive Branch's constitutional and statutory discretion in making foreign assistance funding decisions as described above. *See* Points II-B-3, III-B, *supra*. For example, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson*, U.S. Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980); *see also* Point II-B, *supra*.

Plaintiffs' reliance (GHC Am. Compl. ¶¶ 162, 164, 169, 217, 229, 264) on *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, Cir. J., for the Court), is misplaced. There, the D.C. Circuit issued a writ of mandamus directing the Nuclear Regulatory Commission (NRC) to "promptly continue" proceedings on the Department of Energy's application for authorization to store nuclear waste at Yucca Mountain. 725 F.3d at 267. The D.C. Circuit rejected the NRC's contention that, because Congress had not appropriated sufficient funds for the agency to complete that process, NRC could "shut down its review and consideration" of the application. *Id.* at 258. But there, substantive law, the Nuclear Waste Policy Act, mandated the Commission "shall consider" the application and "'shall issue a final decision approving or disapproving'" the application within three years of its submission. *Id.* at 257-58 (quoting 42 U.S.C. § 10134(d)). "[I]f Congress appropriates no money for a *statutorily mandated program*," the D.C. Circuit remarked, "the Executive obviously cannot move forward." *Id.* at 259 (emphasis added). But as explained above, here, there is no statutory mandate, either in the Foreign Assistance Act or in any pertinent appropriations statute, requiring Defendants to contract with Plaintiffs.

Plaintiffs also err in relying (GHC Am. Compl. ¶ 123) on the opinion in *Off. of Mgmt. & Budget—Withholding of Ukr. Sec. Assistance*, B-331564, 2020 WL 241373, at *6 (Comp. Gen. Jan. 16, 2020). There, Congress appropriated approximately $214 million to the Department of Defense for security assistance to Ukraine to be obligated by September 30, 2019. *See* Dep't of Def. Appropriations Act, 2019, Pub. L. No. 115-245, div. A, title IX, § 9013, 132 Stat. 2981, 3044-45 (2018). OMB withheld amounts by issuing nine apportionment schedules starting July 25, 2019 and subsequently allowed "DOD [to] continue its planning and casework for the [funds] during this period." 2020 WL 241373, at *2-3 (quoting Letter from Mark R. Paoletta, Gen. Couns., OMB, to Tom Armstrong, Gen. Couns., U.S. Gov't Accountability Off. 1-2 (Dec. 11, 2019) ("OMB Response")). On September 12, 2019, OMB made the funds unavailable for obligation, estimating it withheld the entire amount ($214 million). 2020 WL 241373, at *3. OMB did *not* propose to defer or rescind the funds. *Id*. Although GAO did find OMB violated the ICA when it withheld DOD's funds from obligation for policy reasons, *id*. at *5, that conclusion reflected legal and factual errors, as OMB subsequently explained. [21] And, in any event, OMB started withholding obligated funds on July 25, 2019, and maintained for nearly a month that DOD would still have time to execute the final policy direction. OMB Response at 2 n. 2. That supports Defendants' statement that "'there remains, and will remain for several additional months, time sufficient for USAID and State to obligate any presently unobligated funds, or take other appropriate action consistent with applicable law with respect to those funds, before the end of the current fiscal year.'" *See* GHC Am. Compl. ¶ 122. Funds proposed for recission must be made available after

---

[21] *See generally* Letter from Russell Vought, Dir., OMB, & Mark Paoletta, Gen. Couns., OMB, to Chairman John Yarmuth, H. Comm. on the Budget (Jan. 19, 2021), https://trumpwhitehouse.archives.gov/wp-content/uploads/2021/01/Response-to-House-Budget-Committee-Investigation.pdf.

45 calendar days of a continuous session, 2 U.S.C. § 683, and a deferral only "prudently obligated before the end of its period of availability," 2 U.S.C. § 684.[22]  Defendants still have time to reach appropriate decisions regarding the obligation of funds, and Plaintiffs identify no clear, nondiscretionary duty, enforceable through mandamus, requiring Defendants to make those decisions according to Plaintiffs' preferred timetable.

