UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AIDS VACCINE ADVOCACY COALITION, et al., | ) ) ) ) |  |
| *Plaintiffs*, | ) ) | Civil Action No. 25-cv-400 |
| v. | ) ) ) |  |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) ) |  |
| *Defendants*. | ) ) |  |

**DECLARATION OF SCOTT ROEHM**

I, Scott Roehm, declare as follows:

1. I am the Director of Global Policy and Advocacy at the Center for Victims of Torture (CVT), a Minnesota-based non-profit organization whose mission is to heal the wounds of torture on individuals, their families, and their communities and to end torture worldwide.

2. Given CVT's experience, staff, and expertise, CVT is willing and able to compete for federal foreign assistance award funding that may be obligated through appropriations to the U.S. Agency for International Development (USAID), including for programs to aid victims of torture and for atrocities prevention. CVT is also willing and able to compete for foreign assistance award funding that may be obligated through appropriations to the Department of State, including for refugee and entrant assistance programs, programs to counter transnational repression, programs funded through the Human Rights Defenders Fund, and region-based democracy programs in the Near East, South Sudan, Syria, and Yemen.

3. CVT was founded in 1985 as a nongovernmental organization after the Governor of Minnesota, Rudy Perpich, assembled a committee to recommend initiatives that would make a difference for human rights. The committee proposed creation of the United States' first center for rehabilitative care for survivors of torture. Over the years, CVT grew geographically and programmatically, today offering culturally competent and interdisciplinary care to survivors of torture, along with initiatives to end torture, enhance the skills and resilience of human rights defenders and organizations, and facilitate justice for survivors.

4. Among other funding streams, the Torture Victims Relief Act (TVRA) specifically authorizes, pursuant to the Foreign Assistance Act of 1961, USAID to provide $13 million annually to treatment centers for victims of torture to administer "direct services to victims of torture" and "to provide research and training to health care providers" to enable them to provide services to torture victims.

5. Following enactment of the TVRA, USAID established the Victims of Torture Program to assist individuals, families, and communities affected by the physical and psychological effects of torture and trauma.

6. Each year, including Fiscal Year 2024 – and by extension Fiscal Year 2025, through Public Law 119–4, the Full-Year Continuing Appropriations and Extensions Act, 2025 – Congress has appropriated funds directly to USAID's Victims of Torture Program. As a result of the TVRA, hundreds of thousands of torture survivors have benefited from expert rehabilitative care that otherwise would not have been available.

7. Many of CVT's programs receive federal funding from the Department of State or from USAID. Every year since TVRA funding began in 2000, CVT has received funding from

USAID's Victims of Torture Program to organize technical assistance and training for treatment centers for victims of torture located outside the United States.

8. On January 20, 2025, the following grants and cooperative agreements were in effect:

   a. A one-year cooperative agreement from the Department of State that enabled CVT to address the psychological rehabilitation needs of South Sudanese torture and trauma survivors living in the Nguenyyiel refugee camp.

   b. A five-year cooperative agreement from USAID for the Helping Survivors Heal project—CVT's project to enhance the effectiveness of local service providers for survivors of torture in the Global South. The project both provides subgrants to local institutions that deliver mental health and psychosocial support services to survivors of torture and also builds the efficacy, capacity, and impact of those services.

   c. A one-year cooperative agreement from the Department of State to enable CVT to address the needs of Iraqi, Syrian, and other refugee survivors of torture, war trauma, and gender-based violence living in Jordan.

   d. A one-and-a-half-year cooperative agreement from the Department of State to support CVT's Survivors of Torture Initiative, a project designed to rehabilitate survivors of torture and to empower Syrian civil society to redress the harms of torture and other gross human rights violations.

   e. A two-year cooperative agreement from the Department of State to enable CVT to strengthen and facilitate northern Uganda's transition to durable, positive peace through directly addressing post-war emergent conflicts and empowering survivors to participate in justice, healing and reconciliation.

   f. Five additional grants or cooperative agreements funded by the Department of State for projects which received branding and marking waivers to mitigate risk and which should not be disclosed publicly.

9. Between January 24 and January 27, 2025, all of these programs were abruptly suspended.

10. One additional grant was in effect on January 20, 2025: a one-year grant from USAID to provide and enhance trauma-focused, life-saving mental health care to internally displaced persons in Northern Ethiopia. CVT did not receive a formal suspension or stop-work

3

order for this program. Given the sweeping language in Executive Order 14169 pausing foreign assistance, CVT repeatedly sought to clarify with USAID whether it could continue work on the award. USAID offered no official guidance. CVT therefore stopped work on the award rather than risk incurring prohibited costs.

11. The funding suspension and stop-work orders (as well as the de facto stop-work order on the Northern Ethiopia grant) were devastating to CVT's ability to provide and enhance services to victims of torture and conflict-related trauma.

12. CVT was forced to halt most of its international operations, including the provision of mental health and psychosocial services to victims of torture.

13. Clinics that serve or enhance services to refugee survivors of torture in Iraq, Jordan, Uganda, and Ethiopia—among other countries—all but shuttered.

14. For survivors of torture, continuity of care is essential. Based on a recent review of CVT programs, approximately one fourth of incoming CVT clients have thoughts of suicide and a quarter have attempted to end their life before connecting with CVT. We estimate that the sudden and senseless disruption of care that clients were receiving, without knowing if or when that care might return, will result not only in widespread suffering, but also in several hundred deaths.

15. Our clients regularly express to our staff the life-saving nature of CVT's services. Statements from just three of the thousands of CVT's clients and beneficiaries (anonymized here for safety reasons) capture this widespread sentiment: "If I did not work with CVT, I might have killed myself already, but because I worked with CVT I feel supported"; "CVT saved my life"; "If it wasn't for CVT, I think I would be dead by now."

16. After the stop-work orders received in late January, CVT was forced to immediately furlough or terminate the employment of approximately 75% of its 580-person staff. These

4

furloughs and terminations included programmatic staff, as well as staff in our human resources, technology, communications, finance, development, and risk management departments who were supported in part by indirect funding associated with the then-suspended awards. Loss of these staff members has negatively impacted all of CVT's operations, even those that did not receive federal funding.

17. On February 25 and February 26, USAID issued letters terminating the cooperative agreement that funded CVT's Helping Survivors Heal project. As a result, 12 torture treatment centers around the globe lost CVT's financial and technical support.

18. On February 25, USAID issued a letter terminating CVT's program in Northern Ethiopia. That termination was rescinded on March 3 and then reissued on March 10.

19. One client from CVT's program in Northern Ethiopia was a 14-year-old girl who had been subjected to unimaginable abuse. She had struggled with thoughts of ending her life, and attempted suicide before coming to CVT. Through therapy, she began to develop a fragile sense of safety and hope. When told that CVT's services had been suspended indefinitely, she asked her counselor, with tears streaming down her face: "Are you leaving me alone like the others? Am I going back to how I was before I met you?"

20. On February 26, the Department of State terminated the cooperative agreement that supported CVT's programming to assist South Sudanese torture and trauma survivors, and the cooperative agreement that supported CVT's programming to assist refugee survivors of torture, war trauma, and gender-based violence living in Jordan.

21. As a result of the terminations, CVT has lost many talented and experienced staff. Some current staff have had to assume additional roles or responsibilities associated with rebuilding CVT as an organization.

22.     The terminations also meant that CVT lost the majority of its funding. And thousands of survivors, their families, and their communities will no longer have access to or benefit from quality care that CVT was providing or supporting.

23.     CVT received lift-of-suspension notices for all of the remaining cooperative agreements.

Executed on July 7, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Scott Roehm