*Third*, Plaintiffs have adequate alternative remedies.  Plaintiffs' claims arise directly from their agreements with the Government and so they must proceed under the Tucker Act. *See* Point I-B, *supra*.

## VIII.    THE AMENDED COMPLAINTS DO NOT PLAUSIBLY ALLEGE GROUNDS FOR GRANTING THE SWEEPING RELIEF SOUGHT.

Even assuming, arguendo, that any of the claims alleged in the amended complaints are plausibly alleged, Plaintiffs have not shown subject-matter jurisdiction for, or plausibly alleged a sufficient basis for, the expansive injunctive relief sought, which would expose the Government to the risk of contempt proceedings and other sanctions over all foreign assistance award-administration matters.  The prayers for relief should be stricken, and, in any event, the President should be dismissed from these suits.

*First*, Plaintiffs have not plausibly alleged the injunction factors beyond likelihood of success on the merits (which they lack for pleading purposes for the reasons given above). Plaintiffs' asserted harms at this stage, economic in character, are not irreparable.  It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).  "Financial injury is only irreparable where

---

[22] *See* Impoundment of the Advanced Research Projects Agency—Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018, B-329092, 2017 WL 6335684, at *1 (Comp. Gen. Dec. 12, 2017) ("Any amount of budget authority deferred must be prudently obligated before the end of the period of availability.").

no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Id.* If Plaintiffs were to ultimately prevail in these suits (or in litigation before the Court of Federal Claims), they would receive the funds they claim entitlement to.

Conversely, at this stage, the balance of the equities and public interest weigh strongly in the Government's favor. In that regard, the amended complaints totally disregard both the clear injury to the agencies' ability to effectuate Executive Branch policy, as well as the substantial and irreparable harm to the public fisc from allowing massive sums to be paid out to Plaintiffs on agreements the Executive Branch has determined are inconsistent with agency priorities and with the national interest, where agencies are striving to proceed in a manner that ensures accountability and effective expenditure of taxpayer dollars. Nor do Plaintiffs address the risk that sums paid out to Plaintiffs will not be recoverable later, particularly given that the Plaintiffs have not plausibly alleged they are able to satisfy the security posting requirement of Federal Rule of Civil Procedure 65(c). *Cf. California*, 145 S. Ct. at 968-69 (Government showed irreparable harm where "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed").

Indeed, Plaintiffs' prayers for relief impermissibly seek the reversal of grant terminations and foreign policy decisions incompatible with the separation of powers and the public interest. The injunctions they seek would install the Court as an ongoing monitor of foreign assistance funding. That would disrespect the role of the President in foreign affairs and would flout the separation of powers, which assigns to the President the "lead role" and "'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414-15; *see Sale*, 509 U.S. at 188. It would also truncate the prerogatives of Congress and determine foreign policy

84

decisions that have "long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines*, 333 U.S. at 111.

*Second*, extending relief to nonparties would violate the teaching (noted above in addressing Article III standing) that judicial remedies "must be tailored to redress the plaintiff's particular injury." *See Gill*, 585 U.S. at 73. Plaintiffs instead ask the Court to enter sweeping relief to revoke the all award terminations since the challenged pause. *See* AVAC Am. Compl., Prayer for Relief (C); GHC Am. Compl., Prayer for Relief (8)-(10). Relief as to nonparties in this action would find no mooring in any pertinent statutes; to the contrary, various provisions of the foreign assistance statutes confer marked discretion on Executive Branch agencies and the President in selecting awardees of foreign assistance funds. *See, e.g.*, 22 U.S.C. § 2151t(a).

Additionally, as to future obligations of appropriated funds, Plaintiffs have standing to seek at most an order as to programs or funds for which they are willing and able to compete.[23] *Cf. Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (discussing competitor standing in the context of applicants for research grants); *Carney v. Adams*, 592 U.S. 53, 60 (2020) (plaintiff lacked Article III standing because he failed to show he was "able and ready to apply" for office "in the reasonable forseeable future" if challenged requirement of office were not applied to him). Plaintiffs have no cognizable interest in forcing the Executive Branch to make available to nonparties funding that Plaintiffs have no intention of applying for. Relief beyond that would exceed "the inadequacy that produced [Plaintiffs'] injury in fact," *Gill*, 585 U.S. at 66 (*quoting Lewis v. Casey*, 518 U.S. 343, 357 (1996)), and would be "more burdensome to the defendant than necessary" to redress

---

[23] *See* Impoundment of the Advanced Research Projects Agency—Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018, B-329092, 2017 WL 6335684, at *1 (Comp. Gen. Dec. 12, 2017) ("Any amount of budget authority deferred must be prudently obligated before the end of the period of availability.").

Plaintiffs' asserted injury, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The 2024 appropriations statute on which Plaintiffs have relied contains myriad appropriations, many of which Plaintiffs may not be able to compete for, or even be interested in competing for. For example, some appropriated funds finance the Executive Branch's operating expenses and military assistance programs. 138 Stat. at 739-40. Other funds have been earmarked for other specific recipients, like the $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria." 138 Stat. at 742. Moreover, some Plaintiffs and their members may not be equipped to run particular types of programs. For example: Plaintiff AVAC supports "development and delivery of HIV prevention options," AVAC Am. Compl. ¶ 12, and Plaintiff GHC's members "administer global health programs," GHC Am. Compl. ¶ 10, so those Plaintiffs cannot be presumed to be able to qualify for awards involving disaster relief or refugee needs, *see* 138 Stat. at 742, 744. That illustrates how Plaintiffs have failed to plausibly allege which foreign assistance programs and funds out of the many that appear in the relevant appropriations statute they would be eligible and willing to pursue. They therefore have not plausibly alleged their entitlement to that requested relief.

At a minimum, if the Court finds a plausible allegation of deficiency as to the explanation for the challenged terminations, the APA, and respect for the Executive Branch's role in foreign relations and national security affairs, would require limiting the remedy to an ordinary remand directing the agencies to provide additional explanation for their decisions. *See, e.g.*, *Wages & White Lion*, 145 S. Ct. at 928. Given that less burdensome remedy, there would be no basis for the requested invalidation of terminations wholesale, which would compel the agencies to resume awards for activities they determined are inconsistent with their current policies and priorities.

*Third*, the requested equitable and declaratory relief is categorically unavailable against the President, and the President accordingly should be dismissed from these suits. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (Millet, J., concurring) ("federal courts of equitable jurisdiction" lack authority "to enjoin the President in the performance of his official duties"). Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. Courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501.

Reaffirming that principle, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." Nor could Plaintiffs' invocation of the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction: Courts "have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable against the President.

## IX.   COMPLIANCE WITH LOCAL CIVIL RULE 7(n) IS PROPERLY HELD IN ABEYANCE PENDING RESOLUTION OF THE MOTIONS TO DISMISS

The Court should hold in abeyance the requirements of Local Civil Rule 7(n) pending resolution of the instant motions to dismiss because the dismissals sought are appropriate without agency compilation of and judicial consideration of an administrative record. That rule "is

intended to assist the Court in cases involving a voluminous record . . . by providing the Court with copies of relevant portions of the record relied upon in any dispositive motion." *See* Local Civ. R. 7(n) cmt. 1.  Defendants respectfully submit that the rule does not apply to these suits at this juncture because there is no final agency action at issue here, and thus no applicable "administrative record."  *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012).

Even if an administrative record could be compiled, the Local Civil Rule 7(n) requirements should be held in abeyance at this time because the grounds for dismissal advanced in this motion do not require review of an administrative record.  The practice of courts in this District is to waive or postpone compliance with Local Civil Rule 7(n) where, as here, the administrative record is not "necessary" to the Court's decision.  *See, e.g.*, *Arab v. Blinken*, 600 F. Supp. 3d 59, 65 n.2 (D.D.C. 2022); *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 (D.D.C. 2017).

## CONCLUSION

For the reasons stated, Defendants' motions to dismiss should be granted, and these suits should be dismissed in full.

Dated: June 3, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Indraneel Sur*
INDRANEEL SUR
Senior Counsel
(DC Bar No. 978017)
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 616-8488
Email: Indraneel.Sur@usdoj.gov

*Counsel for Defendants*